## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CHARLES F. WARNER, *et al.,*

                          Plaintiffs,

v.                                                    **Case No: CIV-14-665-F**

KEVIN J. GROSS, *et al.,*

                          Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## <u>AND CONCLUSIONS OF LAW</u>

Defendants respectfully submit their Proposed Findings of Fact and Conclusions of Law:

**1.     FINDINGS OF FACT**

The Court makes the following factual findings:

1.     The Court finds that the protocol provides that ODOC will provide Plaintiffs with sufficient information regarding the drugs that will be used in Plaintiffs' executions, the dosages of those drugs that will be used, whether the drugs are compounded, and qualitative analysis of any compounded drug to be used.

2.     The Court finds that the Director of the Department of Corrections has the discretion to choose which of the four methods of execution listed in the protocol will be used.  The Court finds that this discretion does not allow the Director to use drug combinations that are not listed in the protocol.

3.     The Court finds that the use of midazolam as designated in the ODOC protocol does not present a demonstrated risk of serious harm.

4.     The Court finds the expert testimony from Dr. Evans regarding midazolam to be persuasive.   Specifically, the Court finds that Dr. Evan's is credible and persuasive in his statements that:

  a.     Midazolam is a short acting benzodiazepine which is use as a pre-anesthetic agent for routine medical procedures to allay patient apprehension, create amnesia, and anesthesia induction.

  b.     The dose of midazolam indicated in Charts C & D of Attachment D of the State of Oklahoma's execution protocol is 500 mg IV.

  c.     500 mg of midazolam is at least 100 times the normal therapeutic dose.

  d.     Administered in the dosage in Chart D will render a person unconscious and insensate for the remainder of the procedure.

  e.     When midazolam is used as specified in Chart D, the subject quickly reaches an unconsciousness and unresponsive state and would not react to painful stimuli.

  f.     The proper administration of 500 mg of midazolam as specified in Chart D make it a virtual certainty that any individual will be at a sufficient level of unconsciousness to resist the noxious stimuli which could occur from application of the 2nd and 3rd drugs in that Chart.

5.     This Court finds that Dr. Lubarsky's testimony is unpersuasive and not credible regarding the use of midazolam.   Specifically, the Court finds that Dr. Lubarsky

is not credible because his opinion is not based on practice, but rather theories which have been previously rejected when he testified on behalf of Plaintiffs challenging the same drug combination in the State of Florida.   This Court finds Dr. Lubarsky's testimony overly speculative and unpersuasive.

6.      This Court finds Dr. Sasich's testimony regarding the use of midazolam in executions to be unpersuasive.   The Court finds specifically that:

a.      Dr. Sasich's testimony regarding the increase of perception of pain with midazolam is unpersuasive, as Dr. Sasich has no knowledge of whether this increase can still occur at large doses as specified in the protocol.

b.      Dr. Sasich's testimony regarding the ceiling effect of midazolam is unpersuasive, as Dr. Sasich admits that he cannot say what the midazolam does for a ceiling effect on unconsciousness would be.

c.      Dr. Sasich's testimony regarding paradoxical reactions is unpersuasive, as the reactions only range from 1-10%, and the literature only describes paradoxical effects when midazolam is used in very small doses in comparison to the dosage prescribed by the protocol, and that a 500 mg dose of midazolam as specified in Chart D sufficiently compensates for any alleged paradoxical effect even if it were present.

7.      The Court finds the testimony of Dr. Katz unpersuasive and not credible on many of the issues to which he testified.   Specifically, the Court finds that Dr. Katz's opinion that the lethal drugs should be reversed is unpersuasive, as these reversal methods

3

have never been attempted with such large dosages of drugs, nor have they ever been required in execution protocols.

8.     The Court finds that Dr. Katz's testimony was cumulative regarding the issues that arose in Clayton Lockett's execution, as the DPS Report already identified those issues and sufficiently accounted for them.

9.     The Court finds that Dr. Cohen's testimony is cumulative regarding the autopsy of Clayton Lockett, as he reaches the same medical conclusions reached by the autopsy performed by the Southwestern Institute of Forensic Sciences (SWIFS) with only minor differences.

10.     The Court finds that Dr. Cohen's testimony is unpersuasive and not credible with regards to his opinion that Clayton Lockett suffered pain, as he relied only on inconsistent witness testimony for his conclusion, and there is no reasonable medical conclusion that could possibly be determined on that matter in an autopsy.

