**CASE NO. CIV-14-665-F**

---

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

---

**CHARLES F. WARNER**, *et al.*,

**Plaintiffs,**

**v.**

**KEVIN J. GROSS**, *et al.*,

**Defendants.**

---

**DEFENDANTS' TRIAL BRIEF**

---

**JOHN D. HADDEN, OBA#18716
JEB JOSEPH, OBA#19137
AARON J. STEWART, OBA#31721
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 NE 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 521-3921   Facsimile: (405) 521-4518
john.hadden@oag.ok.gov
jeb.joseph@oag.ok.gov
aaron.stewart@oag.ok.gov
*Attorney for Defendants***

**December 12, 2014**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ............................................................................................ i

**TABLE OF AUTHORITIES** ................................................................................... iii

**DEFENDANTS' TTRIAL BRIEF** ............................................................................ 1

**SUMMARY OF FACTS** ........................................................................................... 1

**REVISED PROTOCOL** ........................................................................................... 2

     1.  Observation of IV Insertion Points and Saline Infusion ..................................... 3

     2.  Additional Training Regarding Execution Logs ................................................. 4

     3.  Additional Execution Supplies ......................................................................... 5

     4.  Contingency Plans in Protocols/Policy ............................................................. 5

     5.  Formal and Continuing Training Programing for Execution Personnel ............. 5

     6.  Formal After-Action Review of the Execution Process ..................................... 6

     7.  Defined Execution Terminology ....................................................................... 7

     8.  Completion of One Execution per Seven Calendar Day .................................... 7

     9.  Updated Methods of Communication ................................................................ 7

     10. Disposition of Executed Offender's Property ..................................................... 7

     11. Execution Witness Briefing .............................................................................. 7

**SUMMARY OF DEFENDANTS' LEGAL ARGUMENT** ............................................ 8

**PROPOSITION I:**

     **P/I PLAINTIFFS FAIL TO ESTABLISH A SUBSTAINTIAL LIKELIHOOD
     OF SUCCESS ON THE MERITS OF THEIR CASE** ....................................... 8

1. P/I Plaintiffs are Unlikely to Prevail on the Merits of their Due Process Claim .................................................................................................. 8

   a. P/I Plaintiffs have no process right to information regarding their executions ................................................................................................. 9

   b. The Director's discretion does not violate due process ............................. 11

2. P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Challenge Regarding the use Midazolam ......................................................... 11

   a. P/I Plaintiffs cannot show a substantial risk of serious harm ..................... 13

   b. P/I Plaintiffs cannot proffer a feasible alternative to midazolam ............... 13

3. P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Claims regarding ODOC's Procedures ......................................................... 14

   a. P/I Plaintiffs' allegations regarding unqualified IV team members ............ 14

   b. P/I Plaintiffs' allegations regarding monitoring of the IV line .................. 15

   c. P/I Plaintiffs' allegations regarding training of team members ................ 15

4. P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Claims Regarding Human Experimentation ................................................ 16

5. P/I Plaintiffs are Unlikely to Prevail on their "Right of Access to Information" Claim ................................................................................... 17

6. P/I Plaintiffs are Unlikely to Prevail on their "Right Counsel and Courts' Claim ................................................................................................. 18

**PROPOSITION II:**

   **P/I PLAINTIFFS FAIL TO SHOW A NON-SPECULATIVE, IRREPARABLE HARM** ................................................................................ 20

**PROPOSITION III:**

    **A PRELIMINARY INJUNCTION WILL CAUSE GREAT HARM TO DEFENDANTS** ................................................................................................ 20

**PROPOSITION IV:**

    **PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION** ...................................................................................................... 22

**ANTICIPATED EVIDENTARY ISSUES** .................................................................... 22

**USUSAL ISSUES THAT MAY ARISE AT TRIAL** ...................................................... 23

**CONCLUSION** ............................................................................................................ 24

**CERTIFICATE OF SERVICE** ................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Baze v. Rees,*
553 U.S. 35 (2008) ...................................................................... 11, 12, 13, 14, 15, 16, 17

*Beaty v. Brewer,*
791 F.Supp. 2d 678 (D. Ariz. 2011) ................................................................................ 10

*Chavez v. Palmer,*
742 F.3d 1267 (11th Cir. 2014) ................................................................................... 6, 13

*Cooey v. Strickland,*
479 F.3d 412 (6th Cir. 2007) ..................................................................................... 11, 12

*Copelin-Brown v. N.M. State Personnel Office,*
399 F.3d 1248 (10th Cir. 2005) ........................................................................................ 9

*Gomez v. U.S. Dist. Ct. for No. Dist. of Cal.,*
503 U.S. 653 (1992) ....................................................................................................... 20

*Heideman v. S. Salt Lake City,*
348 F.3d 1182 (10th Cir. 2003) ........................................................................................ 8

*Helling v. McKinney,*
509 U.S. 25 (1993) ......................................................................................................... 12

*Hill v. McDonough,*
126 S.Ct. 2096 (2004) ..................................................................................................... 22

*Houchins v. KQED, Inc.,*
438 U.S. 1 (1978) ........................................................................................................... 17

*In re Lombardi,*
741 F.3d 888 (8th Cir. 2014) .......................................................................................... 12

*JB Pictures, Inc. v. Dept. of Defense,*
86 F.3d 236 (D.C. Cir. 1996) .......................................................................................... 17

*Lewis v. Casey,*
518 U.S. 343 (1996) .................................................................................. 19

