## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CHARLES F. WARNER, *et al*.,

Plaintiffs,

v.

KEVIN J. GROSS, *et al*.,

Defendants.

Case No. CIV-14-665-F

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

*s/ Patti Palmer Ghezzi*
Patti Palmer Ghezzi, OBA # 6875
Assistant Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
phone: 405-609-5975
fax:  405-609-5976
email: patti_ghezzi@fd.org

COUNSEL FOR PLAINTIFFS

# TABLE OF CONTENTS

**PROPOSED FINDINGS OF FACT**

**I.   Selection of drugs and development of drug protocol to be used in the Lockett execution** ................................................................................... **1**

A. Uncontested facts ...........................................................................1

B. The Attorney General and ODOC General Counsel select drugs and revise the execution procedures ....................................................2

   1. ODOC did not have the drugs required by the previous execution procedures. ...............................................................................2

   2. "*I did my own research, I looked on-line, you know. Went past the key Wiki leaks, Wiki leaks or whatever it is.*"   How ODOC changed the execution drugs. ...................................................................4

   3. "*I signed the damn thing. I did not write that policy. I did not choose those drugs.*" Defendant Trammell's lack of involvement in changes to the protocol. ............................................................................7

   4. Two executions are set for one evening. ...............................8

   5. The day of the Lockett execution, Defendant Trammell signs an affidavit. ......................................................................................9

**II.  "*An atmosphere of apprehension.*" Lack of training and oversight before the scheduled executions.** ....................................................... **10**

A. Uncontested Facts..........................................................................10

B. "*The executioners didn't know anything about it. No one did.*" Lack of knowledge of midazolam.......................................................10

   2. Inadequate training......................................................................12

   3. Inadequate supplies.....................................................................14

   4. Inadequate planning....................................................................15

**III. "[I]t was such a cluster." The execution of Clayton Lockett.** ............................. **16**

A. Uncontested facts ..........................................................................16

B. Acquiring the execution drugs .....................................................17

C. "[W]e had stuck this individual so many times." Setting the IV line ........19

D. "*I didn't really care to know what they were.*" Administering the chemicals...................................................................................22

E. "*It was a bloody mess.*" Behind the blinds....................................27

F. "*[T]he director knew that if he requested us to stay it we would stay it.*" The order to stay Lockett's execution....................................29

G. "*[T]he purpose of being there was to provide an execution . . . and we were told not to reverse it.*"   No post-stay life-saving measures were taken. ...............................................................................34

H. "*[I]t was very bad.*" ODOC's initial response to the Lockett execution. ....................................................................................35

IV. *"It's not working.*" Witness accounts of the Lockett execution. ...................... 37

V.  Oklahoma's responses to the Lockett execution ................................................. 44

    A. Uncontested facts ........................................................................................44
    B. Preparation of timeline. ..............................................................................45
    C. ODOC officials' response. ...........................................................................45
    D. Changes to written protocol: chemicals and team members.....................46

VI. The Lockett execution is experimental evidence that midazolam is inappropriate for use in executions. .................................................. 49

VII. Facts supported by expert testimony..................................................................... 50

    A. Midazolam................................................................................................50
        1.  Ceiling effect.................................................................................50
        2.  No analgesic effect.........................................................................51
        3.  Paradoxical reactions .....................................................................51
        4.  Midazolam in Oklahoma's three-drug execution protocol...................52
    B. Intravenous access...................................................................................55
        1.  IV placement in Lockett .................................................................56
        2.  Qualifications in placing IV lines .......................................................57

VIII. Midazolam's use in other states in three-drug lethal-injection protocol ....... 57

PROPOSED CONCLUSIONS OF LAW

    A. Plaintiffs have shown both a likelihood of success and serious questions on the merits of their claims .....................................................60
        1.  Claims related to the Eighth Amendment (Cruel and Unusual Punishment): Claims 2, 4, 7..................................................................60
        2.  Claim related to the Fourteenth Amendment (Notice and Opportunity to be Heard): Claim 5................................................................................68
        3.  Claim related to the First and Fourteenth Amendments (Right of Access to Information, to Counsel, and to the Courts): Claim 8 ......................69
    B. Other Factors to Consider for Preliminary Injunction Relief ....................75

## FINDINGS OF FACT

I.    **Selection of drugs and development of drug protocol to be used in the Lockett execution**

    A.    **Uncontested facts.**[1]

On April 1, 2014, Defendants Charles Patton and Anita Trammell, through their counsel, notified the now-deceased Clayton D. Lockett and Plaintiff Charles Warner that they would be executed by administration of midazolam, pancuronium bromide, and potassium chloride, in accordance with section IX.C.7.e of the March 21, 2014 Field Memorandum. (Doc. 96, ¶25.)

On April 14, 2014, Defendants Patton and Trammell changed the written procedures in section IX.C.7.e of the March 21, 2014 Field Memorandum, which had previously been noticed as those that would be used in the executions of Clayton Lockett and the Plaintiff Warner. In the new procedures, the prescribed concentration of midazolam in each lethal injection syringe was raised tenfold, from 50mg/100 ml to 50mg/10 ml. (Doc. 96, ¶25.)

On April 29, 2014, Defendant Trammell affirmed under oath that she would ensure that Oklahoma Department of Corrections (ODOC) policies pertaining to the execution procedures to be used on Clayton Lockett and Plaintiff Warner would be followed. (Doc. 96, ¶30.) On April 29, 2014, Defendant Trammell affirmed under oath that execution personnel tasked with carrying out the scheduled executions of Clayton

---

[1] The uncontested facts in this document are either facts that Defendants admitted in their Answer (Doc. 96) or facts that Defendants did not contest that are in the Department of Public Safety's Executive Summary (Doc. 49, also Pls.' Ex. 65).

Lockett and Plaintiff Warner were qualified and experienced, and that their qualifications and experience had been "verified" by ODOC. (Doc. 96, ¶30.)   On April 29, 2014, Defendant Trammel affirmed under oath that the execution personnel had undergone specific-task training to carry out their designated responsibilities during the scheduled executions of Clayton Lockett and Plaintiff Warner, and that training was scheduled to continue up to when the executions were to be carried out. (Doc. 96, ¶30.) On April 29, 2014, Defendant Trammell affirmed under oath that she knew no facts that would cause her to question the effectiveness of the training provided to execution personnel. (Doc. 96, ¶30.)

### B. The Attorney General and ODOC General Counsel select drugs and revise the execution procedures

#### 1. ODOC did not have the drugs required by the previous execution procedures.

On January 22, 2014, the Oklahoma Court of Criminal Appeals scheduled Lockett's execution date for March 20, 2014.  (Pls.' Ex. 14.)  The following day, the court scheduled Plaintiff Charles Warner's execution date for March 20, 2014.  (Pls.' Ex. Ex. 13.)  At the time that these two executions were set, ODOC had in place "Procedures for the Execution of Offenders Sentenced to Death" since August 26, 2011. (Pls.' Ex.  6.) Under those procedures, the prisoner would be administered 500 milligrams of either sodium thiopental or pentobarbital, followed by 40 milligrams of vecuronium bromide and 200 milliequivalents of potassium chloride. (Pls.' Ex.  6 at 15-16.)

When  the  court  scheduled  Warner's  and  Lockett's  executions,  Defendant Trammell  was  the  warden  of  Oklahoma  State  Penitentiary  (OSP)  and  was  statutorily

charged with being present at every execution. In February 2014, Defendant Patton was named director of ODOC. (DPS 1795.)  Defendant Patton explained that the execution procedures in place at that time of Lockett's execution "did not involve Director" and "put the onus on the Warden." (DPS 1795.)

In early March 2014, Director Patton learned that ODOC did not have the drugs required by the execution procedures to carry out the scheduled execution. (DPS 1796.) On March 17, 2014, the Attorney General, through Assistant Attorney General Seth Branham, represented to the Oklahoma Court of Criminal Appeals that ODOC had learned three days earlier that it was unable to obtain the lethal drugs needed to carry out Lockett's execution. (Pls.' Ex. 15 at 8.) The Attorney General also noted that the shortage of the drugs "may prompt ODOC to revise its execution protocol to incorporate drugs that are currently available, and obtainable on the open market." (Pls.' Ex. 15 at 9.)[2] Defendant Patton said that the court stayed the execution because the drugs required by the procedures were not available.  (DPS 1796; Pls.' Ex. 16.)

"On March 18, the Court of Criminal Appeals vacated Lockett's execution date and it was reset for April 22. This order also rescheduled Warner's execution from March 27 to April 29." (Pls.' Ex. 65 at 1.)

---

[2] The ODOC knew as early as January 2012 that obtaining pentobarbital on the open market was becoming difficult. (Pls' Ex. 18 at 2.) This was not an eventuality that suddenly arose in March 2014. (Pls' Ex. 15 at 8.)

> **2.** ***"I did my own research, I looked on-line, you know. Went past the key Wiki leaks, Wiki leaks or whatever it is."***[3]   **How ODOC changed the execution drugs.**

Defendant Patton was not involved in the process of looking for a new drug. (DPS 1798.)  Similarly, Defendant Trammell said that she did not make the decision "at all" to "choose a drug combination that's gonna be used." (DPS 2947.)  She said, "I made zero decisions on the drugs."  (DPS 2948.)

Michael Oakley was General Counsel for ODOC until he retired on April 23, 2014. (DPS 1514.) In early March, while Oakley was on vacation, Gary Elliot, his colleague in the General Counsel's office, was looking for "phenobarbital,"[4] which "is the first drug in the protocol." (DPS 1517.) Oakley said that they knew that "phenobarbital was going to be very difficult to locate," but that Elliot had found three potential sources. (DPS 1518.) Oakley said "[a]s far as looking for drugs, we were all looking for drugs." (DPS 1526.) Oakley said that they "decided that we were not going to be able to locate Phenobarbital [*sic*] and we had to change the first drug." (DPS 1518.)

Oakley recounted that the State decided on midazolam after speaking with the "State of Illinois,[5] the State of Arizona[6] and the State of Texas one day." (DPS 1519.)

---

[3] Statement by then-General Counsel for ODOC. (DPS 1543.)

[4] Various witness statements refer to the drug phenobarbital as being used in past executions.  Pentobarbital has been listed as a drug in previous execution protocols, but phenobarbital has not.  It is unclear whether the witnesses misspoke or whether there was a transcription error.

[5] Illinois abolished the death penalty in 2011. *See* Christopher Wills, Illinois Gov. Pat Quinn abolishes death penalty, clears death row, Washington Post (Mar. 9, 2011) http://www.washingtonpost.com/wp-dyn/content/article/2011/03/09/AR2011030900319. Html (last visited Dec. 10, 2014).

He also said that the Attorney General's (AG) office had expert testimony on the use of midazolam from [redacted], "who was our expert witness who had testified in the Florida case that, that he used this drug to administer sedation." (DPS 1519.)  The AG's office relied upon "transcripts" but did not meet with this expert "face to face," "not for this revision." (DPS 1524.)  Oakley said it was not necessary to talk to the expert: "We knew what [redacted] would say and we knew [redacted] would be consistent with what [redacted] had testified within Florida. And so, and as far as the dosage and the amounts that [redacted] testified too, [redacted] wasn't going to say anything different on the witness stand here. . . ." (DPS 1524.)

Oakley explained "there is political pressure. This is political." (DPS 1529.) "[T]he Attorney General's office, being an elective office, was under a lot of pressure. The, the staff over there was under a lot of pressure to, to say, 'Get it done,' you know, and so, yeah, I, I think it was a joint decision but there was, I got to say there was a definite push to make the decision, get it done, hurry up about it." (DPS 1529.)

Oakley explained his understanding of how the effects of midazolam differed from the effects of other drugs previously used: "originally we started with Thiopental, as the sedative, as the first drug, and it did the job as the first drug is to render the offender sedated, unconscious, and what I knew about Midazolam, or I what I learned about Midazolam was it did exactly that, and so regardless of, you know that was the job of the

---

[6] Arizona did not change its protocol to permit the use of a midazolam/hydromorphone combination until after Director Patton left Arizona. (Pls' Ex. 7.) No Arizona execution had used midazolam at the time of Lockett's execution.

first, first drug." (DPS 1530.)  Oakley said he "knew it probably might take longer" from the General Counsel in Ohio.  (DPS 1530.)

Oakley explained that he also did some research on midazolam: "I did have a discussion with our medical director at the time and he said, 'Yeah Midazolam probably when administered will, will render sedation.' And that's all he would say. Then, you know, I did my own research, I looked on-line, you know. Went past the key Wiki leaks, Wiki leaks or whatever it is, and I did find out that when administered, Midazolam would administer, would render a person unconscious. That's what we needed . . . . So we thought it was okay." (DPS 1543.)   He also reiterated that he spoke with "General Counsel in those three states, in Texas, Illinois and Arizona." (DPS 1544.)  "[W]e talked about Midazolam at that time, because Ohio had recently used Midazolam [and] had been criticized because it took so long, and the general counsel told me, well, you know, those are the news stories, but it really didn't take that long. It took longer than Phenobarbital, but it didn't take as long as what the news stories were. So yeah, that, that's how I researched it."  (DPS 1544.)

Oakley said Defendant Trammell knew it was only the first drug that was being changed. (DPS 1525.)  Defendant Patton was told the first drug would be changed to midazolam. (DPS 1791.)   Defendant Patton understood that midazolam "was slower acting than pentobarbital, . . . pentobarbital is quick acting as soon as it hits the system the person goes unconscious, it is a slower acting drug and that's what I briefed the Warden, don't expect from what I've been told don't expect it to hit his system and he goes unconscious it's more gradual unconsciousness." (DPS 1801.)   Defendant Patton

said that he understood that "the previous general counsel and the attorney general's office" made the decision to use the three-drug formula involving midazolam for Lockett. (DPS 1838.)  Defendant Patton reiterated that the use of midazolam was a decision that former ODOC General Counsel: "Mike Oakley said this is a decision made by himself and the AG's office, Mr. Hadden."  (DPS 1846.)

3.     ***"I signed the damn thing. I did not write that policy. I did not choose those drugs."***[7] **Defendant Trammell's lack of involvement in changes to the protocol.**

The execution procedures were amended on March 21, 2014, and gave the OSP warden "sole discretion as to which lethal agent will be used for the scheduled execution." (Plaintiffs' Ex. 3 at 15, §C.7.)  Despite the fact that the procedures placed the responsibility for choosing drugs on the warden, Defendant Trammell was not included in conversations regarding the selection of drugs. (DPS 2949.)  Oakley said that he tried to bring Defendant Trammell "up to speed" on the protocol, but "she was not saying, 'Oh we need to use Midazolam.' No she wasn't."  (DPS 1545.)  He further elaborated that decisions were being made and "she wasn't really brought into all those decisions." (DPS 1545-46.)

According to Defendant Patton, "once the drugs were found. . . it was decided to rewrite the protocol." (DPS 1807.)   Regarding the decision to select drug protocols, Defendant Patton said there was discussion from "Mr. Oakley [and] from the AG's office," who said, "here's the five drug protocols we're going to put into the protocol

---

[7] Statement of Defendant Trammell. (DPS 2949.)

policy for the Warden for her signature."  (DPS 1807.)  Defendant Trammell supported

Defendant Patton's statement and said, "all I can say is that I didn't write the policy. I

don't know anything about the drugs. I was just—I'm told the drugs that's gonna be

used."  (DPS 2873.)

