# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

RICHARD E. GLOSSIP, JAMES A.
CODDINGTON, BENJAMIN R. COLE by and
through his next friend Robert S. Jackson,
CARLOS CUESTA-RODRIGUEZ, NICHOLAS
A. DAVIS, RICHARD S. FAIRCHILD, JOHN
M. GRANT, WENDELL A. GRISSOM,
MARLON D. HARMON, RAYMOND E.
JOHNSON, EMMANUEL A. LITTLEJOHN,
JAMES D. PAVATT, KENDRICK A.
SIMPSON, KEVIN R. UNDERWOOD,
BRENDA E. ANDREW, SHELTON D.
JACKSON, PHILLIP D. HANCOCK, JULIUS
D. JONES, ALFRED B. MITCHELL, and
TREMANE WOOD,

      Plaintiffs,

           v.

KEVIN J. GROSS, MICHAEL W. ROACH,
JOHN T. HOLDER, GENE HAYNES,
FRAZIER HENKE, IRMA J. NEWBURN,
JAMES M. TILLY, Members of the Oklahoma
Board of Corrections; ROBERT C. PATTON,
Director of the Oklahoma Department of
Corrections; ANITA K. TRAMMELL, Warden
Oklahoma State Penitentiary; EDWARD
EVANS, Associate Director of Field
Operations; DAVID PARKER, Division
Manager of East Institutions; GREG
WILLIAMS, Division Manager of West
Institutions; and H-UNIT SECTION CHIEF,
IV TEAM LEADER and IV TEAM MEMBERS
#1-10, SPECIAL OPERATIONS TEAM
LEADER and SPECIAL OPERATIONS TEAM
MEMBERS #1-10, whose identities are

Case No. CIV-14-665-F

**Second Amended
Complaint for Equitable
and Injunctive Relief**

unknown, in their official capacities as
Employees, Contractors and/or Agents of the
Oklahoma Department of Corrections,

     Defendants.

## Nature of Action

1.    This action is brought under 42 U.S.C. § 1983 for violations
and threatened violations of Plaintiffs' rights under the First, Eighth,
and Fourteenth Amendments to the United States Constitution.

2.    Each Plaintiff is under a sentence of death imposed by the
judgment of an Oklahoma court before November 1, 2011. Plaintiffs are
not challenging their convictions or sentences of death in this action.
They are challenging only the manner and means by which their
sentences of death will be carried out by Defendants.

3.    Defendants plan to execute Plaintiffs using written
procedures set out in Oklahoma State Penitentiary (OSP) Policy No.
OP-040301, Execution of Offenders Sentenced to Death (hereinafter
"Execution Policy"). The current Execution Policy was revised on June
30, 2015.  The Execution Policy details the roles and responsibilities of
individuals and teams assigned to assist in carrying out executions.  It
also affords the Defendant Robert C. Patton, the Director of the
Oklahoma Department of Corrections, unfettered discretion in carrying
out executions.  The current Execution Policy, both as written and as
will be applied, is being challenged in this lawsuit.

4.     Exhaustion of administrative remedies is not necessary because this action does not challenge prison conditions and because there are no available administrative remedies capable of addressing the violations of federal law challenged in this pleading. Moreover, because Defendant Patton has unfettered discretion to change the Execution Policy at any time–even after providing notice as to certain aspects–any attempt to grieve would be impracticable.

<u>Parties to the Action</u>

5.     Plaintiff Brenda E. Andrew resides within this District in Pottawatomie County, Oklahoma. Each of the remaining Plaintiffs resides within Pittsburg County, Oklahoma.

6.     Plaintiff Richard E. Glossip currently has an execution date set for September 16, 2015.

7.     Plaintiff Benjamin R. Cole is an incompetent person. He sues by and through his next friend, Robert S. Jackson.  Cole currently has an execution date set for October 7, 2015.

8.     Plaintiff John M. Grant currently has an execution date set for October 28, 2015.

9.     Defendants Kevin J. Gross, Michael W. Roach, John T. Holder, Gene Haynes, Frazier Henke, Irma J. Newburn, and James M. Tilly are current members of the Oklahoma Board of Corrections and have official residences within this District.

10.     Defendants Gross, Roach, Holder, Haynes, Henke, Newburn, and Tilly establish policies for the Oklahoma Department of Corrections ("ODC"). Each acts under color of Oklahoma law, and is sued in official capacity only.

11.     Defendant Patton is Director of ODC. He has an official residence within this District, acts under color of Oklahoma law, and is sued in his official capacity only.

12.     Defendant Patton is assigned by Oklahoma law with authority over execution of all death sentences, and with responsibility to supervise all activities of ODC, including the official activities of all persons involved in carrying out executions. Defendant Patton selects the H-Unit Section Chief, the IV Team Leader, and the IV Team members.

13.     Defendant Anita K. Trammell is warden of the Oklahoma State Penitentiary ("OSP") and an employee of ODC. She has an official residence within Pittsburg County, Oklahoma, acts under color of Oklahoma law, and is sued in her official capacity only.

14.     Under Oklahoma statute, Defendant Trammell has the responsibility to carry out death warrants issued by Oklahoma courts, including those issued in Plaintiffs' cases.

15.     Under Oklahoma statute, Defendant Trammell has the responsibility of inviting a physician to be present at all executions.

16. Defendant Trammell is responsible for selecting the members of the Restraint Team.

17. Defendant Edward Evans is Associate Director of Field Operations and has an official residence within this District. Defendant Evans coordinates the activities of the division managers of East and West Institutions and the wardens in activating execution teams, and he is responsible for the annual review and revisions of the Execution Policy. Defendant Evans is responsible for ensuring that all execution team members understand and comply with the lethal-injection procedures. He acts under color of Oklahoma law, and is sued in his official capacity only.

18. Defendant David Parker is the Division Manager of East Institutions and is the Commander of the Command Team, and has an official residence within this District. Defendant Parker is responsible for selecting other members of the Command Team. He acts under color of Oklahoma law, and is sued in his official capacity only.

19. Defendant Greg Williams is the Division Manager of West Institutions and has an official residence within this District. Defendant Williams is responsible for selecting the Restraint Team leader, the Special Operations Team Leader, and the Special Operations Team members. He is responsible for ensuring the IV members thoroughly understand all provisions in the Execution Policy that are written and practiced. He is responsible for establishing a training schedule and

identifying dates for on-site practice of the Restraint and Special Operations Teams. He acts under color of Oklahoma law, and is sued in his official capacity only.

