**IN THE SUPREME COURT OF THE STATE OF OKLAHOMA**
**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 1 9 2016

RICK WARREN
COURT CLERK

IN THE MATTER OF THE MULTICOUNTY   )   Case No. SCAD-2014-1
GRAND JURY, STATE OF OKLAHOMA   )   D.C. Case No. GJ-2014-1
   27

### INTERIM REPORT NUMBER 14

The Fifteenth Multicounty Grand Jury of Oklahoma received evidence in its session held

on May 17 through 19, 2016. In this session, the grand jury received testimony of witnesses, and

numerous exhibits, in several different matters. The grand jury also returned one (1) Indictment

which was returned to the Presiding Judge in Open Court for review and further action pursuant

to law.

**FINDINGS OF THE FIFTEENTH MULTICOUNTY GRAND JURY AS TO THE USE AND ATTEMPTED USE OF POTASSIUM ACETATE BY THE OKLAHOMA DEPARTMENT OF CORRECTIONS IN THE EXECUTION OF INMATE CHARLES FREDERICK WARNER AND THE SCHEDULED EXECUTION OF INMATE RICHARD GLOSSIP**

The Fifteenth Multicounty Grand Jury of Oklahoma received evidence in its sessions held

in October, November, and December 2015, and January, February, March, April, and May

2016, related to the use and attempted use of potassium acetate by the Oklahoma Department of

Corrections ("Department") in the execution of Charles Frederick Warner ("Warner") and the

scheduled execution of Richard Eugene Glossip ("Glossip"). The Multicounty Grand Jury finds

that Department of Corrections staff, and others participating in the execution process, failed to

perform their duties with the precision and attention to detail the exercise of state authority in

such cases demands, to wit:

- the Director of the Department of Corrections ("Director") orally modified the execution protocol without authority;

- the Pharmacist ordered the wrong execution drugs;

1

**Exhibit 3**

- the Department's General Counsel failed to inventory the execution drugs as mandated by state purchasing requirements;

- an agent with the Department's Office of Inspector General ("OIG Agent 1") failed to inspect the execution drugs while transporting them into the Oklahoma State Penitentiary;

- Warden A failed to notify anyone in the Department that potassium acetate had been received;

- the H Unit Section Chief failed to observe the Department had received the wrong execution drugs;

- the IV Team failed to observe the Department had received the wrong execution drugs; the Department's Execution Protocol failed to define important terms, and lacked controls to ensure the proper execution drugs were obtained and administered;

- and the Governor's General Counsel advocated the Department proceed with the Glossip execution using potassium acetate.

Based on these failures, justice has been delayed for the victims' families and the citizens of Oklahoma, and confidence further shaken in the ability of this State to carry out the death penalty. In support of its findings, the Fifteenth Multicounty Grand Jury informs this Honorable Court as follows:

**I.     The Oklahoma Court of Criminal Appeals set the execution dates for Charles Frederick Warner and Richard Eugene Glossip after their respective trials and the exhaustion of their appeals.**

On January 15, 2015, the State of Oklahoma carried out the execution of Charles Frederick Warner. Having previously been convicted of Murder in the First Degree,[1] Warner was sentenced on June 23, 2003, by the trial court to be put to death:

. . . by continuous, intravenous administration of a lethal quantity of an ultra-short acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical

---

[1] Oklahoma County Case No. CF-1997-5249.

**Exhibit 3**

practice, or in any other manner that may be designated by the laws of the State of Oklahoma.[2]

On October 24, 2014, the Oklahoma Court of Criminal Appeals (Court of Criminal Appeals) issued an Order setting Warner's execution date for January 15, 2015,[3] and the Director subsequently scheduled the execution for 6:00 p.m. on that date.[4]

On July 8, 2015, the Court of Criminal Appeals issued an order setting the execution date for Glossip, also previously convicted of Murder in the First Degree, for September 16, 2015. The Director scheduled Glossip's execution for 3:00 p.m. on that date.[5]  On September 16, 2015, the Court of Criminal Appeals stayed Glossip's execution until September 30, 2015.[6]

**II.     The Execution Protocol provides for three primary teams—further broken down into nine cooperative teams—who together administer the death penalty and who are required to receive extensive training in the procurement, preparation, and administration of execution drugs.**

---

[2] Grand Jury Ex. #2a, *Death Warrant, State v. Warner*, Oklahoma Co. CF-1997-5249.

[3] Grand Jury Ex. #29a, *Court of Criminal Appeals Order Setting Execution Date for Charles Frederick Warner Dated Oct. 24, 2014*. Warner's execution was previously set March 27, April 29, May 13, and November 13, 2014. Grand Jury Ex. #29b, *Court of Criminal Appeals Order Rescheduling Execution Dates*. The May 13, 2014, execution date was continued, in part, at the Director's request to provide ". . . sufficient time for a complete review/revision of the Execution Protocols in order to conform to best practices and ensure that Oklahoma protocol adopts proven standards." *Id.* Likewise, Warner's November 13, 2014, execution date was rescheduled at the State's request in order to implement recommendations contained in the September 4, 2014, report on the Lockett execution, obtain the execution drugs, obtain the services of necessary medical personnel, and complete the required training of execution team members. Grand Jury Ex. #29a.

[4] Grand Jury Ex. #2, *Execution Procedures Checklist, Inmate: Charles Frederick Warner, #273669*; Grand Jury Ex. #35 *Email Between the Department and OBNDD's Gen. Counsel. See also* Grand Jury Ex. #1, *Operational Procedure OP-040301, Effective Sept. 30, 2014*, Sec. VII(A)(2).

[5] Tr. of Dep't. Gen Counsel, Oct. 22, 2015, pg. 90, ln. 7-10.

[6] The Director scheduled the execution for 3:00 p.m. on this date. Tr. of Dep't. Gen Counsel, Oct. 22, 2015, pg. 90, ln. 7-10.

**Exhibit 3**

**a. The Department's Execution Protocol was revised on September 30, 2014, and again on June 30, 2015.**

On April 29, 2014, Clayton Lockett ("Lockett") was executed at the Oklahoma State Penitentiary.[7] Immediately afterward, and as a result of complications arising from this execution, Governor Mary Fallin issued an executive order appointing the Department of Public Safety to review the events leading up to, and during, Lockett's execution.[8] During this same period, and also as a result of the Lockett execution, the Director assembled a team to revise the Department's Execution Protocol, set out in Field Memorandum OSP-040301-01.[9] The goals of this revision included: improving logistics and accountability, creating a system of checks and balances in every aspect of the process, and ensuring procedures were properly implemented through logging and documentation.[10] Around this same time, the Department also rebuilt the Oklahoma State Penitentiary's H Unit,[11] and obtained additional equipment.[12]

---

[7] Tr. of AFO, pg. 6, ln. 25, pg. 7, ln. 1-3.

[8] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 9, ln. 14-25, pg. 10, 1-8, pg. 12, ln. 16-25. The Department has two levels of policy. These include Department-wide Operational Policies and facility-level Field Memorandums. Tr. of Dir., Oct. 21, 2015, pg. 18, ln. 22-24. The Director issues Operational Policies, while wardens issue Field Memorandums. Tr. of Dir., Oct. 21, 2015, pg. 18, ln. 22-24. Field Memorandums outline facilities' implementation of Department-wide policy. Tr. of Dir., Oct. 21, 2015, pg. 19, ln. 4-12. At the time of the Lockett execution, executions were carried out under OSP-040301-01, a Field Memorandum. Grand Jury Ex. #25, *Field Memorandum OSP-040301-01. See also* Tr. of AFO, pg. 8, ln. 20-25, pg. 9, ln. 1-13 (noting at the time of the Lockett execution, there was also an Operational Policy that would "typically [be] an overview of the policy," with the Field Memorandum providing more detail).

[9] Tr. of AFO, pg. 6, ln. 15-25, pg. 7, ln. 1-21, pg. 12, ln. 1-11; Tr. of SOT1, pg. 5, ln. 1-4; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 12, ln. 25, pg. 13, ln. 1-3; Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 5, ln. 18-25; Grand Jury Ex. #25.

[10] Tr. of AFO, pg. 15, ln. 1-4.

[11] Tr. of Dir., Jan. 21, 2016, pg. 5, ln. 1-10. The H Unit of the Oklahoma State Penitentiary, in addition to housing inmates under administrative and disciplinary segregation, is also the site of the Oklahoma death row and execution chamber.

4

**Exhibit 3**

The Director oversaw the revisions with the assistance of other administrators, including the General Counsel, Security Operations personnel, the Oklahoma State Penitentiary's Warden, a Division Manager, and others. [13]   As part of the revision process, the Director asked administration members to obtain publically available execution policies from other States, including Arizona, Florida, and Texas, identify these States' policies, and merge their best and most efficient practices into the Department's new Execution Protocol.[14]

In July 2014, a working draft of the revised Protocol was referred to the Department's General Counsel for review.[15]   The Department's General Counsel testified he[16] was heavily involved in the development of the Execution Protocol, providing advice and legal opinions to the Director.[17]   The Department also referred the protocol to the Attorney General's Litigation and Criminal Appeals Divisions for review of any potential constitutional issues.[18]   The Attorney General's Office returned a draft version to the Department with hand-written comments and

---

[12] Tr. of IVTL, pg. 87, ln. 11-19; Tr. of AFO, pg. 48, ln. 3-23; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 8, ln. 6-13.

[13] Tr. of Dir., Jan. 21, 2016, pg. 3, ln. 20-25, pg. 4, ln. 1-11; Tr. of AFO, pg. 7, ln. 8-15.

[14] Tr. of Dir., Jan 21, 2016, pg. 5, ln. 13-14; Tr. of AFO, pg. 7, ln. 4-17, pg. 12, ln. 4-11, pg. 16, ln. 2-21. Another witness indicated the third state was Ohio, not Texas. Tr. of AFO, pg. 16, ln. 18-21. Although all three states' protocols were reviewed during the revision process, the Department's final protocol mirrored Arizona's. Tr. of AFO, pg. 17, ln. 1-6, Tr. of SOT1, pg. 24, ln. 12-19.

[15] Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 6, ln. 6-20.

[16] References in this Report to unnamed individuals will be by the pronoun "he," regardless of the actual gender of the individual.

[17] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 6, ln. 2-8.

[18] Grand Jury Ex. #51, *Letter from Dep't General Counsel.*

**Exhibit 3**

suggestions, most of which the Director approved.[19]  Following final review by the Director and

the Department's General Counsel, [20] the revised Execution Protocol, OP 04-0301-"Execution of

Offenders Sentenced to Death," was implemented on September 30, 2014.[21]  The policy was

minimally amended on June 30, 2015, prior to Glossip's scheduled execution.[22]

One of the major additions to the Execution Protocol was Attachment D, which lists the

drugs authorized to be used in an execution, and a step by step protocol for administering these

drugs.[23]  Attachment D of the September 30, 2014, Execution Protocol lists four chemical charts,

Chart A,[24] Chart B,[25] Chart C,[26] and Chart D,[27] from which the Department could select when

---

[19] *Id.*

[20] Tr. of AFO, pg. 28, ln. 3-11.

[21] Grand Jury Ex. #1.

[22] Grand Jury Ex. #11, *Operational Procedure OP-040301, Effective June 30, 2015.*  The Litigation and Criminal Appeals Units of the Attorney General's Office also reviewed this revised execution protocol, effective June 30, 2015, for constitutional issues prior to implementation. Grand Jury Ex. #51.

[23] Grand Jury Ex. #1d, *Operational Procedure OP-040301, effective Sept. 30, 2014; Attachment D, Preparation and Admin. of Chemicals*; Grand Jury Ex. #11d, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment D, Preparation and Administration of Chemicals*; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 14, ln. 13-17.

[24] Two syringes of 2.5 gm pentobarbital and one syringe of 60 ml heparin/saline.  Grand Jury Ex. #1d, Sec. C(1); Grand Jury Ex. #11d, Sec. C(1).

[25] Four syringes of 1.25 gm sodium pentothal and one syringe of 60 ml heparin saline. Grand Jury Ex. #1d, Sec. C(2); Grand Jury Ex. #11d, Sec. C(2).

[26] Two syringes of 250 mg midazolam, two syringes of heparin/saline, and one syringe of 500 mg hydromorphone. Grand Jury Ex. #1d, Sec. C(3).

[27] Two syringes of 250 mg midazolam, two syringes of 50 mg vercuronium bromide, two syringes of 120 mEq potassium chloride, and three syringes of 60 ml heparin/saline.  Grand Jury Ex. #1d, Sec. C(4); Grand Jury Ex. #11d, Sec. C(4).  The vecuronium bromide can be substituted

**Exhibit 3**

performing an execution by lethal injection.[28]   The Director has sole discretion as to which chemical chart to use for a scheduled execution, but the Department must provide the offender notice of the Director's decision in writing ten days prior to the scheduled execution.[29]   As part of the June 30, 2015, amendments, however, Chart C was removed from the Protocol.[30]

### b. The Execution Protocol provides for three sets of execution teams who coordinate events inside and outside the execution chamber.

Prior to each scheduled execution and pursuant to the Execution Protocol, the composition of the execution teams is reviewed.   Per the Protocol, the wardens of the Oklahoma State Penitentiary and Mabel Bassett Correctional Center ("Mabel Bassett") review the current team rosters and recommend retention or replacement of staff alternates to the Division Manager of West Institutions.[31]   The Division Manager of West Institutions evaluates the teams' composition and the wardens' recommendations, and then makes recommendations to the Director.[32]   In carrying out this review, the Protocol tasks the Associate Director of Field Operations with coordinating the activities of the Division Managers of East and West

---

with two syringes of 50 mg pancuronium bromide or two syringes of 50 mg rocuronium bromide. *Id.* at Sec. C(4)(b).

[28] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 38, ln. 10-24.

[29] Grand Jury Ex. #1d, Sec. D; Grand Jury Ex. #11d, Sec. D.

[30] Grand Jury Ex. #11d. Sec. C(3).

[31] *Id.* at Sec. III(B)(2). The Division Manager of West Institutions is responsible for oversight of all private prisons and halfway houses in the State of Oklahoma, all of the Department's county jail contracts, and all public prisons in the western half of the State. Tr. of HUSC, pg. 4, ln. 23-25, pg. 5, ln. 1-22.

[32] Grand Jury Ex. #1, Sec. III(B)(3); Grand Jury Ex. #11, Sec. III(B)(3). Team members are evaluated based on factors set out in Section III(B)(4) of the protocol. *Id.* at Sec. III(B)(4).

**Exhibit 3**

Institutions[33] and the wardens of the Oklahoma State Penitentiary and Mabel Bassett, but does not define what coordinating those activities entails.[34]

Execution Protocol provides for three sets of execution teams: the Command Teams, which coordinate events outside the execution chamber, the H Unit Section Teams, which coordinate events inside the execution chamber, and the Intravenous (IV) Team.[35] The Command Teams consist of:[36]

- The Command Team,[37]

- the Maintenance Response Team,

- the Critical Incident Management Team,

- the Traffic Control Team,

- the Witness Escort Team,

- and the Victim Services' Team.[38]

The H Unit Section Teams are directed by the H Unit Section Chief and consist of:

- the Restraint Team

---

[33] The Division Manager of East Institutions supervises public prisons in the eastern half of the State.

[34] Grand Jury Ex. #1, Sec. III(B)(1); Grand Jury Ex. #11, Sec. III(B)(1).

[35] Grand Jury Ex. #1, Sec. IV, Grand Jury Ex. #11, Sec. IV.

[36] The Division Manager of East Institutions serves as Commander of the Command Team, and all other team members are selected by the Division Manager of East Institutions with the documented approval of the Director. *Id.* at Sec. IV(A)-(B).

[37] The Command Team is comprised of at least three team members, including a commander, recorder, telephone operator, and others as necessary, and provides overall coordination of execution procedures. *Id.* at Sec IV(A).

[38] All of these teams report to the Command Team with the exception of the Victim Services Team, which reports to the Witness Escort Team. *Id.* at Sec. IV. (D)-(H).

8

**Exhibit 3**

- and the Special Operations Team.[39]

The third execution team—the IV Team—works closely with the H Unit Section Teams but answers directly to the Director.[40]   Although all teams play an important role in the execution process, this Grand Jury has focused on the training, duties, actions, and failures of the H Unit Section Teams and the IV Team.

i. **The Special Operations Team—a team within the H Unit Section Teams working inside the execution chamber - administer the execution drugs per the Protocol.**

The H Unit Section Chief, who is selected by the Director, oversees the activities of the H Unit Section Teams, including the Special Operations Team.[41]   The Special Operations Team is comprised of a minimum of five team members including a team leader, a recorder, and three other team members, and is primarily responsible for administering the execution drugs.[42]   Per the Protocol, the Division Manager of West Institutions, with the documented approval of the Director, selects the team members, including the team leader who then designates each team member's function.[43]   In practice, however, the Director selected the Special Operations Team, and the Special Assistant to the Director prepared the memorandum documenting the Director's approval of these team members.[44]

---

[39] *Id.* at Sec. IV.

[40] *Id.* at Sec. IV.

[41] Grand Jury Ex. #1, Sec. IV(B)(1)-(3); Grand Jury Ex. #11, Sec. IV(B)(1)-(3).  *See also* Tr. of HUSC, pg. 6, ln. 8-21.

[42] Grand Jury Ex. #1, Sec. IV(B)(3)(b)(1)-(2); Grand Jury Ex. #11, Sec. IV(B)(3)(b)(1)-(2). *See also* Tr. of HUSC, pg. 11, ln. 10-13.

[43] Grand Jury Ex. #1, Sec. IV(B)(3)-(4); Grand Jury Ex. #11, Sec. IV(B)(3)-(4).

[44] Tr. of HUSC, pg. 12, ln. 17-25, pg. 13, ln. 1; Grand Jury Ex. #3, *Memo Re. Selection and Training of Execution Team Members.*

9

**Exhibit 3**

In both the Warner and scheduled Glossip executions, Warden A served as Special Operations Team Leader, supervising three team members and the Special Operations Team's recorder.[45] Per Warden A's designation, each Special Operations Team member was responsible for pushing the syringes for one of the three execution drugs, and one syringe of heparin/saline.[46] Although the Special Operations Team Leader was the same for both the Warner and Glossip executions, only one of the Special Operations Team members participated in both.

### ii. The IV Team—a third execution team that works closely with the H Unit Section Teams—prepares the drugs and was, in practice, selected by the Department's General Counsel.

The IV Team, although selected by the Director, works closely with the H Unit Section Teams.[47] The IV Team is made up of two or more members, with the IV Team Leader directing the IV Team's responsibilities, which include: drawing up the syringes from the drug vials, establishing adequate IV access, verifying the IVs are working, determining loss of consciousness, and pronouncing death.[48] The other IV Team members may include a physician, physician's assistant, nurse, emergency medical technician, paramedic, military corpsman, or other certified or licensed personnel, including those trained in the United States military.[49] The

---

[45] Grand Jury Ex. #3a, *List of Execution Team Members Effective Jan. 12, 2015*; Grand Jury Ex. #3c, *List of Execution Team Members Effective Sept. 14, 2015*.

[46] Tr. of SOT1, pg. 9, ln. 11-25, pg. 10, ln. 1-22; Tr. of Warden A, pg. 18, ln. 7-25, pg. 19, ln. 1-3.

[47] Grand Jury Ex. #1, Sec. IV(C)(3), Grand Jury Ex. #11, Sec IV(C)(3). Per the Execution Protocol, licensing and criminal history reviews are conducted by the Department's OIG prior to an IV Team member's retention. *Id.* at Sec. IV(C)(3)(b).

[48] Grand Jury Ex. #21, *Transcript of Interview of IVTL*, pg. 34, ln. 15-25, pg. 35, ln. 1-20.

[49] Grand Jury Ex. #1, Sec. IV(C)(1).

**Exhibit 3**

IV Team members assist the IV Team Leader in drawing up the drugs, establishing IV access, and other tasks as needed.[50]

In both the Warner execution and Glossip scheduled execution, the IV Team consisted of two members: the IV Team Leader (a licensed physician) and IV Team Member A (a licensed paramedic).[51] Contrary to Protocol, however, the majority of the IV Team's selection process, along with the licensing review,[52] was performed by the Department's General Counsel.[53]

In October 2014, the Director and the Department's General Counsel contacted the IV Team Leader by telephone about serving in the Warner execution, and the Department's General Counsel followed up with several additional phone conversations.[54] In late October 2014, the IV Team Leader met with the Director and the Department's General Counsel at the Department's headquarters.[55]   At this meeting, and in subsequent conversations, the Director and the Department's General Counsel verbally outlined the Execution Protocol with the IV Team

---

[50] Tr. of IVTM, pg. 15, ln. 22-25, pg. 16, ln. 1-15.

[51] Tr. of IVTM, pg. 5, ln. 23-25, pg. 6, ln. 1-4, pg. 8, ln. 6-14; Grand Jury Ex. #21, pg. 3, ln. 17-21, pg. 4, ln. 21-25, pg. 5, ln. 1-11. The IV Team was the same in both the Warner and scheduled Glossip executions. Tr. of IVTL, pg. 7, ln. 12-15.

[52] Grand Jury Ex. #20, *Interview of Agent 1*, pg. 16, ln. 13-25. Agent 1 initialed on Warner's Execution Procedures Checklist that he conducted both licensing and criminal history reviews for the IV Team members on December 30, 2015, at 2:00 p.m.  Grand Jury Ex. #2.

[53] Tr. of IVTM, pg. 11, ln. 1, pg. 14, ln. 19-25, pg. 15, ln. 1-25; pg. 16, ln. 1-9; Grand Jury Ex. #22, *Interview of IVTM*, pg. 7, ln. 7-18, pg. 8, ln. 10-19. The Department's General Counsel testified the Director tasked him with locating a physician and another IV Team member. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 6, ln. 15–16. The IV Team Leader stated his direct supervisors during the execution were the Director and the Department's General Counsel, with the Department's General Counsel acting as his main point of contact throughout the process. Tr. of IVTL, pg. 8, ln. 20-25, pg. 9, ln. 1-2.

[54] Tr. of IVTL, pg. 9, ln. 12-16; Grand Jury Ex. #21, pg. 6, ln. 18-25, pg. 7, ln 1-10, pg. 15, ln. 17-25, pg. 16, ln. 1-25, pg. 17, ln. 1-25, pg. 18, ln. 1-4.

[55] Tr. of IVTL, pg. 19, ln. 5-15; Grand Jury Ex. #21, pg. 18, ln. 5-11.

**Exhibit 3**

Leader, including the execution drugs utilized, but never provided the IV Team Leader a written copy of the Protocol.[56]

Similarly, in the fall of 2014, the Department's General Counsel contacted IV Team Member A by telephone about serving in the Warner execution.[57] Shortly thereafter, IV Team Member A met with the Department's General Counsel for an informal interview.[58] IV Team Member A did not meet the Director prior to being hired.[59] A few weeks later, the Department's General Counsel called IV Team Member A to arrange training.[60] Although the Department's General Counsel discussed the Execution Protocol with IV Team Member A, including the drugs to be utilized, the Department's General Counsel never provided IV Team Member A a written copy of the Execution Protocol.[61] IV Team Member A testified it was not until he attended his first hands-on training, on January 14, 2015, the day before the Warner execution, he understood what "assisting the IV Team Leader" entailed.[62] Moreover, it was not until the day of the execution he realized he would be assisting in drawing up the syringes from the vials.[63]

---

[56] Tr. of IVTL, pg. 25, ln. 4-23, pg. 88, ln. 13-25; Grand Jury Ex. #21, pg. 18, ln. 24-25, pg. 19, ln. 1-9, pg. 27, ln. 22-25, pg. 28, ln. 1-7, pg. 71, ln. 22-25, pg. 72, ln. 1.

[57] Tr. of IVTM, pg. 10, ln. 23-25, pg. 11, ln. 1, pg. 14, ln. 19-25, pg. 15, ln. 1-25, pg. 16, ln. 1-12.

[58] *Id.* at pg. 15, ln. 1-21.

[59] Grand Jury Ex. #22, pg. 10, ln. 7-18.

[60] *Id.*

[61] Tr. of IVTM, pg. 17, ln. 5-25, pg. 18, ln. 1-21. The IV Team was also not provided a copy of the revised Execution Protocol prior to the scheduled Glossip execution. *Id.* at pg. 19, ln. 8-11, pg. 51, ln. 5-6.

[62] *Id.* at pg. 43, ln. 17-25, pg. 44, ln. 1-11.

**Exhibit 3**

### iii. The Execution Protocol requires the completion of many trainings in preparation for an execution, but training lacked key components, and the IV Team was largely absent.

Execution Protocol mandates Command and H Unit Section teams attend at least ten trainings within twelve months preceding a scheduled execution.[64] Weekly trainings for these teams must occur starting thirty-five days prior to the execution date; within two days of a scheduled execution, they must attend a minimum of two training sessions.[65] This training includes scenarios and contingency plans for execution equipment and supply issues, offender IV access issues, other unanticipated medical issues involving the offender or an execution team member, and Oklahoma State Penitentiary security issues.[66]

During trainings, the H Unit Section Teams practiced the Execution Protocol from start to finish, including administration of the execution drugs, and ran scenarios on possible complications.[67] Primary and secondary drug manifolds—a manifold being the apparatus used to connect IV lines to syringes—were used, with each manifold containing color-coded labels

---

[63] *Id.* Grand Jury Ex. #9, *Execution Training Attendance Sheets From Oct. 7, 2014 to Jan. 15, 2015*. The IV Team Leader was made aware the day prior to the Warner execution that he would be responsible for drawing up the syringes. Tr. of IVTL, pg. 119, ln. 17-25, pg. 120, ln. 1-6.

[64] Grand Jury Ex. #1, Sec. V(A); Grand Jury Ex. #11, Sec. V(A).

[65] Grand Jury Ex. #1, Sec. V(B)-(C); Grand Jury Ex. #11, Sec. V(B)-(C). The Division Manager of West Institutions is responsible for activating the training schedule thirty-five days prior to an execution and for ensuring execution team members receive adequate training, written instruction, and practice. *Id.* at Sec. VII(B)(2)(d).

[66] *Id. See also* Grand Jury Ex. # 29a.

