# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

RICHARD GLOSSIP, *et al.*,           )
                                     )
         Plaintiffs,                 )    Case No. CIV-14-665-F
                                     )
         vs.                         )    **THIRD AMENDED COMPLAINT**
                                     )
RANDY CHANDLER, *et al.*,            )
                                     )
         Defendants.                 )

## I.    Nature Of Action

1.       Plaintiffs Brenda E. Andrew, Ronson Bush, Jemaine Cannon, James A. Coddington, Benjamin R. Cole, Carlos Cuesta-Rodriguez, Nicholas A. Davis, Scott Eizember, Richard S. Fairchild, Richard E. Glossip, Clarance Goode, Jr., Donald Grant, John M. Grant, Wendell A. Grissom, Phillip D. Hancock, John Hanson, Marlon D. Harmon, Jimmy Dean Harris, Raymond E. Johnson, Julius D. Jones, Wade Lay, Emmanuel A. Littlejohn, Ricky Malone, Mica Martinez, Alfred B. Mitchell, Patrick Murphy, James D. Pavatt, Gilbert R. Postelle, Richard Rojem, James Ryder, Anthony C. Sanchez, Kendrick A. Simpson, Michael Smith, Kevin R. Underwood, and Termane Wood bring this action seeking injunctive and declaratory relief for: (a) actual and threatened violations of their right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment; (b) actual and threatened violations of their right of access to counsel under the First, Fifth, and Sixth Amendments of the United States Constitution; (c) actual and threatened violations of their right to due

1

process under the Fourteenth Amendment of the United States Constitution; (d) actual and threatened violations of Section 3599(a)(2) of Title 18 of the U.S. Code; (e) actual and threatened violations of the *ex post facto* provision of the United States Constitution and Article V, Section 54 of the Oklahoma Constitution; (f) actual and threatened violations of their right to religious liberty under the First Amendment to the United States Constitution due to the alternative pleading requirement; (g) actual and threatened violations of the right to be free from human experimentation under the Eighth and Fourteenth Amendments to the United States Constitution; and (h) actual and threatened violations of the right to access to governmental information under the First and Fourteenth Amendments to the United States Constitution.

2.     Each Plaintiff was sentenced to death by an Oklahoma court pursuant to 22 Okla. Stat. Ann. § 1014(A).   At the time Plaintiffs' (other than Mica Martinez's) respective judgments were entered, the statute provided that executions by lethal injection must "be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A).  Defendants include the individuals charged with carrying out Plaintiffs' death sentences.

3.     On February 13, 2020, the Oklahoma Department of Corrections ("ODOC") released a revised OSP Policy No. OP-040301, Execution of Offenders Sentenced to Death (the "Execution Protocol"), effective February 20, 2020, to be

utilized in the executions of prisoners, including Plaintiffs.  The same day, Oklahoma Attorney General Michael Hunter announced that executions of Plaintiffs will be conducted utilizing a three-drug protocol (set forth in Chart D of Attachment D to the Execution Protocol) utilizing intravenous injections of midazolam, vecuronium bromide, and potassium chloride.

4.      The petitions for *writ of certiorari* of Plaintiffs Mr. Harmon, Mr. Mitchell, and Mr. Davis are pending before the United States Supreme Court.  Plaintiff Mr. Murphy's appeal is awaiting decision from the United States Supreme Court.  The petitions for *writ of habeas corpus* for Plaintiffs Ms. Andrew, Mr. Harris, Mr. Martinez, and Mr. Coddington remain pending.  The sentences of each of the other Plaintiffs have become final.  Upon information and belief, Defendants will carry out the execution of Plaintiffs pursuant to the Execution Protocol, including Chart D of Attachment D to the Execution Protocol.

5.      As discussed more fully below, the implementation and use of the Execution Protocol, including Chart D of Attachment D to the Execution Protocol, violates Plaintiffs' rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and violates the Oklahoma Constitution.

6.      Accordingly, Plaintiffs seek the following relief in this action: (a) a permanent injunction preventing the Defendants from executing them pursuant to the Execution Protocol; (b) an order declaring that the implementation or use of the Execution Protocol violates Plaintiffs' rights under the First, Fifth, Sixth, Eighth, and

Fourteenth Amendments of the U.S. Constitution; (c) an order declaring that the adoption and use of the Execution Protocol violates the Oklahoma Constitution; and (d) any such other equitable relief as this Court deems just and proper.

7.      The claims in this Third Amended Complaint are cognizable under the constitutional and statutory grounds identified herein and described in more detail below. This action is not, and should not be treated as, a successor *habeas corpus* petition. Plaintiffs are not challenging through this action the validity of their convictions or death sentences.  Rather, Plaintiffs assert that the Execution Protocol, by which their executions are to be implemented, violates the United States Constitution, the Oklahoma Constitution, and other applicable laws.

## II.   Parties

8.      Plaintiffs Ronson Bush, Jemaine Cannon, James A. Coddington, Benjamin R. Cole, Carlos Cuesta-Rodriguez, Nicholas A. Davis, Scott Eizember, Richard S. Fairchild, Richard E. Glossip, Clarance Goode, Jr., Donald Grant, John M. Grant, Wendell A. Grissom, Phillip D. Hancock, Marlon D. Harmon, Jimmy Dean Harris, Raymond E. Johnson, Julius D. Jones, Wade Lay, Emmanuel A. Littlejohn, Ricky Malone, Mica Martinez, Alfred B. Mitchell, Patrick Murphy, James D. Pavatt, Gilbert R. Postelle, Richard Rojem, James Ryder, Anthony C. Sanchez, Kendrick A. Simpson, Michael Smith, Kevin R. Underwood, and Termane Wood are incarcerated at the Oklahoma State Penitentiary ("OSP"), 1301 N. West Street, McAlester, Oklahoma, under the control and supervision of the ODOC.

9.     Plaintiff Brenda E. Andrew is incarcerated at the Mabel Bassett Correctional Center, McLoud, Oklahoma, under the control and supervision of the ODOC.

10.     Plaintiff John Hanson is incarcerated at the United States Penitentiary, Pollock (USP Pollock), 1000 Airbase Road, Pollock, Louisiana, and is subject to execution by the ODOC.

11.     Defendant Scott Crow is Director of ODOC.   Under Oklahoma law, Defendant Crow is responsible for carrying out the death sentences of Oklahoma prisoners.  Defendant Crow is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendants Randy Chandler, Betty R. Gesell, Joseph A. Griffin, F. Lynn Haueter, Kathryn A. LaFortune, Stephan Moore, Calvin Prince, T. Hastings Siegfried, and Daryl Woodard, are current members of the Oklahoma Board of Correction who establish policies for the ODOC.  Each of these Defendants is sued in his or her official capacity for the purpose of obtaining declaratory and injunctive relief.

13.     Defendant Tommy Sharp is Warden of the OSP with responsibility for carrying out death warrants issued by Oklahoma courts, including warrants pertaining to Plaintiffs.  Defendant Sharp is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14.     Defendant Aboutanaa El Habti is Warden of Mabel Bassett Correctional Center with responsibilities under the Execution Protocol concerning prisoners subject to

death warrants issued by Oklahoma courts, including the warrant pertaining to Plaintiff Ms. Andrew.  Defendant El Habti is sued in her official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Justin Farris is the Acting Chief of Staff of the ODOC and responsible for ensuring that executions comply with the Execution Protocol.  Defendant Farris is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendant Michael Carpenter is Chief of Field Operations and responsible for ensuring that all execution team members understand and comply with the lethal-injection procedures.  Defendant Carpenter is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.     Defendant Justin Giudice is the Employee Assistance Program Coordinator, and is the team leader of the Critical Incident Management Team ("CIMT"), responsible for educating affected staff before, during, and after the execution regarding psychological responses to the execution.  Defendant Giudice is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     Defendants John Does I-X are employed by, or have contracted with, the ODOC to consult with, prepare for, participate in, and/or carry out the executions of Plaintiffs.  Plaintiffs do not know, and the ODOC Defendants have not revealed, the identities of the John Does I-X.  Defendants John Does I-X are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

### III.   **Exhaustion Of Administrative Remedies**

19.     Exhaustion of administrative remedies is not necessary because this action does not challenge prison conditions and because there are no available administrative remedies capable of addressing the violations of federal law challenged in this pleading. Moreover, because Defendant Crow has unfettered discretion to change the Execution Protocol at any time – even after providing notice as to certain aspects – any attempt to grieve would be futile.  In addition, the Court's Order Granting Joint Stipulation, dated Oct. 16, 2015 (Doc. 260) expressly provides that "Defendants agree not to assert any defenses concerning exhaustion of administrative remedies."

### IV.   **Jurisdiction And Venue**

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the ODOC is headquartered in this District and a substantial part of the events giving rise to the claims made herein by Plaintiffs, including the formulation of the Execution Protocol, took place and continue to take place in this District.

## V.   Factual Background

### A.   The History Of Execution By Lethal Injection In Oklahoma

22.     In 1977, Oklahoma adopted lethal injection as a manner of inflicting punishment of death.  22 Okla. Stat. Ann. § 1014(A).

23.     Beginning in 1977 and until November 2011, Oklahoma law provided that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice."  22 Okla. Stat. Ann. § 1014(A).

24.     Each Plaintiff (with the exception of Mica Martinez) was sentenced to death prior to November 2011, when 22 Okla. Stat. Ann. § 1014(A) provided that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate."

25.     The first execution protocol promulgated by ODOC in 1978 was a two-drug protocol utilizing thiopental and a paralytic, although that protocol was never used in an execution.  In 1981, ODOC amended the execution protocol to add potassium chloride as the third drug in the execution process.

26.     Oklahoma carried out its first execution by lethal injection in 1990. Between 1990 and 2011, Oklahoma carried out executions pursuant to 22 Okla. Stat. Ann. § 1014(A) utilizing a three-drug protocol: (1) an ultrashort-acting barbiturate intended to induce and maintain anesthesia and render the prisoner unconscious and

insensate to pain and suffering throughout the execution; (2) a paralytic to paralyze the prisoner and eliminate all movement and communication during the execution; and (3) potassium chloride to induce cardiac arrest and cause death.

