1                 IN THE UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4    RICHARD GLOSSIP, et al.,

5            Plaintiffs,

6    vs.                          Case No. CV-14-665-F

7    RANDY CHANDLER, et al.,

8            Defendants.

9    ----------------------------

10

11

12                 TRANSCRIPT OF MOTION TO COMPEL

13             BEFORE THE HONORABLE STEPHEN P. FRIOT

14                 UNITED STATES DISTRICT JUDGE

15                     DECEMBER 18, 2020

16                       3:00 P.M.

17

18                       APPEARANCES

19   FOR THE PLAINTIFFS:  Mr. James K. Stronski, Mr. Harry P. Cohen
     and Mr. Michael K. Robles, Crowell & Moring, LLP, 590 Madison
20   Ave., New York, NY 10022

21

22   FOR THE DEFENDANTS:  Mr. Mithun S. Mansinghani and Mr. Bryan G.
     Cleveland, Attorney General's Office, 313 N.E. 21st St.,
23   Oklahoma City, OK 73105

24

     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

```
1          (PROCEEDINGS HAD ON DECEMBER 18, 2020.)

2              THE COURT:  Good afternoon.  We're here in Civil

3    14-665, Richard Glossip and others vs. Randy Chandler and

4    others for a motion hearing.

5        Counsel will please give your appearances.

6              MR. STRONSKI:  Jim Stronski, Your Honor, from Crowell

7    & Moring for plaintiffs, on video.

8              MR. COHEN:  Harry Cohen from Crowell & Moring for the

9    plaintiffs, other than Mr. Lay, also on video.

10             MR. ROBLES:  And Mike Robles also from Crowell &

11   Moring on video for moving plaintiffs.

12             THE COURT:  Okay.  Thank you.

13             MR. MANSINGHANI:  Mithun Mansinghani for the

14   defendants.

15             THE COURT:  Okay.  Thank you.  Just let me make a

16   note here.

17       Okay.  I do thank you all for making the time to be

18   available.  I appreciate the State's compliance with the

19   requirement of an expedited response, and let me make one or

20   two brief preliminary comments.  One reason I set it down for

21   hearing on a fairly short fuse is that my preliminary reading

22   of the motion -- and let me emphasize, that was only a

23   preliminary reading of the motion.  My preliminary reading of

24   the motion suggested to me that it was not so much a matter to

25   be adjudicated as a problem to be solved.  And by that, I mean
```

 1  a problem to be solved by doing my best to accommodate the
 2  needs and interests of both sides.  That's still my -- that's
 3  still my approach to it.  And momentarily, I'm going to hear
 4  from counsel for the plaintiff, but I want you all to
 5  understand that the approach I just described is my -- remains
 6  my approach to resolving this motion.
 7      Now, there's also some issues that are essentially
 8  procedural.  I don't mean to cut off counsel for the defendants
 9  on these issues, but the time-related -- as far as the -- what
10  you might call the time-related objections, I'm not
11  particularly swayed by, even though in some respects, if not
12  all respects, the defendants may technically be correct, I have
13  had the case on a fairly demanding schedule, that's --
14      Mr. Cohen, please mute your microphone.
15      I've had the case on a fairly demanding schedule, that is
16  intentional.  I intend to stay with that schedule.  And so in
17  that spirit, if you will, and I realize that as lawyers, we
18  don't very often talk about spirit, but in that spirit, I'm not
19  inclined to resolve this motion by hanging my hat on the time-
20  related issues.
21      Now, as far as the depositions are concerned, if we want
22  to talk about whether this or that requires a notice or a
23  subpoena, we can.  And we may have different issues as to -- as
24  to the two proposed witnesses as to whether a notice or a
25  subpoena is required.

1      But anyway, so, as I say, momentarily I'm going to hear

2   from counsel for the plaintiffs, who I understand is going to

3   be Mr. Stronski.  But unless I hear more on this from counsel

4   for the defendants, I don't plan to dwell a whole lot on the

5   time-related issues.  I do have some questions as to other

6   aspects of it that I'll get into as we go.

7      So with that, I'll hear from counsel for the plaintiff.

8          MR. STRONSKI:  Thank you, Your Honor.  It's a

9   pleasure to appear before you.  Unfortunately, I wish it was in

10  person, but thank you for accommodating us in this manner.

11     I won't focus on the timing.  I would add, quite simply,

12  that we have proceeded expeditiously, and I can lay that out.

