

# ARIZONA DEPARTMENT OF CORRECTIONS

Consulting Services for Assessment and
Review of Execution Protocols

December 15, 2014

Assessment and Review of the

Arizona Department of Corrections

Execution Protocols

December 15, 2014



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

# TABLE OF CONTENTS

Background ...................................................................................................................................... 1

Project Approach .............................................................................................................................. 3

National Perspective ...................................................................................................................... 10

Observations of the ADOC Protocol ............................................................................................. 25

Training .......................................................................................................................................... 36

Summary of State Drug Protocols ................................................................................................. 40

Drug Protocol Considerations and Review .................................................................................... 44

Findings and Recommendations .................................................................................................... 48



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## Background

CGL and its partner, Correctional Solutions, Inc. (project team), conducted an independent assessment and review of the Arizona Department of Corrections (ADOC) execution protocols with respect to the state-ordered execution of Joseph R. Wood III. This review was completed at the request of the ADOC and consistent with the scope and requirements outlined in Solicitation No. ADOC15-000043901, entitled *Consulting Services for the Assessment and Review of Execution Protocols*.

Joseph R. Wood III was executed on July 23, 2014, at the Arizona State Prison Complex (ASPC)-Florence Central Unit consistent with the amended warrant of execution issued by the Arizona Supreme Court on May 30, 2014.  Based on investigative reports provided by the ADOC, review of witness statements, and review of other official documents, the execution drug protocol commenced at 1:52 p.m. on July 23, 2014.  At 1:57 p.m., the IV team leader verified that Mr. Wood was sedated.  The drug protocol was repeated 14 additional times until death was pronounced by the IV team leader at 3:49 p.m.

The elapsed time from commencing the drug protocol to pronouncement of death is unprecedented in comparison to prior executions within Arizona and other death penalty jurisdictions in the United States.  As a result, the ADOC retained CGL to conduct a comprehensive review of the existing ADOC protocols, the application of these protocols in the case of Joseph R. Wood III, and an assessment as to whether the existing protocols are consistent with national best practices.

The specific scope of work developed for this project is intended to achieve the project objectives as stated in the following key elements:

- Complete a full assessment of the ADOC execution protocols and procedures. Included in this review was an on-site walkthrough of the protocol as it was utilized in the case of Joseph R. Wood III, including the completion of interviews with all staff present and participating in the execution, a review of execution logs to determine any deviations from required protocol, and a review of other available documentation related to this execution.
- Assess the application and compliance with these protocols and procedures as they apply to the case of Joseph R. Wood III.
- Complete a review and comparison of the ADOC protocols and procedures with those utilized in other state systems.  State protocols presently in place for 10 different states were obtained, reviewed, and a comparison completed to those in place in the ADOC. Information on the drug protocol only was obtained from 2 additional states.  Staff from 12 states were contacted to obtain additional information/clarification on the development and implementation of their respective protocols. The focus of these interviews was on those systems that have divergent protocols and procedures to those in place in Arizona.
- Obtain input from experienced medical professionals on the pharmacological effects of the combination of midazolam and hydromorphone in quantities of 50 mg. or more.
- Conduct a review of the Ohio execution protocol litigation and other available opinions and/or documents related to the pharmacological application of drugs in an execution protocol.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15 2014

The overall purpose of the state reviews was to determine if those alternative protocols are appropriate for the Arizona system. Based on the review of ADOC protocols, the comparison of ADOC protocols to other state correctional systems, information obtained from interviews with representatives of other states, and the project team's experience, recommendations for possible modification and improvement to the ADOC protocols will be developed.

## CONFIDENTIALITY

The ADOC and the project team formally agreed to make all reasonable efforts to maintain the confidentiality of information provided by the ADOC during the course of this assessment. The project team also agreed not to make any duplication or other copies of confidential material obtained during the course of this assessment or provide confidential material or documents to persons or entities not a party to this contract (this includes any future solicitations, responses to potential customers, or any future engagements) without written authorization from the ADOC.

In addition, the project team agreed to be bound by confidentiality agreements in place between the ADOC and individuals who participate in the execution protocols. These agreements ensure that those participating in the execution protocol will remain anonymous and will be identified only by their role and function.  As a result, most interviews with staff participants in the execution protocol were done by phone.

Issues of confidentiality were also encountered in discussions with other state correctional systems in the review of their existing execution protocols.  In many instances the execution protocols, including the drug protocols, are public documents and are accessible for review; however, in some states the execution protocols are restricted documents and are not available for public access. The project team was permitted access to these protocols while guaranteeing that confidentiality be maintained on the source.  In other cases, the jurisdiction did not permit access to the protocol but did have staff brief the project team on the contents of the protocol and, specifically, the drug regimen used in the execution procedure.  In the course of this review, the project team agreed not to disclose the specific states in which the protocols reviewed were restricted.  In these cases, the states are identified and referenced by an alphabetic code (State A, State B, State C, etc.).



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

# PROJECT APPROACH

## PROJECT TEAM

The project team has experience in developing execution protocols, conducting evaluations of their effectiveness and efficiency, and in directly supervising the execution process in the states in which they were correctional administrators.

Kenneth McGinnis served as the project director for this review. He has more than 42 years of professional experience in the management of correctional institutions, programs, and organizations and has spent the last 14 years providing consultation to correctional agencies and organizations across the United States.  His governmental responsibilities have ranged from the management and administration of all facets of the Illinois and Michigan correctional systems to serving as warden and directing the operations of maximum-, medium-, and minimum-security adult institutions. He served as the chief administrative officer of two of the nation's largest and most complex correctional systems: the Illinois Department of Corrections and the Michigan Department of Corrections.

As Director of the Illinois Department of Corrections, Mr. McGinnis was charged with the responsibility of creating the execution protocol for the State of Illinois when the death penalty was reinstated.  He directed the development of the protocol that was used in Illinois until the suspension of the death penalty. In the course of this process he researched and evaluated protocols in place in several systems and developed a protocol based on national best practices and consistent with Illinois law.

Since 2000, Mr. McGinnis has been assisting other systems in improving their operational protocols and in conducting performance assessments on a wide range of operational issues. These have included post-incident reviews of significant critical events that have occurred in correctional systems in several jurisdictions.

Ron Angelone has served as the head of two major state correctional systems.  He was appointed by the Governor of the Commonwealth of Virginia as Director of the Virginia Department of Corrections on May 1, 1994, and served until September 2002.  During his tenure, he was responsible for the supervision and administration of all institutions in the department and for probation and parole services throughout the state. He was also directly responsible for the formulation of administrative policies and programs for the department and interpretation of the policies, outlining plans and procedures to employees and appointing officers and employees best qualified to carry on the department's mission.

During his tenure in Virginia, Mr. Angelone oversaw the execution of more than 85 individuals. He is familiar with the national protocols, procedures, and policies as related to the conducting of an execution consistent with national standards and established legal requirements.

Prior to serving in Virginia, Mr. Angelone had been appointed by the Governor of the State of Nevada in June 1989 to serve as the Director of the Nevada Department of Corrections. In this position he was responsible for the overall supervision, direction, and administration of all correctional institutions

3



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

within the state, including the formulation, interpretation, and implementation of policies, plans, and procedures to meet the agency's mission.

Mr. Angelone is an active member of the American Correctional Association and has served as chairman of the standards committee from 2000-2002 and as chairman of the adult corrections committee from 1997-1999.  In addition, he is active in the Association of State Correctional Administrators and served that organization as chairman of the past president committee (2002-present), president (2000-2002), vice-president (1998-2000), and treasurer (1996-1998)  He was also a recipient of the Michael Franke Award in 2000: the highest honor the association bestows on its members.

Dave Runnels has more than 30 years of experience working in the criminal justice system, culminating in his appointment as Undersecretary for the California Department of Corrections and Rehabilitation (CDCR) and Chief Deputy Receiver/Chief of Staff for the Office of the Federal Court Receiver.

Mr. Runnels has been appointed to four governor's office positions under the Davis and Schwarzenegger administrations and confirmed by the full California State Senate. Mr. Runnels has routinely identified and provided recommendations to the governor, legislature, and department of finance to improve policies in California. He has also served as Policy Advisor to the Secretary for the CDCR, as undersecretary of operations, and warden at High Desert State Prison.

Mr. Runnels was the deputy director in the CDCR when executions were reinstated after many years in delays. He was assigned to lead an effort to assess the protocol in place in other systems.  As a result, a revised protocol was developed. Mr. Runnels participated in executions in CDCR in the operations center and was the ranking person at the Michael Angelo Morales execution, which was stopped by the court. This case resulted in the *Morales v. Tilton* litigation, which stayed executions in the State of California and challenged CDCR's administration of its lethal injection protocol. Morales challenged the constitutionality of his execution, contending that San Quentin State Prison operational procedure and the manner in which the department implements it would subject him to an unnecessary risk of excessive pain, thus violating the Eighth Amendment's command that cruel and unusual punishments not be inflicted.  Mr. Runnels led an extensive internal review of the CDCR protocol, which resulted in the implementation of revised policy and procedures and the issuance of an internal report on the protocols in place prior to the Morales litigation.

## SUMMARY OF KEY TASKS

As noted in the background section to this report, several key tasks were completed during the course of this review.  This includes interviews with a wide range of staff and external individuals who were directly or indirectly involved in the execution of Joseph R. Wood III.  In order to maintain the required anonymity of those directly involved in the implementation of the protocol, many of those interviewed are not identified by name.  Those who are identified by title or role only were interviewed by phone so as to ensure their confidentiality.

In addition, numerous documents were reviewed during the course of the assessment. The following is a list of the key interviews and the documents reviewed.

4

 Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**INTERVIEWS**

The following individuals were interviewed by the project team over the course of this assessment.  As noted previously, the identity of several individuals will remain anonymous consistent with the agreements of the ADOC and these individuals.  In these cases their role/function is identified.

1. Charles Ryan, Director, Arizona Department of Corrections
2. Jeff Hood, Deputy Director
3. Greg Lauchner, Inspector General
4. Dawn Northup, General Counsel
5. Carson McWilliams, Division Director, Offender Operations; ADOC Training Coordinator
6. Lance Hetmer, former Warden of ASPC-Florence
7. Greg Fizer, Warden of ASPC-Florence
8. Special operations team leader
9. IV team leader/attending physician
10. Housing Unit 9 section leader
11. Housing Unit 9 recorder
12. Maintenance response team leader
13. Designated execution commander
14. Execution restraint team leader
15. Brandon Rodarte, Inspector General/CIU Supervisor
16. Special operations team member
17. Doctor Gregory Hess, Medical Examiner of Pima County, Arizona
18. Correctional medical physician, correctional health care consultant expert, and emergency room physician (not identified by name)
19. Steve Gray, Chief Counsel, Ohio Department of Corrections and Rehabilitation
20. Kim Thomas, Director, Alabama Department of Corrections
21. Anne Adams Hill, Chief Legal Counsel, Alabama Department of Corrections
22. Dave Robinson, Chief of Correctional Operations, Virginia Department of Corrections
23. Bryon Collier, Deputy Executive Director, Texas Department of Criminal Justice
24. Jon Pence, Deputy Warden of Operations, Chillicothe Correctional Institution, Ohio Department of Corrections and Rehabilitation
25. LaDonna Thompson, Director, Kentucky Department of Corrections
26. Brian Owen, Director, Georgia Department of Corrections
27. Robert Patton, Director, Oklahoma Department of Corrections
28. Bruce Lemon, Director, Indiana Department of Corrections
29. William Wilson, Executive Director, Adult Facilities, Indiana Department of Corrections

**DOCUMENTS REVIEWED**

The following documents were reviewed and examined by the project team in the course of conducting this assessment.  These documents were also utilized in the course of conducting the interviews with

5



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

the above-noted individuals. It is noted that several of the state execution protocols were considered "restricted" and not public documents. In these cases, the state is not specifically identified but is referenced by an alphabetical code. In some cases, the state protocols were not made available to the project team in hard or electronic copy, but team members were permitted to review the actual protocol or were briefed on the specifics of the protocol by agency staff. In other cases, the specifics of the protocols became known through court filings and through news articles.

