# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD GLOSSIP, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. CIV-14-665-F |
| | ) | |
| vs. | ) | |
| | ) | |
| RANDY CHANDLER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION OF PLAINTIFFS (OTHER THAN WADE LAY) TO DEFENDANTS' SUMMARY JUDGMENT MOTION

Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022

Michael W. Lieberman, OBA  #32694
Emma V. Rolls, OBA # 18820
Office of the Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102

Jon M. Sands
Federal Public Defender District of Arizona
Dale A. Baich (OH Bar No. 0025070)
Jennifer M. Moreno (Bar No. CA 244967)
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

COUNSEL FOR PLAINTIFFS
OTHER THAN WADE LAY

Alex Kursman
Lynne Leonard
Shawn Nolan
Asst. Federal Defenders Capital Habeas Unit
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
Philadelphia, PA 19106

COUNSEL FOR PHILLIP HANCOCK

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT..........................................................................................3

   A.    Applicable Standard...............................................................3

   B.    There Are Disputed Material Facts Relating To Plaintiffs' Eighth
       Amendment Claim...............................................................4

       1.    There Is A Disputed Question Of Fact Whether
            Administration Of The Execution Drugs To A Sensate
            Prisoner Causes Constitutionally Intolerable Pain. .....................5

            a)    Midazolam Causes Constitutionally Intolerable
                 Pain. ........................................................................5

            b)    Vecuronium Bromide And Potassium Chloride
                 Cause Constitutionally Intolerable Pain. .........................9

       2.    There Is A Disputed Question Of Fact Whether
            Midazolam Renders A Prisoner Insensate To Pain....................11

            a)    Plaintiffs' Experts Are Unequivocal That
                 Midazolam Will Not Render Prisoners Insensate
                 To Significant Pain.......................................................13

            b)    Defendants' Attempts To Avoid An Issue Of Fact
                 All Fail. .....................................................................14

       3.    There Is A Genuine Question of Fact Whether The
            Execution Protocol Contains Sufficient Safeguards Against
            A Sensate Individual Receiving The Execution Drugs...............20

       4.    Whether There Is An Available Alternative To The Current
            Execution Method Is Disputed...............................................26

            a)    Defendants' "Gotcha" Argument Fails. .........................27

            b)    Firing Squad...............................................................27

            c)    Removal Of The Paralytic And The Addition Of
                 Fentanyl. ...................................................................30

            d)    Barbiturate Plus Opioid................................................31

C.      There Are Disputed Facts Material To Plaintiffs' *Ex Post Facto* and
        Due Process Claims. ........................................................................35

D.      There Are Disputed Material Facts Concerning Plaintiffs' Human
        Experimentation Claim. ....................................................................38

E.      There Are Disputed Material Facts Concerning Plaintiffs'
        Deprivation Of Access To Counsel And The Courts Claim. ...............40

F.      There Are Disputed Material Facts Concerning Plaintiffs' Access
        To Government Information Claim. ....................................................44

CONCLUSION ...................................................................................................45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alberty v. State*,
    140 P. 1025 (Okla. Crim. App. 1914)................................................................38

*Arabalo v. City of Denver*,
    625 F. App'x 851 (10th Cir. 2015) ..........................................................3, 4, 10

*Arthur v. Dunn*,
    137 S. Ct. 725 (2017).........................................................................................29

*Baze v. Rees*,
    553 U.S. 35 (2008)....................................................................................*passim*

*Blocker v. ConocoPhillips Co.*,
    378 F. Supp. 3d 1066, 1068 (W.D. Okla. 2019) ..................................................4

*Bucklew v. Precythe*,
    587 U.S. --, 139 S. Ct. 1112 (2019).........................................................*passim*

*DeMallory v. Cullen*,
    855 F.2d 442 (7th Cir. 1988) .............................................................................40

*Doe v. Univ. of Denver*,
    952 F.3d 1182 (10th Cir. 2020) .........................................................................40

*Matter of Fed. Bureau of Prisons' Execution Protocol Cases*,
    No. 05-CV-2337, 2021 WL 127602 (D.D.C. Jan. 13. 2021)..............................37

*Fiber Optic Designs, Inc. v. New Eng. Pottery, LLC*,
    262 F.R.D. 586 (D. Colo. 2009) .......................................................................13

*First Amendment Coal. of Arizona, Inc. v. Ryan*,
    938 F.3d 1069 (9th Cir. 2019) ...........................................................................45

*Frederick v. Swift Transp. Co.*,
    591 F. Supp. 2d 1149 (D. Kan. 2008),
    *aff'd*, 616 F.3d 1074 (10th Cir. 2010)................................................................13

*Garner v. Jones*,
    529 U.S. 244 (2000)..................................................................35, 37

*Glossip v. Gross*,
    576 U.S. 863, 877 S. Ct. 2726 (2015)...........................................5, 29

*Greene v. Impson*,
    530 F. App'x 777 (10th Cir. 2013) ..................................................40

*Harbison v. Bell*,
    556 U.S. 180 (2009)..........................................................................40

*Henderson v. Scott*,
    260 F.3d 1213 (10th Cir. 2001) .................................................35, 37

*Hicks v. Oklahoma*,
    447 U.S. 343 (1980)..........................................................................38

*Lewis v. Casey*,
    518 U.S. 343 (1996)..........................................................................40

*Malloy v. South Carolina*,
    237 U.S. 180 (1915)..........................................................................37

*Mann v. Reynolds*,
    46 F.3d 1055 (10th Cir. 1995) .........................................................41

*Northglenn Gunther Toody's LLC v. HQ8-10410-10450 Melody Lane,*
    *LLC*, No. 16-cv-2427-WJM-KLM, 2018 U.S. Dist. LEXIS 62171
    (D. Colo. Apr. 12, 2018)....................................................................40

*In re Ohio Execution Protocol*,
    860 F.3d 881 (6th Cir. 2017) .....................................................27, 30

*In re Ohio Execution Protocol Litig.*,
    No. 2:11-CV-1016, 2018 WL 6529145 (S.D. Ohio Dec. 12, 2018) ...........40, 42

*One Chi. Coin's Play Boy Marble Bd., No. 19771 v. State ex rel.*
    *Adams*, 212 P.2d 129 (Okla. 1949)..................................................38

*OraLabs, Inc. v. The Kind Grp., LLC*,
    No. 13-cv-00170-PAB-KLM, 2015 U.S. Dist. LEXIS 98246
    (D. Colo. Jul. 28, 2015) ....................................................................13

*Ross v. Oklahoma*,
    487 U.S. 81 (1988)............................................................................38

*Seabourn v. Indep. Sch. Dist. No. I-300*,
    775 F. Supp. 2d 1306 (W.D. Okla. 2010) ...........................................3

*United States v. Wade*,
    388 U.S. 218 (1967)..........................................................................40

*Vitek v. Jones*,
    445 U.S. 480 (1980)..........................................................................38

*Ward v. Anderson*,
    494 F.3d 929 (10th Cir. 2007) ..........................................................40

*Wellson v. Comm'r Ga. Dep't of Corr.*,
    754 F.3d 1260 (11th Cir. 2014) .........................................................45

*Wolff v. McDonnell*,
    418 U.S. 539 (1974)..........................................................................40

*Zink v. Lombardi*,
    783 F.3d 1089 (8th Cir. 2015) ...........................................................42

## U.S. & Okla. State Constitutions

U.S. Const. art. I, § 10 ...........................................................................35, 37

U.S. Const. amend. VIII ......................................................................*passim*

U.S. Const. amend. XIV ...........................................................38, 40, 44

U.S. Const. Due Process Clause ..............................................................38

Okla. Const. Art. V, § 54 .....................................................................37, 38

## Codes, Statutes & Rules

22 Okla. Stat. Ann. § 1014(A) (1977).....................................................35

18 U.S.C. ¶ 3599.....................................................................................43

45 C.F.R. Part 46 ....................................................................................39

Fed. R. Civ. P. 56......................................................................................2

Fed. R. Civ. P. 56(a) ...............................................................................3

Okla. Admin. Code 310:2-31-1 (2020)....................................................39

Okla. Stat. tit. 22 § 1014(A) (2011) ........................................................35

U.S. Code Title 18 Section 3599 ..............................................................40

## Other Authorities

Austin Sarat, *Gruesome Spectacles: Botched Executions and
America's Death Penalty* (2014) .......................................................29

"Execution of Inmates Sentenced to Death" (the "Execution
Protocol")...................................................................................*passim*

R. Miller, *Miller's Anesthesia*, 6th ed. 2005 ..........................................36

Plaintiffs, other than Wade Lay who is a *pro se* party in this action (hereafter "Plaintiffs"), submit this memorandum in opposition to Defendants' motion for summary judgment (the "Motion" or "Mot.").

## INTRODUCTION

The stated purpose of the February 20, 2020 protocol for "Execution of Inmates Sentenced to Death" (the "Execution Protocol") is to ensure that executions are "carried out in keeping with statute, case law and professional practices," and that the ODOC "[f]aithfully adheres to the constitutional mandates against cruel and unusual punishment" and "[p]rovides contingency planning to identify and address unforeseen problems."  Doc. No. 388-1 (Execution Protocol) at Section II.  As Plaintiffs will demonstrate at trial, the Execution Protocol does not satisfy that mandate.  Indeed, the Execution Protocol itself is non-binding, and the putative "safeguards" it contains are merely illusory as they are subject to change at any time at the unfettered discretion of the Director of the Oklahoma Department of Corrections ("ODOC").

Even putting that aside, there simply is no way to adjudicate each of Plaintiffs' causes of action without seeing the parties' witnesses and gauging their credibility and qualifications. Plaintiffs have submitted medical and scientific evidence from experts from a variety of backgrounds and disciplines, including anesthesiology, pharmacology, corrections, medical ethics, and emergency care, each of whom is prepared to explain in detail for the Court the profound deficiencies in the Execution Protocol.  Those experts, reinforced by the testimony of Defendants' own experts and fact witnesses, demonstrate, at a minimum, that the following genuinely disputed material facts require a trial:

- administration of each of the three execution drugs to a sensate individual would independently cause excruciating and unconstitutional pain and suffering, including feelings of suffocation, asphyxiation, drowning or burning alive;

- midazolam, the first drug in Oklahoma's execution protocol, cannot render a prisoner insensate to the excruciating pain and suffering caused by all three drugs in the Execution Protocol;

- the so-called "safeguards" in the Execution Protocol relied on by the State to guard against a sensate individual experiencing such excruciating pain and suffering are illusory and, in any event, scientifically and medically insufficient to ensure that a prisoner is not experiencing that suffering;

- there are feasible, readily implemented alternatives that would significantly reduce the substantial risk of severe pain and suffering associated with the current Execution Protocol; and

- the current midazolam Execution Protocol increases the punishment to Plaintiffs as compared to the punishment at the time each Plaintiff purportedly committed the crime that serves as the basis for their death sentence because execution by an ultrashort-acting barbiturate would involve significantly less pain and suffering.

