# EXHIBIT 3

Page 1

1

2                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF OKLAHOMA
3    - - - - - - - - - - - - - - -X
     RICHARD GLOSSIP, et al.,
4
                   Plaintiffs,
5                                          Case No.
     vs.                                   CIV-14-665-F
6
     RANDY CHANDLER, et al.,
7
                   Defendants.
8    - - - - - - - - - - - - - - -X
9

10

11

12           Remote videotaped deposition of DANIEL E.
13    BUFFINGTON, PharmD, taken via Zoom, on February 10,
14    2021, beginning at approximately 9:35 a.m., before
15    Maureen E. Broderick, Registered Professional
16    Reporter and Notary Public in and of the
17    Commonwealth of Pennsylvania.
18

19

20

21

22

23

24

25

```
                                                    Page 35
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2        Q    That says from '87 to '95, correct?
 3        A    Correct.
 4        Q    Let's take a look at what Mercer requires
 5   for a Doctor of Pharmacy.
 6              MR. KURSMAN:  Pilar, can you pull that up?
 7              MS. STILLWATER:  Yes, one moment.
 8              (Discussion off the record.)
 9              MS. STILLWATER:  For the record, this has
10         been pre-marked as Exhibit 1251.
11                   (Exhibit Buffington-1251 was
12                   marked for identification.)
13   1251
14              MR. CLEVELAND:  I'll just note the
15         authentication objection.
16              MR. KURSMAN:  Sure.  I will read the --
17   BY MR. KURSMAN:
18        Q    You see, Dr. Buffington, see page 2 of
19   this web page, it says PharmD at the top?
20        A    Yes.  I don't know that it's page 2, but I
21   see that labeled at the top of this screen.
22        Q    This is from -- I will represent that this
23   is from Mercer University.
24                   You can see, in the very second full
25   paragraph, it says:  Mercer's Doctor of Pharmacy
```

Page 36

1              (D. BUFFINGTON, PharmD - 2/10/21)

2      Program?

3          A     Sure.

4          Q     Do you see it says:  In 1981, the College

5      of Pharmacy became the first pharmacy school in the

6      Southeast and the fifth in the nation to offer the

7      Doctor of Pharmacy (Pharm.D.) as its sole

8      professional degree.  This program requires six

9      years of study following high school, a minimum of

10     two years of pre-pharmacy education at a

11     regionally-accredited college or university and four

12     years of professional curriculum at the College of

13     Pharmacy.

14              Do you see that?

15         A     I do.  It's very tiny, but I see it.

16         Q     And those were the requirements when you

17     got your Doctor of Pharmacy?

18         A     Very similar.

19         Q     Now, can we go to another page on Mercer's

20     website?

21              MR. KURSMAN:  Pilar, can you pull up a

22         different page, which is the admissions page.

23     BY MR. KURSMAN:

24         Q     Dr. Buffington, while we're getting there,

25     did you receive a copy of our exhibits, as well?