11.     The Court finds that at this time, it is not feasible for ODOC to obtain sodium thiopental or pentobarbital for use in executions so that is not a reasonable alternative to the extent it is being offered by Plaintiffs.

12.     The Court finds that the ODOC procedures do not create a substantial risk of serious harm.

13.     The Court finds that the ODOC protocol provides that the both the H Unit Section Chief and the IV team leader will confirm the visibility of the IV site, and the H Unit Section Chief will observe the site throughout the process, looking for swelling,

4

infiltration, or leaking.   [Doc 55-1 at 27].   The H Unit Section Chief will be present in the execution chamber during the execution.   *Id*. at 44.   Furthermore, the execution chamber contains a moveable camera, which provides live video feed into the execution control room, allowing individuals in the control room to monitor the IV site.   The Court finds that while medically trained personnel are not explicitly required by the protocol to view the IV site or be in the chamber, the live feed provides medical personnel with the needed access to view the site.

14.     The Court finds that observation of the IV site by the H-Unit Section Chief inside the execution chamber and IV Team members via camera will allow ODOC to determine whether infiltration of the drugs has occurred and whether proper IV access is being maintained, as the signs of infiltration are very obvious due to the swelling which occurs.

15.     The Court finds that ODOC uses a manifold that allows the saline flow to flow continuously, with the exception of when other drugs or saline flushes are being administered.   The Court finds that this equipment adequately allows execution team members to maintain the integrity of vein access.

16.     The Court finds that the ODOC protocol requires ODOC officials to contact the Governor for instructions on how to proceed after one hour of unsuccessful IV attempts.

17.     The Court finds that the ODOC protocol requires a back-up set of chemicals on hand for executions.   [Doc. 55-1 at 38].

18.    The Court finds that the ODOC protocol provides for a back-up set of chemicals to be on hand for executions.   [Doc. 55-1 at 38].

19.    The Court finds that the ODOC protocol provides for a back-up electrocardiograph, and allows for the use of a venous ultrasound machine.   [Doc. 55-1 at 27, 38].  The Court finds that the inventory of equipment and supplies is sufficient for carrying out executions according to the protocol.

20.    The Court finds that ODOC has established various contingency procedures, including back-up electrocardiographs, back-up chemicals, and provisions for back-up IV sites.  [Doc. 55-1 at 27-29, 38].   In addition, the Court finds that the protocol provides for periodic training regarding several contingencies.  *Id.* at 9-10.

21.    The Court finds the ODOC protocol provides for ten training sessions the H Unit Section Teams within the 12 months prior to a scheduled execution.  Doc. 55-1 at 9-10.  Those teams include the Restraint Team and the Special Operations Team, which will be administering the chemicals.  *Id*. at 6.  Those sessions are to include various scenarios encompassing numerous contingencies.  *Id*. at 9-10.  The protocol requires no less than one training session per week in the 35 days prior to the execution.  *Id*. at 10.  The protocol requires at least two training sessions with multiple scenarios during the two days prior to the execution.  *Id*.  IV team members are required to participate in at least one training session the day prior to the execution.   All other teams are trained seven days prior to the execution.  *Id*.

6

22.     The Court finds that ODOC has conducted several trainings encompassing multiple scenarios, and that these trainings are sufficient to prepare execution team members for executions and that ODOC has sufficiently planned for such training within their protocol.

23.     The Court finds that ODOC has implemented a system of communication for executions that includes verbal communications.   The Court finds that this implementation provides for proper communication regarding issues that may arise during executions.

24.     The Court finds that Plaintiffs have failed to offer any feasible, readily implemented alternative procedures that would significantly reduce a substantial risk of serious harm.

25.     The Court finds that ODOC is not using an untested method of execution, as the state of Florida has used the exact same drug cocktail in several previous executions without serious incident after several legal determinations that it was constitutionally adequate.

26.     The Court finds that Plaintiffs' counsel is able to visit with their clients on the day of their execution, pursuant to the protocol.   Offender Lockett was afforded that same opportunity and declined to do so.   The contact with legal counsel offered to Offender Lockett was constitutionally sufficient and the protocol allows for a constitutionally sufficient amount of attorney client contact going forward should the client so desire.