*Muhammad v. Florida,*
132 So.3d 176 (Fla. 2013) ........................................................................... 6

*Oken v. Sizer,*
321 F.Supp. 2d 658 (D. Md. 2004).............................................................. 10

*Osborn v. Shillinger,*
932 F.2d 975 (10th Cir. 1991) ..................................................................... 18

*RoDa Drilling Co. v. Siegal,*
552 F.3d 1203 (10th Cir. 2009) ................................................................... 20

*Ryan v. Wood,*
2014 WL 3600262 (July 22, 2014)............................................................... 18

*Sepulvado v. Jindal,*
729 F.3d 413 (5th Cir. 2013) ........................................................... 9, 10, 11

*Sizer v. Oken,*
542 U.S. 916 (2004) ................................................................................... 10

*Towery v. Brewer,*
2012 WL 592749 (D. Ariz. Feb. 23, 2012) *aff'd Towery v. Brewer,*
672 F.3d 650 (9th Cir. 2012) ....................................................................... 19

*Valle v. Singer,*
655 F.3d 1223 (11th Cir. 2011) ................................................................... 12

*Wellon v. Comm'r, Ga. Dep't of Corr's,*
754 F.3d 1260 (11th Cir. 2014) ........................................................... 9, 18

*Westar Energy, Inc. v. Lake,*
522 F.3d 1215 (10th Cir. 2009) ..................................................................... 8

*Whitaker v. Livingston,*
732 F.3d 465 (5th Cir. 2013 ........................................................................ 12

*Wood v. Ryan,*
759 F.3d 1076 (9th Cir. 2014) ........................................................................ 18

*Zemel v. Rusk,*
381 U.S. 1 (1965) ........................................................................................... 17

## OTHER

U.S. CONST. amend. V.  ................................................................................... 8

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CHARLES F. WARNER, *et al.*,

              Plaintiffs,

v.

KEVIN J. GROSS, *et al.*,

              Defendants.

**Case No: CIV-14-665-F**

## DEFENDANTS' TRIAL BRIEF

## SUMMARY OF FACTS

On April 29, 2014, the State of Oklahoma lawfully executed Offender Clayton Lockett by lethal injection.  [Doc. 49-1 at 4, 16].  After the execution, the Oklahoma Department of Public Safety ("DPS") was ordered by Governor Mary Fallin to investigate the events surrounding the execution of Offender Lockett.  A multitude of investigators and experts were utilized over a four (4) month period.  During the pendency of the investigation, Plaintiffs, who are all death row inmates at various stages of their habeas cases, filed their Complaint.  Defendants Patton and Trammell moved for the Court to stay the case until the investigation concluded and a new protocol was issued.  [Doc. 42].

On September 30, 2014, ODOC promulgated a revised execution protocol, addressing concerns raised by the DPS investigation and its findings.  [Doc. 55-1].  The Oklahoma Court of Criminal Appeals set Plaintiffs Warner, Glossip, Grant, and Cole for execution on January 15, 29, February 19, and March 5, 2015, respectively.  [Doc. 71].

Plaintiffs filed an Amended Complaint, presenting the same claims as before, yet framing their claims against the provisions of the revised protocol. [Doc. 75]. That protocol is the subject now before the Court. Plaintiffs seek injunctive relief against the State (1) using drugs or procedures without adequate notice, (2) using any of the drugs or procedures or any colorable variations of such that were used in the execution of Clayton Lockett, (3) using midazolam, (4)"using any drug or combination of drugs that is experimental and being used on captive human subjects," (5) using "unsound execution procedures with unqualified and inadequately trained individuals performing the execution," and (6) "without providing necessary and relevant information about the execution and while interfering with P/I Plaintiffs' access to counsel and the courts." [Doc. 92 at 20]. None of this relief sought reaches the Constitutional threshold, which is the needless and purposeful infliction of pain upon the condemned offender. Put another way, Plaintiffs cannot show a demonstrated risk of severe pain and that the protocol for the anticipated executions creates any substantial risk of such in comparison to alternative methods available.

## REVISED PROTOCOL

The DPS investigation resulted in eleven separate recommendations for changes to the ODOC execution protocol. Those recommendations were (1) observation of the IV insertion points and constant infusion of saline, (2) additional training regarding execution logs, (3) additional execution supplies, (4) contingency plans, (5) formal and continual training for execution teams, (6) formal after-action execution review by director, (7) defined execution terminology, (8) no more than one execution within seven

days, (9) updated methods of communication, (10) maintaining executed offender's property until after an autopsy is completed, (11) briefing of execution witnesses on what parts of the execution they will be able to observe. [Doc. 49-1 at 26-29]. In regards to all recommendations (with the possible exception of Recommendation No. 8 which would be within the ambit of the jurisdiction of the Oklahoma Court of Criminal Appeals), the evidence will demonstrate ODOC made the following changes which it believes fully address the recommendations.

### 1. Observation of IV Insertion Points and Saline Infusion

DPS recommended that the IV insertion point should remain visible during all phases of the execution, and continuously observed by a "person with proper medical training in assessing the ongoing viability of an IV." [Doc. 49-1 at 29]. The ODOC protocol provides that both the H Unit Section Chief and the IV team leader will confirm the visibility of the IV site, and the H Unit Section Chief will observe the site throughout the process, looking for swelling, infiltration, or leaking. [Doc. 55-1 at 27]. The H Unit Section Chief will be present in the execution chamber during the execution. [Doc. 55-1 at 44]. Furthermore, the execution chamber contains a moveable camera, which provides live video feed into the execution control room, allowing individuals in the control room to monitor the IV site including, but not limited to, the IV Team Leader, who will have proper medical training in assessing the ongoing viability of an IV.