Defendant Trammell also said one of the mistakes she made was "[r]elying on my

legal department and the AG's office like I did to just sign in a policy when I didn't write

the damn thing."  (DPS 2937.)   After signing the policy that switched to midazolam,

Defendant Trammell said the policy was then "revised for the second time, you know,

there was a mistake and the mistake was the dosage of the Midazolam and you got that."

(DPS 2949.) She summed up, "I signed the damn thing. I did not write that policy. I did

not choose those drugs."  (DPS 2949.)

### 4.    Two executions are set for one evening.

On April 9, the Court of Criminal Appeals denied an application for stay made by

both offenders. On April 21, the Oklahoma Supreme Court issued a stay of execution for

Lockett and Warner. In response, Governor Mary Fallin issued Executive Order 2014-08,

which granted a stay of Lockett's execution and rescheduled it for April 29, based on the

Supreme Court not having constitutional authority to issue a stay. On April 23, the

Supreme Court dissolved their stay. Between April 23 and April 29, an application for

extraordinary relief was denied by the courts, as was another request for a stay." (Pls.'

Ex. 65 at 1.)

"It was apparent the stress level at OSP was raised because two executions had been scheduled on the same day. This was the first time since 2000 two offenders were scheduled to be executed the same day. Four days prior to the execution, the protocol was revised to accommodate the logistics for two offenders." (Pls.' Ex. 65 at 23.)

### 5. The day of the Lockett execution, Defendant Trammell signs an affidavit.

Defendant Trammell signed two affidavits—one original and one revised—on April 29, 2014, the day on which the executions of Clayton Lockett and Plaintiff Warner were to be held. The revised affidavit was returned as an attachment to Assistant Attorney General Aaron Stewart at 4:30 p.m. on April 29, 2014, with the Defendant Trammell's secretary reporting "this had a change made to number 8 and has been reviewed by those from AG's office here and now it is good to go." (DPS 3404-3408). The affidavit was released to the media by the Attorney General's office and posted on the Tulsa World website at 5:18 p.m. on April 29, 2014. *See* Tulsa Word, Affidavit of Warden Anita Trammell, *available at* http://www.tulsaworld.com/osp-warden-anita-trammel-s-affidavit/pdf_4394f3ec-cfec-11e3-9b64-0017a43b2370.html (last visited Dec. 10, 2014).

Defendant Patton was told that the affidavit served two purposes: "for future litigation and for possible press release if there was [*sic*] questions about the pharmacist." (DPS 1816.) Defendant Trammell had never signed an affidavit of this sort in the past, and assumed "that it has to do because of the change in the drug protocol and all the

9

media involvement with the execution of these two offenders on the same day."  (DPS 2883.)

## II.    *"An atmosphere of apprehension*."[8] **Lack of training and oversight before the scheduled executions.**

### A.    Uncontested Facts.

"Warden Trammell and Director Patton both acknowledged the training [ODOC] personnel received prior to the execution was inadequate.  Warden Trammell stated the only training she received was on-the-job training and that [ODOC] had no formalized training procedures or processes concerning the duties of each specific position's responsibility. The [W]arden and [D]irector both indicated [ODOC] had no training protocols or contingency plans on how to proceed with an execution if complications occur during the process."  (Pls.' Ex. 65 at 21.)

### B.    *"The executioners didn't know anything about it. No one did*."[9] **Lack of knowledge of midazolam.**

Defendant Patton said: "the day of the execution, I briefed the Warden and the team again that it's my understanding that midazolam is slower acting than pentobarbital and stressed the importance since it was a three drug protocol, stressed the importance of the consciousness check at the five minute mark to make sure the offender was fully unconscious since they were used to the pentobarbital where they were unconscious within seconds, uh I had heard it takes three, four, five minutes for unconsciousness with midazolam, stressed the importance of the consciousness check."  (DPS 1802.)

---

[8] Statement of Defendant Paramedic Y, who has participated in dozens of executions in the past, describing the day of Lockett's execution. (DPS 1777.)

[9]  Statement of Defendant Trammell. (DPS 2894.)

Defendant Trammell was told by someone, whose name has been redacted, on the day of the execution "how an offender normally reacts and the-the process. How it's so much slower. It's the first information I received on that."  (DPS 2879.)  Defendant Trammell was told midazolam "was gonna be slower, a lot slower than Phenobarbital" and she thinks that opinion "was based on experience."  (DPS 2942.)  Defendant Trammell explained, "[redacted] told me that it's possible after the first five minutes the inmate may not be unconscious and so we had a conversation about that." (DPS 2880.) Defendant Trammell said "[redacted] had previous experience with the use of Midazolam"; Defendant Trammell assumed that meant that [redacted] "had used drug in Arizona[.]"[10] (DPS 2942.) She personally read no "medical information related to Midazolam" nor did she "consult with any medical personnel prior to that day about the effects of Midazolam." (DPS 2942-43.)

Shortly before the execution, Defendant Trammell talked to the three executioners about "this drug, Midazolam, and the effects, the slower effects and so I–the executioners didn't know anything about it. No one did."  (DPS 2894.)  Defendant Trammell said she and the executioners "developed a plan that after the first 5 minutes the green like [*sic*] comes on. That's when the [word missing] gets up and checks and then I'll turn and face the door. . . . And I'll- -I'll either say he's unconscious or the offender is not unconscious and then we'll set - set again for two minutes. And then after two minutes the light will go off and then the [redacted] will come check and we'll continue that. So we come up with that plan." (DPS 2894.)

---

[10] Midazolam had not yet been used in Arizona. (Pls' Ex. 7.).

Jennifer Chance, Deputy General Counsel to the Governor, also stated, "I knew that these drugs were expected to take longer than the old drugs . . . . I had an understanding that it would take 10 to 15 minutes instead of the six to eight minutes." (DPS 432-33.)  Chance learned that information from Defendant Patton and she "got the impression the director had some experience with the other drug cocktail." (DPS 433.) Travis Brauer, aide to the Governer, said he "was informed that this new mixture would take 9 about 10 minutes" but he did not recall who provided him with that information. (DPS 358.)  Redacted #20 said, "This drug was supposed to take longer between the losing consciousness and actually expire [*sic*]." (DPS 3015.)

## 2.    Inadequate training

Defendant Patton said that the executions of Lockett and Warner, both scheduled for April 29, 2014, "were particularly concerning to [him]."  Defendant Patton elaborated, "A new protocol, one I was not familiar with really, I have never participated in nor as many people in the world has participated in two executions in one day. But that's what the Court had ordered. . . . " (DPS 1798.)  Defendant Patton said he understood that the Warden and her team were involved in training, but he is "not aware of specifically what they trained to." (DPS 1840.)

Two medical personnel—Defendant Doctor X and Defendant Paramedic Y—were involved in the scheduled executions.[11]  Neither Defendant Paramedic Y nor Defendant

---

[11] Plaintiffs will use the pronoun "he" to refer to Defendant Doctor X and Defendant Paramedic Y, in order to avoid disclosing identifying information about these Defendants.

Doctor X attended any training with ODOC.  (DPS 1598, 2171.)  And as Defendant Doctor X explained: "I was hesitant to do anything, I said. I don't know, you know, what my status is inside here.  I'm not supposed to be doing anything except, you know, deciding whether he was unconscious and then declaring him deceased." (DPS 2166; *see also* DPS 2145, DPS 2184.)   Defendant Doctor X further said, "we are really not supposed to be the ones putting lines in. Someone else is supposed to put the lines in, even though I was told that we might have to in an emergent situation." (DPS 2143.)

According to Redacted #13, there was no "briefing or training" of the three executioners. (DPS 2013.)  If there is any "training whatsoever for these executioners," then Redacted #13 is "not aware of it." (DPS 2016.)  Redacted #13 only "read" the policy to the executioners from page 18, starting at E, through page 19. (DPS 2014.)  Defendant Executioner 1 "believed that the medications were the only changes in the instructions." (DPS 639.)

Redacted #13 stated, "I don't know who picks what. I don't know. All's I know is this is who your - - you know, call these people, give them a date and we get them over to the facility and - - we meet and we take them to the facility and like I said, we go over this . . . and we talk about that and really that's it." (DPS 2015.)  Defendant Executioners 1, 2, and 3 were "driven to the Oklahoma State Penitentiary in a van.  About three blocks from the prison, they put on hoods."  (DPS 639.)  Defendant Executioner 2 stated that he was "normally paid $300 each performing each execution," but was paid a total of $600

before the scheduled executions to participate in the executions of Lockett and Warner. (DPS 641.)

### 3.    Inadequate supplies

Defendant Paramedic Y stated, "There was an air of urgency there. The quick, quick. Got to get it done. Got to get it done. And got to make sure that everything is done right. This -- knowing this was our first time with this particular drug and it was not setup; it was not given to us at -- the way it had been previously." (DPS 1600.) Defendant Paramedic Y reported that the amounts of drugs in the syringes were different than what he received in the past, stating, "In this situation I only got 20 milliliters--a total of 40 milliliters for the patient . . . [o]f the first drug." (DPS 1604.)   Defendant Paramedic Y then states that he "got 50-milliliter syringes." (DPS 1605.)   Defendant Paramedic Y confirmed that "the second and third drugs were 60 milliliters total, shorter than what [he] normally ha[s] used in the past." (DPS 1606.)

The protocol specifically stated "[m]edical equipment and instruments will be provided for the attending Licensed Physician, as previously designated and requested by the Physician." (Pls' Ex. 4 at 164.)  Despite that direction, Defendant Trammell said that ODOC "had to borrow some stuff from our medical. . . [redacted] had asked for certain sized needles."  (DPS 2933.)  Defendant Paramedic Y also confirmed, "the tubing they sent me was suction tubing, so I had to provide the IV tubing that was used." (DPS 1601.) In fact, Defendant Paramedic Y explained that someone at the prison asked if he would "willing to supply everything except the drugs? I said sure. I did it for the first ten; I can

do it again. I have it in stock. It's not something that I would not -- I would not have to be buying per -- you know, specifically for." (DPS 1664-65.)

### 4.    Inadequate planning

The procedures for executing Lockett at 6:00 p.m. and Warner at 8:00 p.m. on April 29, were changed on April 25, 2014, to accommodate the double execution. (Pls.' Ex. 5.) Warden Trammel describing the process of "staging" two executions on the same day and admitted that orchestrating two executions in a row caused "more stress for all the staff." (DPS 2848-59.)   Defendant Doctor X stated that the other physician who usually is present at executions was unavailable, and the one who usually substitutes for him was also unavailable. (DPS 2143.)   ODOC contacted Defendant Doctor X "two days before" the execution and he "finally agreed to do it." (DPS 2143.)

After the Lockett execution, Defendant Trammell acknowledged ODOC's lack of preparedness.   Defendant Trammell explained, "with this new drug and not knowing if there was enough left or if there was enough in his system. You know it just didn't know--just didn't know what to do on it." (DPS 2935.)   Defendant Trammell admitted that the "department failed . . . because we didn't have anything in place." (DPS 2956.)   "[W]e didn't have anything in place if it went--goes wrong once it goes to the body or to the, you know, insertion." (DPS 2956.)   She further admitted that she "should've realized that our policy does not tell us what to do when something goes south."  (DPS 2938.)

III.    *"[I]t was such a cluster."*[12] **The execution of Clayton Lockett.**

A.    **Uncontested facts**

Clayton Lockett was scheduled to be executed on April 29, 2014. (Pls.' Ex. 65 at 1.) ODOC used a three-drug formula in his execution consisting of midazolam, followed by vecuronium bromide and potassium chloride.  (Pls.' Ex. 65 at 11.)   A problem occurred during the execution; it "was stopped and Lockett later died in the execution chamber." (Pls.' Ex. 65 at 1.)

Clayton Lockett was placed on the execution table and restrained at or around 5:22 p.m. (Doc. 96, ¶32.)  For approximately one hour, Defendant Doctor X and Defendant Paramedic Y attempted to place intravenous (IV) lines into Lockett, puncturing him at least sixteen times in his arms, feet, neck region, and groin area. (Doc. 96, ¶32.) Defendant Doctor X made several unsuccessful attempts to insert a line in both Clayton Lockett's jugular and subclavian veins. (Doc. 96, ¶34.) Defendant Doctor X attempted to place a central IV line in Clayton Lockett's right femoral vein. (Doc. 96, ¶34.)  The ODOC did not have a needle of the correct length to establish a patent IV line in the femoral vein. (Doc. 96, ¶34.)  A 1.25 inch-long needle, rather than a 2 inch to 2.5 inch-long needle, was used by Defendant Doctor X to set the femoral line.  (Doc. 96, ¶34.)

Defendants moved forward with Clayton Lockett's execution with only one IV line, which was covered by a sheet. (Doc. 96, ¶36.) At approximately 6:23 p.m., Defendants began the administration of midazolam into Clayton Lockett. (Doc. 96, ¶36.)

---

[12]  Response made by the paramedic who participated in Lockett's execution when describing "the process that day as a whole from the time  [he] got there to the time [he] left" (DPS 1777.)

Five minutes after the midazolam was administered, at approximately 6:30 p.m., the physician determined Clayton Lockett was still conscious.   (Doc. 96, ¶36.)   At approximately 6:33 p.m., the physician stated that Clayton Lockett was unconscious. (Doc. 96, ¶36.)

At approximately 6:42 p.m., Defendants closed the blinds on the window between the execution chamber and the witness room. The blinds remained closed. (Doc. 96, ¶38.) At approximately 6:54 p.m., Defendant Patton informed the witnesses that the execution was being stopped on the authority of the Governor, that there was a "blown vein," and that Lockett's "vein exploded." (Doc. 96, ¶38.)

During the attempted execution of Clayton Lockett at least some of the 100 mg of midazolam was not injected into Lockett's vein. (Doc. 96, ¶59.)   However, over the period of time involved in the execution, midazolam would have been equally effective even though it was not injected into the vein. (Doc. 96, ¶59.)   Any failure of intravenous access during the Clayton Lockett execution did not materially interfere with the absorption and distribution of midazolam within Clayton Lockett's body. (Doc. 96, ¶59.)

Clayton Lockett was declared dead at approximately 7:06 p.m., 43 minutes after the start of his execution. (Doc. 96, ¶41.)

## B.    Acquiring the execution drugs

Defendant Paramedic Y stated that ODOC got the drugs from the Attorney General.  (DPS 1667-68; 1705-06.)

The pharmacist who supplied the drugs for the execution of Clayton Lockett is a "licensed pharmacist in the State of Oklahoma." (DPS 2137.)  The Pharmacist "was notified four weeks from the original execution date that the Department of Corrections was going to purchase the execution drugs from the pharmacy, where he/she is employed." (DPS 2137.)  "When the execution was re-scheduled, new prescriptions were faxed to the pharmacy." (DPS 2137.)  "The only drug that needed to be ordered was midazolam. The sodium chloride bags, potassium chloride and, vecuronium bromide were purchased from another pharmacy."  (DPS 2137.)  "The drugs that were purchased from the other pharmacy were delivered by someone from the Department of Corrections, several weeks prior to the original execution date." (DPS 2137.)