20.    The identity of Defendant H-Unit Section Chief is unknown at this time. The Defendant H-unit Section Chief is selected by Defendant Patton. Defendant H-Unit Section Chief is required to be present at every execution. She or he is responsible for coordinating the activities of the Restraint Team and the Special Operations Team, for ensuring compliance with conditions of confinement and application of approved procedures, for ensuring all equipment, including medical equipment, necessary to conduct execution is on site and functioning properly, for ensuring the chemicals are ordered and properly stored, for physically remaining in the room with the condemned person and monitoring the condemned person during an execution, and for monitoring the IV site, including determining whether to use an alternate site. She or he acts under color of Oklahoma law, and is sued in his or her official capacity only.

21.    The identities of Defendant IV Team Leader and IV Team Members #1–10 are unknown at this time. They are individuals who have participated or will participate as IV Team Members in executions in Oklahoma. The IV Team Leader designates the functions of the IV Team Members. IV Team Leader and IV Team Members #1–10 act

under color of Oklahoma law, and are sued in their official capacities only.

22.    The identities of Defendant Special Operations Team Leader and Special Operations Team Members #1–10 are unknown at this time. They are individuals who have participated or will participate as Special Operations Team Members in executions in Oklahoma. Special Operations Team Leader and Special Operations Team Members #1–10 act under color of Oklahoma law, and are sued in their official capacities only.

## Jurisdiction and Venue

23.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil-rights violations), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). Plaintiffs invoke this Court's jurisdiction pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

24.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District.

## Relevant Procedural Background

25.    Plaintiffs filed their original complaint on June 25, 2014. (ECF No. 1.)

26.    ODC filed a copy of their revised Execution Policy on October 1, 2014.  (ECF No. 55.)

27.    Plaintiffs filed their Amended Complaint on October 31, 2014.  (ECF No. 75.)

28.    On November 10, 2014, Plaintiffs Charles Warner, Richard Glossip, John Grant, and Benjamin Cole, who each had pending execution dates at the time, filed a motion for preliminary injunction. (ECF No. 92.)  Their motion was denied by this Court on December 22, 2014 (ECF No. 173), and that decision was affirmed by the Tenth Circuit (ECF No. 187).

29.    On January 15, 2015, Plaintiff Charles Warner was executed by the State of Oklahoma.

30.    On January 23, 2015, the Supreme Court granted certiorari to review the decision of this Court. (ECF No. 194.)

31.    On January 28, 2015, the Supreme Court issued a stay of execution for Glossip, Grant, and Cole, pending final disposition of the case.  *Glossip v. Gross*, 135 S. Ct. 119 (2015) (mem.).

32.    On June 29, 2014, the Supreme Court issued its opinion in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), where it affirmed the denial of the preliminary injunction. (ECF No. 204.)  In light of *Glossip v. Gross*, Plaintiffs now file their Second Amended Complaint.

## Factual Background

### A.    Execution Policy

33.    Defendants plan to execute Plaintiffs using written procedures set out in the Execution Policy as well as unwritten

procedures that may be implemented at any time at the discretion of Defendant Patton.  The written policy has been revised and altered repeatedly, most recently on June 30, 2015. Prior versions of the policy were adopted on September 30, 2014, and March 21, 2014 (with two subsequent revisions to the March version on April 14 and April 25, 2014).

34.    Under the Execution Policy, Defendant Patton has the unfettered discretion to deviate from its terms at any time in any manner and without any notice to Plaintiffs or Plaintiffs' counsel.

35.    Under the Execution Policy, there are two primary teams that are involved during the actual process of preparing and administering the lethal drugs: the IV Team and the Special Operations Team.

36.    The Special Operations Team implements the protocols associated with the administration of the drugs for an execution.  The Special Operations Team includes a team leader, a recorder, and at least three additional team members.

37.    Under the Execution Policy, the Special Operations Team Leader has the following responsibilities: selects team members, assigns responsibility for preparing the drugs and syringes, confirms that the syringes and drugs are properly labeled, observes the condemned prisoner throughout the process, confirms that the

microphone is functioning so that the condemned prisoner can be heard, and instructs the team members when to dispense the lethal drugs.

38.   The recorder is responsible for recording the amount of the drugs and when they are administered. The recorder must note and explain any deviation from the written procedure.

39.   The Special Operations Team Members are responsible for preparing and administering the lethal drugs.

40.   The IV Team Leader, with the assistance of a Special Operations Team Member, is responsible for preparing and labeling the syringes that will contain the drugs to be used in the execution.

41.   One of the roles of the IV Team is to insert primary and backup intravenous catheters in the condemned person. The March 21, 2014 version of the Execution Policy, required participation in each execution by a physician and a paramedic, who both had the assigned role of establishing intravenous access in the condemned person.  The current Execution Policy allows, but does not require, participation by either a physician or a paramedic. The Execution Policy does not require any IV team member to have currency in the practice of setting IVs or even to have recently placed any specific number of peripheral and central lines.

42.   Under the written terms of the Execution Policy, the IV Team Leader determines whether the prisoner is unconscious. The

consciousness check, which occurs five minutes after the administration of the first drug, does not measure the electrical activity in the brain.

43.   Defendant Patton has the sole discretion to select the lethal drugs to be used in Plaintiffs' executions. The Execution Policy includes three specific lethal drug formulas, but also empowers Defendant Patton to deviate from those chemicals and procedures as he sees fit. Defendant Patton is to inform the condemned prisoner in writing ten calendar days before the scheduled execution which drug formula ODC will use in the execution.

44.   Defendant Patton can order the curtains to the witness room be closed at any time during the execution.

45.   The Execution Policy intends to restrict sound from the execution chamber from reaching the witness room, including by turning off the microphone following the condemned prisoner's last statement.

46.   Upon information and belief, Defendants intend to increase the restriction of a prisoner's movement on the execution table. The prisoner is strapped to the table in such a manner that unduly restricts movement and restricts the observation of movement, and thus further increases the concealment of any suffering as the drugs are delivered.

47.   If problems occur during a prisoner's execution and he wishes to consult with counsel regarding his constitutional rights, he will be denied access to counsel.