[67] Tr. of SOT1, pg. 10, ln. 23-25, pg. 11, ln. 8-14; Tr. of HUSC, pg. 21, ln. 3-22; Grand Jury Ex. #10, *Execution Training Notes From Oct. 7, 2014 to Jan. 14, 2015*; Grand Jury Ex. #10a, *Execution Training "Corr. Serv. Logs" From Oct. 7, 2014 to Jan 14, 2015*; Grand Jury Ex. #14a, *Execution Training Notes [long hand] From Jan. 22, 2015 to Sept. 29, 2015*; Grand Jury Ex. #14b, *Execution Training Notes [typed] From Jan. 22, 2015 to Sept. 29, 2015*; Grand Jury Ex. #14c, *Execution Training "Corr. Serv. Logs" From Oct. 7, 2015 to Jan. 14, 2015.*

**Exhibit 3**

with the names of the drugs, the drug amounts, and the designated syringe numbers.[68]   The syringes were also labeled with color-coded, pre-printed labels, identical to the manifold labels, containing the names of the chemicals, the chemical amounts, and the designated syringe numbers.[69]   Although each syringe was labeled with the name and amount of the actual execution drug, during training the syringes were filled with water.[70]   Additionally, the Special Operations Team Leader labeled the syringes prior to training, so the Special Operations' and IV Team's members did not practice labeling the syringes, drawing up the syringes from the vials, or comparing the syringes' labels to the vials' labels to ensure they corresponded.[71]

The Command and H Unit Section Teams began training for Warner's execution, scheduled January 15, 2015, on October 7, 2014, and weekly training continued through the week of the execution.[72]   Daily trainings were held January 13, 2015, through January 15, 2015, and weekly trainings continued after Warner's execution, in preparation for the other scheduled executions, through the month of January.[73]   Training was suspended in February 2015.[74]   The Department held two trainings in March,[75] and restarted monthly trainings in April 2015.[76]

---

[68] Tr. of Warden A, pg. 47, ln. 16-25, pg. 79, ln. 4-25, pg. 80, ln. 1-25, pg. 81, ln. 1-4; Tr. of IVTL, pg. 39, ln. 7-25. The labels were printed at the Department's print shop. Tr. of IVTL, pg. 39, ln. 25, pg. 40, ln. 1-2; Grand Jury Ex. #21, pg. 79, ln. 10-19.

[69] Tr. of Warden A, pg. 15, ln. 23-25, pg. 16, ln. 1-4, pg. 47, ln. 22-25; Tr. of SOT1, pg. 20, ln. 22-25, pg. 21, ln. 1-8. *See also* Grand Jury Ex. #1d, Sec. C(4); Grand Jury Ex. #11d, Sec. C(4).

[70] Tr. of Warden A, pg. 21, ln. 19-25, pg. 22, ln. 1-5; Tr. of HUSC, pg. 65, ln. 20-25; Tr. of IVTL, pg. 40, ln. 3-9.

[71] Tr. of Warden A, pg. 21, ln. 14-25, pg. 22, ln. 1-2; Tr. of HUSC, pg. 20, ln. 19-25, pg. 21, ln. 1-2; Tr. of IVTL, pg. 39, ln. 1-6, pg. 40, ln. 3-13.

[72] Grand Jury Ex. #9. Training is overseen by the H Unit Section Chief. Tr. of HUSC, pg. 19, ln. 15-25.

[73] Grand Jury Ex. #9.

14

**Exhibit 3**

On August 12, 2015, weekly trainings resumed in preparation for Glossip's execution, originally scheduled for September 16, 2015, and subsequently rescheduled to September 30, 2015.[77] Detailed notes, including attendance sheets, execution training notes, and correctional service logs were maintained for all trainings.[78] At the initial training session on October 7, 2014, the Command and H Unit Section Teams were provided a copy of the Execution Protocol,[79] the Director discussed it, and every Command and H Unit Section Team member signed a document stating they had received and understood the Protocol.[80]

In contrast to the Command and H Unit Section Teams, Execution Protocol requires the IV Team participate in only one training session prior to a scheduled execution.[81] Thus, although the Command and H Unit Section Teams began training on October 7, 2014, the IV Team did

---

[74] *Id.*; Grand Jury Ex. #14, *Execution Training Attendance Sheets for Jan. 22, 2015, to Sept. 9, 2015.*

[75] On March 3 and 31, 2015. *Id.*

[76] *Id.*

[77] Grand Jury Ex. #14; Grand Jury Ex. #21, pg. 24, ln. 15-25. Leading to Glossip's scheduled execution, trainings were held August 12, 18, and 26, 2015, September 1, 9, 14, 15, 16, 23, 28, and 29, 2015. Grand Jury Ex. #14c, Grand Jury Ex. #14.

[78] Grand Jury Ex. #10.

[79] Tr. of SOT1, pg. 7, ln. 3-13; Grand Jury Ex. #10. Execution team members were also verbally advised of the drug protocol to be utilized. Tr. of SOT1, pg. 7, ln. 21-25, pg. 8, ln. 1-11.

[80] Grand Jury Ex. #10. *See also* Tr. of Warden A, pg. 9, ln. 4-22.

[81] At the time of the Warner execution, this training had to be completed within one day of the scheduled execution. Grand Jury Ex. #1, Sec. V(D). This requirement was modified in the revised June 30, 2015, Execution Protocol to one training within seven days of the scheduled execution. Grand Jury Ex. #11, Sec. V(D).

**Exhibit 3**

not. Rather, the IV Team attended the Warner execution trainings on January 14 and 15, 2015, and three of the Glossip trainings on September 9, 16,[82] and 23, 2015.[83]

The IV Team's training included multiple scenario-based trainings preparing equipment and determining good IV access, but did not include scenario-based trainings filling the syringes from drug vials.[84] The simulations performed during training, however, included the use of the drugs' names.[85] Because the IV Team was not present for the October 7, 2014, training, the IV Team was never provided a written copy of the Protocol, effective September 30, 2014.[86] And, again, because the IV Team was also not present at the August 18, 2015, training where the updated Protocol, effective June 30, 2015, was distributed and discussed, the IV Team was also not provided a copy of the updated Protocol.[87]

In December 2014, however, the IV Team Leader toured the Oklahoma State Penitentiary's H Unit to view the layout, inspect the equipment, and make additional equipment

---

[82] On September 16, 2015, the IV Team was en route to the Oklahoma State Penitentiary for Glossip's scheduled execution, when the Court of Criminal Appeals granted a stay. As the IV Team was almost halfway to McAlester, they continued to the Oklahoma State Penitentiary for a debriefing with the Director. Grand Jury Ex. #21, pg. 24, ln. 15-25.

[83] *Id.* At trainings where the IV Team was not present, staff members pretended to be the doctor and paramedic. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 72, ln. 24–25, pg. 73, ln. 1–4.

[84] Tr. of IVTM, pg. 23, ln. 8-25, pg. 24, ln. 1-12, pg. 24, ln. 1-15, pg. 28, ln. 15-20; Tr. of IVTL, pg. 33, ln. 16-25, pg. 34, ln. 1-25, pg. 35, ln. 1-25, pg. 36, ln. 1-25, pg. 37, ln. 1-25, pg. 38, ln. 1-20; Grand Jury Ex. #21, pg. 40, ln. 20-25, pg. 41, ln. 1-16. The IV Team Leader felt the training was sufficient, although acknowledging, in retrospect, the IV Team should have been trained in drawing up the syringes from the vials. Tr. of IVTL, pg. 38, ln. 18-25; Grand Jury Ex. #21, pg. 67, ln. 16-25, pg. 68, ln. 1-15.

[85] Tr. of HUSC, pg. 16, ln. 3-25, pg. 17, ln. 1-4; Tr. of IVTM, pg. 53, ln. 2-8; Tr. of IVTL, pg. 25, ln. 24-25, pg. 26, ln. 1-6.

[86] Tr. of IVTL, pg. 25, ln. 4-23; Grand Jury Ex. #21, pg. 27, ln. 22-25, pg. 28, ln. 1-9, pg. 71, ln. 22-25, pg. 72, ln. 1; Tr. of IVTM, pg. 17, ln. 5-25, pg. 18, ln. 1-17.

[87] Grand Jury Ex. #14b; Tr. of IVTL, pg. 27, ln. 22-25, pg. 28, ln. 1-25, pg. 29, ln. 1-8.

**Exhibit 3**

requests.[88]  This tour was arranged by the Department's General Counsel.[89]  Execution Protocol

tasked the Division Manager of West Institutions with ensuring the IV Team understood all

provisions of the Protocol,[90] and, at the January 14, 2015, training, the Division Manager of West

Institutions did verbally review the Protocol with the IV Team, but, again, never provided them

with a written copy of the Protocol, or specifically reviewed the execution drugs to be utilized.[91]

### c. The Execution Protocol provides for the procurement, storage, and verification of execution drugs.

Upon receipt of the Court of Criminal Appeals' orders setting the execution dates for

Warner and Glossip, the Department notified each inmate by letter it would use the three-drug

Protocol set out in Chart D of Attachment D of the Execution Protocol, consisting of midazolam,

a Schedule IV controlled dangerous substance ("CDS"), rocuronium bromide, and potassium

chloride.[92] In order to obtain the execution drugs, the Department must have legal authorization

to obtain and store CDS.[93]

---

[88] Tr. of IVTL, pg. 27, ln. 13-25, pg. 28, ln. 1-25, pg. 29, ln. 1-22; Grand Jury Ex. #21, pg. 28, ln. 16-25, pg. 29, ln. 1-13. The IV Team Leader had a few relatively minor suggestions, including a request for a couple of different needles to inject local anesthetic. Tr. of IVTL, pg. 30, ln. 7-17. IV Team Member A did not tour the H Unit prior to January 14, 2015. *Id.* at pg. 30, ln. 18-25.

[89] Tr. of IVTL, pg. 8, ln. 20-25, pg. 9, ln. 1-2, pg. 27, ln. 15-20; Grand Jury Ex. #21, pg. 23, ln. 4-6.

[90] Grand Jury Ex. #1, Sec. IV(C)(4); Grand Jury Ex. #11, Sec. IV(C)(4).

[91] Tr. of HUSC, pg. 15, ln. 10-25, pg. 16, ln. 1-25, pg. 17, ln. 1-25, pg. 18, ln. 1-7. The Department's General Counsel testified it was his responsibility to coordinate IV Team training. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 6, ln. 15–21.

[92] Grand Jury Ex. #2b, *Ltr. Dated Nov. 26, 2014 Giving Warner Notice of Department's Intent to Use Chart D Chemical Chart*; Grand Jury Ex. #30; *Ltr. Dated Aug. 14, 2015 Giving Glossip Notice of Department's Intent to Use Chart D Chemical Chart.* The letters were sent by an attorney with the Attorney General's Litigation Unit, on behalf of the Department. *Id.*

[93] Tr. of OBNDD Deputy Gen. Counsel, pg. 5, ln. 8-14, pg. 6, ln. 1-18.

**Exhibit 3**

### i. Procurement of execution drugs requires registration with the U.S. Drug Enforcement Agency and the Oklahoma Bureau of Narcotics and Dangerous Drugs.

In the State of Oklahoma, CDS is regulated by the U.S. Drug Enforcement Agency ("DEA") and Oklahoma Bureau of Narcotics and Dangerous Drugs ("OBNDD"). The combined efforts of both entities regulate CDS from the point it is manufactured until it is provided to an end user.[94] As CDS is in a "closed system," both the DEA and OBNDD should be able to track any single dosage unit from the manufacturer to the distributor, the distributor to the pharmacy or doctor receiving it, and from the pharmacy or doctor to the individual patient.[95] Each location where CDS is transferred must have a professional license affiliated with it, along with a registration.[96] The OBNDD Director may grant exemptions to the registration requirement in certain circumstances,[97] but this exemption only permits an entity to possess CDS, not order it.[98]

Beginning in March 2014, the Department discussed with OBNDD methods for legally obtaining and storing execution-related drugs, including midazolam, at the Oklahoma State

---

[94] *Id.* at pg. 4, ln. 14-25, pg. 5, ln. 1. Oklahoma is a "dual registration state," requiring both federal and state registrations. *Id.* at pg. 5, ln. 8-18. Most states only require DEA registration and a professional license. *Id.* at pg. 6, ln. 23-25, pg. 7, ln. 1-19. OBNDD "does essentially the same job as DEA, but it's just within our borders." *Id.* at pg. 7, ln. 7-10.

[95] *Id.* at pg. 5, ln. 1-7.

[96] For a doctor or pharmacist to possess, distribute, or dispense CDS, he must have a DEA registration, OBN registration, and a professional license. *Id.* at pg. 5, ln. 8-14, pg. 6, ln. 1-18. *See also* Title 63 O.S. § 2-302; and § 2-303(D.1).

[97] Tr. of OBNDD Deputy Gen. Counsel, pg. 27, ln. 5-25, pg. 28, ln. 1-25, pg. 29, ln. 1-11. *See also* Title 63 O.S. § 2-302(F). There are two types of exemptions. The first allows the possession of CDS for research purposes. The second allows state agencies to possess CDS under certain circumstances. Tr. of OBNDD Deputy Gen. Counsel, pg. 27, ln. 13-23, pg. 28, ln. 12-16.

[98] *Id.* at pg. 28, ln. 6-9. As part of the closed system, distributors and pharmacists are prohibited from selling CDS to non-registrants. *Id.* at pg. 28, ln. 17-25, pg. 29, ln. 1-11. An exemption has not been granted to the Department. *Id.* at pg. 33, ln. 1-15; Tr. of OBNDD Gen. Counsel, pg. 11, ln. 4-14; Tr. of OBNDD Dir., pg. 6, ln. 24-25, pg. 7, ln. 1-18.

**Exhibit 3**

Penitentiary.[99]   During these conversations, which continued off-and-on for over a year, the

Department and OBNDD discussed various options including the "ambulance service model,"[100]

registering the Department as a distributor,[101] and changing state law to exempt the Department

from hospital licensing requirements.[102]   The "ambulance services model" requires a physician

or other qualified registrant at the Oklahoma State Penitentiary to register with OBNDD.[103]   If

---

[99] Tr. of OBNDD Deputy Gen. Counsel, pg. 9, ln. 2-5. The original inquiry came from a member of the Department's field operations staff. *Id.* at pg. 8, ln. 14-24. The discussions continued with other Department officials, including the Department's current General Counsel, through mid-August 2015. *Id.* at pg. 26, ln. 2-19; Grand Jury Ex. #35.

[100] Tr. of OBNDD Deputy Gen. Counsel, pg. 8, ln. 14-24, pg. 9, ln. 2-15, pg. 11, ln. 7-18.

[101] *Id.* at pg. 22, ln. 14-25, pg. 23, ln. 1-19. This was not an option for the Department as distributors must have a license from the Board of Pharmacy, and there are strict parameters defining distributors which the Department did not meet. *Id.* at pg. 23, ln. 4-14.

[102] *Id.* at pg. 17, ln. 8-17, pg. 23, ln. 20-25, pg. 24, ln. 1-25, pg. 25, ln. 1-22; Grand Jury Ex. #34, *Emails Between OBNDD and the Department*. One email, sent April 10, 2014, from OBNDD's Deputy General Counsel to the Department's then-general counsel, included a discussion of both professional registrants and location registrants. Grand Jury Ex. #34. Specifically, the Department was advised "[f]or CDS to get to a [Department] facility without a registration, a licensed practitioner would have a registration at that location and would need to order the CDS to stock the shelves. A practitioner would then need to authorize a specific order for the actual administration of the CDS . . . . The CDS can be administered by the practitioner or an agent/employee of the practitioner." *Id.* On July 10, 2015, OBNDD's General Counsel sent a second e-mail to the Department's General Counsel recommending three options: "1. Register each Department clinic under a physician, 2. Register the facility as a hospital (for inpatients only—which of course should work) but that would have to come with a license through the Department of Health, [and] 3. Register the location as a pharmacy through the pharmacy board." Grand Jury Ex. #35. A hospital must have a state licensing board number issued by the Oklahoma State Health Department ("OSHD") before registering with OBNDD as a hospital. *Id.* at pg. 23, ln. 20-25, pg. 25, ln. 1-22. *See also* Title 63 O.S. § 1-702. The Department's General Counsel stated it would be extremely expensive for the Department's infirmaries to comply with OSHD hospital licensing standards, as they do not meet OSHD's emergency room standards, and discussed amending state statute to exempt the Department from OSHD licensing requirements. Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 21, ln. 2–24; Grand Jury Ex. #35.

[103] Tr. of OBNDD Deputy Gen. Counsel, pg. 11, ln. 11-23, pg. 15, ln. 1-13. The Department could use any doctor in the State willing to register at the Oklahoma State Penitentiary. *Id.* Registrants can register at multiple locations. *Id.* at pg. 55, ln. 15-23. The registrant is not

**Exhibit 3**

the physician had an existing OBNDD registration, and no prior disciplinary matters involving his license, registration could be completed in a day.[104]  Once the Department had a registration in place, it would be required to install protocols governing how the drugs were securely stored, inventoried, obtained from the storage cabinet, and dispensed or administered.[105]  The registrant would be responsible for supervising the protocol, and for ordering, storing, and destroying the drugs, but would not be responsible for dispensing them to the patient.[106]  With a qualified individual registered at the Oklahoma State Penitentiary, and protocol in place, the drugs could be delivered there.[107]  Once the drugs were on-site, the protocol would control when the drugs could be dispensed, and in what quantities.[108]  Because of this, the registrant used to obtain the drugs would not otherwise have to be involved in the execution process.[109]  After multiple conversations, OBNDD recommended the ambulance services model.

---

required to be on-site on a daily basis. *Id.* at pg. 56, ln. 2-3. The registrations are public, but can only be searched by the registrant's name or by city, not by a specific location. *Id.* at pg. 18, ln. 16-25, pg. 19, ln. 1-19.

[104] *Id.* at pg. 18, ln. 2-9.

[105] *Id.* at pg. 11, ln. 11-25, pg. 12, ln. 1-25, pg. 13, ln. 1-17. For the Department, the protocol would likely be crafted and/or approved by the Board of Corrections with the assistance of medical professionals. *Id.* at pg. 35, ln. 10-17.

[106] *Id.* at pg. 13, ln. 3-17. An agent of the registrant could order the drugs. *Id.* at pg. 16, ln. 15-25, pg. 17, ln. 1-7. The registrant could also delegate other duties, such as conducting regular inventories, as long as he monitored the inventories. *Id.* at pg. 53, ln. 25, pg. 54, ln. 1-13.

[107] *Id.* at pg. 15, ln. 14-22, pg. 69, ln. 4-5.

[108] *Id.* at pg. 16, ln. 9-14. *See also Id.* at pg. 74, ln. 5-15 ("Q: So for DOC [the Department] purposes, [the protocol] should include not only how they would obtain the drugs, how they would be stored and kept secure, but also which drugs are used and what quantities? A: Exactly. And when to be administered, how to be administered. Just everything—every fine nuance.").

[109] *Id.* at pg. 36, ln. 17-25, pg. 37, ln. 1-6.

20

**Exhibit 3**

Despite numerous conversations with OBNDD's attorneys, the Department never obtained OBNDD or DEA registration allowing it to possess and/or store execution-related drugs prior to the Warner execution or scheduled Glossip execution.[110] OBNDD's Deputy General Counsel testified he has no idea how the Department properly obtained the execution drugs for the Warner execution and scheduled Glossip execution.[111]

During the course of this investigation, however, the Department successfully secured a statutory amendment allowing it to obtain OBNDD registration. Senate Bill 884, signed by Governor Fallin on April 19, 2016, allows the Department to register as a hospital with OBNDD without first meeting the Oklahoma State Health Department's hospital licensure requirements.[112] This statutory amendment, effective November 1, 2016, should allow the Department to acquire registrations permitting it to store execution-related drugs at the Oklahoma State Penitentiary.[113]

### c. Procurement of the execution drugs through the Pharmacist was fraught with problems.

While attempting to secure these registrations, the Department also attempted to locate a pharmacist to provide the execution drugs. Initially, the Department wanted to utilize Chart A of the Execution Protocol, consisting of two syringes of 2.5 gm pentobarbital and one syringe of

---

[110] Tr. of the Dep't Gen. Counsel, Feb. 16, 2016, pg. 21, ln. 25, pg. 22, ln. 1-2; Tr. of Dir., Jan 21, 2016, pg. 12, ln. 1-4.

[111] Tr. of OBNDD Deputy Gen. Counsel, pg. 30, ln. 16-21.

[112] Grand Jury Ex. #46, *Certified Copy of SB 884.* The bill added the Department to a list of exempt entities that already included the federal government, state mental hospitals, and community-based crisis centers. *Id. See also* 63 O.S. § 1-702.

[113] Grand Jury Ex. #46.

**Exhibit 3**

heparin/saline.[114]  Accordingly, in early 2014, the Department and the Office of the Attorney

General began contacting pharmacies looking for a supplier of pentobarbital.[115]  A list of

potential pharmacists was developed, and the Department began calling to determine if these

pharmacists were willing to supply execution drugs and, if so, if they could obtain

pentobarbital.[116]  The first pharmacist contacted refused, the second agreed to provide execution

drugs but could not get pentobarbital, and the others also could not obtain pentobarbital.[117]  As a

result, the Department decided to utilize Chart D of the Execution Protocol instead.[118]  The

Department then returned to the top of the list of pharmacists, and selected the first pharmacist

that agreed to supply the Department with the execution drugs set out in Chart D of the

Execution Protocol.[119]

---

[114] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 136, ln. 7-11; Grand Jury Ex. #1d, Sec. C. *See also Id.* at pg. 35, ln. 7-24 (noting the Department had been searching for pentobarbital, which was a historically proven drug and that sodium thiopental and pentobarbital were used in Oklahoma until the Lockett execution in 2014). He testified Chart D was selected due to issue obtaining the drugs for Chart B; however, he testified at length about attempting to locate the drugs required for Chart A. *Compare Id.* at pg. 39, ln. 14-21, with *Id.* at pg. 6, ln. 6-14, pg. 35, ln. 11-21.

[115] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 31, ln. 24-25; pg. 32, ln. 1-25; pg. 33, ln. 1-25; pg. 34, ln. 1-4 (the Department General Counsel noted a previous pharmacy refused to continue to provide pentobarbital prior to the Lockett execution; a pharmacy was located that provided the drugs for the Lockett execution but it refused to continue to participate in future executions). *Id.*, pg. 104, ln. 9-25.

[116]*Id.* at pg. 104, ln. 17-25; Grand Jury Ex. #23, *Transcript of Interview of Pharmacist*, pg. 6, ln. 7-21.

[117] Tr. of the Dep't Gen. Counsel, Oct. 22, 2015, pg. 104, ln. 17-24; Tr. of Pharm., pg. 8, ln. 10-25, pg. 9, ln. 1-5.

[118] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 44, ln. 2-8.

[119] *Id.* at pg. 104, ln. 24-25, pg. 105, ln. 1-4 ("Q: Was there anything special about that person or that made them – or is that just where he appeared on the list? A: It's where he appeared on the list."). *See also* Grand Jury Ex. #23, pg. 6, ln. 22-25, pg. 7, ln. 1-5.

**Exhibit 3**

On November 19, 2014, the Department's General Counsel contacted the selected Pharmacist by phone and placed an order for twelve sets of execution drugs—the amount needed for six executions.[120] The Department's General Counsel never submitted a written prescription or contract to the Pharmacist.[121] The Pharmacist accepted the order from the Department's General Counsel using the IV Team Leader's DEA number[122] and subsequently released the drugs directly to another Department employee based on the Department's General Counsel's representation the IV Team Leader "was part of the process" and had given consent.[123] The Pharmacist acknowledged he could only release CDS to a doctor or the doctor's agent, or a client with a patient-specific prescription from a doctor,[124] and the Department's General Counsel did not meet either of these criteria.[125]

---

[120] Tr. of Pharm., pg. 10, ln. 8-25, pg. 11, ln. 1-10, pg. 21, ln. 11-15; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 47, ln. 1-12. The Department needed two sets of execution drugs for each execution, one set for the primary manifold and one set for the secondary manifold. Tr. of IVTL, pg. 39, ln. 7-25; Tr. of Pharm., pg. 28, ln. 17-24.

[121] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 49, ln. 12–25, pg. 50, ln. 1; Grand Jury Ex. #23, pg. 14, ln. 7-24, pg. 47, ln. 13-25.

[122] Tr. of Pharm., pg. 30, ln. 14-25, pg. 31, ln. 1-5; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 54, ln. 17-25, pg. 55, ln. 1-23; Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 23, ln. 12-25, pg. 24, ln. 1-4. A doctor cannot give a layperson authority to order under his DEA number. Tr. of OBNDD Deputy Gen. Counsel, pg. 47, ln. 6-8. The Department General Counsel stated the Department's doctors are not willing to allow execution drugs to be stored at the Oklahoma State Penitentiary under their DEA number. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 53, ln. 22-25, pg. 54, ln. 1-16.

[123] Tr. of Pharm., pg. 30, ln. 14-25, pg. 31, ln. 1-5. The Pharmacist testified the Department's General Counsel told him the IV Team Leader had authorized use of his DEA number, but the Pharmacist did not verify this with the IV Team Leader. Id. at pg. 31, ln.1-18. A pharmacy can only send drugs to a location where the DEA number used to order the drugs is registered. Tr. of OBNDD Deputy Gen. Counsel, pg. 46, ln. 24-25, pg. 47, ln. 1-4.

[124] A doctor could write a prescription to the offender for the execution drugs, and then a Department employee could take the prescription to the pharmacy, get it filled, and deliver the

**Exhibit 3**

While placing this order, the Department's General Counsel told the Pharmacist, over the phone, the quantity of each drug needed[126] and the syringe sizes, and, based on this information, the Pharmacist calculated the necessary concentration.[127] The Department's General Counsel directed the Pharmacist to the Execution Protocol on the Department's website, and verified the Pharmacist was looking at the Protocol while the order was placed,[128] but did not provide the Pharmacist a copy of the Execution Protocol until he paid for the drugs on January 9, 2015.[129]

On November 19, 2014, the Pharmacist placed an order with his wholesaler for five cartons of midazolam (five milligrams per mil solution vials),[130] three cartons of rocuronium bromide (ten milligrams per mil solution vials), and six cases of *potassium chloride* solution (40 milliequivalent).[131] When placing this order, the Pharmacist used a wholesaler's website, which

---

drugs to the Oklahoma State Penitentiary. Tr. of OBNDD Deputy Gen. Counsel, pg. 47, ln. 12-24.