27.    In at least 93 executions carried out by Oklahoma between 1990 and 2010, ODOC utilized sodium thiopental, an ultrashort-acting barbiturate, as the first drug in the three-drug procedure.

28.    In 2010, ODOC began using pentobarbital, another barbiturate, in place of sodium thiopental, as the first drug in the three-drug procedure.

29.    In November 2011, Oklahoma amended 22 Okla. Stat. Ann. § 1014(A). The new statute does not require a "continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate," but, rather, that the "punishment of death shall be carried out by the administration of a lethal quantity of a drug or drugs until death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A), eff. Nov. 1, 2011.

30.    In March 2014, Oklahoma revised the execution protocol to include the option of midazolam as the first drug in the three-drug protocol.

31.    Oklahoma used midazolam for the first time in the execution of Clayton Lockett on April 29, 2014.  The Emergency Medical Technician and the physician on the execution team worked for nearly an hour to establish intravenous (IV) access.  They made at least twelve attempts resulting in puncture wounds to Mr. Lockett's arms, foot, jugular vein, and subclavian vein.  The physician finally gained IV access by setting a

femoral line in Mr. Lockett's right groin area, but no back-up IV line was set.   The Warden directed the team to cover Mr. Lockett's groin area, preventing the team from monitoring the IV insertion point to ensure it remained in place throughout the execution.

32.   The execution team administered Mr. Lockett 100 milligrams of midazolam and the physician determined Mr. Lockett was still conscious.   Two minutes later, the physician checked again and determined he was unconscious.   After the full dose of vecuronium bromide and most, but not all, of the potassium chloride were administered, Mr. Lockett regained consciousness.   He began to strain against the restraints, buck his head, and speak.   Witnesses reported that Mr. Lockett said "this shit is fucking with my mind," "something is wrong," and "the drugs aren't working."   The physician lifted the sheet covering Mr. Lockett's groin area, determined that the IV had infiltrated and that some amount of the drugs had been injected into his tissue instead of the vein.

33.   The Warden ordered the open blinds between the execution chamber and witness room closed.   The physician then attempted to start another femoral IV line in Mr. Lockett's left side, but punctured his artery instead of accessing his vein.   The ODOC Director and Oklahoma Governor Mary Fallin called off the execution, but Mr. Lockett died twenty-four minutes later.

34.   On April 30, 2014, Governor Fallin issued Executive Order 2014-11 appointing the Commissioner of the Oklahoma Department of Public Safety ("DPS") to undertake a full investigation of the events leading up to, and the circumstances of, Mr. Lockett's execution.

35.     In September 2014, the ODOC amended the Execution Protocol to increase the dosage of the paralytic vecuronium bromide from 40 milligrams to 100 milligrams. Upon information and belief, ODOC more than doubled the dosage of the paralytic because it had reason to believe midazolam was not adequately rendering prisoners unconscious and insensate.   The increase was necessary to ensure prisoners were completely paralyzed and unable to communicate or exhibit signs of pain and suffering experienced during the execution process.

36.     On September 30, 2014, DPS issued a report concluding that the execution of Mr. Lockett was "fundamentally sound," but also identifying specific errors that occurred during the execution, as well as systemic problems with ODOC's approach to carrying out executions.   Notably, however, DPS did not investigate the specific drugs used in executions, particularly midazolam, and did not make any determination regarding the effectiveness of midazolam for its intended purpose.

37.     Oklahoma used midazolam again in the execution of Charles Warner on January 15, 2015.  Mr. Warner was administered 500 milligrams of midazolam, and was heard saying, "My body is on fire.  No one should go through this."  Several minutes later, Mr. Warner was declared unconscious.  He was administered 100 milligrams of the paralytic rocuronium bromide and 240 milliequivalents of potassium acetate.   The execution protocol in place at the time required administration of potassium chloride, but Oklahoma had erroneously purchased potassium acetate in lieu of potassium chloride. The Special Operations Team Leader inventoried the drugs on the day of Mr. Warner's

execution and recorded the receipt of potassium acetate, but did not alert anyone in the department that the wrong drug had been ordered.  As the potassium acetate was being administered to Mr. Warner, he experienced visible chest movements and his lips fluttered.

38.     Richard Glossip was scheduled to be executed on September 30, 2015. Shortly before the scheduled execution, ODOC discovered that it had used the wrong drug, potassium acetate, in Mr. Warner's execution, and that it had obtained the same wrong drug to use in Mr. Glossip's execution.  After an internal debate in which some state officials advocated for moving forward using the incorrect drug, Mr. Glossip's execution was stayed by Governor Fallin.

39.     On October 1, 2015, at the request of Attorney General Scott Pruitt, the Oklahoma Court of Criminal Appeals ("OCCA") issued an order staying all executions pending a multi-county grand jury investigation into the circumstances surrounding the botched executions of Messrs. Lockett and Warner and the aborted execution of Mr. Glossip.

**B.      The Grand Jury Investigation And Report**

40.     In sessions between October 2015 and May 2016, the Fifteenth Multi-County Grand Jury (the "Grand Jury") received evidence "related to the use and attempted use of potassium acetate by the [ODOC] in the execution of [Warner] and the scheduled execution of [Glossip]."

41.    In May 2016, the Grand Jury issued "Interim Report Number 14" (Doc. 303-3) (the "Interim Report") detailing its findings and recommendations.  The Grand Jury found that ODOC "staff, and others participating in the execution process, failed to perform their duties with the precision and attention to detail the exercise of state authority in such cases demands," noting that "[b]ased on these failures, justice has been delayed for the victims' families and the citizens of Oklahoma, and confidence further shaken in the ability of this State to carry out the death penalty."   The Grand Jury specifically determined that ODOC staff and others participating in the execution process had failed in the following respects:

- "the Director of the [ODOC] orally modified the execution protocol without authority;

- the Pharmacist ordered the wrong execution drugs;

- the Department's General Counsel failed to inventory the execution drugs as mandated by state purchasing requirements;

- an agent with the Department's Office of Inspector General . . . failed to inspect the execution drugs while transporting them into the OSP;

- [a warden] failed to notify anyone in the Department that potassium acetate had been received;

- the H-Unit Section Chief failed to observe the Department had received the wrong execution drugs;

- the IV team failed to observe the Department had received the wrong execution drugs;

- the Department's Execution Protocol failed to define important terms, and lacked controls to ensure the proper execution drugs were obtained and administered; and

- the Governor's General Counsel advocated the Department proceed with the Glossip execution using potassium acetate." (*Id.* at 1–2).

42.    The Interim Report also concluded that the Execution Protocol "was vague and poorly drafted" (Doc. 303-3 at 77–81); that "most Department employees profoundly misunderstood the Protocol," (*id.* at 105); and that the trainings failed to ensure that all participants gained "intimate knowledge of the policies and protocols surrounding an execution," which "demands something more than repeated dry-runs and walk-throughs" (*id.*).

43.    In addition, the Interim Report found that the ODOC's "paranoia of identifying participants clouded the Department's judgment and caused administrators to blatantly violate their own policies" (*id.* at 103); "had the purchase of the execution drugs been accompanied by a timely inventory in conformity with the requirements of [state law], the potassium acetate could have been discovered" (*id.* at 91); "the pharmacist tasked with procuring the requisite drugs performed negligently" (*id.* at 93–96); "the Warden carelessly assumed others would fulfill his own oversight responsibility . . . ." (*id.* at 96–97); and "the IV team Leader failed to detect the improper receipt of potassium acetate" (*id.* at 98).

44.    The Grand Jury recommended that "the execution protocol should be revised again," and that, as part of those revisions: (a) "key terms should be defined and duties clearly assigned"; (b) "the protocol should require verification of execution drugs

at every step"; (c) "administrators should not serve in dual roles"; (d) the ODOC "should follow laws requiring the documentation of purchases and inventories while still safeguarding the privacy of those participating in execution of the death penalty"; (e) the "Quality Assurance Review called for in the Protocol should be performed by an independent third party bound by confidentiality"; and (f) "individuals involved in the execution process must be thoroughly trained on the Execution Protocol." *Id.* at 100-06.

## C.   The Death Penalty Commission Report

45.    The Oklahoma Death Penalty Review Commission (the "Commission") was formed shortly after Oklahoma issued a moratorium on executions in October 2015. The Commission spent over a year studying all aspects of the Oklahoma death penalty system and heard "from those with direct knowledge of how the system operates – including law enforcement, prosecutors, defense attorneys, judges, families of murdered victims, and the families of those wrongfully convicted."

46.    At the conclusion of its year-long investigation, the Commission issued a 270-page report. Okla. Death Penalty Review Comm'n, *The Report of the Okla. Death Penalty Review Comm'n*, The Constitution Project, 197-98 (Apr. 25, 2017) (the "Commission Report").  The Commission unanimously recommended that, "[d]ue to the volume and seriousness of the flaws in Oklahoma's capital punishment system," the "moratorium on executions be extended until significant reforms are accomplished." Commission Report at vii.

47.     The Commission Report, which was "designed to highlight issues giving rise to urgent questions about the manner in which the death penalty is imposed and carried out in Oklahoma," described some of its own findings as "disturbing," and "question[ed] whether the death penalty can be administered in a way that ensures no innocent person is put to death."   The Commission "encourage[d] the Oklahoma Legislature, executive branch, and judiciary to take actions to address the systemic flaws in Oklahoma's death penalty system," and encouraged an "informed discussion" about "whether the death penalty in [Oklahoma] can be implemented in a way that eliminates the unacceptable risk of executing the innocent, as well as the unacceptable risks of inconsistent, discriminatory, and inhumane application of the death penalty."