13  I think what's most helpful for Your Honor is to understand the

14  context of Mr. Bentley's testimony that we seek and the IV team

15  leader's testimony and its relevance and its essential

16  importance here.  And how it's still possible to do this,

17  again, solving the problem consistent with compliance with the

18  state secrecy statute, which obviously is important to do and

19  to do so consistent with Your Honor's prior orders in 2014 on

20  the subject.

21     With respect to Mr. Bentley, we learned -- and again, I'm

22  not focusing on timing, but we learned within the week before

23  the discovery closed from Director Crow that he had delegated

24  to Mr. Bentley the sourcing of alternate drugs or of drugs.

25  And that much of that work that was done was done by him, and

1   that -- and that he would be the person to answer who they

2   spoke to, who he spoke to, where he had some success, where he

3   had no success.  And we didn't know that before the deposition,

4   and we didn't know that Director Crow as a 30(b)(6) witness

5   wouldn't have been prepared to answer those questions more

6   specifically.  That's obviously important because we plead that

7   in Attachment D, Schedules A and B, which go to the alternate

8   drugs pentobarbital and thiopental, that we plead that those

9   are alternatives that we request.

10      And we understand the State may take the position that

11  they're not available to the State.  And so whether they tried

12  to get them, how hard they tried to get them and the results of

13  that largely are within the information of Mr. Bentley.  And so

14  we haven't closed the loop on that essential discovery, which

15  will be critical for the Court, I think, to resolve the issue

16  of availability. So that's -- that is the, you know, he's an

17  important individual.  He was not identified in the initial

18  lists of preliminary witnesses, but he's become important in

19  that respect.

20      With respect to the IV team leader, again, with respect to

21  Mr. Bentley, we believe that the 30(b)(6) -- I'm sorry, that

22  the -- that a 30(b)(1) notice would be appropriate.  He is an

23  employee.  He's an employee who was designated as a person who

24  had authority in this area to go source the drugs, and we

25  believe he's under their control.

1    And so the cases that they cite with respect to that
2  technical defect, that alleged technical defect with him, at
3  least we think, wouldn't apply.  And if you looked at, you
4  know, some of those cases, they do make distinctions between
5  some employees for whom -- or some individuals for whom a
6  subpoena might be required, and for some for whom it is not
7  required.  And they talk about language like a managing
8  director, not technically that title, but somebody who has
9  authority and who is controlled by the party and can act for
10  the party with respect to that area.  And so we think that
11  Mr. Bentley falls squarely there, but we're happy to serve a
12  subpoena.  We just see that as a technical issue.  And we'll
13  schedule it at his convenience and at everybody's convenience.
14    With respect to the IV team leader, the IV team leader is
15  a person who we learned from the 30(b)(6) of Director Crow in
16  his individual depositions will have great authority and
17  discretion in connection with making decisions that are
18  necessary to ensure a -- to limit the risk of a botched
19  execution.
20    And so there's no -- no one else in terms of -- there
21  are two -- there are at least two very important issues here
22  that we're concerned about.  One is training.  And the only
23  individual who will be involved in training the Special
24  Operations Team, which we understand is administering the
25  chemicals, and the IV team is the IV team leader.

1    And so that training is to happen shortly before the

2  execution.  But that training is necessary, for example, in

3  terms of how to deal with problems with respect to establishing

4  a peripheral line, problems with the peripheral line, the kinds

5  of problems that can occur that may affect the amount of drugs

6  that's being administered, when and if they should get -- try

7  to set up a central line if the peripheral line is not working,

8  when -- and this is very important, determination is to be made

9  in terms of whether the prisoner is unconscious.  And our

10  position is would need to be insensate and, you know, under

11  anesthesia.  And some of the team is involved in making those

12  observations beyond the IV team leader.

13          THE COURT:  Let me interrupt with a question on that

14  score.  I'm looking at page 9 of your brief, and on page 9, you

15  list five topics with respect to the desired deposition

16  testimony of an IV team leader, those being selection of the

17  appropriate placement of the IV lines in the inmate, the rate

18  at which the drugs are pushed, the methodology used to

19  determine -- to run the consciousness check, the methodology,

20  and relatedly the methodology used to perform the consciousness

21  check on the inmate during the Protocol.  Fourth, circumstances

22  in which an attempt to place a central IV would be made, and

23  fifth, the situations in which the execution should proceed or

24  be stayed because of complications.

25      Leaving the consciousness check out of it for the moment,

1 can you cite any case in which a Court has determined that any

2 of those other aspects of execution procedure would be a

3 potential ground for Eighth Amendment relief?