1. *Arizona Department of Corrections, Department Order 710, Execution Procedures, Effective September 21, 2012,* with replacement page revision dated March 26, 2014.

2. *Arizona Department of Corrections, Department Order 710, Execution Procedures, Effective January 25, 2012,* with replacement page revision dated June 5, 2012.

3. *Arizona Department of Corrections, Department Order 710, Execution Procedures, Effective May 12, 2011,* with replacement page revisions dated September 12, 2011, and June 10, 2011.

4. *Arizona Department of Corrections, Department Order 710, Execution Procedures, Effective September 15, 2009,* with replacement page revisions dated September 29, 2010 and September 24, 2010.

5. *Investigative Report, Execution of James Rudolph Wood III,* Office of the Inspector General, Arizona Department of Corrections.

6. *Amended Warrant of Execution,* Supreme Court of Arizona, filed May 30, 2014.

7. *Photo Log, Execution of Joseph Rudolph Wood III,* Office of the Inspector General, Arizona Department of Corrections.

8. Pinal County Medical Examiner's Office, *Preliminary Death Report,* dated July 23, 2014, *Joseph Rudolph III.*

9. *Execution Procedures Checklist, Execution of Joseph Wood III.*

10. *Correctional Service Log, Housing Unit 9, Special Operations, Execution of Joseph R. Wood,* Time Period Covered: 0800 on 7/23/14 through 1718 on 7/23/14.

11. *Correctional Service Log, Lethal Injection Room Log, Restraint Team, Execution of Joseph R. Wood III,* Time Period Covered: *1323 on 7/23/14 through 1349 on 7/23/14.*

12. *Correctional Service Log, Housing Unit 9 Section Leader, Execution of Joseph R Wood III,* Time Period Covered: *0800 on 7/23/14 through 1650 on 7/23/14.*

13. *Command Center Execution Log, Joseph Rudolph Wood #086279, July 23, 2014,* Time Period Covered: *0600 on 7/23/2014 through 1635 on 7/23/2014.*

14. *ASPC-Tucson Criminal Investigation Unit, Supplemental Investigative Report, Execution of Joseph Rudolph Wood III,* Office of the Inspector General, Arizona Department of Corrections.

15. Arizona Department of Corrections, *Evidence and Chain of Custody Log, Execution of Joseph Wood.*

16. Arizona Department of Public Safety, *Agency Request for Scientific Examination, Submission of Execution Drugs for Scientific Analysis, Joseph Wood III.*

17. Arizona Department of Corrections, Contraband/Evidence Control, Control Number 14-196, Execution of Joseph Wood.

 Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

18. Pima County Forensic Science Center, personal effects receipt, Case Number 14-01808, Joseph R Wood III.

19. *Arizona Department of Public Safety, Scientific Examination Report, dated August 8, 2014, Execution Drugs for Scientific Analysis, Joseph Wood III.*

20. State of Arizona Department of Health Services, *Certificate of Death, Joseph R. Wood III,* dated August 22, 2014.

21. *Autopsy Report,* Pinal County, Arizona, Joseph R. Wood III.

22. *Toxicology Report,* Joseph R. Wood III, August 21, 2014.

23. Execution procedures checklists, Joseph Wood III, checklist began on June 18, 2014.

24. *Execution Training Notes and Records,* July 21, 2014.

25. *Execution Training Notes and Records,* July 22, 2014.

26. *Execution Training Notes,* October 7, 2013.

27. *Execution Training Notes and Records,* October 21, 2014.

28. *Execution Training Notes and Records,* October 22, 2014.

29. Medication administration records for Joseph R. Wood III for July 2014 at ASPC Eyman-Browning.

30. *Order, United States District Court, Southern District of Ohio, Eastern Division, Case NO. 2:11-ev-1016, Ohio Execution Protocol Litigation, order issued January 13, 2014.*

31. *Opinion and Order, United District Court, Southern District of Ohio, Eastern Division, Case NO. 2:11-ev-1016, Ohio Execution Protocol Litigation, Order Issued January 13, 2014.*

32. *Letter from the Office of the Federal Public Defender to Charles Ryan,* dated January 27, 2012.

33. List of attending witnesses, Execution of Joseph Rudolph Wood III.

34. *Statement of Daniel Hughes, Chief of Police, Florence, Arizona,* dated August 4, 2014.

35. *Memorandum dated August 20, 2014, Phillip Schonig, Supervisor AIU, Interview with Deacon Ed Scheffer.*

36. *Memorandum and audio recording dated August 20, 2014, Phillip Schonig, Supervisor AIU, Inspector General, Interview with Jeanne Brown.*

37. *Memorandum and audio recording dated August 13, 2014, Phillip Schonig, Supervisor AIU, Interview with Troy Hayden, KSAX Fox 10.*

38. *Memorandum and audio recording dated August 15, 2014, 2014, Jason Fisk, Investigator, Interview with Terry Adriance, Arizona Board of Executive Clemency.*

39. *Memorandum and audio recording dated August 20, 2014, Jason Fisk, Investigator, Interview with Richard Brown.*

40. *Memorandum and audio recording dated August 21, 2014, Phillip Schonig, Supervisor AIU, Interview with Jan Upchurch, Victim Services Administrator.*

41. *Memorandum and audio recording dated August 21, 2014, Jason Fisk, Investigator, Interview with Jessica Raak, ADOC Mental Health Monitor.*

42. *Memorandum and audio recording dated August 21, 2014, Phillip Schonig, Supervisor AIU, Interview with Doug Nick, Communications Director.*



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

43. *Memorandum and audio recording dated August 21, 2014, Jason Fisk, Investigator, Interview with Jeanette Guerrero, ADC Office of Victim Services.*

44. *Memorandum and audio recording dated August 22, 2014, Phillip Schonig, Supervisor AIU, Interview with Deputy Warden Morris.*

45. *Memorandum and audio recording dated August 22, 2014, Jason Fisk, Investigator, Interview with Stephanie Grisham, Arizona Attorney General Press Secretary.*

46. *Memorandum and audio recording dated August 25, 2014, Jason Fisk, Investigator, Interview with Candice Young, Corrections Officer II, ASPC-Lewis.*

47. *Memorandum and audio recording dated August 26, 2014, Jason Fisk, Investigator, Interview with Michael Clark.*

48. *Memorandum and audio recording dated August 26, 2014, Phillip Schonig, Supervisor AIU, Interview with Warden James O'Neal, ASPC-Phoenix.*

49. *Disk of Housing Unit 9 photos* documenting locations visited and observed by the project team.

50. *Statement of Julie Singleton Hall, Attorney at Law, September 8, 2014,* delivered by email to Greg Lauchner, Inspector General.

51. *Volume 1, Transcript of Motions Hearing, United States District Court, Southern District of Ohio, Eastern Division, Case NO. 2:11-ev-1016, Ohio Execution Protocol Litigation.*

52. *Volume 2, Transcript of Motions Hearing, United States District Court, Southern District of Ohio, Eastern Division, Case NO. 2:11-ev-1016, Ohio Execution Protocol Litigation.*

53. *Executive Summary, Ohio Department of Rehabilitation and Correction, Execution of Dennis McGuire, January 16, 2014.*

54. *Declaration of IV Team Leader, Execution of Joseph Wood III,* statement dated July 25, 2014.

55. Summary spreadsheet of Arizona DOC executions since April 25, 2012.

56. Summary spreadsheet of Arizona DOC executions since 10/26/2010 with drug protocol for each execution noted.

57. Summary of Special Operations Log, Section Leader Log, and Lethal Injection Room Log.

58. Policy Summary Sheet, DO 710.

59. *Execution Protocol, Kentucky Department of Corrections, Lethal Injection Protocols.*

60. *Oklahoma Execution Protocol, OP-040301, Effective 9/30/2014.*

61. *Texas Department of Criminal Justice Execution Protocol.*

62. *Ohio Department of Rehabilitation and Correction, Execution Protocol, 01-COM-11, Effective October 10, 2013.*

63. *Execution Protocol, Preparation and Administration of Chemicals for Lethal Injection, Missouri Department of Corrections.*

64. *Execution protocols for six unidentified state departments of corrections: specific state identity withheld at the request of the state administrators/legal counsel.*

## HOUSING UNIT 9 REVIEW

On September 24, 2014, the project team completed an on-site visit to ASPC-Florence.  Within ASPC-Florence is Housing Unit 9, which is the location of all executions in the State of Arizona.  Inmates



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

scheduled for execution are housed at ASPC-Eyman until the evening before the scheduled execution, when they are relocated to Housing Unit 9. The inmate is housed in a small detention area immediately adjacent to the execution chamber.  The unit also has a witness observation area, a command center for the execution, and the lethal injection room.  All direct activities in preparation and completion of the execution are conducted in Housing Unit 9.

The project team completed a walkthrough of Housing Unit 9 and received a detailed explanation of the functions and processes completed in the area as it pertains to the implementation of the execution protocol.   In addition, the role and function of each staff member present during the protocol was explained in detail.  The project team was accompanied by Jeff Hood, Deputy Director, Greg Lauchner, Inspector General, and Brandon Rodarte, Inspector General Supervisor.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## NATIONAL PERSPECTIVE

The project team completed a comparative review of lethal injection protocols for the ADOC and 10 state protocols that were obtained through discussion with the administrative officials of the various state systems.  As noted previously in this report, issues of confidentiality arose in discussions with several of the states.  As a result, the project team committed to maintaining the confidentiality of several of the states by withholding their specific identities. The project team was able to review the protocols and interview staff where necessary to clarify any provisions contained in the protocols.  The state systems in which the protocols were provided and are considered public documents included Arizona, Ohio, Kentucky, Oklahoma, Texas, and Missouri. Four other states provided information on their protocols or permitted the project staff to review the documents, but did not provide a copy of the protocol.  Two other states provided detailed information only on the chemicals used in the execution protocol. The information provided was supplemented by available court documents, news reports, and statements for those involved in the process in each state.

The review of state execution protocols focused on several key areas that the project team considers critical to the process.  These included:

- Selection process of execution team members
- Execution team member training
- Execution team record keeping
- Medical file review
- Drug protocols

The details of the comparative review are outlined in the following summaries.

### COMPOSITION OF EXECUTION TEAM AND SELECTION PROCESS

**Arizona**
The ADOC execution protocols require 10 teams and approximately 46 staff to assist with all operational areas within the prison during executions.  Execution team members are selected by the division director(s) based on established screening criteria and include documented approval of the director.  Medical team member qualifications are verified and documented.  The 10 teams identified are the command team, housing unit team, restraint team, special operations team, IV team, maintenance response team, critical incident response team, traffic control team, escort team, and victim services team.  Each team has specific written duties and responsibilities.

**State B**
State B's execution policy calls for no less than 12 execution team members to carry out the court-ordered executions within the system.  The execution team members are designated and selected by the warden.  State B's policy does not provide established screening criteria to be utilized in team member selection.  The warden may also designate a physician as an auxiliary team member to provide consultation or advice. Medical team member qualifications are verified and documented.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**State C**
State C's execution procedures call for no less than 20 members recruited by the warden with the assistance of the director.  State C's policy identifies established screening criteria for consideration in team member selection.

**State D**
State D's execution team members and team member selection procedures are not referenced in the lethal injection protocols obtained.

**State E**
State E's execution procedure calls for the execution team to be selected by the team warden designated by the secretary.  The team warden is authorized to select a sufficient number of team members to cover 13 identified areas and has the authority to assign staff as necessary for any other necessary tasks to carry out the execution.  State E's policy does not provide established screening criteria for consideration in team member selection.

**State F**
State F's execution procedures call for 10 teams and approximately 46 team members to assist with all operational areas within the prison during executions. Team members are selected through the wardens' recommendations, evaluated by the division managers, and provided to the director for documented approval.  Team member selections are based on established screening criteria.  The 10 teams identified are the command team, housing unit team, restraint team, special operations team, IV team, maintenance response team, critical incident management team, traffic control team, witness escort teams, and victim services team.