Those facts, if proven, will demonstrate that the Execution Protocol violates the Eighth Amendment and the *ex post facto* clause of the Constitution, and disputed material facts abound for Plaintiffs' other claims as well.

Defendants, however, want to knock Plaintiffs out of the box before a single witness is sworn or a single document is introduced into evidence. At bottom, Defendants are merely arguing that their version of the facts is correct and Plaintiffs' version of the facts is incorrect. Accepting Defendants' self-serving narrative would contravene the very text and purpose of Federal Rule of Civil Procedure 56. Not only is the Court obligated to consider the facts in the light most favorable to the Plaintiffs, it must also recognize that, in any event, the parties' diametrically opposed positions plainly demonstrate the existence of "genuine

disputes" as to "material facts."  As such, the Defendants are *not* entitled to judgment as a matter of law, and Plaintiffs respectfully request that the Motion be denied in its entirety.

## ARGUMENT

### A.    Applicable Standard.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if it is essential to the proper disposition of the claim." *Seabourn v. Indep. Sch. Dist. No. I-300*, 775 F. Supp. 2d 1306, 1310-11 (W.D. Okla. 2010).  "In seeking summary judgment, the moving party must initiate the process by averring an absence of evidence to support the nonmoving party's case." *Arabalo v. City of Denver*, 625 F. App'x 851, 861 (10th Cir. 2015).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Id.* (internal quotations and citations omitted).  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything….  If the movant carries this initial burden, the nonmovant . . . must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  *Id.* (internal quotations and citations omitted).

"The burden is not an onerous one for the nonmoving party in each case…." *Seabourn*, 775 F. Supp. 2d at 1311.  "All facts and reasonable inferences therefrom are construed in the light most favorable to the nonmoving party."  *Id.*  "Before summary

judgment will be granted it must be clear what the truth is and any doubt as to the existence of a genuine issue of material fact will be resolved against the movant." *Arabalo*, 625 F. App'x at 861 (internal quotations and citations omitted).  In other words, the Court must "determine whether the evidence … is so one-sided that one party must prevail as a matter of law." *Blocker v. ConocoPhillips Co.*, 378 F. Supp. 3d 1066, 1068 (W.D. Okla. 2019) (internal quotations and citations omitted).

As explained below, Defendants' motion is built upon what it characterizes as a "Statement of Undisputed Facts."  Defendants' purported "facts," however, are distorted and one-sided, designed to create an illusion of the lack of any disputed material facts. Construing the facts and all reasonable inferences therefrom in the light most favorable to Plaintiffs, Defendants' ploy must fail.  Based on any objective view, it is clear that there are material facts in dispute on each of the counts on which Defendants seek summary judgment, and that Defendants have not carried their heavy burden of establishing that "the evidence … is so one-sided that one party must prevail as a matter of law." *Id.* (internal quotations and citations omitted).

**B.    There Are Disputed Material Facts Relating To Plaintiffs' Eighth Amendment Claim.**

Plaintiffs contend that Oklahoma's three-drug execution protocol – 500 mg midazolam followed by 100 mg vecuronium bromide followed by 240 mEq potassium chloride – violates the Eighth Amendment.  To succeed on that claim, Plaintiffs must show that the protocol is "sure or very likely to cause serious illness and needless suffering," and "identify an alternative that is feasible, readily implemented, and in fact significantly reduces

a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (internal quotations and citations omitted).

Answering that question requires fact-finding on the following four independent issues: (1) is the pain associated with the administration of midazolam, vecuronium bromide, or potassium chloride to a sensate prisoner constitutionally tolerable; (2) if not, will midazolam render a prisoner insensate to the constitutionally intolerable pain of the execution drugs; (3) does the Execution Protocol contain sufficient safeguards to guard against a sensate prisoner experiencing constitutionally intolerable pain; and (4) if not, is there a "feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain that the State has refused to adopt without a legitimate penological reason" (*Bucklew v. Precythe*, 587 U.S. --, 139 S. Ct. 1112, 1125 (2019)).

> **1.     There Is A Disputed Question Of Fact Whether Administration Of The Execution Drugs To A Sensate Prisoner Causes Constitutionally Intolerable Pain.**

Contrary to Defendants' assertion, the facts as to whether injection of each of the execution drugs will cause unconstitutional levels of pain are very much disputed.

> **a)     Midazolam Causes Constitutionally Intolerable Pain.**

Plaintiffs' pathology expert, Dr. Mark Edgar, a Senior Associate Consultant and Associate Professor of Pathology at Mayo Clinic, will explain at trial that the rapid intravenous injection of a massive dose of highly-acidic, injectable midazolam solution will almost immediately destroy the delicate tissue of the prisoner's lungs, causing the prisoner's lungs to fill with blood and other fluids.  Known as sudden and acute pulmonary edema, this

medical phenomenon results in severe pain and panic.  *See* Doc. No. 388-16 (Expert Report of Mark A. Edgar, M.D.) at ¶13.  Specifically, "acute pulmonary edema causes intolerable sensations of asphyxiation and causes significant suffering as the person struggles to breathe without being able to inflate the lungs due to abnormal fluid accumulation."  *Id.* at ¶61.  According to Dr. Edgar, "unless rendered insensate by a drug that either deeply depresses brain function or otherwise prevents perception of pain and suffering, inmates subjected to a 500 mg intravenous injection of midazolam will experience severe respiratory distress with associated sensations of drowning and asphyxiation."  *Id.* at ¶62.  In short, if administered to a sensate prisoner, the pain from midazolam would be constitutionally intolerable.  *Baze v. Rees*, 553 U.S. 35, 53 (2008) ("substantial, constitutionally unacceptable risk of suffocation from the administration of [the paralytic]").

Defendants' attempts to avoid the significance of this testimony are unavailing.

First, Defendants falsely assert that "Plaintiffs produce no proof that pulmonary edema developed before death rather than post-mortem…."  Mot. at 27.  Dr. Edgar's report clearly explains that the pulmonary edema arose before death "*immediately following administration of the midazolam*" and that his opinion is confirmed by the "presence of froth in the airways."  Doc. No. 388-16 (Edgar Report) at ¶¶19, 20 (emphasis added).  As he explains, "respiration is necessary for the production of foam and froth in the lungs and airways," and that "will not occur after the onset of the paralytic."  *Id.* at ¶20.  In other words, the pulmonary edema could only have occurred while the individual was still breathing and thus still alive.  And, as discussed below, Plaintiffs' other experts have opined

that midazolam does not render a prisoner insensate, meaning that there is at least a genuine issue of material fact concerning whether a prisoner will experience pulmonary edema.

Second, Defendants' assertion that Plaintiffs have not produced any "medical literature on the quantum of pain" a person would experience if undergoing pulmonary edema (Mot. at 29) is at best misleading.  Dr. Michael Weinberger, another of Plaintiffs' experts, has explained that pulmonary edema causes "severe suffering" due to the "sensations of air hunger, drowning and/or suffocation."  Doc. No. 388-5 (Expert Opinion of Dr. Michael L. Weinberger) at ¶26.  Dr. Edgar characterizes the pain of pulmonary edema as "intolerable sensations of asphyxiation" and "drowning."  Doc No. 388-16 (Edgar Report) at ¶¶61, 62, 13.

Third, Defendants' assertion that Plaintiffs have produced no evidence that pulmonary edema would result in more pain than "traditional constitutional methods of execution like hanging" is a false construct.  First, Plaintiffs are not suggesting hanging as an alternative.  Second, Defendants have not provided any evidence that execution by hanging is less painful than flash pulmonary edema.  To the contrary, midazolam will cause severe pulmonary edema, and a person experiencing severe pulmonary edema will suffocate to death.  Doc. No. 388-16 (Edgar Report) at ¶¶61-62.  Flash pulmonary edema thus would be equivalent to a botched hanging where an individual is starved for air for minutes on end while sensate to the pain and terror of gasping for air.  The Supreme Court has made clear that death by suffocation is constitutionally intolerable.  *See Baze*, 553 U.S. at 53 ("substantial, constitutionally unacceptable risk of suffocation from the administration of [the paralytic]").

Whether or not other methods of execution are more or less unacceptable does not change the fact that death by consciousness of suffocation is constitutionally intolerable.

Fourth, Defendants' reliance on the fact that Dr. Edgar testified that "the edema found in midazolam executions could have causes other than midazolam's acidity" (Mot. at 14, ¶70) is unavailing. Defendants ignore Dr. Edgar's testimony that, based on all available data, the edema occurs during the administration of the midazolam and the cause of the edema is the toxic effect of midazolam's acidity when injected into the bloodstream. Ex. 1 (Edgar Dep. Tr.) at 87:13-14. Indeed, Dr. Edgar debunked Defendants' comparison of the acidity level in midazolam and apple juice. Mot. at 14, ¶71. As Dr. Edgar explained, "keep in mind it's not just the pH of the solution. It's the amount that's being put in," as well as "the amount of speed or administration." Ex. 1 (Edgar Dep. Tr.) at 88:2-3 & 88:7-8. In any event, Defendants are not injecting prisoners with apple juice, and the fact that apple juice may be ingested safely does not mean that an injection of apple juice at the same rate and in the same amount as midazolam required by the Execution Protocol would not be toxic.

Fifth, Defendants note that Dr. Edgar testified that "autopsy indications of severe pulmonary edema are foam or froth in the airways." Mot. at 14, ¶81. However, Defendants again ignore the complete facts, including that the lack of foam or froth does not necessarily mean the pulmonary edema was not severe: "It could still be severe without froth in the airways if, for some reason, there was difficulty breathing, because that difficulty breathing might prevent the agitation of air and water that's necessary to cause" foam and froth in the lungs. Ex. 1 (Edgar Dep. Tr.) at 49:5-9.

8

Finally, Defendants criticize Plaintiffs' experts for relying on studies of rats that prove IV injection of acidic chemicals causes diffuse lung injury.  Mot. at 14, ¶74.  As Dr. Edgar will explain at trial, the rat studies were "looking at diffuse lung injury, and that's always accompanied by pulmonary edema at some level."  Ex. 1 (Edgar Dep. Tr.) at 96:3-4.  There was no need to look specifically for pulmonary edema because its presence would have been assumed when the injection of acid resulted in lung injury.  These studies are relevant because they demonstrate that the IV injection of acids, like midazolam, cause "diffuse lung injury, and it's a diffuse chemical injury, and that's something that is going to be accompanied by pulmonary edema."  *Id.* at 96:21-25.