                                                              Page 37

                    (D. BUFFINGTON, PharmD - 2/10/21)
 1
 2      A     No.
 3            MR. CLEVELAND:  Counsel, I think the link
 4      you sent me had reports and the references.
 5      I'm not sure it had exhibits.
 6            MR. KURSMAN:  Let's try to get them to
 7      you.
 8            MR. CLEVELAND:  If you can resend me, to
 9      both me and the doctor, that might be helpful.
10            MR. KURSMAN:  So this is Mercer's website
11      again.  Can we go to the second page?
12            MR. CLEVELAND:  Of course, yeah.  Same
13      objection, authentication --
14            MS. STILLWATER:  Can we go off the record
15      for one moment?
16            (Discussion off the record.)
17            VIDEO OPERATOR:  The time is 10:09 a.m.,
18      and we're going off the record.
19            MS. STILLWATER:  Back on the record.
20            VIDEO OPERATOR:  The time is 10:12 a.m.,
21      and we're back on the record.
22                      (Exhibit Buffington-1253 was
23                      marked for identification.)
24   BY MR. KURSMAN:
25      Q    So now what we have pulled up is

```
                                                    Page 38
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2    Exhibit 1253, which is Mercer's Doctor of Pharmacy
 3    website, "PharmD" at the top.
 4                  Do you see that, Dr. Buffington?
 5        A    I do.  I'm on the same page.
 6        Q    Let's go to the third paragraph.
 7                  Do you see it says:  The Mercer
 8    Doctor of Pharmacy program provides the didactic and
 9    clinical preparation for a professional career as a
10    pharmacist?
11                  Do you see that?
12        A    I do.
13        Q    So the degree that you got provided for a
14    professional career as a pharmacist, right?
15              MR. CLEVELAND:  Object to the form.
16    BY MR. KURSMAN:
17        Q    You can answer my question.
18        A    I already did.
19        Q    Oh, I didn't hear your answer.  I
20    apologize.
21        A    I already said it before, yes.
22        Q    And this is an entry-level degree, right?
23        A    It is a professional doctor degree, just
24    like physician.
25        Q    Well, you don't need an undergraduate
```

```
                                          Page 39
```

1              (D. BUFFINGTON, PharmD - 2/10/21)

2   degree to get this degree, right?

3      A    Or for medicine.

4      Q    You don't need an undergraduate degree to

5   get a medical degree?

6                  I'm sorry.  You're muted.  I can't

7   hear you at all.

8      A    Hello.

9      Q    Now I can hear you.

10                 What was your answer to my question?

11     A    The question was, do you need an

12  undergraduate degree to get into med school?  No.

13     Q    Do you have an undergraduate degree?

14     A    No.

15     Q    You're not an anesthesiologist, are you?

16     A    That is correct.

17     Q    You're not a pharmacologist, are you?

18     A    Yes.

19     Q    Yes, you're not a pharmacologist, or yes,

20  you are a pharmacologist?

21     A    Yes, I am a pharmacologist.

22     Q    Well, before we go any further, let's pull

23  up Mercer's Ph.D. program for pharmacology.

24     A    That wouldn't apply.  I didn't do that

25  program.

                                        Page 81

1              (D. BUFFINGTON, PharmD - 2/10/21)

2        Q     Let's go to Shenandoah University.   It

3    says:  College of Pharmacy, Clinical Preceptor, 2004

4    to present.

5                    Do you see that?

6        A     That is correct.

7        Q     When was the -- when was the last time you

8    were a clinical preceptor for Shenandoah?

9        A     I still am a clinical preceptor for

10   Shenandoah.

11       Q     Does that make you -- have you ever taught

12   at Shenandoah?

13       A     I have.

14       Q     What have you taught at Shenandoah?

15       A     Pharmacotherapy and professional practice

16   design.

17       Q     Did they pay you?

18       A     Yes, they did.

19       Q     How much did they pay you?

20       A     A, I don't remember; B, I don't see how

21   that's relevant to this discussion.

22       Q     How much did they pay you?

23             MR. CLEVELAND:  Objection.  Just asked and

24       answered.

25             THE WITNESS:  He didn't hear the last

Page 85

1             (D. BUFFINGTON, PharmD - 2/10/21)

2    paragraph, the very last sentence.

3             Do you see it says:  It is my

4    understanding that Mr. Buffington is not now and has

5    never been an employee of the University?

6        A    Correct.  Nor would I ever state that,

7    either.

8        Q    Now, let's go back to your CV.

9             Now, you list Idaho State University,

10   right?

11       A    That is correct.

12       Q    It says:  College of Pharmacy affiliate

13   faculty member, 2004 to present, right?

14       A    That is correct.  We are still listed as a

15   clinical rotation site with the university.

16       Q    So you're still an affiliate faculty

17   member at Idaho State University, right?

18       A    That is correct.  And affirmed that with

19   their dean.