27.     The Court has carefully reviewed and considered the Investigative Report by the Department of Public Safety, and has determined that the Report is thorough, and that the Department of Corrections has adequately fulfilled the recommendations in that Report. To the extent that the Department of Public Safety raised concerns, the Court finds that the Department of Corrections has addressed these concerns, regardless of whether those concerns implicate constitutional issues.

28.     Captain Holt was credible and persuasive in his description of the integrity and accuracy of the Investigative Report produced by the Department of Public Safety. The Court finds Captain Holt credible as to the variance of the descriptions of the Lockett execution, and finds that the Investigation afforded the proper weight to that testimony in light of the inconsistencies in the testimony.

29.     The Investigative Report produced by the Department of Public Safety is a thorough and credible report, and presents well-reasoned findings which sufficiently explain the issues that arose during the execution of Clayton Lockett.   The Report thoroughly explains what went wrong, and gives practical and well-founded recommendations for the Department of Corrections to implement moving forward in order to ensure they are addressed.   The Court is persuaded that the reasons that DPS gave for the issues that arose in Clayton Lockett's execution are an accurate account of what actually happened.

30.     The Court finds that the Department of Corrections has followed the Investigative Report's recommendations to the extent possible.   On the matters where the

Department of Corrections did not follow the recommendations, the Department of Corrections is either not in control of those processes, or has made adjustments and allowances that correspond with the intent and spirit of the Report.   The Court finds that the Department of Corrections made the following changes to address the Report's recommendations:

a.      DPS recommended that the IV insertion point should remain visible during all phases of the execution, and continuously observed by a "person with proper medical training in assessing the ongoing viability of an IV." [Doc. 49-1 at 29].   The ODOC protocol provides that the both the H Unit Section Chief and the IV team leader will confirm the visibility of the IV site, and the H Unit Section Chief will observe the site throughout the process, looking for swelling, infiltration, or leaking.   [Doc. 55-1 at 27].   The H Unit Section Chief will be present in the execution chamber during the execution.   *Id*. at 44.   Furthermore, the execution chamber contains a moveable camera, which provides live video feed into the execution control room, allowing individuals in the control room to monitor the IV site.   The Court finds that while medically trained personnel are not explicitly required by the protocol to view the IV site or be in the chamber, the live feed provides medical personnel with the needed access to view the site, which corresponds to the intent and spirit of the Report's recommendation.

b.      DPS recommended that the saline infusion should be constant, with the exception for times when drugs are being administered.  [Doc. 49-1 at 29].  The protocol provides that a flow of heparin/saline will be started and administered at a slow rate to keep the lines open.  [Doc. 55-1 at 43]. ODOC uses a manifold that allows the saline flow to flow continuously, with the exception of when other drugs or saline flushes are being administered. The Court finds that the protocol and equipment changes have addressed the Report's recommendation on this topic.

c.      DPS recommended that ODOC contact the Governor for instructions on how to proceed after one hour of unsuccessful IV attempts.  [Doc. 49-1 at 29].  The execution protocol contains this directive in two separate areas. Doc. 55-1 at 27, 43].  The Court finds that the protocol change has addressed the Report's recommendation on this topic.

d.      DPS recommended that ODOC conduct training regarding information on execution logs.  [Doc. 49-1 at 29].  The protocol places the responsibility for ensuring the accuracy and sufficiency of the logs on the shift commander and the warden.  [Doc. 55-1 at 18].  Further, DPS recommended that the logs include

        a.      all statements or behaviors that could be
                detrimental to completing an execution;

> b.　　all meals provided to an offender and what portions of the meals the offender consumed or refused;
>
> c.　　all medication provided to an offender and the observations made by personnel as to whether the offender ingested the medication as prescribed;
>
> d.　　all liquids consumed by the offender.