DPS also recommended that the saline infusion should be constant, with the exception for times when drugs are being administered. [Doc. 49-1 at 29]. The protocol provides that a flow of heparin/saline will be started and administered at a slow rate to

keep the lines open.  [Doc. 55-1 at 43].  ODOC uses a manifold that allows the saline to flow continuously, with the exception of when other drugs or saline flushes are being administered.

Finally, DPS recommended that ODOC contact the Governor for instructions on how to proceed after one hour of unsuccessful IV attempts.  [Doc. 49-1 at 29].  The execution protocol contains this directive in two separate areas.  [Doc. 55-1 at 27, 43].

### 2.    Additional Training Regarding Execution Logs

DPS recommended that ODOC conduct training regarding information on execution logs.  [Doc. 49-1 at 29].  The protocol places the responsibility for ensuring the accuracy and sufficiency of the logs on the shift commander and the warden.  [Doc. 55-[Doc. 55-1 at 18].  Further, DPS recommended that the logs include

> a. all statements or behaviors that could be detrimental to completing an execution;
>
> b. all meals provided to an offender and what portions of the meals the offender consumed or refused;
>
> c. all medication provided to an offender and the observations made by personnel as to whether the offender ingested the medication as prescribed;
>
> d. all liquids consumed by the offender.

[Doc. 49-1 at 29-30].  The execution protocol requires that information verbatim.  [Doc. 55-1 at 18].  Finally, the post order for the Oklahoma State Penitentiary provides detailed training for how the logs are to be kept.

### 3.   Additional Execution Supplies

DPS recommended that ODOC have a back-up set of chemicals on hand for executions.  [Doc. 49-1 at 30].  The protocol provides that ODOC will have a back-up set of chemicals on hand.  [Doc. 55-1 at 38].

DPS also recommended that ODOC consult with medical personnel to determine equipment to have in the execution chamber.  [Doc. 49-1 at 30].  The protocol places the responsibility for ensuring all needed equipment is needed on the H Unit Section Chief.  [Doc. 55-1 at 38].  Also, the protocol provides for a back-up electrocardiograph, and allows for the use of a venous ultrasound machine.  *Id.* at 27, 38.

### 4.   Contingency Plans in Protocols/Policy

DPS recommended protocols and training regarding contingencies such as issues with equipment, IV access, or other issues.  [Doc. 49-1 at 30].  ODOC has established various contingency procedures, including back-up electrocardiographs, back-up chemicals, and provisions for back-up IV sites.  [Doc. 55-1 at 27-29, 38].  In addition, the protocol provides for periodic training regarding the exact contingencies noted by DPS.  [Doc. 55-1 at 9-10].  To date, ODOC has conducted 8 different days of training and practiced 46 different training scenarios, which encompass the various contingencies that DPS noted.

### 5.   Formal and Continuing Training Program for Execution Personnel

DPS recommended that ODOC establish a formal and continuing training program for personnel involved in executions.  [Doc. 49-1 at 31].  DPS suggested that ODOC explore training procedures from other correctional institutions.  *Id.*  The revised protocol

provides for ten training sessions for the H Unit Section Teams train within the 12 months prior to a scheduled execution.  [Doc. 55-1 at 9-10].  Those teams include the Restraint Team and the Special Operations Team, which will be administering the chemicals.  *Id*. at 6.  Those sessions are to include various scenarios encompassing numerous contingencies.  *Id*. at 9-10.  The protocol requires no less than one training session per week in the 35 days prior to the execution. *Id*. at 10.  The protocol requires at least two training sessions with multiple scenarios during the two days prior to the execution.  *Id*.  IV team members are required to participate in at least one training session the day prior to the execution.  All other teams are trained seven days prior to the execution. *Id*.

The Oklahoma protocol provides for more training than does the protocol used in the State of Florida, which only requires quarterly training and a simulation the week prior to the execution, and their protocol was deemed constitutional in *Chavez v. Palmer*, 742 F.3d 1267, 1273 (11th Cir. 2014) and *Muhammad v. Florida*, 132 So.3d 176, 197 (Fla. 2013).

### 6.    Formal After-Action Review of the Execution Processes

DPS recommended that all personnel with assigned execution duties attend an after-action review.  [Doc. 49-1 at 31].  The protocol provides that all execution teams and on-site administrators will meet for an after-action review, which will be formally documented.  [Doc. 55-1 at 31].

### 7.      Defined Execution Terminology

DPS recommended definitions for terms regarding executions, and words that should be used during executions.  [Doc. 49-1 at 31].  The protocol provides these definitions.  [Doc. 55-1 at 2].

### 8.      Completion of One Execution per Seven Calendar Days

As noted above, the scheduling of executions is exclusively under the authority of the Oklahoma Court of Criminal Appeals, not ODOC.

### 9.      Updated Methods of Communication

DPS recommended that ODOC improve its methods of communications during the execution process.  [Doc. 49-1 at 31-32].  ODOC has implemented various steps to help with communication issues, including an intercom system and a direct line to the Governor's Office.

### 10.      Disposition of Executed Offender's Property

This particular recommendation is not relevant to any Constitutional concerns about an execution itself.