The Pharmacist created "two execution drug kits." (DPS 2137.)   "The kits contained two syringes of each medication, one or two larger IV bags and several 50ml sodium chloride bags." (DPS 2137.)  "On April 29, 2014 someone from the Department of Corrections arrived at the pharmacy to pick up the drugs." (DPS 2138.)

Redacted #1 "receive[d] a prescription the day prior to the execution from the Warden, then I t[ook] the prescription to the pharmacist to have it filled, then I t[ook] the medicine to the penitentiary." (DPS 273.)  The drugs were "sealed in bags, like, clear bags." (DPS 276.)  Redacted #1 said there were no special instructions "to be maintained at a certain temperature." (DPS 277.)   Once Redacted #1 handed the drugs off to [redacted], he had no further interaction with them.  (DPS 278.)  On the morning of the execution, Redacted #19 picked up the drugs and "secure[ed] them in the refrigerator in Main Control." (DPS 2567.)  Around 4:00 pm later that day, Redacted #19 "retrieve[d]

18

the drugs from the refrigerator; go[es] directly to H Unit to the execution chamber all the way back to where the executioners are staged at." (DPS 2567.)  Redacted #19 then put the drugs in the "refrigerator that's back in that area." (DPS 2567.)

**C.**      ***"[W]e had stuck this individual so many times."***[13] **Setting the IV line.**

A licensed paramedic, Defendant Doctor X, and licensed physician, Defendant Paramedic Y, were present to start intravenous (IV) access, to assess Lockett's consciousness, and to pronounce death.  (DPS 1594-95; 2141; 1597-98; 2166.)

Defendant Paramedic Y had been involved in "several" executions. (DPS 1598.) He described his responsibilities: "My duties are to start an IV; make sure the fluid is running; make sure that everything is setup properly; attach a cardiac monitor to the patient… make sure that the executioners do the procedure aseptically at the right time, the right speed, right dosage of drugs and that everything is accounted for and documented."  (DPS 1597-98.) Defendant Paramedic Y stated, "I don't watch the patient. That's not my job." (DPS 1625.)

Defendant Paramedic Y reported he initially "got the vein the first stick" when attempting to set the IV line, but he did not have tape to secure the line with him.  (DPS 1613.)  He asked [redacted] to get him some tape, but Defendant Paramedic Y said, "They brought me gauze and they brought me monitor tape, but – and, of course, by the time I was holding it trying to it secure, it blew."  (DPS 1613.)  He said he then "stuck [Lockett] three times on the left arm . . . on the medial, antecubital, the lateral and then . .

---

[13] Statement of Defendant Doctor X. (2154.)

. tried to get one right up here in the brachial." (DPS 1619.) Defendant Paramedic Y looked at Lockett's hands, but "their hands are down like this. And so it's hard to turn around because they're taped." (DPS 1619.) Defendant Doctor X noted that taping the hands "is a disadvantage for anyone who is going to try to start a line, because that is usually one of the best places, you know, to start an IV. But I guess that they are required to completely tape their hands up. So their [*sic*] hands and wrists were completely taped up." (DPS 2147.)

In his interview, Defendant Paramedic Y was asked about why it might be difficult to find a vein. He expressed his opinion "that people who are very fair complected, their veins are deep because -- I don't know why. And black people have small veins." (DPS 1692.)

After Defendant Paramedic Y was unable to set a peripheral line in Lockett's left arm, Defendant Doctor X attempted to set a line in the jugular vein and instructed Defendant Paramedic Y to see if he could set a line on the right arm. (DPS 1620.) Defendant Doctor X stated that after Defendant Paramedic Y could not get peripheral access, Defendant Doctor X first tried to start a line in jugular. (DPS 2151.) He got the needle in, but then it infiltrated. (DPS 2152.) "In other words, it went in, had blood coming back on it, and then shortly after that you could see that blood was coming out of the vein, and was around the, you know it was under the, the skin." (DPS 2152.) Defendant Doctor X then said he tried to set a line in the left subclavian vein with a central line kit. (DPS 2149, 2152.) Defendant Doctor X said he spent five or ten minutes trying to start a subclavian line. (DPS 2173.) Defendant Paramedic Y "stuck [Lockett]

three times on the right side" attempting to set an IV, but was unsuccessful. (DPS 1620.) Defendant Paramedic Y also made an unsuccessful  attempt to set a line in his foot. (DPS 1621.)

Defendant Trammell observed the attempted insertion of IV lines and stated, "sitting there thinking to myself I've never seen the cut down so I didn't know how bloody it would be and I thought-I purposely did not get up to look because I - I didn't wanna have a bad reaction to it, you know fixing to do an execution." (DPS 2900.) Defendant Trammell explained that someone had his "hand over [redacted] forehead. Just to keep the offender calm because you could tell he was in some pain."  (DPS 2900.) Defendant Trammell said Lockett was "in some pain" but he was "taking it like a man." (DPS 2900.) According to Defendant Trammell, Defendant Doctor X and Defendant Paramedic Y were "try[ing] real hard to get the vein . . . You know how painful that can be so I was really proud of [Lockett] for that."  (DPS 2901.)

After being unable to set an IV elsewhere, Defendant Doctor X explained, "the only other option I could see was to put a femoral line in. The only thing they had was a, was a short 1 ¼" needle which is pretty, kind of marginal. So I placed the needle in, had the access, had the IV access. It was kind of positional, because you had to have it in tho [*sic*] right position and if you moved it, it was bending the catheter, but they had it flowing and someone asked me about putting another line in, and I said I wouldn't attempt it, I couldn't, that I didn't think I could get another line in and I wasn't going to attempt too [*sic*]." (DPS 2146.)   Defendant Doctor X "also asked for an intraosseous infusion needle, but was told the prison did not have those either." (Pls.' Ex. 65 at 16.)

After the femoral line was set, Defendant Doctor X said someone (he does not recall who) asked him to start a second line.  (DPS 2153-54.)  He said, "I had so much difficulty with doing the lines, okay. And we had stuck this individual so many times, I didn't want to try and do another line."  (DPS 2154.)  And he explained, "I wasn't wanting to do the IV access in the first place, and once I got the one in, I wasn't going to do—I didn't want to do anymore, plain and simple." (DPS 2194.)  Defendant Doctor X opined that the femoral line "was a good line at that point." (DPS 2154.)

Defendant Paramedic Y decided to cover the line because the prisoner "deserves a certain amount of privacy."  (DPS 1653.)  Defendant Paramedic Y stated, "if I had it to do over again, I'd still pull the sheet up."  (DPS 1653.)  Defendant Doctor X stated that the decision to cover up the IV line was "the warden's or whoever is in charge there." (DPS 2154.)  Defendant Patton also said that Defendant Trammell made "a statement that they covered it--was the decision to cover it up for the dignity of the offender." (DPS 1829.)

After the IV was set, Defendant Executioner 3 "held the flashlight on the IV bag, so [redacted] could watch the IV drip."  (DPS 643.)

### D.    *"I didn't really care to know what they were*."[14] **Administering the chemicals.**

Defendant Doctor X said he knew what the first drug was, but he did not "know how fast they were infusing it." (DPS 2156.) Defendant Doctor X thought that "they said they were going to give [Mr. Lockett] 20 mg" of the first drug. (DPS 2157.) He stated,

---

[14] Statement of Defendant Doctor X. (DPS 2146.)

"[t]hat should have been more than enough . . . [t]o make him unconscious." (DPS 2157.)

When asked whether he was told of the expectation as to how long the execution would

take, Defendant Doctor X said, "No. [N]obody told me . . . of course this was a whole

different set of medications. . ." (DPS 2193.)

There were at least five individuals in the chemical room—three executioners,

who pushed the syringes on the three chemicals; Defendant Paramedic Y; and [redacted],

who watched the IV drip and the clock.  (DPS 639, 641, 643, 2038.)

Redacted #13 said that shortly before the execution began, "[w]e had agreed to

wait two minutes [after the five-minute consciousness check] and then would check him

again." (DPS 2040; *see also* DPS 2041.)  He explained that this drug "was a sedative,"

and in the past "you know, it would  - - the phenobarbital, the seventh minute you're

done . . . [a]nd this wasn't like that." (DPS 2041-42.)   And he stated, "we asked

[redacted], how long should we wait? [Redacted] said two minutes is good." (DPS 2042.)

Redacted #13 described his role in the chemical room: "I'm watching the

stopwatch, I'm watching the main clock, I'm watching everything."   (DPS 2034.)

Redacted #13 explained that "[redacted] will get [redacted] - - the drugs arranged, 1A,

1B, 2A, 2B, 3A, 3B, and lay them out in sequence." (DPS 2021.)  Redacted #13 further

stated, "I don't think they gave the right amounts either as far as what they told us to use .

. . . Just from being around this the [redacted], times that I've done, I've seen the size of

the syringes."  (DPS 2089.)

Defendant Executioner 1 began the execution and "attached each syringe and

administered its contents." (DPS 639.)   "When this was completed, [redacted] held a

stopwatch and checked time to determine when five minutes had elapsed."  (DPS 639.)

Defendant Executioner 3 "did notice that the syringes for the first drug were smaller than

the syringes used in the past." (DPS 644.)   After five minutes had passed, [redacted]

signaled to Defendant Executioner 3 "to flip the switch that activates a light in the

chamber.  This light is a signal for the doctor to check the consciousness of the offender.

[Redacted] signaled to turn the light off, because the offender was no [*sic*] unconscious."

(DPS 644.)  "After approximately two minutes, [redacted] signaled for EXECUTIONER

THREE to turn on the light in the chamber.  Again, this was the signal for the doctor to

check for consciousness of the offender."  (DPS 644.)

Redacted #13 said: "[W]e pushed the first group of drugs; turned on the green

light after the five minutes. [Redacted] gets up, goes over and checks him."  (DPS 2036.)

Redacted #13 said that at the five-minute mark, Lockett was "still conscious. . . . We had

agreed to wait two minutes and then [redacted] would check him again." (DPS 2040.)

Redacted #13 said, "in the past, you flip the green light on . . . seven minutes it's done. . .

. This was all new."  (DPS 2044.)

 Redacted #13 said after Lockett was conscious during the five-minute check,

"Two minutes goes by; [redacted] checks - - you know, the last time, says he's

unconscious. The Warden says that. That's my cue to tell the executioners to continue to

push the rest of the drugs." (DPS 2047.)

"Once EXECUTIONER ONE was finished, EXECUTIONER TWO stood up and

the paramedic handed [redacted] a syringe."  (DPS 642.)   Defendant Executioner 2

"noticed that this syringe was much smaller than the normal syringes they had used in

previous executions." (DPS 642.) Defendant Executioner 2 pushed two syringes "labeled as number two" and "felt that both of these syringes were harder to push than normal. . . ." (DPS 642.) After he finished pushing the second of his two syringes, Executioner 2 "hear[d] what sounded like a moan come from inside the chamber, but EXECUTIONER TWO did not know if it was from LOCKETT." (DPS 642.)

Defendant Doctor X explained that after "they started infusing the medications, and it took a considerable amount of time, but [Lockett] he finally appeared to be asleep and then they asked me to assess him. I got up to assess him. Gave him some noxious stimulation, there was no response. Checked his eyes, they were, they constricted which is typical with some of the medications they gave him and they weren't reactive at that point, to the noxious stimulation, that is. Then at that point they started infusing the other meds, and I don't know what they were. In fact I didn't really care to know what they were. They started infusing them." (DPS 2146.)

Defendant Doctor X described his test for consciousness: "I blow in his eyes, I'll rub on his sternum, and I pinch him. I check his, his eye movement to see if there is any eye movement." (DPS 2156.) Defendant Doctor X stated, "I believe he was not unconscious the first time, sat back down, waited a little while, got up and then at point repeated and he was unconscious." (DPS 2156.) It was "probably two minutes" from the time he first assessed for consciousness to the second time he assessed. (DPS 2156.) Defendant Doctor X said that when he conducted first consciousness check, Lockett "was not completely. He, he was, he still had a little bit of a response. . . waited a few more minutes and checked him and he didn't have any response." (DPS 2185.)

Redacted #13 said that the second and third drugs were pushed separately, "one plunger at a time." (DPS 2047.) He explained, "Usually there would be two plungers . . . going at the same time with two lines but because of one line it was one at a time." (DPS 2047.)

Defendant Executioner 3 "is normally the last executioner to administer a syringe in the execution process." (DPS 644.) When it was his "turn," he "stepped up to the IV line and the paramedic handed [him] a syringe." (DPS 644.) He "push[ed] the entire syringe" and then he was given another syringe. (DPS 644.) Defendant Executioner 3 "took the second syringe and began to push it into the IV line slow and steady. At some point while administering the second syringe, [redacted] told EXECUTIONER THREE to stop." (DPS 644.) Defendant Executioner 3 "immediately stopped pushing, held onto the syringe for approximately 30 minutes and was then told to remove it from the IV line." (DPS 644.) Defendant Executioner 3 stated that the "syringe still had drugs remaining inside." (DPS 644.) Shortly before execution was stopped, one of the executioners told Defendant Paramedic Y, "it's tough to push the plunger right now." (DPS 1685.)

Redacted #13 said that they "actually stop[ed] pushing the drugs" "[w]hen [redacted] took the line out." (DPS 2059.) When he "saw the [redacted] remove the IV or the line," Redacted #13 "verbally" told the executioner to "stop." (DPS 2068.) When the execution was stopped, according to Defendant Paramedic Y, "there were 10 milliliters left" of syringe 3B, which contained potassium chloride that he wasted after Lockett died. (DPS 1679; *see also* DPS 1629, 1678, 1717-18.)

26

### E.    *"It was a bloody mess."*[15] **Behind the blinds.**

Defendant Trammell told [Redacted #7] "to close the blinds." (DPS 1166.)
Defendant Paramedic Y "heard [redacted] stay, they're lowering the blinds. They're
putting the blinds down and he's trying to get off the table.  I thought, wow. Okay.
What's going on.  And then all of a sudden [redacted] said they need you out there."
(DPS 1679.)  Once blinds were closed, Redacted #7 then walked to the door and "let the
phlebotomist[16] out to help the doctor."  (DPS 1167.)

Defendant Paramedic Y left the chemical room and went into the chamber. (DPS
1679.)  Defendant Paramedic Y explained what occurred when he went into the room
with Lockett: "[redacted] said I need to get another IV in the left femoral. And I said
okay. That's all I have is those inch and a quarters, still.  And he said okay.  We'll just
have to do the best we can."  (DPS 1680.)  Defendant Doctor X attempted to start another
femoral line on the other side, but he went into the artery. (DPS 2168.)  Defendant Doctor
X said he attempted to start another line before he learned there were no remaining drugs;
"[a]ll they had was the ones for the subsequent execution that was scheduled." (DPS
2183.) Defendant Doctor X did not know why he was trying to start another line. (DPS
2183.) No one ever asked him why he was starting the other line. (DPS 2184.)