## B.  Lethal Drugs

48.  The State of Oklahoma has carried out lethal injections using a three-drug formula, which includes a paralytic and potassium chloride.

49.  Under the three-drug formula, the first drug administered is intended to place the condemned prisoner in a state in which he will be unable to experience pain and suffering.

50.  Under the Execution Policy, five minutes after the first drug is administered, the IV Team Leader physically confirms that the condemned prisoner is unconscious.

51.  The second drug administered—vecuronium, rocuronium, or pancuronium bromide—is a paralytic. The purpose of the administration of the second drug is to prevent a prisoner from moving during the execution. The paralytic produces paralysis and will result in a slow death by asphyxiation.

52.  The dose of the paralytic in the March 21, 2014 Execution Policy was 40 milligrams. The current Execution Policy now indicates that a dose of 100 milligrams of a paralytic will be administered.

53.  If the second drug, which is given in large doses, is administered while the prisoner is aware, he will experience suffocation. After this agent takes effect, an individual under its influence is unable to communicate the terror, agony, and needless suffering being experienced.

54.   The third drug administered, potassium chloride, is intended to produce cardiac arrest, stopping the condemned prisoner's heart.

55.   If the third drug, which is given in large doses, is administered to an aware individual, it will produce burning and intense pain as it circulates through the body.

56.   In at least 93 executions carried out between 1990 and 2010, ODC used a three-drug formula where sodium thiopental was the first drug administered.

57.   Starting in 2010, ODC began to use pentobarbital in lieu of sodium thiopental as the first drug in the three-drug execution formula. Initially, the pentobarbital used in executions was a manufactured, Food & Drug Administration (FDA)-approved product under the brand name Nembutal.

58.   ODC later used pentobarbital in executions that was produced by compounding.

59.   Pharmacy compounding is a practice by which a pharmacist combines, mixes, or alters ingredients in response to a prescription to create a medication tailored to the medical needs of an individual patient. Independent laboratories can test compounded drugs for a variety of measures, including identity, strength, and contaminants.

60.   In the March 21, 2014 Execution Policy, ODC introduced a new chemical to be used as the first drug in its three-drug formula—

midazolam. The current Execution Policy indicates that 500 milligrams will be administered.

61. Based on known scientific information regarding its mechanism of action, midazolam is unable to ensure that the condemned prisoner is and remains in a state in which he will be unable to experience pain and suffering.

62. Midazolam belongs to a class of drugs called benzodiazepines. Benzodiazepines are central nervous system depressants that reliably produce sedative, hypnotic, muscle relaxant, anxiety inhibitory, and anticonvulsant effects.

63. Midazolam has no pain-relieving effects, and it is not used as a sole agent to maintain unconsciousness in painful procedures.

64. The FDA package insert label for midazolam reports that 5% of adult patients reported pain during the intravenous administration of the drug.

65. Midazolam takes effect in the central nervous system. The central nervous system consists of the brain and the spinal cord.

66. Midazolam has rapid onset of activity following IV administration. Midazolam has a short duration of activity due to its very high metabolic clearance and rapid rate of elimination from the body.

67.     Sodium thiopental and pentobarbital belong to a class of drugs called barbiturates. Barbiturates differ from benzodiazepines in that each class of drug has different mechanism of action.

68.     Both benzodiazepines and barbiturates interact with a naturally occurring substance in the body called gamma-aminobutryic acid (GABA).  GABA is a neurotransmitter in the brain that acts on a $GABA_A$ receptor-chloride ion channel complex ("GABA receptor"). When GABA binds to the GABA receptor, the chloride ions rush from outside the neuron to inside the neuron, causing the neuron to decrease electrical activity. Thus, GABA has the effect of inhibiting neuronal activity.

69.     Benzodiazepines act at the GABA receptor and promote the binding of GABA to the GABA receptor. In order for benzodiazepines to have an effect, GABA must both be released by inhibitory neurons and be acting on the GABA receptor at the same time. When midazolam alone (without GABA present) binds to the GABA receptor, there is no inhibitory neuronal consequence.

70.     Barbiturates also act on the GABA receptor, although they act at a different region distinct from the binding site of benzodiazepines. Barbiturates, unlike benzodiazepines, can cause neuronal inhibition even when GABA is not present. As a result, barbiturates alone (without GABA present) can completely shut down the activity of the neuron resulting in electrical silence.

71.    When all electrical activity in the brain ceases, a person will be in a deep comalike unconsciousness and will be insensate to pain.

72.    To prevent a person from returning to consciousness during a painful procedure, electrical activity in the brain must be depressed well past the point at which consciousness would theoretically be lost and to the point where the application of expected stimuli during the procedure will not sufficiently increase electrical activity and restore consciousness.

73.    Because of their mechanism of action, barbiturates are used to induce coma in brain-injured patients. Benzodiazepines are not used to induce coma in brain-injured patients, or any other patients.

74.    Defendants' expert previously testified in this Court that midazolam is used to induce coma in brain-injured patients.  Since giving testimony in this Court, he has admitted under oath in a Tennessee court that the source he relied upon does not support his opinion that midazolam is used to induce coma in brain-injured patients.

75.    Because of midazolam's mechanism of action, there is a point at which additional doses of midazolam no longer have an additional effect on the neurons.  This is called the ceiling effect.

76.    Based upon known scientific data regarding midazolam concentrations in the brain and in blood plasma, midazolam will reach

its ceiling effect at a dose significantly lower than 500 milligrams and likely at a dose of 50 milligrams or less.

77.   Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Plaintiffs will remain in a state in which they will be unable to experience pain and suffering caused by the paralytic and potassium chloride.

## C.   Executions Using Midazolam

### *Clayton Lockett*

78.   On April 29, 2014, Defendants attempted to carry out the execution of Clayton Lockett using midazolam, followed by vecuronium bromide, and potassium chloride.

79.   At approximately 5:22 p.m. on April 29, Lockett was strapped onto the execution table.   The execution team worked for nearly an hour to establish intravenous (IV) access to Lockett's cardiovascular system.   There were at least twelve attempts that resulted in puncture wounds, including in his arms, his foot, his jugular vein, and his subclavian vein. Finally, IV access was gained by placing a needle into Lockett's right femoral vein. No additional IV line was set.

80.   At 6:23 p.m., once IV access had been established, the execution began. Approximately ten minutes later, the physician-executioner determined that Lockett was unconscious.