[125] Tr. of Pharm., pg. 30, ln. 14-24.

[126] *Id.* at pg. 12, ln. 20-23.

[127] *Id.* at pg. 15, ln 15-25, pg. 16, ln. 1-7, pg. 29, ln. 15-24. *See also* Grand Jury Ex. #1d.

[128] Tr. of the Dep't Gen. Counsel, Oct. 22, 2015, pg. 139, ln. 25, pg. 140, ln. 1- 24.

[129] Tr. of Pharm., pg. 12, ln. 24-25, pg. 13, ln. 1-25, pg. 14, ln. 1-9; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 141, ln. 18-22; Grand Jury Ex. #18g, *Long Hand Memo from Pharm. to Dep't Gen. Counsel Re. Sale of Execution Drugs Dated Jan. 9, 2015.*

[130] Tr. of Pharm., pg. 22, ln. 6-12; Tr. of Wholesale Rep., p. 22, ln. 1-11, Grand Jury Ex. #18b *Invoice – Billing No. ******4827*; Grand Jury Ex. #19b, *Invoice – Billing No. ******4827*. Each carton contained ten 10 mL vials. Tr. of Pharm., pg. 22, ln. 9-13; Grand Jury Ex. #18b; Grand Jury Ex. #19b. The midazolam was listed on a separate invoice because state law requires CDS to be invoiced separately. *Id.* at pg. 22, ln. 16-20; Tr. of Wholesale Rep, pg. 21, ln. 3-7.

[131] Grand Jury Ex. #18a, *Invoice – Billing No. ******4824*; Grand Jury Ex. #19a, *Invoice – Billing No. ******4824*. Tr. of Pharm., pg. 20, ln. 4-15, pg. 21, ln. 13-15, pg. 22, ln. 1-15; Tr. of Wholesale Rep, pg. 17, ln. 9-17. Each case of rocuronium bromide contained ten vials, while

**Exhibit 3**

allowed him to search the term "potassium," pull up a list of hundreds of different potassium combinations in multiple types of formulations, and scan the list for the needed dose and concentration.[132]   The Pharmacist stated, however, the ordering system "doesn't necessarily show chloride or acetate."[133]

On November 20, 2014, this order was delivered to the Pharmacist.[134]   The potassium chloride received on that day, however, was in an IV solution in a very diluted concentration.[135] The Pharmacist testified, although the midazolam and rocuronium bromide delivered on November 20th were ordered for the Department, the six cases of potassium chloride were ordered for another customer.[136]   That same day, the Pharmacist ordered three cartons of *potassium acetate* (20 milliliter vials of 40 milliequivalent).[137]   The Pharmacist could not explain why he ordered two of the three execution drugs on November 19, 2014, the third execution drug

---

each case of potassium chloride contained twelve IV bags. Grand Jury Ex. #18a; Grand Jury Ex. #19a; Tr. of Wholesale Rep., pg. 16, ln. 21-25, pg. 17, ln. 1-2.

[132] Tr. of Pharm., pg. 16, ln. 25, pg. 17, ln. 1-15.

[133] *Id.* at pg. 48, ln. 17-19. The wholesale representative testified each item description would include the strength and size, if it was a vial, bottle, tablet or capsule, and an item description. Tr. of Wholesale Rep., pg. 12, ln. 9-13.

[134] Tr. of Pharm., pg. 23, ln. 21-24; Tr. of Wholesale Rep., pg. 13, ln. 17-25, pg. 14, ln. 1-2, pg. 14, ln. 16-22. The invoice date reflects the date of delivery, not the date the order was placed. *Id.*

[135] Tr. of Pharm., pg. 20, ln. 10-20.

[136] *Id.* at pg. 20. He testified he was supposed to order potassium oral liquid for this client, but ordered IV bags instead. *Id.* at pg. 20, ln. 21-25. This product was returned to the wholesaler on December 10, 2015. Grand Jury Ex. #18f, *Long Hand Notes Re. Return of Drugs*; Tr. of Pharm., pg. 21, ln. 5, pg. 39, ln. 2-25, pg. 40, ln. 1-16; Tr. of Wholesale Rep., pg. 31, ln. 15-25, pg. 32, ln. 1-3.

[137] Grand Jury Ex. #18c, *Invoice – Billing No. ******5699*; Grand Jury Ex. #19c, *Invoice – Billing No. ******5699*. Each carton contained twenty-five vials. *Id.* Tr. of Wholesale Rep., pg. 24, ln. 22-23.

25

**Exhibit 3**

that same day in the wrong form for a different customer, and then a drug similar to potassium chloride, in the correct concentration, for the Department, on November 20, 2014.[138]   The Pharmacist acknowledged this looked very strange.[139]

On January 7, 2015, the Pharmacist reordered seven cartons of midazolam,[140] and on June 30, 2015, he reordered three cartons of potassium acetate.[141]   Interestingly, when the Pharmacist placed the June 30, 2015, potassium acetate order, he selected an option on the ordering system prohibiting the wholesaler from filling the order with substitutions.[142] This was the only order entered by the Pharmacist for the Department in which that option was selected.[143] The Pharmacist testified he selected no substitutions because he believed the proper drug was ordered the first time, and he did not want it substituted.[144]

---

[138] Tr. of Pharm., pg. 23, ln 14-20. The Pharmacist testified "I don't know why it was ordered the next day. If it was done late in the afternoon, or if I got busy and then did it the next day. I don't know why it was done the next day." *Id.*

[139] *Id.* at pg. 51, ln. 1-20.

[140] Grand Jury Ex. #18d, *Invoice – Billing No. ******9573*; Grand Jury Ex. #19d, *Invoice – Billing No. ******9573*. Each carton contained ten vials of five milligrams per mil solution vials. *Id.* Tr. of Wholesale Rep., pg. 27, ln. 21-25, pg. 28, ln. 1-10.

[141] Grand Jury Ex. #18e, *Invoice – Billing No. ******8999*; Grand Jury Ex. #19e, *Invoice – Billing No. ******8999*; Tr. of Wholesale Rep., pg. 29, ln. 9-20. There were twenty-five vials per carton. *Id.* The pharmacist testified he ordered this additional potassium acetate because the original quantity was about to expire. Tr. of Pharm., pg. 36, ln. 17-25, pg. 37, ln. 1-11.

[142] Grand Jury Ex. #18d; Grand Jury Ex. #19d. The wholesale representative explained multiple manufacturers may make the same item with different prices. So when a pharmacist wants a specific product by a specific manufacturer, he hits "do not sub" to prevent the wholesaler from substituting a cheaper product from another manufacturer. Tr. of Wholesale Rep, pg. 39, ln. 17-25, pg. 40, ln. 1-5.

[143] Grand Jury Ex. #18a; Grand Jury Ex. #18b; Grand Jury Ex. #18c; Grand Jury Ex. #18d; Grand Jury Ex. #18e.

[144] Tr. of Pharm., pg. 25, ln. 18-25, pg. 38, ln. 10-14.

**Exhibit 3**

As to the interchangeability of potassium chloride and potassium acetate, the Pharmacist explained to the Grand Jury that the active ingredient in both potassium acetate and potassium chloride is the potassium ion itself.[145] Chloride and acetate are two types of salts to which the potassium ion attaches, and, thus, the difference between potassium acetate and potassium chloride is the salt form, not the active ingredient. [146] Therefore, even though potassium acetate and potassium chloride are medically interchangeable, they are not the same drug.[147] In the dosage set in the Protocol, however, either would cause death.[148]

The Pharmacist denied intentionally sending the Department potassium acetate, explaining:

> When I looked through the ordering system, I looked at potassium. I looked – I did not look at the salt form like I should have. In my pharmacy, my – in my brain, the potassiums are interchangeable. They're not generic. They're not – but in a setting that they're used in, potassium is the drug that we're looking for. I did

---

[145] Tr. of Pharm., pg. 42, ln. 25, pg. 43, ln. 1-21; Grand Jury Ex. #23, pg. 12, ln. 25, pg. 13, ln. 1-8, pg. 35, ln. 12-25, pg. 36, ln. 1; Grand Jury Ex. #21, pg. 50, ln. 24-25, pg. 51, ln. 1-12, pg. 52, ln. 15-20, pg. 54, ln. 10-21. The potassium is used for cessation of the heart. Grand Jury Ex. #23, pg. 11, ln. 21-22, pg. 36, ln. 4-20.

[146] Tr. of Pharm., pg. 42, ln. 25, pg. 43, ln. 1-2; Grand Jury Ex. #23, pg. 12, ln. 3-11. *See also* Grand Jury Ex. #21, pg. 51, ln. 7-16.

[147] Tr. of Pharm., pg. 26, ln. 16-20. *See also* Tr. of IVTL, pg. 65, ln. 20-25, pg. 66, ln. 1-14; Grand Jury Ex. #21, pg. 50, ln. 10-19; Grand Jury Ex. #23, pg. 13, ln. 13-19. The Pharmacist said that in the pharmacy world, the two drugs are 100 percent interchangeable. Grand Jury Ex. #23, pg. 27, ln. 13-14. *See* Grand Jury Ex. #21, pg. 51, ln. 17-20 (the IVTL also stated, from a medical perspective, the two drugs are completely interchangeable).

[148] Tr. of Pharm., pg. 45, ln. 12-18; Grand Jury Ex. #23, pg. 43, ln. 18-25, pg. 44, ln. 12-14, pg. 45, ln. 1-3; Grand Jury Ex. #21, pg. 80, ln. 24-25, pg. 81, ln. 1-3. The IV Team Leader did not believe either drug would act faster than the other. Grand Jury Ex. #21, pg. 81, ln. 4-11. He further noted, although he did not believe the inmate would feel any discomfort when either potassium chloride or potassium acetate was administered due to heavy sedation, if the inmate could feel anything, the potassium acetate would likely be more comfortable because it is more alkaline and thus less acidic. *Id.* at pg. 81, ln. 16-25, pg. 82, ln.1-25, pg. 83, ln. 1-2.

**Exhibit 3**

not look close enough and look at the acetate or chloride. I was looking at potassium.[149]

He further explained "in my head I was not thinking potassium chloride, because I was looking at it, going, it's potassium. As I said, pharmacy brain versus probably a law brain, I guess. I don't know."[150]

The Pharmacist did not specifically recall telling anyone potassium chloride was unavailable at the time of ordering, but admitted he may have said that to someone.[151] He testified he learned for the first time he had ordered the wrong drug when he was contacted by the Department's General Counsel thirty minutes prior to Glossip's September 30, 2015, scheduled execution.[152]

In order to procure the execution drugs, the Department's General Counsel received $869.85 from the Department's Chief Financial Officer for execution-related expenses on

---

[149] Tr. of Pharm., pg. 37, ln. 13-25, pg. 38, ln. 1-9. The Pharmacist further stated: "when I was looking through my ordering system, I looked for potassium. It was – my pharmacy brain looking at potassium and milli-equivalents, frankly not paying attention to whether it was acetate or chloride." *Id.* at pg. 16, ln. 14-18. *See also* Grand Jury Ex. #23, pg. 12, ln. 17-21, pg. 17, ln.16-25, pg. 28, ln. 9-15, pg. 41, ln. 12-25, pg. 42, ln. 1-5.

[150] Grand Jury Ex. #23, pg. 28, ln. 11-15.

[151] Tr. of Pharm., pg. 45, ln. 22-25, pg. 46, ln. 1-12. The Pharmacist later testified his normal distributor did not stock potassium chloride in the proper concentration, but he could have ordered it through another distributor. *Id.* at pg. 41, ln. 20-24. The Department's General Counsel stated the Pharmacist never expressed any concerns about not being able to obtain the drugs the Department ordered. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 51, ln. 22–25.

[152] Tr. of Pharm., pg. 38, ln. 10-16, pg. 47, ln. 11-18; Grand Jury Ex. #23, pg. 17, ln. 22-25, pg. 18, ln. 1-18. The Pharmacist testified he checks orders against the invoice when the drug arrives, but, as the invoice and drug vials both said potassium acetate, it did not occur to him there was a problem. Tr. of Pharm., pg. 41, ln. 25, pg. 42, ln. 1-13. He further stated, if he had noticed he had mistakenly ordered potassium acetate, he would have notified the Department. *Id.* at pg. 44, ln. 15-25, pg. 45, ln. 1-11.

**Exhibit 3**

December 29, 2014.[153] The request for funds consisted of an undated, unsigned, handwritten note, presumably from the Department's General Counsel to the Department's Chief Financial Officer, stating: "Our total cost for the drugs for the next 6 execution totals $869.85 cash. -Want cash in all 100s – week a/f Christmas."[154] Receipt of the funds was documented by a typed, dated receipt signed by the Department's General Counsel.[155] The Department's General Counsel paid the Pharmacist in person, in cash, on January 9, 2015.[156] Upon receiving payment, the Pharmacist provided the Department a typed receipt containing the name and address of the pharmacy, the amount paid, and the notes "PREPAID DRUGS FOR 6 EXECUTIONS" and "PAID IN FULL."[157] The receipt did not document the person paying, the person receiving the money, the date of payment, the method of payment, or the type or volume of execution drugs purchased.[158] The Pharmacist also retained a copy of this receipt in his records.[159] As the

---

[153] Grand Jury Ex. #4, *Department Paperwork Reflecting Purchase of Execution Drugs.*

[154] *Id.*

[155] *Id.* This receipt was not numbered.

[156] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 50, ln. 2-13, pg. 146, ln. 12-25, pg. 148, ln. 10-24. Tr. of Pharm., pg. 27, ln. 7-20; Grand Jury Ex. #23, pg. 48, ln. 1-25, pg. 49, ln. 1-5; Grand Jury Ex. #18g. In late November/early December 2014, the Department's General Counsel verified with the Pharmacist through a telephone conversation that the drugs had arrived, but did not verify the specific drugs received. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 52, ln. 1-20, pg. 144, ln. 6-20.

[157] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 147, ln. 6-12; Grand Jury Ex. #4.

[158] *Id.*

[159] Grand Jury Ex. #18g. The Pharmacist retained the receipt due to federal regulations of CDS. Tr. of Pharm., pg. 28, ln. 1-8.

**Exhibit 3**

Department did not have an OBNDD registration, however, the drugs were stored at the pharmacy until the day of each scheduled execution.[160]

### III. Charles Frederick Warner was executed on January 15, 2015.

#### a. Preparations leading up to Warner's execution did not include review of the execution drugs received.

On November 26, 2014, following the Court of Criminal Appeals' issuance of the order setting Warner's January 15, 2015, execution date,[161] Assistant Attorney General ("AAG") John Hadden provided Warner's attorney with notice the Department would use the three-drug Protocol set out in Chart D of Attachment D of the Execution Protocol consisting of midazolam, rocuronium bromide, and potassium chloride, in Warner's execution.[162]  On December 9, 2014, Warden A provided Warner his thirty-five-day notification packet, which included a summary of rules and procedures, visitor and witness lists, a last meal request, the designation for disposition of property, and a release of remains and burial arrangements form, reviewed this notification packet with Warner, and began daily checks of the inmate.[163]  On December 10, 2014, the Commander of the Command Team, the H Unit Section Chief, and the IV Team were approved by the Director, and on December 12, 2014, the Director formally approved all other execution team members.[164]

---

[160] Tr. of Agent 1, pg. 9, ln. 24-25, pg. 10, ln. 1-3; Grand Jury Ex. #23, pg. 42, ln. 6-23.

[161] Grand Jury Ex. #28b.

[162] Grand Jury Ex. #2; Grand Jury Ex. #2b. *See also* Grand Jury Ex. #1d, Sec. (D)(1).

[163] Grand Jury Ex. #2; Tr. of Warden A, pg. 12, ln. 4-10 (excluding holidays and weekends). *See also* Grand Jury Ex. #1, Sec. VII(A)(3).

[164] Grand Jury Ex. #2; Grand Jury Ex. #3. Although, as previously noted, the execution teams began training in October 2014, the team members were formally approved by the Director in December 2014 after a background check was completed to ensure team members met the

**Exhibit 3**

On January 9, 2015, Warden A verified the execution inventory and equipment checks were completed.[165]   Warden A did not verify the execution drugs, however, testifying the execution inventory did not include execution drugs on this date since they were not delivered to the Oklahoma State Penitentiary until the day of the execution.[166]   Both Warden A and the Department's General Counsel acknowledged the Execution Protocol does not define execution inventory, and execution drugs are not expressly exempted from the Protocol's execution inventory requirements, but said there was a tacit understanding they were not included.[167]

**b. Preparations on the day of Warner's Execution**

On January 15, 2015, Agent 1 picked up the execution drugs for Warner's execution from the Pharmacist, and both the Pharmacist and Agent 1 signed a chain of custody form documenting delivery.[168]   Although the chain of custody form contains the Pharmacist's name, the receiving party's name, the date and time the drugs were received, and the drug's storage location upon receipt, the form does not contain any information on the type or amount of items

---

requirements for serving on the execution teams. *Id.*  *See also* Grand Jury Ex. 1, Sec. III (B)(4); Tr. of HUSC, pg. 11, ln. 21-25, pg. 12, ln. 1-16.

[165]  Grand Jury Ex. #2. *See also* Grand Jury Ex. #1, Sec. III(D)(2)(a). The Execution Protocol's fourteen-day requirements had been previously completed on December 30 and 31, 2014. Grand Jury Ex. #2. *See also* Grand Jury Ex. #1, Sec. VII(C).

[166]  Tr. of Warden A, pg. 69, ln. 21-25, pg. 70, ln. 1-16.

[167]  *Id.* at pg. 70, ln. 12-25, pg. 71, ln. 1-25, pg. 72, ln. 1-19; Tr. of Dep't Gen. Counsel, pg. 63, ln. 9-25, pg. 64, ln. 1-21. The Department's General Counsel further stated that if the Department "had a DEA registration number and could store them, then that would probably be a part of that [execution inventory]. But since we don't have the drugs, then it's not." Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 64, ln. 3-5.

[168]  At 10:22 a.m. Tr. of Agent 1, pg. 10, ln. 1-24, pg. 13, ln. 10-16; Grand Jury Ex. #5c, *Chain of Custody Form For Warner Execution.*

**Exhibit 3**

delivered to Agent 1 by the Pharmacist.[169]  Agent 1 testified this information was excluded from

the chain of custody form due to privacy concerns, but was unable to specify the nature of these

privacy concerns.[170]

The Pharmacist provided the execution drugs to Agent 1 in a sealed, unmarked cardboard

box.[171]  Agent 1 did not receive an itemized list of the box's contents, and took no steps to verify

its contents prior to delivery at the Oklahoma State Penitentiary. [172]   Thus, despite his

responsibility for maintaining security, Agent 1 acknowledged he had no idea of the actual

contents of the box.[173]  Rather, Agent 1 testified his only responsibility was to hand the box to

Warden A, and to receive approval of the contents.[174]

At 12:12 p.m., the execution drugs were delivered by Agent 1 to Warden A at the

Oklahoma State Penitentiary in the same sealed, unmarked box.[175]  Upon delivery, Warden A

---

[169] Grand Jury Ex. #5c.

[170] Tr. of Agent 1, pg. 10, ln. 14-24, pg. 14, ln. 20-25. *See also* Grand Jury Ex. #5c. Agent 1 acknowledged this chain of custody form would be insufficient for documenting collection of evidence in a criminal investigation. Tr. of Agent 1, pg. 15, ln. 10-16.

[171] *Id.* a pg. 16, ln. 1-19.

[172] *Id.* at pg. 17, ln. 5-22, pg. 18, ln. 20-25.

[173] *Id.* at pg. 21, ln. 10-15.

[174] *Id.* at pg. 22, ln. 23-25, pg. 23, ln. 1. Execution Protocol mandates the H Unit Section Chief "ensure the chemicals are ordered, arrive as scheduled and are properly stored." Grand Jury Ex. #1d, Sec. A(1)(c). The Execution Protocol further dictates that "[t]he chemicals shall be under the direct control of the H Unit Section Chief and stored in a secured, locked area and monitored to ensure compliance with manufacturer specifications." *Id.*

[175] Tr. of Agent 1, pg. 20, ln. 1-4; Grand Jury Ex. #5c. The Command Post Recorder and H Unit Section Chief were also present. Tr. of CPR, pg. 12, ln. 13-18, pg. 13, ln. 1-5; Tr. of Warden A, pg. 25, ln. 10-17, pg. 26, ln. 24-25, pg. 27, ln. 1-4; Tr. of HUSC, pg. 25, ln. 7-19.

**Exhibit 3**

signed the same chain of custody form previously signed by Agent 1 and the Pharmacist.[176] Once again, however, no notation was made indicating the type or amount of items delivered by Agent 1 to Warden A, despite one of the execution drugs being CDS.[177]

Upon receipt, Warden A brought the box into a conference room where Warden A opened it, removed the vials, and lined them up to be photographed by the Command Post Recorder.[178] Warden A also completed an "Execution Drugs" form recording the name, description, expiration date, and lot number for each drug received.[179] On this form, Warden A noted he received twenty vials of midazolam, two vials of rocuronium bromide, and *twelve vials of Potassium Acetate*.[180] He stated the information written on the "Execution Drugs" form was recorded from the drug vials' labels.[181]

Warden A testified he did not recall having any concerns when he observed and recorded the potassium acetate labels, and he did not alert anybody at the Department that potassium

---

[176] Grand Jury Ex. #5c.

[177] *Id. See also* Tr. of Warden A, pg. 27, ln. 5-25, pg. 28, ln. 1-6; Grand Jury Ex. #1d, Sec. C(4). Midazolam is a Schedule IV CDS. 21 C.F.R. § 1308.14(c) and 63 O.S. § 2-210(A)(37).

[178] Tr. of CPR, pg. 13, ln. 6-25, pg. 14, ln. 1-4; Tr. of HUSC, pg. 25, ln. 25, pg. 26, ln. 1-6, pg. 27, ln. 4-24. The vials were photographed together, and separately by type of drug. Tr. of CPR, pg. 15, ln. 22-25, pg. 16, ln. 1-9; Grand Jury Ex. #8, *Photographs of Execution Drugs Received by the Dep't on Jan. 15, 2015*; Grand Jury Ex. #36, *Photographs of Execution Drugs Received by the Dep't on Jan. 15, 2015 – Full Set*. Immediately after taking the photos, the Command Post Recorder downloaded them to a computer in the warden's secretary's office, printed them, and provided the photos to Warden A. Tr. of CPR, pg. 17, ln. 5-12. *See also* Tr. of Warden A, pg. 24, ln. 16-21. The photos were taken on the Director's orders to record expiration dates. Grand Jury Ex. #17, *Transcript of Warden A*, pg. 35, ln. 19-24.

[179] Grand Jury Ex. #6, *Execution Drugs Form Dated Jan. 15, 2015 at 12:25 p.m. Id. See also* Tr. of Warden A, pg. 28, ln. 9-22.

[180] Grand Jury Ex. #6 (emphasis added).

[181] Tr. of Warden A, pg. 28, ln. 23-25, pg. 29, ln. 1.

33

**Exhibit 3**

acetate was received.[182]  Although the H Unit Section Chief was also present when the execution

drugs arrived, watched their unpacking, photographing, and repacking, and testified the

execution drugs did not leave his sight until they were transferred to the Special Operations

Room, he "really wasn't looking at the bottles that closely."[183]  The Command Post Recorder did

not attend any training sessions prior to the Warner execution, was not familiar with the drugs

authorized under the Department's Protocol, and did not recall anybody present expressing

concerns about the receipt of potassium acetate. [184]

    After the drugs were photographed, they were put back in the box and delivered by

Warden A and the H Unit Section Chief to the IV Team Leader in the Special Operations

Room.[185]  Nevertheless, Warden A and the IV Team Leader did not sign a chain of custody form

documenting transfer of the execution drugs upon delivery.[186]

    The Special Operations Team arrived around 2:00 p.m., and immediately began verifying

and readying the Special Operations Room equipment, including checking IV tubing and filling

---

[182] *Id.* at pg. 30, ln. 23-25, pg. 31, ln. 1, pg. 34, ln. 24-25, pg. 35, ln. 1-3. Warden A later stated
he did not realize Special Operations Team Member 1 pushed potassium acetate, not potassium
chloride because, although Warden A wrote potassium acetate on the "Execution Drugs" form,
he does not even recall writing it down. *Id.* at pg. 106, ln. 5-15, pg. 107, ln. 4-10. Indeed, when
Warden A was told potassium acetate was used in Warner's execution, he did not believe it until
he reviewed the execution paperwork. Grand Jury Ex. #17, pg. 21, ln. 7-9, pg. 32, ln. 7-18.

[183] Tr. of HUSC, pg. 22, ln. 18-25, pg. 23, ln. 1-12, pg. 27, ln. 4-25, pg. 28, ln. 1-25, pg. 29, ln. 1-
25, pg. 30, ln. 1-21, pg. 80, ln. 20-25, pg. 81, ln. 1-3. The H Unit Section Chief said, if he had
noticed the vials said potassium acetate, and recalled this drug was not in the Execution Protocol,
he would have reported it to the Director. *Id.* at pg. 31, ln. 7-23.

[184] Tr. of CPR, pg. 8, ln. 11-13, pg. 15, ln. 7-21, pg. 16, ln. 12-24.

[185] *Id.* at pg. 16, ln. 25, pg. 17, ln. 1-2; Tr. of SOT1, pg. 13, ln. 1-14; Tr. of Warden A, pg. 24, ln.
16-23, pg. 31, ln. 14-22; Tr. of HUSC, pg. 32, ln. 3-19.

[186] Tr. of IVTL, pg. 50, ln. 22-25; Tr. of Warden A, pg. 32, ln. 4-22; Grand Jury Ex. #21, pg. 48,
ln. 14-25, pg. 49, ln. 1-5. Warden A said he did not even know the name of the IV Team Leader,
or if the IV Team Leader was a doctor.  Grand Jury Ex. #17, pg. 29, ln. 21-25, pg. 30, ln. 1-3.