48.     The Commission Report laid out seven specific "recommendations" concerning Oklahoma's execution process:

a.     "Oklahoma should adopt the most humane and effective method of execution possible, which currently appears to be the one-drug (barbiturate) lethal injection protocol";

b.     the ODOC "should revise its execution protocol to provide clear direction to department personnel involved in preparing for and carrying out executions," including, "at minimum . . . specify[ing] who within the department's chain of command has the authority and responsibility to perform critical steps in the execution process";

c.     the ODOC "should amend its written execution protocol to require verification—at the point of acquisition and at all stages of the execution process—that

the proper drug(s) for carrying out the execution have been obtained and will be used in any execution" and "prohibit drug substitutions not specified within the protocol itself and should require that all drug purchases be in writing";

        d.     "[a]ll government personnel involved in carrying out an execution, as well as those individuals contracted with the government to provide services related thereto, should be thoroughly trained and evaluated on all relevant aspects of the [ODOC's] execution protocol";

        e.     the ODOC director should provide the governor prior to any scheduled execution, "a written, signed certification that the director has confirmed that all aspects of the execution protocol have been followed, including: ensuring that all personnel who will participate in the upcoming execution have been adequately trained and prepared; ensuring that the necessary equipment and facilities that will be used are adequate and satisfy the standards promulgated within [ODOC's] execution protocol; and ensuring that any drugs that will be used have been obtained pursuant to and are consistent with [ODOC's] execution protocol";

        f.     "the inmate should be provided written notice as to which drug(s) will be used at least 20 days prior to the scheduled execution"; and

        g.     "[f]ollowing any execution, an independent third party should conduct a thorough quality assurance review to determine whether state laws, regulations, and protocols were properly followed before, during, and immediately after the execution."  Commission Report at 197-98.

D.     **Nitrogen Hypoxia**

49.     Effective November 1, 2015, Oklahoma amended 22 Okla. Stat. Ann. § 1014 to provide that, if execution by lethal injection "is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by nitrogen hypoxia."  Oklahoma was the first state to allow executions to be carried out by nitrogen hypoxia.

50.     On March 14, 2018, Attorney General Michael Hunter and former ODOC Director Joseph Allbaugh announced that acquiring drugs to perform executions by lethal injection had become "exceedingly difficult."    Accordingly, Messrs. Hunter and Allbaugh announced that, going forward, and subject to completion of a protocol and procedures to be prepared by the ODOC, the primary method of execution in Oklahoma would be nitrogen hypoxia.  Oklahoma embraced nitrogen hypoxia as its primary method of execution despite the fact that the method had never been used to execute a prisoner. Oklahoma's new execution plan using nitrogen hypoxia was therefore experimental.

51.     ODOC never issued any protocols or procedures for executions using nitrogen hypoxia.

E.     **The February 20, 2020 Execution Protocol**

52.     On February 13, 2020, Oklahoma Governor Kevin Stitt, Attorney General Michael Hunter, and ODOC then-Acting Director Scott Crow announced that Oklahoma had secured access to the drugs – midazolam, vecuronium bromide, and potassium chloride – necessary to carry out executions by lethal injection using a three-drug

protocol.  No details about the provenance of the drugs were provided, including whether the drugs were FDA-approved or compounded, or whether the drugs had actually been acquired by and were in the possession of ODOC.

53.     Attorney General Hunter also noted that: nitrogen hypoxia is "a humane and Eighth Amendment-appropriate alternative"; under Oklahoma law, nitrogen hypoxia would be used "only if the drugs for lethal injections are unavailable"; "good progress has been made to complete an architecture for the nitrogen hypoxia method, but we're not there yet"; and the Attorney General's office was "working with ODOC to finalize the protocol [for nitrogen hypoxia] to make sure it complies with Eighth Amendment structures."

54.     Governor Stitt, Attorney General Hunter, and ODOC then-Acting Director Crow also announced that the ODOC had made "minor changes" to the Execution Protocol and issued a new version effective February 20, 2020.

55.     At a February 13, 2020, press conference, Attorney General Hunter noted that "additional training for members of the execution team will also be provided," and the goal of the updated Protocol was "to ensure that what has happened in the past won't happen again."   ODOC Director Crow explained that "training" and "checks and balances" are necessary for "accountability"; "to make sure that we are, in fact, carrying every piece of [the Protocol] out meticulously"; "to make sure that each of the requirements in the protocol is done exactly in accordance with the way that it's

specified"; and so that the procedures are strictly and diligently followed "to make sure that there are no mistakes."

56.     The updated Execution Protocol provides three alternative methods of execution by lethal injection.  Those alternatives are set forth in "Chemical Charts" A, B, and D of Attachment D to the Execution Protocol.

    a.     "Chart A" provides for a "One (1) Drug Protocol with Pentobarbital," which calls for a 5 gram dose of pentobarbital.

    b.     "Chart B" provides for a "One (1) Drug Protocol with Sodium Pentothal," which calls for a 5 gram dose of sodium pentothal.

    c.     "Chart C" is "reserved" as a placeholder, but Defendants have no plans to amend the Execution Protocol to add any new, undisclosed execution methods, and no amendments will be made to the Execution Protocol (including Attachment D) without complete and timely notice.

    d.     "Chart D" provides for a "Three (3) Drug Protocol with Midazolam, Vecuronium Bromide and Potassium Chloride," which calls for a 500 milligram dose of midazolam, followed by a 100 milligram dose of vecuronium bromide, followed by a 240-milliequivalents dose of potassium chloride.

57.     Section V of the Execution Protocol states that the "agency will establish protocols and training to enable staff to function in a safe, effective and professional manner before, during and after an execution."  On June 5, 2020, ODOC provided Plaintiffs with what appears to be the curriculum for an 8-hour training session for the

Command, H-Unit and IV teams.   These materials do not satisfy the requirements for execution team training required by the Execution Protocol.

### 1.   Issues With Midazolam

#### a)   Midazolam Will Not Render Plaintiffs Unconscious And Insensate To Pain and Suffering

58.   The intended purpose of midazolam, the first drug in Oklahoma's three-drug protocol, is to anesthetize the prisoner, rendering him or her unconscious and insensate to pain and suffering throughout the execution procedure.

59.   Midazolam is physically and pharmacologically incapable of inducing general anesthesia, regardless of how large the dose of the drug administered.

60.   Midazolam is a short-acting benzodiazepine, not a barbiturate. Benzodiazepines are a class of drugs used primarily for treating anxiety.  Midazolam is a central nervous system depressant that produces sedative, hypnotic, muscle relaxant, anxiety inhibitory, and anticonvulsant effects.   Midazolam has no analgesic (pain-relieving) properties, and studies have shown that midazolam actually increases the perception of pain.  Midazolam is typically administered prior to the administration of an anesthetic; midazolam itself is not used as, nor is it FDA-approved for use as, a stand-alone anesthetic.

61.   Midazolam has a "ceiling effect" (estimated at 25-40 milligrams) which prevents it from producing a level of surgical or general anesthesia.  Midazolam binds with a neurotransmitter known as "GABA" to produce sedation.  Because GABA is present in the brain in limited quantities, midazolam's sedative properties are limited, a

phenomenon referred to as the "ceiling effect."  Any dose of midazolam more than 25-40 milligrams will have no effect on the prisoner and serves no purpose.  The administration of 500 milligrams of midazolam (as required by the Execution Protocol) may sedate Plaintiffs, but it will not produce general anesthesia and will not render Plaintiffs insensate to pain and suffering.

62.     Vecuronium bromide is a neuromuscular blocking agent that paralyzes all skeletal muscles, including the diaphragm.  The intended purpose of vecuronium bromide is to paralyze the prisoner and suppress all movement.  This prevents the prisoner from communicating or exhibiting any signs of consciousness or pain and suffering, including screaming, wincing, other facial expressions, or any other responsive movements or actions indicative of pain and suffering.

63.     If a prisoner is administered vecuronium bromide without first being rendered unconscious and insensate by the first drug in Oklahoma's three-drug process, the prisoner will experience conscious asphyxiation from the paralytic.  The vecuronium bromide will cause the prisoner to suffocate to death while experiencing the agonizing and conscious urge to breathe.  Because the prisoner will be paralyzed by the vecuronium bromide, the prisoner will be unable to move, communicate, or exhibit any signs of suffering due to the paralysis.

64.     Potassium chloride induces cardiac arrest and is intended to cause death by stopping the prisoner's heart.

65.     If a prisoner is administered potassium chloride without first being rendered unconscious and insensate to pain and suffering by the first drug in Oklahoma's three-drug process, the prisoner will experience the excruciating feeling of being burned alive, compared to having one's veins set on fire, and the agony of cardiac arrest.  Because the prisoner will be paralyzed by the vecuronium bromide, the prisoner will be unable to move, communicate, or exhibit any signs of suffering due to the paralysis.

66.     Removing the paralytic from Oklahoma's three-drug protocol will allow the prisoner to communicate or alert the execution team to any pain and suffering experienced during the execution process.

67.     Because midazolam will not induce or maintain anesthesia throughout an execution and will not render the prisoner unconscious and insensate to pain and suffering, the prisoner will experience excruciating physical and psychological pain and suffering as a result of the administration of the midazolam and from the effects of vecuronium bromide and potassium chloride.  Use of midazolam as the first drug in Oklahoma's three-drug protocol therefore poses an objectively intolerable risk of substantial harm that is sure or very likely to occur.