4          MR. STRONSKI:  Your Honor, I can't cite case law now.

5 And we can look at that, and if we find something, send it to

6 the Court.  But the Eighth Amendment relief, as Your Honor

7 knows better than most, stems from a serious risk of -- of --

8 of -- or the risk of a serious pain and suffering.  And the

9 serious pain and suffering here stems from several things.

10      One is midazolam itself can cause harm to the lungs, which

11 can cause suffering and pain.  Two, the suffering and pain

12 stems from -- or is caused by the vecuronium bromide, which

13 paralyzes and would slowly cause suffocation.  And three, the

14 potassium chloride is administered at a dose which is -- you

15 know, which is orders of magnitude higher than used clinically,

16 and it's painful when it's used clinically.

17      And so it's -- and the Supreme Court has acknowledged that

18 if you -- that is -- and we can give you that cite, that the

19 administration of the second two drugs, if not protected with

20 an appropriate drug to establish anesthesia or to protect from

21 the pain would be an Eighth Amendment violation.  So perhaps we

22 can send that to Your Honor.

23          THE COURT:  No.  I --

24          MR. STRONSKI:  And that's the only thing I can think

25 of at present.  But I'm sorry, I don't want to talk over Your

1    Honor.

2            THE COURT:  Back on that list of five items on page

3    9, I need you to set me straight if I'm headed in the wrong

4    direction on this.  But it seems to me that the overall subject

5    of the consciousness check and the -- if you will, the accuracy

6    or reliability of the consciousness check really supplants or

7    encompasses the concerns of the other -- or at least most of

8    the other topics you have listed there, because the name -- I

9    don't want the say the name of the game, but the object of the

10   exercise is to render the inmate unconscious.

11       Well, if he has been rendered unconscious as determined

12   with a reliable consciousness check, then the question of

13   whether the lines have been appropriately placed, the question

14   of the rate of push, the question of whether a central IV line

15   should or should not have been placed and the question of

16   whether the execution should proceed or be stayed seems to me

17   to be pretty much rendered moot if there is a reliable means of

18   conducting a consciousness check.  So if I'm wrong about that,

19   this is your chance to persuade me otherwise.

20           MR. STRONSKI:  Sure.  No, I think Your Honor -- I

21   would agree with Your Honor to the extent that the

22   consciousness check is paramount, because if you have

23   unconsciousness and you have an insensate state, so you have

24   somebody who is not simply unconscious but they are not

25   responsive to harmful and painful stimuli, that that addresses

1   anything that would happen later.  It doesn't address what

2   would happen before.  And so when some of these issues with

3   respect to establishing a line can cause pain, establishing a

4   central line can cause problems if the drug is infiltrated into

5   the tissue and not the veins, that has caused a lot of pain

6   prior to either death or unconsciousness, but yes.

7          THE COURT:  We certainly had that in one case that I

8   vividly recall, so you're certainly right about that.

9          MR. STRONSKI:  That's right, Your Honor.  And so I

10  hope I answered your question.

11      With respect to the IV team leader, it's critical for us

12  to not -- let me take a step back.  Your Honor addressed in

13  2014 the issue of the identity of those involved in the

14  execution and how it would be dealt with in discovery.  And

15  quite clearly, the statute says that the identity is not to be

16  the subject of civil discovery.  And Your Honor ordered that it

17  should not be.  Your Honor ordered if it's inadvertently

18  disclosed, it should be maintained as confidential by the

19  parties, and we understand that and we will abide by that.

20      But we don't seek the identity of the individual.  Given

21  the discretion of the IV team leader in terms of training and

22  training people who have little or no experience in medical

23  areas, and also in making these critical decisions, the most

24  important, Your Honor is absolutely right, is whether it is

25  consciousness or unconsciousness.  And we would add that it --

1  it has to be -- you can be asleep and woken up rather easily,

2  or you can be in a state where they can cut you open and do

3  open heart surgery and you're not going to wake up.  And so,

4  you know, there are degrees in terms of consciousness.  But

5  it's important that the prisoner be put into a state of

6  unconsciousness where they're insensate.

7        And so the IV team leader is the only one involved, and

8  the commissioner -- or the director, rather, relies on him for

9  all of these determinations and decisions with respect to

10  things like consciousness and unconsciousness.  And so it's

11  important for us to understand the qualifications and

12  experience.  You could have a medical doctor who is a

13  psychiatrist and doesn't like the sight of blood.  You could

14  have a medical doctor who has done very, very different things,

15  a dermatologist who is a wonderful doctor but hasn't done

16  anything really relevant to this, if ever, in a long time.