**State G**
State G's execution team members and team member selection procedures are not referenced in the lethal injection protocols obtained.

**State H**
State H's execution procedures require approximately 18 team members to assist with the scheduled execution.  Team members are selected by the warden.  State H's policy does not provide established screening criteria for consideration in team member selection.

**State I**
State I's execution procedures require a combination of department employees and contracted medical personnel, including a physician, nurse, and pharmacist.  The execution team is selected by the director.  State I's policy does not provide established screening criteria for consideration in team member selection.

**State J**
State J's execution team members and team member selection procedures are not referenced in the lethal injection protocols obtained.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## EXECUTION TEAM MEMBER TRAINING

**Arizona**

Per the protocol, the director schedules 10 training scenarios within 12 months preceding any scheduled execution.  The training protocol establishes a roll over schedule that ensures that the training requirement is met for all scheduled executions. The director schedules a minimum of two training sessions with multiple scenarios two days prior to the scheduled execution.  All training sessions are documented.  Beginning 35 days prior to the scheduled execution date, execution team members who are participating in the execution receive training, written instruction, and practice—all of which is documented.

**State B**

Per the protocol, beginning 30 days prior to the scheduled execution date, the execution team begins conducting training sessions no less than once per week until the scheduled execution date.  The team leader provides each execution team member a copy of the current execution policy, and all team members sign for its receipt.

**State C**

The team administrator conducts training simulations for execution team members on a monthly basis. Upon receipt of a death warrant, training is scheduled in the 30 days immediately preceding the scheduled execution.  Team members must have participated in six training sessions prior to being assigned duties during an execution.  Execution team members also participate in three daily training sessions immediately preceding the scheduled execution.  The team leader maintains a lethal injection process training file documenting all process training sessions.

**State D**

There is no specific execution team member training referenced in the lethal injection protocols obtained from this jurisdiction.

**State E**

The state protocol requires that the team warden conduct simulations of the execution process, at a minimum, on a quarterly basis and a simulation the week prior to any scheduled execution. All persons involved with the execution should participate in the simulations. A written record of any training activities is required.

**State F**

The division manager schedules 10 training scenarios within 12 months preceding a scheduled execution for periodic on-site practice by the housing unit team.  Beginning 35 days prior to the execution date, the housing unit team initiates training sessions no less than once per week until the scheduled date of the execution.  The housing unit team conducts a minimum of two training sessions with multiple scenarios two days prior to the scheduled execution.  The command team leader conducts training for the witness escort team, maintenance response team, critical incident management team, traffic control team, and victim services team seven days prior to the execution date.  The IV team participates in at least one training session with multiple scenarios within one day prior to the scheduled execution date.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**State G**
The procedures reference that the drug team is to have one medically trained individual who has followed the drug team through at least two executions, received step-by-step instructions from existing team members, and participated in at least two executions under the direct supervision of existing team members. There is no additional execution team member training referenced in the lethal injection protocols obtained.

**State H**
There is no specific execution team member training referenced in the lethal injection protocols obtained.

**State I**
There is no specific execution team member training referenced in the lethal injection protocols obtained.

**State J**
There is no specific execution team member training referenced in the lethal injection protocols obtained.

### EXECUTION TEAM RECORD KEEPING

**Arizona**
The ADOC's execution protocols require record keeping in the following areas:

- Training sessions
- Team member approval
- Execution team recorder
- Notice of execution involvement (signed by all execution team members)
- Letter of invitation to witness an execution
- Official witness agreement (signed by all witnesses, approved by director)
- Official witness/pool reporter agreement (signed by all media, approved by director)
- Warden's 35-day confirmation
- Inmate continuous observation record/log
- Return of death warrant notification (signed by warden/director's notification to supreme and superior courts)
- Certificate of death (medical examiner)
- Debrief

**State B**
The execution policy for this jurisdiction requires execution events be documented in an execution timeline and requires that all actions by department personnel in carrying out the sentence be fully documented.  State B's policy requires documentation in the following areas:

- Medical assessment of prisoner
- Mental health assessment of prisoner



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

- Execution team training
- Execution information release
- Continuous prisoner monitoring
- Mental health progress reports
- 24-hour medical evaluation (vein assessment and medical file review)
- Inmate property record disposition and release
- Morning of execution vein assessment
- Order for execution medications
- Drug preparation
- Confirming and recording establishment of IV sites (# of attempts)
- Start and finish times of each injection
- Changes to alternative IV sites
- Warden decisions during execution
- Death warrant (signed by warden)
- Disposal of prepared execution drugs
- Return of unprepared execution drugs
- Recording of used execution drugs
- After action review
- Quality assurance review

**State C**

The execution procedures include a record keeping sub-team and require record keeping in the following areas:

- Security
- Intravenous
- Infusion
- Team administrator
- Team leader
- Training
- Facility inspection
- Lethal injection process
- Inmate activities
- Notifications to inmate – execution date and choice of execution method
- Death warrant
- Media notification
- Medical review documentation
- Inmate visiting records
- Inmate's execution information
- Execution logs

14



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

- Equipment accountability report
- Execution records
- Post execution records
- Legal documents
- Execution report
- Return of death warrant/certificate of death
- Warden's after action critique

**State D**
The lethal injection protocols of this jurisdiction require record keeping in the following areas:

- Execution drug storage
- Disposal of unused execution drugs
- Return of unprepared execution drugs

**State E**
The jurisdiction's execution procedures require the use of appropriate checklists to document the lethal injection procedures upon completion of each step in the process, include independent law enforcement agents who keep execution room and execution chamber logs during the execution process, and reference record keeping in the following areas:

- Training activities
- Executioner's room log (documented at two-minute intervals)
- Execution chamber log (documented at two-minute intervals)
- Medical examination
- Time of death
- Death certificate
- Warrant of execution/warden's signed statement

**State F**
This jurisdiction's execution procedures require record keeping in the following areas:

- Team member approval
- Execution command team recorder
- Special operations team recorder
- Training sessions
- Witnesses
- Notification letter to dignitaries/law enforcement
- Notification letter to offender witnesses
- Warden's 35-day confirmation
- Medical assessment
- Mental health assessment
- Offender continuous observation log

15



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

- Special operations team recorder execution timeline
- Signing and filing of death warrant
- Certificate of death
- After action review
- Quality assurance review

**State G**
This jurisdiction's lethal injection protocols require record keeping in the following areas:

- Execution summary packet
- Execution watch log
- Execution transportation log

**State H**
This jurisdiction's lethal injection procedures require record keeping in the following areas:

- Controlled chemical inventory
- Chemicals administered during execution
- Chemicals destroyed after execution
- Chemicals returned after execution/stay

**State I**
This jurisdiction's lethal injection protocols require record keeping in the following areas:

- Disposal of unused chemicals
- Sequence of chemical form
- Chemical log – quantities used and discarded

**State J**
There is no specific record keeping referenced in the lethal injection protocols obtained from this jurisdiction.

## MEDICAL FILE REVIEW

**Arizona**
The ADOC's protocols require that a contracted health provider conduct a medical records file review 35 days prior to the scheduled execution to identify any prescribed medication(s) and dosages the inmate is currently, or was recently, taking and modify as necessary, ensuring the offender medications are unit dosed and any keep-on-person medications are removed.

**State B**
This jurisdiction's policy requires a medical chart review 21 days prior to the scheduled execution to establish any unique factors which may impact the manner in which the execution team carries out the execution, as well as a medical condition assessment and mental health evaluation to identify any necessary accommodations or contingencies that may arise from the prisoner's medical condition or history.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**State C**
The execution procedures require a vein assessment to determine the size, location, and resilience of the inmate's veins and a medical review at 20 days and again at 7 days prior to the scheduled execution to establish the inmate's psychiatric condition.

**State D**
The jurisdiction's protocols do not require a review of the inmate's medical file prior to the execution. State D's protocols require an examination of the condemned person's veins within 24 hours prior to the execution to determine possible locations for the IV sites and within 5 hours of the execution require an examination to determine the appropriate size needle to be used.

**State E**
The jurisdiction's procedures require one or more designated execution team members review the inmate's medical file in order to determine whether there are any medical issues that could potentially interfere with the proper administration of the lethal injection process.

**State F**
This jurisdiction's procedures require that health services staff conduct a medical records file review 35 days prior to the scheduled execution to identify any prescribed medication(s) and dosages the inmate is currently, or was recently, taking. Health services staff will modify prescribed medication as necessary and ensure the offender medications are unit dosed and any keep-on-person medications are removed.

**State G**
Procedures require that any keep-on-person medication be removed from the inmate upon notification of the execution date, and that the inmate's medical file be transported with the condemned person to the execution unit.

**State H**
The protocols do not require a review of the inmate's medical file prior to the execution.

**State I**
There is no review of the inmate's medical file prior to the execution referenced in the lethal injection protocols obtained.

**State J**
There is no review of the inmate's medical file prior to the execution referenced in the lethal injection protocol obtained.

## EXECUTION TEAM PREPARATION AND ADMINISTRATION OF DRUG PROTOCOL

**Arizona**
The ADOC director has the discretion, 20 calendar days prior to the scheduled execution, to identify whether a one- or two-drug protocol will be utilized. The drug protocol identified is reported to the inmate at that time.

Preparation:  At the appropriate time, the special operations team leader takes custody of the chemical(s) from a secure location and, with assigned team members, begins the chemical and syringe



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

preparation in the chemical room under the direct supervision of the IV team leader.  The team prepares one complete set of chemicals, labeling the assigned sterile syringes in a distinctive manner and identifying the specific chemical(s) contained in each syringe by assigned number, chemical name, chemical amount, and designated color in conformance with chemical chart protocols.  The flow of each gauge is checked by the IV team leader; the syringes are affixed to the manifold in the proper order and verified by the special operations team leader.

Administration:  The inmate is escorted into the execution room.  Closed-circuit monitors allow witnesses to observe the establishment of the IV sites. A microphone is attached to the inmate to allow the team to directly communicate with the inmate and hear any utterances or noises made by the inmate throughout the procedure.  The electrocardiograph leads are affixed to the inmate's chest.  The IV team leader ensures the proper placement and a flow of heparin/saline is started to keep the lines open.  The warden physically remains in the room with the inmate throughout the administration of the lethal chemical(s) in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems.  Upon direction from the special operations team leader, the assigned team member visually and orally confirms the chemical name on the syringe and then administers the full dose of the lethal chemical(s) immediately followed by the heparin/saline flush.  The inmate's consciousness level is reviewed after three minutes.   If deemed appropriate, the director may instruct the special operations team to administer an additional dose of the lethal chemical(s) followed by the heparin/saline flush.  The special operations team recorder documents on the correctional services log the start and end times of the administration of the lethal chemical(s).  The IV team members, special operations team members, and the warden continually monitor the inmate using all available means to ensure the inmate remains unconscious and that there are no complications.  Upon completion of the process, death is pronounced.

**State B**
State B's warden determines, 14 days prior to the scheduled execution, whether a sufficient amount of the one-drug protocol is available for use, or whether the two-drug protocol will be utilized. The warden advises the inmate of the drug protocol to be used.

Preparation:  On the morning of the execution, a drug administrator, in the presence of a second drug administrator, takes custody of the execution drug(s) from the institution pharmacy storage area, delivers the drug(s) to the execution location, and prepares the drugs for injection.  The chemicals are divided into syringes and labeled according to the drug protocol identified for use.  Additional syringes and chemicals are labeled and available in the event the primary dosages prove to be insufficient. The second drug administrator monitors the preparation and independently verifies the preparation and dosage of the drug(s).