In sum, Defendants' attempts to discredit or discount Plaintiffs' experts fail.  Even giving them any credence, they at best demonstrate beyond any legitimate doubt that there are genuine disputes of material fact as to whether midazolam administered to a sensate individual causes constitutionally intolerable pain.

> **b)    Vecuronium Bromide And Potassium Chloride Cause Constitutionally Intolerable Pain.**

Defendants assert that Plaintiffs "have failed to prove" that the injection of vecuronium bromide and potassium chloride after injection of midazolam will cause unconstitutional pain, going so far to say that "even in fully awake patients, potassium would cause only pain at the injection site" (Mot. at 31), and that "while muscle relaxants may cause sensations of suffocation, they do not cause physical pain" (*id.* at 18, ¶98).  As an initial matter, there has not yet been an opportunity to "prove" anything.  At this stage, Defendants must produce evidence "negating an essential element" of Plaintiffs' claim or

show that Plaintiffs have insufficient "evidence to carry [their] burden of persuasion at trial."
*Arabalo*, 625 F. App'x at 861.

In any event, Plaintiffs have proffered expert testimony that administration of the paralytic and/or potassium chloride to a sensate individual will cause constitutionally intolerable pain.  For example, according to Dr. Weinberger, "[p]atients who have suffered intraoperative awareness while paralyzed including as a result of vecuronium, without being adequately sedated or anesthetized describe feelings of pain, extreme fear and panic, distress, [and] sensations of suffocation."  Doc. No. 388-5 (Weinberger Report) at ¶126.  These feelings are compounded by an "inability to signal to providers with gestures or facial expressions that they are aware and suffering."  *Id.*  Accordingly, "such patients are commonly described as experiencing 'outward calm and inner terror'; the outward appearance of the patient is serene because the paralysis, such as that produced by vecuronium and other paralytic agents, does not permit movement or changes of expression that otherwise clue an observer that the patient is in extreme terror and discomfort, even though beneath the serene exterior, the patient is fully aware and in agony."  *Id.*  Defendants' expert, Dr. Antognini, also acknowledged that sensate patients given vecuronium bromide per the Execution Protocol will experience air hunger and suffocation, and will not become unconscious from hypoxia and die until several minutes later.  Ex. 2 (Antognini Dep. Tr.) at 251:21-253:13.

Similarly, Dr. Weinberger opined that "injection of concentrations of potassium chloride of more than 80-100 mEq/L (milliequivalents per liter) are known to cause severe pain," and "[t]his pain does not stop after injection, because the injury to the lining of the

blood vessels continues." Doc. No. 388-5 (Weinberger Report) at ¶134. Defendants' expert (Dr. Antognini) admits that patients receiving potassium chloride at clinical doses, *i.e.*, doses ten times less than provided by the Execution Protocol, report "significant pain." Ex. 2 (Antognini Dep. Tr.) at 83:3-11, 89:13-90:10 & 258:13-259:19. According to Dr. Antognini, it may take 10 seconds for potassium chloride to cause a heart attack, and it is "possible" the prisoner is exposed to 10 seconds of severe pain as a result. *Id.* at 262:20-263:10. Finally, Dr. Antognini admits that any suggestion there is a ceiling on pain caused by increasing potassium chloride is mere speculation with no basis in data/studies. *Id.* at 260:11-261:12.

The Supreme Court has recognized that a paralytic (pancuronium bromide) and potassium chloride would be severely painful if injected into someone who has not been adequately anesthetized. *See*, *e.g.*, *Baze*, 553 U.S. at 53 ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). (For execution purposes, pancuronium bromide and vecuronium bromide are functionally equivalent. They are both paralytics and serve the same function at the doses used in executions.)

In sum, there is at best a genuine dispute of material fact as to whether vecuronium bromide and potassium chloride administered to a sensate individual causes constitutionally intolerable pain.

### 2.    There Is A Disputed Question Of Fact Whether Midazolam Renders A Prisoner Insensate To Pain.

According to Defendants, the "undisputed evidence" demonstrates that a 500 mg dose of midazolam "can meet" the requirements of "general anesthesia," and that "Plaintiffs'

experts cannot manufacture a genuine dispute of material facts ... by opining that ... midazolam cannot 'reliably' induce general anesthesia." Mot. at 24. Specifically, Defendants contend that "[b]ecause all that Plaintiffs can produce at summary judgment is a 'scientific controvers[y]' between credible experts battling between 'marginally safer alternative[s],' Plaintiffs cannot make out an Eighth Amendment case." Mot. at 25.[1] Defendants are wrong on all counts.

First, the "scientific controversy" at issue is absolutely not between "marginally safer alternatives." As explained below, Plaintiffs' experts have explained why midazolam is not safe to use as the first drug in the State's three-drug protocol – it will ***not*** render a prisoner insensate to the pain and suffering caused by the execution drugs. Defendants' experts dispute that, but that is exactly why a trial on the issue is required. In other words, to the extent there is any "scientific controversy" here, it is between Plaintiffs' proffered alternatives – for example, using a barbiturate like pentobarbital as the first drug in the

---

[1] Defendants' argument presumes without any judicial determination that its experts are "credible." Plaintiffs will debunk that myth at trial. For example, Defendants' expert, Dr. Buffington, was precluded from testifying in another matter because his opinion was "entirely without any intellectual rigor or indicia of reliability." Ex. 3 (Buffington Dep. Tr.) at 109 (discussing *Priest v. Sandoz, Inc.*, 2017 WL 7172504 (W.D. Tex. Dec. 28, 2017)). According to the court, Dr. Buffington's "opinion rests on its own ipse dixit." *Id.* at 112. The same is true here. Dr. Buffington also inflates or misstates his credentials. He claims to be a pharmacologist even though his degree is in pharmacy (Ex. 3 (Buffington Dep. Tr.) at 35-39), and claims to be an expert in pharmacology and toxicology (*id.* at 148-49), anesthetic depth (*id.* at 215), levels of sedation (*id.* at 245), and pain (*id.* at 259). Dr. Buffington claims that he is paid by, and is still a clinical preceptor at, Shenandoah University. *Id.* at 81. However, Shenandoah University says "that Mr. Buffington is not now and has never been an employee of the University." Ex. 4; *see also* Ex. 3 (Buffington Dep. Tr.) at 85. He claimed to be an affiliate faculty member at Idaho State from 2004-present. *Id.* at 85. However, Idaho State's general counsel says he is no longer an active affiliate faculty at the university. *Id.* at 86. The list goes on, but the point is that the court has not yet, but will need to make credibility determinations after hearing the experts' testimony.

protocol that would be safe (but which Defendants refuse to utilize) – and the existing execution method – using midazolam, which is very much "unsafe."

Second, Defendants' contention that a "scientific controversy" cannot create a genuine dispute of material fact is wrong and ignores clear case law on the issue. Competing expert opinions on issues central to the parties' disputes, as is indisputably the case here, is a textbook reason to deny summary judgment. *See, e.g. OraLabs, Inc. v. The Kind Grp., LLC*, No. 13-cv-00170-PAB-KLM, 2015 U.S. Dist. LEXIS 98246, at *16 (D. Colo. Jul. 28, 2015) ("Competing expert opinions present the classic battle of the experts and it is up to a jury to evaluate what weight and credibility each expert opinion deserves.") (internal quotations, alteration, and citation omitted); *Fiber Optic Designs, Inc. v. New Eng. Pottery, LLC*, 262 F.R.D. 586, 596 (D. Colo. 2009); *Frederick v. Swift Transp. Co.*, 591 F. Supp. 2d 1149, 1155 (D. Kan. 2008), *aff'd*, 616 F.3d 1074 (10th Cir. 2010).

Third, and perhaps most importantly, Defendants position is premised on a self-serving, and incorrect assertion, presented as unvarnished, undisputed scientific fact, that a prisoner injected with 500 mg of midazolam will be insensate to any pain associated with the administration of the execution drugs. To the contrary, that issue is hotly contested.

### a) Plaintiffs' Experts Are Unequivocal That Midazolam Will Not Render Prisoners Insensate To Significant Pain.

Plaintiffs' anesthesiology expert, Dr. Michael Weinberger, is the Medical Director of the Pain Management Center, Associate Professor of Anesthesiology at Columbia University Medical Center, and Section Chief, Pain Medicine at Columbia University Department of Anesthesiology. Dr. Weinberger's expert opinion is that "[m]idazolam alone is…*incapable* of rendering a subject insensate to pain, and may, in some circumstances, actually enhance

pain." Doc. No. 388-5 (Weinberger Report) at ¶98 (emphasis added). Accordingly, "midazolam will be *ineffective* for mitigating any painful stimuli, including the pain and suffering caused by the third drug in Oklahoma's three-drug lethal injection protocol." *Id.* at ¶99 (emphasis added). Stated differently, "[m]idazolam is therefore not sufficient alone to maintain a patient in an insensate and anesthetic state in the presence of painful or noxious stimuli, such as the pain and suffering caused by the second and third drugs in Oklahoma's three-drug execution protocol." *Id.* at ¶111.

Another of Plaintiffs' experts, Dr. Craig Stevens, Professor of Pharmacology at the College of Osteopathic Medicine, a unit of the Oklahoma State University in Tulsa, Oklahoma, was equally unequivocal: "Midazolam, a benzodiazepine, is a *scientifically-unfounded choice* for the first drug in a three-drug lethal Execution Protocol, because it cannot reliably render the prisoner insensate to the terror of chemical suffocation from the second drug (vecuronium bromide) or the pain of being burned alive from the inside from the third drug (potassium chloride)." Doc. No. 388-4 (Expert Declaration of Craig W. Stevens, Ph.D.) at ¶93 (emphasis added). It is Dr. Stevens' "opinion to a reasonable degree of medical certainty that 500 mg of midazolam is unlikely to maintain the prisoner in a state of general anesthesia, and there is a *substantial and almost certain risk* that Midazolam will leave the prisoner sensate to the second and third drugs of the execution protocol." *Id.* at ¶98 (emphasis added).

By disputing these informed and unequivocal medical and scientific opinions, Defendants have created a genuine issue of material fact that must be resolved at trial.