20             MR. KURSMAN:  Pilar, can you pull up the

21        Idaho State document.  This will be

22        Exhibit 1245 for the record.

23                  (Exhibit Buffington-1245 was

24                  marked for identification.)

25             MR. CLEVELAND:  Page 3.

                                                    Page 86

1              (D. BUFFINGTON, PharmD - 2/10/21)

2              MR. KURSMAN:  Yep.

3    BY MR. KURSMAN:

4         Q    First, you see this is a letter --

5                   Can you scroll up a bit, Pilar.

6                   This is a letter from Idaho State

7    University, the Office of General Counsel --

8         A    Who I would have no affiliation with.

9         Q    If you go down to the bottom --

10                  Can you go down to the bottom, Pilar.

11                  It's signed by James Francel,

12   Associate General Counsel.

13        A    Correct.  Who I have no association with.

14        Q    Okay.  Do you see it says, at the very

15   end:  The records attached contain the 2003 and 2009

16   application of Dr. Buffington.  Dr. Buffington did

17   not submitted [sic] the required paperwork in 2014,

18   and therefore he is no longer an active affiliate

19   faculty at the university.

20                  Do you see that?

21        A    I do.

22        Q    So they don't consider you an active

23   affiliate faculty at the university, right?

24             MR. CLEVELAND:  Object to form.

25             THE WITNESS:  Which is different than the

```
 1            (D. BUFFINGTON, PharmD - 2/10/21)
 2    opinions as unreliable and irrelevant to the issues
 3    in the case.
 4                 Do you see that?
 5       A    I do see that.  So you highlighted a
 6    point.  That should be stricken from my list because
 7    I never did give testimony.
 8       Q    Well, you testified in a deposition,
 9    right?
10       A    Thank you.
11            MR. KURSMAN:  Let's go back to that case
12       again, Pilar.
13            (Discussion off the record.)
14    BY MR. KURSMAN:
15       Q    Do you see it says:  Buffington's opinion
16    is entirely without any intellectual rigor or
17    indicia of reliability.
18                 Do you see that?
19       A    I do.  I don't know who wrote that.  That
20    would be incorrect.
21       Q    Well, let's go to the top of the exhibit.
22       A    Let's go the what?
23       Q    Let's go to the top of the exhibit to see
24    who wrote it.
25                 (Reporter clarification.)
```

```
                                              Page 112
 1          (D. BUFFINGTON, PharmD - 2/10/21)
 2             It says -- this is what the United
 3    States magistrate judge said:  Buffington's opinion
 4    is entirely without any intellectual rigor or any
 5    indicia of reliability.
 6       A    So without understanding the medical
 7    topics, that could be his opinion, but he doesn't go
 8    on to substantiate why he states -- why he believes
 9    that.
10       Q    Do you see he says:  His opinion rests on
11    its own ipse dixit?
12       A    That's his opinion.
13       Q    His opinion is that your opinion rests on
14    unproven statements; is that right?
15             MR. CLEVELAND:  Object to the form.
16             THE WITNESS:  As previously stated, that's
17        that judge's opinion.  But I understand the
18        issues and the merits of that case.
19             The judge can make a statement.  It
20        doesn't mean they're correct.
21    BY MR. KURSMAN:
22       Q    This was the only case that you didn't
23    list a case number for.
24       A    Actually, it's now going to be a case that
25    I scratch because it's noncompliant to have it on
```

1          (D. BUFFINGTON, PharmD - 2/10/21)

2     A     Could be what?

3     Q     Compounded.

4     A     It can be compounded.

5     Q     Do you recall testifying that

6  pentobarbital isn't difficult to compound?

7     A     No.  But it can be compounded.

8     Q     Do you recall testifying that you could

9  compound it?

10     A     Under the right circumstances, sure.  I'm

11  not offering to do that.

12     Q     I didn't ask if you were offering to do

13  it.  All I'm asking is, do you have the ability to

14  compound pentobarbital?