[Doc. 49-1 at 29-30]. The execution protocol requires that information verbatim. [Doc. 55-1 at 18]. The Court finds that the protocol change has addressed the Report's recommendation on this topic.

e.　　DPS recommended that ODOC have a back-up set of chemicals on hand for executions. [Doc. 49-1 at 30]. The protocol provides that ODOC will have a back-up set of chemicals on hand. [Doc. 55-1 at 38]. The Court finds that the protocol change has addressed the Report's recommendation on this topic.

f.　　DPS also recommended that ODOC consult with medical personnel to determine equipment to have in the execution chamber. [Doc. 49-1 at 30]. The protocol places the responsibility for ensuring all needed equipment is needed on the H Unit Section Chief. [Doc. 55-1 at 38]. Also, the protocol provides for a back-up electrocardiograph, and allows for the use of a venous ultrasound machine. *Id*. at 27, 38. While the protocol does not specifically mention consultation with medical personnel, the Court finds

that the protocol changes regarding equipment, along with the inventory of the equipment that ODOC currently has in its possession, has addressed the Report's recommendation on this topic.

g.      DPS recommended protocols and training regarding contingencies such as issues with equipment, IV access, or other issues.   [Doc. 49-1 at 30]. ODOC has established various contingency procedures, including back-up electrocardiographs, back-up chemicals, and provisions for back-up IV sites. [Doc. 55-1 at 27-29, 38].   In addition, provides for periodic training regarding the exact contingencies noted by DPS.   [Doc. 55-1 at 9-10].   At the hearing, the Director testified that to date, ODOC has conducted 8 different days of training and practiced 46 different training scenarios, which encompass the various contingencies that DPS noted.   The Court finds that these training sessions, as well as the protocol changes that account for contingencies, have addressed the Report's recommendation on this topic.

h.      DPS recommended that ODOC establish a formal and continuing training program for personnel involved in executions.   [Doc. 49-1 at 31]. DPS suggested that ODOC explore training procedures from other correctional institutions.   *Id*.   The revised protocol provides for ten training sessions the H Unit Section Teams within the 12 months prior to a scheduled execution.   [Doc. 55-1 at 9-10].   Those teams include the Restraint Team and the Special Operations Team, which will be administering the chemicals.

*Id*. at 6.   Those sessions are to include various scenarios encompassing numerous contingencies.   *Id*. at 9-10.   The protocol requires no less than one training session per week in the 35 days prior to the execution.   *Id*. at 10. The protocol requires at least two training sessions with multiple scenarios during the two days prior to the execution.   *Id*.   IV team members are required to participate in at least one training session the day prior to the execution.   All other teams are trained seven days prior to the execution. *Id*.   The Oklahoma protocol provides for more training than Florida, which only requires quarterly training and a simulation the week prior to the execution.   The Court finds that this training program addresses the Report's recommendations on this topic.

i.      DPS recommended that all personnel with assigned execution duties attend an after-action review.   [Doc. 49-1 at 31].   The protocol provides that all execution teams and on-site administrators will meet for an after-action review, which will be formally documented.   [Doc. 55-1 at 31]. The Court finds that the protocol change has addressed the Report's recommendation on this topic.

j.       DPS recommended definitions for terms regarding executions, and words that should be used during executions.   [Doc. 49-1 at 31].   The protocol provides these definitions.   [Doc. 55-1 at 2].   The Court finds that

the protocol change has addressed the Report's recommendation on this topic.

k.      The Court finds that this recommendation is outside of the scope of ODOC's authority, as execution dates are set by the Oklahoma Court of Criminal Appeals.    Therefore, ODOC's failure to address this recommendation is no indication that they have ignored the recommendation, but merely an acknowledgment that they lack the ability to affect the dates of the executions.

l.      DPS recommended that ODOC improve its methods of communications during the execution process.   [Doc. 49-1 at 31-32]. ODOC has demonstrated that going forward, they will implement a direct line and intercom system during executions.   The Court finds that these changes have addressed the Report's recommendation on this topic.

m.      DPS recommended that ODOC look into maintaining executed offender property until after the autopsy, and recommended that all property be inventoried prior to release.   [Doc. 49-1 at 32].   The protocol provides that all property will be inventoried before it is stored.   [Doc. 55-1 at 18-19]. The property is then disposed of pursuant to OP-030120.   *Id*.   The Court finds initially that this recommendation has no relevance to the issues before the Court, but nonetheless acknowledges that ODOC has addressed the Report's recommendation on this topic.

14

n.     DPS recommended that ODOC provide witnesses with briefing regarding what they will be viewing and what conduct is expected.   [Doc. 49-1 at 32].   The protocol provides that all witnesses will be provided a summary that explains the details of the process.   [Doc. 55-1 at 13].   The Court finds that the protocol change addressed the Report's recommendation on this topic.