### 11.      Execution Witness Briefing

DPS recommended that ODOC provide witnesses with briefing regarding what they will be viewing and what conduct is expected.  [Doc. 49-1 at 32].  The protocol provides that all witnesses will be provided a summary that explains the details of the process.  [Doc. 55-1 at 13].

## SUMMARY OF DEFENDANTS' LEGAL ARGUMENT

Plaintiffs' Motion for Preliminary Injunction should be denied because they will not meet the standard required for a preliminary injunction.   Plaintiffs will fail to establish the necessary elements needed to show they are entitled to injunctive relief.

A preliminary injunction is an extraordinary remedy, and should not be issued unless the movant's right is clear and unequivocal.  *Heideman, v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  To obtain this extraordinary remedy, the movant bears the burden of showing (1) substantial likelihood of success on the merits, (2) irreparable injury absent the injunction, (3) the threatened injury outweighs the cost to its opponent, and (4) the injunction is not against the public interest.  *Westar Energy, Inc. v. Lake*, 522 F.3d 1215, 1224 (10th Cir. 2009).  The movant must show that *each* of the four factors tips in his or her favor.  *Heideman*, 348 F.3d at 1188-89.  P/I Plaintiffs will fail to make any such showing, and therefore this Court should deny P/I Plaintiffs' Motion.

**PROPOSITION I: P/I PLAINTIFFS FAIL TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CASE**

**1.      P/I Plaintiffs are Unlikely to Prevail on the Merits of their Due Process Claim.**

The Due Process Clause of the United States provides that no individual will be deprived of life, liberty, or property without due process of law.  U.S. CONST. amend. V. In order to establish a procedural due process claim, P/I Plaintiffs must show (1) they possess a protected life, liberty, or property interest to which the due process clause is

applicable, and that (2) they did not or will not receive an appropriate level of process. *Copelin-Brown v. N.M. State Personnel Office*, 399 F.3d 1248, 1254 (10th Cir. 2005).

P/I Plaintiffs claim that ODOC will deprive them of a procedural due process right by executing P/I Plaintiffs without "timely and meaningful notice as to how they will be executed." [Doc. 92 at 8]. Specifically, P/I Plaintiffs complain that ODOC will not give P/I Plaintiffs notice as to the type of the lethal drugs, and leaves open the lethal injection method for executions. *Id*.

### a. P/I Plaintiffs have no due process right to information regarding their executions.

Federal courts are near-unanimous in holding that death row inmates have no due process right to information regarding the methods of their executions. *Sepulvado v. Jindal*, 729 F.3d 413, 418-19 (5th Cir. 2013). In *Sepulvado v. Jindal*, the Fifth Circuit held that Louisiana did not violate the due process clause by withholding details of the execution protocol. *Id*. at 420. The Fifth Circuit noted that "no appellate court has recognized the due-process claim on which the district court a quo granted relief" and that the fact that such information might be necessary for an Eighth Amendment challenge "does not substitute for the identification of a cognizable liberty interest." *Id*. at 419. The Eleventh Circuit reached a similar conclusion in *Wellon v. Comm'r, Ga. Dep't of Corrs*., stating that "[n]either the Fifth, Fourteenth, or First Amendments afford [the inmate] the broad right" to the information he sought.754 F.3d 1260, 1266-67 (11th Cir. 2014).

9

The sole published opinion holding there is a due process right to information regarding executions is *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004). The district court stayed the offender's execution, stating that "[f]undamental fairness, if not due process, requires that the execution protocol that will regulate an inmate's death be forwarded to him in a prompt and timely fashion." Id. at 664. The district court freely admitted that there were no cases establishing any such right, but merely stated that "[d]ue process requires nothing less—an opportunity to receive notice of how one's rights will be affected and opportunity to respond and be heard." Id. The *Oken* court's overreach was swiftly corrected by the United States Supreme Court, which vacated the stay two days later. *Sizer v. Oken*, 542 U.S. 916, 916 (2004). *Oken* has since been rejected by courts in both the Ninth and Fifth Circuits. *Sepulvado*, 729 at 418 (noting that *Oken* was "swiftly—and summarily—vacated" by the United States Supreme Court); *Beaty v. Brewer*, 791 F. Supp. 2d 678, 685-86 (D. Ariz. 2011) *aff'd* 649 F.3d 1071, 1072 (9th Cir. 2011) (declining to rely on a district court's unsupported assertion of a due process right).

P/I Plaintiffs' claims of a due process right to information regarding their executions are clearly baseless and unsupported by the law. P/I Plaintiffs cannot identify any protected interest, and therefore cannot state a cognizable procedural due process claim. Notwithstanding the fact there is no right to this information, however, the policy does provide information at least ten days prior to execution, including what drugs will be used, what dosages, and whether the drugs are compounded. [Doc. 55-1 at 41].