Defendant Paramedic Y described Defendant Doctors X's attempt to set another
femoral line: "[H]e hit the artery and blood started backing up into the IV line.  And I

---

[15] Statement of Defendant Trammell. (DPS 2927.)

[16]  The interview transcripts often refer to a phlebotomist rather than a paramedic. It
appears that the phlebotomist and the paramedic are the same person, Defendant
Paramedic Y.

told him.  I said [redacted] you've hit the artery.  Well, it'll be alright.  We'll go ahead and get the drugs.  No. We can't do that.  It doesn't work that way and then I wasn't telling him that.  I mean I wasn't trying to countermand his authority but he was a little anxious."  (DPS 1626.)  Defendant Paramedic Y also stated, "I don't think he realized that he hit the artery and I remember saying you've got the artery. We've got blood everywhere." (DPS 1775.) Defendant Paramedic Y stated that after Defendant Doctor X hit the artery, Defendant Doctor X then "start[ed] trying to find the vein." (DPS 1681.) Defendant Paramedic Y did not know whether the execution had been stayed at that point.  (DPS 1681.)

Redacted #7 also was present when Defendant Doctor X  attempted to set another femoral line.   (DPS 1167.)  Redacted #7 described the events he witnessed: "I do remember that the doctor, again, went over there to this -- would be the left groin and tried to get a needle stuck in there and did get a needle -- and I don't know where got it at, but got a needle in there and blood came out of the back of it and got all over coat/jacket and shirt."  (DPS 1167.)  Defendant Trammell reported that when Defendant Doctor X attempted to insert line in the left groin, "blood squirted up and got all over his jacket then." (DPS 2931.) Defendant Trammell also mentioned that "it was a bloody mess" and Defendant Doctor X commented that he had to "get enough money out of this to go buy a new jacket." (DPS 2927.)

When Defendant Trammell was asked what the plan was if they found another vein given that there were not many drugs left, she said there was no plan.  Defendant Trammell explained: "Because the [redacted] I mean, kinda contradicted [redacted] I

mean [redacted] said you know 'No, there's not enough drugs left.' Then [redacted] said 'Well how am I supposed to know if there's enough drugs left?' and so we didn't have a plan." (DPS 2920.)

Redacted #7 stated, "the doctor kept running back and forth to the monitor to check him." (DPS 1167.)  Redacted #7 also stated that Lockett "raised up a little bit a couple of times and the phlebotomist told him to take deep breaths, you know, kind of out loud.  Whether [redacted] could hear them or not, I don't know. I did go over here and hold him down, you know, just so he wouldn't buckle or whatever. He'd -- I don't know what he would do but I just held his shoulder down on that side."  (DPS 1170.)  Redacted #7 says Lockett's movement "was a little bit more aggressive" than Lockett's movement before the blinds were lowered.  (DPS 1172.)  Redacted #7 explained that because of the restraints, Lockett's "not able to get up very far but he did raise up a little bit."  (DPS 1173.)  Redacted #7 reported, "He might have mumbled a little bit more, too, when we were there or after the -- after the blinds went down. But, again, it was just mumbling." (DPS 1173.)

F.    **"[T]he director knew that if he requested us to stay it we would stay it."[17]
The order to stay Lockett's execution.**

Defendant Patton was seated in the witness room when the blinds were closed.  He received a call from Defendant Trammell from inside the chamber, and Defendant Trammell told him that either the "vein had blew or the vein collapsed." (DPS 1825.) Defendant Patton then explained what happened next: "I asked her specifically, 'has [sic]

---

[17] Statement of Jennifer Chance, Deputy General Counsel to the Governor. (DPS 434.)

enough drugs been administered to cause death?' She repeated the question to the doctor and I clearly heard him say in the background, 'No.' I then asked, 'Is there another vein available and if so do you have another set of chemicals back there?' She repeated the question to the doctor and the doctor said, 'No.' And then I asked, I said, "I wanna be clear with this, Warden, and I want you to ask the doctor specifically. Has enough drugs entered into the inmate's system to cause death?' She repeated the question to the doctor and again the response was, 'No.'" (DPS 1825.)

Defendant Patton then briefed the Governor's office: "I was recommending that we stop the execution at that time. [Steve Mullins General Counsel with the Governor's office] concurred with my stopping the execution." (DPS 1826.) Defendant Patton then "got the Warden back on the phone, I told the Warden, 'At this time, I'm stopping the execution and the Governor is gonna issue a stay for the second execution and that I'd be removing the witnesses from the room." (DPS 1826.) According to a hand-written ODOC log, the execution was called off at 6:56 p.m. (DPS 4402), one hour and thirty-four minutes after Lockett was placed on the execution table. Defendant Patton said, "Prior to the last witness leaving, the Warden called me back on the phone and said the offender had expired--had died. And I said, 'Wow. Was it the chemicals or what?' And she--and at that time I believe she said, 'The doctor says he had a massive heart attack.'" (DPS 1826.)

Assistant Attorney General John Hadden recalled Defendant Patton "saying something along the lines of we've applied all the drugs that we had for him and he's not deceased yet. The doctor doesn't know and can't tell from just looking at him if there's

enough for him to expire or not." (DPS 908.)  And then Hadden said, "[redacted] did ask, you know, should we -- is it an option, I think [redacted] said to use the drugs from Mr. Warner's execution in this one and I think Tom [Bates, First Assistant to the Attorney General] immediately said no. But I remember thinking in my head, no, we can't. That's not what the protocol says. We can't do that." (DPS 908.)  Hadden also said at some point, the Director said, "I'm going to go ahead and stop the execution on my authority and . . . I'm gonna stay the second one too . . . until some other time but definitely not tonight." (DPS 904.)

Steve Mullins, General Counsel to the Governor, was at the Governor's office during Lockett's execution and was notified at some point "that there was a problem." (DPS 1394.)  Mullins explained, "When the blinds are lowered, we now have an obligation in our office. We now have an execution that has a significant issue. We now have to start making some legal decisions." (DPS 1394.)  He further stated that [redacted] began "working on and Executive Order to stay the execution if we needed it." (DPS 1394.)  Mullins first spoke to DPS Commissioner Michael Thompson who "recommended that we terminate the execution." (DPS 1396.)  Then, Mullins spoke with Tom Bates, who is First Assistant to the Attorney General and asked, "Tom, what authority do we want to use to stop the execution? He said I have not made a recommendation to the Director yet." (DPS 1397.)

Then, Mullins spoke with Defendant Patton: "first I asked him, do you want to stop the execution?  He said, yes. I said what authority do you want to use? And he -- he said, I don't know. And to be fair, I'm not sure he knew there were options, he just knew

that was the right thing to do."  (DPS 1398.) Mullins then told Defendant Patton, "I said the Governor will stop it under her authority. So I said you have the authority to stop the execution. The Governor will issue a Stay." (DPS 1398.)

Mullins then called the Governor to update her and the Governor asked, "where are we taking Lockett?" (DPS 1399.)  Mullins contacted Defendant Patton to find out, and Defendant Patton said, "I need to tell you something. Lockett has suffered a massive heart attack and passed away."  (DPS 1400.)  Mullins called the Governor and told her that Lockett had passed away. (DPS 1403.)  The Governor asked how, and Mullins stated, "I don't know for sure what happened. If our drugs got there; if the stress of the event did it; I don't know why. . . . But I said he's passed away, so the execution has been carried out." (DPS 1403.)

Jennifer Chance, Deputy General Counsel to the Governor, stated, "the director made the final decision to request the Governor . . .  order a stay and the director knew that if he requested us to stay it we would stay it." (DPS 434.)  Chance said that "in an earlier meeting," the Governor's office had communicated to Defendant Patton that if he requested a stay, it would be granted.  (DPS 434.)  According to Chance, "the director said, 'I'm asking that the Governor issue a stay for both.'" (DPS 435.)  Chance said that she and Steve Mullins, the Governor's General Counsel, have "the authority to that on behalf of the Governor." (DPS 435.)  Chance said from the time that that it was decided the execution should be stayed until Lockett passed away was "within 10 minutes." (DPS 437.)  Chance said, "there was no discussion that I was witness to about life saving efforts. And I don't--the director was off the phone and then back on the phone and as

soon as he got off the phone and said we want the two stays, I went to my office." (DPS 438.)

Redacted #2 said that "Commissioner Thompson indicated to use – I believe that there was an issue with the IV and the drugs getting through but at that time didn't say -- it said the inmate is still currently alive. He hadn't died at this point so it was probably 6:45, 6:50."  (DPS 413.)  Redacted #2 further said that Commissioner Thompson "had indicated that there was clearly some fluid around where the IV was. He didn't say whether or not that was the first drug, second drug, third drug, blood, just bodily fluid but said that there was I believe some fluid around where the insertion point on the IV was." (DPS 419.)

According to Redacted #2, Tom Bates then spoke with Mullins and "said something to the effect of kind of based on what I've seen I think we should not proceed with the execution, um, and call off the second one."  (DPS 420.)  Redacted #2 said Mullins then "talked to Director Patton and asked him, do you wanna call the execution off under your authority? Would you rather have us as -- under our authority order you to call off the execution. Director Patton was unsure. He just indicated to us that he wanted it to be called off at that time. So Steve [Mullins] ordered the execution be called off under the authority of the Governor." (DPS 413-14.)  Redacted #2 stated that it was "20, 25 minutes probably" from the time that the Governor called off the execution until Lockett died. (DPS 417.)

Travis Brauer, the Governor's aide, said that Mullins and [redacted] were talking to "one of the AG guys and possibly the warden" and "they made the point that the

warden can issue an emergency stay and then at that point in time, I knew . . . that we were going to have to file an executive order issuing the stay so we exited the room to try to get ahold of Secretary Benge." (DPS 360.)

G. **"*[T]he purpose of being there was to provide an execution . . . and we were told not to reverse it.*"[18]** **No post-stay life-saving measures were taken.**

Defendant Doctor X stated that Defendant Trammell asked him if Lockett could be resuscitated.  (DPS 2167.)  Defendant Doctor X stated that he would have to take Lockett to the emergency room, but someone told Defendant Doctor X that they could not do that.  (DPS 2167, 2176.)  Defendant Doctor X said that he could have started "CPR and advance cardiac life support." (DPS 2188.) Defendant Doctor X said that there are drugs to reverse midazolam "[b]ut that medication I doubt was available there." (DPS 2188.)

Defendant Paramedic Y stated that there were no lifesaving measures given. (DPS 1683.)  When asked why he thought lifesaving measures were not given, Defendant Paramedic Y stated "[b]ecause the purpose of being there was to provide an execution . . . and we were told not to reverse it."  (DPS 1684.)

Redacted #13 said that there was not "[a]ny discussion about lifesaving measures." (DPS 2062.)  Redacted #7 said that Defendant Trammell asked "if they could bring him back to life" and he thought Defendant Doctor X "said no."  (DPS 1215.) Redacted #7

---

[18] Statement of Defendant Paramedic Y. (DPS 1684.)

also said that Defendant Paramedic Y "didn't have the medication there to - - to - - I guess reverse the - -."  (DPS 1215-16.)

Defendant Doctor X stated that Lockett "got enough medication to make him unconscious.  I mean, so the medication was getting into there, a certain amount of it, at what point it stopped, I don't know." (DPS 2176.)  Defendant Doctor X stated, "he obviously had enough medication in him to make him unconscious and enough to, you know complete the execution." (DPS 2177.)

Defendant Trammell said that after the blinds were closed, someone was checking the electrocardiogram.  (DPS 2908.)  Defendant Trammell asked this person, "'Are you gonna call it?' [redacted] said 'Not yet.'"  (DPS 2908.)  Defendant Trammell then explained, "So I asked [redacted] a couple of times and [redacted] got pretty frustrated with me."  (DPS 2908.)

### H.    *"[I]t was very bad."*[19] ODOC's initial response to the Lockett execution.

Gary Elliott is Assistant General Counsel for ODOC. (DPS 618.) Elliott was at OSP during Lockett's execution, but "never left the administration building" and "remained there until after the debriefing." (DPS 620.)  During the debriefing, according to Elliott, Defendant Patton said there were issues with Lockett's execution and that "the second execution had been called off for the evening."  (DPS 623.)  Elliott said that Defendant Trammell "spoke and talked about what she had observed during the

---

[19] Statement of DefendantTrammell. (DPS 1190.)

execution process, about Lockett's movements, about him trying to either trying to speak or making audible sounds at least." (DPS 624.)

Elliott said that Defendant Trammell also "talked about the fact that there were issues with getting the IV started."  (DPS 624.)  He also stated, "I think she and the Director both made comments about the fact that after the execution began on the 5 minute check for consciousness that he wasn't conscious. This didn't surprise the Director. I think it was the first time due to the different drug that was used that perhaps Warden Trammell had experienced the fact that if you're still conscious after five minutes. She stated that she waited two more, he's unconscious at that time. Both she and the doctor had determined that."  (DPS 625.)

Elliott said that Defendant Trammell then "talked about him moving his feet. About that it appeared that he raised or attempted to raise his head on one or more occasions."  (DPS 625.)  And, according to Elliott, Defendant Trammell said "that at some point, and it was clear to her that he was no long unconscious when he should have been. That she made a decision to close the curtains and then some short period of time afterwards he was unconscious and pronounced dead."  (DPS 625.)

When asked if Defendant Trammell talked about why they knew there was a problem and why they lowered the blinds, Elliott said, "To the best I remember just the fact that he obviously got to the point where he wasn't unconscious, was still moving when he shouldn't have been. That they were well into the process and time had passed that you've got a guy here moving who shouldn't be moving. She talked about the sounds. Talked about movements." (DPS 625.)  Elliott expressed: "My memory is that

36

that was the purpose for lowering the curtain was the fact that he exhibited signs of not being unconscious. . . . I know that it was clear to her that he was not unconscious at some point after the seven minutes when they decided that he was and that that was the reason that she decided to lower the curtain." (DPS 628.)

Redacted #7 was present at a debriefing after Lockett's execution.  (DPS 1188-89.)  Redacted #7 said, "the Warden, you know, said it was very bad.  You Know.  And said we'd all be  - - said we'd all be going to federal court."  (DPS 1190.)

## IV.    *"It's not working."*[20] **Witness accounts of the Lockett execution.**

Defendant Patton stated, "When it hit five minutes and the doctor goes to check consciousness, I knew he wasn't unconscious. You know, he was still opening his eyes, blinking." (DPS 1822.)   But after Defendant Doctor X determined he was unconscious after seven minutes, and shortly after the other sets of chemicals were being administered, Defendant Patton saw Lockett "start moving, start straining against the restraints, heard at least two utterances from him." (DPS 1822.) Defendant Patton stated, "I heard him say the word 'man', he did strain, he did--I guess a good word is to kinda bear [*sic*] his teeth a little bit. He had appeared, and by no means am I a medical professional, but it did appear that he was at least tremors.  I'm not sure it was convulsions, but there were--he was having tremors in his legs, mainly. You know, the reaction from the witnesses was pretty intense."  (DPS 1822.)