81.   After Lockett was determined to be unconscious, the vecuronium bromide was administered; and then most, but not all, of the potassium chloride was administered.

82.   During the administration of the potassium chloride, Lockett regained consciousness and began moving and speaking. One witness reported that Lockett said, "This shit is fucking with my mind." Another witness reported that Locket said, "The drugs aren't working."

83.   If the paralytic had been intravenously administered during Lockett's execution, then it would have resulted in complete paralysis, and Lockett would have been unable to breathe, speak, or move.

84.   At 6:42 p.m., the physician-executioner determined that the IV had infiltrated; the blinds to the witness observation room were then closed, and the execution process was halted. The physician-executioner attempted to start another femoral IV line, but instead of puncturing the vein, he punctured Lockett's artery.

85.   After the blinds were closed, Lockett was not given any additional drugs.

86.   After the blinds were closed, no life-saving measures were implemented.

87.   At approximately 6:56 p.m., Defendant Patton called off the execution under the authority granted by Oklahoma Governor Mary Fallin.

88.    On April 29, 2014, at approximately 7:06 p.m., the physician executioner pronounced Lockett's death.

89.    On April 30, 2014, Governor Fallin issued Executive Order 2014-11, appointing Michael Thompson, the Commissioner of Department of Public Safety ("DPS") and Secretary of Safety and Security in Governor Fallin's cabinet, to conduct a review of events surrounding Lockett's death.

90.    On September 4, 2014, DPS released a report titled Executive Summary of the Execution of Clayton Lockett, Case. No. 14-189SI.

91.    DPS did not investigate the specific drugs, particularly midazolam, being used in executions.

92.    DPS did not make a determination regarding the effectiveness of midazolam.

## *Charles Warner*

93.    The execution of Charles Warner was scheduled for 6:00 p.m. on January 15, 2015.

94.    On January 13, 2015, one of Warner's counsel who was not designated as a witness to the execution requested to be present at the prison in H-Unit—the unit where death-sentenced individuals are housed and where executions occur. Specifically, Warner's counsel explained that his request was being made so that he would be able to access the courts on his client's behalf during the execution if necessary.

95.   On January 14, 2015, Defendant Patton denied the request for Warner's counsel to be present in the H-Unit.  Defendant Patton also informed Warner's counsel that he would not be allowed to remain anywhere on OSP after 2:00 p.m. on the day of Warner's execution.

96.   On January 14, 2015, after the request was denied, Warner's counsel then asked if Defendant Patton would allow the attorneys witnessing the execution to have access to a telephone during the execution if the attorneys needed to access the courts on behalf of their client.  Defendant Patton denied the request.

97.   On January 15, 2015, at approximately 2:30 p.m., Warner had his last legal meeting with his attorneys.

98.   Under the Execution Policy, a prisoner is permitted two hours of in-person visitation with no more than two attorneys of record concluding two hours prior to the scheduled execution.

99.   Warner's attorneys were only permitted approximately one hour of visitation time, which ended at 3:40 p.m.

100.  The legal visit did not permit confidential communications, as there were officers present in the room within earshot. The visitation accommodations prevented the attorneys from jointly communicating with Warner at the same time.

101.  On January 15, 2015, at approximately 4:20 p.m., Warner's attorneys, along with all witnesses, were read a prepared script regarding the execution process.  At that time, witnesses were told that

they would not be permitted to leave their seats at any time during the execution process.

102. At approximately 5:25 p.m., Defendant Patton informed Warner's counsel that he was going to delay the execution. Warner had an application for a stay of execution pending before the United States Supreme Court, and Defendant Patton decided to hold off on proceeding with the execution until the Supreme Court ruled on the application. While this occurred, Warner was not in communication with his counsel.

103. The Supreme Court denied the stay application, but Warner's attorneys who were witnessing the execution were not informed of this nor were they provided access to the Supreme Court decision before the execution.

104. At approximately 6:38 p.m. and unbeknownst to Warner's counsel at the time, ODC began the execution process and two IV lines were established: one in Warner's left hand; one in Warner's right arm.

105. IV Team Member(s) unsuccessfully attempted at least twice to set a line in Warner's right hand.

106. The IV insertion was completed at 6:43 p.m.

107. After the lines were set, saline/heparin solution was continuously administered.

108. Saline/heparin solution may cause irritation when administered.

109. Warner's counsel entered the execution chamber at approximately 7:00 p.m. Witnesses, including Warner's counsel, were not permitted to view the insertion of the IV lines.

110. At approximately 7:08 p.m., Warner made his last statement. He informed his attorneys that he was poked five times during the IV insertion process and that his right arm felt like acid was flowing through it.

111. At approximately 7:10 p.m., Special Operations Team Members began administering 500 milligrams of midazolam into the IV placed in Warner's right arm.

112. At approximately 7:10 p.m. after the microphone was turned off, Warner was heard to say, "[M]y body is on fire. No one should go through this."

113. At approximately 7:12 p.m., Warner's head was rolling around in his mouth and his breathing started to get labored.

114. At approximately 7:14 p.m., Warner still appeared to be breathing.

115. At approximately 7:16 p.m., the IV Team Leader examined Warner by lifting his head and rubbing his eyelashes. The IV Team Leader said that Warner was sedated.

116. At no point during the execution did the IV Team Leader, H-Unit Section Chief, or anyone else confirm that Warner was unconscious.

117.  Procedures that will result in intense pain require more extensive reductions in sensation. Sedation occurs on a continuum. A person may be sufficiently sedated to withstand the effects of certain stimuli, but not sufficiently sedated to withstand the administration of more painful stimuli.

118.  Between approximately 7:16 p.m. and 7:22 p.m., the Special Operations Team Members administered 100 milligrams of rocuronium bromide and 240 milliequivalents of potassium chloride to Warner.

119.  At approximately 7:19 p.m., when the potassium chloride was being administered, Warner's chest moved visibly and his lips fluttered slightly.

120.  On January 15, 2015, at approximately 7:28 p.m., the IV Team Leader pronounced Warner's death.

### Dennis McGuire

121.  On January 16, 2014, the State of Ohio executed Dennis McGuire using a combination of 10 milligrams of midazolam and 40 milligrams of hydromorphone. This experiment was the first time that a two-drug formula of midazolam and hydromorphone had been used to execute a prisoner.