**Exhibit 3**

saline bags.[187] The IV Team arrived at 4:00 p.m., at which time the IV Team Leader took receipt of the execution drugs, and he, along with IV Team Member A, began drawing up syringes from the vials.[188] Although the Execution Protocol mandates the Special Operations Team Leader assign a team member to assist in preparing each chemical and corresponding syringe under the supervision of the IV Team Leader,[189] the IV Team prepared the syringes containing the execution drugs by themselves, and the Special Operations Team only assisted in drawing up the heparin/saline syringes.[190] After an IV Team member drew up a syringe, it was labelled and connected to the manifold.[191]

The IV Team drew up the syringes in the order they would be administered, starting with the two midazolam syringes for the primary manifold, with each IV Team Member drawing up one of the syringes for each drug.[192] After all the primary manifold's syringes were prepared, the

---

[187] Grand Jury Ex. #5c.

[188] Tr. of IVTL, pg. 43, ln. 12-24, pg. 46, ln. 10-13; Tr. of IVTM, pg. 35, ln.1-25, pg. 36, ln. 1-19.

[189] Grand Jury Ex. #1d, Sec. B(2).

[190] Tr. of IVTL, pg. 50, ln. 6-18; Tr. of Warden A, pg. 40, ln. 12-16, pg. 82, ln. 16-19, pg. 83, ln. 1-3; Tr. of SOT1, pg. 14, ln. 1-5; Grand Jury Ex. #17, pg. 7, ln. 9-11, pg. 53, ln. 3-22, pg. 54, ln. 22-25; Grand Jury Ex. #21, pg. 46, ln. 7-25, pg. 47, ln. 15-19. Warden A said the Special Operations room was too congested for the Special Operations Team to assist the IV Team in drawing up vials, and the IV Team was more qualified to mix the drugs. Tr. of Warden A, pg. 16, ln. 23-24.

[191] Tr. of IVTM, pg. 38, ln. 2-12, pg. 40, ln. 21-25; Tr. of IVTL, pg. 48, ln. 15-23, pg. 49, ln. 1; Grand Jury Ex. #21, pg. 47, ln. 20-23. As previously noted, the labels were pre-printed at the the Oklahoma State Penitentiary print shop, peeled off a label sheet, and attached to each syringe after the syringe had been drawn up. Grand Jury Ex. #21, pg. 79, ln. 6-23.

[192] Tr. of IVTM, pg. 36, ln. 1-25, pg. 41, ln. 18-25, pg. 43, ln. 6-8; Grand Jury Ex. #21, pg. 50, ln. 4-7.

**Exhibit 3**

IV Team drew up the secondary manifold's syringes.[193]  Drawing up the syringes took longer than anticipated, as neither IV Team Member had previously prepared that quantity of drugs.[194]

The IV Team Leader testified he commonly examines the vial's label when drawing up a syringe,[195] but the IV Team members did not notice the vials in the Warner execution were labelled potassium acetate rather than potassium chloride.[196]  When questioned how this failure could have occurred, the IV Team Leader responded:

> That's a great question. And I don't know that I can absolutely answer that. If I may, I'd offer the best speculation that I can. But I'll preface that by saying the buck stops with me. There was no one else in that room that was tasked with that responsibility. I should have noticed it. I didn't notice it. And I feel terrible for that. And I feel terrible that – if anyone else is, you know, taking any heat for that, because it was my – it was my job. It was my role. And if anyone dropped the ball, I dropped the ball. And I don't want to make an excuse. There's no – there is no excuse. . . . And I accept – I will accept the full weight of responsibility, whatever that is, for this. But I will offer the best explanation I can, because I don't know. Again, I was shocked, personally. All I can conjecture is that this was my first foray into this very unusual world of executions, lethal injections. And as you can imagine, my anxiety level was significant . . . . the high stress environment is not new to me, but this was very unique and very unusual.
>
> And keep in mind that right or wrong, and not because anyone told me this – again, all on my own, in my mind, my primary goal – I had several tasks, but my primary goal was getting those IVs started. I knew that was where the land mines were . . . . that's what I was thinking about for hours and days leading up to this event. Again, I knew I had other roles. I don't want to imply that I didn't take

---

[193] Tr. of IVTM, pg. 36, ln. 24-25, pg. 37, ln. 1-4.

[194] Tr. of IVTL, pg. 46, ln. 15-23; Tr. of IVTM, pg. 59, ln. 5-12. The IV Team Leader testified he anticipated it would take fifteen to twenty minutes, but it actually took the full thirty, even with both IV Team members working together. Tr. of IVTL, pg. 46, ln. 15-23.

[195] Tr. of IVTL, pg. 72, ln. 1-24. The IV Team Leader did not need to look at the vial labels to differentiate between the midazolam, rocuronium bromide, and potassium acetate because the vials were different sizes, shapes, and colors. Grand Jury Ex. #21, pg. 77, ln. 14-20, pg. 78, ln. 7-19. Furthermore, drug manufacturers tend to use some sort of color coding on all drug vials, and neuromuscular blockers, including rocuronium bromide, have red lids. *Id.* at pg. 78, ln. 13-24.

[196] Tr. of IVTM, pg. 47, ln. 4-11; Tr. of IVTL, pg. 58, ln. 22-25; Grand Jury Ex. #21, pg. 57, ln. 9-14 ("I'm 100 percent certain that I did not. I was not aware of it in any way, shape, or form.").

**Exhibit 3**

those roles seriously. But clearly I was thinking ahead, I've got to get those IVs in. So when it came time to actually draw up the drugs . . . . the concentration of this drug [midazolam] is much more concentrated than what we normally use . . . . So – and I'm not very good at math in my head. So I had to really think about the concentration of that. Am I – is this right? I know what this is supposed to be. So I was – and that was the first drug we drew up, because I intentionally drew them up in the chronological order. So I put – and again, I had an assistant. We sort of tag teamed it. I put a lot of thought into making sure that that was the right concentration of a drug that I drew up all the time. The next drug, rocuronium . . . . The actual vial in this case, it was a – the same concentration I'm used to, but a larger volume. Again, unbelievable dosages of these drugs. Dosages that we've never even thought about using in conventional medicine. This one, it wasn't as much that – getting the concentration. It was – because the volume, per the Protocol, the syringes have to all be filled in the same volume. Just the timing, et cetera. But the volume of this drug is only 10 CCs and we needed to make it 60, so we had to highly dilute this drug. So, again, we had to really concentrate on making sure that we, you know, did it correctly to have the right dilution. When it came to the potassium, the third – so by now it's – we're 20 minutes into this. It's a drudgery, but we're again, we're focusing. We're making very – we're – we've got anxiety. We're trying to do a great job. Potassium is a drug that we don't get very often . . . . . Because of the nature – because of the danger of potassium, we don't draw it up and give it like a lot of other drugs. When we give it, we almost always – almost always give it through a central line. And then we also give it as a very slow infusion. For that reason, we ask the pharmacy to prepare it for us. We order it as an infusion . . . . So when it came time to pick the potassium up, again, a vial that I'm not as familiar with, I was – again, I'm at the end of the line of 30 minutes of drawing up drugs. Again, not an excuse. I'm just – I'm trying to come up with the best explanation of how I could have missed this. I picked it up. I'm looking for potassium. I'm looking for the concentration. Concentration is identical. I see the active ingredient. Somehow in  my – again, my mind is going, 30 minutes from now you're going to be in that room starting IVs on some guy that is not going to like you very much. And you've got – and all eyes are on you, in effect.  And I believe that I just let – you know, have no doubt that I looked at it. I saw potassium. I saw the accurate dose. And this one was easy because all we had to drop – because it was perfect. It was three vials; boom, boom, boom. It just took a minute and we drew them up, we were done. It was the easiest of the three. In terms that we didn't have to focus on dilutions and concentrations. We just had to draw them up and they were done. And somehow that glaring word, acetate – I don't know, ma'am. I just totally dropped the ball, is all I can say.[197]

---

[197] Tr. of IVTL, pg. 73, ln. 5-25, pg. 74, ln. 1-25, pg. 75, ln. 1-25, pg. 76, ln. 1-25, pg. 77, ln. 1-25, pg. 78, ln. 1-7. The IV Team Member also testified he was extremely nervous during the Warner execution, as it was quite intimidating participating in an execution for the first time. Tr. of IVTM, pg. 61, ln. 12-14.

**Exhibit 3**

At 4:40 p.m., the IV Team and Special Operations Team completed preparing, labeling, and affixing the syringes to the primary and secondary manifolds, and, at 4:49 p.m., the Special Operations Team verified all syringes were properly labelled and correctly affixed to the manifolds.[198] Verification consisted merely of comparing syringe labels to manifold labels; the Special Operations Team did not compare the syringe labels to the vial labels.[199]

Although Warner's execution was originally scheduled for 6:00 p.m., it was delayed slightly over an hour because the Office of the Attorney General was waiting to learn from the United States Supreme Court if Warner's request for a stay would be granted.[200]   At approximately 6:30 p.m., both the Office of the Attorney General and the Governor's Office advised the Department to proceed with the execution,[201] at which time the offender was brought into the execution chamber[202] and IV procedures were commenced.[203] At 7:06 p.m., the Director confirmed with the Office of the Attorney General and the Governor's Office there were no legal impediments to proceeding,[204] and at 7:10 p.m., the Director instructed the Special Operations

---

[198] Grand Jury Ex. #5a, *Corr. Service Log Dated Jan. 15, 2015*; Tr. of Warden A, pg. 12, ln. 20-25, pg. 13, ln. 1-5.

[199] Tr. of Warden A, pg. 16, ln. 14-23. The manifold has a piece of Plexiglas over it with labels indicating where each syringe goes. *Id.* at pg. 33, ln. 17-25.

[200] Grand Jury Ex. #5b, *Execution Notes Dated Jan. 15, 2015*; Grand Jury Ex. #17, pg. 10, ln. 20-24. *See also* Grand Jury Ex. #1, Sec. VII(F)(4).

[201] Grand Jury Ex. #5b. *See also* Grand Jury Ex. #2.

[202] Grand Jury Ex. #1d, Sec. E(1).

[203] Grand Jury Ex. #1, Sec. VII(F)(5)-(7); Grand Jury Ex. #5a; Grand Jury Ex. #5b; Tr. of HUSC, pg. 35, ln. 18-25, pg. 36, ln. 1-4. *See also* Grand Jury Ex. #1d, Sec. (F).

[204] Grand Jury Ex. #2; Grand Jury Ex. #5a. *See also* Grand Jury Ex. #1, Sec. VII(F)(8)(b); Grand Jury Ex. #1d, Sec. H(1). The Governor's Office acts as the central location for messages from the U.S. Supreme Court and the Court of Criminal Appeals, and the Governor, under the Oklahoma

**Exhibit 3**

Team Leader to initiate the Execution Protocol.[205] Present in the Special Operations Room were the Director, the Department's General Counsel, Agent 1, the IV Team, and the Special Operations Team.[206]

After receiving approval from the Director to proceed, the Special Operations Team Leader instructed Special Operations Team Member 3 to start syringe 1-A, 250 milligrams of midazolam.[207] Special Operations Team Member 3 then confirmed he was starting syringe 1-A, pushed said syringe, and notified the Special Operations Team Leader the syringe was completed.[208] The Special Operations Team Leader and Special Operations Team Member 3 then repeated the same procedure for syringe 2-A, also containing 250 mg of midazolam, and syringe 3A containing 60 ml of heparin/saline.[209]

At 7:16 p.m., the IV Team Leader verified Warner was unconscious, and so informed the Director, who then instructed the Special Operations Team Leader to complete the Chart D drug

---

Constitution, also has the authority to issue a stay of up to sixty days.   Tr. of Governor's Counsel, pg. 6, ln. 8-23.

[205] Grand Jury Ex. #2; Grand Jury Ex. #5a; Tr. of Warden A, pg. 18, ln. 25, pg. 19, ln. 1-3. *See also* Grand Jury Ex. #1, Sec. VII(F)(8)(e).

[206] Tr. of Agent 1, pg. 9, ln. 7-16. The H Unit Section Chief remained in the execution chamber with the offender and monitored the IV sites. Tr. of HUSC, pg. 37, ln. 16-25, pg. 38, ln. 1-9. *See also* Grand Jury Ex. #1d, Sec. F(6).

[207] Tr. of SOT1, pg. 10, ln. 1-22; Tr. of Warden A, pg. 18, ln. 25, pg. 19, ln. 1-20; Grand Jury Ex. #17, pg. 11, ln. 14-20. *See also* Grand Jury Ex. #1d, Sec. H(2).

[208] Tr. of SOT1, pg. 10, ln. 1-22; Tr. of Warden A, pg. 18, ln. 25, pg. 19, ln. 1-20; Grand Jury Ex. #17, pg. 11, ln. 16-25, pg. 12, ln. 1-3. *See also* Grand Jury Ex. #1d, Sec. H(3).

[209] *Id.*

**Exhibit 3**

protocol.[210]  Accordingly, the Special Operations Team Leader told Special Operations Team Member 4 to start syringe 4-A, 50 mg rocuronium bromide, Special Operations Team Member 4 confirmed he was starting syringe 4-A, pushed syringe 4-A, and confirmed completion.[211]  The same process was repeated with Special Operations Team Member 4 for syringe 5A, containing 50 mg rocuronium bromide, and syringe 6A containing 60 mL of heparin/saline, and with Special Operations Team Member 1 as to syringes 7A and 8A, labelled 120 mEq potassium chloride,[212] and syringe 9A containing heparin/saline.[213]  Syringe 9A was pushed at 7:23 p.m., and the IV Team Leader pronounced Warner dead at 7:28 p.m.[214]  The administration of each drug, and the time it was administered, was recorded by the Special Operations Team Recorder on a pre-printed Correctional Service Log form.[215]  None of the parties present saw or heard

---

[210] Grand Jury Ex. #5a; Tr. of Warden A, pg. 20, ln. 1-15; Grand Jury Ex. #17, pg. 12, ln. 4-9. *See also* Grand Jury Ex. #1d, Sec. H(4)-(5).

[211] Tr. of SOT1, pg. 10, ln. 1-22; Tr. of Warden A, pg. 18, ln. 25, pg. 19, ln. 1-20; Grand Jury Ex. #17, pg. 12, ln. 10-18. *See also* Grand Jury Ex. #1d, Sec. H(6).

[212] Warden A acknowledged if he had called out push Syringe 7A, 120 mEq potassium acetate, the Director would have stopped the execution. Tr. of Warden A, pg. 109, ln. 18-25, pg. 110, ln. 1-13. The Department's General Counsel also stated the Director would have stopped the execution. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 123, ln. 12–20.

[213] *Id.* The Special Operations Team Leader then told the Director the protocol was complete.

[214] Grand Jury Ex. #2; Grand Jury Ex. #5a. *See also* Grand Jury Ex. #27, *Return of Death Warrant – Charles Frederick Warner*. Per Execution Protocol, either the Director or his designee may announce death. Grand Jury Ex. #1, Sec. VII(G)(1).

[215] Grand Jury Ex. #5a. *See also* Grand Jury Ex. #1d, Sec. D(9). The Special Operations Team recorder simply handwrote the time at which certain steps occurred and small notes on events of significance. Grand Jury Ex. #5a. The name and amount of the drug contained in each syringe and each syringe's label number and color were preprinted on the form. Grand Jury Ex. #5a. *See also* Grand Jury Ex. #1d, Sec. H(11).

**Exhibit 3**

anything indicating the drugs administered to Warner were not in accordance with the Execution Protocol.[216]

After the execution, the IV Team disconnected the IVs,[217] and Warden A collected the used syringes and recorded the drug name, description, and expiration date on a form titled "Execution Drugs Utilized."[218] Although the drug expiration dates and lot numbers written on the "Execution Drugs Utilized" form are identical to those listed on the "Execution Drugs" form completed by Warden A earlier that day, the third drug written under "Drug Names" on the Execution Drugs Utilized" form is potassium chloride.[219] Warden A testified he completed the "Execution Drugs Utilized" form based on the manifold labels, but did not know where he would have found the expiration dates and lot numbers, which are not listed on the manifold labels.[220] Warden A did not recall examining any of the drug vials or the packaging while completing this form, or comparing it to the "Execution Drugs" form previously completed, and did not ask anyone else present to verify the accuracy of the information.[221]   Upon completion of their

---

[216] Tr. of SOT1, pg. 15, ln. 15-17.

[217] Tr. of IVTL, pg. 58, ln. 3-10.

[218] Grand Jury Ex. #7, *Execution Drugs Utilized Form Dated Jan. 15, 2015 at 7:35 p.m.* A separate "Execution Drugs" form was completed by Warden A earlier that day at 12:25 p.m. Grand Jury Ex. #6. *See also* Grand Jury Ex. # 1, Sec. VII (J)(3).

[219] Grand Jury Ex. #6; Grand Jury Ex. #7.

[220] Tr. of Warden A, pg. 33, ln. 17-25, p. 34, ln. 1-10, pg. 48, ln. 10-20.

[221] *Id.* at pg. 34, ln. 4-15, pg. 35, ln. 4-7. Warden A further explained:

> I cannot even – I am trying to think back to that time when all this happened. I know that when I filled out the first form, I was in that conference room and it was quiet. No one was in there but me. And then when – at the conclusion, when I was filling that out – because it's – this happens quick. You know, [Agent 2] was in there taking pictures of the body, and everything is getting ready for the

**Exhibit 3**

duties, the IV Team was driven back to their meeting location by an OIG Agent.[222]  On arrival, both IV Team Members were paid in cash for their services.[223]

After the witnesses and media exited the H Unit, another OIG agent ("Agent 2") escorted the Oklahoma Chief Medical Examiner's Office ("OCME") livery driver into the H Unit's execution chamber to take custody of Warner's body and transport it to OCME.[224]  Per Execution Protocol,[225] Agent 2 photographed all IV sites, removal of restraints, placement of the decedent in the body bag, the body bag number, and the boxing up of empty syringes, IV bags, and vials.[226]  All of the IV tubes, drug vials, and used syringes were also placed in Warner's body bag.[227] Copies of Agent 2's photographs were sent to Department headquarters.[228]

---

medical examiner. And I knew I had this responsibility to get this filled out. And so I don't know if I even looked at anything. I may have been looking at the board that said potassium chloride, thinking that that's what we used.  Grand Jury Ex. #17, pg. 36, ln. 23-25, pg. 37, ln. 1-9.

[222] Tr. of IVTL, pg. 23, ln. 15-20. The IV Team met the Department's General Counsel and an OIG agent at an undisclosed location, and was driven to and from OSP. *Id.* at pg. 23, ln. 15-25, pg. 43, ln. 25, pg. 44, ln. 1-5.; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 79, ln. 16-25, pg. 80, ln. 1.

[223] Tr. of IVTL, pg. 23, ln. 12-25, pg. 24, ln. 1-2; Grand Jury Ex. #21, pg. 23, ln. 18-25, pg. 24, ln. 1-5; Tr. of IVTM, pg. 12, ln. 4-24, pg. 13, ln. 1-25.

[224] This occurred at approximately 7:42 p.m. Tr. of Agent 2, pg. 10, ln. 9-18; Grand Jury Ex. #5a. OCME remained in the Oklahoma State Penitentiary parking lot during the execution process. Tr. of Agent 2, pg. 7, ln. 4-8. *See also* Grand Jury Ex. #1, Sec. VII(G)(3); Grand Jury Ex. #1d, Sec. I(4)-(5).

[225] Grand Jury Ex. #1d, Sec. I(3). Execution Protocol dictates the Special Operations Team Leader photograph the used syringes, IV bags, and vials. Grand Jury Ex. #1, Sec. (J)(4).

[226] Tr. of Agent 2, pg. 10, ln. 19-25, pg. 11, ln. 1-4, pg. 12, ln. 3-16; Grand Jury Ex. #2. *See also* Grand Jury Ex. #1d, Sec. I.

[227] Tr. of Agent 2, pg. 11, ln. 5-16. Representatives of OCME did not participate in any of the trainings. *Id.* at pg. 9, ln. 21-24.

**Exhibit 3**

Other than Agent 2's photographs, and the minimal information contained on the "Execution Drugs Utilized" form,[229] there is no Department chain of custody or inventory form detailing the type and quantity of vials, syringes, and IV bags delivered on January 15, 2015, by the Department to OCME. Agent 2 testified he did not notice any variations from the Execution Protocol, or observe anything causing him concern.[230]

Per OCME protocol, any items delivered to OCME with a body are treated as evidence, and are documented, photographed, placed in containers, and sealed.[231] Accordingly, on January 16, 2015, OCME employees inventoried the contents of Warner's body bag, and placed these items in three evidence security bags, with each bag listing:

- the decedent's name,

- the offense,

- the delivering agency and its phone number,

- the date and time the evidence was collected by the delivering agency,

- the person who collected the evidence at the delivering agency,

- an inventory of the evidence received by OCME,

- OCME's case number,

- the pathologist and case investigator assigned to the case,

- the date the evidence was inventoried by OCME,

---

[228] Tr. of Agent 2, pg. 12, ln. 17-25.

[229] Grand Jury Ex. #7.

[230] Tr. of Agent 2, pg. 13, ln. 15-21. Agent 2 participated in three to four training sessions prior to the Warner execution, but was located in the media room or by the front doors of the H Unit, not in the Special Operations Room, as his duties did not begin until the execution was complete. *Id.* at pg. 8, ln. 5-22, pg. 9, ln. 2-12.

[231] Tr. of Morgan Carpenter, May 19, 2016.

**Exhibit 3**

- the initials of the OCME employee who conducted the inventory, and

- the date and initials of the OCME employee who sealed the evidence bag.[232]

A full inventory was also included under the Clothing and Personal Effects section of Warner's Report of Autopsy.[233] Per OCME's inventory, two of the syringes in Warner's body bag had red labels stating 120 mEq *potassium chloride*, but none of the vials had a corresponding potassium chloride label.[234] Twelve of the vials, however, did contain white labels with the word *potassium acetate*, Injection USP, 40 mEq (2mEq/mL).[235]

Approximately an hour after the execution, the Director held an "After-Action Review" with the IV Team, Restraint Team, and Special Operations Team,[236] the purpose of which was to discuss unique or unusual events, opportunities for improvement, review actions and documentation to identify any discrepancies, and provide an opportunity for all involved to voice opinions, concerns, and recommendations.[237] At this debriefing, no concerns were expressed regarding the execution drugs utilized.[238]

At 8:03 p.m. on the evening of January 15, 2015, Agent 2 took custody from Warden A of the unused syringes in the secondary drug manifold, which contained execution drugs.[239] The

---

[232] Grand Jury Ex. #31a-31t, *Photos of the Warner Vials and Syringes Stored at OCME.*

[233] Grand Jury Ex. #32, *Report of Autopsy for Charles Frederick Warner.*

[234] Grand Jury Ex. #31a-31t.

[235] *Id. See also* Grand Jury Ex. #32.

[236] Grand Jury Ex. #5a; Grand Jury Ex. #5b. *See also* Grand Jury Ex. #1, Sec. VII(M).

[237] Grand Jury Ex. #1, Sec. VII(M).

[238] Grand Jury Ex. #5b.

44

**Exhibit 3**

same vague chain of custody form used by the Department prior to the execution documenting receipt of the execution drugs by Agent 1 from the Pharmacist, and then by Agent 1 to Warden A, was also used to document Agent 2's receipt of the unused syringes from Warden A.[240] The unused syringes were stored overnight in the Oklahoma State Penitentiary Main Control Evidence lockbox, and transported by Agent 2 to the OSBI's McAlester Office the next day for destruction.[241] Although the Department's chain of custody form does not document the type or volume of items provided to Agent 2 by Warden A,[242] the OSBI's Inventory of Drugs Submitted for Destruction Form, which Agent 2 completed upon submitting the execution drugs to the OSBI for destruction, lists:

- the name, title, agency, and signature of the person delivering the drugs;

- the signature of the OSBI personnel receiving the drugs;

- the date the drugs were received;

- the delivering agency's case number;

- a description of the container the drugs were delivered in;

- a description of the items delivered; and

---

[239] Tr. of Agent 2, pg. 14, ln. 18-25, pg. 15, ln. 1-5; Grand Jury Ex. #17, pg. 13, ln. 4-18. *See also* Tr. of IVTM, pg. 36, ln. 24-25, pg. 37, ln. 1-4.

[240] Grand Jury Ex. #5c.

[241] *Id. See also* Grand Jury Ex. #1, Sec. VIII(J)(1). The next provision of the Execution Protocol, however, states: "The warden of OSP shall witness the disposal of the unused execution drugs and document the disposal in accordance with procedure. *Id.* at Sec. VIII(J)(2). It is unclear how this provision should work in conjunction with Section VIII(J)(1), which directs the Special Operations Team Leader to inventory and forward the execution drugs to the OSBI for destruction. *See also* Grand Jury Ex. #1d, Sec. D(7).

[242] Grand Jury Ex. #5c.

**Exhibit 3**

- a count of the items delivered.[243]

Per this form, Agent 2 delivered the following to the OSBI for destruction: three syringes containing 60 ml of heparin/saline, two syringes containing 50 mg of rocuronium bromide, two syringes containing 250 mg of midazolam, and two syringes containing 120 mEq of potassium chloride.[244] Agent 2 testified he completed the form based on the syringe labels, and had no way of knowing what drugs were actually contained in the syringes.[245] He also said no one, including Warden A, indicated the syringes contained any substance other than potassium chloride as labelled.[246]

On January 16, 2015, OCME conducted a full autopsy of Warner listing probable cause of death as judicial execution by lethal injection.[247] In the pathologic diagnoses, OCME noted the Execution Protocol medications were midazolam, rocuronium bromide, and potassium chloride.[248] In the Autopsy Report, OCME also noted the decedent's body was submitted with:

1. 3 empty 60 mL syringes labelled "60 mL Heparin/saline" and "3B", "250 mg Midazolam" and "2B", "250 mg Midazolam" and "1B".

---

[243] Grand Jury Ex. #5d, *OSBI Inventory of Drugs Submitted for Destruction Dated Jan. 15, 2015*.

[244] *Id.* This inventory form is consistent with the labels on the syringes submitted to the OSBI for destruction but, as to the syringes labelled potassium chloride, not consistent with the drug actually contained in those syringes. Tr. of Morgan Carpenter, Oct. 20, 2015, pg. 11, ln. 4-8. The Department's General Counsel subsequently received a preservation letter to maintain certain evidence related to this execution. Consequently, the drugs were transferred from OSBI to the Medical Examiner's Office for storage. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 59, ln. 17–25, pg. 60, ln. 1–9.

[245] Tr. of Agent 2, pg. 15, ln. 22-25, pg. 16, ln. 1-16.

[246] *Id.* at pg. 16, ln. 17-25, pg. 1-3.