68.     Witness reports from executions that included midazolam confirm that prisoners were not rendered insensate by the drug and therefore experienced the excruciating pain and suffering caused by the administration of subsequent drugs in the three-drug execution procedure.

a.      On January 16, 2014, the State of Ohio executed Dennis McGuire using 10 milligrams of midazolam and 40 milligrams of hydromorphone.  Witnesses to Mr. McGuire's execution reported that he struggled and gasped loudly for air "like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe." Lawrence Hummer, I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane, THE GUARDIAN, Jan. 22, 2014.

b.      In January 2014, the State of Florida executed Paul Howell using a three-drug protocol: midazolam, vecuronium bromide, and potassium chloride.  *In re Ohio Execution Protocol Litig.*, 235 F. Supp. 3d 892, 906 (S.D. Ohio 2017), *vacated by* 860 F.3d 881 (6th Cir. 2017).  A witness observed Mr. Howell open his eyes after the State had performed its consciousness check.  *Id.*

c.      On July 23, 2014, the State of Arizona executed Joseph Wood using a combination of 750 milligrams of both midazolam and hydromorphone.  For over an hour and a half, Mr. Wood "gulped like a fish on land . . . more than 640" times.  *See* Michael Kiefer, Reporter describes Arizona execution: 2 hours, 640 gasps, ARIZ. REPUBLIC, July 24, 2014.

d.      On December 8, 2016, the State of Alabama executed Ronald Bert Smith using 500 milligrams of midazolam followed by 600 milligrams of rocuronium bromide and 240 milliequivalents of potassium chloride.  During the execution, Mr. Smith "was apparently struggling for breath as he heaved and coughed for about 13 minutes."  Mark Berman & Robert Barnes, After Divided Supreme Court Allows

Alabama Execution, Inmate Heaves and Coughs During Lethal Injection, WASH. POST, Dec. 9, 2016, available at http://wapo.st/2hnRs7p.

      e.      On April 24, 2017, the State of Arkansas executed Marcel Williams using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride.  Mr. Williams closed his eyes at 10:17 p.m. and was breathing heavily with his chest rising in hard, almost jerky motions.  At 10:19, heavy breathing and movement continued.  The executioner spoke into Mr. Williams's ear at 10:22 and his head turned; he was still breathing heavily.  At points during the execution, his breathing was so heavy that a media witness saw his back arch off the gurney.  Jacob Rosenberg, Arkansas Executions: I Was Watching Him Breathe Heavily and Arch His Back, The Guardian, Apr. 25, 2017, available at https://bit.ly/2pekMhK. He continued to breathe hard until 10:23, and coughed at 10:25.  Mr. Williams's right eye opened at 10:28, continued to move at 10:29, and the eye was still open at 10:31.

      f.      On April 24, 2017, the State of Arkansas executed Jack Jones using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride.  During Mr. Jones' execution, his lips moved for about a minute after he completed his final words.  Five minutes into the execution, his lips moved an additional three to five times.  *See* Andrew DeMillo, Contrasting Accounts of Arkansas Executions from Witnesses, AP, Apr. 25, 2017, available at https://bit.ly/2J5yCMf.

g. On April 27, 2017, the State of Arkansas executed Kenneth Williams using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. During his execution, Mr. Williams began bucking against the restraints so hard that it caused bruising to his head. One witness said Mr. Williams "lurche[d] forward 15 times in quick succession, then another five times at a slower rate." Other witnesses described the movement as "lurching, jerking, convulsing, and coughing," which was heard by witnesses on the other side of the glass. One witness described his chest pumping for about four minutes. Timeline of Latest Arkansas Execution from AP Reporter, Apr. 28, 2017, available at https://bit.ly/2xo5i2e. One witness described hearing a sigh through the glass without the microphone on in what sounded like an expression of pain. A media witness described it as "disturbing." https://www.nbcnews.com/storyline/lethal-injection/arkansas-executes-kenneth-williams-4th-lethal-injection-week-n752086.

### b) Midazolam Causes Flash Pulmonary Edema

69. Midazolam has an acidic low pH, significantly lower than normal blood pH. As a result of that low pH level, injection of a large dose of midazolam, including the 500 milligram dose provided in the Execution Protocol, will cause "flash" or non-cardiogenic pulmonary edema in the vast majority of, if not all, executions carried out pursuant to the Execution Protocol.

70. Flash pulmonary edema results from direct toxic/caustic damage to the small blood vessels in the lungs (alveolar capillaries) which causes immediate leakage of

fluid through the damaged capillaries into the lungs. ("Flash" or non-cardiogenic pulmonary edema is distinguished from cardiogenic pulmonary edema which occurs more gradually when fluid backs up in the lungs as a result of heart failure.)

71.    Flash pulmonary edema produces foam or froth in the airways of the lung (bronchi and trachea) resulting from the mixture of air, edema fluid and pulmonary surfactant (a detergent-like secretion normally present in the airspaces). As a result, flash pulmonary edema causes obstruction or partial obstruction of the upper airway, thus greatly increasing the work of breathing, such that the chest muscles and diaphragm strain as they expend greater effort to try to move air into the lungs.

72.    Pulmonary edema prior to the loss of consciousness produces excruciating feelings and sensations similar to drowning and asphyxiation as fluid occupies a greater volume of the air spaces in the lungs. The experience of pulmonary edema in a prisoner who is still sensate will result in extreme pain, terror and panic. For Plaintiffs, those feelings will be heightened by being restrained in a prone position.

73.    Autopsies performed on prisoners who were executed with midazolam confirm that acute pulmonary edema occurs in virtually every instance, revealing signs of heavy, congested lungs and bloody froth in the lungs and upper airways. Witness reports of midazolam executions support the autopsy findings, demonstrating that prisoners who were executed with midazolam were sensate and continued to breathe after the onset of the edema, and experienced burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress.

74.     Flash pulmonary edema will occur immediately after administration of a large dose of midazolam.  Because midazolam has no analgesic properties, and will not render prisoners unconscious and insensate to pain and suffering, prisoners executed pursuant to the Execution Protocol will continue to be conscious and sensate and continue to breathe after flash pulmonary edema occurs.  As a result, there is a virtual medical certainty that the pulmonary edema caused by the administration of midazolam will cause Plaintiffs to experience excruciating suffering, including sensations of drowning and suffocation.

75.     Accordingly, midazolam will not only fail to protect Plaintiffs from experiencing the excruciating pain and needless suffering caused by administration of the second and third drugs in Oklahoma's three-drug execution process, but also independently and separately cause Plaintiffs to experience severe pain and suffering by triggering the agonizing effects of flash pulmonary edema.  The Execution Protocol thus creates a substantial, foreseeable, and avoidable risk that prisoners will suffer significant pain and suffering.

## 2.     Issues With Consciousness Checks

76.     The consciousness check is critical to confirm the prisoner has been rendered unconscious and insensate to pain and suffering prior to the administration of the paralytic and potassium chloride, and for the duration of the execution process.  The Execution Protocol lacks sufficient detail and important safeguards to ensure that the execution team can competently and confidently determine whether the prisoner has been

rendered and remains unconscious after the administration of midazolam and will not experience the effects of the second and third drugs.

### 3. Issues With Compounded Drugs

77.     The Execution Protocol permits the ODOC to source drugs from a licensed compounding pharmacy and requires that a qualitative analysis of the drugs be performed within thirty days of the execution (Execution Protocol at 40).  But the Execution Protocol contains no requirement that the ODOC inform the prisoner whether the execution drugs are manufactured or compounded and no requirement that the ODOC provide the results of the qualitative analysis or the expiration date to the prisoner.  In addition, ODOC has refused to disclose whether it intends to use compounded drugs.

78.     The Execution Protocol lacks sufficient detail and important requirements and safeguards to ensure that compounded drugs used in ODOC executions meet minimum standards of purity and potency.  Use of contaminated, impure or sub-potent compounded drugs materially and foreseeably increases the likelihood that prisoners will suffer severe pain and serious harm during executions.

79.     Compounded drugs are not FDA-approved and are subject to less rigorous regulation and oversight relating to their identity, purity, and potency.  There is a substantial risk that compounded drugs will be contaminated, handled improperly, or suffer from quality issues, the most common and concerning of which is lack of potency.

80.     Compounding drugs is a complex and highly specialized process that requires specialized equipment, numerous pharmaceutical-grade ingredients, chemical

adjustments during the process, and the appropriate experience and credentials in aseptic compounding techniques.

81.     Even minor deviations from the complex procedures for compounding drugs can result in a sub-potent drug.  The use of a sub-potent drug increases the risk of severe pain and suffering because it would not produce the necessary pharmacological effect, potentially leading to prolonged suffering.

82.     The Execution Protocol lacks information explaining how the drugs Defendants intend to use for executions have been or will be compounded.  In particular, the Execution Protocol omits any discussion of: the quality of the Active Pharmaceutical Ingredient ("API") used to compound drugs; an appropriate formulation recipe; the procedures by which the drug has been or will be compounded; the ingredients and their concentrations; the equipment used and how that equipment is maintained and calibrated; or the contents of "compounding logs," a master worksheet that documents the criteria used to determine the beyond-use date, storage requirements, and documentation of performance of quality-control procedures.  Without that information, it is impossible to verify that the drugs have been properly compounded, and are safe and effective.

83.     Proper compounding also involves standards for proper storage of drugs, including standards relating to temperature, humidity, and sterile conditions.  Storage conditions must be continually monitored and documented, but the Execution Protocol contains no requirements to ensure that these critical storage requirements are met and that sub-potent drugs are not used in executions.  Improper storage, such as excessive

temperature, excessive humidity, or unsterile conditions, will cause drugs – both the API and the compounded form – to become degraded, contaminated, or damaged, increasing the risk that the drugs will lose potency and not have the required pharmacological effect. The Execution Protocol provides no mechanism to ensure that critical storage standards are met and will not result in sub-potent or otherwise tainted drugs.

84.     Compounded drugs are assigned a shelf-life or "beyond use date," which set forth the allowable time between compounding and administration.  The "beyond-use date" of a compounded drug indicates the window of time when the drug remains stable, sterile, and potent.  Using a compounded drug after its "beyond use date" creates a substantial risk that the drug will be unstable, unsterile, or sub-potent.  The Execution Protocol contains no safeguards or guidelines to ensure drugs will be assigned an appropriate "beyond use date" and will not be used after such date has passed.

85.     If Defendants carry out executions using compounded drugs, there is a significant and foreseeable risk that the drugs will be handled improperly, contaminated, sub-potent, and/or expired, creating a substantial risk of serious harm.