17        And so to ensure that the person who is making these

18  critical determinations, perhaps the most critical

19  determinations to ensure a safe execution that doesn't violate

20  the Eighth Amendment, that the person that we -- be

21  appropriately experienced and qualified.

22            THE COURT:  Let me interrupt with a question.

23  Approximately how many plaintiffs do we have?

24            MR. STRONSKI:  Your Honor, you stumped me there.  I

25  think we have 20 -- I'm going to say 23, but I could be off by

1    one or two.  Perhaps one of my colleagues would correct me.

2              THE COURT:  Well, that's close enough.  It sounds to

3    me like you're presupposing that the IV team leader would be

4    the same physician with all 23.  Am I right about that?

5              MR. STRONSKI:  That's what we understand, that

6    they've chosen an individual, and they would use this

7    individual until there was a reason to change, but, yes.

8              THE COURT:  Here is my problem.  Well, for openers, I

9    am far from satisfied, I'll just leave it that way, far from

10   satisfied that the Eighth Amendment inquiry that I'm authorized

11   to make gets down into this degree of detail, but that's an

12   issue for another day.  But assuming that it does, I -- these

13   executions don't all happen in one week.  And they're not

14   likely to happen all in one year.

15       And I'm having a little trouble with the implicit notion

16   that this sort of evaluation of qualifications and methodology

17   and exercise of medical judgment is fair game for an inquest,

18   if you will, every time there might be a change in the IV team

19   leader.  I don't know that that degree of that fine grained

20   approach is really an approach that the Court is required to

21   take, or even to entertain.  And if not, then that certainly

22   has some bearing on what discovery is reasonable, what

23   discovery is proportionate to the needs of the case.

24       So just as a fair word to the wise, I'm a little concerned

25   about the implicit assumption either that it would be the same

1  IV team leader in every instance, or that the inmate would have

2  the right to undertake this sort of an examination every time

3  there's a change.  Can you help me with that?

4          MR. STRONSKI:  Sure.  At least for me, Your Honor,

5  the critical issue here remains the qualifications of the IV

6  team leader with respect to -- in view of their

7  responsibilities.  The Protocol, frankly, is inadequate in this

8  respect, on its face, because the Protocol provides that a Navy

9  corpsman, you know, in the ancient past who hasn't, you know,

10  done this work in a long time, could be the IV team leader.

11  And so it --

12          THE COURT:  Well, we have Supreme Court cases that

13  are not -- in which the Court is not bothered by having EMT

14  people do this, right?

15          MR. STRONSKI:  In this case -- well, Your Honor, what

16  we are -- I don't know what -- you know, I think -- I think the

17  Protocol that we have is no different than the Protocol that

18  was before Your Honor in 2014, at least with respect to the

19  definition of the IV team leader.  So in that respect, perhaps

20  absolutely, you're right, that that issue was -- perhaps wasn't

21  raised.  But in that context, it was a medical doctor, I

22  believe, who was designated as the IV team leader.  My point --

23          THE COURT:  Well, just for clarification, I can't

24  remember whether it was Baze v. Rees or maybe even Bucklew or

25  maybe even this very case, but I do recall one of those cases

```
 1   in which it may not to have been litigated to fairly well, but
 2   at least the Court seemed to be minimally satisfied with
 3   consciousness check.  And maybe I'm thinking of some Court of
 4   Appeals cases; I don't know.
 5        But whatever -- whether it was the Supreme Court or one of
 6   the circuit courts, the Court was at least minimally satisfied
 7   with individuals doing the consciousness check having decidedly
 8   less stringent qualifications than a medical doctor.  But
 9   nevertheless, I'm probably getting you too far down into the
10   weeds, and I'll ask you to forgive me for that.  You may
11   continue.
12        MR. STRONSKI:  No.  Thank you -- no, it's very
13   instructive and helpful to get these questions, Your Honor, and
14   we appreciate them.
15        Regardless of the Baze or other case or any Court of
16   Appeal case, we're trying to create the best record here on the
17   facts.  And the facts, as we understand them, are that
18   midazolam itself can cause pain and suffering, and that it's
19   widely understood not to be an effective drug used on its own
20   in this way to create a state of anesthesia to protect the
21   inmate, the prisoner from the pain and suffering that the
22   Supreme Court has acknowledged exists with the second two
23   drugs.
24        And so regardless of the other cases, we think it's
25   important here to have a record that the Protocol either
```