Administration:  The inmate is escorted into the execution room.  Closed-circuit monitors allow witnesses to observe the establishment of the IV site(s).  The medical team member tests the viability of the IV site with a low-pressure saline drip.  A heparin lock may be attached to the IV needle as an alternative to the saline drip.  Upon direction from the warden, a drug administrator intravenously



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

administers the prepared syringes, followed by a low-pressure saline drip to flush the lines upon completion of the drug administration.  A second drug administrator observes the administration of the execution drugs and announces the start and finish times of each injection for documentation in the execution timeline.  Following administration of the IV drug(s), the inmate's consciousness level is reviewed.  If a sufficient time for death to occur has passed, but the inmate has not died, the medical team consults with the warden and director.  The warden, after consultation with the director, determines whether to proceed with additional syringes of execution drug(s) and may order the medical team to prepare such additional syringes, as necessary, and intravenously administer them in accordance with policy.  Upon completion of the process, death is pronounced.

Additionally, State B's protocols address using an alternative IV site as deemed necessary by the medical team, or alternative execution by intramuscular injection, both upon direction from the warden after consultation with the director.

### State C
Within 10 days of receiving the warrant of execution, the inmate chooses penalty of death by either lethal gas or lethal injection.

Preparation:  Approximately three hours prior to a scheduled execution, the execution team administrator and the team leader remove the lethal injection chemicals and saline from the lethal injection facility safe and transfer custody to two members of the infusion sub-team.  One member of the infusion sub-team prepares the lethal injection chemicals and saline syringes on the first color-coded tray.  The tray has identical, matching syringes labeled by content and sequence of administration. The other infusion sub-team member verifies proper preparation of the syringes.  A record keeper observes and documents the process.  Another infusion sub-team member prepares the lethal injection chemicals and saline syringes on the second color-coded tray.  The tray has identical, matching syringes labeled by content and sequence of administration. A different infusion sub-team member verifies proper preparation of the syringes.  A record keeper observes and documents the process.

Administration:  The inmate is escorted into the execution room.  The IV sub-team member places the electronic monitoring sensors on the inmate, inserts two catheters into pre-designated veins, and reports to the infusion control room to continuously monitor the saline drips.  One member of the IV sub-team remains in the execution room to continuously monitor the IV lines.  This IV sub-team member stands next to the inmate and assesses the consciousness of the inmate throughout the execution.  The warden physically remains in the execution room in close proximity to the inmate.  Upon direction from the warden, the infusion sub-team administers the lethal injection chemicals and saline.  A record keeping sub-team member initiates a 10-minute countdown at the start of the infusion.  Following administration of the first IV drug, the inmate's consciousness level is reviewed.  Observations are documented, and if the inmate is unconscious, the lethal injection procedure continues.  If after 10 minutes the inmate has not died, the warden directs the additional syringes of execution drugs be intravenously administered in accordance with policy.  Upon completion of the process, death is pronounced.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

Additionally, State C's protocols address using an alternative IV site as deemed necessary by the IV sub-team upon direction from the warden.

**State D**
Seven days prior to the scheduled execution, State D's warden determines whether a sufficient amount of the one-drug protocol is available for use, or whether the two-drug protocol will be utilized.  The commissioner notifies the inmate of the drug protocol identified.

Preparation:  The IV team, 24 hours prior to the execution, completes an examination of the inmate's veins to determine possible locations of the IV sites.  On the day of the execution, the warden provides the IV team with sufficient amounts of the lethal injection chemicals to prepare two syringes for the drug protocol identified.  At the execution building, one member of the IV team prepares the syringes.  A second member of the IV team observes the process and verifies the procedures were carried out correctly.  A member of the IV team determines the appropriate size needle based on the examination of the inmate's veins.

Administration:  The inmate is escorted into the execution room.  The IV team runs two IV lines: one primary and one backup.  If the IV team cannot secure two sites within one hour, the execution is scheduled for a later date.  The execution team connects the electrodes of the cardiac monitor to the inmate and ensures the equipment is functioning.  During the execution, the warden and deputy warden watch the primary IV site for any problems.  Upon direction from the warden, the lethal injection protocol is administered.  If the inmate is not unconscious within 60 seconds, the warden stops the process in the primary site and orders the backup be used with a new flow of chemicals.  Once the lethal injection is complete, a designated execution team member starts a stopwatch.  If after 10 minutes the coroner is not able to declare death, the injections continue until death has occurred.  Upon completion of the process, death is declared.

**State E**
Upon receipt of the warrant of execution, a designated execution team member purchases and, at all times, ensures a sufficient supply of the chemicals to be used in the lethal injection process.

Preparation:  On the day of the execution, an execution team member, in the presence of one or more additional team members and independent law enforcement observer, prepares the lethal injection chemicals, ensuring that the syringes are appropriately labeled and include the name of the chemical contained within.  The execution team member who prepared the two lethal chemical stands transports them personally, in the presence of one or more additional members of the execution team, to the executioner's room and places them in the appropriate locations.  The lethal injection chemicals remain secure until the executioner arrives. A designated execution team member also prepares two standard IV infusion sets of pre-filled sterile plastic bags of normal saline for IV use.

Administration:  A designated member of the execution team escorts the two executioners into the executioner's room.  The inmate is escorted into the execution chamber.  Two heart monitor leads are attached to the inmate's chest.  An execution team member establishes two IV lines and tests the viability of the IV site with a saline drip.  Witnesses are escorted into the witness room, and the



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

execution chamber and executioner's room are secured.  Upon direction from the warden, in the presence of the secondary executioner, one or more execution team members, and an independent law enforcement monitor, the primary executioner administers the lethal chemicals in accordance with policy.  Following administration of the IV drugs, the inmate's consciousness level is reviewed.  If the inmate is unconscious, the process continues as initiated.  If the inmate is not unconscious, the warden suspends the execution process, establishes a secondary access site, or designates an execution team member to secure a peripheral venous or central venous line placement and continues the execution utilizing the second stand of lethal chemicals.  Upon completion of the process, death is pronounced.

**State F**
The director has sole discretion 30 calendar days prior to the scheduled execution date as to which chemicals will be used for the execution using a one-, two- or three-drug protocol.  State F's director provides the drug protocol identified to the inmate no less than 10 calendar days prior to the scheduled execution date.

Preparation:  At the appropriate time, the housing unit section chief transfers custody of the chemical(s) from a secure location to the special operations team to begin the chemical(s) and syringe preparation in the chemical room under the direct supervision by the IV team leader.  The team prepares one complete set of chemicals, labeling the assigned syringes in a distinctive manner and identifying the specific chemical(s) contained in each syringe by assigned number, chemical name, chemical amount, and designated color in conformance with chemical chart protocols.  The flow of each gauge is checked by the IV team leader; the syringes are affixed to the manifold in the proper order and verified by the operations team leader.

Administration:  The inmate is escorted into the execution room and positioned on the table to enable the IV team or the special operations team leader and the housing unit section chief to directly observe the offender and to monitor the offender with the aid of a high-resolution color camera and a high-resolution color monitor.  A microphone is affixed to the inmate to allow the team in the chemical room to hear any utterances or noises made by the inmate throughout the procedure.  Throughout the procedure, the IV team leader monitors the offender's level of consciousness.  After one hour of unsuccessful IV attempts, the director contacts the governor or designee to potentially request a postponement of the execution.  A flow of heparin/saline is started in each line and administered at a slow rate to keep the lines open.  The housing unit section chief remains in the room with the inmate throughout the administration of the chemicals in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems and immediately notifies the IV team leader and director should any issue occur.  At the appropriate time, the director orders the administration of chemical(s) to begin.  The assigned special operations team member visually and orally confirms the chemical name on the syringe and then administers the full dose of the chemicals immediately followed by the heparin/saline flush.  After five minutes has elapsed, the IV team leader enters the room to confirm the inmate is unconscious by using all necessary and medically-approved methods.  If after five minutes the offender remains conscious, the director may instruct the special operations team to administer an additional dose of the lethal chemical(s) followed by the heparin/saline flush.  The IV team



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

leader again physically confirms the offender is unconscious.  When all electrical activity of the heart has ceased, the IV team leader confirms the inmate is deceased, and the inmate's death is announced by the director.  The special operations team recorder documents on the special operations team log the start and end times of the administration of the lethal chemical(s).  The IV team members, special operations team members, and the housing unit section chief continually monitor the inmate using all available means to ensure the inmate remains unconscious and that there are no complications.

**State G**
Prior to the scheduled execution, designated staff are responsible for ensuring all chemicals used in the lethal injection execution in State G are available and properly stored.

Preparation:  A member of the drug team prepares one syringe of normal saline and one syringe of the lethal injection chemical(s).  The drug team also prepares a back-up set in case unforeseen events make their use necessary.

Administration:  The inmate is escorted into the execution chamber.  A medically trained individual inserts two IV catheters: one primary and one backup.  There is no time limit to properly insert the IV lines.  A normal saline solution at a slow rate commences.  The director and warden or their designees, as well as a medically trained individual, observe the IV line to ensure the rate of flow is uninterrupted.  The director or his designee gives the order to commence with the execution.  The warden or designee instructs the drug team to induce, by syringe, substances necessary to cause death.  The flow of normal saline through the IV line is discontinued.  The lethal dose of chemical(s) commences.  The lines are flushed with normal saline.  The director or designee and warden or designee observe the appearance of the inmate during the application of the lethal chemicals.  If visible signs of life are exhibited  after a sufficient time for death has passed, the director or designee instructs the drug team to administer additional chemicals, followed by a saline flush.  After a sufficient time has passed, the warden directs the physician to enter the execution chamber and examines the inmate, pronounces death, and designates the official time of death.

**State H**
Prior to the scheduled execution, all controlled chemicals, a disposition log, and lockable transport case are kept in the pharmacy.

Preparation:  On the day of the scheduled execution, an authorized team member draws keys and proceeds to the pharmacy to obtain the appropriate amount of chemicals.  Within two hours of the scheduled execution, the chemicals are delivered to the chemical room. The IV team performs a check of all necessary equipment and instruments. Within one hour of the scheduled execution, the chemicals are drawn into syringes to be used by the injection team by a trained staff member and supervised by a nurse.  Two sets of syringes are prepared at the dosage identified in the procedure, and the remaining chemicals and syringes are locked in the transport case and stored nearby in the event they are needed.

Administration:  The inmate is escorted into the execution room.  The IV team runs two IV lines.  If the IV team cannot secure access, a physician provides access by central venous cannulation or other medically approved alternative. A nurse from the IV team applies the heart monitor leads.  Upon the order from



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

the warden, the execution process commences.  A staff member monitors the time when the injection process begins.  The first member of the injection team injects one syringe, the second member of the injection team injects an additional syringe, and a third member of the injection team injects saline, ensuring a steady, even flow of chemical.  A nurse monitors the progress to ensure proper delivery of the chemicals and to monitor for any signs of consciousness.  If after a sufficient time for death to have occurred the inmate exhibits visible signs of life, the warden instructs the injection team to administer additional chemicals.  Upon completion of the injection of the final syringe, the designated physician advises the warden when the heart monitor indicates that the inmate is deceased.  If the inmate shows residual signs of life within a reasonable period after all injections have been completed, the injection sequence is repeated upon the order of the warden.  Upon completion of the process, death is declared.

**State I**

Preparation:  Medical personnel prepare the lethal chemicals.  The quantities of these chemicals may not be changed without prior approval of the director.  The chemicals are prepared and labeled as syringes 1 and 2, with the chemical name and amount of solution; and syringe 3, with 30 cc of saline solution. Additional chemicals are prepared and labeled as syringes 4 and 5, with the chemical name and amount of solution; and syringe 6, with 30 cc's of saline solution.  Syringe 6 is prepared in the event that additional flush is required.