        **b)**       **Defendants' Attempts To Avoid An Issue Of Fact All Fail.**

Defendants devote much of their discussion about midazolam to falsely characterizing their *assertions* about midazolam as "undisputed facts." In fact, many of those assertions are demonstrably false, but, in any event, even giving them any credence, Defendants' assertions merely highlight and confirm the existence of disputed questions of fact that must be resolved at trial.

*That Midazolam is Approved for Inducing Anesthesia Does Not Mean That It Renders Prisoners Insensate to Pain.* According to Defendants, "midazolam is approved by the FDA for the induction of anesthesia, has been used to induce anesthesia both clinically and in medical research, is used regularly for short procedures and produces surgical anesthesia in animal studies." Mot. at 24; *see also id.* at 7, ¶¶33 & 36. Significantly, however, there is a critical difference between "inducing anesthesia" (which midazolam is approved for and which cannot render a prisoner insensate to pain) and "maintaining anesthesia" (which midazolam is *not* approved for). *E.g.*, Doc No. 388-5 (Weinberger Report) at ¶¶89-97. According to Dr. Weinberger, "[i]t is widely accepted that midazolam, a sedative, should not be used as the only drug to induce and maintain anesthesia or render a patient insensate to pain." *Id.* at ¶22. In fact, "midazolam is not FDA approved for maintenance of general anesthesia, or for pain relief," but instead for "induction of general anesthesia, before administration of other anesthetic agents." *Id.* at ¶41 (internal quotations and citation omitted). Even Defendants' expert, Dr. Antognini, admits that he has no basis in science or data to conclude that midazolam can maintain anesthesia at any dose, that midazolam is not and has not been used clinically at massive doses, and that doing so would be clinically and ethically inappropriate. Ex. 2 (Antognini Dep. Tr.) at 10:13-11:23.

Similarly, contrary to Defendants' assertion, it is disputed that midazolam is ever used as "the primary surgical anesthetic agent." Mot. at 7, ¶36. The most widely used textbook on pharmacology states: "Although the clinical literature often refers to the 'anesthetic' effects and uses of certain benzodiazepines, these drugs do not cause a true general anesthesia; awareness usually persists, and a failure to respond to a noxious stimulus sufficient to allow surgery cannot be achieved." Doc. No. 388-5 (Weinberger Report) at ¶38 (*citing* Mihic SJ, Mayfield J, Harris RA. Hypnotics and Sedatives. 2017. In Brunton LL, Hilal-Dandan R, Knollmann BC, editors. Goodman and Gillman's The Pharmacological Basis of Therapeutics. 13th ed. McGraw-Hill Education/Medical.). As explained by Dr. Weinberger: "[W]e're not providing general anesthesia with midazolam alone, which is not FDA approved for the maintenance of general anesthesia. We're using often a combination of agents: Analgesics such as opioids; hypnotic agents like midazolam; inhalation anesthetics; intravenous anesthetics like propofol. You know, one part of it is that we're using drugs that have been tested for the maintenance of anesthesia, and we know that these drugs can provide ongoing general anesthesia for an individual." Ex. 5 (Weinberger Dep. Tr.) at 205:10-20.[2] Defendants' other expert, Dr. Yen, confirmed that he has rarely used midazolam as the sole drug to induce anesthesia, that those rare experiences were about 25 years ago, were virtually always when the patient was in a life-threatening situation, and in

---

[2] Relying on their expert, Dr. Buffington, Defendants assert that a post-mortem examination of Charles Warner demonstrated Mr. Warner had a "blood concentration" of midazolam higher than what Defendants contend is present "when used as the primary surgical anesthetic agent." Mot. at 7, ¶36. But, again, it is disputed, whatever the blood concentration level, that midazolam can be used as the primary surgical anesthetic agent. Indeed, Dr. Buffington could not cite any support for his conclusion that the expected blood concentration of a 500 mg dose of midazolam should be 31.35 mcg/ml.

such cases other drugs were used to maintain general anesthesia. Ex. 6 (Yen Dep. Tr.) at 53:19-54:14 & 58:25-59:25.

Defendants' contention that midazolam is used to "induce and maintain unconsciousness" for "endotracheal intubation" (Mot. at 8, ¶43), "for induction of anesthesia in caesarean sections," and/or for colonoscopies (*id.* at ¶¶32, 43-46) is an irrelevant overstatement. As Defendants' expert Dr. Antognini confirmed, colonoscopies can be done without any anesthesia; Dr. Antognini testified that he has never used midazolam alone for a colonoscopy, and he does not know the state of anesthesia – e.g., conscious sedation, deep sedation, general anesthesia – achieved in those patients involved in the colonoscopy study he relies on. Ex. 2 (Antognini Dep. Tr.) at 113:18-115:24. In fact, colonoscopies are generally performed under "conscious sedation." Doc. No. 388-5 (Weinberger Report) at ¶42. As explained by Dr. Weinberger, midazolam "is used infrequently as a solo drug for moderate sedation and for 'conscious sedation' in some *low-discomfort* procedures such as colonoscopy, which is of such low pain stimulus that it can be performed in the majority of patients without any sedation at all." *Id.* (emphasis added).

Dr. Antognini also confirmed that although a cystoscopy may be done with a local anesthetic, he has never used midazolam as the sole drug for any cystoscopy, and the study he relies on used midazolam and a local anesthetic. Ex. 2 (Antognini Dep. Tr.) at 116:6-16 & 120:17-121:21. Finally, with respect to intubation, Dr. Antognini acknowledged that endotracheal intubation is a procedure that may take 30 seconds to 90 seconds (*id.* at 10:7-11, 16:18-17:3), and that he may have used midazolam for an endotracheal intubation a very long time ago but may also have used an opiate with the midazolam. *Id.* at 119:11-120:16.

In that regard, Defendants' reliance on the Miyake study (Miyake, App. Ex. 15) is unavailing. There, the procedure was done using an analgesic opioid (remifentanil) prior to administration of the midazolam. *See* Ex. 2 (Antognini Dep. Tr.) at 15:14-18. As Dr. Weinberger explained, when performing an intubation, where time is normally of the essence, "one would probably give a hypnotic intravenous anesthetic like propofol, followed by a muscle relaxant, and then rapidly perform an intubation and make sure the endotracheal tube was in the right place and then quickly blow up the endotracheal cuff to reduce the risks of aspiration." Ex. 5 (Weinberger Dep. Tr.) at 89:10-91:24.

*Defendants' reliance on Bispectral Index Scores (BIS) is unavailing.* According to Defendants, "BIS scores…between 40 and 60 are targeted in anesthetic practice as the range desired for general anesthesia during surgery" (Mot. at 5, ¶24), and "midazolam at therapeutic doses can lower BIS scores into the 60s, with some scores falling below 60" (*id.* at 9, ¶47). However, Defendants offer no support for that statement. None of Defendants' experts cited studies or other evidence demonstrating circumstances where midazolam caused BIS scores to reliably fall below 60.

To the contrary, the studies relied on by Defendants' experts demonstrate the opposite – that midazolam cannot achieve general anesthesia. In the Liu study, the authors found that the lowest average BIS score was 69.2. *See* Ex. 3 (Buffington Dep. Tr.) at 263-64. The Bulach study indicates that the lowest BIS score in its study was 71. *Id.* at 268. The Miyake study reflects that the maximum effect of midazolam on the BIS is 70. Ex. 7, (Miyake) at 5 ("These results are consistent with those reported earlier showing that BIS decreased only to 70 by the end of continuous infusion of midazolam at 0.03 mg kg-1 min-1

for 10 min and that the maximum effect of midazolam on the BIS is approximately 70. These findings suggest that BIS does not decrease further even if its plasma concentration increases to levels higher than that required for sedation."); *see also* Ex. 3 (Buffington Dep. Tr.) at 276.  In addition, even with higher levels of midazolam, the BIS does not decrease further.  *Id.* at 276-77 & 279-80 & Ex. 7 (Miyake) at 5-7.  While the studies were based on a lower dosage than that required by the Execution Protocol, it does not matter because the authors of those studies noted that there was a ceiling effect in which the administration of midazolam – no matter how great – could not reduce the BIS below 70.  Ex. 7 (Miyake) at 5.

In sum, the BIS studies on which Defendants and their experts rely prove Plaintiffs' position that midazolam is insufficient to maintain general anesthesia.

### *Defendants offer no evidence to dispute midazolam's "ceiling effect."*

According to Defendants, "no medical consensus exists with respect to the point at which any ceiling effect for midazolam occurs in humans."  Mot. at 11, ¶57.  However, Defendants have not offered any legitimate basis to dispute Plaintiffs' expert opinions or published studies on the issue, other than naked disagreement.  Plaintiffs' expert, Dr. Weinberger, on the other hand, opines that "midazolam has been described as having an observed 'ceiling effect' such that after a certain dose, any increase in the amount or concentration administered will have little to no additional effect."  Doc. No. 388-5 (Weinberger Report) at ¶100.  Another of Plaintiffs' experts, Dr. Stevens, explained the same thing in his report. Doc. No. 388-4 (Stevens Report) at ¶73.  The Court must weigh the parties' competing expert testimony and the studies and data relied upon (or not relied upon) by the parties' experts and draw a conclusion.

3. **There Is A Genuine Question of Fact Whether The Execution Protocol Contains Sufficient Safeguards Against A Sensate Individual Receiving The Execution Drugs.**

Defendants assert that "Oklahoma's execution safeguards," including "IV procedures," "consciousness checks," and "training regimen," are sufficient to eliminate any risk of Eighth Amendment violations. Mot. at 1-3 & 31. The record, however, and, indeed, the Execution Protocol itself, demonstrates that any such "safeguards" are either illusory or are ineffective for protecting condemned prisoners.

*The "Safeguards" Are Illusory.* The Execution Protocol provides that "[t]hese procedures shall be followed as written unless deviation or adjustment is required, as determined by the agency director or, in the event of an absence, their designee." Doc No. 388-1 (Execution Protocol) at 1. The Director thus has unfettered discretion to modify the Execution Protocol any time he or she determines it is "required."

Significantly, in making those critical judgments, the Director is entirely unconstrained; there is no oversight, scrutiny or accountability whatsoever; there are no criteria or requirements, whether medical necessity, scientific reality, or penological justification. The Director can in essence do anything he or she wants, at any time, with no notice to the prisoner, his/her counsel or the courts, and without having to explain why.

As relevant here, that unfettered discretion extends to modifying or even eliminating any of the critical elements of the Execution Protocol that are specifically designed to protect the prisoners and ensure that the Execution Protocol "[f]aithfully adheres to the constitutional mandates against cruel and unusual punishment." IV procedures can be modified, consciousness checks can be eliminated or altered, execution teams can be selected

20

without regarding to experience or background, and training can be dispensed with or pared down to accommodate administrative convenience or budgetary constraints.