15     A     Currently, in my current scenario, no.

16     Q     Why not?

17     A     Wow.  I don't have a lab configured to do

18  that.

19     Q     Why did you say you could do it back in

20  Wilson v. Dunn, back in 2015, but you can't do it

21  now?

22     A     I still can --

23          MR. CLEVELAND:  Object to form.

24          THE WITNESS:  Yeah, I object to the form,

25     as well.

1           (D. BUFFINGTON, PharmD - 2/10/21)

2    previously testified that you did have discussions

3    with colleagues in conferences and they said they

4    would compound pentobarbital for departments of

5    corrections for executions?

6        A    I do.  Now, I also remember --

7             MR. CLEVELAND:  Object to form.

8             THE WITNESS:  Subsequent to that, I also

9        remember reaching out to them, finding, as I

10       stated, no one who actually is willing to do

11       it.

12   BY MR. KURSMAN:

13       Q    Who did you reach out to them -- did you

14   reach out to them on behalf of DOC?

15       A    No.

16       Q    You just reached out to them and asked?

17       A    Yes.

18       Q    And do you recall what they told you?

19       A    As I stated.

20       Q    Do you remember testifying that they told

21   you not unless there was privacy and that they were

22   contacted directly by DOC?

23       A    I --

24            MR. CLEVELAND:  Object to form.

25            MR. KURSMAN:  What's that?  I'm sorry?

```
                                             Page 148
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2    correct?
 3         A    No.  That's an area of practice.  So if
 4    you look at pharmacology, understanding the positive
 5    attributes of medication and the negative attributes
 6    are both elements of the specialty.
 7         Q    Do you understand that there are master's
 8    degrees in toxicology?
 9         A    Correct.  That would be a lesser degree
10    and only focused on toxicology.  I have a doctor's
11    degree that includes toxicology as a therapeutic
12    focus within it.
13         Q    You don't have a degree in toxicology,
14    right?
15         A    No.  My degree includes toxicology.
16         Q    Are you saying you're an expert in
17    toxicology?
18         A    Yes.  And I provide that service on a
19    routine basis.
20         Q    Even though your degree is only in
21    pharmacy?
22              (Overtalking.)
23              MR. CLEVELAND:  Object to the form and to
24         the extent that mischaracterizes prior
25         testimony.
```

Page 149

1            (D. BUFFINGTON, PharmD - 2/10/21)

2            Now go ahead, Doctor.

3            THE WITNESS:  Yes, I think that's a

4       mischaracterization.  The Doctor of Pharmacy

5       degree is a broad clinical degree, like an MD,

6       that encompasses a wide range of

7       pharmacotherapy, a wide range of

8       pathophysiology.

9            I don't know.  Maybe you don't know the

10      degree or the program.

11  BY MR. KURSMAN:

12      Q    I'm just trying to figure out what area of

13  expertise doctors of pharmacy can claim to have.

14            I'm wondering all of your areas of

15  expertise, and so --

16      A    So part -- go ahead.

17      Q    You go ahead.  Why don't -- go ahead.  Go

18  ahead.

19            MR. CLEVELAND:  What's the question?

20            I'll object to the extent there's no

21      question on the table yet.

22  BY MR. KURSMAN:

23      Q    Why don't you tell me what areas you

24  believe that you are an expert in.