31.    The Court finds that the lay witness testimony regarding observation of Clayton Lockett's execution is speculative, unreliable and inconsistent.   The Court finds that the lay witness testimony regarding the Lockett execution, therefore, is unpersuasive on the issue of whether Clayton Lockett consciously suffered pain.

## 2.     CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

1.     A preliminary injunction is an extraordinary remedy, and should not be issued unless the movant's right is clear and unequivocal.   *Heideman, v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).   To obtain this extraordinary remedy, the movant bears the burden of showing (1) substantial likelihood of success on the merits, (2) irreparable injury absent the injunction, (3) the threatened injury outweighs the cost to its opponent, and (4) the injunction is not against the public interest.   *Westar Energy, Inc. v. Lake*, 522 F.3d 1215, 1224 (10th Cir. 2009).

2. Plaintiffs are unlikely to prevail on the merits of their Due Process claims. Specifically:

a. Plaintiffs do not have a protected life, liberty, or property interest in notice as to how they will be executed. *Sepulvado v. Jindal*, 729 F.3d 413, 418-19 (5th Cir. 2013); *Wellon v. Comm'r, Ga. Dep't of Corrs*., 754 F.3d 1260, 1266-67 (11th Cir. 2014). Therefore, neither Plaintiffs' claims regarding notice of method of execution, nor the Director's discretion violate the Due Process Clause.

3. The ODOC protocol is constitutional under the standards set forth by *Baze v. Rees*, 553 U.S. 35, 52 (2008). Specifically, the ODOC protocol does not present a substantial risk of serious harm *Id*. There is no substantial risk regarding ODOC's drug cocktail that is sure or very likely to cause serious illness or needless suffering during Plaintiffs' executions. *Id*. at 49-50. Further, ODOC's protocol is constitutional because it implements the most humane method available to ODOC, as there are no feasible, readily implemented alternatives that significantly reduces a substantial risk of serious pain. *Baze*, at 52.

4. Plaintiffs cannot prevail on the merits of their Eighth Amendment claim regarding midazolam.

a. Plaintiffs fail to offer any evidence that shows that the use of midazolam in ODOC's protocols present a substantial risk of serious harm. *Baze v. Rees*, 553 U.S. 35, 52 (2008). Plaintiffs fail to show that there is a

16

risk to ODOC's drug cocktail that is sure or very likely to cause serious illness or needless suffering during their executions. *Id*. at 49-50. Plaintiffs' speculative allegations of possible pain are insufficient to establish a potential Eighth Amendment violation.

b.      Plaintiffs' Eighth Amendment claim fails because Plaintiffs failed to proffer a feasible, readily implemented alternative that significantly reduces a substantial risk of serious pain. *Baze*, at 52.

5.      Plaintiffs cannot prevail on the merits of the Eighth Amendment claim regarding ODOC's procedures.

a.      Plaintiffs fail to offer any evidence that shows that the procedures in ODOC's protocols present a substantial risk of serious harm. *Baze v. Rees*, 553 U.S. 35, 52 (2008).   Plaintiffs fail to show that there are risks to ODOC's procedures that is sure or very likely to cause serious illness or needless suffering during their executions. *Id*. at 49-50. Plaintiffs' speculative allegations of possible pain are insufficient to establish a potential Eighth Amendment violation.

b.      Plaintiffs' Eighth Amendment claim fails because Plaintiffs failed to proffer feasible, readily implemented alternatives that significantly reduce any substantial risk of serious pain. *Baze*, at 52.   Plaintiffs have failed to offer any alternatives that would significantly reduce any purported risks.

6.      Plaintiffs cannot prevail on the merits of their access to information claims. Plaintiffs do not have a First Amendment right of access to information that is within the government's control   *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965); *Wellons v. Comm'r, Ga. Dep't of Corrs.*, 754 F.3d 1260, 1267 (2014); *but see Wood v. Ryan*,   759 F.3d 1076, 1078 (9th Cir. 2014), *rev'd Ryan v. Wood*, ___S.Ct.___, 2014 WL 3600362 at *1 (July 22, 2014).

7.      Plaintiffs cannot prevail on their right to counsel and courts claim.   No court has held that attorneys for condemned inmates have a right to view the insertion of IVs into the inmate, nor has any court held that access to courts prevents prison officials from using curtains in order to deal with problems which might arise during an execution.   Access to courts is not a guarantee of a particular methodology but rather allows the capability to bring challenges before the courts.  *Lewis v. Casey*, 518 U.S. 343, 354 (1996).   The ODOC protocols do not violate Plaintiffs' rights to courts or counsel.