10

### b.      The Director's discretion does not violate due process

The ODOC Director's discretion regarding execution procedures does not raise any due process concerns.  The Director does have discretion to choose between four methods of lethal injection, variations of which have all been upheld by federal courts. *Baze v. Ree*s, 553 U.S. 35, 45 (three-drug protocol using sodium thiopental is valid); *Chavez v. Florida SP Warden*, 742 F.3d 1267, 1269, 1272 (11th Cir. 2014) (three-drug protocol using midazolam and a blocking agent is valid);  *Sepulvado v. Jindal*, 729 F.3d 413, 416-17 (5th Cir. 2013) (one drug protocol with pentobarbital valid under *Baze*); *Cooey v. Strickland*, 589 F.3d 210, 230 (6th Cir. 2009) (protocol using midazolam and hydromorphone is valid).   Unless P/I Plaintiffs show that any of those methods are constitutionally infirm, the Director's discretion is merely the power to choose between equally constitutional methods of execution.   Whether the exigencies that arise around preparations for executions require the Director to switch from one constitutional method to another constitutional method is an issue that has no bearing on P/I Plaintiffs' due process rights.   This is especially true in regards to Oklahoma's policy, since information which is not required is provided at least ten days prior to the execution.

### 2.      P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Challenge Regarding the use of Midazolam.

The United States Supreme Court has stated that when evaluating Eighth Amendment challenges, courts should not act as "boards of inquiry charged with determining 'best practices' for executions," because such an approach would "embroil the courts in ongoing scientific controversies beyond their expertise, and would

11

substantially intrude on the role of state legislatures in implementing their execution procedures…." *Baze v. Rees*, 553 U.S. 35, 51 (2008).   Rather, courts must determine whether the execution protocols present a "substantial risk of serious harm."   *Id*. at 52. To establish this risk, "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.' *Id.* at 49-50 (citing *Helling v. McKinney,* 509 U.S. 25, 33-35 (1993)) (emphasis in original).   The fact that a method may result in pain does not establish an Eighth Amendment violation.   *Id*. at 50.

A stay of execution is only warranted if the inmate shows that the execution protocol "creates a demonstrated risk of severe pain…[and] that the risk is substantial when compared to the known and available alternatives."   *Id*. at 61.   Any proffered alternatives must be "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain."   *Id*. at 52 (emphasis added).   As several Circuits have noted, an inmate challenging a protocol under the Eighth Amendment must present plausible allegation of either a feasible and more humane alternative method of execution or a purposeful design by the State to inflict unnecessary pain.   *In re Lombardi*, 741 F.3d 888, 895-96 (8th Cir. 2014); *Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013); *Valle v. Singer*, 655 F.3d 1223, 1237 (11th Cir. 2011); *Cooey v. Strickland*, 589 F.3d 210, 220 (6th Cir. 2009).

In this case, P/I Plaintiffs have not and cannot show that ODOC's protocol presents a substantial risk of serious harm, or that there are any feasible alternatives that significantly reduce that risk.

12

### a.    P/I Plaintiffs cannot show a substantial risk of serious harm.

P/I Plaintiffs will present only conclusory possibilities regarding the use of midazolam.  Plaintiffs do not challenge the use of pentobarbital or sodium thiopental.  Of the two execution protocols using midazolam, ODOC only has plans to use Chart D, which is a three-drug protocol using midazolam as the first drug.  At this time, ODOC does not intend to use Chart C.  P/I Plaintiffs cannot show that ODOC's three-drug protocol using midazolam is "sure or very likely" to cause needless suffering.

There is specific precedent on this matter, as ODOC's three-drug protocol with midazolam has been litigated previously.  In fact, both Dr. Lubarsky (Plaintiffs' expert) and Dr. Evans (Defendants' expert) testified in evidentiary hearings in *Chavez v. Palmer*, in which the court found this specific combination of drugs was constitutional.  No. 14-cv-110-J-39JBT, 2014 WL 521067 at *11-13 (M.D. Fla. Feb. 10, 2014).  That method has been utilized 11 times without serious incident.

Plaintiffs' evidence, at best, hypothesizes an almost non-existent risk of complications related to the use of midazolam.  This falls short of the legal standard for an Eighth Amendment challenge.

### b.    P/I Plaintiffs cannot proffer a feasible alternative to midazolam.

P/I Plaintiffs cannot proffer a feasible, readily implemented alternative to midazolam.  P/I Plaintiffs do not, and cannot point to any current feasible source of sodium thiopental or pentobarbital, nor have they pointed to any other drug that might be such an alternative.  As Judge Carnes, Chief Judge of the Eleventh Circuit stated in his concurring opinion in *Chavez,* "[a]n alternative drug that its manufacturer, or its

13

distributor, or the FDA will not allow to be used for lethal injection purposes is no drug at all for *Baze* purposes."  P/I Plaintiffs' have not and cannot present any feasible, readily implemented alternative to midazolam, therefore they are unlikely to prevail on their Eighth Amendment challenge to midazolam.

**3.      P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Claims regarding ODOC's Procedures.**

As noted above, Plaintiffs can only establish an Eighth Amendment violation by showing that ODOC's protocol presents a substantial risk of serious harm, and that feasible, readily implemented alternatives exist that would significantly reduce that risk. *Baze* at 61.  P/I Plaintiffs cannot make that showing with regards to ODOC's protocol.

**a.      P/I Plaintiffs' allegations regarding unqualified IV team members.**

P/I Plaintiffs allege that the protocol allows ODOC to retain unqualified IV team members.   However, the protocol states that selections of IV team members "shall include a review of the proposed team member's qualifications, training, experience, and/or any professional license(s) and certification(s) they may hold."  [Doc. 55-1 at 7]. Further, the Inspector General's office will conduct licensing and criminal history reviews prior to an assignment of an execution team member.  *Id*.  All members of the IV team are required to be currently certified or licensed within the United States.  *Id*.  The protocol clearly and adequately safeguards against unqualified individuals on the IV team.   Plaintiffs allegations are speculative and only show a *possibility* that IV team members may make mistakes.  This is not a sufficient showing to establish an Eighth

Amendment claim, especially since the DPS recommendations regarding IV access have now been implemented to ensure proper IV access is accomplished and maintained.