Defendant Patton  described Lockett's movement: "he was trying to pull up and his head was pulling up off the table. . . and kind of bearing [*sic*] his teeth."  (DPS 1823.)

---

[20] Statement of DefendantTrammell. (DPS 2906.)

Defendant Patton was not looking at Lockett's head, but was "focused a lot where the tremors were happening in the leg area and looking at the Warden." (DPS 1824.) According to Defendant Patton, Defendant Doctor X then "walks over, lifts the sheet up, says something to the Warded [*sic*], I don't know what he said" and then the blinds were lowered. (DPS 1824.) When the doctor lifted the sheet, Defendant Trammell stated that she saw underneath the sheet and saw "[a] clear liquid on top of his groin area . . . and blood." (DPS 2915.)

After Defendant Doctor X declared Lockett unconscious, and while the other drugs were being administered, Defendant Doctor X indicated Lockett "raised his head up" and "kind of jerking it."   (DPS 2158.) Defendant Doctor X noticed "that [Mr. Lockett] started moaning" and "thought he was seizing." (DPS 2146.)   Defendant Doctor X said, "at some point, I just decided, hey, there's something wrong.  I got up and told her [Warden Trammell]. I guess at that point she pulled the curtain. I looked at the, I removed the sheet and you can see where the line had infiltrated." (DPS 2166.) Defendant Doctor X described the infiltration site on the skin as being "smaller than a tennis ball but larger than a golf ball." (DPS 2167.)

Defendant Trammell was in the room with Lockett.  She said that after Defendant Doctor X determined Lockett was unconscious, "they started pushing the second drug." (DPS 2905-06.)  She said "it looked like everything was going okay, just really slow." (DPS 2906.)  "And then he moved his mouth side to side like that and I thought, that's odd."  (DPS 2906.)   She then said "a little while l-later . . .  he started shaking, quivering." (DPS 2906.)  Defendant Trammell reported that "he mumbled something like

an odd sound" and "he raised, try to raise his hands and his feet and his head up." (DPS 2906.)  Defendant Trammell further explained: "He raised his head up and at some point he said something and the media said that he said something's wrong. I don't know if that's what he said or not. It was just something that I recognized. I thought he said something but I can't remember exactly what it was because I was just—you know inside I didn't know what to—I mean, I was kind of panicking. Thinking oh my God.  He's coming out of this. It's not working. . . ." (DPS 2906.)

Redacted #13 said, "Third drug is when we started seeing something . . . . [Mr. Lockett] mumbled something." (DPS 2049.)  As to when Lockett moved, Redacted #13 stated, "It was the third drug in between the -- during the third drug for sure, but I couldn't tell you if it was during the second at all." (DPS 2055.) Redacted #13 explained that Lockett looked like "he was trying to get up out of the -- out of the -- and we had him strapped down and taped down and wouldn't let him. Arching his back." (DPS 2049.)  He further explained, "I guess to an extent you could say it was aggressive. I guess. I mean, like I said we never used this stuff before so, you know,. . . he tried to get up. In my opinion he tried to get up, because it floored me." (DPS 2050.)

Jeanetta Boyd was present at Lockett's execution as the victim's family escort. (DPS 320.)  Boyd had been part of "several" executions, but she said, "I've never seen anything like, quite like that before." (DPS 322.)  "He just wouldn't die." (DPS 322.) Boyd said, "[A]fter the medication was given, like I said, he still was talking." (DPS 322.)  She noted that "he said at one point, 'This is messing me up.'" (DPS 323.)  "One point they said he was unconscious, and he tried to raise up." (DPS 323.)  Boyd said,

"when they decided to stop the process, or, or whatever it was or however they worded it, when the closed the curtains, he was still moving somewhat."  (DPS 327.)

Edith Treasea Shoals, who is a Victim Services Advocate with ODOC, has witnessed about nine executions.  (DPS 2426.)  Shoals witnessed Lockett's execution from the overflow room. (DPS 2441.)  Shoals said that when Defendant Doctor X "walked up there to him and checked him, he opened his eyes and looked at the Medical Examiner and says . . . shit's fucking with me."  (DPS 2430-31.)  Shoals said the lady next to her jumped up and ran out of the room.  (DPS 2431.)  Shoals said "it was like a horror movie . . . he kept trying to talk." (DPS 2431.)  She explained, "[W]hen he first opened his eyes and looked at the Medical Examiner and that's what scared - - scared us."  (DPS 2439.)  Shoals said that "he started trying to raise his raise, like, three or four times to get off the gurney, like he was trying to get up or something." (DPS 2433.) She also said, "I don't know exactly what he was saying but he was saying -- mumbling and saying things as he was trying to get up."  (DPS 2445.) And she said, "Medical Examiner went over and checked, I guess, where he had the needle at in his -- and that -- I never seen that happen either. I never seen that happen." (DPS 2431.) When the monitor was cut off, Shoals said Lockett "was still kicking. He was just bucking like a little -- like he wanted to get off the gurney." (DPS 2438.)

Karen Rae Cunningham, a victim services coordinator with the Attorney General's office, witnessed the Lockett execution.  (DPS 503.)  Cunningham has "been to a few of these before" (DPS 505); this was her "tenth or eleventh" (DPS 509).  After Cunningham heard the "warden say he's unconscious," she saw Lockett move and start talking.

40

Cunningham said, "He did raise up more than what I had ever seen . . . and I heard him say man at one time and that's the only legible thing I could ever hear him say." (DPS 506.)  Cunningham said, around 6:38pm, Lockett "started moving a little bit more and then immediately after that" the execution was stopped and the blinds were shut.  (DPS 506.)  Cunningham "could see that he opened his eyes some . . . just open and shutting his eyes." (DPS 507.)

Lisbeth Exon witnessed the Lockett execution as a member of the media. She said that the first drug was administered from 6:23pm to 6:35pm, "from 6:23:35 to 6:28 Lockett is staring at the ceiling, his eyes are blinking and he's occasionally licking his lips fully conscious." (DPS 649.)  Exon said, "[a]t 6:30:25, the doctor opens Lockett's eyes and kind of thumps on his chest and says something to the warden and then the warden announced . . . Lockett is not unconscious." (DPS 649.)  Exon reported that "at 6:32 Lockett's eyes are closed and his mouth is just open and the doctor approaches him again, opens his eyes, thumps and rubs his chest and then the warden declares Lockett is unconscious." (DPS 649.)  Then, Exon said "he kind of lifts up and he kind of goes over that way to the right and says something's wrong, like something's wrong is what I heard him say." (DPS 649.)  Exon further stated, "At 6:37:59 Lockett is grimacing and lifting his head and shoulders off the gurney and shortly thereafter he lifts his upper head and shoulders with, with all lot more force off the gurney and he mumbled man."  (DPS 650.)  Exon described Lockett's face as "squitching up his eyes ya know like you would if you were in pain."  (DPS 655.)  She said, "The grimace was consistent with somebody I've seen in pain. . . . Severe pain." (DPS 655.)

41

Exon said, "at 6:39 he's still writhing, his head up is high and his shoulders off the gurney and then right then when he did that pronounced lift up, the warden announces we are temporarily closing the blinds." (DPS 650.) Exon explained that Lockett's movements "progressively got more pronounced." (DPS 653.)  She said, "I don't know how far up the restraints were on him but I mean he, he was pretty powerful." (DPS 653.) Exon was asked why she thought he was conscious when he was moving and she explained:   "Because of the statements he made, the slurred statements and the deliberateness of his movements off that gurney, . . . the lifting off the gurney and his head and his shoulders was, was a voluntary movement. It wasn't ya know that he ya know there was some, nerves stimulated something that made his body do that like a convulsion." (DPS 660.)

Redacted #1 was in the "viewing chamber with the Director."   (DPS 274.) Redacted #1 said, "[N]ormal executions they're usually over between six and seven minutes." (DPS 296.)   Redacted #1 said he "knew it was taking a lot longer than it usually does."   (DPS 296.)   He said that Lockett "raised up a couple of times and he shouldn't have been moving like that.   " (DPS 297.)   Redcated #1 also reported that Lockett "was making some noises but [he] couldn't understand what he was saying." (DPS 297.)   According to Redacted #1, after Lockett was pronounced unconscious, "he did raise up a couple of times." (DPS 298.)

John Hadden, an assistant attorney general, said that "around four minutes, four and half minutes or so [Lockett] closed his eyes and his jaw went a little slack as if he was asleep or something."  (DPS 901.)  Hadden then saw the doctor do a consciousness

check and "started out saying his name or something and shaking him. And [redacted] did one where [redacted] struck his eyelash and then the last one was [redacted] took [redacted] knuckles and rubbed them on his rib cage pretty strongly. And so the first conscious check [redacted] said he's not unconscious and sat back down. He didn't look to me lie [*sic*] he moved though. So I don't know how determined that." (DPS 901.) Hadden then said, "So they waited two more minutes and then did it again and at that point [redacted] said he's unconscious." (DPS 901.)

Then, according to Hadden, "I don't remember how long it was, probably a minute, he mumbled something or made some kind of sound. . . . And then at some point he kinda did it again bit this time he kinds raised his head up a little bit. . . . He kinda would as, you know, time would kinda go on it was almost like he was trying to get up." (DPS 902.) Hadden said, "he would murmur things occasionally but again they were unintelligible words to me." (DPS 902.)

Bates, First Assistant to the Attorney General, said that Lockett "did raise up his – kind of his chest up off the  – off of the gurney and he mumbled something." (DPS 160.) Bates said "his upper body, chest came off the gurney" (DPS 192) and described the movement "kind of like you're doing a crunch" (DPS 193). Bates was not sure what Lockett said; "[m]aybe it was, something man." (DPS 161.)

Redacted #2, who was listening to execution from Governor's office, said, "we did hear noises from the chamber but I couldn't make out any words. It sounded more just kinda grumble, mumble. . . ." (DPS 412.) Brauer, who also was listening to execution from Governor's office, said he "[h]eard a moaning noise." (DPS 358.) He described it

43

as "a muffled moaning noise that we heard." (DPS 359.)   At that point, according to

Redacted #2, "the curtains were ordered down and then the doctor and other people came

back into the chamber. And so at that point in our office we started to kind of -- at that

point we realized, okay, something's not right. . . ." (DPS 412.)

## V.     Oklahoma's responses to the Lockett execution

### A.     Uncontested facts

On April 30, 2014, Oklahoma Governor Mary Fallin issued Executive Order

2014-11, appointing Michael Thompson, the Commissioner of Department of Public

Safety (DPS) and Secretary of Safety and Security in Governor Fallin's cabinet, to

conduct a review of events surrounding Lockett's death. (Doc. 96, ¶43.) Secretary

Thompson was the highest ranking state official present at Lockett's execution. (Doc. 96,

¶43.)

The Executive Summary of the DPS investigation reports varying descriptions of

what occurred between 6:42 p.m. and 7:06 p.m., after the blinds were closed: Lockett was

still; Lockett was slightly moving; and Lockett moved aggressively. (Doc. 96, ¶46.)  The

transcription and audio-tapes of the interviews of these behind-the-blinds witnesses have

not been made public or produced to Plaintiffs. (Doc. 96, ¶46.)    There was an

electrocardiogram (EKG) machine hooked up to Clayton Lockett during his execution.

(Doc. 96, ¶46.)  Only two pages of the EKG strip from Lockett's execution, representing

the last seconds of his life, have been made public and produced to Plaintiffs. (Doc. 96,

¶46.)

The Executive Summary does not address why no emergency measures were taken to reverse the effects of the lethal chemicals after Lockett's execution was stayed by Governor Fallin. (Doc. 96, ¶46.)  According to the Executive Summary, Defendants Patton and Trammell admit that the training of ODOC personnel for Clayton Lockett's execution was inadequate. The DPS materials documenting these admissions and clarifying whether the inadequacy of the training extended to non-ODOC personnel have not been released to the public or produced to Plaintiffs. (Doc. 96, ¶46.)  In its Executive Summary, DPS made several recommendations regarding future lethal injections in Oklahoma that have not been incorporated into the September 30, 2014 Execution Procedures. (Doc. 96, ¶46.)

## B.      Preparation of timeline.

On the morning after the execution, a "group of people . . . helped prepare the timeline of events" for the letter from Defendant Patton to Governor Fallin.  (DPS 627.)  Elliott was one of the members of the group, as was Warden Trammell, Scott Crow, Ed Evans, and "Navel Massey."[21] (DPS 627.)  Elliott said that Defendant Patton "came in and told us what he wanted done and gave us direction of what he wanted done but then he was not in the room while we worked on it." (DPS 627.)

## C.      ODOC officials' response.

Defendant Trammell said: "Was [*sic*] there mistakes made? Yes, but it was the ultimate goal was to execute the offender." (DPS 2951.)

---

[21] The transcript likely is referring to Jerry Massie, who is the Public Information Officer for ODOC.

Director Patton said, "[A]t the conclusion of the [DPS] investigation we'll know what went wrong and we're gonna fix it."  (DPS 1838-39.)

The DPS Executive Summary of the investigation into the Lockett Execution provided very general descriptions of the witnesses' observations of Lockett's movements and sounds, and generally minimized them. (Pls.' Ex. 65 at 83.)[22]  The Executive Summary concluded "the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs." (Pls.' Ex. 65 at 14) Nothing in the Executive Summary indicated that it was informed by any significant investigation or inquiry into the use of midazolam as the first drug in the three-drug combination. The Executive Summary offered no recommendation regarding whether midazolam should or should not continue to be used in executions.

While the Executive Summary reported midazolam had distributed throughout Lockett's body at a concentration greater than the therapeutic level necessary to render an average person unconscious (Pls.' Ex. 65 at 71-72), it offered no explanation of how Lockett was able to speak and move despite the midazolam in his system.

**D.      Changes to written protocol: chemicals and team members**

Director Patton, in an email to a former colleague in Arizona, indicated he planned to rewrite Oklahoma's execution procedures months before the Executive Summary recommended any changes. (Defs.' Resp. to RFP 6260.)  "Director Patton assigned [ODOC Administrator of Field Operations, Scott Crow,] with the responsibility of

---

[22] The transcripts of the interviews of witnesses are very detailed and describe what responses Lockett had in graphic and disturbing detail.

putting together a committee for the purpose of developing a framework for what would later become the new execution policy for the Department of Corrections." (Crow Depo. Nov. 26, 2014, 32:18-22.)   For the committee, Crow selected "West division manager Greg Williams[,] [e]ast division security operations manager Becky Guffy[, and] [i]nvestigator supervisor Carl Wilkes with the inspector general's office." (Crow Depo. Nov. 26, 2014, 33:3-6.)  Crow indicated that Dr. Lee Evans was consulted regarding the execution policy.  (Crow Depo. Nov. 26, 2014, 33:21-34:6.)  Crow explained, "As we progressed through the process, I am confident there were other people that were involved such as [ODOC General Counsel David] Cincotta and others that may have had communications with other states or other colleagues or professionals." (Crow Depo. Nov. 26, 2014, 36:18-22.)