122.  In advance of McGuire's execution, Ohio officials exchanged emails with various medical professionals about how the combination of midazolam and hydromorphone would work. Doctors warned that the use of the drugs may become "a distasteful and disgusting spectacle"

and Ohio officials expressed their concern about going forward with a drug formula that "would create the appearance, at least, of suffering, which would upset witnesses and inspire litigation."[1]

123. Those concerns materialized at McGuire's execution. Those who witnessed the 26-minute execution reported that McGuire struggled and gasped loudly for air "like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe."[2]

124. Ohio has not carried out an execution since McGuire, and has indicated it will not use midazolam in future executions.

### Joseph Wood

125. On July 23, 2014, the State of Arizona carried out the execution of Joseph Wood using a combination of midazolam and hydromorphone, the second experiment using this drug combination. Although Arizona's lethal-injection protocol called for the administration of 50 milligrams of midazolam and 50 milligrams of hydromorphone, Wood was injected with 750 milligrams of each drug before he died. The execution took nearly two hours, and for over an

---

[1] Ben Crair, *Exclusive Emails Show Ohio's Doubts About Lethal Injection*, NEW REPUBLIC, Aug. 17, 2014, http://www.newrepublic.com/article/119068/exclusive-emails-reveal-states-worries-about-problematic-execution.

[2] Lawrence Hummer, *I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane*, GUARDIAN, Jan. 22, 2014, http://www.theguardian.com/commentisfree/2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane.

hour and a half, Wood "gulped like a fish on land. . . more than 640" times.[3]

126. At approximately 1:54 p.m., Wood was injected with 50 milligrams of midazolam and 50 milligrams of hydromorphone. Within ten minutes after administration of the drugs, Wood began gasping for breath.

127. At approximately 2:10 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

128. At approximately 2:16 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

129. At approximately 2:27 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

130. At approximately 2:34 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

131. In approximately forty minutes, Wood was administered 250 milligrams of midazolam and 250 milligrams of hydromorphone.

---

[3] See Michael Kiefer, *Reporter describes Arizona execution: 2 hours, 640 gasps*, ARIZ. REPUBLIC, July 24, 2014, http://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637/.

132.   At approximately 2:45 p.m., one of Wood's attorneys left the execution chamber and was given access to her cellular telephone in another area of the prison.   The attorney who left the execution contacted Wood's other attorney, who was at the office, and the state courts in an attempt to protect Wood's constitutional rights.

133.   At approximately 2:45 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

134.   At approximately 2:53 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

135.   At approximately 2:55 p.m., another one of Wood's attorneys left the execution chamber and joined the other attorney in another area of the prison.   He also assisted in attempting to protect Wood's constitutional rights.

136.   At approximately 2:59 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

137.   At approximately 3:04 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

138.   At approximately 3:09 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

139.   At 3:27 p.m., the United States District Court for the District of Arizona held an emergency telephonic hearing based on Wood's motion for an emergency stay that was filed minutes earlier. *See Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. July 23, 2015), ECF Nos. 26, 31.

140.   At approximately 3:32 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

141.   At approximately 3:36 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone. Wood continued to gasp for breath.

142.   At approximately 3:39 p.m., after being administered a total of 650 milligrams of midazolam and 650 milligrams of hydromorphone, Wood appeared to stop breathing.

143.   At approximately 3:41 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone.

144.   At approximately 3:46 p.m., Wood was injected with another 50 milligrams of midazolam and 50 milligrams of hydromorphone.

145. At approximately 3:49 p.m., and after being administered a total of 750 milligrams of midazolam and 750 milligrams of hydromorphone, Wood was pronounced dead.

146. Wood died while the emergency hearing was ongoing, and the motion for an emergency stay was denied as moot. *See* Order, *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. July 24, 2015), ECF No. 34.

147. The Office of the Arizona Attorney General, on behalf of the Arizona Department of Corrections, stipulated that it will not seek a warrant of execution for any condemned prisoners until the issues related to the lethal-injection procedures have been finally resolved. *See* Order at 2, *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. filed Nov. 24, 2014), ECF No. 68.

## D.    Alternative Methods of Execution

148. One of the authorized procedures in the Execution Policy involves the use of a single chemical, pentobarbital.

149. Pentobarbital is a barbiturate that, in large doses such as those given in executions, is known to induce a deep comalike unconsciousness and will result in death in a short period of time.

150. Since January 2015, there have been sixteen executions in the United States using a single dose of pentobarbital. Texas has carried out nine executions using a single dose of pentobarbital; Missouri has carried out five executions using a single dose of

pentobarbital; Georgia has carried out two executions using a single dose of pentobarbital.

151. There are at least 125 compounding pharmacies in Oklahoma; approximately 70 of those pharmacies are authorized to compound sterile injectables. Pentobarbital is a known and available drug to Defendants. It would be feasible for Defendants to use pentobarbital in a single-drug formulation to execute Plaintiffs.

152. Another one of the authorized procedures in the Execution Policy involves the use of a single chemical, sodium pentothal. Sodium pentothal is the trade name for the drug sodium thiopental.

153. Sodium thiopental is an ultrashort-acting barbiturate that, in large doses such as those given in executions, is known to induce a deep comalike unconsciousness and will result in death in a short period of time.

154. The patent for the creation of sodium thiopental has expired and the patent provides the scientific information to permit its reproduction. Sodium thiopental drug is a known and available drug to Defendants. It would be feasible for Defendants to use sodium thiopental in a single-drug formulation to execute Plaintiffs.

## Claims for Relief

**Count One: Defendants' use of midazolam in a three-drug execution formula will violate Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment.**

155.  Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

156.  One of the execution procedures identified in the Execution Policy requires sequential intravenous injection of 500 milligrams of midazolam, 100 milligrams of a paralytic agent, and 240 milliequivalents of potassium chloride.

157.  Because of its chemical properties, its mechanism of action, its ceiling effect, and its reliance on the presence of GABA to have effect, midazolam is incapable of producing a state of unawareness that will be reliably maintained after either of the other two drugs—the paralytic and potassium chloride—is injected.

158.  The administration of either the paralytic agent or potassium chloride or both to someone who is aware and sensate violates the Eighth and Fourteenth Amendments to the United States Constitution, by inflicting severe pain, needless suffering, and a lingering death.