[247] Grand Jury Ex. #32.

[248] *Id.*

**Exhibit 3**

2. **3 empty 60 mL syringes with attached white tape labelled "120 mEq Potassium Chloride" and "7B", "120 mEq Potassium Chloride" and "8B", "60 mL Heparin/saline" and "9B".**

3. 3 empty 60 mL syringes labelled "50 mg Rocuronium Bromide" and "4B", "50 mg Rocuronium Bromide" and "5B", "60 mL Heparin/saline" and "6B".

4. Fluid bag with attached intravenous apparatus labelled "0.9% Sodium Chloride Injection USP 1000 mL' with approximately 500 mL of liquid within bag.

5. Fluid bag with attached intravenous apparatus labelled "0.9% Sodium Chloride Injection USP 1000 mL' with approximately 500 mL of liquid within bag.

6. **White box containing 12 empty vials labelled "20 mL single dose Potassium Acetate Injection, USP 40 mEq/2 mEq/mL", insert labelled Heparin Lock Flush Solution, USP", pill bottle containing 2 empty vials labelled "Rocuronium Bromide Injection 100 mg/10mL", 9 red vial caps, 1 yellow vial cap and 1 green vial cap.**

7. Cardboard box containing 2 empty containers labelled "Midazolam Injection, USP 50 mg/10mL", 1 vial approximately ¾ full labelled "2% Lidocaine HCl Injection, USP 20 mg/mL" and "50 mL", "Midazolam Injection, USP" insert infusion apparatus, empty 10 mL syringes, empty needle package labelled "B-D 18G Precision Glide needle", 20 empty vials labelled "Midazolam Injection, USP 50 mg/10 mL", 10 mL vial, 17 vial caps.

8. White sheets x2.[249]

OCME employees stated they are not familiar with the Department's Execution Protocol, and had no reason to question the names on the drug vials submitted to OCME with Warner's body.[250] Laboratory analysis of Warner's femoral blood tested positive for midazolam at a

---

[249] *Id.* (emphasis added).

[250] Tr. of Morgan Carpenter, May 19, 2016.

**Exhibit 3**

concentration of 3.2 mcg/ML,[251] but OCME advised it is unlikely Warner's blood samples could be tested for the presence of potassium acetate.[252]

On January 20, 2015, a Return of Death Warrant, signed by the Department's General Counsel,[253] was filed in *State v. Charles Frederick Warner*.[254] On March 9, 2015, Warner's

---

[251] *Id.*

[252] Grand Jury Ex. #28, *Email from OCME to Office of the Attorney General Investigator Re. Testing of Warner's Blood Sample*. In an email to Investigator Terry Cronkite on October 9, 2015, OCME's Chief Forensic Toxicologist for OCME, advised as follows:

> . . . As listed on the toxicology report, we tested and quantitated the blood for midazolam. We did not test the vials or syringes, and the evidence bags containing what was described as leftover "unused" items were not opened, and were left in the condition they were received.
>
> In terms of testing for potassium, it can be done but the concentration in the blood cannot be reliably distinguished from those of naturally deceased persons as potassium rises dramatically after death due to release of potassium store inside of cells.
>
> Acetate rapidly forms acetic acid in solution and is converted by the body to bicarbonate so it is unclear whether the blood itself could be tested for it.
>
> It is unlikely that the paralytic could be tested for in the blood at this point due to it being highly unstable.
>
> It is unclear if the un-injected solutions of the paralytic would be stable enough to be tested after this time span. They may be. . . .

[253] Execution Protocol mandates the H Unit Section Chief complete and sign the Return of Death Warrant, and it be filed with the sentencing court and the Court of Criminal Appeals within forty-eight hours of the execution. Grand Jury Ex. #1, Sec. VII(G)(2). *See also Id.* at Sec. VII(L)(2). Although the H Unit Section Chief initialed on the Execution Procedures Checklist he had delivered "the Death Warrant and all pertinent information to the General Counsel within 48 hours following the execution, stating the date, time and manner of death," he correctly dated the form January 20, 2015. Grand Jury Ex. #2. This delay in filing was noted in the Quality Assurance Review. *See* Grand Jury Ex. #3b, *Quality Assurance Review From Dep't Div. Manager for Field Support to the Dir. Dated Feb. 4, 2015.*

[254] Oklahoma Co. District Court Number CF-1997-5249. Grand Jury Ex. #27.

**Exhibit 3**

Certificate of Death was filed with the Oklahoma Department of Health.[255] All of the paperwork associated with Warner's execution was assembled by Department staff into a "death book" and retained by the Department's General Counsel.[256]

### c. The Department's Quality Assurance Review lacked specificity and thus failed to identify the receipt of potassium acetate.

Upon completion of an execution, the Department's Division Manager for Field Support is tasked with conducting a Quality Assurance Review to evaluate the performance of the execution process, and to report his findings to the Director.[257]  Specifically, he is required to review all documentation, training, and professional qualifications to ensure compliance with the Execution Protocol.[258]  He is permitted, as part of his Quality Assurance Review, to utilize assistance as necessary to compile or assess information, including consulting with properly trained medical personnel to review the medical aspects of the execution procedures, which are among the areas covered by the Quality Assurance Review.

[259]  Although the Division Manager for Field Support had a PhD in clinical psychology, he had no specialized training in conducting quality assurance reviews of executions.[260]

---

[255] Date of death was listed as January 15, 2015, at 19:28 in McAlester, Oklahoma. Cause of death was judicial execution by lethal injection. Grand Jury Ex. #33, *Death Certificate for Charles Frederick Warner.*

[256] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 115, ln. 17–25, pg. 116, ln. 1-25, g. 117, ln. 1-25, pg. 118, ln. 1-3.

[257] Grand Jury Ex. #1, Sec. VIII.

[258] *Id.*

[259] *Id.*

[260] Tr. of DMFS, pg. 8, ln. 20-25, pg. 9, ln. 1-2.

**Exhibit 3**

The Division Manager for Field Support completed his Quality Assurance Review for the Warner execution on February 4, 2015, and prepared a written memorandum to the Director documenting his findings.[261] In performing this review, he familiarized himself with the Execution Protocol in effect during the Warner execution, including the medical aspects of the execution process,[262] and reviewed all documentation provided by the Department's General Counsel.[263]

The Department's General Counsel refused to provide the names of the execution team members, however, and therefore the Division Manager for Field Support was unable to review these individuals' training and professional qualifications as mandated by the Protocol.[264] This also limited his ability to review all documentation as part of a thorough review, as some of the documents in the Department's General Counsel's possession contained the identities for individuals within the execution teams.[265]

For example, although the Division Manager for Field Support reviewed training records indicating the IV Team only attended one training prior to the Warner execution, he did not

---

[261] Grand Jury Ex. #3b.

[262] Grand Jury Ex. #1.

[263] Tr. of DMFS, pg. 8, ln. 2-11.

[264] *Id.* at pg. 13, ln. 3-18, pg. 15, ln. 22-24; Grand Jury Ex. #3b, Recommendation 10 (the Department General Counsel stated he had verified professional qualifications prior to the execution). Per Execution Protocol, the IV Team's licensing and criminal history reviews are conducted by OIG prior to assigning or retaining any team member. Grand Jury Ex. #1, Sec. IV(c)(3)(b). Professional qualifications are then reviewed post-execution by the Division Manager for Field Support as part of the Quality Assurance Review. *Id.* at VIII(a). There is no provision in the protocol permitting the Department's General Counsel to assume this duty from OIG or waive this obligation as to the Division Manager for Field Support. The Execution Protocol further states "any exception to this procedure will require prior written approval from the director." *Id.* at Sec. X.

[265] Tr. of DMFS, pg. 22, ln. 10-17.

**Exhibit 3**

know their professional licenses and credentials, if they had participated in previous executions, or if they were correctional professionals familiar with Department policies and procedures independent of the execution training, and therefore could not make informed recommendations as to whether the IV Team's training was sufficient.[266] Likewise, based on the documentation provided, the Division Manager for Field Support was unaware whether the IV Team was ever provided a written copy of the Execution Protocol.[267] Thus, he was not able to review and provide recommendations regarding training.

In the Quality Assurance Review, the Division Manager for Field Support made no reference to the use of potassium acetate in the Warner execution.[268] He testified, although he believes he reviewed the "Execution Drugs" and "Execution Drugs Utilized" forms,[269] he did not notice the discrepancy between them.[270] He stated, if he had noticed the discrepancy, it would have been reported in the Quality Assurance Review.[271]

> **c. Following Warner's execution, the Department's Employees, Members of the Department's Board of Corrections, Employees of the Governor's Office, and Employees of the Oklahoma Attorney General's Office received documents detailing the execution but were not looking for and, therefore, failed to notice the use of potassium acetate.**

---

[266] *Id.* at pg. 25, ln. 7-25, pg. 26, ln. 1-14.

[267] *Id.* at pg. 27, ln. 1-12; Tr. of IVTL, pg. 59, ln. 25, pg. 60, ln. 1-6.

[268] Grand Jury Ex. #3b.

[269] Grand Jury Ex. #6; Grand Jury Ex. #7.

[270] Tr. of DMFS, pg. 28, ln. 23-25, pg. 29, ln. 1-22. *See also* Grand Jury Ex. #6; Grand Jury Ex. #7.

[271] *Id.* at pg. 30, ln. 1-16.

**Exhibit 3**

On April 1, 2015, Department employee Judy Brinkley received a copy of Warner's Report of Autopsy from OCME per her request.[272]   Ms. Brinkley was employed by the Department as a nurse manager, and her duties included tracking the deaths of all Department inmates.[273]   Upon receipt of this Report of Autopsy, Ms. Brinkley logged Warner's cause and manner of death into his offender file, and uploaded a copy of the report into the electronic health records.[274]   Ms. Brinkley advised she reviewed Warner's Report of Autopsy solely to obtain the cause and manner of death, and had no reason to notice vials of potassium acetate were listed in the report's "Clothing and Personal Effects" inventory.[275]

On April 2, 2015, after uploading Warner's Report of Autopsy into the electronic health records, Ms. Brinkley emailed a copy of the report to Department employees Joel McCurdy,[276] Pat Sorrels,[277] Carl Wilks, Jennifer White, Joshua Phillips[278] and Kimberly Owens.[279]   On April 2, 2015, Ms. Owens emailed a copy of the Report to Audrey Rockwell, Jeffrey Cartmell, and Jennifer Chance at the Governor's Office, and to the Department's Board of Corrections.[280]

---

[272] Tr. of Morgan Carpenter, May 19, 2016.

[273] *Id.*

[274] *Id.*

[275] *Id. See also* Grand Jury Ex. #32.

[276] The Department's Chief Medical Officer. Grand Jury Ex. #45, *Emails Between the Department and OCME.*

[277] The Department's Health Service Administrator. *Id.*

[278] Employees of the Department's OIG. *Id.*

[279] *Id.* Kimberly Owens was the executive assistant to the Director. *Id.*

[280] *Id.* The Board of Corrections is comprised of seven members appointed by the Governor and confirmed by the Oklahoma Senate. Each term is for seven years. The Board oversees the

**Exhibit 3**

Members of the Department's Board of Corrections advised they learned of the use of potassium acetate in the Warner execution at a meeting shortly after the September 30, 2015, stay entered on behalf of Glossip.[281] Prior to that date, some members conducted a cursory review of the Report of Autopsy, some looked at the cause of death listed on the first page of the report, and others do not recall reviewing the report at all.[282] Likewise, the Governor's Office did not observe the reference to ". . . 12 empty vials labelled "20 mL single dose Potassium Acetate Injection, USP 40 mEq/2 mEq/mL. . . ." contained on page two of Warner's Report of Autopsy, and was not aware of the use of potassium acetate in Warner's execution prior to September 30, 2015.[283]

Following Warner's execution, all Department documents related to the execution process were compiled and provided to the Department's General Counsel. Due to on-going litigation involving Oklahoma's Execution Protocol, the Department's General Counsel was required to review these records, and redact information to protect the identity of the execution team members.[284] Specifically, the Department's General Counsel was concerned about

---

operations of the Department of Corrections. Members of the Department's Board of Corrections receive autopsy reports, when available, after the death of any inmate. Tr. of Morgan Carpenter, May 19, 2016. OAG Agent Carpenter interviewed all seven individuals who were a member of the Board between April, 2015, and September 30, 2015.

[281] Tr. of Morgan Carpenter, May 19, 2016.

[282] *Id.*

[283] Grand Jury Ex. #53, *Affidavit of Governor's Dep't Gen. Counsel*; Grand Jury Ex. #32.

[284] Tr. the Dep't Gen. Counsel, Oct. 22, 2015, pg. 165, ln. 13-24. *See also* Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 32, ln. 2-12 The Department's General Counsel testified:

> Q: When redactions were required, were you tasked with that? Is that something that you did?

**Exhibit 3**

compromising the Pharmacist's confidentiality through the execution drug vials' lot numbers or the chain of custody form.[285]   The records reviewed by the Department's General Counsel included the "Execution Drugs" forms completed by Warden A at the time the drugs were received at the Oklahoma State Penitentiary and after Warner's execution, and included photographs depicting the same, but the Department's General Counsel did not take note of any references to potassium acetate, and did not actually learn of its use until September 30, 2015.[286]

In late March 2015, the Office of the Attorney General's Litigation Unit received documents pertaining to Warner's execution, including the execution logs and the "Execution Drugs" forms.[287]   These documents were forwarded to the Federal Public Defender's Office on April 3, 2015, as part of the on-going litigation surrounding lethal injections in Oklahoma,[288] and

---

A: It was either something I would do or something that the attorneys in the civil division of the AG's office would do. . . .   There was a decision made that we did not need to take the chain of custody form or the form you referenced about the drugs utilized or the pictures of the drugs and do anything with them because they would be likely redacted to an extent that they wouldn't serve any purpose." *Id.* at pg. 32, ln. 2-25, pg. 33, ln. 1.

[285] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 165, ln. 13-24. The General Counsel further testified:

I didn't go through them page by page to make sure that all the Is were dotted and Ts were crossed, so to speak. That was – there was an after action review that was done on that. And we would go into those books to get documents as they were requested in discovery or as an initial review of what might we expect to have to turn over in discovery. *Id.* at pg. 31, ln. 18-24.

[286] *See* Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 165, ln. 25, pg. 166, ln. 1-2. *See also* Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 32, ln. 21 to pg. 33, ln. 1.

[287] Tr. of Morgan Carpenter, May 19, 2016. A photograph of a potassium acetate vial from the Warner execution was forwarded to AAG Hadden on September 30, 2015, the day of the scheduled Glossip execution.

[288] *Id.*

54

**Exhibit 3**

were also provided to the Office of the Attorney General's Solicitor General's Unit.[289]  Similarly, on April 1, 2015, attorneys with the Litigation Unit and the Federal Public Defender's Office also received a copy of Warner's Autopsy Report.[290]

Although attorneys for both the State and the Federal Public Defender's Office received these documents, no one noticed the presence of potassium acetate.[291]  The Litigation Unit reviewed the documents for confidentiality of participants pursuant to 22 O.S. § 1015(B).[292]  Further, AAG Hadden told investigators the defense team consists of numerous attorneys and medical experts.[293]  Despite this, the Litigation Unit has not been contacted by members of that team regarding the use of potassium acetate.[294]

In August 2015, attorneys with the Office of the Attorney General's Litigation Unit contacted AAG Tiffany Wythe, who serves as OCME's attorney,[295] to determine if the drug vials from Warner's execution were available.[296]  The Litigation Unit's attorneys made this inquiry in anticipation the federal public defender's office would request testing of Warner's execution

---

[289] *Id.*

[290] *Id.*

[291] *Id. See also* Grand Jury Ex. #44a, *Affidavit of Lori Cornell,* Grand Jury Ex. #44b, *Affidavit of Jeb Joseph*, Grand Jury Ex. #44c, *Affidavit of Aaron Stewart.*

[292] Tr. of Morgan Carpenter, May 19, 2016.

[293] *Id.*

[294] *Id.*

[295] AAG Wythe is employed with the Office of the Attorney General's General Counsel Unit, and serves as the attorney for OCME pursuant to a legal services contract between the Office of the Attorney General and OCME.

[296] Tr. of Morgan Carpenter, May 19, 2016.

**Exhibit 3**

drugs as part of on-going litigation.[297]  During AAG Wythe's discussions with the Litigation

Unit's attorneys, the drug of emphasis was midazolam, not potassium.[298]

On September 2, 2015, AAG Wythe, contacted OCME to determine what items of

evidence they had pertaining to the Warner execution.[299]  In response, AAG Wythe received an

email from OCME which included a copy of Warner's Report of Autopsy and OCME's evidence

log for the decedent.[300]  This evidence log included a sheet entitled "Drug Information,"

inventorying the drugs submitted to OCME with the decedent.[301]  On this form, it states

Warner's body was submitted with twelve empty vials of potassium acetate.[302] AAG Wythe did

not forward the execution evidence log to the Office of the Attorney General's Litigation Unit, or

any other parties, and is not familiar with the Department's Execution Protocol [303]

**V.     Richard Glossip was scheduled to be executed on September 30, 2015.**

**a. Preparations the day of Glossip's execution were extensive but, at multiple points,
were devoid of the detailed attention necessary for execution of the death penalty.**

On August 14, 2015, following the Court of Criminal Appeals' issuance of the order

setting Glossip's execution date for September 16, 2015, the Office of the Attorney General's

Litigation Unit notified Glossip's attorneys by letter the Department would utilize the three-drug

Protocol specified in Chart D of the Department's Execution Protocol in Glossip's execution,

---

[297] Who is an employee of the Office of the Attorney General's General Counsel Unit.

[298] Tr. of Morgan Carpenter, May 19, 2016.

[299] *Id.*

[300] *Id.*

[301] *Id.*

[302] *Id.*

[303] *Id.*

**Exhibit 3**

with that Protocol consisting of midazolam, rocuronium bromide, and potassium chloride.[304]   On September 16, 2015, Agent 1 received the execution drugs from the Pharmacist in a sealed unmarked cardboard box,[305] and delivered them to Warden A in an Oklahoma State Penitentiary conference room.[306]   When the drugs arrived at the Oklahoma State Penitentiary, Warden A opened the box, removed the vials, and lined them up, where they were photographed by the individual that served as Command Post Recorder in the Warner execution.[307]   Shortly thereafter, the Court of Criminal Appeals stayed Glossip's execution until September 30, 2015.[308]   As a result, the execution drugs were boxed and returned to the Pharmacist that same day.[309]   Upon receiving the drugs, the Pharmacist placed a seal on the box, and put them back in storage.[310]

On September 30, 2015, Agent 1 again picked up the execution drugs for the Glossip execution from the Pharmacist, and delivered them to Warden A at the Oklahoma State

---

[304] Grand Jury Ex. #30, *Ltr. Dated Aug. 14, 2015 Giving Glossip Notice of Intent to Use Chart D.* *See also* Grand Jury Ex. #11d, Sec. (D)(1).

[305] Grand Jury Ex. #19n, *Photographs of Glossip's Execution Drugs Taken Sept. 16, 2015*. At 10:15 a.m. Grand Jury Ex. #41, *Chain of Custody Form for Sept. 16, 2015 Scheduled Execution.*

[306] At 11:30 a.m. Grand Jury Ex. #41. The contents of the box were not searched by the Oklahoma State Penitentiary security. Tr. of Agent 1, pg. 21, ln. 3-15.

[307] Grand Jury Ex. #17, pg. 8, ln. 4-25, pg. 9, ln. 1-5. Grand Jury Ex. #19n. A different Command Post Recorder was assigned for the Glossip execution, but the Warner Command Post Recorder still photographed the execution drugs for both the September 16 and September 30, 2015, scheduled executions. Tr. of CPR, pg. 6, ln. 8-17. The vials were photographed together and separately. Grand Jury Ex. #19n.

[308] Grand Jury Ex. #21, pg. 24, ln. 15-25.

[309] Tr. Agent 1, pg. 11, ln. 13-19; Grand Jury Ex. #23, pg. 24, ln. 12-125; Grand Jury Ex. #41.

[310] Grand Jury Ex. #23, pg. 24, ln. 25, pg. 25, ln. 1-10.

**Exhibit 3**

Penitentiary.[311] The execution drugs were again packaged in an uninspected, sealed cardboard

box, but were delivered directly to the Special Operations Room because the Oklahoma State

Penitentiary had received several bomb threats that morning, and was evacuating.[312] Warden A,

the H Unit Section Chiefs, and the Warner execution's Command Post Recorder were all present

at time of delivery.[313] The execution drugs were promptly unpacked by Warden A and the H

Unit Section Chief, and the vials were photographed.[314] A chain of custody form, identical to

that used in the Warner execution, documented transfer of the execution drugs from the

Pharmacist to Agent 1, and from Agent 1 to Warden A.[315]

    While photographing and inventorying the execution drugs, Warden A observed some of

the vials said potassium acetate, not potassium chloride, but did not tell anybody about the

substitution.[316] When pressed as to why he did not notify other execution team members of the

substitution,[317] he replied:

---

[311] Tr. of Agent 1, pg. 11, ln. 4-12; Tr. of Warden A, pg. 35, ln. 8-16; Grand Jury Ex. #17, pg. 8, ln. 4-25, pg. 9, ln. 1-5; Tr. of HUSC, pg. 55, ln. 5-20; Grand Jury Ex. #12c, *Chain of Custody Form Dated Sept. 30, 2015*. The Department's General Counsel provided Agent 1 the time and place to pick up the execution drugs for both the Warner and Glossip executions. Grand Jury Ex. #20, pg. 15; ln. 7-18.

[312] Tr. of Agent 1, pg. 21, ln. 3-15; Tr. of CPR, pg. 18, ln. 19-25, pg. 19, ln. 1-18; Tr. of Warden A, pg. 35, ln. 20-24, pg. 36, ln. 10-19; Tr. of HUSC, pg. 26, ln. 8-13; Grand Jury Ex. #17, pg. 40, ln. 9-16; Grand Jury Ex. #19o, *Photographs of Glossip's Execution Drugs Taken Sept. 30, 2015*.

[313] Tr. of CPR, pg. 19, ln. 9-25, pg. 20, ln. 1-7; Tr. of HUSC, pg. 55, ln. 5-20.

[314] *Id. See also* Grand Jury Ex. #19o. The H Unit Section Chief was the same for the Warner and scheduled Glossip executions. Thus, the same three people present for the photographing of the Warner execution drugs were also present both times the Glossip execution drugs were photographed. Tr. of CPR, pg. 19, ln. 9-25, pg. 20, ln. 1-7, Tr. of HUSC, pg. 16, ln. 16-25, pg. 7, ln. 1-14. The Warner CPR immediately downloaded these photos to a computer in the Warden's Secretary's office, printed them, and provided them to Warden A. Tr. of CPR, pg. 20, ln. 21-24.

[315] Grand Jury Ex. #12c.

**Exhibit 3**

> When I seen it, I thought it was the same thing. And I reflected on the way that we had done it previously with the accountabilities to ensure – I didn't know – when the drugs were brought down, I didn't know the pharmacist that we use or the pharmacy. I didn't know who ordered the drugs. That's not part of my job duty. I didn't know it hadn't been looked at, I assumed it had been. I assumed that what the pharmacist provided was that [sic] we needed. So in my mind, that potassium acetate must have been the same thing as potassium chloride.[318]

Warden A later explained, under the previous execution protocol, a staff member, accompanied by two additional people, was assigned to take a written prescription to the pharmacist, and to verify the drugs received against the written prescription.[319]  Warden A was unaware this process was not followed in the Warner execution and the scheduled Glossip execution because, although it was not provided for in the Execution Protocol, "there were lots of things that took place at the Oklahoma State Penitentiary that wasn't in the policy."[320]

---

[316] Tr. of Warden A, pg. 36, ln. 20-25, pg. 37, ln. 1-3; Tr. of CPR, pg. 20, ln. 18-20; Grand Jury Ex. #17, pg. 22, ln. 2-7, pg. 32, ln. 20-22. Warden A later noted:

> I mean, I explained earlier that, you know, my thought when I seen it on Glossip, that that must be a generic. Must be the same thing. Because if we see – you know, you see – every time you get a prescription filled they'll have one name, and then below it will have another name, right. I mean, that happens on all my prescriptions. And that's what I was thinking. That it says potassium acetate, I was thinking it was – meant the same thing. It was the same thing. That was what was going through my head.  Grand Jury Ex. #17, pg. 62, ln. 3-13.

[317] The Department's Execution Protocol states:

> [i]f at any point any team member determines that any part of the execution process is not going according to procedure, they shall advise the IV Team leader who shall immediately notify the director. The director may consult with persons deemed appropriate and shall determine to go forward with the procedure, start the procedure over at a later time, within the twenty-four hour day, or stop the execution. . . . There shall be no deviation from the procedures as set forth herein, without prior consent from the director." Grand Jury Ex. #11d, Sec. K(3)-(4).

[318] Tr. of Warden A, pg. 37, ln. 13-24.

[319] *Id.* at pg. 56, ln. 10-18.

[320] *Id.* at pg. 56, ln. 19-23.

**Exhibit 3**

Warden A further testified he was not responsible for what happened at the Oklahoma State Penitentiary facility as it related to executions, despite being the Oklahoma State Penitentiary's warden, because it was the Director's job.[321] He later contended the IV Team Leader was responsible.[322] Finally, he noted he was not even aware who ordered the execution

---

[321] *Id.* at pg. 37, ln. 25, pg. 38, ln. 1-5.

[322] *Id.* at pg. 62, ln. 4-25, pg. 63, ln. 1-14. For example, Warden A testified:

Q. You've made a lot of references to what the Special Operations Team is responsible for. And I'm going to hand you what's been marked as Grand Jury Exhibit 1D, and let me get back here. I've got my copy over here. We're looking at Attachment D, Page 1 of Attachment D, Section B, "Preparation of Chemicals." Do you see what I'm talking about?

A. Yes.

Q. And it talks about chemical syringe preparation, assigning team members to assist. And under Subsection 3, it talks about the specific information that must be included on the label. And correct me if I'm wrong, but chemical name is on there.

A. Yes.

Q. Is that accurate?

A. That's what it states.

Q. So one of your responsibilities, as that Team Leader, and correct me if I'm wrong, is to verify that the Team Members do their job correctly?