### 4.     Issues With Training

86.     As the Supreme Court has noted, thorough training of execution team members is crucial to ensure executions are carried out properly and without threat to a prisoner's protected rights.  *See Baze v. Rees*, 553 U.S. 35, 55 (2008).

87.     Without complete and proper training protocols, individuals participating in executions will be unable "to function in a safe, effective and professional manner before, during and after an execution" as required by the Execution Protocol.

88.     The botched executions of Messrs. Lockett and Warner and the aborted execution of Mr. Glossip were caused, in large part, by human error and lack of adequate training and safeguards.

89.     In its Interim Report, the Grand Jury found that: "training lacked key components" (Doc. 303-3 at 13); the execution of Mr. Warner was not "in compliance with the Department's Protocol" (*id.* at 74); "the Execution Protocol lacked controls to ensure that the proper execution drugs were obtained and administered" (*id.* at 74-75); "there was an inexcusable failure to act on the part of a few individuals" (*id.* at 75); "most Department employees profoundly misunderstood the Protocol" (*id.* at 105); training failed to ensure that all participants gained "intimate knowledge of the policies and protocols surrounding an execution" (*id.*); "[t]he IV team's training . . . did not include scenario-based trainings filling the syringes from drug vials" (*id.* at 16); and the IV team had not received a copy of the June 2015 protocol (*id*).

90.     Based on its investigation and findings, the Grand Jury recommended that the State "thoroughly train[]" any individuals participating in executions regarding the details and requirements of the protocol.  *Id.* at 101-06.

91.     The Commission also concluded that inadequate training needed to be corrected,   and made several recommendations, including that: "[a]ll government

personnel involved in carrying out an execution . . . should be thoroughly trained and evaluated on all relevant aspects of the Oklahoma Department of Corrections' execution protocol"; "the ODOC director should ensure and certify in writing to the governor that all individuals involved in the ODOC execution protocol are adequately trained and prepared"; and training requires "something more than repeated dry-runs and walk-throughs.  Each person involved in the IV team and Special Operations Team should know the Protocol, the drugs to be used, and the order in which they are to be administered."  Commission Report at 197-98.

92.   The Department of Public Safety concluded that a contributing factor to the botched execution of Mr. Lockett was "limited provisions for contingencies," and included a number of recommendations for contingency plans, most of which were incorporated into the Execution Protocol as the list of "scenarios" some team members must train to address.  DPS Report at 22.  The DPS Report also recommended that "DOC should establish formal and continual training programs." *Id.* at 28.

93.   The Execution Protocol requires execution team members to participate in trainings within specific timeframes that cover specific topics.   In addition, the Execution Protocol, Section V, states that the "agency will establish protocols and training to enable staff to function in a safe, effective and professional manner before, during and after an execution."  Execution Protocol, at 9.  However, the Execution Protocol does not include or identify the training protocols and/or programs that satisfy its own requirements that ODOC "staff be trained "to function in a safe, effective and

professional manner before, during and after an execution." *Id.* at 9.  The omission of the training materials component renders the Execution Protocol materially incomplete on its own terms, and creates a substantial risk that inadequately trained execution team members will bungle additional executions.

94.   Even where the Execution Protocol provides information about training, it is unclear and incomplete, omitting details that would provide for more consistent and effective training.

a.   The Execution Protocol requires the agency director to establish a training schedule for periodic, on-sight practice by the H-Unit Team (Restraint Team and Special Operations Team) to include 10 training scenarios in the twelve months preceding an execution. *Id.* at 9.  It is unclear how many different training sessions this actually requires the H-Unit Team to participate in or whether all 10 scenarios can be completed in a single training session.   The Execution Protocol requires training "scenarios" to include five contingencies: Issues with equipment and supplies; issues with IV access; issues if the prisoner is not unconscious; unanticipated medical or other issues; and issues related to order, security, and the facility.  *Id.* at V.A.  However, it lacks sufficient details to identify whether these requirements apply to the IV team (or any of the other teams), or how the team will be evaluated.  *Id.*

b.   The Execution Protocol also requires the H-Unit Section Teams to "initiate training sessions no less than once per week until the scheduled date of execution beginning 35 days prior to the execution date." *Id.*  It is unclear if these

trainings are separate from the 10 scenarios the team is required to "practice" within the 12 months leading up to an execution or additional trainings that the team is required to attend.   The Execution Protocol also does not indicate what these weekly trainings should encompass or how personnel will be evaluated.

c.      The Execution Protocol provides that the IV team, which is responsible for the most crucial parts of the execution process, must participate in only two trainings with the members of the H-Unit Section Team to include "multiple scenarios" within seven days of the schedule execution.   *Id.* at V.C.   The Grand Jury emphasized the importance of these two teams training together because of the coordination required during the execution, yet the Execution Protocol requires the teams to train together only two times before an execution.   Additionally, it is unclear what "multiple scenarios" requires and if it will ensure these teams are prepared to work together during an execution, particularly if problems arise.

d.      The personnel on the other execution teams (Witness Escort, Maintenance Response, Critical Incident Management, Traffic Control, Victim Services) are required only to attend training within seven days of the execution.   *Id.* at V.D.

95.      On June 5, 2020, ODOC produced documents relating to a one-day training to be conducted by the Special Operations Team Leader for members of the Command, H-Unit and IV teams.   The documents consist of a Lesson Plan Cover Sheet, the outline of an Instructional Lecture, a Power Point presentation, and a twenty-question written assessment. "Execution of Offenders Sentenced to Death," Protocol OP-040301

(OAG – 015650 – OAG - 015722).   However, the one-day training specified in the documents does not satisfy any of the training requirements stated in the Execution Protocol.  The Execution Team requires the H-Unit teams and the IV teams to participate in multiple training sessions and requires teams to "practice" different scenarios related to five areas of contingency planning.  These training documents provide for a single day of training, do not include any "practice," and do not address any of the areas of contingency planning identified in the Execution Protocol.  Additionally, personnel on the other execution teams (Witness Escort, Maintenance Response, Critical Incident Management, Traffic Control, Victim Services) who are required to attend training in the week before the execution do not attend this training.

### 5.    Issues With IV Access And Maintenance

96.   The Execution Protocol provides that the execution drugs will be administered through an IV catheter.   Setting an intravenous line is a delicate, complicated, and invasive procedure that requires appropriate and extensive training, skill, and experience.   Ensuring that intravenous access is properly established, functioning, maintained, and monitored is essential and required to ensure lethal injection will effectively bring about death in a humane and constitutional manner.

97.   Proper establishment and maintenance of the IV catheter throughout the execution is necessary to ensure that drugs are properly and humanely administered to the prisoner.

98. Improper IV insertion may lead to infiltration (a situation in which the drug is injected into the surrounding tissue instead of the vein), extravasation (leakage of the drug into the surrounding tissue), or arterial injection (when the drug is injected into the artery instead of the vein and drugs travel away from the heart and towards the extremities). Extravasation and infiltration cause instant excruciating pain likened to being set on fire. Infiltration, extravasation and arterial injection can result in slow suffocation, a lingering and extremely painful death, and/or failure of the execution altogether.

99. The Execution Protocol lacks sufficient detail and necessary safeguards to ensure that IV access is properly established and maintained throughout the execution.

a. The Execution Protocol contains confusing and incomplete information about setting IVs, selecting IV sites, maintaining IV sites, changing to an alternate site in the event of a problem, and ensuring that IV sites are functioning properly. Execution Protocol at VII.F.6-8. Additionally, the Execution Protocol provides no guidance and lacks necessary safeguards regarding which alternative IV sites may be considered in the event the IV team is not able to establish IVs at the preferred sites. The Execution Protocol does not provide guidance on which IV sites can and cannot be considered, the basis for selecting alternative sites, or a preferential order for assessing the feasibility of alternative sites.

b. The Execution Protocol contains conflicting guidance on the amount of time the IV team has to set the IVs and the authority of the Director to halt the

execution.   This lack of clarity is likely to increase pressure on the IV team.   The Execution Protocol states that "[t]he IV team shall be allowed as much time as is necessary to establish a viable IV site(s)."   *Id.* at VII.F.6.e.   But if the IV team cannot establish IVs, the Execution Protocol requires that they tell the Director, who will "determine whether to request a postponement of the execution" (*id.* at VII.F.6.f), and determine "whether or how long to continue efforts to establish viable IV sites(s)."   *Id.* at VII.F.6.g.   Despite the Director's ability to "determine" whether to postpone the execution, the Director is also required to "contact the governor or designee to advise of the status and potentially request a postponement of the execution" after one hour of IV attempts.   *Id.* at VII.F.6.h.

c.   The Execution Protocol fails to identify and address problems that can prevent the full delivery of the drugs, including by a dislodged or partially dislodged catheter, leaks in the tubing, or syringe errors.

d.   The Execution Protocol contains no specific requirements for the qualifications, training, or experience of the IV team Leader.   The IV team Leader has significant responsibilities during an execution, including advising the Director on where to site the IVs (*id.* at VII.F.6.b), determining whether it is necessary to use an alternate IV site (*id.* at VII.F.8.b), supervising the Special Operations Team (*id.* at VII.F.6), and acting as point person if something goes wrong during an execution (*id.* at VII.F.3.c).   The Execution Protocol contains no requirements or safeguards to ensure that the IV team

leader is competent to perform these duties, let alone to supervise others responsible for setting and maintaining IVs and administering drugs intravenously.

e.     The Execution Protocol also does not specify a number (or even a range) of IV team members.  By the terms of the Protocol, the IV team could be comprised of just the leader, who could have no relevant skills.  If the team has additional members, the Execution Protocol does not require that they routinely set and maintain IVs for drug administration.

f.     The Execution Protocol lacks criteria for selection of members to the Special Operations Team, which is responsible for administering the drugs, verifying the "identity, concentration and quantity" of the drugs, and assisting with "preparing each chemical and corresponding syringe under the supervision of the IV team leader" (*id.* at Attachment D at 1 & 4; & IV.B.2.b), thus allowing the Special Operations Team to be comprised of individuals who lack medical training.