 1    require that the IV team leader have some experience and

 2    training in using anesthesia that's appropriate clinically to

 3    achieve the goal here, which is to have an execution that

 4    doesn't violate the Eighth Amendment, or to look at who is

 5    going to be making these medical decisions in the Protocol that

 6    lacks such specification requirements to understand as applied

 7    whether there is a serious risk -- there's a risk of -- an

 8    unacceptable risk of serious pain and suffering.  And so for

 9    that reason, given the dearth of specification in the Protocol

10    about the training and experience of the person making these

11    decisions, it is critical for us to be able to explore that.

12        Again, we are not interested in the identity of the

13    individual, and we respect that and we will abide by Your

14    Honor's prior rulings in that regard.  But -- and so if there

15    is -- we can -- for example, we can do a telephone deposition

16    where we don't see the person.  We can -- you know, it doesn't

17    matter to me where they went to medical school as long as they

18    went to a U.S. accredited medical school.  What's important to

19    me is what experience do they have and what training do they

20    have that is relevant to exercising the very considerable

21    discretion that they have under this Protocol, which is perhaps

22    the most critical in terms of ensuring that there is not an

23    Eighth Amendment violation and that we don't have another

24    botched execution.  And that's our goal here.

25        And we think -- the State Secrecy statute, if used to

1  prevent us from exploring the training and experience with

2  respect to the use of anesthesia of the IV team leader, would

3  preclude us from making our case, Your Honor.  And so we think

4  it's important.  We can agree to limitations and, you know,

5  including doing it by telephone, that will preclude us from --

6  we're not going to ask the name of the person or where they

7  live or anything that would be, you know, personal identifying

8  information.  If it's disclosed inadvertently, we understand

9  already Your Honor has ordered that it shall be maintained

10  confidential, and we're all officers of the Court and we will

11  do so.  But if we're precluded from finding out about whether

12  this medical doctor has relevant and relatively recent

13  experience in this area, we will not be able to develop the

14  record we need to develop in this case.

15          THE COURT:  Thank you.  I'll hear from the

16  defendants.  And counsel, let me start out with some questions,

17  one or two questions, to get me past some issues that are

18  nagging at me, and then I'll hear your answers to those and

19  anything else you would like to say.

20      First of all, I do have the distinct impression that

21  Mr. Bentley had the laboring oar on securing the alternate

22  drugs, and I'm not necessarily critical of this, but as

23  Mr. Crowe, the 30(b)(6) witness, to some degree, deferred to

24  Mr. Bentley on some aspects of that; am I right about that?

25          MR. MANSINGHANI:  I don't think anything you said is

1   inaccurate.  I think that the way the plaintiffs portrayed in

2   their brief is wildly exaggerated as to how prepared Mr. Crow

3   was to testify.

4           THE COURT:  I understand that.  I understand that,

5   but I've also read the attachments.  And I -- I am concerned,

6   to the extent that there may be an issue as to available --

7   feasible and available alternatives.  I'm a little bit

8   concerned about whether the plaintiffs have had full

9   opportunity to push all the way to the bottom on that issue,

10  because that's -- you've heard me allude to some things that,

11  in my view, may not go to the heart of the matter.  Well, one

12  thing that does go to the heart of the matter is available --

13  feasible and available alternatives.

14      And I well know that sodium thiopental or pentobarbital at

15  one point, to paraphrase Justice Sonia Sotomayor, was the gold

16  standard.  I think maybe she has had some reason to rethink

17  that.  But nevertheless, if the plaintiffs want to recite or

18  cite thiopental or pentobarbital as an available alternative

19  and if the State defends that, as the State is perfectly

20  entitled to do if it has the facts by saying, well, we just

21  can't get it, then the guy who just couldn't get it seems to me

22  to be fair game for a deposition.  I need you to help me on

23  that.

24          MR. MANSINGHANI:  I think -- and I'm not going to

25  belabor the timing points because Your Honor already noted

1    them.  You know, I think with Mr. Bentley, part of it is a

2    timing issue.  If they had asked for his deposition earlier, I

3    don't think we would have objected to it.  That said, you know,

4    they cited excerpts of 36 pages' worth of Director Crow

5    testifying on to the efforts as well as describing

6    Mr. Bentley's efforts.  They mainly asked him about that in his

7    personal deposition rather than his 30(b)(6) deposition.  But

8    he testified, what I would say pretty comprehensibly and

9    fulsomely, that all of Mr. Bentley's conversations up until we

10   were able to secure a supplier for the drugs involved getting

11   answers that said, no, we won't give you our supplier, or we

12   won't supply the drugs for you, and we think that's sufficient.