Administration:  Medical personnel determine the most appropriate location for the IV lines.  Both a primary and secondary IV line are inserted unless the prisoner's physical condition makes it unduly difficult to insert more than one IV.  Properly trained medical personnel may insert the primary IV line as a peripheral line or as a central venous line. The secondary line is a peripheral line.  A sufficient quantity of saline solution is injected to confirm the IV lines have been properly inserted and that the lines are not obstructed.  The gurney is positioned so that medical personnel can observe the prisoner's face directly or with the aid of a mirror.  Medical personnel monitor the prisoner during the execution.  Upon order of the director, the chemicals are injected into the prisoner by the execution team members under the observation of medical personnel.  The lights in the execution support room are maintained at a sufficient level to permit proper administration of the chemicals.  Syringes 1 and 2 are injected.  The saline solution from syringe 3 is injected.  Following a sufficient amount of time for death to occur after the injection of syringe 3, medical personnel examine the inmate to determine if death has occurred. If the inmate is still breathing, syringes 4 and 5 are injected, followed by syringe 6.  At the completion of the process, and after a sufficient time for death to have occurred, medical personnel evaluate the prisoner to confirm death.  In the event that the appropriate medical personnel cannot confirm that death has occurred, the curtain is reopened until an appropriate amount of time has passed to reevaluate the inmate.

**State J**

This jurisdiction identified the preferred three-drug protocol with the following chemicals: 500 mg midazolam hydrochloride, 600 mg rocuronium bromide, and 240 mEq potassium chloride.  There were no additional preparation or administration protocols provided by State J.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**OBSERVATIONS AND CONCLUSIONS FROM PROTOCOL REVIEW**

The comparative review of the ADOC protocols to the requirements of the other state systems reviewed found that in all areas the ADOC execution procedures as outlined in Department Order 710 and observed by the project team equaled or surpassed the provisions contained in the protocol standards reviewed from the other jurisdictions.  In particular, the specificity of the procedures, the comprehensive nature of its provisions, and the training regime that was documented for all team members could serve as national standards for other systems.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## OBSERVATIONS OF THE ADOC PROTOCOL

*ADOC Department Order 710, Execution Procedures,* enumerates detailed procedures required for each staff member participating in the execution process and sets forth the timeframes within which each procedure is to occur.  Ten execution procedure checklists have been prepared for all required protocols.  The checklists are assigned to the general counsel, the office of victim services, the inspector general, the deputy director for offender operations, the director, the ASPC-Eyman warden, the division director for health services, the media and public relations office, the ASPC-Florence warden, and the southern region operations director to ensure all procedures are followed as required by Arizona's execution procedures.  The execution timeline is initiated upon receipt of the warrant of execution and is established in increments of 35 days, 21 days, 14 days, 2 days, 24 hours, and 12 hours prior to execution and post-execution procedures.

A comparative review of the execution procedures checklists utilized in the July 23, 2014, execution of inmate Wood and the Arizona execution procedures verified that all checklist requirements were completed appropriately.  Review details are summarized in the following.  Each item was independently confirmed as completed through the review of checklists, documents, and interviews completed with staff participants.

*Warrant Receipt:  May 28, 2014*

Upon receipt of the warrant of execution from the attorney general's office, the general counsel made all required notifications for inmate Joseph R. Wood III.

*35 Days Prior to Execution:  June 18, 2014*

- The office of victim services identified and advised the victims of the crime of the scheduled execution.
- The deputy director for offender operations identified execution team leaders and members, established and activated the training schedule, confirmed preventive maintenance of equipment, planned and coordinated all operational activities between staff and locations, and initiated the continuous observation log.
- The director approved the execution team members and IV team members and team leader.
- The ASPC-Eyman warden read the warrant of execution to the inmate, outlined how conditions of confinement would be modified, offered the inmate to speak to an attorney or a chaplain, obtained the inmate's current weight, transferred the inmate to a single-person cell, placed the inmate on 24-hour continuous observation, established an observation record, implemented all required conditions of confinement, completed all witness and notification information, directed the inmate to update his "Notification of Inmate Hospitalization or Death and Property," and advised the inmate he could request a last meal.
- The assistant director for health services directed the health services staff to conduct a medical records file review, dispense all inmate medications in unit doses and eliminate keep-on-person medications, initiate continuous monitoring of the inmate's medical or mental health for



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

significant changes, and identified trained medical personnel to be on standby in the event the inmate experienced a medical emergency prior to the execution.

- The media and public relations office issued a news advisory announcing the date of the execution and facilitated non-contact interviews with the inmate by phone.

*21 Days Prior to Execution: July 1, 2014*

- The inspector general conducted licensing and criminal history reviews of the IV team members and conducted background investigations for media witnesses.
- The director invited the attorney general, 12 reputable citizens, media witnesses, crime victims and survivors, and the inmate witnesses to witness the scheduled execution.   The director provided notice to the Arizona Supreme Court and parties of the scheduled time of the execution (20 days prior) and provided the inmate with written notice of the selected chemical protocol to be utilized in the execution.
- The media and public relations office forwarded witness applications to the inspector general for background investigation and sent witness agreement forms to the identified witnesses.

*14 Days Prior to Execution: July 9, 2014*

- The general counsel finalized a list of official, victim, and inmate witnesses, including pool reporters for the director's approval.
- The office of victim services finalized the list of victims interested in witnessing the execution for the director's approval.
- The inspector general finalized arrangements with the medical examiner for disposition of the body, vehicle security, and custodial transfer of the body and obtained a body bag and tag from the medical examiner's office.
- The ASPC-Eyman warden confirmed receipt of the inmate witness and notification information form, confirmed the review of the notification in case of accident, serious illness or death and disposition of property form, confirmed the review of any changes to the disposition of remains form, and confirmed receipt of the last meal request form.
- The media and public relations office issued a news advisory announcing the date and time of the execution and finalized media official witness/pool reporter functions.

*2 Days Prior to Execution: July 21, 2014*

- The deputy director for offender operations conducted two training sessions with multiple scenarios and confirmed adequate staffing and vehicles in place for regular operations and the scheduled execution.
- The ASPC-Florence warden confirmed staff assigned to the maintenance response team would be on site eight hours prior to the execution time, restricted access to the housing unit, readied the housing unit for inmate transfer, and verified the execution inventory and equipment checks were completed and open issues resolved.

 Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

*24 Hours Prior to Execution: July 22, 2014*

- The ASPC-Eyman warden ensured the inmate received his last meal timely, ensured non-contact visits and phone calls were concluded timely, and ensured the inmate was prepared for transfer timely.
- The assistant director for health services confirmed trained medical personnel were scheduled to be at a pre-designated area four hours prior to the execution and confirmed medical equipment was present and operational.

*12 Hours Prior to and Through Execution: July 23, 2014*

- The ASPC-Eyman warden restricted access to institution property.
- The ASPC-Florence warden restricted access to institution property.
- The deputy director for offender operations directed the transfer of the inmate to Housing Unit 9, ensured staff took custody of the inmate and the maintenance of the observation log, offered the inmate a mild sedative, offered the inmate a light meal, ensured the inmate remained on continuous watch, issued the appropriate clothing, ensured the cell was furnished appropriately, and provided the inmate with pencil, paper, religious items, and hygiene supplies for the duration of use.
- The director provided a brief overview of the execution to the witnesses in the staging areas, conferred with the attorney general and the governor's office general counsel to confirm no legal impediment to proceed with the lawful execution, determined the use of IV method after receiving advice from the IV team leader, after inmate was secured on execution table reconfirmed with the attorney general and the governor's office general counsel that there was no legal impediment to proceeding, instructed the disbursement of chemicals to begin by the prescribed means, announced death, made proper notifications of death, and filed the death warrant within 48 hours after death.
- The south region operations director coordinated the monitoring and evaluation of the inmate activity at ASPC-Eyman and ASPC-Florence, assessing the inmate population for any activity related to the execution or its impact on the prisons' operations.
- The media and public relations office provided the news media with regular briefings, provided general information about the execution and inmate, provided the media representatives information on how the press pool would be established, provided a summary of the inmate's final 24 hours of activity, and provided each pool reporter with a tablet of paper and pencil to take notes.

*Post Execution:*

- The inspector general had the CIU investigator take photos of the inmate's body while restrained, prior to placement in body bag, without restraints, prior to placement in body bag, sealed in body bag, and photo of seal in place on body bag.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## IDENTIFIED CHECKLIST DISCREPANCIES

The review of the checklists did identify minor discrepancies in compliance to the requirements contained in the protocols, including the following:

- General counsel checklist - includes references that were "not applicable." Specifically, forwarding the original warrant of execution to the warden of ASPC-Florence (710.01-1.1.1.2), sending a copy of the original warrant of execution to the warden of ASPC-Eyman (710.01-1.1.1.3), and preparing for the director written notification to the sentencing court and the supreme court stating the time, mode, and manner in which the warrant was carried out (710.13-1.4.2).
- Deputy director for offender operations checklist - does not make reference to offering the inmate a mild sedative no later than four hours prior to the execution (710.12 – 1.2.5).
- Assistant director for health services checklist - references 35 days prior responsibilities as Section 710.06, et seq. However, the proper reference in the execution procedures is 710.07, et seq.

None of these discrepancies impacted the execution of Joseph R. Wood III.

## EXECUTION LOGS – DAY OF EXECUTION

To further document the details of the execution, the *ADOC Execution Procedures* identifies team members to serve as recorders. The execution team recorders completed three correctional service logs during the execution of inmate Wood. Specifically, logs were completed for the Housing Unit 9 section leader, the lethal injection room, and Housing Unit 9 special operations. A consolidated log identifying the events documented on the day of the Wood execution follows:

| Time | Event |
|------|-------|
| 0800 | Special Operations and IV Teams assembled for execution of inmate: Wood, Joseph ADC #086279. |
| 0800 | Execution table is prepared at least two hours prior to scheduled time of execution. |
| 0804 | Audio, visual and medical equipment inspected. Witness Room AV feed off. |
| 0818 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. |
| 0819 | Commenced the preparation of chemicals and syringes. |
| 0835 | Completed preparing, labeling and affixing syringes to the manifold. |
| 0836 | Special Operations Team Leader verified that all syringes are properly labeled and affixed to the correct location on the manifold. |
| 0916 | All items are removed from inmate's cell (Linen, property, etc.). |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| 0918 | Housing Unit 9 Section leader advises Director that inmate is ready for search and restraint; requests permission to proceed. Director grants permission to proceed. |
| 0921 | Director receives call from Donna Hallam (Arizona Supreme Court) advising a temporary stay will be issued. |
| 0922 | Director advises the Housing Unit 9 Section leader to disregard the search and restraint of the inmate. |
| 0950 | Director receives call from Arizona Supreme Court advising a temporary stay has been issued. |
| 1003 | Director exits Housing Unit 9 to brief witnesses regarding the temporary stay. |
| 1113 | Director advises stay has been lifted. |
| 1313 | Inmate placed in upper restraints by restraint/escort team after strip search. |
| 1313 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready to move the inmate to the injection room. |
| 1319 | Housing Unit 9 Section leader advises Director all witnesses have arrived at internal staging and requests permission to apply lower restraints to the inmate and move to the injection room. |
| 1320 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution. Per Governor's General Counsel, at this time there is no reason to not proceed. |
| 1321 | Director makes initial call to the Attorney General's Office to ascertain if there are any reasons to not proceed with the execution. At this time there is no reason to not proceed. |
| 1321 | The Director informs Housing Unit 9 Section Leader (proceed with movement of inmate to the injection room). |
| 1321 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9 witness room. |
| 1322 | Inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Restrain Team Leader behind. Support Staff behind Restraint Team Leader. |
| 1323 | Restraint team enters lethal injection room. |
| 1323 | Legs restrained. (maintain good circulation). |
| 1323 | Harness applied. |
| 1324 | Remove left (hard) restraint. |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| 1324 | Apply left (soft) restraint. |
|------|------------------------------|
| 1324 | RTL asks inmate if it feels ok; inmate nods. |
| 1325 | Left arm restrained. |
| 1325 | Remove right (hard) restraint. |
| 1325 | RTL advises inmate they are to apply pulse monitor. |
| 1325 | Apply right (soft) restraint. |
| 1325 | Right arm restrained. |
| 1325 | RTL asks inmate if it feels ok; inmate nods. |
| 1325 | Remove belly chains. |
| 1326 | RTL advises inmate they are going to have to shave his upper body. |
| 1328 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. Initial blood pressure: 137/84. |
| 1329 | RTL advises inmate they are going to apply a second blood pressure cuff. |
| 1329 | Restraint Team Leader checks all restraints. |
| 1329 | RTL asks inmate if left restraint feels alright. |
| 1330 | Inmate advises RTL that it's a little tight but it won't matter in a few minutes.  Also states you'll see a scar under there. |
| 1330 | RLT advises inmate they will adjust it. |
| 1330 | Inmate says thank you. |
| 1330 | Inmate is restrained. |
| 1331 | Restraint Team Leader advises the Housing Unit 9 Section leader that inmate is restrained to the table. |
| 1331 | Command advised Housing Unit 9 Section Leader that all witnesses are in place.  Housing Unit 9 Section Leader advises Director witnesses are in place. |
| 1331 | RTL advises inmate our IV team is going to come in and do an assessment. |
| 1333 | RTL ask inmate if he feels ok; inmate advises yes but it's a little cold in here. |
| 1334 | Housing Unit 9 Section Leader advises the Director the inmate is secure on the table and ready for the IV procedure.  Director grants permission to proceed. |
| 1335 | Monitor is turned on in the witness room. |
| 1335 | IV Team enters lethal injection room, and conducts vein assessment. |
| 1335 | IVTL advises inmate they are here to do the IV procedure; and right now |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