Plaintiffs' prison-operations expert, Dr. Reginald Wilkinson, former Director of the Ohio Department of Rehabilitation and Correction, who was "responsible for the creation and development of Ohio's execution policy and practices" and oversaw 20 executions, will explain that broad and unfettered discretion which has been delegated to the Director.  Ex. 8 (Wilkinson Report) at ¶8.  Among other things, Dr. Wilkinson will explain that the Director has: "(a) the discretion to use chemicals, combinations, and/or dosages not reflected in the written procedures; (b) the discretion to change the chemicals to be used; (c) the discretion to use personnel that do not meet the minimum requirements set forth in the written protocol; (d) the discretion to change any of the purported provisions that would otherwise protect the constitutional rights of condemned prisoners and the press; and (e) the discretion to obstruct the witnesses' ability to view and hear the execution at any time."  *Id.* at ¶18. Further, Dr. Wilkinson will explain why this unfettered discretion is both unwarranted and dangerous.

According to Dr. Wilkinson, "[t]here is no legitimate penological justification for the Director to retain discretion to change the Execution Protocol any time he or she determines in his or her unilateral discretion that it is 'required.'" *Id.* at ¶18.  Additionally, "[w]ithout any definition of when the use of the Director's discretion is 'required,' that portion of the Execution Protocol renders meaningless the procedures set forth in the Execution Protocol, and removes any pretense or requirement that the procedures set forth in the protocol need be, or will be, adhered to." *Id.*

In addition, Dr. Wilkinson will explain that the "Execution Protocol poses a substantial risk of harm to inmates because it leaves unaddressed significant details concerning the establishment and maintenance of the IV catheter and consciousness checks." Ex. 8 (Wilkinson Report) at 5.  "Proper establishment and maintenance of the IV catheter throughout the execution is necessary to ensure that drugs are properly and humanely administered to the prisoner.  For example, an improperly placed and maintained catheter can puncture the vein or become dislodged resulting in the administration of drugs into the surrounding tissue, creating a risk that the drugs will not work as intended." *Id.* at ¶25.  In addition, "[t]he consciousness check is intended to confirm that, following the administration of the midazolam, the prisoner has been rendered unconscious and insensate to pain and suffering throughout the execution." *Id.* at ¶26.  However, "[t]he Execution Protocol does not provide any detail, requirements, or explanation concerning the 'necessary and medically-appropriate methods' that will be used by the IV Team Leader to 'confirm the inmate is unconscious' or identify the training provided to the IV Team leader and/or his or her qualification to make that determination." *Id.*  Among other things, "[t]he absence of that baseline standard in the Execution Protocol deprives inmates of a meaningful opportunity for judicial and public oversight, including the opportunity for clinical experts or other professionals to assess and provide input on those standards." *Id.* at ¶28.

Taken to its logical conclusion, the indiscriminate and unchecked discretion afforded the Director renders any safeguards contained in the Execution Protocol meaningless and illusory.  The Execution Protocol's express "purpose" – to ensure that executions are "carried out in keeping with statute, case law and professional practices" and "[f]aithfully

adhere to the constitutional mandates against cruel and unusual punishment" are little more than an empty and unenforceable promise.  Doc. 388-1 (Execution Protocol) at Section II.

But even putting that aside, as explained below by category, there are disputed material facts concerning whether the currently-documented IV procedures, consciousness checks, and training protocols would effectively eliminate a substantial risk of harm of injecting the execution drugs into a sensate individual.

*Consciousness Checks*.  Defendants' discussion of consciousness checks is limited to the bald assertion that "compared to the consciousness checks in *Baze*, Oklahoma's are more robust."  Mot. at 32.  But *Baze* held only that the petitioners there had failed to show that additional procedures were "necessary to avoid a substantial risk of suffering."  *Baze*, 553 U.S. at 60.  Here, by contrast, Plaintiffs have submitted the expert report of Dr. Weinberger, who describes in detail (over nearly thirty pages) why additional consciousness check procedures are necessary, and most importantly, in scientific detail, why the current iteration of the consciousness check is "inadequate to determine whether a prisoner will be insensate and will remain in a state of general anesthesia."  *See* Doc. 388-5 (Weinberger Report) at ¶152 & pages 56-77.

Based on Dr. Weinberger's expert opinion, backed by "studies," "standard anesthetic practice," and his "own experience," "the *only* reliable method of determining that the prisoner is insensate to pain and suffering and will remain in a state of general anesthesia is to perform assessments of the oculocephalic and corneal reflex; to continuously monitor the prisoner's heart rate and blood pressure for signs of nociception; and to remove the use of the paralytic agent which has no purpose in the execution, in order to be able to sufficiently

observe the patient for signs of movement or vocalization." *Id.* at ¶172 (emphasis added). After summarizing in several paragraphs why the consciousness checks set forth in the Execution Protocol were "deficient," Dr. Weinberger explained that "it is my opinion that prisoners executed using Oklahoma's three-drug lethal injection protocol face a substantial risk of experiencing pain and suffering." *Id.* at ¶206. Accordingly, at an absolute minimum, there is a genuine dispute concerning whether the consciousness checks intended to be used by the IV team leader will "avoid a substantial risk of suffering." *Baze*, 553 U.S. at 60.

**IV Procedures/Training.** Plaintiffs' experts have also issued reports explaining why the training and IV procedures provided by the Execution Protocol are inadequate. For example, Dr. Wilkinson explained that "whether the execution is humane or not depends on how personnel perform at key areas of the process and/or how they respond to unforeseen issues." Ex. 8 (Wilkinson Report) at ¶34. However, the training materials produced by Defendants "do not provide training on crucial aspects of the execution procedure" including: "(a) any training related to setting, maintaining and monitoring IV sites, including what the team should look for to identify potential issues (failure or infiltration), and how to address or remedy problems if they arise; (b) training related to the consciousness check and what it involves and what to do if the prisoner remains conscious; and (c) training concerning issues related to the chain of command and who makes decisions in the event of problems and how instructions and decisions are communicated to the team." *Id.*[3] Again,

---

[3] The testimony of fact witnesses confirms that the execution team members lack the qualifications, skill or training to perform their duties. For example, the individuals who push the drugs have no training or experience or any medical knowledge or expertise. Ex. 9 (CONFIDENTIAL Nov. 11, 2020 Dep. Tr.) at 97:15-19; 90:6-18; 92:7-20 (filed under seal pursuant to Nov. 6, 2014 Protective Order). The H Unit Section Chief testified that he/she

Defendants offer no expert to refute Dr. Wilkinson's opinion, which is based on and informed by his direct and extensive experience preparing execution protocols and overseeing executions.

In addition, Dr. Weinberger is critical of "the requirements set forth in the Execution Protocol for the IV team leader." Doc. 388-5 (Weinberger Report) at ¶194. As Dr. Weinberger explains, the level of experience required varies by drug. Using midazolam as the first drug in the three-drug protocol requires the "highest level of proficiency in performing assessment of depth of anesthesia." *Id.* at ¶193. The requirements for the IV team leader specified in the Execution Protocol are insufficient to "to ensure that someone has the training and experience necessary to sufficiently assess and monitor the anesthetic depth of the prisoner in order to maintain the prisoner under general anesthesia so as to render the prisoner insensate to severe pain and noxious stimuli." *Id.* at ¶194. Moreover, Dr. Weinberg opines that "given the complexity of the application and analysis of the assessment of anesthetic depth and continuous monitoring, and the necessity of proper preparation and placement of the IV line in order to ensure proper administration of the execution chemicals, the training requirements for the H-Unit, Special Operations team

---

is qualified because he/she "handle[s] everything very professionally." Ex. 10 (CONFIDENTIAL Nov. 12, 2020 Dep. Tr.) at 44 (filed under seal pursuant to Nov. 6, 2014 Protective Order). That person too has no medical training, no training inserting IVs, no training with anesthesiology, and no training on consciousness (*id.* at 44-45), and flippantly testified that team members are qualified to administer drugs because "they have thumbs and fingers." *Id.* at 249.

members, and the additional IV team members are inadequate because they are not related to the medical skills required by these execution team members." *Id.* at ¶212.[4]

At a minimum, there are genuine disputes concerning whether the IV procedures and lack of training of execution team members creates a substantial risk of suffering.

### 4.   Whether There Is An Available Alternative To The Current Execution Method Is Disputed.

A prisoner's alleged alternative must be "available," and "significantly reduce a substantial risk of severe pain" in comparison to the challenged method. *Bucklew*, 139 S. Ct. at 1130.  An alleged alternative is "available" if it is a "feasible and readily implemented alternative method of execution" that "the State has refused to adopt without a legitimate penological reason." *Id.* at 1125 (citations omitted).  *Bucklew* recognized that an alleged alternative would still be available if the State's refusal to adopt it was "unreasonabl[e,]" and instructed that a prisoner can satisfy the availability test if he can show evidence that his alleged alternative is "theoretically feasible." *Id.* at 1125 & 1129.  A prisoner can show that his alleged alternative would be similarly effective at causing death as the current protocol by

---

[4] Defendants' expert, Dr. Yen, further acknowledges that in order to do their job appropriately, members of the Special Operations Team and H Unit Team require training based on a curriculum created by medical professionals, and that this training presumably should take place over many months the year before an execution. Ex. 6 (Yen Dep. Tr.) at 247:16-252:11, 330:14-334:19.  Members of these teams play critical roles under the protocol such as monitoring injection sites for signs of a failure and recognizing evidence of injection site failure based on changes in resistance when pushing the chemicals, among other things. Yet, these team members are not otherwise medically trained.  The training these individuals should receive, according to Dr. Yen, involves a medically-relevant curriculum to better recognize a failed or failing injection site. *Id.*  Such training far exceeds any training that is required by the protocol, which only requires these two teams to train together twice, shortly before the execution, and does not require the IV Team leader or other medical professionals to create a relevant training curriculum.

showing a "track record of successful use" causing death.  *Id.* at 1130.  Those matters can be shown by, for example, an alternative's use in another jurisdiction's execution protocol, or by some other evidence of its efficacy at causing death.  *Id.* at 1130 (citations omitted).  Finally, a prisoner can demonstrate that the State should be able to implement the proposed alternative with "ordinary transactional effort."  *In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017).

There are genuine disputes of material fact concerning both the availability of alternative execution methods alleged by Plaintiffs, and whether the proffered alternatives would significantly reduce a substantial risk of pain in comparison to the current protocol.