25      A    Sure.  Clinical pharmacology and

Page 181

1                (D. BUFFINGTON, PharmD - 2/10/21)
2          question.
3                I'm saying that if you have a short
4          procedure and it's in the plane of general
5          anesthesia, you are in the plane, and that is
6          why this product is used as a sole agent.
7    BY MR. KURSMAN:
8          Q    A sole agent to maintain general
9    anesthesia?
10         A    You're missing the point right there.
11   You're plucking a word.
12                    It would be a maintenance if you
13   needed to extend beyond the induction period.  So
14   how long do you hit and achieve the plane?  And
15   that's in the first two hours.
16                    So if your procedure is 15 to 20
17   minutes, you're in general anesthesia at that
18   moment.
19                    If you need to go two, three, four
20   hours for the duration, that would not be an
21   appropriate choice.  You would want to have a
22   balanced anesthesia model or regimen designed for
23   the needs of that procedure, that patient, and that
24   team.
25                    I don't think I'm -- I'm not

```
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2   advocating midazolam alone for longer procedures.
 3         Q     But what you are advocating for, just so
 4   I'm clear, is that midazolam can be used as the
 5   only -- as the sole anesthetic agent in any painful
 6   procedure, no matter how painful it is, so long that
 7   it lasts 15 to 20 minutes?
 8              MR. CLEVELAND:  Object to the form and to
 9         the extent it mischaracterizes testimony.
10              THE WITNESS:  No.  You keep trying to put
11         words in my mouth.
12   BY MR. KURSMAN:
13         Q     Am I wrong?
14         A     Yes, you're wrong.
15         Q     So, then, what are you saying?
16         A     Well, not what you're saying.
17              MR. CLEVELAND:  Object to the extent
18         there's no question pending.
19   BY MR. KURSMAN:
20         Q     Let me ask you this, then:  Are you saying
21   that midazolam shouldn't be used as the sole
22   anesthetic agent for a procedure that lasts only 15
23   to 20 minutes, if that procedure was a heart
24   surgery?
25         A     There are diagnostic procedures and
```

1          (D. BUFFINGTON, PharmD - 2/10/21)

2    anesthesiologists on what anesthetic drugs to use?

3        A     Emory University, USF.

4        Q     Do you remember the last time you taught

5    anesthesiologists on what medications to use?

6        A     Under the nature of consultations, it's

7    somewhat routinely.

8        Q     Would you consider yourself an expert in

9    levels of anesthetic death?

10       A     Yes --

11             MR. CLEVELAND:  Object to the form.

12             THE WITNESS:  -- as part and parcel to

13        understanding the pharmacologic effects and the

14        medication management and setting goals for

15        therapeutic outcomes and patient safety.

16   BY MR. KURSMAN:

17       Q     Let's go to the next paragraph, paragraph

18   26 -- or I guess --

19       A     Twenty-five.

20       Q     Let's go to 26.

21       A     Okay.

22       Q     Do you see the last sentence you said:  An

23   injection of 500 milligrams midazolam in an average

24   adult will produce an average serum concentration of

25   31.35 micrograms per milliter, approximately 35

1        (D. BUFFINGTON, PharmD - 2/10/21)

2        Q    Are you going to answer my question,

3   Dr. Buffington?

4        A    No.

5        Q    You're certainly not an expert in

6   anesthesiology, right?

7             MR. CLEVELAND:  Object to the form.

8             THE WITNESS:  Pharmacologic agents in

9        anesthesiology.

10   BY MR. KURSMAN:

11        Q    Are you an expert in anesthesiology?

12        A    Pharmacologic anesthetic agents, yes.

13        Q    Are you an expert on levels of sedation?

14        A    As it relates --

15             MR. CLEVELAND:  Object to form.  Object to

16        form.

17             Go ahead.

18             THE WITNESS:  As it relates to monitoring

19        medications, yes.

20   BY MR. KURSMAN:

21        Q    You cite the American Society of

22   Anesthesiologists' chart.  So let's turn to that.

23        A    Where is that cited?

24        Q    That's cited in your report, just at the

25   end for references.  And you see in paragraph 30,

Page 259

1                (D. BUFFINGTON, PharmD - 2/10/21)
2       procedure, then that's inappropriate, to say that it
3       would just be that.
4            Q    Will you tell me what hospitals only
5       administer midazolam for those short procedures that
6       you discussed?
7                 MR. CLEVELAND:  Same instruction as
8            before.  You can answer to the extent that it
9            doesn't violate HIPAA.
10      BY MR. KURSMAN:
11           Q    Did you answer?  I apologize.  I didn't
12      hear you.
13           A    I did.  I said, "No, sir."
14           Q    Will you tell me what doctors' offices?
15           A    No, sir.
16                MR. CLEVELAND:  Same instruction.
17      BY MR. KURSMAN:
18           Q    Will you tell me when you've observed this
19      in the clinical setting?
20                MR. CLEVELAND:  Same instruction.
21                THE WITNESS:  No, sir.
22      BY MR. KURSMAN:
23           Q    Are you also an expert in pain, as well?
24           A    Yes.  It's a significant component in our
25      practice population.