8.      Plaintiffs fail to show a non-speculative harm.   Purely speculative harm will not suffice for a preliminary injunction.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).   Plaintiffs fail to offer any non-speculative evidence that they will suffer harm without a stay of their executions.

9.      Defendants have a strong interest in executing the State's criminal sentences. *Gomez v. U.S. Dist. Ct. for N. Dist. Of Cal.*, 503 U.S. 653, 654 (1992).   Defendants have also identified logistical and operational concerns.   These interests show that Defendants will suffer harm from a preliminary injunction.

10.     The public policy interest advanced by Plaintiffs is speculative in nature, as it is premised on the mere possibility of constitutional violations.   The public policy interest advanced by Defendants is more concrete, as the State has an important interest in executing sentences.   *Hill v. McDonough*, 126 S.Ct. 2096, 2104 (2004).   The Court has weighed these interests, and has concluded that strong public policy interest of the Defendants outweighs the speculative interest proposed by Plaintiffs.

11.     Plaintiffs are required to show that all elements tip in their favor. *Heideman, v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).   In this case, considering the evidence before this Court, the Court concludes that Plaintiffs have not shown that any of the factors tip in their favor.

Having considered the evidence before this Court, and after a thorough review of the filings, this Court determines that Plaintiffs' have failed to establish that the four elements required for a preliminary injunction tip in their favor.   Plaintiffs fail to establish any likelihood of success on the merits of their claims.   Plaintiffs fail to advance a non-speculative irreparable harm.   Wherefore, this Court finds not only that that Plaintiffs' Motion for Preliminary Injunction shall be denied, but that these claims should be dismissed.

Respectfully submitted,

/s/Aaron J. Stewart
**JOHN D. HADDEN, OBA#18716**
**JEB E. JOSEPH, OBA#19137**
**AARON J. STEWART, OBA#31721**
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 NE 21st Street
Oklahoma City, OK   73105
Telephone:   (405) 521-3921
Facsimile:   (405) 521-4518
Email: john.hadden@oag.ok.gov
Email: jeb.joseph@oag.ok.gov
Email: aaron.stewart@oag.ok.gov
*Attorney for Defendants Burrage, Gross, Haynes, Henke, Neal, Patton, Roach, Trammell and Ware*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Patti Palmer Ghezzi
Randy A. Bauman
FEDERAL PUBLIC DEFENDER
215 Dean A. McGee Ave., Ste. 109
Oklahoma City, OK 73102
Email: patti_ghezzi@fd.org
Email: randy_bauman@fd.org
*Attorneys for Plaintiffs, Cole, Cueste-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon, Johnson, Littlejohn, Pavatt, Simpson, Underwood and Warner*

Mark Henricksen
Lanita Henricksen
HENRICKSEN & HENRICKSEN, LAWYERS, INC.
600 N. Walker Ave., Ste. 200
Oklahoma City, OK 73102
Email: mark@henricksenlaw.com
*Attorney for Plaintiffs Andrew, Glossip, Jackson, Hancock and Warner*

Mark H. Barrett
PO Box 896

David B. Autry
1021 NW 16th Street

20

Norman, OK 73070
Email: barrettlawoffice@gmail.com
*Attorney for Plaintiff Jones*

Gary Peterson
211 N. Robinson Ave., Ste. 450 South
Two Leadership Square
Oklahoma City, OK 73102
Email: gp@garypeterson.com
*Attorney for Plaintiff Warner*

Dale A. Baich
Robin C. Konrad
FEDERAL PUBLIC DEFENDER
850 W. Adams St., Ste. 201
Phoenix, AZ 85007
Email: dale_baich@fd.org
Email: robin_konrad@fd.org
*Attorney for Plaintiff Wood*

Oklahoma City, OK 73106
Email: dbautry44@hotmail.com
*Attorney for Plaintiff Hancock*

Fred L. Staggs
510 NW 17th St.
Oklahoma City, OK 73013
Email: staggslaw@aol.com
*Attorney for Plaintiff Mitchell*

/s/ Aaron J. Stewart
Aaron J. Stewart