Plaintiffs do not present through their experts any additional screening mechanisms or certification requirements that would significantly reduce any risk of substantial harm. Plaintiffs also do not present any alternative method of retaining IV team members.

### b.    P/I Plaintiffs' allegations regarding monitoring of the IV line.

P/I Plaintiffs allege that the protocol does not require monitory of the IV line by a medically trained participant. However, the protocol does require monitoring by the H Unit Section Chief, and also provides that the IV site stays visible, which would mean that the site remains visible to medical personnel as well. [Doc. 55-1 at 27]. In addition, in *Baze v. Rees*, the Supreme Court noted that a warden and deputy warden monitoring IV lines would be an adequate safeguard, because according to expert testimony, "identifying signs of infiltration would be 'very obvious' even to the average person, because of the swelling that would result." 553 U.S. at 56. P/I Plaintiffs' complaint that the IV site is not monitored does not adequately allege an Eighth Amendment violation.

### c.    P/I Plaintiffs' allegations regarding training of team members

P/I Plaintiffs allege that the protocol does not provide for enough training for IV team members. Members of the IV team are all medical personnel that frequently encounter problems of IV access and unanticipated medical issues, as well as instances where consciousness checks are necessary. Members of the IV team, by the very nature of their training and expertise, do not require as much prior training, because the role that

15

they play in executions is to set IVs and monitor consciousness, tasks they frequently perform in their professional lives. The protocol, however, does provide for training by IV team members with other members of the execution team prior to the date of an execution.

P/I Plaintiffs also claim that other teams cannot accomplish the required training before the first scheduled executions.  [Doc. 92 at 15-16].  However, ODOC has already conducted, and continues to conduct extensive training for execution team members.  To date, ODOC has conducted 8 different days of training and practiced 46 different training scenarios.  The execution teams have already trained extensively, exceeding the ten training scenarios required by the protocol, and will continue the train up to the date of the executions.  P/I Plaintiffs do not suggest any other training regimen or scenarios. Therefore, P/I Plaintiffs fail to show a substantial risk of serious harm, nor do they offer any feasible alternative that would significantly reduce the risk of harm.  P/I Plaintiffs' claims regarding training do not establish an Eighth Amendment violation.

### 4.    P/I Plaintiffs are Unlikely to Prevail on their Eighth Amendment Claims Regarding Human Experimentation.

The goal of the State of Oklahoma has always been to design and implement a workable, feasible, and constitutional execution protocol.  The "broad framework of the Eighth Amendment has accommodated this progress toward more humane methods of executions." *Baze v. Rees*, 553 U.S. 35, 62 (2006).  In fact, the United States Supreme Court has emphasized that "approval of a particular method in the past has not precluded legislatures from taking steps they deem appropriate, in light of new developments, to

ensure human capital punishment." *Id*.   The Supreme Court has cautioned that courts are not be boards of best practices, but should only determine whether a protocol violates the Eighth Amendment. *Id*. at 51.

The law is clear that ODOC is free to craft new protocols in light of new developments.   ODOC is facing shortages and embargoes on traditional execution drugs, therefore ODOC has created a new protocol to ensure human capital punishment.   In addition, this method has been tested and proven in Florida nine-times over.   Plaintiffs are unlikely to prevail on their human experimentation claims.

### 5.    P/I Plaintiffs are Unlikely to Prevail on their "Right of Access to Information" Claim.

The United States Supreme Court has held that

the right to speak and publish does not carry with it the unrestrained right to gather information…For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.

*Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965).   The D.C. Circuit has stated that the First Amendment does not "create any per se right of access to government property or activities simply because such access might lead to more thorough or better reporting."

*JB Pictures, Inc. v. Dept. of Defense*, 86 F.3d 236, 238 (D.C. Cir. 1996).   While there is a right to gather information by lawful means, that right "affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information*." Houchins v. KQED, Inc*., 438 U.S. 1, 10-11 (1978).

In *Wellons v. Comm'r, Ga. Dep't of Corrs*., The Eleventh Circuit stated that the First Amendment does not "afford [the inmate] broad right to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." 754 F.3d 1260, 1267 (2014) (internal quotation marks omitted).

The only other circuit court to address the First Amendment issue is the Ninth Circuit.  In *Wood v. Ryan*, the plaintiff argued that Arizona's confidentiality law violated his First Amendment rights.  759 F.3d 1076, 1078 (9th Cir. 2014).  The Ninth Circuit declined to decide whether there was a First Amendment right in the sought-for information, but did stay the execution, citing "serious questions" as to the merits of the plaintiff's claims.  *Id*. at 1088.  Only three days later, the United States Supreme Court vacated the stay, and reversed the Ninth Circuit's ruling.  *Ryan v. Wood*, ___S.Ct.___, 2014 WL 3600362 at *1 (July 22, 2014).

Plaintiffs have no First Amendment right to information in the government's control.  Therefore, Plaintiffs are unlikely to prevail on the merits of that claim.

**6.      P/I Plaintiffs are Unlikely to Prevail on their "Right to Counsel and Courts" claim.**

P/I Plaintiffs claim that they have a right to consult with and be represented by counsel during every stage of the execution process.  P/I Plaintiffs' claims regarding their right to counsel are unsupported by case law.