ODOC has admitted that the current protocol does not require the Warden to be present at the execution, and the Warden may not even be at the prison. (Crow Depo. at 174:1-21.)  This is inconsistent with Oklahoma law. *See* 22 Okla Stat. § 1015(B).

The protocol does not require that a doctor, an EMT, or a paramedic be involved in the execution. (Crow Depo. Nov. 26, 2014, 183:18-184:5.) State statute, however, requires death to be pronounced "by a licensed physician according to accepted standards of medical practice." 22 Okla Stat. § 1014(A). ODOC has made no decision *not* to use Defendant Doctor X or Defendant Paramedic Y in future executions.  (Crow Depo. at 152:18-153:25.)

**O**DOC admits that the audio feed from the chamber to the witness viewing area will be switched on and off during the course of an execution.  (Crow Depo. at 190:17-

191:4.) Witnesses will be unable to hear any sounds from the execution chamber after the prisoner has spoken his last words, except when announcements are made regarding unconsciousness and death.

The current protocol requires the IV Team to attend training 24-hours before an execution and no training scenarios exist. ODOC has also admitted that there is no written curriculum for training of the personnel involved in executions. (Crow Depo. at 89:14-90:6.) The training of the Special Operations Team members that have been conducted presumes there are two viable IV access points. There have been no training scenarios unique to midazolam. The scenarios deal with syringe failure, unruly or disruptive offenders, and ECG lead issues.  The scenarios are all designed to continue forward with an execution despite what reaction an offender may be having to midazolam.  All scenarios presume the offender is determined to be unconscious and does not become conscious.  (*See* Defs' Exs. 16-23.)

The current protocol's procedures for monitoring consciousness would not have prevented what happened to Lockett.  The person who is to determine a prisoner's state of consciousness after the administration of midazolam does not have to be a physician, nor does the person have to have any qualifications in assessing consciousness.  The protocol has no life-saving procedures in place in the event an execution is stayed after at least some of the chemicals have been administered.

On November 26, Crow stated that "[t]he department is in the process of acquiring those drugs." (Crow Depo. Nov. 26, 2014, 101:3-7.)  That same day, Hadden wrote a letter to Plaintiffs' counsel stating that ODOC has "sufficient drugs to carry out the

executions of the four inmates currently scheduled have been obtained. The drugs are midazolam, rocuronium bromide and potassium chloride." (Doc. 119-1.) The letter additionally stated that ODOC "continues to seek dosages of pentobarbital and sodium pentothal as well. In the event either is located they reserve the right to utilize the single drug protocol specified in Chart A or B." (Doc. 119-1.) And, Crow stated that sodium thiopental is difficult, but not impossible, to obtain. (Crow Depo. Nov. 26, 2014, 193:13-20.)

## VI. The Lockett execution provides evidence that midazolam is inappropriate for use in executions.

The execution of Clayton Lockett provided perhaps the best clinical experimental evidence that midazolam is a poor drug for executions. The entire dose of midazolam was delivered either through Lockett's vein and/or through tissue, depending on when venous access failed. Midazolam has a relatively rapid absorption rate whether injected through the vein or intramuscularly. Lockett was rendered unconscious by the midazolam, however it was introduced. In contrast, the paralyzing agent, vecuronium bromide, is much less effective when delivered through tissue. Thus, Lockett was not paralyzed. What happened next was therefore apparent for all to see.

When the potassium chloride was introduced, Lockett was subjected to the excruciating pain produced by that drug. He was awoken from unconsciousness. He writhed, spoke, and jerked in pain. The problem was so obvious that Defendants had to close the blinds. As the executioner continued to push potassium chloride, Lockett experienced its effects. Midazolam provided no relief from his pain. Nor did midazolam

keep him sedated upon the introduction of noxious chemicals, particularly potassium chloride.  What occurred during Lockett's execution demonstrates that midazolam cannot reliably and consistently maintain a plane of anesthesia and thus is unsuitable as the first drug in a three-drug lethal-injection formula.

## VII.   Facts supported by expert testimony.

### A.   Midazolam

Midazolam is the shortest acting benzodiazepine on the market. Benzodiazepines are a class of drugs primarily used for treating anxiety. In clinical use, midazolam is typically administered prior to the induction of anesthesia for surgery to treat and sedate a patient. (Lubarsky Report, Opinion at 2, ¶ 2.)

### 1.   Ceiling effect

Midazolam has a ceiling effect on anesthetic depth. This means that, after a certain effect has been achieved, continued administration of midazolam has no further effect. (Lubarsky Report, Opinion at 3, ¶ 5; Sasich Report at 4, § B.)

While there is no scientific literature or data addressing the use of midazolam in human executions or in animal euthanasia, the recent execution of Joseph Wood in Arizona provides objective, scientific evidence of the inability of midazolam to guarantee sufficient anesthetic depth to allow a condemned prisoner to withstand the noxious stimuli of the second and third drugs.  According to the Arizona Department of Corrections, Joseph Wood was given a total of 750 milligrams of midazolam, which is 250 milligrams more than the amount called for in Oklahoma's protocol. (*See* Arizona Department of Corrections Press Release, Aug. 1, 2014, at

https://corrections.az.gov/article/independent-review-process-wood-execution-underway.) The ceiling effect of midazolam was demonstrated during the execution of Wood.  He was administered large doses of midazolam, but those large doses did not cause cessation of breathing or prevent movement, both of which would cease in a person placed in a deep levels of anesthesia. Cessation of movement and breathing is also consistent with very large doses required to cause death in animals. (Lubarsky Report, Opinion at 5, ¶ 19.)

There is no evidence to suggest that a 500 mg dose of midazolam, rather than a 100 mg dose, would have prevented the events that Lockett suffered. (Sasich Report at 7, § IV.)

### 2.    No analgesic effect

Midazolam has no analgesic (i.e., pain relieving) effect. (Sasich Report at 3, § A; Lubarsky Report, Opinion at 2, ¶ 3.)   Midazolam is not intended for use as a total anesthetic. Although midazolam can be used to *induce anesthesia*, it has no analgesic properties, and without the addition of pain-relieving drugs, does not render one insensate to noxious stimuli.  Therefore, midazolam is not suitable as a form of anesthesia as a single drug. (Lubarsky Report, Opinion at 2, ¶ 3.)

### 3.    Paradoxical reactions

The product label for midazolam warns of paradoxical reactions.  (Sasich Report at 4, § C.)   A paradoxical reaction is when the drug does not work as intended. Paradoxical reactions manifest in many ways, including hyperactivity and restlessness,

but are not attended by the expected sedative effects, and are addressed by reversal of midazolam, not further administration.   (Lubarsky Report, Opinion at 3, ¶ 8.) A paradoxical reaction can occur after a person is adequately sedated.  (Sasich Report at 5, § C.)

There is a significant risk of a paradoxical reaction when midazolam is given to vulnerable populations, such as the elderly and people with a history of aggression, impulsivity, alcohol abuse or other psychiatric disorders.  (Lubarsky Report, Opinion at 3, ¶ 9; Sasich Report at 4-5, § C.)   In the prison population, which includes those likely to experience paradoxical reactions, midazolam might not cause sedation of sufficient length for the execution, and instead might induce anxiety, discoordinated movement, hyperactivity and/or aggression. (Lubarsky Report, Opinion at 3, ¶ 9.) Plaintiffs Glossip, Grant, and Cole have histories of some or all of the risk factors that make paradoxical reactions to midazolam more likely.  (Pltf RFP 294-96; 255-285, 286-293, 2005.)

### 4.     Midazolam in Oklahoma's three-drug execution protocol

ODOC's three-drug protocol using midazolam requires sequential intravenous injection of 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. (Doc. 96, ¶50.)  It is uncontested that the administration of 100 milligrams of vecuronium bromide will produce paralysis and a slow death by asphyxiation that will be agonizing if administered to an aware individual. After this agent takes effect, an individual under its influence will be unable to communicate the terror, pain, and needless suffering being experienced (Doc. 96, ¶50.) It

is uncontested that when administered to an aware individual, 240 milliequivalents of potassium chloride, which is intended to cause death by cardiac arrest, will produce burning and intense pain as it circulates through the body. (Doc. 96, ¶50.) The use of midazolam, followed by vecuronium bromide and potassium chloride, creates a significant risk of serious harm to condemned prisoners. It also amounts to experimentation on human subjects and vulnerable populations. (Lubarsky Report, Opinion at 3, ¶ 21.)

Midazolam is an unsuitable and inappropriate choice as the first drug in Oklahoma's three-drug lethal-injection protocol for three reasons. First, midazolam has a ceiling effect and therefore cannot guarantee that a person will be unconscious and insensate to the effects of the second and third drugs. Second, midazolam has no analgesic properties. Therefore, even if it is able to produce unconsciousness when a 500 milligram dosage is properly administered, the noxious stimuli of the second and third drugs can overcome its sedative effect. Third, midazolam presents a risk of paradoxical reactions. (Lubarsky Report, Opinion at 3, ¶ 15; Sasich Report at 7, § IV.)

Vecuronium bromide is a non-depolarising neuromuscular blocking agent. (Sasich Report at 5, § II.) In an execution, it will paralyze a prisoner and render him unable to convey pain or suffering. If conscious, a prisoner will experience a sensation akin to being buried alive, but will not be able to convey the feeling of pain or suffocation. The paralysis will camouflage any voluntary movement that might result from an incomplete loss of consciousness. (Lubarsky Report at 4, ¶ 12.) Potassium chloride is a caustic chemical. (Lubarsky Report at 4, ¶ 14.) Solutions containing

potassium are irritating to tissue.  (Sasich Report at 5, § III.)  Potassium chloride will cause excruciating pain to a prisoner upon injection if he is not in a surgical plane of anesthesia.  (Lubarsky Report at 4, ¶ 14.)

In addition to the risk that midazolam will not induce and maintain an adequate level of anesthesia, there is an additional risk that the execution team is ill-equipped to assess whether the prisoner is insensate.  When a condemned prisoner is subjected to noxious stimuli, such as air hunger following an injection of vecuronium bromide or the searing pain of potassium chloride, there is a significant risk that the prisoner will awaken. While a heavily sedated prisoner might not respond to less-noxious stimuli – name calling or a subtle pinch – that is very different from being starved for air once paralyzed or having a caustic chemical injected intravenously.   Without an adequate determination of the prisoner's depth of anesthesia, administration of the vecuronium bromide and potassium chloride creates a significant risk of extraordinary pain and suffering.  (Lubarsky Report, Opinion at 3, ¶ 16.)

The use of midazolam in executions amounts to failed human experimentation. There is no information on the effects of these drugs in large doses. Nevertheless, Departments of Corrections have hypothesized three highly unlikely ideas to support their lethal-injection protocols: (1) a surgical plane of anesthesia could be achieved and maintained with midazolam alone even though extrapolation of the ceiling effect data suggests otherwise;  (2) that midazolam could produce a surgical plane of anesthesia at higher doses even though the drug has never been used to do so previously, is not approved by the FDA for such use and is not used clinically as a sole anesthetic; and (3)

that more drug will produce a deeper level of sedation even though an understanding of midazolam's site of action dictates otherwise.  In testing these hypotheses, the state of Arizona suffered a clinical experimental failure during the execution of Joseph Wood, despite using 750mg of midazolam. This experimental execution now offers proof that Oklahoma's 500 milligram dosage will not rapidly or reliably produce a deep level of anesthesia or coma, and further supports the existing published data that there is a ceiling effect with midazolam and that higher doses of the drug do not equate to a deeper level of unconsciousness. (Lubarsky Report, Opinion at 3, ¶ 20.)

### B.     Intravenous access

Intravenous (IV) access is routinely obtained to ensure access for medications that are to be injected into a person's circulatory system. Peripheral access is a routine procedure performed in multiple medical settings. When performed by qualified individuals, peripheral access poses minimal difficulty and few complications. Central line access involves placing a larger diameter and length tube into one of the larger veins (traditionally the subclavian, internal jugular or femoral).  Central line placement is also commonly done in medical practice with very few complications.   In non-emergent scenarios, central line placement is performed with ultrasound guidance. Peripheral IV insertion can also be facilitated with ultrasound guidance in patients with difficult access. (Katz Report at 3, §1.a.)

### 1. IV placement in Lockett

Defendant Doctor X and Defendant Paramedic Y made multiple attempts to place an IV in Lockett over a 51-minute period.  All reports indicate that Lockett had "good" veins for IV access, and there is no indication of prior injury, dehydration, recurrent IV access or other issues that would make IV placement difficult.  (Katz Report at 3, §1.b.i; Cohen Report at 12.)  Nonetheless, IV access was unsuccessful. In a healthy, muscular, young male, IV access should not be difficult. The sheer number of missed attempts in this patient would create concern in any reasonable medical provider. (Katz Report at 3, §1.b.i.)

The right femoral line was accessed with a 1.25" 14-gauge angiocatheter. The distance from the skin to the vessel (the femoral vein) is highly variable, as is anatomy in general and there was no guarantee that a 1.25" catheter could even reach the femoral vein, let alone be fixed in place for prolonged use.  Defendant Doctor X and Defendant Paramedic Y are reported to have acknowledged that they had never accessed a femoral line with a 1.25" catheter; they knew a longer needle was preferred; and they had access to a central line kit.  Yet they proceeded with the femoral IV with the 1.25" cathether as the only access.   (Katz Report at 3-4, §§1.b.i,1.b.ii.)

In addition to using non-standard equipment, Defendant Doctor X and Defendant Paramedic Y acknowledge that the line was "positional," which refers to a catheter that is functional only when held in a specific position. This may happen with a partially obstructed catheter, one that is against a valve, or one that is kinked. When a catheter is "positional," it is far more likely to fail. Despite the combination of inappropriate device

and unreliable placement, the Defendant Doctor X and Defendant Paramedic Y chose to use the IV as the sole access on Lockett. (Katz Report at 3-4, §§1.b.i.i.)

Evidence shows that Lockett was punctured numerous times, including apparent punctures on the jugular region of the neck, on the left clavicular/subclavian region, on both sides of the groin, and on upper and lower extremities. These punctures represent multiple attempts for the purpose of achieving vascular access.  There is also evidence of a through-and-through perforation/injury of the left femoral vein. (Cohen Report at 11.)

## 2.    Qualifications in placing IV lines

ODOC's current protocol states that a "central femoral venous line shall not be used unless the person placing the line is currently certified or licensed within the United States to place a central femoral line." One does not become certified or licensed to place a central line. Instead, physicians are credentialed in certain procedures. To be credentialed, most medical practices will require proof of a minimum number of successful line placement, with evidence of satisfactory result.  (Katz Report at 4 §1.c.iii.)

The physician and paramedic who attempted to obtain intravenous line placement in Lockett would meet the written requirements under the current protocol. (Katz Report at 4 §1.c.ii.) The new protocol does not even require a physician to be a member of the IV Team.