159.  The use of midazolam creates a substantial risk of severe pain on its own and when compared to the known and available alternatives.

160.  If Defendants are allowed to proceed with executions of Plaintiffs using midazolam following by a paralytic and potassium chloride, Plaintiffs will be subjected to cruel and unusual punishment,

in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Count Two: The Execution Policy and procedures will violate Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment.**

161.  Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

162.  The Execution Policy states that the IV Team Leader will physically confirm that the condemned prisoner is unconscious five minutes after being administered the first drug. This test for consciousness occurs only once during an execution.

163.  During the execution of Charles Warner, the IV Team Leader determined that Warner was sedated.

164.  The consciousness check does not ensure that a person will be insensate and unarousable by painful stimuli that are later applied.

165.  Sedation occurs on a continuum. A person may be sufficiently sedated to withstand the effects of certain stimuli, but may not be sufficiently sedated to withstand the administration of more painful stimuli.

166.  The current Execution Policy provides no contingency plans should problems occur during an execution. Because Plaintiffs will be prevented from accessing counsel and the courts during an execution,

they must rely upon Defendants to protect their constitutional rights. Feasible revival measures include drugs and medical equipment available to reverse the drugs; e.g., flumazenil (to reverse the effects of midazolam); neostigmine (to reverse the effects of vecuronium or other nondepolarizing neuromuscular blocking agents); calcium, sodium bicarbonate, insulin, or dextrose (to reverse the effects of potassium chloride); and naloxone (to reverse the effects of hydromorphone).

167.  The Execution Policy provides no protection against selection of unqualified medical professionals for the IV Team. Its procedures fail to require any particular level of professional experience or professional proficiency for team members. For example, the current procedures do not require any IV team member to have currency in the practice of setting IVs or even to have recently placed any specific number of peripheral and central lines.

168.  The Execution Policy gives Defendant Patton, a non-medical person, the sole discretion to determine catheter sites for the placement of IVs.

169.  The Execution Policy grants full discretion to Defendant Patton to deviate from any or all of those procedures. Defendant Patton has unlimited discretion to modify execution procedures, including modifications to the drugs used, their dosages, the number of intravenous lines used to deliver the drugs, and the personnel involved in carrying out executions.

170. When problems arise, as they did during the execution of Clayton Lockett, the procedures set out in the Execution Policy vests ultimate supervisory and decision-making authority in Defendant Patton. Yet his position requires no medical training whatever, nor even training in the written procedures set out in the Execution Policy. Defendant Patton is not subject to oversight in making changes or modifications to the lethal-injection procedures, nor are there appropriate checks and balances to ensure against severe pain, needless suffering, and a lingering death during the execution process.

171. As a result, there is a substantial risk that the procedures will not be administered as written. Such deviations create a substantial risk of severe pain and needless suffering due to, for example, improper placement of intravenous catheters and/or inadequately administered drugs intended to cause a state of unawareness.

172. Feasible, readily implemented alternative procedures exist that would significantly reduce the substantial risk that the procedures set out in the Execution Policy will produce severe pain, needless suffering, and a lingering death. These alternative procedures include, but are not limited to, procedures that remedy the deficiencies described above.

173. There is a substantial risk that use of the procedures set out in the Execution Policy, or substantially similar procedures, to execute

Plaintiffs will produce severe pain, needless suffering and a lingering death. This risk is illustrated by the severe pain, needless suffering and lingering death inflicted by Defendants as they purportedly used nearly identical procedures when executing Clayton Lockett.

174. If the attempted executions of Plaintiffs are allowed to proceed in accordance with the deficient procedures identified above, Plaintiffs will be subjected to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Count Three: Defendants' failure to use an ultra-short acting barbiturate violates the ex post facto clause and fails to protect Plaintiffs' state-created rights.**

175. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

176. Prior to November 1, 2011, Oklahoma law required that a sentence of death be executed by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic drug. See 22 Okla. Stat. Ann. § 1014(A) (1977). No court has ever held that this method on its face is unconstitutional. Each of the Plaintiffs was sentenced while this statute was in effect.

177.  In conformity with the statute cited in paragraph 176, each of the Plaintiffs is subject to a judicial death warrant directing that they be executed by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic drug.

178.  The statute identified in paragraph 176 was amended, effective November 1, 2011, to require that the punishment of death be carried out by administration of a lethal quantity of a drug or drugs. The amended statute imposes no requirement that any of the drugs be an ultrashort-acting barbiturate.

179.  An ultrashort-acting barbiturate acts very quickly and, and at sufficient doses, it will maintain anesthesia effectively. These characteristics assure that an individual will swiftly lose awareness and remain unaware of any noxious stimuli that may follow administration of the ultrashort-acting barbiturate.

180.  As applied to Plaintiffs, the amended statute increases the punishment for the offense, and makes that punishment less humane and more painful. If the executions of Plaintiffs are allowed to proceed pursuant to that amended statute, without the use of an ultrashort-acting barbiturate, the Ex Post Facto clause of article I, § 10 of the United States Constitution will be violated.

181.  The statute described in paragraph 176 and the death warrants described in paragraph 177 give each Plaintiff the protected

right to be executed by administration of a lethal quantity of an ultrashort-acting barbiturate. This right represents an interest in life and liberty protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

182. The Oklahoma state courts have refused to protect the right identified in paragraph 181.

183. Defendants are aware of the right identified in paragraph 181, yet seek to execute Plaintiffs without using an ultrashort-acting barbiturate, in disregard of that right.

184. If the attempted executions of Plaintiffs are allowed to proceed without the use of an ultrashort-acting barbiturate, the right described in paragraph 181 will be unlawfully extinguished and thereby deprive each Plaintiff of life and liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**Count Four: Defendants' Execution Policy results in the experimentation of captive human subjects and therefore violates Plaintiffs' rights as guaranteed by the Eighth and Fourteenth Amendments.**

185. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

186. Both the liberty clause of the Fourteenth Amendment and the cruel and unusual clause of the Eighth Amendment recognize the

concept that persons shall be treated with dignity and consistent with evolving standards of decency.

187. There is a real and immediate threat that Defendants will continue their program of human experimentation as they attempt to execute Plaintiffs.