A. Yes.

Q. And the way I read that policy is that those labels are supposed to include the chemical name.

A. They do.

Q. Except we now know, for both Mr. Warner and Mr. Glossip, that the chemical name wasn't correct?

A. Yes.

**Exhibit 3**

drugs, or the identity of the pharmacist, as this was above his level, stating "there are just some things you ask questions about, and there's some things that you don't. I never asked questions about the process."[323]  In a separate interview, Warden A again stated:

Q. And so to sit here and say that wasn't your responsibility, how do you justify that, given that you're required to put the correct chemical name?

A. Well, I believe this says 'IV Team Leader, with the assistance of a Special Operations Team Member, shall be responsible for preparing and labeling the assigned sterile syringes in a distinctive manner.' Right?

[323] *Id.* at pg. 57, ln. 1-8. Despite attempting to shift blame, the Special Operations Team paradoxically agreed it was important to understand and question anything out of the ordinary through the chain of command so it could be determined whether to proceed. *Id.* at pg. 42 ln. 2-7. Nevertheless, this blame shifting continued:

Q. Would you agree with me, then, that it would be safe to say that you had knowledge that use of an appropriate drug or use of the proper drugs was important in a state-sponsored execution?

A. Yes.

Q. And that knowing, specifically, what type of drugs were being used would be very important, in light of everything that has happened to Lockett and in light of the Supreme Court opinion, and all of that, correct?

A. Correct.

Q. So when you tell this Grand Jury that, when you were looking at these vials, and you saw potassium acetate, you are expecting them to believe based on all that information that's been happening with executions in the State of Oklahoma, all of the litigation, all of the news media, everything that you've been involved in, that you really didn't think it was important to note that?

A. I never said it wasn't important.

Q. Well, you said that it didn't cause you concern enough to say anything about it.

A. I don't think I said that.

Q. Well, what did you say?

**Exhibit 3**

. . . .And there's questions you ask and there's questions you don't ask. . . I wasn't responsible for ordering the drugs. I don't even know they did a prescription. . . In the past it was my responsibility to know how everything worked, and I did. When I first got to OSP, I had no idea how any of that worked. And everyone knew their specific job, but they didn't know anybody else's job, so if I had an employee leave, we didn't know what that person did. So we finally – we wrote everything down on what everyone did, and we had a big manual on that. Since then, you know, I don't have any of that information.[324]

A. What I said was that I assumed, and that's my mistake, that there were accountabilities in place above me when the drugs were picked up. That's what I said.

Q. Would you agree that, as an individual, a team member, and you are, in fact, not just the Warden, but you are participating as part of one of these teams, and I apologize, I'm missing out on the name, but you have a general responsibility to act as sort of a check in that process to ensure that it's being done properly?

A. Are you talking about generally?

Q. Just in general. This is –

A. I mean, I do that on several things throughout the course of the execution process. Yes, I do.

Q. You know how important it is to make sure the drugs are correct, and you see a name on a bottle that does not match what is in the protocol, the protocol that you have read many times and that you are familiar with, and you don't say anything about that; it's not important enough to say anything about that? This is after an execution where you were the Warden, where an execution goes bad, that generates Federal litigation, that has the United States Supreme Court looking into the practices of the State of Oklahoma, and it simply did not occur to you that that was important. Is that really what you expect this Grand Jury to believe?

A. I never said what I expect them to believe. I'm just trying to be honest and tell them, to the best of my knowledge, what happened. I'm not a pharmacist. I'm not a doctor. *Id.* at pg. 85, ln. 2-25, pg. 86, ln. 1-25, pg. 87, ln. 1-8.

[324] Grand Jury Ex. #17, pg. 68, ln. 9-24.

**Exhibit 3**

Warden A acknowledged he did not receive any written documentation from the Director authorizing a change in the quantity or type of drugs prepared and administered for either execution.[325]

Similarly, the H Unit Section Chief also agreed it was important to verify the execution drugs upon receipt, but, like Warden A, he "just didn't think it was [his] role to do that," claiming it was the IV Team Leader's responsibility.[326] Interestingly, the Execution Protocol explicitly states the Warden of the Oklahoma State Penitentiary is responsible for compliance with the Preparation and Administration of Chemical provisions of the Execution Protocol.[327]

The Special Operations and IV Teams both arrived at the Special Operations Room around 12:00 p.m. and initiated execution preparations.[328] Upon their arrival, Warden A provided the IV Team Leader with the box of execution drugs, and the IV Team Leader, along with the IV Team Member, began drawing up the syringes from the vials.[329] While the IV Team Leader was drawing up syringes, he noticed some of the vials were labelled potassium acetate,

---

[325] *Id.* at pg. 59, ln. 13-24, pg. 60, ln. 3-21. *See also* Grand Jury Ex. #1d, Sec. D(6); Grand Jury Ex. #11, Sec. (D)(6). *See also* Grand Jury Ex. #1, Sec. (K)(4); Grand Jury Ex. #11, Sec. (K)(4).

[326] Tr. of HUSC, pg. 24, ln. 16-19, pg. 107, ln. 12-16. The H Unit Section Chief testified his job was to make sure the drugs were secured from the time they were received until the time they were given to the IV Team Leader. *Id.* at pg. 88, ln. 22-24.

[327] Grand Jury Ex. #1d, Sec. X. Warden A stated, in his opinion, this should say the Director. Grand Jury Ex. #17, pg. 56, ln. 2-11.

[328] Tr. of IVTL, pg. 62, ln. 18-24; Grand Jury Ex. #12a, *Corr. Service Log Dated Sept. 30, 2015*; Grand Jury Ex. #22, pg. 17, ln. 3-10.

[329] Tr. of IVTL, pg. 63, ln. 19-25, pg. 64, ln. 1-8; Grand Jury Ex. #22, pg. 22, ln. 1-4. *See also* Grand Jury Ex. #12a. The Special Operations Team assisted in drawing up the heparin/saline syringes. Tr. of IVTL, pg. 64, ln. 1-6.

**Exhibit 3**

and notified the Department's General Counsel.[330]  The IV Team Leader further advised the Department's General Counsel that potassium acetate was medically interchangeable with potassium chloride.[331] Warden A was also present during this conversation, but did not recall if he disclosed to the IV Team Leader or the Department's General Counsel he had previously noticed the discrepancy.[332]

Upon learning of the receipt of potassium acetate, the Department's General Counsel advised the IV Team Leader to continue execution preparations[333] and left the room to speak with the Director.[334] The Department's General Counsel also called the Pharmacist to determine why the Department had received potassium acetate, rather than potassium chloride, and the difference between the two.[335]  The Pharmacist initially told the Department's General Counsel he had ordered potassium acetate by mistake, but then told him potassium chloride in the

---

[330] Tr. of IVTL, pg. 64, ln. 9-25, pg. 65, ln. 1-3; Tr. of SOT1, pg. 17, ln. 12-25, pg. 18, ln. 1-24; Grand Jury Ex. #22, pg. 22, ln. 1-25; Grand Jury Ex. #17, pg. 45, ln. 11-20; Grand Jury Ex. #21, pg. 50, ln. 4-8, pg. 61, ln. 18-25. Since the IV Team drew up the syringes in the order they would be administered, this was the last set of syringes the IV Team drew up for the primary manifold. Grand Jury Ex. #21, pg. 50, ln. 4-7.

[331] Tr. of IVTL, pg. 65, ln. 20-25, pg. 66, ln. 1-18. *See also* Grand Jury Ex. #17, pg. 45, ln. 11-20; Grand Jury Ex. #21, pg. 50, ln. 10-19.

[332] Tr. of Warden A, pg. 42, ln. 13-25, pg. 43, ln. 1-3.

[333] Grand Jury Ex. #21, pg. 55, ln. 11-18, pg. 75, ln. 22-25, pg. 76, ln. 1-13, pg. 77, ln. 2-7; Tr. of IVTL, pg. 66, ln. 19-25, pg. 67, ln. 1-7. At 12:45 p.m., the H Unit Section Teams completed preparing, labeling, and affixing the syringes to the manifold, and, at 12:57 p.m., the Special Operations Team Leader verified the syringes were properly labeled and affixed in the correct locations on the manifolds. Grand Jury Ex. #12a.

[334] Tr. of SOT1, pg. 19, ln. 2-5; Grand Jury Ex. #22, pg. 23, ln. 5-8. The Department's General Counsel initially texted the Director about the substitution.  Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 92, ln. 14–19.

[335] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 93, ln. 1-3.

**Exhibit 3**

concentration needed by the Department was unavailable.[336] The Pharmacist also indicated potassium acetate and potassium chloride are medically interchangeable.[337] During this conversation, the Pharmacist further advised the Department's General Counsel he had provided potassium acetate for the Warner execution.[338] The Department's General Counsel independently verified this by reviewing the photos of Warner's execution drugs, and showed these photos to the IV Team Leader.[339]

The IV Team Leader subsequently met with the Director and the Department's General Counsel multiple times to explain the difference between potassium acetate and potassium chloride, and the IV Team Leader's medical opinion on proceeding with the execution using potassium acetate.[340] The IV Team Leader again explained potassium acetate and potassium chloride are not identical, but are medically interchangeable.[341]

---

[336] *Id.* at pg. 93, ln. 15-25, pg. 94, ln. 1-11. The Pharmacist told him the district supervisor for his wholesaler had advised the potassium chloride was on backorder with no anticipated date for it coming back into stock. *Id.* at pg. 157, ln. 23-25, pg. 158, ln. 1-4.

[337] *Id.* at pg. 93, ln. 15-17. Grand Jury Ex. #23, pg. 26, ln. 25, pg. 27, ln. 1-6.

[338] Tr. of IVTL, pg. 67, ln. 8-25; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 94, ln. 12-16; Grand Jury Ex. #21, pg. 56, ln. 1-25. This was the first time the Department General Counsel was aware there was even a possibility potassium acetate was used in the Warner execution. Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 84, ln. 10-25.

[339] Tr. of IVTL, pg. 67, ln. 14-25; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 94, ln. 17-25, pg. 95, ln. 1. On September 30, 2015, during the scheduled execution of Glossip, the Department's General Counsel asked his assistant to email him photographs of the potassium acetate vials. Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 33, ln. 11-23.

[340] Tr. of IVTL, pg. 68, ln. 16-25, pg. 69, ln. 1-25, pg. 70, ln. 1-5; Grand Jury Ex. #21, pg. 77, ln. 6-13.

[341] *Id. See also* Grand Jury Ex. #21, pg. 55, ln. 15-25, pg. 56, ln. 1-5.

**Exhibit 3**

**b. Following the discovery that the Department had received potassium acetate, the Department, the Office of the Attorney General, and the Governor's Office held a series of conversations leading to the ultimate stay of Glossip's execution.**

Around 12:30 p.m., the Department's General Counsel contacted AAG Hadden, advised him the Department had received potassium acetate, and inquired about the Office of the Attorney General's position on moving forward with the scheduled execution.[342] AAG Hadden stated he did not know the Office's position at that time, and would need to consult with the Attorney General.[343] AAG Hadden then informed Jennifer Miller, Deputy Attorney General for the Criminal Appeals Division of the Office of the Attorney General, of the situation,[344] who advised the Attorney General.[345] Meetings were held between several members of the Office of the Attorney General, and it was determined the execution should not proceed if potassium chloride was not available.[346] Pursuant to this decision, Deputy Attorney General Miller began preparing a Motion for Stay of Execution to file with the Court of Criminal Appeals.[347]

At approximately 1:15 p.m., the Department's General Counsel advised the Governor's General Counsel and a Deputy General Counsel for the Governor's Office that the Department had received potassium acetate from the Pharmacist, and inquired about the Governor's position

---

[342] Tr. of Governor's Counsel, pg. 13, ln. 1-19.

[343] *Id.*

[344] Tr. of Jennifer Miller, pg. 3, ln. 8-20. In capital cases, the Department is represented by attorneys from both the Litigation and Criminal Appeals Units of the Office of the Attorney General, with the Litigation Unit focusing on challenges to the method of execution. *Id.* at pg. 6, ln. 4-11.

[345] *Id.* at pg. 22, ln. 2-24, pg. 23 ln. 18-25, pg. 24, ln. 1-3.

[346] *Id.* at pg. 23, ln. 17-20.

[347] *Id.* at pg. 23, ln. 17-25, pg. 24, ln. 1-3.

**Exhibit 3**

on proceeding with the execution.[348] The Department's General Counsel told the Governor's Office both the IV Team Leader and the Pharmacist had advised him potassium acetate and potassium chloride were medically interchangeable, and both the IV Team Leader and the Pharmacist would execute an affidavit to that effect.[349] The Department's General Counsel also stated he had spoken with AAG Hadden, but did not yet know the Office of the Attorney General's position.[350] During this conversation, the Department's General Counsel also advised the Governor's General Counsel he believed potassium acetate was used in Warner's execution.[351]

Based in part on the IV Team Leader and the Pharmacist's professional medical opinions that potassium acetate and potassium chloride were medically interchangeable, the Governor's General Counsel felt comfortable proceeding with Glossip's execution using potassium acetate.[352] The Governor's General Counsel testified he planned to obtain affidavits from the IV Team Leader and the Pharmacist stating potassium chloride and potassium acetate were medically interchangeable, proceed with Glossip's execution, and then seek "clarification on the protocol" prior to the next execution.[353]

---

[348] Tr. of Governor's Counsel, pg. 12, ln. 1-22.

[349] *Id.* at pg. 14, ln. 1-25, pg. 15, ln. 1-4.

[350] *Id.* at pg. 13, ln. 1-19.

[351] *Id.* at pg. 15, ln. 5-25. Prior to September 30, 2015, no one in the Governor's Office had knowledge potassium acetate was used in Warner's execution *Id.* at pg. 16, ln. 1-10.

[352] *Id.* at pg. 17, ln. 3-25, pg. 18, ln. 1-6.

[353] *Id.* at pg. 18, ln. 1-6.

**Exhibit 3**

At approximately 2:00 p.m., the Department's General Counsel spoke with Deputy Attorney General Miller, who advised him the Attorney General believed the execution should not proceed using potassium acetate, and she would file a motion with the Court of Criminal Appeals to stay the execution.[354] The Department's General Counsel conveyed the Office of the Attorney General's position to the Governor's General Counsel,[355] prompting him to call Deputy Attorney General Miller in an attempt to persuade her not to file the motion to stay.[356] During this conversation, the Governor's General Counsel stated potassium chloride and potassium acetate were basically one in the same drug, advising Deputy Attorney General Miller to "Google it."[357] The Governor's General Counsel also told Deputy Attorney General Miller that filing a motion to stay would look bad for the State of Oklahoma because potassium acetate had already been used in Warner's execution.[358] Deputy Attorney General Miller responded that strict compliance with the Execution Protocol was required, no alternative for potassium chloride

---

[354] Grand Jury Ex. #12b, *Execution Notes Dated Sept. 30, 2015*; Tr. of Governor's Counsel, pg. 18, ln. 16-24; Tr. of Jennifer Miller, pg. 25, ln. 9-10.

[355] Who in turn advised Governor Fallin. Tr. of Governor's Counsel, pg. 18, ln. 25, pg. 19, ln. 1-4.

[356] *Id.* at pg. 18, ln. 23-25, pg.19, ln. 16-25, pg. 20, ln. 1-2; Tr. of Jennifer Miller, pg. 23, ln. 6-13, pg. 24, ln. 8-25, pg. 25, ln. 9-10. This conversation occurred around 2:00 p.m. *Id.* at pg. 23, ln. 11-13. Deputy Attorney General Miller described the Governor's Counsel as upset. *Id.* at pg. 25, ln. 9-20.

[357] *Id.* at pg. 26, ln. 6-8. Deputy Attorney General Miller told the Governor's Counsel she had "googled it," potassium acetate was an alternative, and "an alternative is not one in the same." *Id.* at pg. 26, ln. 8-11.

[358] *Id.* at pg. 25, ln. 14-17, pg. 27, ln. 5-21. Deputy Attorney General Miller testified this was the first time she had heard potassium acetate was used in the Warner execution, and she was in shock and extremely concerned upon learning this. *Id.* at pg. 26, ln. 21-25, pg. 27, ln. 1-25.

**Exhibit 3**

was provided for in the Protocol, and so, in her opinion, the Department had to use potassium chloride or the execution would have to be stayed.[359]

A conference call ensued between the Governor's Office and the Office of the Attorney General, with Governor Fallin and the Governor's General Counsel participating on behalf of the Governor's Office.[360] The Attorney General, Chief of Staff Melissa Houston, Deputy Attorney General Miller, and Deputy Attorney General Kindanne Jones[361] participated on behalf of the Office of the Attorney General.[362] During this conference call, the Attorney General told the Governor it would violate the Execution Protocol to proceed with Glossip's execution using potassium acetate.[363] Based on the Attorney General's legal opinion, the Governor agreed to stay Glossip's execution, and subsequently issued Executive Order 2015-42, granting Glossip a thirty-seven day stay of execution.[364]

During this conference call, the Governor's General Counsel also informed the Attorney General that potassium acetate had been used in lieu of potassium chloride in Warner's

---

[359] *Id.* at pg. 26, ln. 2-20. Deputy Attorney General Miller also told the Governor's Counsel she would advise the Attorney General why the Governor's Counsel believed they should not stay the execution, but he had not changed her mind, and she felt certain he would not change the Attorney General's mind. *Id.* at pg. 28, ln. 1-7.

[360] The Governor's General Counsel provided ongoing updates to Governor Fallin about the situation throughout this period. Tr. of Governor's Counsel, pg. 17, ln. 17-25, pg. 18, ln. 1-6, pg. 20, ln. 12-18.

[361] Deputy Attorney General for the Litigation Division of the Office of the Attorney General.

[362] *Id.* at pg. 20, ln. 17-25, pg. 21, ln. 1-10.

[363] Tr. of Governor's Counsel, pg. 22, ln. 3-10. The Governor's Counsel said the Governor's Office considers the Attorney General the lawyer for state, and if the Attorney General stated the Department should proceed, the Governor's Office was going to proceed, and if the Attorney General said stop, the Governor's Office was going to stop. *Id.* at pg. 21, ln. 11-20.

[364] *Id.* at pg. 22, ln. 3-10; Grand Jury Ex. #47, *Executive Order 2015-42.*

**Exhibit 3**

execution.[365]  This led to a heated discussion between the Governor's General Counsel and the Attorney General on the language to be used in the Governor's Executive Order staying Glossip's execution.[366]  The Governor's General Counsel did not want to use the phrase "wrong drug" because he did not believe it had been established that potassium acetate was the wrong drug, and he wanted to leave this option open for the court.[367]  Further, the Governor's General Counsel was also concerned using the phrase "wrong drug" would require having to inform people the wrong drug had been used in Warner's execution.[368]  The Attorney General's position was that potassium acetate was the wrong drug, and there was no legal ambiguity.[369]

Various drafts of Executive Order 2015-42 staying Glossip's execution reflect this dispute between the Governor's General Counsel and the Attorney General.[370]  The original draft of the Executive Order, emailed by the Governor's Deputy General Counsel to Deputy Attorney General Miller at approximately 3:16 p.m. on the afternoon of September 30, 2015, states the stay is being issued to "give the Department of Corrections and its attorneys the opportunity to determine whether potassium acetate is compliant with the Execution Protocol."[371]  Deputy Attorney General Miller promptly responded to the email stating:

---

[365] *Id.* at pg. 25, ln. 12-20.

[366] *Id.* at pg. 25, ln 16-25.

[367] *Id.* at pg. 25, ln. 21-25, pg. 26, ln. 1-9.

[368] *Id.* at pg. 26, ln. 10-17.

[369] *Id.*

[370] Grand Jury Ex. #48, *Emails Between Deputy Attorney Gen. Miller and the Governor's Deputy General Counsel Dated Sept. 3, 2015.*

[371] *Id.*

**Exhibit 3**

[t]he General does not agree to the language saying it is stayed to give time for the acetate to be deemed compliant. The General was specific that he is not interested in litigating the acetate. If you maintain that language I have been instructed to go to the court.[372]

This was followed shortly by a second email from Deputy Attorney General Miller to the Governor's Deputy General Counsel stating "[o]ur understanding was the stay was to determine whether chloride is available."[373]

The Governor's Deputy General Counsel emailed a second draft of the Executive Order to Deputy Attorney General Miller five minutes later slightly modifying the Order's language to state the stay was being issued to "give the Department of Corrections and its attorneys the opportunity to determine whether potassium acetate is compliant with the Execution Protocol and/or obtain potassium chloride."[374] Deputy Attorney General Miller responded the Attorney General would only agree to language stating "[t]his stay will give the Department of Corrections the opportunity to obtain potassium chloride," and, if this language was not acceptable to the Governor's Office, Deputy Attorney General Miller had been instructed to file a stay with the Court of Criminal Appeals.[375] The Governor's Deputy General Counsel replied the Governor's Office "appreciate[s] the AG's input and we are issuing the order."[376]

---

[372] *Id.*

[373] These email responses were sent at 3:20 and 3:22 p.m. *Id.*

[374] *Id.* This email was sent at 3:27 p.m.

[375] *Id.* At 3:40 p.m., Deputy Attorney General Miller sent a second email asking the Governor's Deputy General Counsel if she had received her changes. *Id.*

[376] This email was sent at 3:44 p.m. *Id.*

**Exhibit 3**

At 3:50 p.m., Executive Order 2015-42 was issued staying Glossip's execution.[377]  In this

Order, the Governor's Office stated: "This stay will give the Department of Corrections and its

attorneys the opportunity to determine whether potassium acetate is compliant with the

Execution Protocol and/or to obtain potassium chloride."[378] At 3:54 p.m., the Director gathered

the execution teams in the witness area and told them a stay had been issued, advising them the

Pharmacist had provided potassium acetate instead of potassium chloride, potassium chloride

was no longer available, and, therefore, the Department could not proceed with the execution as

potassium acetate was not listed in the Execution Protocol.[379]  At 4:15 p.m., Warden A provided

all of the unused execution drugs to OCME.[380]

The following day, the Governor's Office issued a press release titled "Questions and

Answers regarding Richard Glossip's stay of execution" stating, in part:

> The decision to delay the execution was made because of the legal ambiguity
> surrounding the use of potassium acetate. Out of an abundance of caution and
> acting on the advice of the attorney general and her legal staff, Gov. Fallin
> delayed Glossip's execution so any legal ambiguities could be addressed.
>
> The state of Oklahoma has an Execution Protocol which has been heavily litigated
> and approved by federal courts. . . .
>
> The offices of the governor, the attorney general and DOC[381] are working to
> address any legal ambiguities regarding DOC procedures and execution

---

[377] *Id.*

[378] Grand Jury Ex. #47.

[379] Tr. of SOT1, pg. 19, ln. 8-9; Tr. of HUSC, pg. 57, ln. 4-11; Grand Jury Ex. #12b. *See also* Grand Jury Ex. #17, pg. 43, ln. 15-25, pg. 44, ln. 1-7.

[380] Grand Jury Ex. #12c, *Chain of Custody Form Dated Sept. 30, 2015*; Tr. of Warden A, pg. 43, ln. 11-25, pg. 44, ln. 1-10. The same chain of custody form previously used by the Department, which does not document the actual items transferred between the parties, was used to document transfer of the execution drugs from Warden A to OCME. Grand Jury Ex. #12c; Tr. of Warden A, pg. 44, ln. 12-15.

**Exhibit 3**

chemicals. Executions will resume once those issues have been addressed to the satisfaction of all three parties. . . . [382]

That same day, the Office of the Attorney General filed a *Notice and Request for Stay of Execution Dates* with the Court of Criminal Appeals requesting Glossip and two other executions be stayed indefinitely to provide the Office of the Attorney General "time to evaluate the events that transpired on September 30, 2015, the Department's acquisition of a drug contrary to protocol, and the Department's internal procedures relative to the protocol" due to the State's "strong interest in ensuring that the Execution Protocol is strictly followed."[383]   On October 2, 2015, this Grand Jury began issuing subpoenas to the Department, the Governor's Office, and the Office of the Attorney General for records and testimony relevant to its investigation of the use, and attempted use, of potassium acetate in the execution of Warner and scheduled execution of Glossip.

## VI. Based on the evidence received by the Multicounty Grand Jury, the Grand Jury enters the following findings.

Warner's death was intentionally inflicted by correctional officers acting pursuant to a Death Warrant issued by the District Court in *State of Oklahoma v. Charles Fredrick Warner*, Oklahoma County Case No. CF-1997-5249.[384] The execution, which involved the administration of midazolam, rocuronium bromide, and potassium acetate, was completed in a manner

---

[381] Referred to in this Report as the Department.

[382] Grand Jury Ex. #13, *Press Release from the Governor's Office "Questions and Answers Regarding Glossip's Stay of Execution."* "DOC" is referenced to in this Report as "the Department."

[383] Grand Jury Ex. #49., *Notice and Request for Stay of Execution Dates Filed Oct. 1, 2015*; Tr. of Governor's Counsel, pg. 23, ln. 21-24.

[384] Grand Jury Ex. #27.

**Exhibit 3**

consistent with the Death Warrant and statutory authority.[385]   The intravenous administration of the three-drug cocktail to Warner resulted in his humane death within eighteen minutes of the commencement of the sequential administration of these drugs.[386]   There is no evidence the manner of the execution caused Warner any needless pain. Nevertheless, his execution was not administered in compliance with the Department's Protocol or in a manner allowing Warner to challenge the procedure prior to his death.

Attachment D of the Execution Protocol mandates the Director provide "to the offender in writing ten (10) days prior to the scheduled execution" notice of the chemicals to be used in the scheduled execution.[387]   The Department's General Counsel testified this notice provision allows the offender an opportunity to challenge the use of the drugs in court if he so chooses.[388] The written notice provided to Warner and Glossip through their attorneys clearly identified three (3) specific drugs the Department intended to use in their respective executions.[389] Nowhere in the written notices, and nowhere in Chart D of Attachment D of the Execution

---

[385] At the time Warner was sentenced, executions were accomplished by "ultrashort-acting barbiturate(s) in combination with a chemical paralytic agent." 22 O.S.2001 § 1014(A). By January 2015, the relevant statute had been changed to require executions to be "carried about by the administration of a lethal quantity of a drug or drugs until death is pronounced by a licensed physician." Such a change was contemplated in the Death Warrant. *See* Grand Jury Ex. #27.