**6.     Issues Concerning Documentation And Drug Verification**

100.  Documentation is essential to transparency and proper oversight.  Without a requirement that the execution team document its activities accurately in real time, and in the absence of a mechanism to provide relevant documentation and execution logs to counsel for prisoners and to an independent evaluator, there is no way to determine if execution personnel are complying with the Execution Protocol.  The Execution Protocol fails to require adequate documentation of the execution process in order to verify that execution personnel are in compliance with, and track the required steps of,

the Execution Protocol and that the actual steps taken during an execution are correctly recorded and memorialized.

101.   Documentation of drug verification is essential to ensuring that executions are administered utilizing the correct drugs.   The Commission recommended that the prisoner be provided written notice of the drugs to be used at least 20 days in advance, including information regarding the name, safety and efficacy of the drugs, whether they are manufactured or compounded, and quality assurance testing results.   Commission Report at 198.   However, contrary to this recommendation, the Execution Protocol does not require that drug purchases be recorded in writing and provides the prisoner with only 10-days' notice of the drug selection.   Additionally, the Execution Protocol permits the ODOC to source drugs from a licensed compounding pharmacy and requires that a qualitative analysis of the drugs be performed within thirty days of the execution, but it does not require the ODOC to ever inform the prisoner whether the drugs are manufactured or compounded, or provide any information about the safety and efficacy of the drugs.   No quantitative analysis to ascertain the potency or amount of active pharmaceutical ingredient in the compounded formulation is required.

102.   The Execution Protocol requires a Quality Assurance Review, in which the agency director or designee must review "documentation" to "ensure compliance with the written procedure directive" and the Chief of Staff must prepare a "report" with "appropriate suggestions or recommendations, as needed."   Execution Protocol at VIII.A and D.   However, because the Execution Protocol does not make clear what

documents must be maintained, it is not clear what documentation is subject to the Quality Assurance Review.

103.  The Execution Protocol lacks safeguards to ensure that what actually occurs during an execution is properly and thoroughly memorialized.  Specifically, the Execution Protocol includes a checklist (referred to in the Execution Protocol as a "log"), but does not ensure personnel will record any unexpected events and/or the details of how personnel addressed those events.

### 7.   Issues With Transparency, Oversight, And Review

104.  The Execution Protocol lacks requirements to ensure that ODOC acts with transparency so that there can be an independent and thorough review and oversight of ODOC's performance in carrying out executions.

a.   The Grand Jury recommended that an independent third party, bound by confidentiality, be responsible for conducting the post-execution Quality Assurance Review.  Interim Report at 104; Commission Report at 198.  The Grand Jury based its recommendation on the finding that the previous Quality Assurance Review lacked "specificity" and that the personnel charged with conducting the review "had no specialized training in conducting quality assurance reviews of executions.  Interim Report at 92.  The Grand Jury found the Quality Assurance Review "amounted to little more than a cursory review in a process requiring greater oversight."  *Id.* at 93.  The Grand Jury also recommended an ombudsman be available to execution team members

on-site during executions, who may need anonymity to feel comfortable raising concerns. *Id.* at 105.

b.     The Death Penalty Review Commission recommended a pre-execution review by an independent third party "before an irreversible error can occur." Commission Report at 198.   This review would require the Director to provide certification to the Governor 48 hours in advance of an execution that all aspects of the Execution Protocol have been followed up to that point and would include certification that all personnel have been adequately trained, that the correct drugs are in the possession of the ODOC and that all necessary equipment and facilities are available and ready.   *Id.*   The Commission recommended that all findings from this review be communicated to the ODOC, the Legislature, the Governor's office and the public.

c.     Contrary to the recommendations of the Grand Jury and the Commission, the Execution Protocol provides that a post-execution Quality Assurance Review will be conducted by personnel within the agency and not by an independent third party.   Review by an independent third party would provide a layer of external oversight and accountability to assess whether ODOC is complying with the written terms of the Execution Protocol and addressing any issues that arise in a competent manner.

d.     The Execution Protocol does not require ODOC to provide information to counsel or anyone outside the agency regarding the agency's readiness to

conduct an execution or its compliance with the Execution Protocol's preparatory steps in advance of an execution.

e.     The Execution Protocol does not require the ODOC to disclose in advance of an execution information related to the prisoner's medical assessment, information about whether the drugs are manufactured or compounded, and/or confirmation that the execution teams have conducted all the necessary trainings and that proper drugs and equipment are on-hand.

### 8.     Issues With Access To Counsel

105. The Execution Protocol lacks requirements to protect Plaintiffs' constitutional right to counsel throughout the procedure.

a.     The Execution Protocol contains no requirement that the results of the pre-execution assessment of the prisoner's medical and mental health condition, including concerns related to establishing or maintaining IVs are provided to counsel. Execution Protocol at VII.B.a.(3)-(5).

b.     The Execution Protocol contains no requirement that any of the pre-execution readiness information be provided to the prisoner or counsel.  Without this information, the prisoner has no opportunity to challenge the ODOC's lack of compliance with pre-execution aspects of the Execution Protocol.

c.     The Execution Protocol terminates the prisoner's access to his counsel two hours prior to the execution or "earlier if necessary" (*id.* at VII.E.d), preventing counsel from observing the setting of the IVs and any issues or problems with

IV access.  *Id.* at VII.F.6.a-i.  Counsel is effectively prevented from taking any action to challenge failure to comply with the Execution Protocol, or to challenge problems relating to IV failures.

> d.  The Execution Protocol allows the Director to order that the curtains to the witness viewing room be closed and that witnesses be removed (*id.* at Attachment D, at 7), denying counsel access to information regarding the condition of their client and preventing attorneys and other witnesses from observing what happens to the prisoner if things go awry (as occurred in the botched execution of Mr. Lockett) and how the execution team addressed the problems.  The Execution Protocol's provisions concerning witnesses do not indicate whether attorneys are permitted to have materials to take notes or have access to a phone, or the ability to contact outside counsel or the court.  *Id.* at VI.C.4.

## 9.    The Execution Protocol Is Illusory

106.  The Execution Protocol provides that "[t]hese procedures shall be followed as written unless deviation or adjustment is required, as determined by the agency director or, in the event of an absence, their designee."  Execution Protocol at 1.  The Director thus has unfettered discretion to modify the Execution Protocol any time s/he determines it is "required."

107.  That discretion applies even to the drug formula.  The Execution Protocol states: "The director shall have the sole discretion as to which chemicals shall be used for the scheduled execution.  This decision shall be provided to the inmate in writing ten

(10) calendar days prior to the scheduled execution date." Execution Protocol, Attachment D, at 4.

108. In addition, the Execution Protocol lists three different drug protocols in Attachment D, but does not specifically require the Director to choose one of the three, leaving open the possibility of any drug formula, so long as the notice requirement is met and/or the change is approved in writing by the Director.

109. There is no legitimate penological justification for the Director to retain unchecked discretion to change the Execution Protocol at any time. Nor is there any penological justification to have an Execution Protocol that purports to set out a procedure for executions, but that expressly states it can be withdrawn, modified, or replaced at any time and that purports to create no rights or obligations.

### F.   Alternatives To Oklahoma's Three-Drug Protocol

110. The United States Supreme Court has held that to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).

111. Plaintiffs cannot be required to plead or prove an alternative method of execution because such a requirement is a substantial burden on their sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive means for the government to accomplish its stated interest.

112.   While Plaintiffs' individual, sincerely held religious beliefs vary, there is a uniform, sincerely held belief among them that prohibits participation in the assistance of suicide.   This is a widely accepted and fundamentally normal liturgical belief.   For example, assisting in suicide and suicide itself are forbidden by Jewish law, viewed as a sin, may result in burial in a separate part of a Jewish cemetery, and may bar certain mourning rites.   Assisting in suicide and suicide itself are also objectively a sin in the Roman Catholic Church, which violates the commandment "You shall not commit murder."   Christian Protestants (including Evangelicals, Charismatics, Pentecostals, and other denominations) believe that suicide is self-murder, and so anyone who commits it is sinning, which may result in the unpardonable sin of the refusal of the gift of salvation.   The Orthodox Church normally denies a Christian burial to a person who has committed suicide.   The Church of Jesus Christ of Latter-Day Saints (LDS Church) views suicide as wrong.   Virtually all Muslim scholars and clerics consider suicide forbidden, as the Quran instructs: "And do not kill yourselves, surely God is most Merciful to you."   In Buddhism, for an adherent to break out of samsara, Buddhism advocates the Noble Eightfold Path, which is contrary to participating in suicide.   In Hinduism, suicide is spiritually unacceptable.   Taking one's own life is considered a violation of the code of ahimsa (non-violence) and therefore equally sinful as murdering another.

113. Pleading and proving an alternative execution method would make Plaintiffs complicit in their own deaths in a way that is akin to suicide or assisting suicide, which is contrary to and violates their sincerely held religious beliefs.