13       Of course, you know, recognizing that his testimony is, to

14   some extent, relevant to maybe provide further details of how

15   they said no to him, we offered as a compromise, a limited

16   deposition of Mr. Bentley.  They rejected that.  So I guess

17   that's my full answer to your question.

18            THE COURT:  Okay.  Thank you.  You may continue on

19   the other issues.

20            MR. MANSINGHANI:  I don't want to belabor the things

21   that were already said in the brief.  And I just want to take

22   the opportunity to respond to a few things that Mr. Stronski

23   said, some of which I've already said -- done in response to

24   your question.

25       With respect to the IV team leader, we strongly object to

 1   his deposition for all the reasons that you pointed out.  His

 2   deposition would be of minimal relevance.  I think the case

 3   that you are looking for is Baze v. Rees, where it was both a

 4   phlebotomist and an EMT that was at issue there, but the

 5   Protocol allowed for a broader spectrum of medically trained

 6   individuals, not including physicians.  Here we're including

 7   the physician.  And on page 61 of Baze the Court concluded by

 8   saying any similar Protocol as the one at issue in Baze

 9   complies with the Eighth Amendment.

10       So you weigh that minimal relevance to the things that

11   they've identified they want his testimony on, including with

12   respect to consciousness checks, which was also covered in Baze

13   with the burden on an IV team leader and the risks, however

14   much they want to guard against it that more and more

15   information from him will reveal his identity, including the

16   sound of his voice and including any of the questions they ask

17   about his experience and training.  We think that is just

18   completely disproportionate and would strongly continue to

19   object to his deposition, regardless of when they would have

20   asked for it.

21       You know, with that, again, I don't want to belabor the

22   things that was said in the brief, and I think your questions

23   show that you well understand our arguments and the problems

24   with plaintiffs' requests.  But I'm happy to -- I guess one

25   more thing, which is, you know, they make the claim that the IV

 1  team leader is the only one involved in training the Special

 2  Operations Team; that's just not true.  Both the director and

 3  the Special Operations Team leader testified that they also

 4  train the Special Operations Team, including on some of the

 5  aspects that they're seeking the IV team leader's testimony on.

 6       Okay.  Now, with that, I'm happy to answer any other

 7  questions that the Court may have.

 8            THE COURT:  I've got no further questions.  Anything

 9  further at all?

10            MR. MANSINGHANI:  No, Your Honor.

11            THE COURT:  Okay.  Very well.  You may be seated.

12       Anything further from the plaintiffs?

13            MR. STRONSKI:  No, Your Honor, not right now, unless

14  Your Honor has any questions.

15            THE COURT:  Okay.  Well, I'm going to give both sides

16  something to complain about, because I'm going to tell you what

17  my inclination is, and neither side is going to be all that

18  happy with it.  But I'm going to tell you what my preliminary

19  inclination is with the benefit of the arguments we've had

20  here.  And then I'll give both sides an opportunity to show me

21  why my proposed tentative solution is just altogether

22  inappropriate.

23       First of all, as to Mr. Bentley, my tentative inclination

24  is to direct the defendants to produce Mr. Bentley for a

25  deposition of a maximum of two hours on the issue of the

1 efforts that he made to secure alternative drugs, that with the

2 further requirement that that must be done within 30 days, that

3 he is to be produced in the State of Oklahoma, but that the

4 examination may take place by VTC or telephone.  And that in

5 any event, difficulties relating to scheduling of the Bentley

6 deposition will not be permitted to impact the schedule.  So

7 that's my inclination with respect to Mr. Bentley.

8     And from the defendants' perspective, am I just bulldozing

9 through the niceties of the subpoenas?  Yes, I am.  You can

10 take me to the circuit on a writ if you choose, but I believe I

11 have the remedial discretion under Rule 37 to fashion equitably

12 the solution to this discovery motion, and that's my intent.