|  | they are just going to do an assessment. |
|---|---|
| 1336 | IVTL advises the inmate they'll be right back. |
| 1337 | Acting upon the advice of the IV Team Leader, the Director determines the catheter site(s). |
| 1338 | IV Team explains IV procedure to the inmate. |
| 1338 | IVTL advises the inmate they are going to apply a tourniquet. |
| 1340 | IV procedure commenced. |
| 1340 | IVTL advises the inmate he will get this done as quick as he can. Also advises the inmate he's going to feel a little stick. |
| 1340 | IVTL advises the inmate he is going to remove the tourniquet and blood pressure cuff. |
| 1341 | RTM asks SO for primary line. |
| 1341 | RTM asks SO to check flow. |
| 1341 | SO advises RTM flow is good. |
| 1342 | IVTM advises the inmate they are going to do the same on this side. |
| 1344 | RTM asks SO for secondary line. |
| 1345 | RTM asks SO to check flow. |
| 1346 | SO advises RTM flow is good. |
| 1346 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution Room. Special Ops Team Leader inside the Chemical Room. Inmate is secured to the table with the IV flowing, EKG functioning. |
| 1347 | IV procedure completed. Primary IV catheter placed in inmate's left A/C. Backup IV catheter placed in inmate's right A/C. |
| 1347 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. |
| 1347 | IV Team exits the lethal injection room. |
| 1347 | RTL advises the inmate that over to his right when the curtains open the witnesses will be there. |
| 1348 | Director makes call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution. Per Governor's General Counsel, at this time there is no reason to not proceed. |
| 1349 | Director makes call to the Attorney General's Office to ascertain if there are any reasons to not proceed with the execution. Per Attorney General's Office, at this time there is no reason to not proceed. |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| 1349 | The Director informs Housing Unit 9 Section Leader "we may proceed." |
|---|---|
| 1349 | Restraint Team exits the lethal injection room. |
| 1349 | With permission from the Director and confirmation to proceed, Housing Unit 9 Section leader opens the curtains. |
| 1350 | Housing Unit 9 Section Leader reads the Execution Order. |
| 1351 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. |
| 1351 | Inmate makes his last statement. |
| 1352 | Director instructed Special Ops Team Leader to commence with drug protocol: |
| 1352 | • Syringe 1A |
| 1353.22 | • Syringe 2A |
| 1353 | • Syringe 3A |
| 1354 | Drug protocol completed. |
| 1356 | 3 minute point: 1356.22. Confirmed 3 minutes have elapsed since commencing the administration of chemicals. |
| 1357 | IV Team Leader verified the inmate is sedated. |
| 1357 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. |
| 1408 | • Syringe 1B |
| 1409 | • Syringe 2B |
| 1409 | • Syringe 3B |
| 1410 | Second Drug Protocol Complete. |
| 1413 | • 2C – Bank A |
| 1416 | • 3C – Bank A |
| 1416 | Third Drug Protocol Complete. |
| 1423 | Director orders IV Team to assess sedation and check IV. |
| 1424 | Inmate remains sedated. |
| 1424 | Inmate remains sedated.  No issues with IV. |
| 1425 | • 1D – Bank A |
| 1426 | • 2D – Bank A |
| 1427 | • 3D – Bank A |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| 1427 | 4th Drug Protocol Complete. |
| --- | --- |
| 1433 | • 1E – Bank B |
| 1434 | • 2E – Bank B |
| 1434 | • 3E – Bank B |
| 1434 | 5th Drug Protocol Complete. |
| 1441 | Director orders IV Team to assess sedation and check IV. |
| 1442 | Inmate remains sedated. |
| 1442 | Inmate remains sedated.  No issues with IV. |
| 1443 | • 1F – Bank A |
| 1444 | • 2F – Bank A |
| 1444 | • 3F – Bank A |
| 1445 | 6th Drug Protocol Complete. |
| 1449 | Director orders IV Team to assess sedation and check IV. |
| 1450 | Inmate remains sedated. |
| 1450 | Inmate remains sedated.  No issues with IV. |
| 1452 | • 2G – Bank B |
| 1452 | • 3G – Bank B |
| 1453 | 7th Drug Protocol Complete. |
| 1458 | • 2H – Bank A |
| 1459 | • 3H – Bank A |
| 1459 | 8th Drug Protocol Complete. |
| 1501 | Director orders IV Team to assess sedation and check IV. |
| 1502 | Inmate remains sedated. |
| 1502 | Inmate remains sedated.  No issues with IV. |
| 1502 | • 2I – Bank B |
| 1504 | • 3I – Bank B |
| 1504 | 9th Drug Protocol Complete. |
| 1507 | • 2J – Bank A |
| 1509 | • 3J – Bank A |
| 1509 | 10th Drug Protocol Complete. |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| 1515 | Director makes call to Governor's Office to give update on execution and assessment of inmate. |
|------|------|
| 1529 | Director orders IV Team to assess sedation and check IV. |
| 1530 | Inmate remains sedated. |
| 1530 | Inmate remains sedated.  No issues with IV. |
| 1531 | • 2K – Bank B |
| 1531 | • 3K – Bank B |
| 1532 | 11th Drug Protocol Complete. |
| 1532 | • 2L – Bank A |
| 1533 | • 3L – Bank A |
| 1533 | 12th Drug Protocol Complete. |
| 1536 | • 2M – Bank B |
| 1537 | • 3M – Bank B |
| 1537 | 13th Drug Protocol Complete. |
| 1539 | Director orders IV Team to assess sedation and check IV. |
| 1540 | Inmate remains sedated. |
| 1540 | Inmate remains sedated.  No issues with IV. |
| 1540 | • 2N – Bank A |
| 1541 | • 3N – Bank A |
| 1541 | 14th Drug Protocol Complete. |
| 1542 | Director speaks to Jeff Zick in the Attorney General's Office regarding contingency plan and proceeding with execution. |
| 1545 | • 2O – Bank B |
| 1545 | • 3O – Bank B |
| 1546 | 15th Drug Protocol Complete. |
| 1548 | Inmate remains sedated. |
| 1549 | IV Team Leader pronounced death. |
| 1549 | Director informed of death by Special Ops Team Leader. |
| 1549 | Director advises witnesses that the execution is concluded. |
| 1549 | Housing Unit 9 Section Leader closes the curtains. |
| 1550 | Housing Unit 9 Section Leader notifies command to proceed with removal |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

| | |
|---|---|
| | of witnesses from Delta Staging. |
| 1553 | CIU Investigator examines the body. |
| 1553 | Coroner/Medical Examiner examines the body. |
| 1602 | Housing Unit 9 Section Leader instructs IV Team to cut lines to IVs. |
| 1607 | Team enters and removes restraints from the inmate and places inmate on a gurney. |
| 1608 | Restraint/Escort Team assists Coroner in the removal of the inmate's body. |
| 1609 | All Teams perform clean up duties. |
| 1620 | Housing Unit 9 Section Leader gives directives to secure the Execution Facility. |
| | End Log. |
| | |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## TRAINING

The ADOC execution procedures require the director to schedule, on a continuous rolling basis, 10 training scenarios within a 12-month period. This ensures that 10 training scenarios will precede any scheduled execution.  In addition, the procedures require a minimum of two training sessions with multiple scenarios 2 days prior to the scheduled execution.  All training sessions are documented,  and beginning 35 days prior to the scheduled execution date, execution team members who are participating in the execution receive training, written instruction, and practice—all of which is documented.

A review of documented training and training scenarios for the execution team members included:

- Records of execution team members' years of experience on the execution team
- Training records for the period of October 2010 through July 2014
- Execution training notes identifying training provided to team members for the period of October 2013 through July 2014

The project team's review of these records found that the Arizona execution team followed all required procedures as set forth in Arizona's *Department Order 710, Execution Procedures.*

### EXECUTION TEAM MEMBERS YEARS OF EXPERIENCE ON EXECUTION TEAM

The ADOC's 15-member execution team had a combined total of 65 years of experience serving as execution team members at the time they participated in the July 23, 2014, execution of Mr. Wood. Three of the members each had 7 years of experience, one member had 6 years of experience, four members each had 5 years of experience, one member had 4 years of experience, two members each had 3½ years of experience, three members each had 2 years of experience, and one member had 1 year of experience.  In summary, this team was experienced and well-trained.

### TRAINING RECORDS REVIEWED FOR THE PERIOD OF OCTOBER 2010 THROUGH JULY 2014

The ADOC provided training records for the execution team members for the period of October 2010 through July 2014. During that timeframe, the ADOC provided a total of 54 training sessions, which included a total of 253 simulations/scenarios.

For the time period preceding the July 23, 2014, execution of Mr. Wood, specifically October 2013 through July 2014, ADOC's execution team exceeded the training requirements outlined in their execution procedures.  Although the execution team is required to conduct 10 training scenarios within 12 months preceding a scheduled execution and 2 training sessions with multiple scenarios two days prior a scheduled execution, the Wood execution team participated in a total of 44 simulations/scenarios within a nine-month period preceding the July 23, 2014 execution and participated in 2 training sessions with 13 simulations/scenarios two days prior to the execution.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

Review details are as follows:

Wood Execution Date:  July 23, 2014

| Training Dates | Number of Simulations/Scenarios |
|---|---|
| July 22, 2014 | 7 |
| July 21, 2014 | 6 |
| July 08, 2014 | 3 |
| October 22, 2013 | 7 |
| October 21, 2013 | 8 |
| October 08, 2013 | 6 |
| October 07, 2013 | 7 |
| Total Training Sessions | 44 |

**EXECUTION TRAINING NOTES IDENTIFYING TRAINING PROVIDED TO TEAM MEMBERS**

In addition to the multiple training scenarios conducted during the nine months preceding the Wood execution, the ADOC execution team members complied with the protocol requirement to train on multiple scenarios for the two days immediately preceding the Wood execution.  This review confirmed the training details for the two days prior to the execution:

Wood Execution Date:  July 23, 2014

Training completed on July 22, 2014

Briefing:  Training records document that the director discussed current status of court action.

The execution team practiced seven simulation scenarios, including the monitor/microphone procedure in the witness room and all simulation scenarios involving the IV team leader and IV team member with internal teams.

*Simulation #1: Two-drug protocol*.  Full scenario included all procedures from cell to table.  Normal IV procedures.  No issues with IV.  No issues with inmate's behavior.  Practiced procedures with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral line (back-up).

*Simulation #2: Two-drug protocol*.  Full scenario from table.  Normal IV procedures.  No issues with IV. No issues with inmate's behavior.  Practiced procedures with monitor/microphone in witness room. Right femoral line used (primary) and right peripheral (back-up).

*Simulation #3: Two-drug protocol*.  Full scenario from table. Syringe failure in 2A.  New syringe loaded with two-drug protocol (82 seconds commenced to back-up).  No issues with inmate's behavior. Practiced procedure with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral (back-up).