### a)      Defendants' "Gotcha" Argument Fails.

Defendants assert that Plaintiffs' claim fails as a matter of law because, in paragraph 114 of the Amended Complaint, each Plaintiff "reserve[d] the right following consultation with counsel to object to any proffered alternative."  Doc No. 325, ¶114.  However, it is undisputed that no Plaintiff has objected to any of the proffered alternatives.  To the contrary, Plaintiffs submitted expert reports addressing each of the alternatives alleged in the Amended Complaint.  In other words, there is not now, and there never was, any uncertainty or ambiguity in Plaintiffs' position.  Each of the alternatives has been pled on behalf of each Plaintiff, and no Plaintiff has withdrawn their support for any alternative.

### b)      Firing Squad.

Execution by firing squad is currently authorized by Oklahoma and the laws of two other states (Utah and Mississippi).  It was used in Utah as recently as 2010.  Defendants do not dispute that the ODOC has the means and ability to administer executions by firing

squad or that execution by firing squad has been used successfully.  Nor have Defendants even attempted to identify any penological justification for refusing to utilize this statutorily authorized execution method.  Instead, Defendants argue that execution by firing squad is not a viable alternative because: (1) there is no evidence that the risks associated with death by firing squad are higher or lower than a midazolam protocol; and (2) Plaintiffs have not identified "sufficient detail" for a firing squad protocol.  Neither argument has merit.

First, Plaintiffs have offered expert testimony that the risks associated with death by firing squad are minimal, and indeed comparatively painless.  As noted above, Plaintiffs' experts will testify that a prisoner executed using the current midazolam protocol will experience excruciating pain and suffering.  *See, e.g.*, Doc. Nos. 388-4 & 5 (Stevens and Weinberger Reports).  Plaintiffs also will present the testimony of Dr. James Williams, an emergency room physician who has treated numerous patients with gunshot wounds.  Doc No. 388-23 (Williams Report).  Dr. Williams explains that when one is shot in the heart, the gunshot recipient will lose consciousness within seconds.  *Id.* at 4.  Specifically, "[b]y targeting the cardiovascular bundle, the firing squad causes death with minimal pain."  *Id.* at 3.  Firing squad executions "assure a quick and painless death" by "denying the CNS [central nervous system] the blood supply it requires to continue to function."  *Id.* at 3.[5]

---

[5] Medically and physiologically speaking, a gunshot wound to the cardiovascular bundle causes only minimal pain because "[t]here is only one nerve [the mediastinum] that supplies both the heart and the esophagus and all of the structures of the middle part of the chest." Ex. 11 (Williams Dep. Tr.) at 73:20-74:16.  "All pain from those structures comes through the same nerve fiber and is felt the same way by the brain…." *Id.*  The pain "comes on slowly, and it's more a sense of pressure as opposed to a sense of pain." *Id.*  It is "very unlikely" that pain has time to develop given the "short period of time between the gunshot wound occurring and the onset of unconsciousness." *Id.*

Moreover, contrary to Defendants' speculation (Mot. at 22), "execution by firing squad substantially reduces the chance of a 'botched' execution due to error on the part of the executioner(s)." Doc. 388-23 (Williams Report) at 6. Specifically, "[t]he means by which death is affected is simple and straightforward," with "the chance of 'operator error' being introduced into the execution" being "substantially less than it is in execution by the current standard, lethal injection." *Id.*

Significantly, Justice Sotomayor has expressed the same opinion as Dr. Williams. In *Glossip*, 135 S. Ct. at 2796, and *Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017), Justice Sotomayor noted that execution by firing squad causes a faster and less painful death than execution by lethal injection and "is significantly more reliable" than lethal injection. *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting); *Arthur*, 137 S. Ct. at 733-34 (Sotomayor, J., dissenting); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (noting that Justice Sotomayor "has likewise explained that the firing squad is an alternative method of execution that generally causes an immediate and certain death, with close to zero risk of a botched execution").[6]  At a minimum, Dr. Williams' expert report and opinion creates a genuine issue of fact as to whether death by firing squad significantly reduces a substantial risk of pain as compared to the current protocol.

Second, Defendants' assertion that Plaintiffs have not set forth "sufficient detail" for a firing squad protocol misstates the law and, in any event, is false. Precedent merely

---

[6] In fact, recent studies also have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than execution by lethal injection. *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty.* Stanford, CA: Stanford Univ. Press, 2014. 288 pp.

requires that an "inmate's proposal be sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Bucklew*, 139 S. Ct. at 1129. Indeed, a prisoner can satisfy the availability test if he can show evidence that his alleged alternative is "theoretically 'feasible.'" *Id.* at 1125; 1129. Here, as noted above, firing squad executions are already sanctioned by Oklahoma law. In any event, Dr. Williams' opined that both the Utah firing squad protocol and the U.S. Army firing squad protocol (very detailed and attached to his report) "or a similar protocol would suffice to cause a quick and painless death." Doc. No. 388-23 (Williams Report) at 8.

c)       **Removal Of The Paralytic And The Addition Of Fentanyl.**

Plaintiffs also contend that a viable, feasible alternative to the current midazolam protocol would be to remove the paralytic, add a pre-dose of an opioid (such as fentanyl), and add three additional remedial measures and safeguards to the Execution Protocol.[7] Defendants do not dispute that they have the means and ability to administer executions in this manner with "ordinary transactional effort" (*In re Ohio Execution Protocol*, 860 F.3d at 891). Defendants do not dispute, and thus concede, that fentanyl is available to the ODOC, and that the additional proposed safeguards could easily be implemented. Instead, Defendants argue that: (1) Plaintiffs have failed to present evidence that the proposed alternative "would reduce or eliminate the pain of potassium chloride"; and (2) the proposed

---

[7] Dr. Wilkinson opined that the ODOC could include each of these three remedial measures and safeguards in its Execution Protocol, and that based on his experience, "each of [those] items is reasonable, consistent with the goal of ensuring a humane execution, and there would be no impediment to implementing them." Ex. 8 (Wilkinson Report) at ¶¶39-40.

alternative would force the State to use "untried methods." Mot. at 36-37. Neither argument has merit.

First, several of Plaintiffs' experts have explained that adding a proper dose of fentanyl (a strong opiate) will, unlike midazolam, induce and maintain general anesthesia and thus render the prisoner insensate to pain, including the pain associated with the administration of both midazolam and potassium chloride. Dr. Stevens opines that "fentanyl is the best choice as an opioid premedication" as it is "100 times more potent than morphine." Doc. No. 388-4 (Stevens Report) at ¶103, 105. As explained by Dr. Weinberger, the paralytic "serves no purpose in Oklahoma's lethal injection protocol other than to prevent the inmate from moving, communicating, or otherwise showing physical responses to the other drugs in the protocol." Doc. 388-5 (Weinberger Report) at ¶121. According to Dr. Stevens, the elimination of the paralytic "would ensure that the inmate could self-report any failure of midazolam or previous premedication," the "very real pharmacological nightmare of being conscious but paralyzed would be eradicated," and the addition of fentanyl "would serve to further mitigate suffering." Doc. No. 388-4 (Stevens Report) at ¶¶109, 110. Defendants have not disputed the pharmacological properties of fentanyl. In any event, at a minimum, their unsupported assertion raises a question of fact.

Second, Defendants' assertion that Plaintiffs are "attempting to force the state into untried methods" (Mot. at 37) is false. As Defendants concede, "midazolam has been used in combination with an opioid in past executions." *Id.*

        **d)**      **Barbiturate Plus Opioid.**

Plaintiffs' third proffered alternative is execution by a single dose of FDA-approved or compounded pentobarbital or sodium pentothal (thiopental).  Those methods are already authorized and approved in Charts A and B of the Execution Protocol.  Plaintiffs also propose implementing the remedial measures and safeguards referenced above and adding a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose.  According to Defendants, that alternative is "unavailable" because: (1) "ODOC has not been able to obtain possession of the barbiturates"; and (2) the proposed alternative lacks sufficient detail, and is "untried and untested."  Mot. at 35-36.  Those arguments are unavailing.

As a threshold matter, Defendants' suggestion that the proffered alternative lacks sufficient detail or is untried and untested is belied by the fact that Oklahoma's own Execution Protocol provides a detailed mechanism for execution using pentobarbital or sodium pentothal, and just last year the federal government completed a spate of executions using pentobarbital.  The addition of an opioid such as fentanyl is simply an additional layer of protection against pain.

Moreover, Defendants' contention that they have been unable to obtain pentobarbital with "ordinary transactional effort" is dubious at best.  According to Defendants, "ODOC contacted the federal government, several states, and about 40 in-state pharmacies…in unsuccessful attempts to obtain pentobarbital."  Mot. at 20.  The federal government used pentobarbital in thirteen executions conducted from July 2020 through the waning days of the Trump administration, including three executions in mid-January 2021, only two months ago.  ODOC's "efforts" to determine the federal government's source of pentobarbital were anemic.  Jason Bentley of the ODOC, who was charged with trying to

locate a source for pentobarbital, called the "main line" at USP Terre Haute "three times," each time was transferred to the "public information officer," each time left a message, and never received a call back. Doc. No. 388-20 (Bentley Dep. Tr.) at 71. Mr. Bentley could have called the DOJ Attorneys handling the litigation in federal court in D.C. challenging federal executions; Mr. Bentley could have called the warden at USP Terre Haute or asked Director Crowe to do so. Mr. Bentley was essentially looking for no response by reaching out to the wrong – or at the very least, too few – people.

Within the last two years, Texas, Georgia, Missouri, and South Dakota have all used pentobarbital for executions. Recently, Arizona announced that it located a supplier to provide compounded pentobarbital for executions. In a letter dated August 2020, but just recently released to the public, the Arizona Attorney General advised Governor Doug Ducey that the "Attorney General's Office has found a lawful supplier of pentobarbital that can make the drug available to our state." Ex. 13 (Aug. 20, 2020, Ltr. from Az. AG Brnovich to Gov. Ducey). Here, Defendants represent that ODOC contacted "several states," but no details have been provided, and Mr. Bentley confirmed that he did not contact any states. Doc. No. 388-20 (Bentley Dep. Tr.) at 88. In fact, even though the source of Texas's supply of pentobarbital was made public (Ex. 12), Mr. Bentley chose not to contact that compounding pharmacy because he "did not believe that they would help [ODOC]." Doc. No. 388-20 (Bentley Dep. Tr.) at 83-84. In short, ODOC's own witness testimony, and the circumstances discussed above, cast doubt on the true extent of the ODOC's efforts, and renders dubious at best Defendants' assertion that they have been unable to obtain pentobarbital.