1          (D. BUFFINGTON, PharmD - 2/10/21)

2      A    Upper right corner?

3      Q    Patients were given up to 20 milligrams of

4  midazolam?

5      A    Correct.  With an average of 9.1.

6      Q    And then, if we look at table 1 --

7      A    Correct.

8           MR. KURSMAN:  Pilar, can we go down to

9      table 1?

10  BY MR. KURSMAN:

11     Q    Do you see that the average BIS score --

12     A    I do.

13     Q    -- is 69.2 and the low --

14     A    That's correct.

15     Q    That's the lowest average BIS score.

16          Do you see that?

17     A    Right.  But that's also incomplete

18  sedation, based on the OAA/S score system.

19          (Reporter clarification.)

20          THE WITNESS:  That was based on the -- a

21     level or score of 1 in the OAA/S scoring

22     system.

23  BY MR. KURSMAN:

24     Q    And if you -- the average BIS is 69.2,

25  right?

```
                                                Page 264
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2        A     Correct.
 3        Q     And that lowest average BIS score is
 4   higher than 60, right?
 5        A     Correct.  But lower than 70 and only at
 6   9 milligrams in a dose-dependent medication.
 7        Q     Then it says plus or minus 13.9.
 8        A     That is correct.
 9        Q     Are you relying on Liu, because it says
10   69, plus or minus 13.9, at least one patient got
11   below 60?
12              MR. CLEVELAND:  Object to the form.
13              THE WITNESS:  What?  That made no sense.
14   BY MR. KURSMAN:
15        Q     Why are you relying on this BIS score of
16   69?
17              MR. CLEVELAND:  Object to the form.
18              THE WITNESS:  Because the graph is
19        demonstrating that patients are dropping to as
20        low as below 40 at 9 milligrams, with an
21        average of 69.  And the level of score of 1 is
22        not one patient.  That's full sedation and not
23        responsive to noxious stimuli at 9 milligrams,
24        not 500.
25   BY MR. KURSMAN:
```

```
                                         Page 268
 1            (D. BUFFINGTON, PharmD - 2/10/21)
 2                 So do you see this chart that shows
 3      that subjects got up to 10 milligrams of midazolam?
 4            A    Correct.
 5            Q    You see the lowest BIS score, after four
 6      minutes, was 71?
 7            A    No.
 8            Q    Well, let's look at the average.  In the
 9      BIS, 4 minutes after studied drug -- let's go
10      over -- and it says:  The average is 71.  And then
11      in parentheses, it says:  (66 to 86).
12                 Do you see that?
13            A    No.
14            Q    Are you on page 5?
15            A    If you could highlight where you're seeing
16      that.  I see the 10-milligram column.
17                 MR. KURSMAN:  Pilar, if you could move
18            that hand right to where it says 71.
19                 THE WITNESS:  Yes.
20      BY MR. KURSMAN:
21            Q    And the range is from 66 to 86.  Do you
22      see that?
23            A    Correct.  But this wouldn't be a direct
24      correlation with the execution protocol, because it
25      uses 500 milligrams.
```

Page 276

1              (D. BUFFINGTON, PharmD - 2/10/21)

2              MR. KURSMAN:  I believe it's page 6.  It

3         says -- can you go up a page, please.  If you

4         would do a control-F, Pilar, for "these results

5         are consistent."