In the context of prisons generally, the right to counsel is often tied to access to courts.  *Osborn v. Shillinger*, 932 F.2d 975 at *2 (10th Cir. 1991) (unpublished table

decision) (noting that various Circuits view attorney visits and contact as part of meaningful access to courts).  However, such access is not a guarantee of a "particular methodology but rather the conferral of a capability…of brining contemplated challenges to sentences or conditions of confinement before the courts."  *Lewis v. Casey*, 518 U.S. 343, 354 (1996).

Few courts have addressed the extent to which offenders may have counsel present during the preparations for and implementation of executions.  However, in *Towery v. Brewer*, a district court found that Arizona's time restrictions on attorney visits to condemned offenders within the hours prior to execution were valid, due to the security and confidentiality concerns put forward by the prison officials.  CV-12-245-PHX-NVW, 2012 WL 592749 at *18-19 (D. Ariz. Feb. 23, 2012) *aff'd Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012).  In a later case, the Ninth Circuit addressed a change to Arizona made to the restrictions in *Towery*.  *Lopez v. Brewer*, 680 F.3d 1068, 1076-77 (9th Cir. 2012).  After *Towery*, Arizona changed the time restrictions to create more time between the attorney's visit and the execution.  *Id*.  The Ninth Circuit voiced its disapproval for the repeated ad hoc changes, and reinstated the previous restrictions that were approved in *Towery*.  *Id*. at 1078.

No court has held that attorneys for condemned inmates have a right to view the insertion of IVs into the inmate, nor has any court held that access to courts prevents prison officials from using curtains in order to deal with problems which might arise during an execution.  Such a position is an overly broad extension of access to courts jurisprudence, and should be rejected by this Court.

19

**PROPOSITION II:P/I PLAINTIFFS FAIL TO SHOW A  NON-SPECULATIVE, IRREPARABLE HARM**

The Tenth Circuit has held that "[p]urely speculative harm will not suffice," for irreparable harm unless a plaintiff shows a significant risk of harm.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  In the present case, however, P/I Plaintiffs cannot meet this high burden.  P/I Plaintiffs will be executed, even if they receive all their requested relief. A preliminary injunction would simply delay their executions, based upon the assertion of a purely speculative harm in the method of their execution.  As previously discussed, P/I Plaintiffs are far beyond the point of challenging their sentences or convictions and, at this point, the question is not whether they will be executed, but when and by what method.   Therefore, the only harm this Court should evaluate is the one actually being challenged and asserted by P/I Plaintiffs, applying the standard of clearest proof.

P/I Plaintiffs have no legal or factual basis for their allegations that their executions will violate the Eighth Amendment.  They offer only speculations about possibilities, rather than concrete proof of a substantial risk of serious harm.  Therefore, P/I Plaintiffs fail to show that they will suffer a non-speculative, irreparable harm.

**PROPSITION III: A  PRELIMINARY  INJUNCTION  WILL  CAUSE  GREAT HARM TO DEFENDANTS**

The United States Supreme Court has recognized that any state has a "strong interest in proceeding with its judgment…."  *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992).  The State of Oklahoma also has a strong interest in carrying out its judgments, and has been proceeding under an order properly issued by the

Oklahoma Court of Criminal Appeals, ("OCCA") which reset the execution dates of P/I Plaintiffs to January 15, 29, February 19, and March 5, 2015. [Doc. 71-1]. A preliminary injunction would violate this strong interest of the State of Oklahoma.

Plaintiffs' purely speculative harm is outweighed by the very real harm to the State if the execution is stayed. In order to conduct an execution, the State of Oklahoma must begin preparations far enough in advance to ensure all the legal and procedural requirements are fulfilled. ODOC has already begun many of those preparations, including the isolation process and movement of personnel. A sudden reversal would require several alterations in ODOC procedure resulting in an interruption of the normal processes and preparations. A stay would also require the OCCA to set new dates for executions, which it has already appropriately set and a stay would cause congestion in the scheduling of other executions which could become ripe during that time. In addition, the families and friends of the victims have patiently waited for over a decade for the State to carry out Plaintiffs' sentences, and a delay in execution would also delay their much-needed closure. Finally, the harm to the finality of the criminal process of the State of Oklahoma cannot be understated. The citizens of the State of Oklahoma have found the Plaintiffs guilty and sentenced them to death utilizing a criminal process which has been reviewed and upheld as constitutionally sound. Plaintiffs have also had full benefit of every automatic and permissive appeal required by law, as well as the clemency process and numerous legal junctures such as an opposition to the State's request to the OCCA to set an Execution Date.

At the end of that lengthy and deliberate process, however, the authorities properly vested with jurisdiction to determine the constitutionality of those matters have ordered the death sentences to proceed. The citizens of the State of Oklahoma, therefore, have an interest in

knowing that the criminal justice system within their State will not be thwarted from applying the punishment they have authorized and selected for Plaintiffs, absent proof of the highest order that it is necessary and proper to do so. The citizens should not see their criminal justice system derailed and subverted by criminal defendants who have completely exhausted the entire range of appeals and processes required by the U.S. and Oklahoma Constitutions due to baseless speculation of theoretical harms raised in improper venues. Therefore, the balancing of the harms to Plaintiffs and public policy weigh in favor of denying Plaintiffs' request as well.