## VIII.  Midazolam's use in other states in three-drug lethal-injection protocol

The only other state besides Oklahoma that has used midazolam as part of three-drug lethal-injection protocol is Florida.  Other states are not using mizadolam as part of a three-drug protocol.  Eight states have carried out executions in 2013 and 2014: Florida,

Oklahoma, Ohio, Texas, Missouri, Georgia, Arizona, and Alabama, for a total of 78 executions by lethal injection.  Only twelve executions used midazolam as part of a three-drug protocol—eleven by Florida and one by Oklahoma.

## CONCLUSIONS OF LAW

Plaintiffs are entitled to a preliminary injunction when they demonstrate that (1) they will likely succeed on the merits of their claim(s); (2) without preliminary relief, they will likely suffer irreparable harm; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). And, as another federal district court has noted, "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012).

"[T]he primary goal of a preliminary injunction is to preserve the pre-trial status quo. . . ." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1202 (10th Cir. 2009). As the Tenth Circuit has explained, three types of preliminary injunctions are "disfavored[,]" *id.* at 1208 n.3, none of which is applicable to Plaintiffs' case. The first type of disfavored injunction is one that alters the status quo by forcing the non-moving party to take affirmative action; the second is one that is mandatory; and third is one that gives the movant all the relief it would be entitled to if it prevailed during trial. *Id.* Where the

moving party is not seeking one of the disfavored injunctions, the Court may consider the less stringent, "modified likelihood-of-success-on-the-merits" test—the serious-questions test.[23] *Id.*

Plaintiffs here do not seek a disfavored preliminary injunction. Accordingly, this Court will evaluate Plaintiffs' claims under the "serious questions" test, which queries whether Plaintiffs have raised serious questions going to the merits of their claims. *Id.*

"[P]reliminary injunctions are 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For this reason, the moving party is not required to "prove his case in full at a preliminary-injunction hearing." *Id.* (quoting *Camenisch*, 451 U.S. at 395).

Where the plaintiff is seeking an injunction that would result in a stay of execution, the Court must "consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649 (2004).

---

[23]  In balancing the four preliminary-injunction factors, the Tenth Circuit has also considered whether there are serious questions regarding the merits of the claims at issue. *See generally Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).

### A.   Plaintiffs have shown both a likelihood of success and serious questions on the merits of their claims

#### 1.   Claims related to the Eighth Amendment (Cruel and Unusual Punishment): Claims 2, 4, 7

Six years ago, the Supreme Court addressed a challenge raised by death-row prisoners to lethal-injection procedures in Kentucky. *See Baze v. Rees*, 553 U.S. 35 (2008). In that case, the Court addressed the constitutionality of a three-drug lethal-injection protocol, which used the anesthetic sodium thiopental as the first drug.  At issue was the petitioners' assertion that "there is a significant risk that the procedures will *not* be properly followed—in particular, that the sodium thiopental will not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered." *Id.* at 49. *Baze* specifically addressed the risk of maladministration of sodium thiopental. *Id.* at 45. The Court held that if the sodium thiopental was administered correctly, executions using the protocol would comport with the Eighth Amendment.  *Id.* at 42. The petitioners in *Baze* even "acknowledged that the lethal injection procedure, if applied as intended, will result in a humane death." *Id.* at 41.

The proposed execution procedure at issue in the instant case is not "substantially similar to the protocol" that the Court upheld in *Baze*. *Id.* at 61. And, unlike the petitioners in *Baze*, Plaintiffs here contend that even if Oklahoma's three-drug protocol is administered as intended, the result will not be a humane death.  Plaintiffs contend that the first drug, midazolam, which is not an anesthetic drug, will not adequately anesthetize the prisoners and render them insensate to the noxious stimuli of the second and third

drugs. Thus, because in *Baze*, there was a "concededly humane lethal injection protocol," *id.* at 41, *Baze* is factually inapposite and this Court applies only its legal principles.

The *Baze* plurality opinion briefly summarized the history of the Supreme Court's decisions involving challenges to execution procedures. *See* 553 U.S. at 48. In *Wilkerson v. Utah*, 99 U.S. 130 (1879), the Court upheld the use of a firing squad as a method of execution, as it "was routinely used as a method of execution for military officers." *Baze*, 553 U.S. at 48 (plurality opinion). One year after *Wilkerson* was decided, the Supreme Court reviewed a challenge to New York's use of electrocution as a method of execution in *In re Kemmler*, 136 U.S. 436 (1890), wherein the Court held that "'[p]unishments are cruel when they involve torture or a lingering death . . . .'" *Baze*, 553 U.S. at 49 (quoting *Kemmler*, 136 U.S. at 447). The *Kemmler* Court upheld electrocution, noting "that the New York statute adopting electrocution as a method of execution 'was passed in the effort to devise a more humane method of reaching the result.'" *Id.* (quoting *Kemmler*, 136 U.S. at 447).

In the 1970s, "state legislatures began responding to public calls to reexamine electrocution as a means of ensuring a humane death." *Baze*, 553 U.S. at 42.  As a result, states started to implement lethal injection as a method of execution. According to the Court, "the States were motivated by a desire to find a more humane alternative to then-existing methods," *id.* at 43 n.1; the States therefore devised the three-drug protocol using (1) sodium thiopental, "a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness when given in the amounts used for lethal injection"; (2) pancuronium bromide, "a paralytic agent that inhibits all muscular-skeletal movements and, by

paralyzing the diaphragm, stops respiration"; and (3) potassium chloride, a drug that causes cardiac arrest, *id.* at 44.   The Court took special note, however, that if the anesthetic does not render the prisoner unconscious, when the second and third drugs are administered, "there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride." *Baze*, 553 U.S. at 53.

Relying on the Court's Eighth Amendment jurisprudence, the *Baze* plurality concluded that to demonstrate a punishment is cruel and unusual, the plaintiff must by show that there is a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* at 50 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

In measuring what methods of punishment are acceptable under the Eighth Amendment, the Supreme Court will look to "'evolving standards of decency that mark the progress of a maturing society.'" *Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014) (quoting *Trop v. Dulles*, 356 U.S. 36, 101 (1958) (plurality opinion)). In doing so, the Court "enforce[s] the Constitution's protection of human dignity." *Id.* In determining evolving standards of decency, the Court will look to "objective factors," including how other states are proceeding. *See Atkins v. Virginia*, 536 U.S. 304, 312 (2002). Indeed, the plurality in *Baze* noted that using a three-drug protocol with sodium thiopental as the first drug was "difficult to regard" as an "objectively intolerable" practice because thirty states and the federal government used that formula in executions. *Id.* at 53.

Relatedly, what constitutes a substantial risk of severe pain is informed by the evolving ethical and legal standards of a maturing society. *See Baze*, 553 U.S. at 66 (Alito, J., concurring) ("Objections to features of a lethal injection protocol must be considered against the backdrop of the ethics rules of medical professionals and related practical constraints."). The further an execution—here a medical experiment—departs from those ethical and legal standards, the greater the risk of severe pain in violation of the Eighth Amendment.

Consistent with the standards that have evolved over time, the United States Department of Health and Human Services (HHS) has adopted relevant regulations regarding experimenting on humans—Basic HHS Policy for Protection of Human Research Subjects. *See* 45 C.F.R. § 46 (2014). The policy "applies to all research involving human subjects conducted, supported or otherwise subject to regulation by any federal department or agency which takes appropriate administrative action to make the policy applicable to such research." *Id.* § 46.101(a). The Belmont Report, which the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research published in 1979, heavily influenced the drafting of the HHS Policy. *See Belmont Report*, U.S. Department of Health and Human Services, http://www.hhs.gov/ohrp/humansubjects/guidance/belmont.html (last visited Dec. 12, 2014). The policy also draws upon the Nuremberg Code, many mandates of which are directly applicable to experiments in lethal injection. Those mandates include the following:

• All "risks to subjects" must be minimized by using procedures "consistent with sound research design and which do not unnecessarily expose subjects to risk" and if appropriate, "by using procedures already being performed on the subjects." *Id.* §  46.111(a)(1).

• "When some or all of the subjects are likely to be vulnerable to coercion or undue influence, such as . . . prisoners . . . , additional safeguards [must be] included in the study to protect the rights and welfare of these subjects." *Id.* §  46.111(b).

• "Research on conditions particularly affecting prisoners as a class . . . may proceed only after the Secretary [of the Department of Health and Human Services] has consulted with appropriate experts including experts in penology, medicine, and ethics, and published notice, in the Federal Register, of his intent to approve such research." *Id.* §  46.306(a)(2)(iii).

If a prisoner is subjected to experimentation that is inconsistent with these ethical and legal standards promulgated by the HHS, there is substantial risk that the prisoner's Eighth Amendment rights will be violated.

Applying the legal principles set forth above, the evidence demonstrates that there is a likelihood that Plaintiffs will succeed in demonstrating that Defendants' actions rise to the level of an Eighth Amendment violation for three reasons: (1) the use of Midazolam in a three-drug protocol creates an objectively intolerable risk of harm; (2) Defendants' lethal-injection protocol was not designed as a more humane manner of execution; and (3) Defendants' protocol amounts to experimentation on members of a vulnerable population.

First, Oklahoma intends to execute Plaintiffs Warner, Glossip, Grant, and Cole using a three-drug formula consisting of midazolam, rocuronium bromide, and potassium chloride, as specified in Chart D, Attachment D, to Oklahoma Department of Corrections

Execution Procedures.  Midazolam is not intended for use as a stand-alone anesthetic because it has no pain-relieving qualities and has a ceiling effect.  A ceiling effect means that once the drug reaches its peak effect, increases in dosage beyond that point will have no further effect.  For this reason, midazolam, unlike some barbiturate drugs, is not used to produce a medically induced coma. In other words, is pharmacologically incapable of creating the effect that the Supreme Court requires for a constitutionally sound execution. What is more, midazolam can have a paradoxical effect, which is increased in certain populations, including people with a history of aggression, impulsivity, alcohol abuse or other psychiatric disorders.  Each of the Plaintiffs seeking a preliminary injunction has one or more of these factors, and thus the risk of a paradoxical effect is increased.

As Plaintiffs have demonstrated, this case is factually different from *Baze* because midazolam is not a substitute for sodium thiopental.  Moreover, unlike the prisoners in *Baze*, Plaintiffs here have shown that, even if administered correctly, 500 milligrams of midazolam is *not* a sufficient anesthetic and therefore use of midazolam as the first drug in a three-drug protocol with midazolam as the first drug is not a "humane lethal injection protocol." *See Baze*, 553 U.S. at 41. Defendants' use of midazolam in their three-drug protocol creates an objectively intolerable risk of harm and is therefore unconstitutional.

Second, the protocol was not designed to create "a more humane method" of execution.[24] *Baze*, 553 U.S. at 48 (citing *Kemmler*, 136 U.S. at 447).  Rather, the protocol

---

[24] Even if it had been, that would not be the end of this Court's inquiry.  "Intent" must yield to empirical data.  Thus, even if a given method of execution was originally selected on the belief that it was a humane method, and even if that method survived challenges to its constitutionality, that method would nevertheless lose its constitutional

was created in haste, based on the drugs that Defendants determined would be readily available at that moment, not based on considerations of how the drugs would work and whether they would produce a humane death.  This headlong rush to not only develop the protocol, but also to use it immediately resulted in the selection of a constitutionally deficient first drug. Despite not being involved in the development of the protocol or the selection of the drugs to be used, Defendants Trammell and Patton participated in and directed others to use the fundamentally flawed protocol. Defendants then executed Clayton Lockett using a protocol that lacked pharmacologically—and therefore constitutionally—sound drugs, lacked training provisions, lacked appropriate medical personnel, lacked adequate medical supplies, and lacked necessary contingency procedures.   None of this was done with the intention of executing Lockett more humanely.

And although Defendant Trammell recognized that mistakes were made, she nevertheless acknowledged that "the ultimate goal was to execute the offender." (DPS 2951.)  Defendants cannot ignore the Constitution simply because the end objective is achieved.  *Cf. Ex parte Milligan*, 71 U.S. 2, 76 (1866) (where "the end justifies the means" there is a "rule of conduct [is] denounced by all law, human and divine, as being pernicious in policy and false in morals").  Under these circumstances, Defendants cannot say that "they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Baze*, 553 U.S. at 50.

---

imprimatur if later evidence showed that the method once thought to be humane was not in fact humane.

Third, Defendants' lethal-injection protocol constitutes experimentation on members of a vulnerable population. As explained above, under HHS regulations, any "risks to subjects" must be minimized by using procedures "consistent with sound research design and which do not unnecessarily expose subjects to risk." C.F.R. 45 § 46.111(a)(1). Not only did Defendants engage in an unseemly rush to create a protocol based on, *inter alia*, unsubstantiated information from the internet, but they also allowed that rush to create an experiment with a pharmacologically unsound and illogical drug choice. Moreover, their hastily developed protocol failed to ensure that the executioners would have the equipment that would allow them to properly deliver the experimental drugs, and failed to ensure that executioners even knew what drugs were used or why— much less ensuring that the executioners were trained in the execution and contingency plans. This experiment was borne of expediency, rather than of deliberate care and sound research. This Court does not countenance experimentation on prisoners, who are members of a vulnerable population, and it does not condone the ad hoc guessing game that Defendants have made part of their experimentation protocol. Defendants' past and continued experimentation is inconsistent with the ethical and legal standards promulgated by the HHS, and therefore constitutes an unnecessary risk of harm under the Eighth Amendment.

For each of these three reasons, Plaintiffs can show a likelihood of success on the merits of their Eighth Amendment claim.

## 2.      Claim related to the Fourteenth Amendment (Notice and Opportunity to be Heard): Claim 5

The Fourteenth Amendment provides in relevant part that "[n]o state shall . . . deprive any person of life, liberty or property without due process of law," and that no state "shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "The touchstone of due process is protection of the individual from arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "'The fundamental requisite of due process of law is the opportunity to be heard.' This right to be heard has little reality or worth unless one is informed that the matter is pending . . . ." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).   The procedural due process guarantee guards against the exercise of government power without any reasonable justification in the service of a legitimate governmental objective. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted).

Defendants' Execution Procedures deprive Plaintiffs of their constitutional right to notice and an opportunity to be heard and thereby implicate Plaintiffs' right to be free from cruel and unusual punishment. U.S. Const. amends. I, V, VIII, XIV.    Defendants' September 30, 2014 Execution Procedures provide the Director with "the sole discretion as to which chemicals shall be used for the scheduled execution" and instruct that "[t]his decision shall be provided to the offender in writing ten (10) calendar days prior to the scheduled execution date." Attachment D to Execution Procedures, at 4.  The Execution Procedures further provide that a "decision to use compounded drugs shall be provided to

the offender in writing no less than ten (10) calendar days prior to the scheduled execution." *Id.*   There are no requirements for notice as to the source and characteristics of any compounded drugs or the method of any drug's administration.  *See generally id.*

In practical terms, the Execution Procedures are meaningless as a means of ensuring notice: the document provides Defendant Patton with multiple options for execution protocols; it does not prohibit unwritten options; and it permits Defendant Patton to deviate from any of the given procedures at will and without notice.  *See generally id.* ("There shall be no deviation from the procedures as set forth herein, *without prior consent from the director*." (emphasis added)) ("If deemed appropriate, the director may instruct the Special Operations Team to administer additional doses of the chemical(s) . . . ."). By depriving Plaintiffs of their right to be heard, as a result of either inadequate notice or no notice at all, Defendants deny Plaintiffs the opportunity to bring an effective legal challenge to unlawful aspects of their proposed execution in violation of the Due Process Clause of the Fourteenth Amendment.