188. In March 2014, ODC selected a dose of 100 milligrams of midazolam as the first drug in the three-drug formula to carry out executions. ODC expected that 100 milligrams of midazolam would ensure that the prisoners would not experience the known unconstitutional pain and suffering from a paralytic and potassium chloride.

189. ODC had no scientific basis to expect that 100 milligrams of midazolam would prevent an individual from experiencing the effects of a paralytic and potassium chloride.

190. ODC's experiment failed when the State carried out Lockett's execution.

191. Although Lockett was determined to be unconscious by the physician-executioner after being administered midazolam, Lockett regained consciousness during the administration of the paralytic or the potassium chloride.

192. Without scientific basis to support their new experiment, Defendants' current Execution Policy now uses 500 milligrams, instead of 100 milligrams, of midazolam in a three-drug protocol.

193. After Lockett's death, Defendants' expert testified that 500 milligrams of midazolam would cause a person to die in less than an hour, and likely thirty minutes. Despite their own expert's testimony, Defendants continue to use drugs that are known to cause pain and suffering in combination with midazolam.

194. Defendants are conducting experiments without any scientifically sound expectation that these experiments will succeed in producing an execution that does not inflict severe pain, needless suffering or a lingering death.

195. Defendants have failed to test their drugs and execution procedures on non-human animals before using them on captive and unwilling human subjects. Without the benefit of animal-testing results, Defendants have no reasonable justification for conducting high-risk experiments with lethal drugs on human subjects.

196. There is a substantial risk that Defendants will continue their experimentation as they attempt to execute Plaintiffs, and that this experimentation will cause Plaintiffs to experience severe pain, needless suffering and a lingering death. This risk is illustrated by the severe pain, needless suffering and lingering death that Defendants inflicted on Clayton Lockett. This risk is also illustrated by the experimental execution of Joseph Wood.

197.  In conducting the experimentation on captive, vulnerable, and unwilling human subjects, Defendants have acted and will act with deliberate indifference to the risk identified in paragraph 196.

198.  Experimentation on human beings who have not provided consent violates an individual's substantive due process right to liberty and a prisoner's right to be free from cruel and unusual punishment. If the Defendants are permitted to carry out executions of Plaintiffs in this manner, they will violate Plaintiffs rights under the Eighth and Fourteenth Amendments to the United States Constitution.

**Count Five: Defendants will deprive Plaintiffs of their First and Fourteenth Amendment right of access to counsel and the courts.**

199.  Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

200.  Each Plaintiff has a right to petition the government, guaranteed by the First and Fourteenth Amendments to the United States Constitution. This right exists during every stage of an execution.

201.  Each Plaintiff has a right to consult with and be represented by his counsel before the courts, guaranteed by 18 U.S.C. § 3599 and the Fourteenth Amendment to the United States Constitution. This right exists during every stage of an execution.

202.  The right to counsel and the right to petition the government provide the only mechanism whereby a condemned prisoner can challenge violations of the Eighth and Fourteenth Amendment that may occur on the day of a scheduled execution, including immediately before and during the execution.

203.  For Plaintiffs to have access to counsel on the day of their scheduled executions, they must be afforded confidential and reliable communication with counsel.

204.  For Plaintiffs to have effective access to counsel, Plaintiffs' counsel must be able to observe all steps of any execution, from the time that the condemned prisoner is brought into the execution chamber until the time that the prisoner is pronounced dead.

205.  For Plaintiffs to have effective access to counsel and the courts, Plaintiffs' counsel must be able to communicate with the courts as to any problems or deviations that occur during the execution that impact Plaintiffs' constitutional rights.

206.  Defendants know that Plaintiffs are represented by counsel, and Plaintiffs want to maintain access to their counsel during each step of the execution process.

207.  Defendants are aware that Plaintiffs need to be able to communicate with counsel on the day of their execution during their last legal visit.  The legal visit accommodations, however, do not permit confidential communications. The legal visitation accommodations also

prevent two attorneys from communicating with a client at the same time.

208.  Defendants will deprive Plaintiffs from communicating with counsel immediately before or during an execution in the event there is ongoing litigation in the courts or if there are constitutional violations that arise during the execution. During the execution, counsel is not permitted to have access to a telephone nor may counsel leave their seats.

209.  Defendants will deprive counsel audio and visual access to the critical stage of the insertion and maintenance of intravenous catheters.

210.  By denying Plaintiffs access to counsel and the courts during their executions, Defendants will violate Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and under 18 U.S.C. § 3599.

**Count Six: Defendants have deprived and will continue to deprive Plaintiffs of their First and Fourteenth Amendment right of access to governmental information.**

211.  Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

212. Each Plaintiff has a right of access to governmental proceedings and information about those proceedings, guaranteed by

the First and Fourteenth Amendments to the United States Constitution.

213.  Plaintiffs have a First Amendment interest, no less powerful than that of the public and the press, in being informed of the means by which the state intends to carry out executions.

214. Defendants' deliberate concealment of information that would enable Plaintiffs to determine how Defendants intend to carry out their death sentences, including the failure to disclose in advance of the execution details about the drugs used, the rationale for the selection of these drugs and their dosages, the qualifications and training of the persons administering them, and Defendants' ability to prepare for and respond to complications that may arise during an execution, deprives Plaintiffs of their First Amendment right of access to governmental proceedings.

215.  The Execution Policy also imposes two gag orders on all ODC staff. First, it requires them to "reserv[e] public comment" on any and all facts of an execution. (Execution Policy at 4 § III (A)(1)(e).) Second, it provides: "All ODOC and contract staff is expressly prohibited from providing information not readily available in the public domain." (Execution Policy at 24 § VII(F)(2)(b).)

216.  The lack of transparency deliberately enforced by the gag orders and directives referenced in paragraph 215, and any similar directives, interfere with Plaintiffs' access to information about flaws in

Defendants' executions method(s), to include without limitation procedures used to administer the drugs and the function, or lack thereof, of the drugs themselves.

217. The Execution Policy effectively prevents Plaintiffs as members of the public, from obtaining information regarding governmental proceedings and therefore deprives Plaintiffs of their First and Fourteenth Amendment rights.

## Count Seven: Defendants' Execution Policy violates Plaintiffs' rights to notice and opportunity to be heard.

218. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Second Amended Complaint as if fully set forth herein.