[386] Grand Jury Ex. #5a: 7:10 p.m. to 7:28 p.m. The IV Team Leader also testified the administration of the midazolam and rocuronium bromide in combination, based on the dosage, would have been fatal and irreversible without the administration of a third drug. Tr. of IVTL, pg. 93, ln. 6-25, pg. 94, ln. 1-25, pg. 95, ln. 1-6.

[387] Grand Jury Ex. #1d, Sec. D(1).

[388] Tr. of the Dep't Gen. Counsel, Oct. 22, 2015, pg. 134, ln. 13-18. The witness testified the procedure contemplated giving more than ten days written notice. *Id.* at pg. 134, ln. 19-21. The witness also testified Warner and Glossip challenged the use of midazolam in their executions. *Id.* at pg. 135, ln. 6-10.

[389] Grand Jury Ex. #2b; Grand Jury Ex. #30. *See also* Grand Jury Ex. #1d and #11d (listing the drugs as 1) midazolam, 2) vercuronium bromide, pancuronium bromide, or rocuronium bromide, and 3) potassium chloride).

**Exhibit 3**

Protocol, was potassium acetate mentioned as an alternative to potassium chloride. The Grand Jury's investigation has focused on this failure to adhere to policy and the systemic problems within the Department resulting in the administration and the attempted administration of potassium acetate in the execution of Warner and the scheduled execution of Glossip. The Grand Jury finds that the use and attempted use of potassium acetate occurred primarily due to two reasons. First, the Execution Protocol lacked controls to ensure that the proper execution drugs were obtained and administered. Second, there was an inexcusable failure to act on the part of a few individuals.

Before turning to the details of these findings, the Multicounty Grand Jury would like to thank the Governor's Office and the Department for their cooperation in this investigation. Upon learning of this Grand Jury investigation, Governor Fallin retained outside counsel for the Governor's Office, independent of the attorneys previously involved in this matter, "to advise and represent the Governor's Office in assisting the Attorney General's inquiry arising from the scheduled execution of Richard Glossip and any related matters . . . ."[390] The Governor's Office, through outside counsel, has produced 837 pages of documentation requested by this Grand Jury as part of its investigation and has not withheld any responsive documents on the basis of privilege. Likewise, members of the Governor's Office voluntarily participated in interviews with investigators assigned to assist this Grand Jury in its investigation, and members of the Governor's Office who have been requested to testify before this Grand Jury have done so voluntarily without need of a subpoena.

Likewise, upon initiation of this Grand Jury investigation, the Department also retained independent outside counsel and has produced thousands of pages of documents pursuant to

---

[390] Grand Jury Ex. #43, *Fellers Snider Letter of Engagement With the Governor's Office.*

**Exhibit 3**

grand jury subpoenas, including responsive documents containing unredacted privileged information. Numerous Department employees have voluntarily participated in interviews with investigators assisting this Grand Jury, and several Department employees have provided testimony.[391]

### a. The Department should retain experts to advise the State on the newly-enacted alternative to lethal injection—Nitrogen Hypoxia.

During his testimony before the Grand Jury, the Department's General Counsel discussed the challenges the Department faces in carrying out executions by lethal injection. The Department's General Counsel explained that qualified doctors are often unwilling to assist or are prohibited from assisting in executions due to their medical ethics and professional societies' rules, even banning certain types of doctors from even being present at executions. Further, obtaining proper drugs from pharmacies has become increasingly difficult since pharmaceutical companies are limiting their supplies of lethal injection drugs,[392] and pharmacies themselves are often unwilling to supply drugs to the Department due to privacy and safety concerns.

During this session, the Multicounty Grand Jury also heard testimony from Doctor A and Professor A regarding the viability of nitrogen hypoxia as an alternate method of execution. In 2015, the Oklahoma State Legislature added this method as the first alternative after lethal injection. According to the statute, in the event lethal injection is held unconstitutional or is otherwise unavailable, the death sentence can be carried out by nitrogen hypoxia.

---

[391] Indeed, the Director flew back to the State of Oklahoma on extremely limited notice to accommodate this grand jury's schedule.

[392] During the course of this investigation, Pfizer announced it would prohibit the use of its drugs in executions. Included on the list are midazolam, pancuronium bromide, rocuronium bromide, vercuronium bromide, and potassium chloride, all included in Chart D of Oklahoma's Execution Protocol.

**Exhibit 3**

Both Doctor A and Professor A testified executions carried out by nitrogen hypoxia would be humane, and as nitrogen is the most abundant element in our atmosphere, the components for execution via nitrogen hypoxia would be easy and inexpensive to obtain. Nitrogen is also simple to administer. The scientific research regarding nitrogen hypoxia has shown this method of execution would be quick and seemingly painless. In addition to scientific research, Professor A explained that high altitude pilots who train to recognize the symptoms of nitrogen hypoxia in airplane depressurizations do not report any feelings of suffocation, choking, or gagging. Doctor A testified that a person in a nitrogen-induced hypoxic state would lose consciousness quickly, and the heart would cease to beat within a few minutes. At present, however, no State has implemented the death penalty through nitrogen hypoxia, although it is an approved method of execution in Oklahoma.

Since Oklahoma would be the first State to conduct executions by nitrogen hypoxia, it is the recommendation of the Multicounty Grand Jury that further research, including a best practices study, be conducted to determine how to carry out the sentence of death by this method. To that end, the Multicounty Grand Jury recommends the Department retain experts to advise the State regarding the best method for carrying out executions by nitrogen hypoxia with the goal of developing a nitrogen hypoxia protocol. However, while the Department begins its study into nitrogen hypoxia as a viable method of execution, the State of Oklahoma should still seek to carry out executions by lethal injection and improve upon its current protocol.

**a.  The Execution Protocol lacked controls to ensure the proper execution drugs were obtained and administered.**

**i.  The Execution Protocol was vague and poorly drafted.**

With the exception of retaining qualified medical personnel, the execution process was a procedural failure, from drafting to implementation. The Protocol, drafted after the Lockett

77

**Exhibit 3**

execution and subsequent investigation by the Oklahoma Department of Public Safety, went into effect on September 30, 2014, and was minimally amended on June 30, 2015.[393]

The Director supervised the revisions with the assistance of other Department administrators, including the Department's General Counsel, Security Operations personnel, the Oklahoma State Penitentiary's Warden, a Division Manager, and others.[394]   Although the Director asked this team to obtain execution policies from Arizona, Florida, and Texas, and although administrators testified the revision process was time-consuming, the Department's adopted policy mirrors Arizona's.[395]   The Director testified the policies in Oklahoma and Arizona are similar, at least in part, because of his experience with the Arizona Department of Corrections and his familiarity with its policy.[396]   The broader changes were made because the Director felt the previous protocol placed an unfair burden on the Warden of the Oklahoma State Penitentiary,[397] and he wanted to more evenly distribute responsibilities.[398]

While the Director supervised the revisions, the Department's General Counsel was responsible for providing the Director legal advice and opinions.[399] This included reviewing the Execution Protocol for constitutional requirements and carrying out any applicable court orders

---

[393] The 2015 amendments were largely related to offender comfort, training schedules, and other administrative matters. Tr. of Dir., Oct. 21, 2015, pg. 74, ln. 11-25, pg. 75, ln. 1-12.

[394] Tr. of Dir., Jan. 21, 2016, pg. 3, ln. 20, pg. 4, ln. 1-11.

[395] *Id.* at pg. 5, ln. 13-14. One witness estimates Oklahoma's policy "was revised probably 90% with the Arizona Department of Corrections policy. Most of the information that is in our current policy was extracted from the Arizona Department of Correction policy." Tr. of AFO, pg. 17, ln. 1-6.

[396] Tr. of Dir., Jan. 21, 2016, p. 9, ln. 4-5.

[397] Tr. of Dir., Oct. 21, 2015, at pg. 81, ln. 19-25.

[398] *Id.*

[399] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 6, ln. 6-8.

**Exhibit 3**

in light of the on-going litigation surrounding lethal injections. Revisions should have included, however, ensuring the Protocol's provisions were not vague or subject to multiple interpretations.

In particular, the "Definitions" section of the Execution Protocol was, and is, woefully inadequate.[400] The Execution Protocol is thirty-four pages in length, with ten attachments totaling another nineteen pages, and contains explicit and detailed policies, procedures, and responsibilities, including medical responsibilities.[401] The "Definitions" section, however, only provides definitions for two words used in the Protocol, "stay" and "stop."[402]

For example, per the Execution Protocol, two days prior to the execution, Warden A is responsible for "[v]erify[ing] execution inventory and equipment checks are completed and open issues resolved in accordance with established protocols."[403] Unfortunately, the policy does not

---

[400] Grand Jury Ex. #1, Sec. #1(A); Grand Jury. Ex. #11, Sec. #1(A).

[401] Grand Jury Ex. #11; Grand Jury Ex. #11a, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment A, Notification Letter to Dignitaries and Law Enforcement*; Grand Jury Ex. #11b, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment B, Notification Letter to Offender Witnesses*; Grand Jury Ex. #11c, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment C, Release of Remains and Burial Arrangements*; Grand Jury Ex. #11d; Grand Jury Ex. #11e, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment E, News Media Statement After an Execution*; Grand Jury Ex. #11f.1, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment F-1, 35 Day Information Packet*; Grand Jury #11f.2, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment F-2, Summary of Rules and Procedures*; Grand Jury #11f.3, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment F-3, Witnesses*; Grand Jury #11f.4, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment F-4, Visitors*; Grand Jury #11f.5, *Operational Procedure OP-040301, Effective June 30, 2015; Attachment F-5, Last Meal*.

[402] Grand Jury Ex. #1, Sec. #1(A); Grand Jury. Ex. #11, Sec. #1(A).

[403] Grand Jury Ex. #2. *See also* Grand Jury Ex. #1, Sec. III(D)(2)(a).

**Exhibit 3**

include a definition of "execution inventory,"[404] and there was no consultation between the Department's General Counsel and Warden A regarding the term's meaning.[405] Despite this, an informal, "tacit" understanding developed within the Department limiting the term to on-hand items at the Oklahoma State Penitentiary, including gauze, syringes, general medical supplies, ultrasound machines, and other physical equipment.[406] Although conversations regarding the inventory process occurred, no definitive testimony emerged regarding the exact origin of the tacit understanding of the definition of "execution inventory."[407] Since this term is not expressly defined, it is open to interpretation and *may* have included the execution drugs themselves. In fact, the Department's General Counsel admitted "if we had drugs, if we had a DEA registration number and could store them, then that would probably be part of that. But since we don't have the drugs, then it's not."[408]

The Department's General Counsel should have ensured any terms open to interpretation were defined, especially in light of changes made when it was determined the Department would not have the drugs on-site. Terms such as "execution inventory," "equipment," "supplies," and "medical aspects" must be explicitly defined, and the definitions should include the specific

---

[404] Nevertheless, as discussed *infra* at footnote 456, the drugs were in the Department's inventory once they were paid for and being stored at the pharmacy.

[405] Tr. of Warden A, pg. 71, ln. 9-13 (noting the Director was consulted and the Warden was left with the understanding "execution inventory" did not include the chemicals). *See also* Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 64, ln. 8-12.

[406] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, p. 62, ln. 8-25, pg. 63, ln. 1-25, pg. 64, ln. 1-21.

[407] Warden A testified a discussion was had with the Director regarding inventory. Although the Warden could not recall specifics about that conversation, it was his understanding based on those conversations the drugs used in the execution were not included. *See* Tr. of Warden A, pg. 69, ln. 21-25, pg. 70, ln. 1-25, pg. 72, ln. 1-18.

[408] Tr. of the Dep't Gen. Counsel, Oct. 22, 2015, pg. 63, ln. 19-25, pg. 64, ln. 1-5.

**Exhibit 3**

items included in each category. Defining terms will thus ensure everyone has the same understanding of the policy's terms and ***should*** prevent future confusion.

      ii.    **The Execution Protocol required no verification of execution drugs.**

The Execution Protocol's failure to require verification of the execution drugs contributed greatly to the Department's use and attempted use of potassium acetate. This verification failure manifested in three ways: (1) there was no specific individual(s) responsible for verifying proper execution drugs were ordered; (2) there was no verification of the correct execution drugs at the time the drugs were taken into the Department's custody; and (3) there was no verification of the correct execution drugs prior to injection.

      1.    **No one was specifically tasked with verifying that the proper execution drugs were obtained and administered.**

A previous version from May 2014 of Oklahoma's Attachment D—the schedule controlling the preparation and administration of the drugs—included provisions not found in Arizona's policy or the final Oklahoma policy.[409] That version required the H Unit Section Chief to "[a]t the appropriate time, . . . transfer custody of the chemicals to the Special Operations Team to begin the ***verification of chemical(s)*** and syringes in the chemical room."[410] The draft continues, "[t]he Special Operations Team Leader will ***confirm the receipt and correct labeling of the chemicals.***"[411] These provisions, according to one administrator, were in place to ensure the Department "received the chemicals and . . . that they [we]re as what was ordered."[412]

---

[409] *See* Grand Jury Ex. #24, *Arizona Department* of Corrections "Execution Procedures" dated Jan. 21, 2012; Grand Jury Ex. #37, *Email of Draft Attachment D Sent May 22, 2014.*

[410] Grand Jury Ex. #37 (emphasis added).

[411] *Id.* at Sec. B(2) (emphasis added).

[412] Tr. of AFO, pg. 25, ln. 2-5.

**Exhibit 3**

For unknown reasons, these provisions were modified, removing any specific verification requirement for receipt of the proper drugs.[413] Indeed, one administrator involved in the revisions admitted the policy, as adopted, no longer required verification of the drugs,[414] and was surprised such verification was not required under the adopted policy.[415]

Oklahoma's adopted policy also excluded a provision requiring the H Unit Section Chief to "[e]nsure that complete sets of chemicals are on site and immediately available for use and functioning properly."[416] Again, it is unclear why this provision was removed, although the H Unit Section Chief testified similar provisions were modified because of an inability to store the drugs on-site.[417] The removal of this section again left it unclear as to who was responsible for ensuring the drugs were at the Oklahoma State Penitentiary.[418] The other duties assigned to the H Unit Section Chief involving the drugs, namely ensuring they were ordered and arrived as scheduled, were removed by way of verbal order from the Director.[419] The verbally-modified portions remained unchanged after the June 30, 2015, amendments.[420]

---

[413] A final review was generally conducted by the Director and the Department's General Counsel, Tr. of AFO, pg. 28, ln. 10-11 (discussing other amendments to the policy). The Department's General Counsel does not recall seeing the language requiring verification of the chemicals. Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 15, ln. 9-10.

[414] Tr. of AFO, pg. 31, ln. 3-4. The witness was later asked: "[W]ho is responsible for verifying that the correct drugs are being used under this procedure? A: This procedure does not clearly state that, sir." *Id.* at pg. 31, ln. 5-8.

[415] Tr. of AFO, pg. 49, ln. 13-21.

[416] *See* Grand Jury Ex. #37 (Attachment D, (A)(1)(III)). Tr. of AFO, pg. 27, ln. 15-17. This provision *was* a part of the Arizona policy. *See* Grand Jury Ex. #24.

[417] Tr. of HUSC, pg. 53, ln. 4-19.

[418] Tr. of AFO, pg. 28, ln. 18-23.

[419] Tr. of HUSC, pg. 44, ln. 16-25, pg. 45, ln. 1-6.

**Exhibit 3**

While Attachment D of the Execution Protocol requires the H Unit Section Chief to ensure execution drugs are ordered, arrive as scheduled, and are stored properly,[421] as previously noted, the Director ordered the H Unit Section Chief to ignore this provision and, instead, directed the Department's General Counsel to obtain the drugs.[422] The Director testified he did this because the Department's General Counsel had previous contact with the Pharmacist, and the H Unit Section Chief "had all this other stuff on [his] plate, building the teams."[423] The Director's oral modification added to confusion within the Department regarding whose "role" it was to verify the proper execution drugs were received, thus creating an overall lack of accountability.[424]

Indeed, confusion was rife among execution team members regarding who was responsible for verifying receipt of the drugs.[425] Various witnesses claimed the IV Team Leader was responsible;[426] however, this duty was not expressly delineated in the Protocol. Warden A, who is required to document the drugs used in the execution, including expiration dates and lot numbers, denied any responsibility for verifying receipt of the proper drugs, testifying he simply

---

[420] *See* Grand Jury Ex. #11d.

[421] Grand Jury Ex. #1d and #11d.

[422] *See* Tr. of Dir., Jan. 21, 2016, pg. 11, ln. 18-25, pg. 12, ln. 1-7.

[423] *Id.* at pg. 11, ln. 1-18, pg. 12, ln. 1-7.

[424] Tr. of HUSC, pg. 24, ln. 16-19, pg. 107, ln. 12-16.

[425] The Department's General Counsel testified although there was not a specific policy requiring anybody in the Department to verify the proper drugs were received, "it was more or less just something that was understood." Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 6, ln. 21-25, pg. 7, ln. 1-13.

[426] Tr. of Dir., Jan. 21, 2016, pg. 16, ln. 25, pg. 17, ln. 1-5. Tr. of Warden A, pg. 62, ln. 4-25, pg. 63, ln. 1-14. Tr. of HUSC, pg. 107, ln. 12-16.

**Exhibit 3**

assumed the right drugs were received.[427] Interestingly, the Director testified Warden A's inventory process was intended to verify the proper drugs were brought into the facility.[428]

In short, the failure to include provisions requiring specific individuals to verify that the proper drugs were received led directly to the use of potassium acetate in the Warner execution and receipt of potassium acetate for the scheduled Glossip execution.

### 2. No one verified that the correct execution drugs were received at the time the drugs were taken into the Department's custody.

The 2014 revisions to the Execution Protocol led to changes in the chain of custody form used to track the acquisition, transportation, and use of the drugs. These changes resulted in a poor paper trail and prevented verification of the drugs prior to their admission to the Oklahoma State Penitentiary.

Under OSP-040301-01, the previous field memorandum for executions, the chain of custody forms for each specific drug protocol were included as attachments to the policy. Specifically, the drug protocol to be used in the execution of Warner and scheduled execution of Glossip was included as Attachment B-5.[429] This attachment listed each drug, including syringe designations.[430] It also called for the pharmacist filling the prescription to sign the form, in an apparent verification of the included chemicals.[431] Although such a system relied upon the

---

[427] Tr. of Warden A, pg. 37, ln. 20-24.

[428] Tr. of Dir., Jan. 21, 2016, pg. 20, ln. 8-25, pg. 21, ln. 1-11.

[429] Grand Jury Ex. #25. OSP-040301-01 called for "vercuronium bromide or other blocking agent." The revised policy allowed for the use of vercuronium bromide, pancuronium bromide, or rocuronium bromide.

[430] Grand Jury Ex. #25.

[431] Id.

**Exhibit 3**

accuracy of the information provided by the pharmacist, it also allowed each official in the chain of custody to verify receipt of the proper chemicals.

The chain of custody form from the revised Execution Protocol adopted prior to Warner's execution removed any and all references to the drugs it was intended to track.[432] It included signature blocks for the party receiving the "contraband/evidence," who it was received from, the date, time, and location at which it was stored, but it never identified the actual "contraband" received.[433] In fact, Agent 1 testified he would not use the form as-is in a criminal investigation because it did not contain enough information to be helpful.[434] Exclusion of the drug names on the form was justified by a supposed need to protect the identity of the Pharmacist providing the chemicals,[435] even though the Pharmacist signed the form when Agent 1 collected the drugs on the day of Warner's execution and on the day of the scheduled Glossip execution.[436]

In reality, the chain of custody form used under the revised Execution Protocol was an incomplete version—the back—of the chain of custody form used throughout the Department for other purposes.[437] The front of the form—excluded from use in the Warner execution and in the scheduled Glossip execution—includes locations for descriptions of items "seized," where the items were recovered from, and other pertinent information.

---

[432] *See* Grand Jury Ex. #12c.

[433] Grand Jury Ex. #5c; Grand Jury Ex. #12c.

[434] Tr. of Agent 1, pg. 15, ln. 10-14.

[435] *Id.* at pg. 14, ln. 20-23.

[436] *See* Tr. of Agent 1, pg. 14, ln. 25 (when asked about the pharmacist signing the form, Agent 1 explained away the obvious privacy issue by saying "[h]e scribbles on it.").
[437] *See* Tr. of AFO, pg. 43, ln. 19-25, pg. 45, ln. 1-23; Grand Jury Ex. #42, *Two Sided Dep't Chain of Custody Form*; Grand Jury #41.

**Exhibit 3**

Had the Department utilized its entire institutional form for the tracking of contraband/evidence, it would have allowed anyone within the chain of custody to review and record what they were receiving. Assuming those individuals had taken the time to learn the Protocol, they would have been alerted to the receipt of potassium acetate well before it reached the death chamber.

Further, additional checks could have been instituted to ensure the correct execution drugs were on hand after the drugs had been collected from the Pharmacist. The chain of custody form used to track movement of the execution drugs was initiated by Agent 1, who obtained the drugs from the Pharmacist and delivered them to the Oklahoma State Penitentiary for both the Warner execution and the scheduled Glossip execution. [438] When Agent 1 took possession of the drugs, they were in an unmarked, sealed cardboard box with no inventory list.[439] Agent 1 did not verify the contents of the box upon receipt from the Pharmacist, was not required by Execution Protocol to do so, and was not asked to do so by the Director or the Department's General Counsel.[440] Agent 1, who is in charge of security for the prisons, thought the box contained the execution chemicals called for in the Execution Protocol, but did not actually know its contents and admitted the box could have contained anything.[441] Furthermore, when Agent 1 arrived at the Oklahoma State Penitentiary, he bypassed traditional security measures,[442] explaining the

---

[438] Tr. of Dir., Jan. 21, 2016, pg. 22, ln. 3-8.

[439] Tr. of Agent 1, pg. 16, ln. 20-24.

[440] *Id.* at pg. 17, ln. 11-19.

[441] *Id.* at pg. 18, ln. 18-22, pg. 21, ln. 10-12.

[442] *Id.* at pg. 20, ln. 5-23, pg. 21, ln. 3-9. Agent 1's rationale for bypassing traditional security measures, including those required of daily employees of the Oklahoma State Penitentiary, was that he supervised the security unit. *Id.* at pg. 20, ln. 20-23, pg. 23, ln. 13-15.

**Exhibit 3**

contents were not checked because he was simply there to transport the drugs and wanted to avoid having others sign the chain of custody form or to accidently break a vial.[443]

When Agent 1 arrived at OSP, he was required, pursuant to Protocol, to deliver the chemicals to the H Unit Section Chief, the individual who was required to maintain custody and control of the chemicals until delivery to the Special Operations Team.[444] Unfortunately, Agent 1's knowledge of the policy was so lacking he was unaware of the identity of the H Unit Section Chief.[445] And although through testimony it appears the H Unit Section Chief was present when the chemicals were delivered,[446] he did not take an active role in handling the chemicals. Rather, Agent 1 assumed he was to deliver the chemicals to Warden A based on past practices.[447] Consequently, he delivered the chemicals to the Warden; the Warden took physical control of them, had them photographed, and transported them to the chemical room.[448]

It is troubling that Agent 1, whose job includes facility security and criminal investigations, including thwarting the smuggling of contraband into prisons, did not require formal documentation of what "contraband" he was bringing into the Oklahoma State Penitentiaryfor the purpose of executing an offender. Indeed, Agent 1 never verified he was, in fact, transporting medications into the prison. A minimal inspection of the contents of the box

---

[443] *Id.* at pg. 22, ln. 1-2; ln. 17-25, pg. 23, ln. 1-25, pg. 24, ln. 1-2, pg. 40, ln. 19-23.

[444] *See* Grand Jury Ex. #1d; Grand Jury Ex. #11d.

[445] Tr. of Agent 1, pg. 26, ln. 2-12.

[446] Tr. of HUSC, pg. 25, ln. 15-21.

[447] Tr. of Agent 1, pg. 28, ln. 21-24.

[448] *See* Tr. of Warden A, pg. 25, ln. 6-9.

**Exhibit 3**

should be conducted at the very least to ensure nothing other than the approved drugs are introduced into the state's most secure prison.

Further, had Agent 1 been more insistent on properly documenting what entered the prison utilizing proper chain of custody techniques, the error may have been caught before the wrong drug was administered to Warner. It is also possible, although not certain, that had the drugs been delivered to the H Unit Section Chief and had Agent 1 followed Protocol related to his duties involving the drugs, the error may have been caught.

### iii. The Department's failure to follow state purchasing requirements contributed to the Department's use and near use of potassium acetate.

The method by which the execution drugs were ordered contributed greatly to the Department's receipt of the wrong execution drugs. Indeed, the process used by the Department to acquire the necessary drugs was questionable at best.

Further, the Department's General Counsel's failure to adhere to state purchasing requirements also contributed to the use of the wrong execution drugs, even though the Department was partially exempted from following state purchasing requirements when buying execution-related materials. Both the Pharmacist and the Department's General Counsel testified the drugs were ordered over the phone; the Pharmacist was never provided a written order, prescription, or copy of the Execution Protocol prior to ordering the drugs.[449] Once the drugs were received by the Pharmacist, the Department's General Counsel physically went to the pharmacy to pay for the drugs but failed to verify receipt of the drugs.[450]

The surreptitious manner in which the Department's General Counsel obtained the drugs appears largely based on confidentiality concerns. Oklahoma law protects from disclosure the

---

[449] Tr. of Pharm., pg. 11, ln. 1-7; Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 46, ln. 14-21.

[450] Tr. of the Dep't Gen. Counsel, Oct. 22, 2015, pg. 148, ln. 10-24.

**Exhibit 3**

"identity of all persons who participate in or administer the execution process, and persons who supply the drugs, medical supplies, or medical equipment for the execution."[451] It also exempts the "purchase of drugs, medical supplies or medical equipment necessary to carry out the execution from the Oklahoma Central Purchasing Act."[452] This exemption allows the Department to avoid the Act's procedural requirements, including competitive bidding and submission of written purchase orders to the Purchasing Division of the Office of Management and Enterprise Services (OMES), avoiding accidental disclosure of the identities of the persons supplying these items.[453]

The Department's General Counsel apparently construed 22 O.S. § 1015(B) as a mandate, negating the requirements regarding the lawful acquisition, possession, and regulation of CDS. Section 1015(B), however, does not provide an express exemption from the provisions of any other laws governing purchases by a state agency. Further, 62 O.S. § 34.62 requires state agencies to use written contracts or purchase orders when purchasing property, services, or labor, and the contract or purchase order must be forwarded to the director of OMES.[454] Additionally, another statutory provision requires all "state institutions to make or cause to be made an

---

[451] 22 O.S. § 1015(B).