114. Subject to the foregoing, solely for purposes of this pleading, based on statutory authority and current and historical practices, and upon information and belief, counsel alleges on behalf of Plaintiffs (each of whom reserve the right following consultation with counsel to object to any proffered alternative), the following alternative methods of execution are feasible, available, readily implemented and would significantly reduce a substantial risk of severe pain.  Defendants have refused, without a penological reason, to adopt any of these alternatives.

a. Execution by a single dose of FDA-approved pentobarbital or sodium pentothal (thiopental) as provided by Charts A and B of the Execution Protocol, each of which is, upon information and belief, accessible to ODOC, including implementing the remedial measures and safeguards detailed below and adding a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose.  There are a wide variety of well-known, accessible, and easily administered pain-relieving medications used in anesthetic procedures.  The opioid fentanyl is one drug that is accessible to ODOC and that would substantially reduce the risk that the prisoner would remain sensate to pain. The necessary remedial measures and safeguards are as follows:

    i.       the selection of qualified, competent and vetted team members, whose qualifications are disclosed;

ii.  establishment of two patent, functioning peripheral IV lines and assurance (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional, and (b) central lines will be set only by qualified and competent medical professionals; and

iii.  the administration of FDA-approved pentobarbital or thiopental in close proximity to the prisoner, rather than remotely.  Eliminating the need for extension sets of IV tubing significantly would reduce the risks of leakage and pinching of the tubing.  Proximate administration would also ensure adequate surveillance and monitoring of the IV, the catheter site and the prisoner.  By eliminating the need for lengthy IV tubing, proximate administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing.  Any concern about revealing the identity of personnel participating in the execution process could be satisfactorily addressed by using face and hair coverings or a privacy screen.

b. Execution by a single dose of compounded pentobarbital or sodium pentothal (thiopental) that complies with all state and federal compounding requirements, and has been tested for purity and potency, with records of testing, chain of custody and compounding formula disclosed to prisoners and their counsel, including a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose, and implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above.

c. Execution by a single dose of 40 milligrams of FDA-approved midazolam and potassium chloride, including implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above and adding a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose.  If the prisoner is deemed

unconscious and insensate to pain and suffering, removing the paralytic will allow the prisoner to communicate any pain and suffering he/she experiences during administration of the potassium chloride.

d. Execution by firing squad.   Execution by firing squad is currently authorized by Oklahoma and the laws of two other states (Utah and Mississippi). Defendants have the means and ability to administer executions by firing squad. Execution by firing squad eliminates entirely the risk of pain and suffering inherent in executions using midazolam, a paralytic, and potassium chloride according to the procedures set forth in the Execution Protocol, including risks associated with establishing IV access and addressing a prisoner's unique physical, health and medical conditions.   Execution by firing squad causes a faster and less painful death than execution by lethal injection.   *See Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a  firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative).   Execution by firing squad also "is significantly more reliable" than lethal injection.   *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting).   Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection.   *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014).

## VI.    Claims For Relief

### Count I
### (Fifth Amendment Violation — Denial Of Due Process)

115.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

116.  The Due Process Clause of the Fifth Amendment of the U.S. Constitution entitles each Plaintiff to notice and an opportunity to be heard before they can be deprived of life, liberty, or property.

117.  Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Const. amend. V, and the U.S. Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).

118.  Defendants have not disclosed sufficient information or details regarding the development and drafting of the Execution Protocol or the procedures that will be utilized in carrying out Plaintiffs' executions pursuant to the Execution Protocol, thereby preventing Plaintiffs from determining all aspects of the Execution Protocol that violate provisions of federal law or constitute cruel and unusual punishment, from consulting medical experts concerning those aspects, and from determining and seeking to remedy the ways in which the Execution Protocol presents an avoidable risk of unconstitutional pain and suffering during their executions.

119.  In addition, the discretion the Execution Protocol gives the ODOC Director to change the implementation of death sentences means that Plaintiffs will not have sufficient notice and opportunity to challenge the manner of their executions.

120.  Executing Plaintiffs pursuant to the Execution Protocol would violate the Due Process Clause in the Fifth Amendment of the U.S. Constitution because it would deprive Plaintiffs of their lives and liberty without providing sufficient notice and opportunity to be heard on the execution procedures to be used.

## Count II
### (Eighth Amendment Violation — Cruel And Unusual Punishment)

121.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

122.  The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life.  *In re Kemmler*, 136 U.S. 436, 447 (1890).  "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life."  *Id.; see also Baze*, 553 U.S. at 50 (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

123.  Defendants intend to execute Plaintiffs in a manner that is cruel and/or unreliable and that will inflict excruciating pain on Plaintiffs.  The execution procedure Defendants intend to use creates a substantial risk of inflicting grievous suffering and harm that is foreseeable and significant, but which is unnecessary and can be avoided.

124.  Because of the use of midazolam, a paralytic drug, and concentrated potassium chloride, the three-drug protocol carries significant risks of pain and suffering, as recognized by the United States Supreme Court. *Baze*, 553 U.S. at 114.  In order for the execution to comport with the U.S. Constitution's prohibition against cruel and unusual punishment, the first drug must render the prisoner unconscious and insensate to painful stimuli prior to the injection of the second and third drugs.  The second drug, which paralyzes all skeletal muscles, including the diaphragm, prevents the prisoner from drawing breath, moving, and speaking.  The third drug, concentrated potassium chloride, if administered to a conscious person, causes excruciating pain that has been likened to the feeling of having one's veins set on fire.  Because midazolam, the first drug, both inflicts pain and suffering by triggering non-cardiogenic pulmonary edema and fails to induce and then maintain anesthesia throughout the execution, the prisoner will experience excruciating pain and conscious asphyxiation, but be unable to communicate that there is a problem.

125.  There are alternative methods of execution, as described above, that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

126.  Because the Execution Protocol poses a substantial risk of serious harm to Plaintiffs, it violates Plaintiffs' constitutional right guaranteed by the Eighth Amendment of the U.S. Constitution to be free from cruel and unusual punishment.

## Count III

### (Eighth And Fifth Amendment Violation — Deliberate Indifference)

127.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

128.  The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner, *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

129.  Substantive Due Process affords similar protections: "[A] physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the [Constitution's] protection against the deprivation of liberty without due process." *West v. Atkins*, 487 U.S. 42, 58 (1988) (Scalia, J., concurring).

130.  The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub nom. Cannon v. Thomas*, 419 U.S. 813 (1974).

131.  Defendants are required to provide Plaintiffs with appropriate medical care until the moment of their deaths.  Thus, the Eighth Amendment's proscription against

"deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

132.  The means chosen by Defendants to execute Plaintiffs under the Execution Protocol constitute deliberate indifference to a substantial risk of serious harm to Plaintiffs.  Plaintiffs have alleged several feasible and readily-implemented alternatives to the Execution Protocol that would substantially reduce the risk of substantial harm to Plaintiffs.

133.  The Execution Protocol violates rights secured and guaranteed to Plaintiffs by the Fifth and Eighth Amendments of the U.S. Constitution.

## Count IV
### (First, Fifth And Sixth Amendment Violations — Access To Counsel)

134.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

135.  Prisoners have a right under the First and Fifth Amendment of the U.S. Constitution to access to the courts.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).

136.  Prisoners also have a right under the Sixth Amendment of the U.S. Constitution to access to counsel at all "critical" stages of criminal proceedings.  *United States v. Wade*, 388 U.S. 218, 227-28 (1967).

137.  Prisoners have the right to access to counsel throughout the execution procedure, including during an execution.  *See Harbison v. Bell*, 556 U.S. 180, 194

(2009); *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at **4-5 (S.D. Ohio Dec. 12, 2018).

138. To assert an Eighth Amendment violation prior to or during execution, Plaintiffs must be able to communicate that violation to their counsel, and counsel must be able to access the courts on the Plaintiffs' behalf.  Abridgement of either prisoner-counsel communication or counsel's access to the courts violates Plaintiffs' constitutional right to access to counsel and the courts.

139. The Execution Protocol does not provide Plaintiffs with access to counsel during an execution.  Therefore, under the Execution Protocol, Plaintiffs will not be able to communicate with their counsel prior to and during the execution and will not be able to communicate with counsel regarding any problems, including constitutional violations.

140. In addition, the Execution Protocol does not permit witnesses (including Plaintiffs' attorneys or medical consultants) to view the setting of IVs and/or the syringes being pushed, so there is no way to identify, object to, challenge, or correct, any issues with the IV-setting or drug administration process, including constitutional violations.

141. The Execution Protocol's deprivation of access to counsel and the courts prior to and during the execution violates Plaintiffs' rights under the First, Fifth, and Sixth Amendments.

## Count V
## (18 U.S.C. § 3599 Intentional Deprivation Of Right To Counsel)

142.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of this Third Amended Complaint as if set forth in full below.

143.  Under Section 3599(a)(2) of Title 18 of the U.S. Code, an indigent defendant's appointed attorney shall represent the defendant throughout every stage of available judicial proceedings, including all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, in addition to competency proceedings and proceedings for executive or other clemency as may be available to the defendant.  *See Harbison*, 556 U.S. at 194.

144.  By denying Plaintiffs meaningful access to counsel and to the courts during the preparation for, and carrying out of, their executions, Defendants intentionally will violate Plaintiffs' rights under 18 U.S.C. § 3599.

## Count VI
## (Violation Of The *Ex Post Facto* Provision Of The
## United States Constitution And Article V, § 54 Of The Oklahoma Constitution)

145.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

146.  In accordance with Article I, Section 10, clause 1 of the United States Constitution, no State may enact a law which, by retroactive operation, creates a significant risk of increased punishment for a crime after the defendant has been sentenced.

147.  Article V., § 54 of the Oklahoma Constitution provides "[t]he repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

148.  At the time each of the offenses occurred that subjected Plaintiffs to a death sentence, and at the time that each Plaintiff was sentenced to death (other than Mica Martinez), the law of Oklahoma required that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice."  22 Okla. Stat. Ann. § 1014(A).

149. Defendants are using midazolam, a benzodiazepine, instead of an "ultrashort-acting barbiturate," as the first drug in the three-drug execution process Unlike a barbiturate, midazolam cannot produce surgical anesthesia, cannot render Plaintiffs insensate to pain, and will result in Plaintiffs experiencing the excruciating pain and suffering caused by administration of the second and third drugs.  The Execution Protocol thus creates a significant risk of increased punishment.

150.  Accordingly, the Execution Protocol is unconstitutional as an *ex post facto* law as applied to Plaintiffs, and violates Article V., § 54 of the Oklahoma Constitution, which entitles Plaintiffs to be executed in accordance with an "ultrashort-acting barbiturate" instead of midazolam.

## Count VII
### (14th Amendment Due Process Violation)

151.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

152.  Plaintiffs have a protected life and liberty interest in being executed with the use of "an ultrashort-acting barbiturate" as required by 22 Okla. Stat. Ann. § 1014(A) (2010).

153.  The use of midazolam, instead of an ultrashort-acting barbiturate, imposes atypical and significant hardship on Plaintiffs beyond the ordinary for those facing execution.