13     Okay.  Then with respect the IV team leader, I do have

14 serious trouble with -- as to whether in a case that is to be

15 litigated within the confines of the Eighth Amendment as it

16 applies to lethal injection executions as has been expounded at

17 length by the Supreme Court, I'm very concerned about how far

18 down into the weeds this Court or a Court of Appeals or the

19 Supreme Court gets in parsing the particulars of an execution

20 Protocol or the carrying out, if you will, of that Protocol for

21 Eighth Amendment purposes.

22     Nevertheless, my preliminary inclination is to permit a

23 deposition on written questions of the anonymous IV team

24 leader, limited to three things.  Number one, did he or she

25 graduate from an accredited U.S. medical school?  And there are

1   some good medical schools outside of the United States, so a

2   "no" answer to that is not necessarily dispositive of anything.

3   But number one, did he or she graduate from a U.S. accredited

4   medical school?  Number two, what method will be used to

5   perform a consciousness check?  Let me double-check my notes

6   here.  And number three, what criteria will be used to

7   determine whether any unanticipated difficulties should result

8   in delay of the execution or interruption or delay of the

9   execution procedure?  Those three subjects and no others,

10  deposition on written questions to be signed by Pat Doe so that

11  we don't even have gender identification under 278 U.S.C.

12  Section 1746 as a declaration, under 28 U.S.C. Section 1746

13  with the Attorney General required to maintain a record until

14  the final conclusion of this litigation as to the actual

15  identity of that deponent, the IV team leader, who would sign

16  his or her answers to the deposition on written questions Pat

17  Doe.

18       Okay.  So those are my -- that's my inclination.  I'm not

19  inclined to -- as you might infer from that, I'm not inclined

20  to compel discovery as to the other topics listed on page 9.  I

21  really have a very hard time with the idea that those are

22  material for an Eighth Amendment challenge as long as the IV

23  team leader does have the requisite minimal qualifications and

24  proposes an effective consciousness check procedure.

25       So anyway, to the extent that this compels discovery, the

1    State might logically be the first side to be afforded an

2    opportunity to push back.  And so I'll inquire of defense

3    counsel as to whether there's anything you really think I ought

4    to reconsider with respect to my tentative disposition of this

5    motion.

6             MR. MANSINGHANI:  I'm not going to reargue anything,

7    don't plan on changing your mind.  I think the main concern I

8    might have is with the third, deposition questions seems

9    somewhat open ended, and I'm not sure exactly what plaintiffs

10   mean to inquire by that.  You know, one can imagine a sort of

11   an infinite number of scenarios that might cause an IV team

12   leader to recommend that this execution be stayed or halted, so

13   that's, I think, my one concern.

14            THE COURT:  Okay.  Thank you.  I'll hear pushback

15   from the plaintiffs.

16            MR. STRONSKI:  Your Honor, Jim Stronski, can you hear

17   me?

18            THE COURT:  I certainly can, yes.

19            MR. STRONSKI:  Wonderful.  Your Honor, I am very

20   sorry, but when you started speaking, I heard some of what you

21   said and then I was disconnected and I called back in.

22            THE COURT:  Okay.  Let me repeat just for the sake of

23   clarity, since you have no way of knowing exactly what you

24   missed, let me repeat for the sake of clarity my tentative

25   conclusion as to disposition of this motion.

1        First of all, as to Mr. Bentley, my tentative conclusion

2    is that I should direct the defendants to produce Mr. Bentley

3    for a deposition of a maximum of two hours on the issue of the

4    efforts that he made to secure alternate drugs.  That

5    deposition to occur within 30 days.  Mr. Bentley to be produced

6    in the State of Oklahoma, but with the understanding, of

7    course, that doing it by video or by telephone to accommodate

8    plaintiffs' counsel would be perfectly appropriate.  And by the

9    way, this won't be in the minutes, but by limiting it to two

10   hours, I'm assuming that there will be zero game playing and

11   evasiveness and gratuitous objections and so on.  And so that's

12   my tentative intent with respect to Mr. Bentley.

13       With respect to the IV team leader, my tentative intent is

14   to authorize a deposition on written questions of the IV team

15   leader limited to three issues.  Number one, did you or did you

16   not graduate from a U.S. accredited medical school?  And I

17   commented to the effect that if he or she did not, that's not

18   necessarily dispositive of anything, but that's a fair

19   question, I think, all things considered.  Number two, what is

20   your proposed methodology to perform a consciousness check?

21   And number three, what are your criteria for determining

22   whether any unanticipated difficulties during the execution

23   will result in the execution being interrupted or stayed?