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

*Simulation #4: Two-drug protocol*.  Full scenario from table.  Cross-train leaders.  Normal IV procedures, (inmate complains during IV procedure).  Practiced procedures with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral (back-up).

*Simulation #5: Two-drug protocol*.  Full scenario from cell to table.  Normal IV procedure.  No issues with IV.  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral (back-up).

*Simulation #6: Two-drug protocol*.  Full scenario from table.  Syringe failure in 1A.  Commenced to back-up set (1 minute, 42 seconds commenced to back-up).  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral (back-up).

*Simulation #7: Two-drug protocol*.  Full scenario from table.  Normal IV procedures.  No issues with IV.  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Right femoral line used (primary) and right peripheral (back-up).

<u>Training Completed on July 21, 2014</u>

Briefing:  Operations Division Director discussed current status of court action.

Team practiced six simulation scenarios including monitor/microphone procedure in the witness room and all simulation scenarios involving internal teams.

*Simulation #1: Two-drug protocol*.  Full scenario from cell to table.  Normal IV procedures.  No issues with IV.  No issues with inmate's behavior.  Practiced procedures with monitor/microphone in witness room.  Right femoral line used (primary) and left peripheral line (back-up).

*Simulation #2: Two-drug protocol*.  Full scenario from cell to table.  Syringe failure in 2A. New syringe loaded (90 seconds commenced to back-up). No issues with inmate's behavior.  Practiced procedures with monitor/microphone in witness room.  Right peripheral line used (primary) and right peripheral (calf, as back-up).

*Simulation #3: Two-drug protocol*.  Full scenario from table.  Cross-train section leaders.  Normal IV procedures.  No issues with IV.  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Left femoral line used (primary) and right peripheral (back-up).

*Simulation #4: Two-drug protocol*.  Full scenario from table.  Cross-train section backups.  (Inmate refuses to be restrained, warden talks to inmate). Normal IV procedures.  No issues with IV.  Practiced procedures with monitor/microphone in witness room.  Right femoral line used (primary) and left peripheral (back-up).

*Simulation #5: Two-drug protocol*.  Full scenario from cell to table.  Normal IV procedure.  No issues with IV.  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Right peripheral line used (primary) and left peripheral (back-up).



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

*Simulation #6: Two-drug protocol*.  Full scenario from cell to table.  (Difficulty inserting IV).  No issues with inmate's behavior.  Practiced procedure with monitor/microphone in witness room.  Right femoral line used (primary) and left peripheral (back-up).



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## SUMMARY OF STATE DRUG PROTOCOLS

As noted previously, the project team completed a comparative review of lethal injection protocols for the ADOC and the 10 state protocols that were obtained through discussion with the administrative officials of the various state systems.  The drug protocols of two additional states were obtained verbally but the information provided was limited to the chemical components used in the execution protocol for those specific states. As a result, information was obtained from 12 systems on the various elements of the drug protocols.  The project team was able to review the protocols and interview staff where necessary to clarify any provisions contained in the protocols.  The state systems in which the protocols were provided and are considered public documents included Arizona, Ohio, Kentucky, Oklahoma, Texas, and Missouri. Four other states provided information on their protocols or permitted the project team to review the documents, but did not provide a copy of the protocol.  Two other states provided detailed information only on the chemicals used in the execution protocol. The information noted below was obtained through a review of the protocols that were provided and through discussion with staff involved in the process with additional information available through court documents, news reports, and statements for those involved in the process in each state.

Most of the jurisdictions reviewed have multiple options for the drug compounds utilized. This is necessary due to the need to have flexibility to respond to the fluctuations in the availability of the specific drugs required for the execution.  In the past, most systems relied on a one-drug protocol consisting of thiopental, propofol, and pentobarbital.  Pentobarbital had proven to be effective and reliable. However, the availability of pentobarbital has been greatly reduced and most systems no longer have access to the chemical.  Selected systems, such as Texas and Missouri, have either stocked the drug or have found sources to obtain the necessary amounts.  Others have developed alternative protocols consisting of a variety of chemicals.

The protocols reviewed utilized the following protocols:

**Arizona**
> *One-drug protocol with pentobarbital*
>> Syringe 1A       60 ml heparin/saline
>> Syringe 2A       2.5 gm pentobarbital
>> Syringe 3A       2.5 gm pentobarbital
>> Syringe 4A       60 ml heparin/saline
>
> *One-drug protocol with sodium pentothal*
>> Syringe 1A       60 ml heparin/saline
>> Syringe 2A       1.25 gm sodium pentothal
>> Syringe 3A       1.25 gm sodium pentothal
>> Syringe 4A       1.25 gm sodium pentothal
>> Syringe 5A       1.25 gm sodium pentothal
>> Syringe 6A       60 ml heparin/saline
>
> *Two-drug protocol with midazolam and hydromorphone*
>> Syringe 1A       60 ml heparin/saline
>> Syringe 2A       50 mg midazolam and 50 mg hydromorphone



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

Syringe 3A          60 ml heparin/saline

## State B

*One-drug protocol with pentobarbital*

Syringes 1 and 2          5 gm pentobarbital (divided into two syringes, labeled "1" and "2")
Syringes 3 and 4          5 gm pentobarbital (divided into two syringes, labeled "3" and "4")

*Two-drug protocol with midazolam and hydromophone*

Syringe 1          50 mg midazolam, 50 mg hydromorphone
Syringe 2          50 mg midazolam, 50 mg hydromorphone
Syringe 3          60 mg hydromorphone
*Note:  Additional syringes of 60 mg hydromorphone shall also be obtained or prepared if needed.*

*Two-drug protocol with midazolam and hydromorphone with intermuscular injection*

Syringe A          10 mg midazolam, 40 mg hydromorphone
Syringe B          10 mg midazolam, 40 mg hydromorphone
Syringe C          60 mg hydromorphone
*Note:  Additional syringes of 60 mg hydromorphone shall also be obtained or prepared if needed.*

## State C

*Three-drug protocol with sodium thiopental, pancuronium bromide and potassium chloride*

Tray A:

1.   60 cc Syringe          1.5 grams sodium thiopental
2.   60 cc Syringe          1.5 grams sodium thiopental
3.   60 cc Syringe          50 cc saline flush
4.   60 cc Syringe          50 mg pancuronium bromide
5.   60 cc Syringe          50 cc saline flush
6.   60 cc Syringe          100 milliequivalents potassium chloride
7.   60 cc Syringe          100 milliequivalents potassium chloride
8.   60 cc Syringe          50 cc saline flush

*Note:  Tray B is prepared identically to Tray A and used as a back-up.*

## State D

*One-drug protocol with sodium thiopental or pentobarbital*

Inject 3 gm of sodium thiopental or 5 gm of pentobarbital

*Note:  If it appears to the warden, based on his visual inspection, that the inmate is not unconscious within 60 seconds of his command to proceed, the warden shall stop the flow of the sodium thiopental or pentobarbital in the primary site and order that the backup IV be used.*

*Two-drug protocol with midazolam and hydromorphone*

Inject 10 mg midazolam and 40 mg hydromorphone

*Note:  If it appears to the warden, based on his visual inspection, that the inmate is not unconscious within 60 seconds of his command to proceed, the warden shall stop the flow of the midazolam and hydromorphone in the primary site and order that the backup IV be used.*



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

**State E**

*Three-drug protocol with midazolam hydrochloride, vecuronium bromide and potassium chloride*

Tray A:

| | |
|---|---|
| Syringe 1A | 250 mg midazolam hydrocloride |
| Syringe 2A | 250 mg midazolam hydrochloride 20 ml |
| Syringe 3A | sterile solution |
| Syringe 4A | 50 mg vecuronium bromide |
| Syringe 5A | 50 mg vecuronium bromide |
| Syringe 6A | 20 ml sterile solution |
| Syringe 7A | 120 milliequivalents potassium chloride |
| Syringe 8A | 120 milliequivalents potassium chloride |

Tray B:

| | |
|---|---|
| Syringe 1A | 250 mg midazolam hydrocloride 250 mg |
| Syringe 2A | midazolam hydrochloride 20 ml sterile |
| Syringe 3A | solution |
| Syringe 4A | 50 mg vecuronium bromide |
| Syringe 5A | 50 mg vecuronium bromide |
| Syringe 6A | 20 ml sterile solution |
| Syringe 7A | 120 milliequivalents potassium chloride |
| Syringe 8A | 120 milliequivalents potassium chloride |

**State F**

*One-drug protocol with pentobarbital*

| | |
|---|---|
| Syringe 1A | 2.5 gm pentobarbital |
| Syringe 2A | 2.5 gm pentobarbital |
| Syringe 3A | 60 ml heparin/saline |

*One-drug protocol with sodium pentothal*

| | |
|---|---|
| Syringe 1A | 1.25 gm sodium pentothal |
| Syringe 2A | 1.25 gm sodium pentothal |
| Syringe 3A | 1.25 gm sodium pentothal |
| Syringe 4A | 1.25 gm sodium pentothal |
| Syringe 5A | 60 ml heparin/saline |

*Two-drug protocol with midazolam and hydromorphone*

| | |
|---|---|
| Syringe 1A | 250 mg midazolam |
| Syringe 2A | 250 mg midazolam |
| Syringe 3A | 60 ml heparin/saline |
| Syringe 4A | 500 mg hydromorphone |
| Syringe 5A | 60 ml heparin/saline |

*Three-drug protocol with midazolam, vecuronium bromide and potassium chloride*

| | |
|---|---|
| Syringe 1A | 250 mg midazolam |
| Syringe 2A | 250 mg midazolam |
| Syringe 3A | 60 ml heparin/saline |
| Syringe 4A | 50 mg vecuronium bromide |
| Syringe 5A | 50 mg vecuronium bromide |
| Syringe 6A | 60 ml heparin/saline |
| Syringe 7A | 120 milliequivalents potassium chloride |



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

Syringe 8A      120 milliequivalents potassium chloride
Syringe 9A      60 ml heparin/saline

**State G**
*One-drug protocol with pentobarbital*
One (1) syringe of normal saline shall be prepared
100 ml of solution containing 5 grams of pentobarbital
*Note:  The drug team shall have available a back-up set of normal saline syringe and lethal injection drug in case of unforeseen events.*

**State H**
*One-drug protocol with pentobarbital*
Syringe 1      2.5 grams pentobarbital
Syringe 2      2.5 grams pentobarbital
Syringe 3      60 cc saline solution
*Note: A secondary set of syringes numbered 1, 2, and 3 will be prepared in a manner outlined above if additional dosage of pentobarbital is needed.*

**State I**
*One-drug protocol with pentobarbital*
Syringe 1      5 grams pentobarbital
Syringe 2      5 grams pentobarbital
Syringe 3      30 cc saline solution
Syringe 4      5 grams pentobarbital
Syringe 5      5 grams pentobarbital
Syringe 6      30 cc saline solution

**State J**
*Three-drug protocol with midazolam hydrochloride, rocuronium bromide and potassium chloride*
500 mg midazolam hydrochloride
600 mg rocuronium bromide
240 milliequivalents potassium chloride

**State K**
*Three-drug protocol with brevital, vecuronium bromide and potassium chloride*
50 mg brevital
50 mg vecuronium bromide
240 milliequivalents potassium chloride

**State L**
*Three-drug protocol with midazolam hydrochloride, rocuronium bromide and potassium chloride*
500 mg midazolam hydrochloride
600 mg rocuronium bromide
240 milliequivalents potassium chloride



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## DRUG PROTOCOL CONSIDERATIONS AND REVIEW

In the execution of Joseph R. Wood III, the ADOC utilized the following two-drug protocol.

| | |
|---|---|
| Syringe 1A | 60 ml heparin/saline |
| Syringe 2A | 50 mg midazolam and 50 mg hydromorphone |
| Syringe 3A | 60 ml heparin/saline |

The drug protocol was initiated at 1:52 p.m.  At 1:57 p.m., the IV team leader indicated that Wood was sedated.  At 2:08 p.m., the second set of the drug protocol was administered.  The process continued until the drug protocol was administered for the fifteenth time at 3:46 p.m.  At 3:49 p.m., the IV team leader pronounced death.