Moreover, Defendants ignore the expert testimony proffered by *both* parties demonstrating their agreement that pentobarbital can be compounded. Dr. Lawrence Block, Professor Emeritus of Pharmaceutics, School of Pharmacy, Duquesne University, will explain at trial "that a compounding pharmacist, licensed by the state…could prepare the pentobarbital syringes called for" in the Execution Protocol. *See* Doc. 388-17 (Expert Opinion of Dr. Lawrence H Block) at ¶47. Dr. David Sherman, a Professor of Medicinal Chemistry at the University of Michigan, will explain at trial that the method for synthesizing pentobarbital's active pharmaceutical ingredient is "efficient, scalable, and straightforward," the necessary ingredients "are commercially available, and [require] standard laboratory equipment," "[t]he safety protocols are similar to those followed in a typical undergraduate organic chemistry laboratory course," and, therefore, "a typical person of skill in the art capable of synthesizing Thiopental or Pentobarbital is an undergraduate student with one to two years of laboratory experience in synthetic chemistry." Doc. 388-27 (Expert Opinion of David H. Sherman, Ph.D.) at ¶¶25, 26.

Dr. Buffington, Defendants' own expert, agrees, asserting that pentobarbital "can be compounded" and that any pharmacist or pharmacologist could do it. Ex. 3 (Buffington Dep. Tr.) at 118. Indeed, Dr. Buffington acknowledged previously that he believes there are pharmacies in the United States that would compound pentobarbital for lethal injections, and that he had "discussions with colleagues in conferences and they said they would compound pentobarbital for departments of corrections." *Id.* at 120.

In that regard, Defendants' contention that Plaintiffs are suggesting that "the state create an illicit drug-cooking lab using undergraduate students to synthesize barbiturates"

(Mot. at 36) should not be taken seriously.  Obviously, drugs would need to be compounded lawfully using all proper and professional standards.  Plaintiffs' experts have not suggested anything to the contrary.  Defendants know full well that no Plaintiff is interested in being executed with drugs created in an "illicit drug-cooking lab."  The point is that the suggestion that pentobarbital is "unavailable" is belied by the fact that, according to Defendants' own expert, it is easily compounded and can be easily obtained by the ODOC with "ordinary transactional effort."

In sum, at a minimum, there are genuine issues of disputed fact concerning the "availability" to the ODOC of compounded barbiturates, including pentobarbital.

## C.   There Are Disputed Facts Material To Plaintiffs' *Ex Post Facto* and Due Process Claims.

The United States Constitution prohibits the States from passing any "*ex post facto* law."  U.S. Const. art. I, § 10, ¶ 1.  "Two critical elements must be present for a law to fall within the *ex post facto* prohibition: first, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it," *Henderson v. Scott*, 260 F.3d 1213, 1215 (10th Cir. 2001) (emphasis added) (internal quotations and citation omitted), by creating "a significant risk" of increased punishment, *Garner v. Jones*, 529 U.S. 244, 255 (2000).

Here, it is undisputed that at the time each Plaintiff (with the exception of Mica Martinez) was sentenced to death, Oklahoma law required that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent" (22 Okla. Stat. Ann. § 1014(A) (1977)).  In 2011, the Oklahoma statute was "amended" to replace the

"ultrashort-acting barbiturate" requirement with broader authorization to execute prisoners with "a lethal quantity of a drug or drugs." Okla. Stat. tit. 22 § 1014(A) (2011); Mot. at 41. By relying on the amended statute to utilize the midazolam three-drug protocol, the law is being given retrospective effect by Defendants, and, thus, the first element is satisfied.

The second element is satisfied as well. Three ultrashort-acting barbiturates are used in anesthesia: thiopental, methohexital and thiamylal. Thiopental (sodium pentothal) is an ultrashort-acting barbiturate (R. Miller, *Miller's Anesthesia*, 6th ed. 2005 at 326-29), and is the only such drug authorized as a lethal agent by the Execution Protocol (DOC 388-1 at Attachment D, Chart B). The Supreme Court has held that using sodium thiopental as part of a three-drug method of execution does not violate the Eighth Amendment's ban on cruel and unusual punishment. *Baze*, 553 U.S. at 63. That conclusion reflects the fact that, as explained by Plaintiffs' expert, Dr. Craig Stevens, an ultrashort-acting barbiturate "will produce a state of general anesthesia, noted by unawareness and non-responsiveness to painful stimuli," Doc. No. 388-4 (Stevens Report) at ¶¶11, 99, thereby rendering the prisoner insensate to pain as required by the prior law.

The same is not true for midazolam. It is undisputed that midazolam is ***not*** an ultrashort-acting barbiturate. In fact, it is not a barbiturate at all, but rather is in the separate class of drugs called benzodiazepines. Doc. No. 388-4 (Stevens Report) at ¶50. As such, as explained above, Plaintiffs' experts have opined that midazolam will not render a prisoner insensate to pain, and, as a result, the prisoner will experience the pain and suffering associated with the administration of the midazolam (suffocation and drowning), vecuronium bromide (same), and potassium chloride (chemical burning and cardiac arrest).

Thus, at a minimum, there is a genuine dispute of material fact as to whether midazolam creates "a significant risk" of increased punishment, and thus whether the Defendant's method of execution violates the *ex post facto* clause. *Garner*, 529 U.S. at 255.

Defendants argue that the statutory change does not violate the *ex post facto* provision because it merely "chang[ed] the mode of death." Mot. at 42. But that argument misstates the applicable standard, and their reliance on *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 05-CV-2337, 2021 WL 127602 (D.D.C. Jan. 13. 2021), is misplaced. As noted above, the authority in this Circuit and the Supreme Court is clear that the applicable standard is whether the offender is "disadvantage[d]" by the law by creating "a significant risk" of increased punishment. *Henderson*, 260 F.3d at 1215; *Garner*, 529 U.S. at 255. A significantly more painful lethal execution method *ipso facto* "disadvantages" the offender and increases the punishment.[8] Taken to its (il)logical conclusion, Defendants' argument would mean that a prisoner sentenced to death by lethal injection could be executed with a lethal dose of any substance (gasoline, battery acid, you name it) and that would not violate the *ex post facto* clause of the Constitution. That is not the applicable standard.

---

[8] *Malloy v. South Carolina*, 237 U.S. 180 (1915), cited by Defendants, is also inapposite. There, the Court found a change to electrocution was not an *ex post facto* law because it eliminated "some of the odious features" incident to the older and less "barbarous" method of execution. *Id.* at 184, 185. Here, however, the change in the statute **increases** the odious features of the method of execution by ensuring that a prisoner is sensate during his or her execution and thus able to experience the horrific and excruciating pain and suffering caused by the administration of the execution drugs. Proceeding with Plaintiffs' executions without using an ultrashort-acting barbiturate thus exposes them to additional punishment. As such, the statute as amended violates article I, §10 of the United States Constitution and Article V, § 54 of the Oklahoma Constitution.

Finally, executing Plaintiffs without using an ultrashort-acting barbiturate would also violate Plaintiffs' Due Process rights under the Oklahoma Constitution, which does not permit an amended or repealed statute to "affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."  Okla. Const. art. V, § 54; *see also One Chi. Coin's Play Boy Marble Bd., No. 19771 v. State ex rel. Adams*, 212 P.2d 129, 133 (Okla. 1949).

Here, lethal injection by ultrashort-acting barbiturate, as specified in Plaintiffs' death warrants, is an "accrued right" and a "penalty incurred" before the 2011 amendment to the statute.  Plaintiffs have a constitutional right to be executed by the statutory method in effect when they were sentenced, and duly reflected in their death warrants.  *See Alberty v. State*, 140 P. 1025 (Okla. Crim. App. 1914).  Accordingly, absent Plaintiffs' consent, they must be executed using an ultrashort-acting barbiturate, not using the midazolam three-drug execution protocol.[9]

### D.    There Are Disputed Material Facts Concerning Plaintiffs' Human Experimentation Claim.

It is axiomatic that experimentation on human beings without their consent offends standards of decency and violates an individual's substantive due process rights to liberty and to be free from cruel and unusual punishment, under the Eighth and Fourteenth

---

[9] Defendants' contention that there is no Due Process violation fails for the same reasons. As discussed above, Oklahoma law protects Plaintiffs' life and liberty interests. These interests cannot be denied without offending the Due Process Clause of the United States Constitution. *See Vitek v. Jones*, 445 U.S. 480, 488 (1980); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988).  Allowing Defendants to execute Plaintiffs using a method that state law did not permit when Plaintiffs were sentenced and which would disadvantage Plaintiffs and create a significant risk of increased punishment would, by definition, violate their due process rights under the United States Constitution.

Amendments to the United States Constitution.   Such experimentation likewise violates Oklahoma laws that govern unauthorized research on humans and are designed to protect the rights and welfare of human research participants.   *See, e.g.,* Okla. Admin. Code 310:2-31-1 (2020); Title 310, Chapter 10, Oklahoma State Department of Health, Human Subjects Protection.

As explained by Plaintiffs' medical-ethics expert, Dr. Joseph Fins, Professor of Medical Ethics and Chief of the Division of Medical Ethics at Weill Cornell Medical College, Oklahoma admittedly has no "clinical experience" using 500 mg of midazolam in executions. Ex. 14 (Expert Report of Joseph J. Fins, M.D.) at ¶¶25-29 (collecting testimony of ODOC witnesses).   Accordingly, "Oklahoma has not shown that its three-drug lethal injection protocol using midazolam works for its intended purpose: executing prisoners in a manner that avoids a substantial risk of severe pain and suffering."   *Id.* at ¶¶20 & 77.

Logically, therefore, using an untested execution method to determine if it actually works as intended amounts to human experimentation.   That process is therefore subject to all of the applicable laws and procedures required for conducting experiments on humans, which Oklahoma admits it has not complied with.   *Id.* at ¶¶78-80 & ¶83 (citations omitted). Under the circumstances, as explained in Dr. Fins' expert report, "Oklahoma's three-drug lethal injection protocol constitutes an unregulated experiment on human subjects in violation of well-established legal and ethical standards for human subject protection."   *Id.* at 6.[10]

---

[10] Defendants' reliance on this Court's 2014 decision to assert that this claim is "foreclosed both by precedent and as law of the case" (Mot. at 43) ignores the different applicable standard here.   A motion for a preliminary injunction assesses "a plaintiff's ultimate

In sum, there are genuine disputed material facts as to whether Defendants' execution method constitutes impermissible human experimentation and, thus, violates Plaintiffs' rights guaranteed by the Eighth and Fourteenth Amendments.