6              Oh, here it is.  I see it in here.

7    BY MR. KURSMAN:

8         Q    Do you see it says:  These results are

9    consistent with those reported earlier showing that

10   BIS decreased only to 70 by the end of continuous

11   infusion of midazolam at 0.03 milligrams per

12   kilogram for 10 minutes and the maximum effect of

13   midazolam on the BIS is approximately 70.

14        A    Correct.  On a lower dose, which is

15   associated with deep sedation and amnesia.

16              And the other factor that's the

17   takeaway is that all these patients hit the lowest

18   level of anesthesia consistent with being

19   nonresponsive to noxious stimuli.

20        Q    Then if you go down two sentences, the

21   very last part of Pilar's highlighting, do you see

22   it says:  These findings suggest that BIS does not

23   decrease further even if plasma concentration

24   increases to levels higher than that required by

25   sedation?

```
 1              (D. BUFFINGTON, PharmD - 2/10/21)
 2      A     Correct.  However, the problem is, is that
 3   the authors in this study only used two dosing
 4   groups that were close together.  .2 and
 5   .3 milligrams per kilogram.  There is not in this
 6   study comparative data at higher doses and nothing
 7   that rivals what's used in the execution protocol.
 8              MR. KURSMAN:  Pilar, can you go up to the
 9          top of this study.
10   BY MR. KURSMAN:
11      Q     Do you know that the authors are from a
12   department of anesthesiology?
13      A     Sure.  And your point?
14      Q     The point is, do you believe you have more
15   expertise in anesthesiology than authors of a report
16   from a department of anesthesiology?
17      A     Given that --
18              MR. CLEVELAND:  Object to the form.
19              THE WITNESS:  Given that that is the
20          population that I teach and provide
21          consultative services for, I hope so, when it
22          comes to the pharmacology.
23              In addition to this -- what we're talking
24          about here is study design, not their opinion.
25              If the study design didn't go out further,
```

                                                        Page 279

1            (D. BUFFINGTON, PharmD - 2/10/21)

2            The only data you're going find on

3      continuum is when people have tried to do a

4      calculated theoretical model based on animal

5      data and then tried to say, well, if I carry it

6      way out, this is what I think it will be.

7      That's postulation.

8            So we really don't see a ceiling effect

9      with midazolam.

10           And the other issue is, if you are already

11     therapeutically able to achieve levels of

12     sedation to be used for general anesthesia,

13     respected, acknowledged and used for, then I'm

14     really confused on why a theoretical ceiling

15     dose later has any merit in the discussion.

16           You've already demonstrated that doses far

17     less than the 500, that you achieve that.  So

18     there's nothing in the data that says going to

19     500 removes the effect that's already produced

20     along that way, whether it's 20, 25, 30,

21     50 milligrams.  There's nothing that says 500

22     abates that and somehow reverses that effect.

23   BY MR. KURSMAN:

24     Q    Are you aware that this study found the

25   maximum effect of midazolam on the BIS is lowering

```
                                              Page 280
```

2     the BIS to 70?

3          A    Yes.  In two --

4               MR. CLEVELAND:  Object to the form.

5               THE WITNESS:  Yes.  In two specific

6          subgroups of dosing, .2 and .3, yes.

7     BY MR. KURSMAN:

8          Q    Are you aware that these authors, who are

9     from an anesthesiology department, reported that

10    these findings suggest that the BIS does not

11    decrease further even if plasma concentration

12    increases to levels higher and than that required by

13    sedation?

14              MR. CLEVELAND:  Object to the form.

15              THE WITNESS:  Which you cannot say from

16         that data.

17              So do I see the authors say that?  Sure.

18              Are they speculating?  Yes.

19              Can you say that definitively from this

20         data?  No.

21              MR. KURSMAN:  Pilar, can we turn to page 3

22         now, under Study Protocol.  Up a bit.  Up a

23         bit.  Up a bit.  Pilar, could you go up a bit.

24         Up a bit more.

25              THE WITNESS:  Top of page 3, you said.