## PROPOSITION IV: PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION

While P/I Plaintiffs note that there is a public interest in prevention of constitutional rights, the speculative nature of that interest, based on mere possibilities, is outweighed by the definite, strong, and clear public policy that the people of the State of Oklahoma have a vested interest in ensuring timely enforcement of their laws. This policy is far stronger than any purported public policy P/I Plaintiffs' claim. Both the State and the victims of crime (in this case the family of P/I Plaintiffs' murder victims) have an important interest in the timely enforcement of a sentence. *Hill v. McDonough*, 126 S.Ct. 2096, 2104 (2004). Therefore, the equities of the public policies interests weigh against P/I Plaintiffs' requested preliminary injunction.

## ANTICIPATED EVIDENTIARY ISSUES

Based on affirmative assertions by Plaintiffs' counsel on December 5, 2014 Defendants anticipated a potential evidentiary issue regarding attorney-client privilege, and possible waiver thereof. These privileges are claimed for communications between attorneys that serve as general counsel for ODOC, as well as communications to and

from attorneys in the Attorney General's Office, which also serve as counsel for ODOC. Defendants did not and do not waive any such privileges.  Defendants are aware that documents from the Department of Public Safety investigation contain information that can be reasonably viewed as attorney-client communications and work product.  Yet that information was passed within the confines of the "State" sphere, and not disclosed by ODOC outside of that relationship.  As the Court indicated during the December 12, 2014 hearing on Plaintiff's motions to compel, Plaintiffs' assertion that there has been a general waiver of ODOC's attorney-client and work product doctrine privileges is misplaced.  Given the Court's comments about the nature of the Executive Order and ensuing investigation, Defendants are optimistic that this will no longer be an issue pressed by Plaintiffs.

## UNUSUAL ISSUES THAT MAY ARISE AT TRIAL

Due to the sensitive nature of this case and much of the information that this Court will consider, Defendants seek to alert the Court to potential problems that will arise during the injunction hearing.   This case is expected to be highly publicized, and will likely draw numerous reporters and members of the public.  Defendants have no per se objection to the public being present, however, Defendants do have concerns with the handling of confidential information and documents, and whether such information should be disclosed while the public is present.  Such information includes primarily security information, and privileged information contained within interview transcripts, and similar matters.  Ideally, the attorneys involved can be mindful of this, and will only introduce the most essential material, and hopefully find a way to do so without

disrupting the confidential nature of the information.  Defendants seek to alert this Court to this possibility, and are willing to work with Plaintiffs to achieve a mutual resolution.  Unfortunately, given the uncertainty over what Plaintiffs intend to introduce, and how they intend to introduce it, this matter remains unresolved.   But Defendants remain optimistic.

## CONCLUSION

Defendants have presented the reasons that they are entitled to judgment in this matter.  As Defendants will show in the hearing, Plaintiffs fail to show that they are substantially likely to prevail on the merits, they fail to show a non-speculative, irreparable harm, the Defendants have presented a great harm they will suffer if this Court enters a stay, and public policy weighs in Defendants' favor.  Therefore, this Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

 /s/Aaron J. Stewart
**JOHN D. HADDEN, OBA#18716**
**JEB E. JOSEPH, OBA#19137**
**AARON J. STEWART, OBA#31721**
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 NE 21st Street
Oklahoma City, OK  73105
Telephone:   (405) 521-3921
Facsimile:    (405) 521-4518
Email: john.hadden@oag.ok.gov
Email: jeb.joseph@oag.ok.gov
Email: aaron.stewart@oag.ok.gov
*Attorney for Defendants Burrage, Gross,*
*Haynes, Henke, Neal, Patton, Roach, Trammell*
*and Ware*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Patti Palmer Ghezzi
Randy A. Bauman
FEDERAL PUBLIC DEFENDER
215 Dean A. McGee Ave., Ste. 109
Oklahoma City, OK 73102
Email: patti_ghezzi@fd.org
Email: randy_bauman@fd.org
*Attorneys for Plaintiffs, Cole, Cueste-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon, Johnson, Littlejohn, Pavatt, Simpson, Underwood and Warner*

Mark Henricksen
Lanita Henricksen
HENRICKSEN & HENRICKSEN, LAWYERS, INC.
600 N. Walker Ave., Ste. 200
Oklahoma City, OK 73102
Email: mark@henricksenlaw.com
*Attorney for Plaintiffs Andrew, Glossip, Jackson, Hancock and Warner*

Mark H. Barrett
PO Box 896
Norman, OK 73070
Email: barrettlawoffice@gmail.com
*Attorney for Plaintiff Jones*

David B. Autry
1021 NW 16th Street
Oklahoma City, OK 73106
Email: dbautry44@hotmail.com
*Attorney for Plaintiff Hancock*

Gary Peterson
211 N. Robinson Ave., Ste. 450 South
Two Leadership Square
Oklahoma City, OK 73102
Email: gp@garypeterson.com
*Attorney for Plaintiff Warner*

Fred L. Staggs
510 NW 17th St.
Oklahoma City, OK 73013
Email: staggslaw@aol.com
*Attorney for Plaintiff Mitchell*

Dale A. Baich
Robin C. Konrad
FEDERAL PUBLIC DEFENDER
850 W. Adams St., Ste. 201
Phoenix, AZ 85007
Email: dale_baich@fd.org
Email: robin_konrad@fd.org
*Attorney for Plaintiff Wood*

/s/ Aaron J. Stewart
Aaron J. Stewart

25