### 3.   Claim related to the First and Fourteenth Amendments (Right of Access to Information, to Counsel, and to the Courts): Claim 8

#### a)   Right to Counsel and the Courts

Death-sentenced prisoners are entitled to access to appointed counsel throughout the execution procedure. *See* 18 U.S.C. § 3599(e) (providing that appointed counsel shall represent the defendant throughout the "post-conviction process, together with applications for stays of execution and other appropriate motions and procedures").  The

right of access to counsel protects, in turn, the right of access to the courts. *See Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (noting that right of access to courts "is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights"); *see also Bounds v. Smith*, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts.").

The Execution Procedures terminate all legal visitation at least two hours prior to an execution, but the constitutional right of access to the courts does not disappear two hours prior to an execution. Nor does it disappear during an execution. If circumstances arise that present a constitutional injury in the hours prior to or during an execution, Plaintiffs have a right—through counsel—to petition the courts for appropriate relief. *See Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at \*10 (S.D. Ohio Jan. 28, 2011) ("If Plaintiffs cannot communicate with counsel [on the day of execution], then this Court can hardly conclude as a matter of law that Plaintiffs have adequate, effective, and meaningful access to the courts."). In fact, only several months ago, a district court in Arizona held a hearing during the execution of Joseph Wood, after counsel filed an emergency motion to stay an execution using midazolam that lasted nearly two hours. *See Wood v. Ryan*, 14-CV-1447-PHX-NVW, Order (D. Ariz. July 24, 2014) (describing proceedings and noting that Mr. Wood died during the hearing).

Based on the evidence presented, Plaintiffs can demonstrate a likelihood of success on the merits on their claim that they will be deprived of their right to counsel immediately before and during their execution. The Execution Procedures terminate all

legal visitation at least two hours prior to an execution—and longer if Defendant Patton so determines.  During the Lockett execution, Lockett was denied his right to counsel during the procedure whereby Defendant Doctor X and Defendant Paramedic Y attempted to gain IV access. The repeated attempts occurred for nearly an hour, and Lockett had no access to counsel, and accordingly no access to the courts, during this time. What is more, Lockett continued to be deprived of his access to counsel and therefore the courts after the blinds were lowered.  Lockett's execution was stayed, yet his counsel was never informed of this, nor was his counsel informed that life-saving measures were not initiated after the stay was issued.

The new Executions Procedures do not protect against a repetition of Defendants' egregious actions, which robbed Lockett of his ability to challenge the constitutional violations that occurred before and during his execution.  In fact, the procedures still permit the lowering of the blinds during an execution. *See* Execution Procedures, Attachment D, at 8 § G.5.  Based on both the facts from the Lockett execution, as well as the written Execution Procedures, Plaintiffs have demonstrated a likelihood of success on the merits of their claim.

b)  Right of Access to Information

Based on the importance of the participation of individual citizens in the American system of self-governance, the First Amendment provides the public with the right of access to historically open government proceedings that benefit from public discussion. *See Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 8-14 (1986) (*Press-Enterprise II*); *Press-*

71

*Enter. Co. v. Super. Ct.*, 464 U.S. 501, 510–11 (1984) (*Press-Enterprise I*); *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 603–11 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980).   The right of access attaches specifically where (1) proceedings or records are historically open to the public, and (2) public access to the specific proceedings or records plays a significant positive rule in the functioning of government.[25]   *Press-Enterprise II*, 478 U.S. at 8 (citing *Globe Newspaper Co.*, 457 U.S. at 604).   The First Amendment's "expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers*, 448 U.S. at 575.

The right of access attaches to criminal proceedings because the proceedings have historically been open, and because public access to those proceedings plays a significant positive role in the functioning of the system.   The "historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." *Id.* at 569. "The accusation and conviction or acquittal, *as much perhaps as the execution of punishment*," are core components of our system of historically open criminal proceedings.   *See id.* at 571 (citation omitted) (emphasis added).

Further, in recognizing a First Amendment right of access to information about criminal proceedings, the Supreme Court has carefully detailed a variety of reasons that

---

[25] The lack of "history and the prevalent use of [the procedure in question] should not automatically foreclose a right of access," and the second prong of *Press-Enterprise II* may nevertheless weigh in favor of a First Amendment right of access. *Seattle Times Co. v. U.S. Dist. Court for W. Dist. of Wash.*, 845 F.2d 1513, 1516-17 (9th Cir. 1988); *accord United States v. Chagra*, 701 F.2d 354, 363 (5th Cir. 1983).

public access plays a significant role in the functioning of our criminal justice system. To summarize, the non-exclusive list of benefits includes: "informing the public discussion of government affairs, assuring the public perception of fairness, promoting the community-therapeutic effect of criminal justice proceedings, providing a public check on corrupt practices, intimidating potential perjurers, and generally enhancing the performance of all involved in the process." *United States v. McVeigh*, 106 F.3d 325, 336 (10th Cir. 1997) (citing *Globe Newspaper Co.*, 457 U.S. at 604–05; *United States v. Criden*, 675 F.2d 550, 556 (3d Cir.1982)). Openness in criminal proceedings serves an important role because "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government. The institutional value of the open criminal trial is recognized in both logic and experience." *Globe Newspaper Co.*, 457 U.S. at 606 (footnotes omitted). When the government carries out a death sentence, the execution represents the final stage of a defendant's criminal proceedings.

One circuit court has carefully analyzed the relationship between First Amendment legal principles and judicial executions; that court held that executions are historically open proceedings that benefit from public discussion. *See Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002). First, relying on multiple sources, the court observed that "[h]istorically, executions were open to all comers." *Cal. First Amendment Coal.*, 299 F.3d at 875. Even as the methods of executions have changed, a long-standing pattern of public access has remained constant. *Id.* at 876 (noting that the public viewed executions by hanging and lethal gas). Second, the court

explained that public access to executions serves an important function and stressed the importance of "independent public scrutiny" in ensuring "the proper functioning of capital punishment." *Id.* at 876. The court observed that "an informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Id.* at 876 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  "[T]he citizens must have reliable information" in order to determine whether "executions are fairly and humanely administered[.]"  *Id.* (citation omitted).

Here, the First Amendment right of access to information about the manner and method of executions exists because that information is crucial to the functioning of capital punishment. *See Cal. First Amendment Coal.*, 299 F.3d at 877; *cf. Seattle Times Co. v. U.S. Dist. Court for W. Dist. of Wash.*, 845 F.2d 1513, 1517 (9th Cir. 1988) (citation omitted) (documents related to pretrial proceedings "are often important to a fully understanding of the way in which the judicial process and the government as a whole are functioning"). Under our constitutional framework, the records related to the drugs to be used in an execution, the state's reason for selecting a particular method or drug amount, and the details regarding qualifications of the executioners, are all necessary parts of the execution process.  This information is critical to carrying out a death sentence and is necessary to allow the public to assess whether capital punishment is functioning as it should.[26]  *See also Schad v. Brewer*, No. CV–13–2001–PHX–ROS,

---

[26] Once the First Amendment right of access "attaches to a governmental proceeding, that right 'may be overcome only by an overriding interest based on findings that closure

2013 WL 5551668 (D. Ariz. Oct. 7, 2013), at *5 (noting that "the public must have reliable information about the lethal injection drugs themselves in order to judge the propriety of the particular means used to carry out an execution.").

Plaintiffs have alleged that Defendants are depriving them of their right to know "how the State and its justice system implement the most serious punishment a state can exact from a criminal defendant—the penalty of death." *Cal. First Amendment Coal.*, 299 F.3d at 874.   As noted above, Defendants have provided neither any information regarding the drugs to be used in Plaintiffs' executions nor any information regarding why Defendants selected the drug formula they did in anticipation of carrying out Plaintiffs' executions.   Defendants have refused to provide specific information regarding the training and qualifications of those who will participate in Plaintiffs' executions.   As explained above, Plaintiffs have a First Amendment right to this information.   Therefore, Plaintiffs will likely succeed in demonstrating that Defendants' actions are depriving Plaintiffs of this First Amendment right.

## B.      Other Factors to Consider for Preliminary Injunction Relief

In addition to showing a likelihood of success on the merits, Plaintiffs must show that (1) without preliminary relief, they will likely suffer irreparable harm; (2) "an injunction is in the public interest;" and (3) "the balance of equities tips in [their] favor."

---

is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Cal. First Amendment Coal.*, 299 F.3d at 877 (quoting *Press-Enter. II*, 478 U.S. at 9). No such overriding interest exists here.

*Winter*, 555 U.S. at 20.  They must also show that they have not been dilatory in bringing their claims to this Court. *See Nelson*, 541 U.S. at 649.  Plaintiffs have done so here.

First, Plaintiffs will suffer irreparable harm if Defendants are permitted to carry out their executions prematurely and before the opportunity for complete discovery and a trial on the merits. There is nothing more final and irreversible than death. If Plaintiffs are unconstitutionally executed, the injury is irreparable.

Second, the issuance of a preliminary injunction is in the public interest. *Tyson Foods, Inc.*, 565 F.3d at 788. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). Indeed, "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012) (citation omitted).

Third, the balance of equities tips in Plaintiffs favor.  Plaintiffs seek only to enjoin Defendants from attempting to execute them in an unconstitutional manner and before a trial on the merits can be held. This Court will not permit executions to proceed before it has the opportunity to review Plaintiffs' fully- developed claims. The delay resulting from granting the preliminary relief sought here will have little adverse effect on the State's interest and will ensure that the State does not perform an unconstitutional execution. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting from grant of writ of mandate) ("The state will get its man

in the end.  In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."). Here, equity favors the issuance of the preliminary injunction.

Further, this lawsuit was brought as soon as practicable after Lockett's execution and contains serious allegations of constitutional violations. Moreover, Plaintiffs have been attempting to discover what occurred during Lockett's execution to ensure that protections are in place to avoid it happening again. Defendants initially moved to stay the litigation and have continued to battle Plaintiffs over what discovery would be provided and slow-walked their required disclosures. As of this filing, Plaintiffs have been provided only very limited information from Defendants.

Moreover, in addition to satisfying the standard for preliminary injunction, Plaintiffs have not been dilatory in seeking relief in this case. Plaintiffs amended their complaint thirty days after Defendants amended their lethal-injection procedures. Plaintiffs then shortly thereafter filed their motion for preliminary injunction. Given the terms of the September 30, 2014 Execution Procedures, including the fact that Defendants only need to provide prisoners with ten days' notice of what drugs will be used in an execution,[27] Plaintiffs were careful to bring this motion at an appropriate time. Plaintiffs timely filed this motion over two months before the first of the four scheduled

---

[27] Ten days is the stated time period for notice; however, because ODOC's director can change the drug protocol at any time,   Sept. 30, 2014 Execution Procedures ("There shall be no deviation from the procedures as set forth herein, *without prior consent from the director*." (emphasis added)).

executions. For these reasons, Plaintiffs did not delay at all—and certainly did not delay unnecessarily— in bringing their claims. The concern expressed by the Supreme Court in *Nelson* is not applicable here.

Accordingly, Plaintiffs have presented serious questions going to, and a likelihood of success on the merits of, their claims, and have satisfied the four preliminary-injunction requirements.  They are entitled to a preliminary injunction on all claims raised in their motion for preliminary injunction.

Respectfully submitted,

*s/ Patti Palmer Ghezzi*
Patti Palmer Ghezzi
OBA # 6875
Assistant Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
phone: 405-609-5975
fax:  405-609-5976
email: patti_ghezzi@fd.org
*Attorney for Plaintiffs Cole, Cuesta-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon,Johnson, Littlejohn, Pavatt, Simpson, and Underwood*

*s/ Gary Peterson*
Gary Peterson
OBA # 7068
211 N. Robinson Ave., Ste. 450 South
Two Leadership Square
Oklahoma City, OK 73102
phone: 405-606-3367
fax: 866-628-0506
email: gp@garypeterson.com
*Attorney for Plaintiff Warner*

*s/ Randy A. Bauman*
Randy A. Bauman
OBA # 610
Assistant Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
phone: 405-609-5975
fax:  405-609-5976
email: randy_bauman@fd.org
*Attorney for Plaintiffs Cole, Cuesta-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon,Johnson, Littlejohn, Pavatt, Simpson, and Underwood*

*s/ Mark Henricksen*
Mark Henricksen
OBA # 4102
Henricksen & Henricksen
600 N. Walker Ave., Ste. 200
Oklahoma City, OK 73102
phone: 405-609-1970
fax: 405-609-1973
email: mark@henricksenlaw.com
*Attorney for Plaintiffs Andrew, Glossip, and Jackson*

*s/ David Autry*
David B. Autry
OBA # 11600
1021 NW 16th Street
Oklahoma City, OK 73106
phone: 405-521-9600
fax: 405-521-9669
Email: dbautry44@hotmail.com
*Attorney for Plaintiff Coddington*

*s/ Fred Staggs*
Fred L. Staggs
OBA # 8534
510 NW 17th St.
Oklahoma City, OK 73013
phone: 405-990-5523
Email: staggslaw@aol.com
*Attorney for Plaintiff Mitchell*

*s/ Lanita Henricksen*
Lanita Henricksen
OBA # 15016
Henricksen & Henricksen
600 N. Walker Ave., Ste. 200
Oklahoma City, OK 73102
phone: 405-609-1970
fax: 405-609-1973
email: lanita.henricksen@coxinet.net
*Attorney for Plaintiffs Hancock and Warner*

*s/ Mark Barrett*
Mark H. Barrett
OBA # 557
P.O. Box 896
Norman, OK 73070
phone: 405-364-8367
fax: 405-364-8329
Email: barrettlawoffice@gmail.com
*Attorney for Plaintiff Jones*

*s/ Dale Baich*
*s/ Robin Konrad*
Dale A. Baich
Robin C. Konrad
Federal Public Defender
850 W. Adams St., Ste. 201
Phoenix, AZ 85007
phone: 602-382-2816
fax: 602-889-3960
email: dale_baich@fd.org
email: robin_konrad@fd.org
*Attorneys for Plaintiff Wood*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

JOHN D. HADDEN, OBA # 18716
JEB E. JOSEPH, OBA # 19137
AARON J. STEWART, OBA # 31721
Assistant Attorneys General
Oklahoma Attorney General's Office
Litigation Division
313 N.E. 21st Street
Oklahoma City, OK   73105
phone:   (405) 521-3921
fax:     (405) 521-4518
email: john.hadden@oag.ok.gov
email: jeb.joseph@oag.ok.gov
email: aaron.stewart@oag.ok.gov
*Attorneys for Defendants Burrage, Gross, Haynes, Henke, Neal, Patton, Roach, Trammell and Ware*

*s/ Patti Palmer Ghezzi*
Patti Palmer Ghezzi
Assistant Federal Public Defender
Western District of Oklahoma