219. There is a real and immediate threat that Defendants Patton, Trammell, and H-Unit Section Chief will attempt to execute Plaintiffs without providing them with timely and meaningful notice as to how they will be executed, and will therefore deprive them of meaningful access to counsel and the courts.

220. The Execution Policy provides for written notice to be given to the condemned prisoner only ten calendar days before the scheduled execution detailing the particular drugs to be used and whether they are compounded. It has no requirement for notice as to the source and characteristics of those drugs and the method of their administration, including the way that venous access will be obtained.

221. As written, the Execution Policy does not provide sufficient notice to Plaintiffs of how they will be executed. The Execution Policy lists multiple options, does not exclude unlisted and unwritten options, and allows Defendant Patton to deviate from any of those procedures at will and without notice, thereby making the written instrument virtually meaningless as a form of notice.

222. Notice only as to the drugs to be used, and the fact of any compounding, with the execution only ten days away, is insufficient to allow Plaintiffs and the courts to determine whether executions will be carried out lawfully by Defendants. Without timely and meaningful notice, Plaintiffs will be unable to bring an effective legal challenge to any unlawful aspects of their proposed execution.

223. The risk of unlawful action by Defendants is substantial, as evidenced by the severe pain, needless suffering and lingering death that Defendants inflicted during their execution of Clayton Lockett, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

224. By failing to require and provide meaningful and effective notice of how Plaintiffs will be executed, Defendants are depriving Plaintiffs of their right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment, and are subjecting Plaintiffs to cruel and unusual punishment, in violation

of the Eighth and Fourteenth Amendments to the United States
Constitution.

## Relief Requested

Plaintiffs request:

A.     That Defendants be enjoined from attempting to execute
Plaintiffs:

    1.     using midazolam followed by a paralytic and potassium
chloride;

    2.     under the current Execution Policy;

    3.     without providing timely and meaningful notice to
Plaintiffs of how they will be executed, including identification of
the drugs to be used, the source and characteristics of those drugs,
and the method of their administration, including the way that
venous access will be obtained;

    4.     using drugs that do not include an ultrashort-acting
barbiturate;

    5.     in the course of human experimentation with drugs
and procedures of scientifically unproven efficacy in avoiding
severe pain, needless suffering and a lingering death;

    6.     without having access to information regarding the
execution process, without having access to counsel at every stage
of the proceedings, and without having access to the courts.

B.   That a declaratory judgment be awarded declaring that Plaintiffs have the legal right not to be executed:

1.   using midazolam followed by a paralytic and potassium chloride;

2.   under the current Execution Policy;

3.   without being provided timely and meaningful notice from Defendants of how Plaintiffs will be executed, including identification of the drugs to be used, the source and characteristics of those drugs and the method of their administration, including the way that venous access will be obtained;

4.   using drugs that do not include an ultrashort-acting barbiturate;

5.   in the course of human experimentation with drugs and procedures of scientifically unproven efficacy in avoiding severe pain, needless suffering and a lingering death;

6.   without providing access to information regarding the execution process, without providing access to counsel at every stage of the proceedings, and without providing access to the courts.

C.   An award of attorney fees and costs.

D.   Such other relief to which Plaintiffs may be entitled.

Respectfully submitted,


*s/ Patti P. Ghezzi*

Patti P. Ghezzi, OBA #6875
Office of the Federal Public Defender
215 Dean A. McGee Ave.
 Suite 109
Oklahoma City, 73102
Telephone: 405 609 5975
Facsimile:  405 609 5976
Email:  patti_ghezzi@fd.org

*Attorney for Plaintiffs Cole, Cuesta-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon, Johnson, Littlejohn, Pavatt, Simpson, and Underwood*

_s/ Randy A. Bauman_*

Randy A. Bauman, OBA #610
Office of the Federal Public Defender
215 Dean A. McGee Ave
 Suite 109
Oklahoma City, OK  73102
Telephone: 405 609 5975
Fascimile:  405 609 5976
Email:  randy_bauman@fd.org

_Attorney for Plaintiffs Cole, Cuesta-Rodriguez, Davis, Fairchild, Grant, Grissom, Harmon, Johnson, Littlejohn, Pavatt, Simpson, and Underwood_

_s/ Mark Henricksen_*

Mark Henricksen, OBA #4102
Henricksen & Henricksen, Lawyers, Inc.
600 N. Walker Ave.
 Suite 220
Oklahoma City, OK  73102
Telephone: 405 609 1970
Facsimile:  405 609 1973
Email:  mark@henricksenlaw.com

_Attorney for Plaintiffs Andrew, Glossip and Jackson_

*s/ David B. Autry**

David B. Autry, OBA #11600
1021 N.W. 16th St.
Oklahoma City, OK  73106
Telephone: 405 521 9600
Facsimile:  405 521 9669
Email:  dbautry44@hotmail.com

*Attorney for Plaintiff Hancock*


*s/ Mark H. Barrett**

Mark H. Barrett, OBA #557
111 N. Peters Ave.
 Suite 200
Norman, OK  73069
Telephone: 405 364 8367
Facsimile:  405 364 8329
Email:  barrettlawoffice@gmail.com

*Attorney for Plaintiff Jones*


*s/ Fred L. Staggs**

Fred L. Staggs, OBA #8534
510 N.W. 17th St.
Oklahoma City, OK  73103
Telephone:  405 990 5523
Email:  staggslaw@aol.com

*Attorney for Plaintiff Mitchell*

49

_s/ Dale A. Baich_*

Dale A. Baich
Office of the Federal Public Defender
850 W. Adams St.
 Suite 201
Phoenix, AZ  85007
Telephone: 602 382 2816
Facsimile:  602 889 3960
Email:  dale_baich@fd.org

_Attorney for Plaintiff Wood_


_s/ Robin C. Konrad_*

Robin C. Konrad
Office of the Federal Public Defender
850 W. Adams St.
 Suite 201
Phoenix, AZ  85007
Telephone: 602 382 2816
Facsimile:  602 889 3960
Email:  robin_konrad@fd.org

_Attorney for Plaintiff Wood_


*Signed by filing attorney with permission.

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August, 2015, I served this document by ECF notification to the following persons:

John D. Hadden, Aaron J. Stewart, and Jeb E. Joseph
Assistant Attorneys General
Oklahoma Attorney General's Office
Litigation Division
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105

*Patti Palmer Ghezzi*
Patti Palmer Ghezzi