[452] *Id.*

[453] 74 O.S. § 85.4(A). The Department is not otherwise exempt from the provisions of the Oklahoma Central Purchasing Act. *Id.* Copies of the Purchasing Division's records are generally available through the Oklahoma Open Records Act, 51 O.S. §§ 24A.1, *et seq.*, though records documenting the purchases of drugs, medical supplies, and medical equipment to be used in executions might have been withheld or redacted as records "required to be kept confidential," which are exempt from public disclosure, 51 O.S. § 24A.5(1). *Id. See also* 22 O.S. § 1015(B).

[454] 62 O.S. § 34.62(A). The Department is not exempt from compliance with Section 34.62.

**Exhibit 3**

inventory of all purchases made for such institution at the time of their delivery or receipt."[455] The inventory is required "for the purpose of determining whether the items delivered are in conformity with the specifications required of such items at the time of purchase."[456]

As the Department could not legally store the execution drugs at the Oklahoma State Penitentiary, they were instead stored at the pharmacy until the day of an execution.[457] Since the pharmacy was serving as the Department's storage unit,[458] the Department effectively received the execution drugs at the pharmacy at the time of payment. The Department failed, however, to make a timely inventory of the execution drugs purchased at the time of delivery or receipt. Finally, any inventory must be maintained pursuant to the Oklahoma Open Records Act, which requires "every public body and public official . . . to keep and maintain complete records of the receipt and expenditure of any public funds reflecting all financial and business transactions relating thereto," even if those records may be otherwise confidential.[459]

The Department did not document its contract for the purchase of execution drugs or its contract for the IV Team's services with either a written contract or a purchase order in conformity with Section 34.62.[460] Had the requirements of Section 34.62 been followed, the

---

[455] 74 O.S. § 88.1.

[456] *Id.* The Department is also not exempt from compliance with Section 88.1.

[457] To store the drugs at the Oklahoma State Penitentiary, the Department would need registrations with OBNDD and the DEA. *See* Tr. of Dep't General Counsel, Oct. 22, 2015, pg. 53, ln. 10-21.

[458] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 50, ln. 23–25, pg. 51, ln. 1–8.

[459] Title 51 O.S. § 24A.4. Clearly the Department is a "public body" under the Oklahoma Open Records Act, and its officers and employees are "public officials" under the Act. *Id.* The Department is not exempt from fully complying with the Oklahoma Open Records Act, although certain documents may remain confidential.

**Exhibit 3**

Pharmacist should have had no question regarding which drugs to order for the Department.[461]

Additionally, had the purchase of the execution drugs been accompanied by a timely inventory in

conformity with the requirements of 74 O.S. § 88.1, the potassium acetate could have been

discovered.   Non-compliance with state purchasing requirements thus contributed to the

Pharmacist ordering and dispensing, and the Department receiving and using, potassium acetate

instead of potassium chloride.

### iv.   The Quality Assurance Review lacked substance.

The revised Execution Protocol required the Department administrator to conduct a

Quality Assurance Review of the execution process. This review tasked the assigned person to

"review documentation, training, and professional qualifications, to ensure compliance with the

written procedure directive."[462] The provision also required the reviewer, when appropriate, to

"consult with a properly trained medical person when reviewing the medical aspects of the

execution procedures."[463] The review culminates in a report to the Director at the end of each

execution with recommendations for possible changes to the procedure.

The Protocol provides no discretion in appointing the individual who will conduct the

Quality Assurance Review.  Rather, the Protocol mandates it be conducted by a specific division

---

[460] Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 49 ln. 24-25, pg. 50, ln. 1. Any reference in the expenditure records that might disclose the identity of one participating in the execution process could be redacted from such records provided pursuant to an Open Records Act request since such information is plainly exempt from disclosure, 51 O.S. § 24A.5(2). *See also* 22 O.S. § 1015(B).

[461] When the potassium acetate originally received expired, the Pharmacist claimed he re-ordered potassium acetate instead of potassium chloride because he believed he originally ordered the correct drug. *See* Tr. of Pharm., pg. 25, ln. 18-25.

[462] Grand Jury Ex. #1 and #11, Page 32.

[463] *Id.*

**Exhibit 3**

director whose primary responsibilities involve support services related to prison population, construction, and maintenance. The Department does not provide this person with any specialized training to complete this process.[464]

Additionally, the Protocol does not define "medical aspects" for purposes of the execution process. This, perhaps, led to more confusion. The Department's General Counsel testified he believes the intent was for the IV procedure to be reviewed, but he also admitted there were numerous other medical aspects to executions, including the drugs themselves.[465]

As discussed previously, Warden A created two forms documenting the drugs used in the Warner execution. The first, completed when the drugs arrived at the Oklahoma State Penitentiary, showed potassium acetate was received. The second, completed after the execution, listed potassium chloride. The administrator conducting the review testified that he did not specifically recall the documents, but agreed potassium acetate was not in compliance with the Protocol and, had it been noticed, should have been noted in the Quality Assurance Review.[466] The administrator also agreed the two forms included two different drugs that should have been noted in the report if noticed.[467] In addition to the information sheets produced by Warden A, photographs of the drugs were taken when they were brought into the Oklahoma State Penitentiary. The photographs clearly showed potassium acetate was received.[468]

---

[464] Tr. of DMFS, pg. 8, ln. 20-25, pg. 9, ln. 1-2.

[465] Tr. of Dep't Gen. Counsel, Feb. 16, 2016, pg. 37, ln. 20-25.

[466] Tr. of DMFS, pg. 28, ln. 20-25, pg. 29, ln. 1-16.

[467] *Id.* at pg. 30, ln. 1-8.

[468] Grand Jury Ex. #8.

**Exhibit 3**

Although the policy dictated the reviewer should verify professional qualifications of those involved in the process, the administrator was not authorized to learn the identity of those involved,[469] and, therefore, was unable to complete that required process.

The Quality Assurance Review lacked substance and amounted to little more than a cursory review in a process requiring greater oversight. As with most every other aspect of this process, the bare minimum was completed.

### b.  Second, specific individuals failed to act with the care required of the responsibilities placed on them.

#### i. The Pharmacist was negligent in his procurement of the drugs.

As with many others involved in the execution process, the Pharmacist was negligent and failed to perform his assigned tasks. Of course, in this instance, it was of no assistance to the Pharmacist that the Department ordered by telephone, did not subsequently provide a written prescription or contract, and did not once ask to verify the Pharmacist received the correct drugs.

Although the Pharmacist was not provided a copy of the Execution Protocol, he admitted that he was told of the drugs required, including the need for potassium chloride.[470]  In explaining why he ordered potassium acetate, the Pharmacist provided various explanations, including: he was focused on potassium, not acetate or chloride;[471] his ordering system did not distinguish between chloride and acetate;[472] and his "pharmacy brain" caused him to review the potassium and its strength, but not distinguish between acetate and chloride.[473]

---

[469] Tr. of DMFS, pg. 13, ln. 3-7.

[470] Tr. of Pharm., pg. 15, ln. 4-10.

[471] *Id.* at pg. 16, ln. 13-18.

[472] *Id.* at pg. 48, ln. 17-19.

**Exhibit 3**

Unfortunately, the records did not support the notion that the Pharmacist's system was unable to distinguish between chloride and acetate, or that he did not know the difference between the two. The Pharmacist dispenses various forms of potassium chloride routinely.[474] In fact, between September 2, 2014, and July 30, 2015, he filled nearly six hundred prescriptions for some form of potassium chloride,[475] while placing orders of the drug to refill his stock more than fifty times.[476] Invoices of his purchases show, even to the untrained eye, a clear indicator the order was for potassium chloride, with invoice descriptions listing "Pot Chl," followed by the designationof capsule, tablet, oral solution, or IV solution.[477] A representative from the Pharmacist's wholesaler also testified that when ordering through its online system, the item description includes the drug's strength and size, and if it is in a bottle, vial, tablet, or capsule.[478]

The Pharmacist's records and testimony show he first ordered drugs for the Department on November 19, and November 20, 2014.[479] As previously discussed, on November 19, 2014, the Pharmacist ordered midazolam, rocuronium bromide, and potassium chloride at the strength required by the Department, but ordered the potassium chloride in IV bags, not vials.[480] The

---

[473] *Id.* at pg. 16, ln. 13-18.

[474] Grand Jury Ex. #50, *Pharmacy Dispensing Records.*

[475] *Id.*

[476] Grand Jury Ex. #50a, *Pharmacy Invoice Records.*

[477] *Id.*

[478] Tr. of Wholesaler's Rep., pg. 12, ln. 9-13.

[479] Grand Jury Ex. #18a; Grand Jury Ex. #18b; Grand Jury Ex. #18c.

[480] Grand Jury Ex. #18a; Grand Jury Ex. #18b.

**Exhibit 3**

Pharmacist then ordered vials of potassium acetate on November 20, 2014.[481] Those were the *only* drugs the Pharmacist ordered on those two days, which is inconsistent with his normal practice of ordering a large quantity of medications each time he placed an order through his wholesaler.[482]

It seems apparent the Pharmacist *thought* he had ordered the entire three-drug cocktail for the Department on November 19, 2014, realized he made a mistake when IV bags of potassium chloride were received, and then placed the now fateful order for vials of potassium acetate. The Pharmacist refused to acknowledge this, however, insisting instead that the November 19 potassium chloride order was for another customer.[483] Interestingly, the Pharmacist also testified the potassium chloride he ordered for the unknown customer on November 19, 2014, was the incorrect form for that client.[484] Although his records reflect the IV form of potassium chloride was returned to his wholesaler on December 10, 2014,[485] he did not order another potassium chloride liquid solution—despite testifying it was what the client wanted—until January 27, 2015.[486] The records also indicate he never dispensed that strength of potassium chloride, 40 milliequivalents, to any patients between September 2, 2014, and June 30, 2015.[487]

---

[481] Grand Jury Ex. #18c.

[482] Grand Jury Ex. #50a.

[483] Tr. of Pharm., pg. 20, ln. 21-24.

[484] *Id.*

[485] Grand Jury Ex. #50a.

[486] *Id.*
[487] Grand Jury Ex. #50.

95

**Exhibit 3**

The Department should have more thoroughly vetted the Pharmacist, and the order for the drugs should have been in writing, making it clear substitutions were unacceptable. The Department should have taken steps to verify the drugs ordered and received by the Pharmacist matched the Protocol. The failure to complete these tasks directly led to the receipt and use of potassium acetate in Warner's execution and receipt of the same in Glossip's scheduled execution.

### ii. The Warden carelessly assumed others would fulfill his own oversight responsibility in ensuring that the proper drugs were procured.

Warden A, who received the chemicals on January 15, 2015, September 16, 2015, and September 30, 2015, was the first full-time Department employee to visually inspect the chemicals. Although this did not follow policy, Warden A, a Department employee with decades of service, simply did not speak up.

For the Warner execution, Warden A produced two forms documenting the chemicals used in the execution. The first form, titled "Execution Drugs," was completed by Warden A after the Oklahoma State Penitentiary received the chemicals.[488] That form correctly identified the third drug as "potassium acetate."[489] The information included on the form came directly from the labels on the drugs themselves.[490] Warden A testified he did not recall whether anyone was made aware of this fact prior to the Warner execution.[491] In fact, Warden A testified he did

---

[488] Grand Jury Ex. #6; Tr. of Warden A, pg. 28, ln. 9-20 (testifying Grand Jury Ex. #6 was filled out at 12:25 p.m.); *see also* Grand Jury Ex. #5c (indicating the drugs for the Warner execution were received by Warden A at 12:12 p.m. on January 15, 2015).

[489] Grand Jury Ex. #6.

[490] Tr. of Warden A, pg. 30, ln. 13-15.

[491] *Id.* at pg. 34, ln. 24-25, pg. 35, ln. 1-3.

**Exhibit 3**

not recall whether receipt of the wrong drug prior to the Warner execution caused him any concern.[492] Warden A remembered his receipt of potassium acetate for the scheduled execution of Glossip, and acknowledged this drug did not match the Protocol.[493] Warden A, however, did not say anything to anyone about the receipt of potassium acetate.[494] Warden A testified he thought the potassium chloride and the potassium acetate were the same thing, although no one had previously advised him the two drugs were interchangeable under the Protocol.[495] Instead, Warden A simply *assumed* the drugs had been checked, *assumed* the Pharmacist provided the correct chemicals, and *assumed* it was not his job to ensure the proper drugs were received.[496]

Warden A did not do his job and, consequently, failed the Department and the State as a whole. Although the Department and the State would have suffered embarrassment and criticism had Warden A told someone the wrong drug had been received for the Warner execution, potentially years of litigation and this investigation could have been avoided. It is inexcusable for a senior administrator with thirty years as a Department employee to testify that "there are just some things you ask questions about, and there's some things you don't."[497] Warden A either lacked or failed to exercise the responsibility and leadership expected from an experienced administrator involved in the death penalty.

---

[492] *Id.* at pg. 30, ln. 23-25, pg. 31, ln. 1.

[493] *Id.* at pg. 36, ln. 24-25, pg. 37, ln. 1.

[494] *Id.* at pg. 37, ln. 2-5.

[495] *Id.* at pg. 37, ln. 11-24, pg. 39, ln. 1-5.

[496] *Id.*

[497] *Id.* at pg. 57, ln. 1-8 (regarding the process of obtaining the execution drugs).

**Exhibit 3**

**iii. Although one of the only individuals to take responsibility for his oversight, the IV Team Leader nevertheless failed to detect that potassium acetate had been delivered in lieu of potassium chloride.**

While the Physician serving as the IV Team Leader was not provided a written copy of the Execution Protocol prior to the Warner execution,[498] he was familiar with the Protocol and should have noted the potassium acetate vials during the Warner execution.[499] He is, therefore, also responsible for the mistakes noted here.

The IV Team Leader, however, was the first, and only, member of the execution teams during the Glossip execution to note and make known that potassium acetate had been received.[500] In contrast to Department employees with the exclusion of the Director, the IV Team Leader—like the Director— accepted full responsibility for not catching the error prior to the Warner execution.[501]

Although there were numerous opportunities for the Department to verify the labels on the received vials matched the approved drugs on the Protocol—when the Department's General Counsel paid for them, when Agent 1 picked them up at the pharmacy, when Agent 1 brought them into the Oklahoma State Penitentiary, when Warden A received them at the Oklahoma State Penitentiary, when they were photographed, and when Warden A filled out his forms—the Department failed to do so. Instead, the Department has attempted to shift blame to the IV Team Leader in an effort to shield itself from responsibility.[502]

---

[498] Tr. of IVTL pg. 25, ln. 8-13.

[499] *Id.*

[500] Tr. of IVTL, pg. 64, ln. 9-19.

[501] *Id.* at pg. 73, ln. 5-24.
[502] Warden A., the H Unit Section Chief, and the Department's General Counsel all placed the responsibility for checking the chemicals used in the execution on the IV Team Leader. Tr. of

**Exhibit 3**

**iv. The Department, the Board of Corrections, the Governor's Office, and the Office of the Attorney General did not review the execution documents received after Warner's execution for the presence of potassium acetate and, thus, never noted its use.**

As noted previously, documents related to the Warner execution were received by various state agencies, including the Department, the Board of Corrections, the Governor's Office, and the Office of the Attorney General. Most of these entities are comprised of individuals without medical training and who received these documents for purposes other than for reviewing, in hindsight, the execution. Rather, when these agencies viewed these documents, their review was premised on information regarding midazolam—the subject of ongoing litigation for which the documents were received—not potassium chloride or potassium acetate.

Each individual who received a copy of the autopsy report or other documents related to the Warner execution prior to September 30, 2015, had the opportunity to discover the error. However, other than the Quality Assurance review, no one was specifically tasked with identifying mistakes. This highlights the importance of enhancing the Quality Assurance Review in the future.

**v. The Governor's Counsel failed to exhibit the care necessary in ensuring the Execution Protocol was followed to the letter.**

In the hours immediately following the stay, discussions were held between the Department, the Office of the Attorney General, and the Governor's Office regarding the discovery that potassium acetate had been received for the scheduled Glossip execution, and the Governor's General Counsel participated in those discussions. He testified before the Grand Jury that on September 30, 2015, he learned from the Department's General Counsel that potassium

---

Dir., Jan. 21, 2016, pg. 16, ln. 25, pg. 17, ln. 1-5. Tr. of Warden A, pg. 62, ln. 4-25, pg. 63, ln. 1-14. Tr. of HUSC, pg. 107, ln. 12-16., Tr. of Dep't Gen. Counsel, Oct. 22, 2015, pg. 65, ln. 1 –25, pg. 66, ln. 1–9.

**Exhibit 3**

acetate *may* have been used in the Warner execution.[503]  Upon learning this, he further testified

he told the Department's General Counsel: "For purposes of our discussion, we'll assume that it

was used in the past, and so that we've already established a practice, that it would go forward

using that medical protocol."[504] He further testified that he advised the Governor there was an

established medical Protocol in place using potassium acetate; medical professionals would

execute affidavits regarding the similarities between potassium acetate and potassium chloride;

and they could seek clarification after Glossip was executed.[505] He also argued heavily against

publically disclosing that the wrong drug was used, believing that had not been established.[506]

It is unacceptable for the Governor's General Counsel to so flippantly and recklessly

disregard the written Protocol and the rights of Richard Glossip. Given the gravity of the death

penalty, as well as the national scrutiny following the Lockett execution, the Governor's Counsel

should have been unwilling to take such chances. Regardless of the fact the wrong drug was used

to execute Warner, the Governor's Counsel should have resoundingly recommended an

immediate stay of execution to allow time to locate potassium chloride.

**VII.    Pursuant to these findings, the Multicounty Grand Jury makes the following recommendations.**

---

[503] Tr. of Governor's Counsel, pg. 15, ln. 13-21 (providing: "It was also important to know what we had done in the past. So I asked at the time, Have we ever used potassium acetate in the past. . . . [the Department General Counsel] said he believed . . . we did use it in Warner's execution, Charles Warner's execution. And I said, Do you know for sure? At that time, [he] did not know for sure."). The Governor's General Counsel did not know when the Department's General Counsel knew for sure potassium acetate was used in the Warner execution, but during discussions on September 30, 2015, the Department's General Counsel assumed it had been used based on photographs from January 15, 2015. *Id.* at pg. 16, ln. 11-22.

[504] *Id.* at pg. 15, ln. 19-25.

[505] *Id.* at pg. 17, ln. 17-25, pg. 18, ln. 1-6.

[506] *Id.* at pg. 25, ln. 21-25, pg. 26, ln. 1-9.

**Exhibit 3**

b. **The Execution Protocol should be revised again.**

    i. **This time, key terms should be defined and duties clearly assigned.**

As noted previously, the Protocol in place for the Warner execution and the scheduled Glossip execution failed to define key terms and failed to clearly assign duties in some instances. The Protocol must be revised to define important or unclear terms and to clearly assign the duty to verify the execution drugs to responsible individuals at each step in the process.

Additionally, the Department should examine amending the protocol to include potassium acetate as an alternative to potassium chloride, much like it did to include three variations of bromide.

    ii. **The Protocol should require verification of execution drugs at every step.**

With the passage of Senate Bill 884, the Department is now in position to acquire much needed OBNDD and DEA registrations allowing it to store execution related drugs on-site. However, the Department must amend its policies to include verification of the drugs. The Department *must* require the drugs be ordered in writing, and that writing should include a statement forbidding drug substitutions. If necessary, legislation should be sought exempting from disclosure the order form and related documents that could be used to identify the pharmacist, wholesaler, and/or physician taking part in the acquisition of execution drugs. Once received, the drugs should be verified against the Protocol. Verifications should be practiced during each training session and prior to being dispensed to the IV Team.

The method the Department uses to obtain drugs in the future will dictate when they can be verified. It is unclear how the Department will acquire drugs once it secures OBNDD and DEA registrations. Regardless, it should verify the drugs against the Protocol (1) when received

**Exhibit 3**

from a supplying pharmacy or wholesaler,[507] (2) when received at OSP,  (3) during each training session, and (4) when provided to the IV Team. Any verification should be documented in writing and *include at least two individuals*. To allow review later in the process, the drugs should be photographed when received at the Oklahoma State Penitentiary and again when they are provided to the IV Team.

Additionally, the Department must again use a chain of custody form that explicitly states what items are being transferred, including documenting the removal of the drugs from storage and their transfer to the IV Team and/or Special Operations Team. This improved form presents another opportunity for members of the execution teams to verify receipt of the proper drugs.

Department officials must insist that anything, including execution-related items, entering the Oklahoma State Penitentiary be well-documented. This includes manual inspection of the items and comparison to the Protocol. Whether the drugs are received directly from a wholesaler or are picked up from a pharmacy, this check must be done prior to the drugs entering prison grounds.

### iii.  Administrators should not serve in dual roles.

Under the Protocol, detention officers, case managers, and others involved in the day-to-day care of an offender are excluded from the execution process. The Warden, however, must have regular contact with an offender during the final thirty-five days prior to the execution and also takes part in the execution.  Another individual should be assigned the task of completing the thirty-five-day requirements currently assigned to the Warden. Although the Warden's contact is largely related to administrative matters, asking him to later take an active role in the actual execution is unfair to both.

---

[507] The Department should place its order in writing and conduct an inventory when the drugs are first received.

**Exhibit 3**

The Warden is not the only administrator charged with both day-to-day interactions and execution duties under the Protocol. For instance, several wardens and department level managers are tasked under the Protocol as managers, but are also required to complete separate tasks as members of the execution teams. This may not be problematic for a correctional officer providing facility security who escorts an offender to the death chamber as that is a regular job duty. But a hardship on others is created when they are required to complete administrative duties under the Protocol while also attempting to train for a role in executing the death penalty. Moving forward, the Department should attempt to limit the number of people serving dual roles in the execution process. This will allow members of the IV Team and/or Special Operations Team to fully focus on those duties, including any new safeguards put in place to verify that proper drugs are received.

### iv. The Department should follow laws requiring the documentation of purchases and inventories while still safeguarding the privacy of those participating in execution of the death penalty.

Confidentiality of execution participants constituted an over-arching theme in the testimony before this Grand Jury. This is, understandably, of the utmost importance. Although Department employees involved in the process may be subject to harassment, the physician and EMT face the very real possibility of losing their current jobs and the potential destruction of their careers. As one witness correctly noted, however, "when you say completely hidden and state government in the same sentence, you've got a problem."[508] And indeed, this investigation revealed that the paranoia of identifying participants clouded the Department's judgment and caused administrators to blatantly violate their own policies.

---

[508] Tr. of Deputy Gen. Counsel, pg. 38, ln. 14-16.

**Exhibit 3**

Due to these concerns, there was no written order for the drugs, and the Pharmacist did not receive a hardcopy of the Protocol until after ordering the drugs. Large cash payments were made to the physician and EMT who assisted in the process. Cash was used to pay for the drugs. No formal invoice was obtained for the drugs. The Inspector General did not include the drug names on the chain of custody form. The drugs bypassed security in an unmarked box with no inventory included when entering the prison. The individual conducting the Quality Assurance Review did not have access to participants' names to verify their credentials.

Moving forward, the Department should continue to take seriously its duty to protect the identities of participants. It cannot, however, sacrifice the execution process in so doing. Internal documentation must be beyond reproach. There should be no question about which drugs are being purchased or what is entering the Oklahoma State Penitentiary for purposes of executions. Payments to a pharmacist/wholesaler and any outside execution team members must be documented, at least internally.

### v. The Quality Assurance Review called for in the Protocol should be performed by an independent third party bound by confidentiality.

The Department must ensure that the Quality Assurance Review is not cursory, but detailed and complete. Every document and photograph collected should be scrutinized. Otherwise, the review lacks merit. Reviewers must also have access to all relevant information, including the identity of the participants, and a thorough understanding of all aspects of the execution process.

Future reviews should be completed by neutral, independent third parties, such as a panel of independent experts from the fields of law, medicine, and corrections. Non-Department personnel are more capable of criticizing each individual involved in the process without reservation. Such independent third parties should, of course, be bound by confidentiality to

**Exhibit 3**

prevent the release of names and other sensitive information not appropriate for public disclosure.

**c. Individuals involved in the execution process must be thoroughly trained on the Execution Protocol.**

This investigation has revealed that *most* Department employees profoundly misunderstood the Protocol. Although some, including the H Unit Section Chief, were able to intelligently testify regarding the Protocol, the majority simply could not. The Department must hold those involved in the execution process accountable, not only to the end result and any errors that may occur during the process, but in their knowledge of the Protocol. This knowledge starts with training. Whoever takes part in executions in Oklahoma going forward must have an intimate knowledge of the policies and protocols surrounding an execution. This demands something more than repeated dry-runs and walk-throughs. Each person involved in the IV Team and Special Operations Team must know the Protocol, the drugs to be used, and the order in which they are to be administered. They must also know that no other chemical may be substituted unless specifically authorized in the policy and protocol (and with proper advance notice to the offender). They must also be free to question anything that appears out of the ordinary.

Given the small population of individuals involved in the execution process and their relative high rank within the Department, each individual must be comfortable questioning *anything* they observe that does not seem right. This will require the Director and other high-ranking administrators to foster an atmosphere conducive to speaking up. These individuals, who have made careers in a system in which orders are not questioned and everything is black-and-white, must learn to hold everyone else in the process accountable through open dialogue and a

**Exhibit 3**

willingness to challenge something that does not seem quite right. This includes, at least in the limited context of executions, questioning individuals who may on any other day be a supervisor. To increase accountability, the Department should consider appointing an ombudsman to be on-site during executions. This individual, who should be independent of the Department in all other respects, should be available to all members of the execution teams for anonymity in raising concerns. The ombudsman could, in turn, address issues with the Director or other administrator.

### RECESSION OF SESSION TO JUNE

The time allotted this session did not permit the grand jury to complete its investigation of the matters heard.  The grand jury will recess at this time to its next scheduled session on June 13-16, 2016, to permit the summoning of additional witnesses, and the gathering of additional physical evidence by the investigators assisting the grand jury, at which time the grand jury will resume its investigations.

Respectfully submitted,

FOREMAN
Fifteenth Multicounty Grand Jury of Oklahoma

**Exhibit 3**