154.  Oklahoma law provides no adequate post-deprivation remedy for the harm that will be caused by Defendants' denial of Plaintiffs' right to be executed with the use of an ultrashort-acting barbiturate.  *See Cole v. Trammell*, 358 P.3d 932, 941 (Ok. Crim. App. 2015).  Thus, Plaintiffs' right to procedural due process as required by the Fourteenth Amendment is violated.

## Count VIII
### (Violation Of Religious Liberty Rights)

155.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

156.  An alternative pleading requirement cannot be validly applied to Plaintiffs under the circumstances.  Doing so would force them to make the untenable, constitutionally repugnant choice of giving up their constitutional right to free religious

exercise to vindicate their constitutional right to be free from a cruel and unusual execution, or *vice versa*. But the Supreme Court has held that "we find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968).

157. In *Holt v. Hobbs*, 574 U.S. 352, 356 (2015), the Supreme Court held that the religious liberty protections in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1 *et seq.*, apply to prisoners through its "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*

158. The provisions of RLUIPA governing religious exercise by institutionalized persons "mirrors RFRA," such that RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Holt*, 574 U.S. at 357-58.

159. RFRA/RLUIPA's protections and provisions apply to all federal law, and the implementation of that law, whether statutory or otherwise. *See* 42 U.S.C. § 2000bb-3(a).

160. Plaintiffs have "sincerely held religious beliefs" and "religious objections" to participating in decisions and planning events that "facilitate" suicide. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

161. The alternative-method requirement – imposing on Plaintiffs the requirement to participate in orchestrating their own deaths – burdens Plaintiffs' exercise of religion.

162. Furthermore, even assuming for the sake of argument the act of pleading or proving an alternative method of execution might, itself, be an "innocent" action, it is certainly an innocent act that "has the effect of enabling or facilitating the commission of" their death, and is thus a sinful and immoral act that presents a significant burden on Plaintiffs' honest convictions. *See Hobby Lobby*, 573 U.S. at 686.

163. Thus, being required to choose, or plead, or prove, the manner or method of their death or otherwise assist Defendants to execute them violates Plaintiffs' sincerely held religious beliefs, and they cannot be compelled to do so.

164. The alternative-method requirement does not further a compelling governmental interest.

165. Because *Glossip* interprets and adds a pleading requirement to a claim raised under a federal statute, and *Bucklew* assigns that requirement to the United States Constitution, it is the federal government's interest, not the states' interests, which must be examined.

166. The federal government has no interest in allowing a state to carry out an execution in a manner that violates the Eighth Amendment.

167. The only role that the federal government can legitimately have with respect to a state judgment is determining whether that judgment and the method of carrying out that judgment comports with the United States Constitution.

168. There is no compelling federal governmental interest in states carrying out executions other than requiring that they do so within the limits of the United States Constitution.

169. Requiring plaintiffs challenging a method of execution to plead a feasible alternative method does not further that governmental interest.

170. Applying that standard to Plaintiffs thus violates their rights under RFRA and RLUIPA.

171. Even if the relevant governmental interest is the State of Oklahoma's interest in carrying out executions, that is an important interest, not a compelling one.

172. The alternative-method requirement is not the least restrictive means of furthering the governmental interest in question here.

173. Even if the federal government has a compelling governmental interest in the states' ability to carry out an execution, or even if the relevant governmental interest is Oklahoma's interest in seeing criminal sentences and judgments finalized, the method used here—requiring an inmate to choose the manner or method of his death and to assist the State by demonstrating that manner or method is available and readily implemented—is not the least restrictive method to achieve those interests.

174.  The least restrictive alternative is to require the ODOC to follow the United States Constitution and not use methods of execution that violate the Eighth Amendment by causing a sure or very likely risk of severe pain and needless suffering.

175.  Plaintiffs have alleged the alternative pleading requirement of *Glossip* burdens their exercise of religion by violating their sincerely held religious beliefs, does not further a compelling governmental interest, and even if it did further that interest, it is not the least restrictive method of furthering that interest.

176.  Applying the alternative-method requirement to Plaintiffs therefore violates RFRA and RLUIPA, and cannot be enforced here.

177.  Consequently, under the religious-freedom protection statutes, Plaintiffs can sufficiently allege a *Baze-Glossip* Eighth Amendment challenge to the Execution Protocol as causing unconstitutional pain and suffering, without needing to plead or prove an alternative execution method or manner.

178.  In addition, any requirement that Plaintiffs demonstrate that there is a readily available and feasibly implemented alternative execution method or manner of execution in order to prevail on an Eighth Amendment challenge violates Plaintiffs' rights to conscience and/or to the free exercise of religion under the First and/or Ninth Amendments to the United States Constitution.

## Count IX
### (Eighth And Fourteenth Amendments - Experimentation On Captive Human Subjects)

179.  Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

180.  Both the liberty clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment recognize that persons shall be treated with dignity and consistent with evolving standards of decency.

181.  Defendants have failed to test the execution drugs and/or the execution procedures on non-human animals before using them on captive and unwilling human subjects.

182.  Without the benefit of animal-testing results, the use of the execution drugs and the execution procedures constitute high-risk experimentation with lethal drugs on human subjects.

183.  Defendants are conducting experiments without any scientifically sound expectation that these experiments will succeed in producing an execution that does not inflict severe pain, needless suffering or a lingering death.

184.  Experimentation on human beings who have not provided consent violates an individual's substantive due process right to liberty and a prisoner's right to be free from cruel and unusual punishment and violates Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## Count X
### (First And Fourteenth Amendment: Right Of Access To Governmental Information)

185.    Plaintiffs reallege and incorporate herein by reference all of the preceding paragraphs of the Third Amended Complaint as if set forth in full below.

186.    Each Plaintiff has a right of access to governmental proceedings and information about those proceedings, guaranteed by the First and Fourteenth Amendments to the United States Constitution.

187.    Defendants deliberately conceal and refuse to provide critically relevant information concerning identification of the source of the drug and that entity's experience, training, qualifications, credentials, and performance history.

188.    Defendants' deliberate concealment of information that would enable Plaintiffs to determine how Defendants intend to carry out their death sentences, including the failure to disclose in advance of the execution details about the drugs used, the rationale for the selection of these drugs and their dosages, the qualifications and training of the persons administering them, and Defendants' ability to prepare for and respond to complications that may arise during an execution, deprive Plaintiffs of their First Amendment right of access to governmental proceedings.

189.    The lack of transparency interferes with Plaintiffs' access to information about flaws in Defendants' executions method(s), to include, without limitation, procedures used to administer the drugs and the function, or lack thereof, of the drugs themselves.

190.   The Execution Protocol effectively prevents Plaintiffs, as members of the public, from obtaining information regarding governmental proceedings and therefore deprives Plaintiffs of their First and Fourteenth Amendment rights.

191.   Plaintiffs have a First Amendment interest in being informed of the means by which the state intends to carry out executions.

192.   Defendants' refusal to provide Plaintiffs with information sufficient to enable them to determine how Defendants intend to execute them violates Plaintiffs' First Amendment right to petition the government for redress of grievances.

193.   Further, Defendants' deliberate concealment and refusal to provide information deprive Plaintiffs of their right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.  By failing to require and provide adequate notice of exactly which method of execution the Defendants will use, and of the identification information of the source of the drugs, Defendants are depriving Plaintiffs of their right to notice and an opportunity to be heard in the form of a constitutional challenge to Defendants' execution method.

194.   Plaintiffs will have no meaningful opportunity to challenge critical aspects of the written execution protocol if they are not informed in advance about the source of the execution drug(s) to be used for their executions, the specific involvement of each and every Defendant, and the identification information of the source providing the drugs to be used.

195.    Nor will Plaintiffs have a meaningful opportunity to challenge the use of execution drugs compounded for the sole purpose of killing them, which have a substantial, objectively intolerable risk of being something other than the pure, sterile, unadulterated, not-expired/not past their beyond-use date, not-imported drugs of the proper potency, content, pH level and other relevant characteristics, as required to be used by the Execution Protocol.

### **Prayer for Relief**

WHEREFORE, in order to prevent the violations of Plaintiffs' rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, Plaintiffs respectfully request that the Court enter a judgment:

a.      declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the Execution Protocol, are illegal and violate the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and the Oklahoma Constitution;

b.      vacating the Execution Protocol and enjoining Defendants and all persons acting on their behalf from using the Execution Protocol, or any revised protocol that violates Plaintiffs' rights and the law, for the same reasons challenged above;

c.      granting Plaintiffs their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States; and

    d.      granting such further relief as the Court deems just and proper.

Dated:      July 6, 2020      Respectfully submitted,

*s/ Michael W. Lieberman*
Michael W. Lieberman, OBA # 32694
Emma V. Rolls, OBA # 18820
Patti P. Ghezzi, OBA #6875
Office of the Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
Telephone: (405) 609-5975
Michael_Lieberman@fd.org
Emma_Rolls@fd.org
Patti_Ghezzi@fd.org

Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
Telephone: (212) 223-4000
hcohen@crowell.com

Jon M. Sands
Federal Public Defender District of Arizona
Dale A. Baich (OH Bar No. 0025070)
Jennifer Moreno (Bar No. CA 244967)
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2816
Facsimile: (602) 889-3960
dale_baich@fd.org
Jennifer_Moreno@fd.org

COUNSEL FOR PLAINTIFFS

Alex Kursman
Shawn Nolan
Assistant Federal Defenders Capital Habeas Unit
Federal Community Defender Office for the Eastern
District of Pennsylvania
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520

COUNSEL FOR PHILLIP HANCOCK

## Certificate of Service

I hereby certify that on July 6, 2020, I electronically filed the foregoing Third Amended Complaint with the clerk's office by using the CM/ECF system for filing and transmittal of Notice of Electronic Filing to the counsel of record who are registered participants of the Electronic Case Filing System.

*s/ Michael W. Lieberman*
Michael W. Lieberman