24       And that the -- that deposition may be signed by the IV

25   team leader as Pat Doe, which is my weak attempt at arriving at

```
 1   a gender neutral moniker as a declaration under 28 U.S.C.
 2   Section 1746 with the attorney general to maintain a record
 3   until the final conclusion of this litigation of the actual
 4   identity of the deponent.
 5       So that's my intended -- my tentative resolution of the
 6   issues presented by this motion.  And I gave defense counsel an
 7   opportunity to push back, which he did to some degree and now
 8   this is your opportunity.
 9            MR. STRONSKI:  Thank you, Your Honor.  One minor
10   issue.  Expert reports are due January 8th, so if perhaps we
11   could do this deposition at least several days before that, it
12   would be helpful instead of 30 days.  So I don't know.  We'll
13   try to work that out with defense counsel, but we obviously
14   want to take this deposition before we submit our -- before we
15   serve our expert reports.
16            THE COURT:  You're talking about the deposition of
17   Mr. Bentley?
18            MR. STRONSKI:  Yes.
19            THE COURT:  Okay.  The 4th of January is a Monday.
20   I'll inquire of defense counsel as to whether you would foresee
21   any difficulty producing Mr. Bentley for this limited purpose,
22   two-hour deposition, not later than close of business on
23   January 5th.
24            MR. MANSINGHANI:  I don't foresee any problem with
25   that, Your Honor.  I would, of course, have to confer with
```

1   Mr. Bentley on his schedule.  But we'll do our best.

2           THE COURT:  Okay.  Thank you, sir, I do appreciate

3   that approach.  I'm going to make that close of business

4   January 5th as to Mr. Bentley.

5       Mr. Stronski, forgive the interruption, I'll hear anything

6   else you have to say.

7           MR. STRONSKI:  Yes.  And Your Honor, the only

8   thing -- and thank you for this.  The only thing I think is

9   appropriate that I would add to your proposed order is the --

10  in addition to the proposal of how to do a consciousness check,

11  I think it's the proposal and your experience and training in

12  connection with doing a consciousness check.  I could recite a

13  proposal to do a consciousness check.  I think the real issue

14  is, is this person more qualified than me in doing it?  So I

15  think that would be -- that would be an important addition,

16  Your Honor, if I were to pick one thing.

17          THE COURT:  Well, what the cases do is they talk

18  about -- and this was a new term to me when I first -- when I

19  drew the first case, which is why I've had all these cases

20  since.  The cases taught me a new term, "noxious stimuli."  And

21  noxious stimuli can be poking the prisoner with something very

22  sharp, and then they go to things like brushing his eyelids,

23  doing other things that might cause a reflex.  I'll think about

24  that.  But at this point, I'm not satisfied that it's necessary

25  to get that far down into the particulars of a consciousness

1  check, given the pretty low bar that the Supreme Court has

2  given us with respect to these issues.

3      Anything further from either side?

4         MR. MANSINGHANI:  No, Your Honor.

5         MR. STRONSKI:  No, Your Honor.  Thank you.

6         THE COURT:  Okay.  Very well, again, I applaud

7  counsel for helpful briefing and helpful argument.  I'll be

8  entering an order by way of minutes of this proceeding as soon

9  as reasonably possible.  And the Bentley deposition, my

10  tentative ruling is modified to the extent that that Bentley

11  deposition is to be completed by close of business on

12  January 5th.  And as I say, I'll be entering an order by way of

13  minutes of this proceeding as soon as reasonably possible.

14     And let me leave you, again, with a friendly reminder and

15  I mean it exactly that way, as a friendly reminder that, yes,

16  we are on a fairly demanding schedule.  And I am going to do my

17  job, as I think you perhaps have already noted, I'm going to do

18  my job as diligently as possible.  And I certainly do intend to

19  stay with this fairly demanding schedule so that we can get the

20  matter at issue on motions in mid to late March, and then, if

21  need be, ready for trial in early May.

22     That will conclude the hearing on these motions and Court

23  will be in recess.  Counsel are excused.

24     (COURT ADJOURNED.)

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2          I, Tracy Thompson, Federal Official Realtime Court

 3   Reporter, in and for the United States District Court for the

 4   Western District of Oklahoma, do hereby certify that pursuant

 5   to Section 753, Title 28, United States Code that the foregoing

 6   is a true and correct transcript of the stenographically

 7   reported proceedings held in the above-entitled matter and that

 8   the transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10                    Dated this 20th day of December 2020.

11

12                    /S/ Tracy Thompson
                      -------------------------------
13                    Tracy Thompson, RDR, CRR
                      Federal Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```