In comparison, Ohio conducted an execution on January 16, 2014, using the same drug combination as was used in the Wood execution—but in lesser amounts than used in the Wood execution—with the death of the inmate in 26 minutes. The amounts used in the Ohio execution were as follows:

| | |
|---|---|
| Syringe A | 10 mg midazolam, 40 mg hydromorphone |
| Syringe B | 10 mg midazolam, 40 mg hydromorphone |
| Syringe C | 60 mg hydromorphone |

Information reviewed on the prior executions conducted by the ADOC confirmed that the Wood execution time lapse was significantly longer than any prior event. The following summarizes the executions that occurred since April 2012 and includes the drug protocol utilized and the time lapse from initiating the execution to time of death.

| Date of Execution | Drug Protocol | Elapsed Time |
|---|---|---|
| 4/25/2012 | Pentobarbital | 7 minutes |
| 6/27/2012 | Pentobarbital | 29 minutes |
| 8/8/2012 | Pentobarbital | 37 minutes |
| 12/5/2012 | Pentobarbital | 20 minutes |
| 10/9/2013 | Pentobarbital | 9 minutes |
| 10/23/2013 | Pentobarbital | 17 minutes |
| 7/23/2014 | Midazolam, Hydromorphone | 114 minutes |

A review of the prior versions of ADOC Policy 710 indicated that the processes and procedures utilized in the above-noted executions were similar. The obvious difference in the Wood execution and the prior executions noted above is the drug combination used during the execution.  The Wood execution utilized the two-drug combination of midazolam and hydromorphone for the first time in Arizona.

## IV TEAM LEADER

The IV team leader is an experienced physician with critical care and trauma specialties. He was assisted by a second IV team member who is an experienced trauma paramedic.  During an interview with the IV team leader he outlined his major responsibilities during the execution protocol. They included drawing

44



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

the correct amounts of the chemicals and mixing the chemicals in accordance to the drug protocol. He confirmed that in the Wood execution he drew and mixed the chemicals and confirmed that the correct amount was to be utilized. He also noted that there were no problems encountered with starting the IVs and that the flow through the IVs was uninhibited.

Upon starting the flow of chemicals, the IV team leader reported that he monitored the level of sedation. In the case of Woods, he reported that the inmate became sedated very quickly. Throughout the course of the protocol Wood remained heavily sedated. He felt that the breathing that was observed by the witnesses was "reflexive" and not an indication that Wood was not totally sedated. During the course of the protocol he conducted tests on Wood to determine the level of sedation and responsiveness. He indicated he was totally unresponsive to stimuli. He reported that he conducted standard tests to confirm sedation including using a cotton swab on the cornea of the eye and a pin prick to determine if there was any reflexive response. He reported in the course of these tests there was no response from Wood.

He was asked if there were chemicals that could serve as blockers to negate or reduce the effect of the chemicals used in this case. He did indicate that there were potential blockers, but they would only serve to slow the process. He also indicated that the amount of saline injected would not in any way dilute or lessen the effect of the midazolam and hydromorphone. He stated that the saline was used to prevent clotting and to keep the IV line open and flowing.

The IV team leader reported that the chemicals in this case sedate and suppress respiration, and the dosage given initially should normally have been sufficient to cause death in a short period of time. He added that everyone reacts differently to chemical agents and drugs, and in this case the midazolam was effective, but for an unknown reason did not cause death until additional dosages were given over the time period specified.

He indicated that in his opinion Wood was not suffering during this process and was sedated fully at all times.

MEDICAL EXAMINER

The autopsy report was prepared and issued by Gregory Hess, MD, Medical Examiner of Pima County, Arizona. The Medical Examiner of Pima County completes autopsies for deaths occurring in Pinal County, Arizona, consistent with a contractual agreement between the two counties. ASPC-Florence is located in Pinal County.

The final autopsy report, which is dated August 22, 2014, states that the "…..cause of death is ascribed to mixed drug intoxication due to judicial execution by lethal injection".[1] Dr. Hess was interviewed by the project team relative to the results of the autopsy and his opinions and observations that stem from this autopsy.

The observations of Dr. Hess as stated to the project team are as follows:

---

[1] Autopsy Report, Joseph Rudolph Wood III, Pinal County, Arizona, Case #2014-020218.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

- There was nothing unusual about this particular case in comparison with other autopsies he has completed on execution cases of the ADOC.
- He observed that the catheters/IV had been properly placed and did not appear obstructed.
- The toxicology report confirmed the presence of high levels of midazolam and hydromorphone.
- Dr. Hess provided no explanation of why the drugs did not result in death in a short time period. He noted that everyone's physical makeup results in a variety of responses to the introduction of drugs.
- He noted that the ADOC does not monitor brain activity, and it is possible that brain death occurred much sooner than the actual pronouncement of death.
- He noted that gasps, snorting, and body reflexes are the normal bodily responses to dying, even in someone highly sedated.

It is clear that the execution of Wood and the resulting time delays cannot be correlated to the issues that occurred with the execution on April 29, 2014 of Clayton Lockett in Oklahoma.  In the case of Lockett, the Oklahoma Department of Corrections has acknowledged that the catheters and IV had not been properly placed thus restricting the flow of the drugs.  Nothing similar to that occurred in the Wood execution. The process and the implementation of the protocol was not "botched" as has been described in the Lockett execution.

### INDEPENDENT MEDICAL EXPERT

The project team also reviewed the Wood execution and the range of available drug options with a physician who is an independent correctional health expert and is familiar with the issues involved in the administration of drugs during lethal injections.  This physician is a board-certified Diplomate of the American Board of Internal Medicine and Diplomate of the American Board of Quality Assurance and Utilization Review Physicians.

The drug protocol used by the ADOC was outlined to him, and he could not offer an explanation as to why the initial administration of drugs was not sufficient to complete the execution. He stated that the amount administered far exceeded what is the normal clinical dosage (1 to 2 mg of midazolam and 1 mg of hydromorphone).  Given the dosage administered to Wood, he would expect the elapsed time to be less than that experienced in Ohio in the McGuire execution. He also opined that the amount of the initial dosage to Wood would result in heavy sedation.

He was familiar with the Ohio case involving the execution of Dennis McGuire on January 16, 2014, and the discussion about the use of the two-drug protocol involving midazolam and hydromorphone.  As he stated, Ohio faced the same situation that many states have faced recently due to the lack of availability of the preferred drug, pentobarbital.  He concurred with the decision of the Arizona Department of Corrections to increase the midazolam and hydromorphone dosages in the aftermath of the McGuire execution.

In reviewing the options that other states are utilizing given the lack of availability of pentobarbital, he concurred that the three-drug option of midazolam, rocuronium or vecuronium bromide, and potassium



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

chloride would be appropriate. He added, however, that large doses of hydromorphone, which causes apnea (cessation of breathing), combined with high doses of midazolam, which results in sedation, should be an effective option.



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

## FINDINGS AND RECOMMENDATIONS

1. The review of the ADOC Execution Protocols indicates that the provisions of the policy are detailed, specific in terms of responsibilities, comprehensive in scope, and provide guidance and direction for all elements of the execution process.

2. A comparison to other protocols and policies within other state systems indicates that the ADOC Execution Protocols meets or exceeds the standards established by other states in terms of scope of coverage of responsibilities and specificity of tasks and assigned duties.

3. Interviews with key participants of the Wood execution indicate that the staff's working knowledge of the provisions of the protocols, individual duties and responsibilities, and contingencies if required was excellent.  Staff was found to be knowledgeable, experienced, and well-trained.

4. A review of training records indicates that staff assigned to execution teams are well-trained and proficient in the requirements of the protocols and all contingency plans in the event that an unexpected event occurs during the execution.

5. A review of the implementation of the execution protocols in the Wood case found no breakdowns in the implementation of the process or the mechanical systems supporting the execution.  Staff performed all required functions consistent with the requirements of the protocol.  Staff performance in no way contributed to the extended time lapse from initiation of the drug protocol to pronouncement of death.  As noted the execution was not 'botched" in comparison to what occurred in Oklahoma with Clayton Lockett.

6. There was no contingency or practiced scenario for the events that occurred with the Wood execution.  The review of other state protocols found no contingency action in any of the reviewed protocols for the event that occurred with the Wood execution.  The ADOC should review the event with the IV team leader and toxicologists and develop contingencies if a similar delay occurs in the future.

7. Discussion with other state administrators and leadership indicate that many states are facing the same challenge as Arizona in terms of access to the preferred chemicals.  Only two states claimed access to pentobarbital at this time.  All others have developed options, some identical to the two-drug protocol used in the Wood execution.  Others have moved to a three-drug protocol consisting of 500 mg midazolam hydrochloride, 600 mg rocuronium or 100 mg vecuronium bromide, and 240 milliequivalents potassium chloride.

8. The medical examiner in this case offered no apparent explanation for the time lapse that occurred in the Wood execution.  The IV team leader, medical examiner, and an independent correctional health expert agreed that the dosage administered was sufficient to cause death in a relatively short period of time.  All agreed that the dosage of midazolam would result in heavy sedation.

9. The Arizona two-drug protocol was consistent with the protocol used in the execution of Dennis McGuire in Ohio and was, in fact, an increased amount compared to the drugs used in that particular execution. The testimony of the medical experts in the Ohio case was consistent with



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

the opinions of the IV team leader and the medical examiner in terms of anticipated effect.  It is noted that the time lapse in the Ohio case was less than the time lapse in two executions in Arizona that utilized the preferred drug, pentobarbital (6/27/2012, 29 minutes and 8/8/12, 37 minutes).  This is an indication of the validity of the statements of medical personnel that the manner that each individual system responds and reacts to the introduction of drugs into their system fluctuates and is sometimes unpredictable.

10. Both the IV team leader and the medical examiner indicated that the catheter and the IV delivery system were in the correct position and that the drugs were administered to Wood consistent with the protocol.

11. It is recommended that the ADOC retain the one-drug option currently included in the protocol. These are as follows:

    One-drug protocol with pentobarbital
        Syringe 1A        60 ml. heparin/saline
        Syringe 2A        2.5 gm pentobarbital
        Syringe 3A        2.5 gm pentobarbital
        Syringe 4A        60 ml. heparin/saline

    One-drug protocol with sodium pentothal
        Syringe 1A        60 ml heparin/saline
        Syringe 2A        1.25 gm sodium pentothal
        Syringe 3A        1.25 gm sodium pentothal
        Syringe 4A        1.25 gm sodium pentothal
        Syringe 5A        1.25 gm sodium pentothal
        Syringe 6A        60 ml heparin/saline

    Each of these options provides a record of being effective and efficient in multiple jurisdictions over a long period of time and should be available as an option if the drugs become available to the ADOC in the future.

12. It is recommended that the ADOC replace the existing two-drug option with a drug protocol consisting of the following:

    a. 500 mg midazolam hydrochloride
    b. 600 mg rocuronium or 100 mg vecuronium bromide
    c. 240 milliequivalents potassium chloride

13. The above protocol has been adopted by at least four other systems in the past year and is considered reliable and effective by these systems. Florida successfully utilized this drug protocol for eight executions in 2014 as of the submission of this report[2]. If access to these drugs becomes problematic, the ADOC should consider using the same mixture as utilized in the

---

[2] Death Penalty Information Center;  Execution List 2014.  (www.deathpenaltyinfo.org.)



Arizona Department of Corrections Execution Protocols
Assessment and Review
December 15, 2014

Wood case but at higher dosages—250 midazolam and 250 mg of hydromorphone.  Other state systems have adopted this enhanced dosage as a contingency in the event that preferred drugs are not accessible.



2485 Natomas Park Drive
Suite 300
Sacramento, CA 95833
T: (916) 678-7890
F: (916) 678-7897
CGLcompanies.com