### E.   There Are Disputed Material Facts Concerning Plaintiffs' Deprivation Of Access To Counsel And The Courts Claim.

Plaintiffs have constitutional and statutory rights of access to counsel and the courts throughout the execution procedure and during the course of the execution itself.   *See Harbison v. Bell*, 556 U.S. 180, 194 (2009); *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at **4-5 (S.D. Ohio Dec. 12, 2018); *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974); *United States v. Wade*, 388 U.S. 218, 227-28 (1967); *DeMallory v. Cullen*, 855 F.2d 442, 446 (7th Cir. 1988); and Section 3599 of Title 18 of the U.S. Code.[11]

For Plaintiffs to have any timely and meaningful opportunity to assert an Eighth Amendment violation that occurs during an execution or the run-up thereto, they must be able to communicate that violation to their counsel, or their counsel must be in a position to see it for themselves, and then counsel must be able to access the courts on the Plaintiffs'

---

likelihood of success on the merits"; a motion for summary judgment assesses the actual legal viability of a claim.   Thus, the findings of fact and conclusions of law made by a court at the preliminary injunction stage – on a far more limited record – are not binding at trial on the merits or summary judgment proceedings.   *Northglenn Gunther Toody's LLC v. HQ8-10410-10450 Melody Lane, LLC*, No. 16-cv-2427-WJM-KLM, 2018 U.S. Dist. LEXIS 62171, at *12 (D. Colo. Apr. 12, 2018).

[11] As previously explained, the Amended Complaint inadvertently relies on the Fifth Amendment Due Process Clause instead of the materially identical Fourteenth Amendment Due Process Clause.   This Court can and should construe the inadvertent allegation of a Fifth Amendment due process violation as a Fourteenth Amendment due process violation.

behalf.  Curtailing or blocking a prisoner's ability to communicate with his or her counsel and/or blocking counsel from the opportunity to view the entire execution process, by definition, violates Plaintiffs' constitutional right to access to counsel and the courts.  *See Mann v. Reynolds*, 46 F.3d 1055, 1061 (10th Cir. 1995) (citations omitted).

Here, the Execution Protocol lacks adequate requirements to protect Plaintiffs' right to counsel throughout the execution procedure. Ex. 8 (Wilkinson Report) at ¶¶35-37. Neither the pre-execution readiness information nor the results of the pre-execution assessment of the prisoner's medical and mental health condition, including concerns related to establishing or maintaining IVs, are provided to the prisoner or counsel.  *Cf.* Doc. 388-1 (Execution Protocol) at VII.B.a.(3)-(5).  That information is critical to understanding potential or extant problems and issues that will result in an inhumane execution.  The Execution Protocol terminates the prisoner's access to his counsel two hours prior to the execution or "earlier if necessary" (*id.* at VII.E.d).  This prevents counsel from observing the setting of the IVs and any issues or problems with IV access, and it prevents the prisoner from communicating with counsel about any problems or adverse circumstances leading up to and during the execution itself, such as botched IV access or adverse reactions to the execution drugs.  *Id.* at VII.F.6.a-i.  The prisoner and counsel thus are effectively prevented from taking any action in court or otherwise to address and challenge serious problems that often arise during the execution process, in particular relating to IV failures.  The Execution Protocol allows the Director to order that the curtains to the witness viewing room be

---

*See Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007); *Greene v. Impson*, 530 F. App'x 777, 779 n.3 (10th Cir. 2013); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1187 n.2 (10th Cir. 2020).

closed and that witnesses be removed (*id.* at Attachment D, at 7), thus denying counsel access to information regarding the condition of their client and preventing attorneys and other witnesses from observing what happens to the prisoner if things go awry, which is the exact point in time when access to counsel and the courts is most critical. (This is what occurred in the botched execution of Mr. Lockett.) The Execution Protocol also does not guarantee counsel the right of access to materials to take notes, and denies access to phones, the tools needed to document problems and take steps in court to challenge constitutional violations. *Id.* at VI.C.4.

Defendants' excuses for denying Plaintiffs their rights to counsel and the courts are unavailing. Plaintiffs are not seeking to protect their rights "to account for a hypothetical possibility that an execution could go wrong" (Mot. at 39-40), and Defendants' assertion that there has been no "actual injury" is false. *Id.* at 40.

Botched executions are not hypothetical, nor are they speculative. They have happened all too often, in Oklahoma and elsewhere, and they have occurred, in part, due to the lack of transparency and accountability in the Execution Protocol. Because they have occurred and undoubtedly will occur in the future, access to counsel and the courts is critical and necessary. Without the ability to access counsel up to the moment of execution, Plaintiffs are "physically unable to file an Eighth Amendment claim," in violation of their constitutional rights. *Zink v. Lombardi*, 783 F.3d 1089, 1108 (8th Cir. 2015) (citation omitted); *see also In re Ohio Execution Protocol Litig.*, 2018 WL 6529145, at **4-5 (access claims premised in part on evidence of difficulties in access during prior execution). Moreover, as a

matter of simple logic, the denial of Plaintiffs' rights – to access to counsel, and the associated denial of access to the courts – in and of itself constitutes an actual injury.

Plaintiffs also are not asking the Court to "fly-speck a state's execution protocol to determine whether it covers everything it could conceivably cover."  Mot. at 39.  Plaintiffs are requesting a specific right for a specific purpose – a meaningful opportunity and ability to take steps to protect their constitutionally guaranteed rights.  That can be accomplished with modest adjustments to the Execution Protocol that are neither invasive nor disruptive; specifically, allowing counsel to be present, and able to communicate with the Plaintiffs, during the process of preparing for and implementing the execution, starting with the setting of IVs, and continuing through the pushing of the syringes to administer the drugs and observing the prisoner's reactions, through the time the prisoner is declared dead. Permitting this access is not "fly-specking."  It is a reasonable and necessary way to ensure Plaintiffs and their counsel have a meaningful opportunity to identify, and take steps to remedy, violations of their fundamental constitutional and statutory rights.

*Finally*, Defendants assert that "even assuming 18 U.S.C. ¶ 3599 confers some right beyond the Sixth Amendment…the Supreme Court presumes that state prison and correctional officials will follow their statutory commands and internal protocols in fulfilling their obligations."  Mot. at 41.  That circular argument makes no sense.  The right of access to counsel and the courts is designed to protect the Plaintiffs in the event situations arise that violate their constitutional rights.  The right of access does not disappear merely because there may be a hope that such problems will not occur.  In any event, as explained above, the Execution Protocol expressly allows the Director the discretion to deviate from or

eliminate the "statutory command and internal protocols" contained therein. That level of uncertainty and opportunity to modify the execution protocols in any manner, at any time, with no applicable criteria or standards, and without any advance notice whatsoever, merely highlights the critical need to zealously protect and enforce the Plaintiffs' right to access during the entire execution process.

### F. There Are Disputed Material Facts Concerning Plaintiffs' Access To Government Information Claim.

Defendants do not dispute that, in order for an execution to be performed in a humane and constitutionally proper manner, compounded drugs used in ODOC executions must meet minimum standards of purity and potency. Compounded drugs are not FDA-approved, and they are subject to less rigorous regulation and oversight than FDA-approved drugs. They thus present a substantial risk of contamination, improper handling, other quality issues, and defective potency.

Instead, Defendants merely argue that "neither the First nor the Fourteenth Amendment grants a prisoner a right 'to know where, how, and why and by whom the lethal injection drugs will be manufactured.'" Mot. at 44-45 (*quoting Wellson v. Comm'r Ga. Dep't of Corr.*, 754 F.3d 1260 (11th Cir. 2014). That argument, however, is unsupported.

Defendants cite no authority in this circuit. Given the troubling history of botched executions in Oklahoma, ensuring disclosure and transparency is particularly important and necessary. Indeed, the concurring judges in the *Wellons* case, on which Defendants rely, made this exact point, noting their "serious concerns about the Defendants' need to keep information relating to the procurement and nature of lethal injection protocol concealed from [plaintiff], the public, and this court, ***especially given the recent much publicized***

44

*botched execution in Oklahoma*." 754 F.3d 1260, 1268 (11th Cir. 2014) (concurrence) (emphasis added). The concurrence went on to note that, "[u]nless judges have information about the specific nature of a method of execution, we cannot fulfill our constitutional role of determining whether a state's method of execution violates the Eighth Amendment's prohibition against cruel and unusual punishment before it becomes too late." *Id.*

In addition, even if the public has no right to access to this information, the Plaintiffs have their own right. When a state has a demonstrated "checkered past with executions," courts are "troubled by the lack of detailed information regarding execution drugs and personnel" and have noted "inmates may be able to assert a procedural due process right to obtain the information" even if the general public does not. *First Amendment Coal. of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1080 (9th Cir. 2019) (citation omitted).

In sum, there are legitimate factual questions concerning the provenance and quality of the execution drugs, and the Court, unconstrained by controlling precedent, should allow this issue to be resolved at trial.

## CONCLUSION

For the reasons set forth above, Defendants' Motion should be denied in its entirety.

Dated:  March 19, 2021                    Respectfully submitted,

                                          *s/ Michael W. Lieberman*
                                          Michael W. Lieberman, OBA #32694
                                          Emma V. Rolls, OBA # 18820
                                          Office of the Federal Public Defender
                                          215 Dean A. McGee Ave., Suite 707
                                          Oklahoma City, OK 73102
                                          Telephone: (405) 609-5975
                                          Michael_Lieberman@fd.org
                                          Emma_Rolls@fd.org

Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
Telephone: (212) 223-4000
hcohen@crowell.com

Jon M. Sands
Federal Public Defender District of Arizona
Dale A. Baich (OH Bar No. 0025070)
Jennifer M. Moreno (Bar No. CA 244967)
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2816
Facsimile: (602) 889-3960
dale_baich@fd.org

COUNSEL FOR PLAINTIFFS

Alex Kursman
Shawn Nolan
Lynne Leonard
Assistant Federal Defenders Capital Habeas Unit
Federal Community Defender Office for the Eastern
District of Pennsylvania
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520

COUNSEL FOR PHILLIP HANCOCK

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2021:

1.      I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to all counsel of record who are registered participants of the Electronic Case Filing System.

2.      I served a hard copy of this document on the following party by First Class Mail via the U.S. Postal Service:

> Wade Lay, DOC # 516263
> Oklahoma State Penitentiary
> P.O. Box 97
> McAlester, OK 74502
> *Pro Se* Plaintiff

> *s/ Michael W. Lieberman*
> Michael W. Lieberman