## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

RICHARD GLOSSIP, et al.,    )
                                 )
      Plaintiffs,        )
                                 )
-vs-                     )    Case No. CIV-14-0665-F
                                 )
RANDY CHANDLER, et al.,    )
                                 )
      Defendants.      )

## <u>ORDER</u>

Before the court is defendants' motion for summary judgment, doc. no. 388. By this order, the motion is granted in part and denied in part.

This action challenges Oklahoma's execution protocol under the United States Constitution, the Oklahoma Constitution and other laws. It is brought by inmates who have been sentenced to death by the State of Oklahoma. Defendants are state actors, sued in their official capacities only, who are charged with carrying out the death sentences. The case has already been before the Supreme Court, but that was at the preliminary injunction stage and involved an earlier version of Oklahoma's lethal injection protocol. On October 16, 2015, a few months after the Supreme Court's ruling on June 29, 2015 affirming denial of plaintiffs' motion to preliminarily enjoin executions, this action was administratively closed, by agreement, for an indefinite period. The purpose of the closure was to permit the state to investigate and amend its execution procedures. This action was reopened on March 19, 2020. On July 6, 2020, a Third Amended Complaint was filed, challenging the state's new protocol. Certain counts of the Third Amended Complaint were dismissed by the court on a motion to dismiss. The remaining

counts are challenged by the motion for summary judgment which is now before the court.

A. Procedural History

Including doc. no. 392, which was stricken, and doc. no. 397, which is moot because it replied to doc. no. 392, the motion for summary judgment resulted in the following filings:

| Date filed | Doc. No. | Filed by | Name of Document |
|---|---|---|---|
| 2-19-21 | 388 | Defendants | Defendants' Motion for Summary Judgment and Brief in Support |
| 3-19-21 | 392 | Plaintiffs | Opposition of plaintiffs (other than Wade Lay) to Defendants' Summary Judgment Motion (stricken,[1] along with doc. nos. 393 and 394) |
| 3-26-21 | 397 | Defendants | Reply in Support of Defendants' Motion for Summary Judgment  (superseded by doc. no. 433) |
| 5-7-21 | 422 | Defendants | Defendants' Supplemental Brief in Support of Their Motion for Summary Judgment |
| 5-14-21 | 425 | Plaintiffs | Opposition of Plaintiffs (other than Wade Lay) to Defendants' Summary Judgment Motion |
| 5-27-21 | 433 | Defendants | Reply in Support of Defendants' Motion for Summary Judgment |

B. Plaintiffs' Claims

In their Third Amended Complaint, doc. no. 325, filed on July 6, 2020, plaintiffs asserted the following claims:

| Count I | Fifth[2] Amendment Due Process claim based on asserted failure to disclose sufficient information re: development of the protocol and execution procedures. **Dismissed** per order at doc. no. 349. |
|---|---|
| Count II | Eighth Amendment claim asserting that constitutionally impermissible pain and suffering will result from the use of the three-drug lethal injection protocol (midazolam, vecuronium bromide and potassium chloride). |

---

[1] Doc. no. 392 was stricken as a result of plaintiffs' failure to comply with LCvR56.1.  The court chose to strike that response rather than taking as true the defendants' statement of uncontroverted facts.  *See*, Order, doc. no. 401.

[2] As was noted at an earlier stage of this action, the Fifth Amendment does not apply to the defendants in this case.  Doc. no. 349, at 4 (Count I construed as asserted under the Fourteenth Amendment).

| Count III | Eighth and Fifth[3] Amendment claim asserting "deliberate indifference" to the serious medical needs of the plaintiffs. **Dismissed** per order at doc. no. 349. |
| Count IV | First, Fifth[4] and Sixth Amendment claim asserting unconstitutional denial of access to counsel and the courts. |
| Count V | 18 U.S.C. § 3599 claim asserting intentional deprivation of right to counsel. |
| Count VI | *Ex Post Facto* claim under U.S. and Oklahoma Constitutions, based on substitution of midazolam. |
| Count VII | Fourteenth Amendment Due Process claim based on use of midazolam instead of barbiturate. |
| Count VIII | Religious freedom claim asserting violation of plaintiffs' sincerely-held religious beliefs resulting from necessity of proposing a feasible alternative method of execution. **Dismissed** per order at doc. no. 349. |
| Count IX | Eighth and Fourteenth Amendment claim asserting that plaintiffs will be subjected to constitutionally impermissible human experimentation. |
| Count X | First and Fourteenth Amendment claim asserting denial of right of access to governmental information. |

## C. Summary Judgment Standard

Under Rule 56, Fed. R. Civ. P., summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

---

[3] See note 2. Plaintiffs elected not to persist with their Fifth Amendment Due Process claim. Doc. no. 349, at 8.

[4] See note 2.

D. <u>The Motion Will Be Granted in Part and Denied in Part as to Count II</u>

The heart of plaintiffs' case is Count II, their direct Eighth Amendment challenge to the lethal injection protocol adopted by the State of Oklahoma on February 20, 2020.[5]  The protocol includes three alternatives for execution by lethal injection, as set forth in Chart A, Chart B and Chart D (Chart C is reserved).  Chart A contemplates completion of the execution with a single dose of pentobarbital.  Similarly, Chart B specifies a single dose of sodium pentothal.  Those two drugs have been used successfully in numerous executions, but "a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences."  Glossip v. Gross, 576 U.S. 863, 869-70 (2015) (this case at earlier stage).  Consequently, Chart D of the Oklahoma protocol provides for sequential use of three readily-available drugs, midazolam, vecuronium bromide (a paralytic) and potassium chloride (to induce cardiac arrest).  The actual effect of midazolam is hotly contested in this action, as it has been in other cases in other courts.

Plaintiffs' principal claim is that midazolam cannot be relied upon to render the prisoner undergoing execution by lethal injection insensate to pain, with the result that execution using Chart D of the protocol will subject the prisoner to a constitutionally unacceptable risk of severe pain and suffering as the lethal injection process proceeds.  Plaintiffs also challenge other features of the protocol, including, prominently, the adequacy of the provision for a consciousness check to be performed after the midazolam is injected but before the second two drugs are

---

[5] All references to the February 20, 2020 protocol (entitled: <u>Execution of Inmates Sentenced to Death</u>) are to that document as it appears in the record as Exhibit 1 to defendants' motion, doc. no. 388-1.  For brevity, the document (including attachments) will simply be referred to in this order as "the protocol," and references to pages will be to the relevant page of the document at doc. no. 388-1, without further citation to the subsection of the protocol or to the ECF docket entry.

pushed.  Defendants, for their part, maintain that lethal injection using the Chart D combination of drugs, implemented with the benefit of other safeguards written into the protocol, clears the Eighth Amendment bar.  The court has concluded, on Count II, that defendants are entitled to judgment as a matter of law under Rule 56 as to six of the thirty-two plaintiffs but that summary judgment should be denied as to the others.

———————————————————————

As Justice Gorsuch wrote two years ago, "the Eighth Amendment does not guarantee a prisoner a painless death–something that, of course, isn't guaranteed to many people, including most victims of capital crimes."  Bucklew v. Precythe, 139 S.Ct. 1112, 1124 (2019).  Also worthy of note is the fact that the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual," id., and that the deference that is due a state's choice of execution procedures means that courts, in method-of-execution challenges, do not sit as "boards of inquiry charged with determining 'best practices' for executions."  Bucklew, 1125, quoting from Baze v. Rees, 553 U.S. 35 (2008).  The case at bar has already been to the Supreme Court and back, all on the issue of the constitutionality of a midazolam lethal injection protocol, but that was at the preliminary injunction stage.  The matter is now before the court for final adjudication, by way of summary judgment or trial, based on a new protocol.

1.  The substantive standards applicable to Count II

The Eighth Amendment standards applicable in this case were articulated by the Supreme Court in Baze, in this case (Glossip, 576 U.S. 863), and in Bucklew.  Those decisions will be discussed here only to the extent necessary (i) to explain why summary judgment on the Eighth Amendment claim will be granted as to some plaintiffs but denied as to others, and (ii) to define the issues remaining for trial.

Defendants argue, in substance, that a successful lethal injection challenge must satisfy both prongs of a two-prong test, as first articulated in <u>Baze</u> and emphatically confirmed (over equally emphatic dissents) in <u>Glossip</u>.  That is correct as far as it goes, but, importantly, the two prongs are not wholly independent of each other; there is some overlap.  Specifically, if there is a fact issue precluding summary judgment for defendants on one of the two prongs, that fact issue may well (and apart from other obstacles to summary judgment) preclude summary judgment on the other.  This is because, as discussed below, the question of whether the prisoner has made his case under the first prong (which hinges on whether the state's method presents a substantial risk of severe pain) is to be determined, at least in part, by looking at how attractive the prisoner's proffered alternative is when compared to the state's chosen method (the second prong).  Thus, where the prisoner, as the non-moving party, enjoys the benefit of all factual inferences reasonably supported by the record, the prisoner is in an advantageous position–again, for summary judgment purposes–if he can raise a triable fact issue as to a proffered method that *might* be more than "slightly or marginally safer," <u>Glossip</u> at 877, than the state's proposed method.[6]

First Prong.  In <u>Bucklew</u>, the court, summarizing its decisions in <u>Baze</u> and <u>Glossip</u>, held that the prisoner who challenges the state's method of execution must show that the state's method presents "a substantial risk of severe pain."  <u>Bucklew</u>, at 1125.  A method of execution that presents a "substantial risk" is one that "is *sure or very likely* to cause serious illness and needless suffering."  <u>Glossip</u>, 877 (quoting from <u>Baze</u>, emphasis in original).

---

[6] It goes without saying, but is nonetheless worth mentioning, that, at trial, the prisoner, having the burden of proof, does not have that advantage.

The risk presented by the state's method is not assessed in the abstract or on an absolute scale.  To the contrary, the court's task "is a *necessarily* comparative exercise."  Bucklew, 1126 (emphasis in original).  Thus, the prisoner must show that "the risk is substantial when compared to the known and available alternatives."  Glossip, 878 (internal quotation omitted).  This is where the second prong comes in.

Second Prong.  It is clear from Bucklew (again summarizing Baze and Glossip) that the alternative method of execution the prisoner is obliged to propose must be "feasible and readily implemented," and it must be one that "the State has refused to adopt without a legitimate penological reason."  To be considered at all, the prisoner's proposal must be "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'"  Bucklew, at 1125, 1129.  And the "mere fact that a method of execution might result in some unintended side effects does not amount to an Eighth Amendment violation."  Glossip, 882, n. 3.  Although states, of necessity, are free to use previously untried methods, it is quite unlikely that an untried method will pass muster as *the prisoner's* proposed alternative: "[C]hoosing not to be the first to experiment with a new method of execution is a legitimate reason to reject it."  Bucklew, 1130.

The proposed alternative need not be one "presently authorized by" state law.  Bucklew, 1128.  Thus, the prisoner "may point to a well-established protocol in another State as a potentially viable option."  *Id.*  But it is not enough to argue for "a slightly or marginally safer alternative."  Glossip, 877 (quoting from Baze).  The "difference [in risk] must be clear and considerable."  Bucklew, 1130.  That said, in a passage that has a natural tendency to accentuate the importance of the first prong (degree of risk and severity of pain), the Court, in Bucklew, observed that "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative—assuming, of course, that the inmate is more interested in avoiding unnecessary pain than in delaying his execution."  *Id.* at 1128-29.  (As is

discussed below in Part 3, this passage also drives home the point that the "available alternative" that the prisoner must "identify" is to be proffered by the prisoner for use in *carrying out his death sentence*, and not for the purpose of setting up another round of Eighth Amendment litigation.)

As has been seen, the court's reckoning of whether the state's proposed method presents a constitutionally unacceptable risk of severe pain is, in large part, the product of a comparison of the risk and pain inherent in the state's method with the risk and pain inherent in the defendant's proffered alternative method of execution. When the state moves for judgment as a matter of law, any of the proffered alternatives (Glossip second prong) that cannot be eliminated as a matter of law become players in the competition against the state's chosen method. The court then determines (bearing in mind this is under Rule 56) whether the state has demonstrated as a matter of law that the prisoner cannot prevail on the first prong– the key question being whether "the risk of pain associated with the State's method is 'substantial when compared to a known and available alternative.'" Bucklew, 1125 (quoting from Glossip at 878).

2. Summary judgment denied – first prong

Some basic facts–such as what Oklahoma's new execution protocol actually says–are not in dispute. And, as is made plain elsewhere in this order, the facts that compel summary judgment on all of plaintiffs' remaining claims other than Count II are not in dispute. But, as to Count II, plaintiffs' direct Eighth Amendment challenge to the new protocol, fact issues preclude summary judgment in favor of the defendants as to those plaintiffs who have, as they must, designated at least one alternative means of carrying out their own sentence of death. The factual disputes arise mostly, if not entirely, from conflicts in the expert testimony and the inferences to be drawn from that testimony. That aspect of the matter–the battle of the experts– is addressed below. It suffices to say at this point that defendants' motion is

essentially an invitation to the court to try this case on the papers before it.  For the reasons set forth below, the court declines to do so.

A survey of defendants' basic contentions and of plaintiffs' responses thereto will show why the court declines to enter summary judgment on Count II. Defendants' arguments for summary judgment on Count II are advanced on pp. 23-32 of defendants' summary judgment brief, doc. no. 388.  Those arguments and plaintiffs' responses will be summarized here.[7]

Defendants first argue, correctly, that the Supreme Court has already spoken positively–in this case, no less–of the use of midazolam in a lethal injection protocol and that, post-<u>Glossip</u>, other states have used a 500 milligram midazolam protocol without incident.   As will be seen, this argument provides the backdrop for defendants' more specific contentions as to the efficacy of midazolam when used as they propose to use it.  The Supreme Court's observation about the successful use of midazolam for execution purposes should not (and will not) be taken lightly, but that comment was made at the preliminary injunction stage of this case.  The Court of Appeals has made it clear (as is plain from the text of Rule 65) that a preliminary injunction hearing is just that–preliminary–and that any resulting adjudications are equally preliminary.  <u>Sec. & Exch. Comm'n v. Pearson</u>, 426 F.2d 1339, 1344 (10th Cir. 1970).   As for the present state of the record with respect to midazolam, plaintiffs cite and quote from the report of one of their experts[8] to the effect that

---

[7] To avoid encumbering this order with excessive (and needless) citations to the record, it suffices to say that all of the defendants' arguments relating to the <u>Glossip</u> first prong are to be found at pp. 23-32 of their brief and all of plaintiffs' arguments in response are at pp. 28-37 of their brief in opposition, doc. no. 425.  This order will cite specific pages in those sections of the briefs only as necessary for clarity.

[8] The papers before the court on summary judgment do not, in terms, challenge the qualifications of any of the parties' experts.  The deadline for Daubert motions was February 26, 2021.  Doc. no. 350.  None were filed.  (At an earlier stage of this case, the court urged counsel on both sides to

midazolam "cannot reliably render the prisoner insensate to the terror of chemical suffocation from the second drug (vecuronium bromide) or the pain of being burned alive from the inside from the third drug (potassium chloride)." (Quoting from doc. no. 388-4, at 31.) There is a fact issue as to whether midazolam performs as well, for execution purposes, as defendants claim it does.

Next, defendants advance more specific arguments as to the effect of midazolam. These arguments go to the actual effect of midazolam on the prisoner's ability to feel pain during the lethal injection process. On this point, the court notes, preliminarily, that defendants use some loose terminology, leaving the court uncertain as to what, exactly, they contend midazolam will actually accomplish when used as specified in the protocol. Defendants first argue that a 500 milligram dose of midazolam will induce "general anesthesia." Doc. no. 388, at 24. Defendants next address the matter in terms of "deep sedation." *Id.* at 26. Still later, they talk about "midazolam's ability to produce unconsciousness." *Id.* at 27. But when discussing the effect of injection of the second drug (vecuronium bromide), they revert to the "deeply sedated" frame of reference for midazolam. *Id.* at 30.

In response, plaintiffs take a slightly different tack. They argue, with backing from one of their experts, that the *duration* of midazolam's effect is the problem, because it is not enough for midazolam simply to *induce* anesthesia, the point being that (per plaintiffs' theory of the case) the prisoner is subjected to the possibility of a sequence of painful episodes as the execution unfolds (first, the sense of suffocation resulting from immediate onset of pulmonary edema, next the sense of chemical suffocation resulting from the injection of vecuronium bromide, and finally the burning sensation resulting from the injection of the potassium chloride). Thus, plaintiffs say, simply inducing anesthesia will not suffice. Anesthesia must be

---

carefully consider whether, under all the circumstances in this nonjury case, Daubert motions are really necessary.)

maintained, which one of their experts says midazolam will not do: "[E]ven if anesthesia is successfully induced using only midazolam, a subject will not remain in an insensate and anesthetic state after they are subjected to even mild pain stimuli." Report at doc. no. 388-5, p. 38, ¶ 93 (citing an article in a professional publication). There is a fact issue as to whether midazolam will reliably render the prisoner insensate to pain–however the required level of suppression of consciousness might be expressed–for the length of time necessary to avoid a constitutionally unacceptable risk that the prisoner will be subjected to a constitutionally unacceptable level of pain.

Defendants next argue that the existence of midazolam's purported "ceiling effect" (broadly speaking, a tendency of the drug's potency to level off even as the dosage increases) has not been supported by scientific data supporting a contention that the ceiling effect kicks in before the midazolam can serve its purpose.[9] The significance of this contention is that if the ceiling effect does keep midazolam from reliably performing as intended during the lethal injection process, that raises a serious question as to whether the protocol can pass constitutional muster (or, at a minimum, significantly complicates the matter). The ceiling effect has been litigated in a dozen or more courtrooms around the country, but it has not been litigated with finality in this case. On that score, the plaintiffs have proffered the expert report of a board-certified anesthesiologist attesting to the ceiling effect (with support from several published sources in the field). To be sure, the up or down question of the existence of the ceiling effect is the beginning, not the end, of the analysis, but the

_____

[9] Not necessary to address in this order is the question of whether the ceiling effect, if it exists, is likely to come into play at a dosage of 500 milligrams or less, or otherwise at a level that would call into question the efficacy of midazolam when used for the purpose of completing an execution per the protocol.

materials in the record get the plaintiffs far enough down that road to avoid a definitive determination on that issue at this stage.

Defendants also engage directly with plaintiffs on a range of issues relating to plaintiffs' contention that midazolam induces pulmonary edema and does so in a way that causes the prisoner to experience what plaintiffs characterize as an intolerable sensation of asphyxiation, equivalent to a botched hanging.  Defendants' overarching argument is that "[p]laintiffs have failed to prove that any 'flash pulmonary edema' after injection of midazolam will cause unconstitutional levels of pain."  Doc. no. 388, at 27.  Elaborating on this point, defendants argue that "[p]laintiffs cannot on the record evidence prove a sure or very likely risk of severe pain [resulting from pulmonary edema]."  *Id*. at 28.  The problem is that, at this stage, plaintiffs do not have to "prove" anything.  Although courts sometimes, on summary judgment, speak in terms of what the non-movant has proven or failed to "prove" or "show" or "establish," the lower bar at this stage is the question of whether plaintiffs have demonstrated the existence of a genuine issue of material fact.  *E.g.*, Goodwin v. General Motors Corporation, 275 F.3d 1005, 1011 at n.7 (10th Cir. 2002), *cert. denied*, 537 U.S. 941 (2002).  As for pulmonary edema, the parties are at odds, backed by experts, on a range of issues, such as (i) its prevalence as a consequence of administration of midazolam, (ii) how soon it sets in after the midazolam is pushed, (iii) how long it lasts, (iv) whether it is likely to occur while the prisoner remains conscious, (v) what the prisoner feels if pulmonary edema actually does occur in any given instance, and (vi) whether pulmonary edema, if experienced by a

sensate prisoner, would be more painful than hanging (which defendants appear to posit as a benchmark for determination of constitutionally permissible pain).[10]

Moving to the second and third drugs specified in the protocol, defendants argue that plaintiffs have "failed to prove" that injection of vecuronium bromide or potassium chloride "will cause unconstitutional pain." Doc. no. 388, at 30, 31. This issue is distinct from the question of whether the midazolam injection causes the *immediate* onset of pulmonary edema, with a resultant sense of suffocation, before the second two drugs are pushed. On the question of the effect of the administration of the second two drugs, and despite defendants' inapt framing of the issue (plaintiffs have "failed to prove"), it is tempting to rule for defendants as a matter of law under Rule 56 (g). Defendants' main argument as to the pain that may result from administration of these drugs is that the prisoner will have been rendered unconscious by the time these last two drugs are pushed. Plaintiffs' response, as to both drugs, is that they will cause a constitutionally intolerable level of pain in a *sensate* person. But, under the protocol, authorization to administer the second two drugs is expressly made conditional; they are be administered only if it is "confirmed the inmate is unconscious." Protocol, p. 44.

In the protocol that passed muster in <u>Baze</u>, the consciousness check required after the administration of the first drug (in that case, sodium thiopental) and before administration of the second two drugs (pancuronium bromide and potassium chloride) was performed "by the warden and deputy warden through visual inspection." <u>Baze</u>, 553 U.S. at 45. In <u>Baze</u>, as here, it was uncontested that administration of the second two drugs would present "a substantial, constitutionally

---

[10] In <u>In re Ohio Execution Protocol Litig.</u>, 946 F.3d 287, 290 (6th Cir. 2019), *cert. denied sub nom.* <u>Henness v. DeWine</u>, 141 S. Ct. 7 (2020), the Sixth Circuit appears to have adopted (much to the consternation of Justice Sotomayor, 141 S. Ct. at 9) the pain associated with hanging as a benchmark. This court makes no determination, at this stage, as to the merits of that approach.

unacceptable risk of suffocation" if the first drug failed to perform as intended.  *Id.* at 53.  In <u>Baze</u>, as here, the consciousness check after administration of the first drug was important to the Court.  But the Court's assessment of the Kentucky protocol led it to the conclusion that the prisoners "have not shown that the risk of an inadequate dose of the first drug is substantial." *Id.* at 54.  Analytically, the Court's focus, in <u>Baze</u>, on the risk presented by an inadequate dose of thiopental is equivalent to the risk, under the Oklahoma protocol, that midazolam will not render the prisoner insensate before the second two drugs are pushed, with the result that the prisoner is subjected to a constitutionally unacceptable level of pain and suffering.

In <u>Baze</u>, the Court concluded that the Kentucky protocol (including, as relevant here, the consciousness check accomplished via visual inspection by the warden and deputy warden) mitigated that risk to the extent required by the Eighth Amendment.  It is tempting to conclude that Oklahoma's protocol does the same.  But in the case at bar, the prisoners squarely attack the warden's unfettered discretion to deviate from the protocol, as well as–among other things–the adequacy of the consciousness check specified in the protocol.  The consciousness check is unmistakably a central consideration in the Supreme Court's lethal injection jurisprudence.  Thus, even acknowledging the necessity of discretion to deviate from the protocol in ways that would not materially increase the risk that has been the focus of no less than three Supreme Court decisions in the last thirteen years, it is passing strange that Oklahoma would write a protocol (knowing it would be looked at under a microscope) which, read literally, gives the director discretion to water down the consciousness check or wink at its results.[11]  On that score, the Supreme

---

[11] In that same vein, the court notes that defendants assert, as an undisputed fact, that "IV Team members must be either physicians, physician assistants, nurses, EMTs, paramedics, or militarily trained medical personnel, and they must be certified or licensed in the United States."  Doc. no.

Court recently reminded us, albeit in a different constitutional context, that a provision for "entirely discretionary exceptions" to the operation of an otherwise constitutional administrative scheme may be fatal to the constitutionality of that scheme. Fulton v. City of Philadelphia, __ U.S. __, 141 S.Ct. 1868, 1878 (2021). For these reasons, and because plaintiffs back up their attack on the protocol's safeguards with credible expert criticism,[12] the court declines to rule, as a matter of law, that plaintiffs' case fails on the issue of whether, under the protocol taken as a whole, the injection of the second two drugs presents a constitutionally unacceptable risk of severe pain.[13]

---

388, at 1 (citing protocol p. 6). Since the consciousness check is to be performed by the IV Team Leader, Protocol, p. 43, "using all necessary and medically-appropriate methods," *id.*, that very reassuring specification of professional credentials would likely be a noteworthy upgrade from the consciousness check performed "by the warden and deputy warden through visual inspection," which cleared the bar in in Baze, 553 U.S. at 45. The problem, again (as plaintiffs point out, doc. no. 425, at 1), is that, under the protocol, the director retains unfettered discretion to eliminate the requirement of professional medical credentials. Protocol, at 1. Although the evidence at trial may (or may not) firm up the court's confidence level as to the integrity with which the reserved power to modify the protocol will work in practice, the reservation of unfettered power in the director or his designee to modify the protocol, especially as to those provisions so strongly touted by defendants, erodes the confidence the court ordinarily needs in order to adjudicate an issue favorably to the movant as a matter of law.

[12] *See*, doc. no. 388-5, at 56-77, which provides a detailed (and documented) critique of defendants' protocol and related plans relating to the consciousness check. To be sure, the Supreme Court has made it clear that this case cannot be about "best practices." Bucklew, 1125. Thus, "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures. This approach would serve no meaningful purpose and would frustrate the State's legitimate interest in carrying out a sentence of death in a timely manner." Baze, 60-61. The question at trial will be whether the defendants' planned approach to ascertaining the prisoner's state of consciousness is at least minimally adequate to satisfy the Supreme Court's requirements with respect to risk mitigation (*e.g.*, avoidance of "a substantial risk of suffering," *id.* at 60) in the comparative context the Court has prescribed.

[13] As a word to the wise, the parties would be well advised to be prepared, at trial, to present evidence as to the actual track record of midazolam as used in executions over the last few years. That evidence may go far to eliminate speculation as to whether midazolam does or does not perform as intended when used as specified in the protocol. (Because, as will be discussed, six of

Summary judgment will be denied on the issue of whether the protocol satisfies the first prong of the Glossip test.

3.   Summary judgment granted in part and denied in part – second prong

As to defendants' attack on plaintiffs' case under Glossip's second prong, three issues rise to the surface:

a. Are defendants entitled to judgment as a matter of law because of plaintiffs' purported reservation of the right to challenge the use of their proffered alternative methods of execution?

b. Should defendants' motion be granted as to those plaintiffs who have declined to propose an alternative method?  If so, should a Rule 54 (b) final judgment be entered as to those plaintiffs?

c. As to the remaining plaintiffs, have defendants demonstrated as a matter of law that none of the proffered alternatives are eligible to be in the running for comparison with Oklahoma's midazolam protocol?

———————————————————

a. Plaintiffs' purported reservation of the right to challenge the use of their proffered alternative methods of execution is of no legal effect but will not result in summary judgment against them.

In the Third Amended Complaint (p. 47, ¶¶ 113, 114) and other documents, plaintiffs have explicitly purported to reserve the right to challenge their proffered alternative methods of execution.  Defendants object to this, arguing in their motion that, because of this reservation, Count II must fail as a matter of law.  Doc. no. 388, at 35.   In response, plaintiffs contend that "whether the alternative might be considered constitutional when assessed against a proffered *alternative to that alternative* . . . is a question for another day and not at issue here."  Doc. no. 425, at 42 (emphasis added).

_____

the plaintiffs in the case at bar have declined to proffer an alternative method of execution, there may well be a track record under Chart D of the new Oklahoma protocol by the time this case is called for trial as to the other twenty-six plaintiffs.)

This reservation is, as a legal matter, wholly untenable. The Supreme Court has made it unmistakably clear that method-of-execution litigation is not an iterative process. The Court was careful to note, in Bucklew, that "Glossip expressly held that identifying an available alternative is 'a requirement of *all* Eighth Amendment method-of-execution claims' alleging cruel pain." Bucklew, 1126 (emphasis in original). Thus, it is unsurprising that, in Bucklew, the Court described the prisoner's failure to identify an alternative as a "dispositive shortcoming." Bucklew, 1121. This was foreshadowed in Baze, where the Court quite understandably expressed its distaste for an approach in which "each ruling [is] supplanted by another round of litigation touting a new and improved methodology." Baze, 51. (And in Bucklew, aside from stating that the prisoner's failure to identify an alternative was a "dispositive shortcoming," the Court noted that "[o]nly when the district court warned that his continued refusal to abide this Court's precedents would result in immediate dismissal did Mr. Bucklew finally point to [his proposed alternative]. Bucklew, 1129.) *See also*, Brooks v. Warden, 810 F.3d 812, 822 (11th Cir. 2016), *cert. denied*, 577 U.S. 1116 (2016) (prisoner not entitled to challenge the constitutionality of his proposed alternative). Consequently, plaintiffs' lame assertion that the constitutional permissibility of their proffered alternatives presents "a question for another day," is of no legal effect. The short of the matter is that the Supreme Court, in requiring that the prisoner propose a "feasible and readily implemented" alternative method of implementing the sentence of death (as laid down in no less than three cases since 2008), was not doing so for the purpose of giving license to additional rounds of litigation.

Plaintiffs' reservation of the right to challenge their proposed alternatives puts the court to a choice of either ignoring the reservation or entering judgment against plaintiffs as a matter of law. The court chooses to ignore the purported reservation. At least pending trial, the court will give plaintiffs the benefit of the literal import of

their supplemental responses to defendants' interrogatories.  Those supplemental responses intimate no reservation of a right to challenge a proffered alternative.  That said, if it should appear at trial that any of the plaintiffs actually do reserve the right to challenge their proposed alternatives, that will be fatal.

> b. The motion will be granted as to those plaintiffs who have declined to propose an alternative method of carrying out their sentence of death.

The following table shows the array of responses (and some nonresponses) to Interrogatory No. 15, which required (as enforced by the court) each plaintiff to identify which of the pled alternative methods of execution he proposes for use in his case:

<u>Plaintiffs' Proposed Alternative Methods of Execution</u>[14]

| Plaintiff | FDA-approved pentobarbital or sodium thiopental | Compounded pentobarbital or sodium thiopental | Midazolam plus pre-dose of anesthetic | Firing squad | Declined |
|---|---|---|---|---|---|
| Andrew | X | | | | |
| Bush | | | | X | |
| Cannon | X | | | | |
| Coddington | | | | | X |
| Cole | X | X | X | X | |
| Cuesta-Rodriguez | X | X | X | X | |
| Eizember | X | X | X | X | |
| Fairchild | X | X | X | X | |
| Glossip | X | X | | | |
| Goode | X | X | X | X | |
| Grant, D. | | | | | X |
| Grant, J.* | | | | | X |
| Grissom | X | X | | X | |
| Hancock | X | X | X | X | |

---

[14] The third amended complaint was brought by the thirty-five plaintiffs, listed in the first paragraph of that pleading.  Doc. no. 325, ¶ 1.  Of those thirty-five, three have been terminated as plaintiffs in this action, leaving, as of the date of this order, the thirty-two plaintiffs identified in the chart.  Nicholas A. Davis died on April 7, 2021 and was termed on April 13, 2021.  *See*, doc. no. 406 (suggestion of death).  On May 10, 2021, Patrick Murphy was dismissed for lack of subject matter jurisdiction, and termed, after his conviction was vacated.  *See,* Doc. no. 424 (order granting defendants' unopposed motion to dismiss claims of Patrick Murphy).  Jimmy Dean Harris died on June 29, 2021 and was termed on June 30, 2021.  *See*, doc. no. 440 (suggestion of death).

| Hanson** | X | | | | |
| Harmon | X | | | X | |
| Johnson | X | | X | | |
| Jones | | | | | X |
| Lay*** | | | | | X |
| Littlejohn | X | | | X | |
| Malone | X | X | X | X | |
| Martinez | X | | | X | |
| Mitchell | X | X | X | X | |
| Pavatt | | | X | X | |
| Postelle | | | | | X |
| Rojem | X | X | X | X | |
| Ryder | X | X | X | X | |
| Sanchez | X | X | X | X | |
| Simpson | X | X | X | X | |
| Smith | X | X | | | |
| Underwood | X | X | | | |
| Wood | | | | X | |

\* Plaintiff John M. Grant was unwilling to respond to Interrogatory No. 15. See doc. no. 441.

\*\* Plaintiff George Hanson signed two versions of a response to Interrogatory No. 15 (both dated the same date). One version opted for execution with FDA-approved pentobarbital or sodium thiopental; the other version expressly declined to identify an alternative. The court considers it appropriate–viewing the record in the light most favorable to the nonmovant–to give plaintiff Hanson the benefit of the response that does not result in summary judgment against him.

\*\*\* Plaintiff Wade Lay expressly declined to proffer an alternative. Doc. no. 447-1.

As shown in the table, six of the plaintiffs—Coddington, D. Grant, J. Grant, Jones, Lay and Postelle—have declined to proffer an alternative for carrying out their sentence of death.[15] As is set forth above in Part D(3)(a), that refusal is fatal to these plaintiffs' Eighth Amendment claims which, as will be seen, are the only claims which would, in any event, remain for trial. Accordingly, defendants are entitled to summary judgment as to these six plaintiffs. That raises the question of whether final judgment should be entered against these plaintiffs under Rule 54 (b).

---

[15] Plaintiff Wade Lay elaborated on his express refusal to proffer an alternative (doc. no. 447-1) in a twelve-page pro se pleading, doc. no. 448. In that pleading, Mr. Lay emphatically repeats his refusal to designate an alternative. *Id.* at 10-11. He also states, incorrectly, that his operative pleading in this case is "his amended complaint (Doc. No. 326)." *Id.* at 10. That amended complaint was stricken on October 1, 2020, by the order at doc. no. 357 (mailed to Mr. Lay on the same day).

Under Rule 54 (b), Fed. R. Civ. P., "[w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."

"Certification under Rule 54(b) is a two-step process. Initially, the district court must determine that the judgment is final. . . . . The judgment must be 'final' in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action. Second, the district court must determine that there is no just cause for delay." McKibben v. Chubb, 840 F.2d 1525, 1528 (10th Cir. 1988) (citations and internal quotes omitted). "No precise test has been developed for determining whether just cause exists for delay, but generally courts have weighed Rule 54(b)'s policy of preventing piecemeal appeals against the hardship or injustice that might be inflicted on a litigant because of the delay." United Bank of Pueblo v. Hartford Acc. & Indem. Co., 529 F.2d 490, 492 (10th Cir. 1976).

The language of the rule, the collective import of the Tenth Circuit decisions, and the guidance to be gleaned from Professor Wright and his colleagues[16] suggest, at least as relevant to the present procedural posture of this case, that the court's Rule 54 (b) determination should be guided by the following considerations:

- Are multiple parties involved, including one or more parties whose claims have been fully adjudicated?

Yes. We have thirty-two plaintiffs and multiple defendants. The claims of these six plaintiffs will be fully and finally adjudicated by this order, in combination

---

[16] 10 Wright and Miller, *Fed. Prac. & Proc. Civ.* § § 2656, 2657 and 2659 (4th ed.).

with the order entered on September 15, 2020, doc. no. 349, dismissing with prejudice Counts I, III and VIII.  Under the most commonly applied test, "whenever more than one claimant requests relief or one or more plaintiffs seek relief against more than one defendant, regardless of the factual similarity of the claims, a final judgment may be rendered under Rule 54(b) on one or more but fewer than all of the claims since each plaintiff's claim or rights as to each defendant could have been enforced separately." *Wright & Miller*, *id.*, § 2657.  Each of these six plaintiffs could have enforced his rights separately. The court expressly determines that its judgment against the six plaintiffs who have not proffered an alternative for carrying out their sentence of death is a final judgment.

• Is there any just reason for delaying finality as to these six plaintiffs?

No.  The court expressly so determines.  There are two main considerations in play here.

*First*, there is clear cleavage between the basis upon which this case now ends (in this court) as to these six plaintiffs and the basis upon which this case will go to judgment as to the other twenty-six plaintiffs.  Regardless of what the final outcome may be as to the plaintiffs who *have* proffered at least one alternative method of execution, none of those plaintiffs will arrive at the Court of Appeals in anything resembling the same posture as these six plaintiffs.  Thus, on appeal from the Rule 54 (b) judgments entered today, the Tenth  circuit will not find itself "hear[ing] appeals that will require it to determine questions that remain before the trial court with regard to other claims." *Wright & Miller*, *id*., § 2659.

*Second*, as the Supreme Court has repeatedly and emphatically recognized, after decades of appeals and collateral review as to these six plaintiffs, both "the State and the victims of crime have an important interest in the timely enforcement of a sentence." Bucklew, 1133 (quoting from Hill v. McDonough, 547 U.S. 573,

584 (2006)).  "The people of [Oklahoma], the surviving victims of [these plaintiffs']
crimes, and others like them deserve better."  *Id.* at 1134.

- Rule 54(b) certification as to six plaintiffs.

Having made the necessary determinations, the court concludes and certifies
that final judgment should be entered under Rule 54(b) against the six plaintiffs who
have not proffered an alternative method for carrying out their sentence of death.
These six plaintiffs are Coddington, D. Grant, J. Grant, Jones, Lay and Postelle.  A
separate judgment will be entered for that purpose with respect to each of these
plaintiffs.[17]

> c. As to the remaining plaintiffs, the defendants have not established, as a
> matter of law, that the proffered alternative methods of execution should
> be excluded as comparators with execution per Chart D of the protocol.[18]

To prevail as a matter of law as to all plaintiffs on the Glossip second prong,
it is necessary for defendants to exclude all four of the plaintiffs' proffered
alternative methods of execution as viable comparators to execution per Chart D.
(As shown in the table in Part (b), above, some of the plaintiffs have selected fewer
than all four of the alternatives pled in the Third Amended Complaint.  That is of no
moment for present purposes because, as will be seen, the court has concluded that
fact issues preclude elimination of any of the four proffered alternatives.)

The Supreme Court has made it clear that if a prisoner makes an adequate
showing on the first Glossip prong, the bar is fairly low (from the prisoner's
perspective) on the second prong.  As noted above, the Court, in Bucklew, observed

---

[17] Entry of final judgment against Lay moots his motions at doc. nos. 408, 409, 429 and 430.

[18] For purposes of this discussion of whether defendants have made a case for rejection of
plaintiffs' proposed alternatives as a matter of law, the court will disregard the fact that the
existence of fact issues as to the Glossip first prong (degree of risk and severity of pain under Chart
D of the protocol) makes it very hard to undertake and adjudicate as a matter of law the *comparison*
mandated by the Court in Glossip and Bucklew.

that "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." *Id.* at 1128-29. This, again, illustrates the interrelationship between the two prongs.

> 1. Fact issues preclude rejection, on summary judgment, of plaintiffs' first and second alternatives.

Plaintiffs' first alternative method of execution proposes use of a single dose of FDA-approved pentobarbital or sodium thiopental (barbiturates),[19] augmented by a "pre-dose" of a large clinical dose of an anesthetic drug such as fentanyl. The second alternative differs from the first only in that the pentobarbital or sodium thiopental would be compounded rather than FDA-approved. In support of these alternatives, plaintiffs point out that Charts A and B of the protocol already provide road maps for use of pentobarbital and sodium thiopental in Oklahoma executions. The difference, essentially, would be the addition of fentanyl.

In urging the court to reject these first two alternatives as a matter of law, defendants argue that (i) the defendants are unable to procure the barbiturates, (ii) the fentanyl-barbiturate proposal lacks sufficient detail, and (iii) in any event, it is untried and untested in any state. Of these three arguments for rejection of the fentanyl-barbiturate proposal as a matter of law, the one that comes closest to being supported by undisputed facts is the third–that this is an untried and untested combination. But the problem is that this proposal basically adopts the Oklahoma protocol (Charts A and B) for using the barbiturates (a method that *was* successfully used by Oklahoma when those barbiturates were available for execution), adding only the pre-dose of fentanyl. It is difficult to conceive, at least with the clarity

---

[19] Examples abound of prisoners arguing against the constitutionality of a method in one case while other prisoners argue, in other courts, that the same method is a satisfactory alternative. *Compare,* Sigmon v. Stirling, 2021 WL 2402279 (D.S.C. June 11, 2021), at *4 (proposing lethal injection of a single dose of pentobarbital), with Barr v. Lee, 140 S.Ct. 2590 (2020), where single-dose pentobarbital was challenged as violative of the Eighth Amendment).

required under Rule 56, that starting out with a big dose of fentanyl in an otherwise tried and tested protocol would really render the barbiturate options (Charts A and B) "untried and untested" in the sense that that concept was discussed in Baze and Bucklew. As for availability of the barbiturates, it appears that the defendants may have the upper hand on that issue at trial, but plaintiffs have succeeded in raising a fact issue as to whether, with reasonable effort, the defendants could procure one or the other of the barbiturates.[20] As for the suggested lack of detail of the fentanyl plus barbiturates proposal, the court is unimpressed. This proposal, as noted, essentially takes the Oklahoma protocol (Charts A and B) on its own terms and adds the fentanyl.

> 2. Fact issues preclude rejection, on summary judgment, of plaintiffs' third alternative (pre-dose of fentanyl, 40 milligrams of midazolam; remove the paralytic).

Plaintiffs' third alternative method of execution proposes starting with fentanyl, followed by 40 milligrams of midazolam, then the potassium chloride (to induce cardiac arrest), without the paralytic (vecuronium bromide). Defendants argue that this proposal should be rejected as a matter of law because (i) it is not sufficiently specific, and (ii) it is an untried method.

As for specificity, defendants point out that plaintiffs' proposal calls for injection of 40 milligrams of midazolam, but their expert's report does not address that dosage. In fact, the only dosage of midazolam addressed in the relevant report is 500 milligrams (which is unsurprising, since that is what Chart D requires), and the section of the report that directly addresses this third alternative (doc. no. 388-4, ¶¶ 108-110) makes no reference to any particular dosage of midazolam. At least for

---

[20] It should go without saying, but the court will say anyway, that there would appear to be no significant obstacle to accommodating plaintiffs on their fentanyl plus barbiturates proposal with no further ado if defendants should, at long last, find a supply of one or the other of the tried and tested barbiturates.

now, the call for exactly 40 milligrams of midazolam is sufficiently specific, and the court takes the call for a pre-dose of fentanyl to be identical to the same component of plaintiffs' first and second proposals.  Specificity is not the real problem.

The defendants' argument that the opiate-plus-midazolam alternative is an untried method is a bit more complicated than either side admits.  Such a combination *has* been used.  Plaintiffs point out two such instances.  *See*, doc. no. 388-5, at ¶¶ 174-177.  But there were problems with those executions.  *Id.*  The record is thoroughly ambiguous as to *why* there were problems with those executions.  Viewing the record in the light most favorable to the plaintiffs, as is required at this stage, it appears that an opiate plus midazolam combination *might* work, and, at a minimum, that it is not "untried and untested," at least if the court were, for this purpose, to equate fentanyl with hydromorphone as the anesthetic pre-dose proposed in plaintiffs' third alternative.

Summary judgment is a very near miss as to this third alternative.  The support it gets in plaintiffs' briefing (less than one page in a sixty-eight-page brief) and from their experts is noticeably feeble.  This proposal smacks of being half-baked at best. But the court declines to reject it at this juncture.

> 3.  Fact issues preclude rejection, on summary judgment, of plaintiffs' fourth alternative (firing squad).

Plaintiffs' fourth, and last, proposed alternative is execution by firing squad, which is the fourth in order of preference among the statutorily mandated methods of execution in Oklahoma, 22 O.S. 2020 Supp. § 1014.  Plaintiffs proffer an expert report from an emergency physician who has treated numerous gunshot wounds and has himself been shot.  The report provides details from two established protocols for execution by firing squad (from the U.S. Army and the State of Utah) and then proceeds to elaborate on those protocols, which are quite similar in many respects. The court, consequently, rejects out of hand defendants' contention that the proposed

firing squad alternative is not advanced with sufficient detail to survive summary judgment. All that is necessary is that the firing squad proposal be "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" Bucklew, 1129. That leaves the contention that execution by firing squad would not significantly reduce a substantial risk of severe pain. On that score, defendants argue–yet again–that "[p]laintiffs have failed to prove their case." Doc. no. 388, at 38. Aside from the fact that plaintiffs are required to prove nothing at this stage, we have the fact that the merits of the firing squad proposal–degree of risk and severity of pain–are the subject of pointed disagreement among three experts, one for the plaintiffs and two for the defendants. Summary judgment will be denied as to the firing squad proposal.

_____

In sum, to the extent that defendants' motion is denied as to Count II, it is not denied on narrow legal grounds but rather because fact issues preclude adjudication under Rule 56. As to Count II, defendants' motion would, on some issues, have the court use the analysis and conclusions of defendants' experts to pick apart the opinions of plaintiffs' experts. On other issues, defendants invite the court, more simply, to weigh the persuasive value of an expert's conclusion and find it wanting. But, on summary judgment, the "approach of weighing the credibility of the competing expert reports amounts to improper fact-finding. Indeed, competing expert opinions present the classic battle of the experts and it is up to [the trier of fact] to evaluate what weight and credibility each expert opinion deserves." Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir. 2005) (citations and internal quotations omitted). That said, it is also true that neither the plaintiffs nor the defendants will have to prevail on every one of the fact issues raised by Count II in order to prevail in this case. But a trial of the fact issues is necessary. The trial will enable the court to resolve those fact issues and judgment will be entered accordingly.

E.  <u>The Motion Will Be Granted as to Count IV</u>

Plaintiffs assert, under the First, Fifth and Sixth Amendments, a violation of their right of access to counsel and the courts.  Specifically, they allege that:

> The Execution Protocol does not provide Plaintiffs with access to counsel during an execution. Therefore, under the Execution Protocol, Plaintiffs will not be able to communicate with their counsel prior to and during the execution and will not be able to communicate with counsel regarding any problems, including constitutional violations.

> In addition, the Execution Protocol does not permit witnesses (including Plaintiffs' attorneys or medical consultants) to view the setting of IVs and/or the syringes being pushed, so there is no way to identify, object to, challenge, or correct, any issues with the IV-setting or drug administration process, including constitutional violations.

Third Amended Complaint, doc. no. 325, ¶¶ 139, 140.

Plaintiffs elaborate on this claim in their opposition brief.  The object of this claim is to enable plaintiffs' counsel "to communicate with the Plaintiffs, during the process of preparing for and implementing the execution, starting with the setting of IVs, and continuing through the pushing of the syringes to administer the drugs and observing the prisoner's reactions, through the time the prisoner is declared dead." Doc. no. 425, at 57.  This is so that counsel may proctor the process, looking for "potential or extant problems and issues that will result in an inhumane execution." *Id*. at 55.  As can be seen, this claim focuses on counsel's access to, and ability to communicate with, the inmate.

Several provisions of the protocol are relevant to this claim:

- *Except for calls from the inmate's attorney of record*, the inmate's telephone privileges are terminated at 9:00 p.m. on the day before the execution.  Protocol, p. 20.

- The inmate may meet with two attorneys of record on the day of the execution, the meeting to conclude "two hours prior to the scheduled execution or earlier if necessary to begin preparing the inmate for the execution."  *Id.*, p. 21.

- After the inmate is moved to the execution room and placed on the execution

table, the IV Team inserts the primary and back up IV catheters.  *Id.*, p. 25.  (By statute, the identities of the IV Team members, and all others "who participate in or administer the execution process," must be kept confidential.  22 Okla. Stat. 2011 supp. § 1015 (B).)

- The execution may be witnessed by five persons selected by the inmate.  *Id.*, p. 11.

- After IV access has been established by the IV team, and the Attorney General and the Governor (or their designees) have confirmed the absence of legal impediments to execution, "the agency director shall order the H Unit Section chief to proceed with the execution."  *Id.*, p. 27.  The inmate is given the opportunity to make his last statement.  After that, the microphone is turned off. *Id.*

- The protocol includes detailed provisions with respect to checking the effectiveness of IV access (*Id.* pp. 26, 43), electrocardiographic monitoring of the inmate (41), confirming the administration of the correct chemicals (43, 44), monitoring the inmate's "level of consciousness" (41), "physically confirm[ing] the inmate is unconscious" (43, 44), halting the execution in the event of problems with the IVs or with administration of the chemicals (42), and confirming death (43).

The last item listed above–the safeguards written into the protocol–deserves brief mention here.  The safeguards in the protocol are, in some respects, more demanding than those in the protocol which was before the court at the preliminary injunction stage.  The Supreme Court, in reviewing this court's denial of a preliminary injunction (and the Tenth Circuit's decision affirming that denial), observed that this court "did not commit clear error in concluding that these safeguards help to minimize any risk that might occur in the event that midazolam does not operate at intended."  Glossip, 886.  That comment by the Court is significant not so much for its faint praise (no clear error) as for the fact that the Court acknowledged the practical reality that, once the multi-step lethal injection process is under way, the implementation of safeguards, per a carefully-developed protocol, is at least as important as anything a lawyer, standing there with a cell phone, might be able to accomplish.

In ruling from the bench at the preliminary injunction stage of this case, the court addressed plaintiffs' access to counsel claim as follows:

> This conjures up an untenable scene in which the prisoner's counsel is standing at the gurney, cell phone in hand, ready to dictate the information necessary to fill in the blanks on an emergency ex parte motion for stay if he or she takes issue with any part of the process as it unfolds.
>
> The reality is that as execution by lethal injection is actually carried out, the prisoner's erstwhile right of access to the courts must, of necessity, give way to the execution team's discharge of its duties as long as those who are carrying out the process are operating within the confines of a constitutionally sound lethal injection protocol. And I hasten to add that it would appear from plaintiffs' contention as to the very closeness of the scrutiny that they say is constitutionally required that protection of the identities of the execution team members would likely be impossible.
>
> . . .
>
> No court has found a constitutional right for the prisoner to have counsel present to supervise the IV insertion process and I decline to be the first judge to so hold.

Transcript of Ruling, December 22, 2014, at 77-78 (doc. no. 179, entered Dec. 23, 2014).

The court's view of the matter has not changed. Practical and legal problems, entwined, are fatal to Count IV.

Because any constitutional claim which might be asserted during an execution would, by definition, be a last-minute (or later) plea for emergency relief to halt an execution in progress, it is appropriate to note at the outset that the Supreme Court has unmistakably set the tone for late-stage capital litigation. Specifically, "[t]he federal courts can and should protect States from dilatory or speculative suits." Hill v. McDonough, 547 U.S. 573, 585 (2006) (lethal injection challenge). Lest anyone miss the point, the Court returned to this theme in Bucklew: "Courts should police carefully against attempts to use such [method of execution] challenges as tools to interpose unjustified delay." Bucklew, 1134.

The Court's admonitions do not, of course, mean that the Constitution can be suspended at some predetermined hour before the execution begins, nor does it mean that an attempt to halt an execution on the basis of allegations relating to events during the execution is to be considered "dilatory" in the usual pejorative sense. But, given the practical realities attendant to litigation and emergency adjudication of any claim lodged while an execution is in progress, the Court's caution about speculative suits fits. And closely related to this admonition from the Court is the fact that "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." Hill, at 583-84. Of the four familiar factors governing the grant or denial of a stay, perhaps the most prominent in this context is the question of "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." Hilton v. Braunskill, 481 U.S. 770, 776 (1987). There is no "execution in progress" exception to this unyielding requirement. Finally, it is worth noting that, in the context of a lethal injection challenge, the Supreme Court has observed that "an isolated mishap alone does not give rise to an Eighth Amendment violation." Baze, 552 U.S. at 50.

Against this backdrop, the court's analysis of plaintiffs' access-to-counsel claim begins with a Tenth Circuit decision, Est. of Clayton Lockett v. Fallin, 841 F.3d 1098 (10th Cir. 2016), *cert. denied*, 137 S.Ct. 2298 (2017). Ordinarily, an on-point Tenth Circuit decision would be the beginning and end of the story for this court, but Lockett turned on issues of qualified immunity, so the circuit court's legal analysis consisted of a search for "clearly established law," a task which differs somewhat from looking for what the law actually is, whether clearly established or not.

As described by the district court (Heaton, J.), the Lockett estate's claim was that:

> Mr. Lockett had a right to communicate with his counsel as he lay on the gurney in the execution chamber, so that he could potentially commence litigation about whatever aspect of the execution process arguably violated his rights. Plaintiff cites no authority which gets remotely close to supporting that remarkable assertion, and the court has considerable doubt whether any constitutional violation of that sort even arguably exists.

Est. of Clayton Lockett v. Fallin, 2015 WL 3874883, at *9 (W.D. Okla. June 23, 2015).

The Tenth Circuit panel, which included then-Judge Neil Gorsuch, agreed with the district court:

> Lockett's Estate attempts to assert a constitutional right to counsel throughout an execution. It asks this court to recognize a constitutional right to counsel "when an execution procedure is producing unexpected and painful results." [record citation omitted] Lockett's Estate points to no law that would support a right to counsel throughout an execution, and we struggle to envision what such a right would look like in practice. Thus, Appellees have violated no clearly established law.

Lockett, 841 F.3d at 1117.

The Supreme Court has not addressed the issue of a constitutional right to counsel (or the courts) while an execution is in progress. The asserted right at issue here is not the abstract right to have an attorney-client relationship as an execution unfolds. Plaintiffs have made it plain that the right asserted here is a right to communicate with counsel at all stages of the execution process, beginning with the setting of the IVs, continuing through the pushing of the chemicals, and ending at "the time the prisoner is declared dead." Doc. no. 425, at 57. Addressing access to counsel in this context, the Courts of Appeals for the Fifth and Eleventh Circuits have reached conclusions consistent with that of the Tenth Circuit in Lockett. One district court has gone the other way to a limited extent, in a decision, Coe v. Bell, 89 F.Supp. 2d 962 (M.D. Tenn. 2000), vacated as moot, 230 F.3d 1357 (6th Cir. 2000), with which this court disagrees.

In Arthur v. Dunn, 2017 WL 1362861 (M.D. Ala. April 12, 2017), the issue took the form of a dispute as to the constitutionality of Alabama's prohibition on possession of a cell phone by counsel during the execution.  As will be seen, the district court focused mainly on the practicalities of the prisoner's claim; the circuit court closely examined the legal aspects.

The district court in Arthur v. Dunn posited a "hypothetical telephonic colloquy," *id.* at *6, occurring during an execution:

> Counsel: "His eye just opened."
> Judge: "What exactly does that mean?"
> Counsel: "I don't know."
> Judge: "What are you asking me to do?"
> Counsel: "Stop the execution."
> Judge: "What drugs have they given?"
> Counsel: "I don't know."
> Judge: "What volume of unknown drugs have they given?"
> Counsel: "I don't know."
> Judge: "At what rate over time were the unknown drugs in unknown amounts given?"
> Counsel: "I don't know."
> Judge: "What would be the effect on your client if I ordered the execution stopped?"
> Counsel: "I don't know."
> Judge: "Can you tell me with any degree of medical certainty that stopping the execution at this point would not harm your client, cause him pain and suffering, or leave him permanently comatose?"
> Counsel: "No, honestly I can't."
> The same colloquy would ensue if the inmate tried to sit up and speak, groaned and thrashed, called for help, or had any other physical reaction that might occur during an execution.

*Id.* at *6.

After extensive discussion of the reasons for which it agreed with the Tenth Circuit in Lockett and disagreed with the Tennessee district court in Coe, the district

court, in <u>Arthur</u>, focused on an issue that was dispositive when the case got to the Eleventh Circuit:  "To state a valid claim, Arthur would have to establish an actual injury. *See* <u>Lewis</u> [v. Casey], 518 U. S. at 349, 351–52. Arthur's request for his counsel to take a cellular device into a prison while an execution is taking place is based on speculation that something might go wrong during the procedure. This theoretical basis for relief falls outside of the injury requirement stated in <u>Lewis</u>." *Id.* at *7.   The Eleventh Circuit agreed:  "To state a valid right-of-access claim, Arthur must show both that denying his witness access to a phone actually prevents him from accessing the courts and that he will specifically be prevented from bringing a colorable or viable underlying Eighth Amendment claim."   <u>Arthur v. Comm'r, Alabama Dep't of Corr.</u>, 680 F. App'x 894, 909 (11th Cir. 2017).

For the Eleventh Circuit, the predominant issue in <u>Arthur</u> was that of standing. There was no "'actual injury' sufficient to state a claim under <u>Bounds</u> [v. Smith, 430 U.S. 817 (1977)] and <u>Lewis</u> because, absent an underlying violation of a fundamental right, no 'injury in fact'–and thus no standing–has been shown." <u>Arthur</u> at 909.  In other words, the right of access to counsel (and, *a fortiorari*, to the courts), applies only to *extant* claims.  But in the case at bar, plaintiffs assert a right, under the First, Fifth and Sixth Amendments, to have their counsel proctor the execution process, from beginning to end, with a view to initiating litigation *if* they see something they deem constitutionally objectionable.  That, as a matter of law, is not sufficient.  *See also*, to the same effect as <u>Arthur</u>, <u>Whitaker v. Collier</u>, 862 F.3d 490, at 501 (5ᵗʰ Cir. 2017) (right to counsel during execution: possibility of a "botched execution" is an "isolated mishap" that is not cognizable via a method-of-execution claim, citing <u>Baze</u>]); <u>Grayson v. Warden</u>, 672 Fed. Appx. 956, 966-67 (11ᵗʰ Cir. 2016) (possibility that "something might go wrong" is not an "actual injury" entitling prisoner to counsel with cell phone); <u>McGehee v. Hutchinson</u>, 463 F.Supp.3d 870,

931-32 (E.D. Ark. 2020) (access during entire process, including setting IVs)[21], *appeal pending*, 8th Cir. No. 21-1965); Bible v. Davis, 2018 WL 3068804 (S.D. Tex. June 21, 2018) (no right to have attorney present, with or without a cell phone, while IV is inserted), *aff'd* (on statute of limitations), 739 Fed. Appx. 766 (5th Cir. 2018); Towery v. Brewer, 2012 WL 592749, *18 (D. Ariz. Feb. 23, 2012) (no "actual injury"), *aff'd* 672 F.3d 650 (9th Cir. 2012) (not reaching merits of access to counsel claim), *cert. denied*, 565 U.S. 1243 (2012).

Finally, the court will note that, even in Coe, the district court went no further than to hold that the prisoner had a right of access to counsel up to an hour *before* the execution and that counsel could have access to a telephone while witnessing the execution, Coe, 89 F.Supp.2d at 966, all of which, it should be noted, caused that court to observe that it was "skeptical about a prisoner's realistic ability to assert and get redress for a violation of his right to be free from cruel and unusual punishment during the execution itself." *Id.*

The court concludes that defendants are entitled to judgment as a matter of law on Count IV.

F.  The Motion Will Be Granted as to Count V

Under 18 U.S.C. § 3599, an indigent defendant in a capital case is entitled to appointed counsel at public expense.  18 U.S.C. § 3599 (a)(1).  That right includes representation in "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures."  18 U.S.C. § 3599 (e).  In Count V, plaintiffs assert that by "denying Plaintiffs meaningful access to counsel and to the courts during the preparation for, and carrying out of,

---

[21] Although clearly holding that plaintiffs had no right to have "their attorneys to see and hear the full execution, including the insertion of the intravenous lines and information about when each drug in the Arkansas Midazolam Protocol is pushed," *id.* at 932-33, the court did grant relief on an access-to-cell phone claim.  *Id.* at 931.  But this result appears, as much as anything else, to have been reached by way of enforcement of an agreed viewing policy.  *Id.*

their executions, Defendants intentionally will violate Plaintiffs' rights under 18 U.S.C. § 3599." Doc. no. 325, at 56.

Defendants argue that plaintiffs' claims of denial of access to counsel and the courts fail under § 3599 for essentially the same reasons for which the constitutional access to counsel (and courts) claim must fail. Doc. no. 388, at 39-41. The court agrees. Plaintiffs cite no authority (and the court has found none) suggesting that, aside from the question of who pays for counsel's services, the right to counsel at the time of execution of a sentence of death is more extensive under § 3599 than it is under the controlling constitutional provisions (as discussed in Part E, above). The court accordingly concludes that defendants are entitled to judgment as a matter of law on Count V.

G. The Motion Will Be Granted as to Count VI

Count VI alleges violations of the Ex Post Facto Clause of the United States Constitution (Article I, Section 10, clause 1) and Article V, section 54 of the Oklahoma Constitution. These arguments are different but related.[22]

A change in the execution method does not increase a condemned inmate's punishment and thus does not implicate the Ex Post Facto Clause. *See*, *e.g.*, Malloy v. South Carolina, 237 U.S. 180, 185 (1915) (law which changed method of execution from hanging to electrocution "did not change the penalty—death—for murder, but only the mode of producing this" and did not otherwise increase the punishment); Zink v. Lombardi, 783 F.3d 1089, 1108 (8th Cir. 2015) (prisoners failed to state an ex post facto claim because the punishment—death—has remained the same, and only the mode of producing death has changed); Poland v. Stewart, 117 F.3d 1094, 1105 (9th Cir. 1997) ("[t]he change in method does not make the

---

[22] Count VI does not challenge the protocol under the Ex Post Facto Clause of the Oklahoma Constitution (Article 2, section 15).

sentence [of death] more burdensome and so does not violate the Ex Post Facto Clause"); United States v. Tipton, 90 F.3d 861, 903 (4th Cir. 1996) (fact that regulation providing for death by lethal injection was promulgated after condemned inmate had been sentenced did not violate Ex Post Facto Clause); United States v. Chandler, 996 F.2d 1073, 1096 (11th Cir. 1993) (reasoning that a new capital statute specifying a method of execution would only provide for the method by which the punishment would be carried out and would not alter a death sentence, thus it would not violate Ex Post Facto Clause); Matter of Federal Bureau of Prisons' Execution Protocol Cases, 2021 WL 127602, *3 (D.D.C. Jan. 13, 2021) (rejecting ex post facto claim at preliminary injunction stage; "The court finds no reason to depart from precedent squarely addressing the question at hand.  The substitution of the drugs used in lethal injection does not alter Higgs' sentence of death—it changes only the way his sentence will be implemented.").[23]

Moving on to the state constitutional provision in question—Article V, section 54 of the Oklahoma Constitution—that section provides as follows:  "The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute." (Emphasis added.)  Plaintiffs allege that, other than Mica Martinez, they were sentenced to death under an earlier version of the first sentence

---

[23] As part of their ex post facto argument, plaintiffs contend that permitting a more painful execution, could, taken to its logical conclusion, permit death by a lethal dose of any substance, such as gasoline, battery acid, etc.  The court disagrees.  The fact that plaintiffs' ex post facto argument has been rejected implies nothing at all–either as a matter of law or logic–about how these types of purely hypothetical injections would fare under the Eighth Amendment if a court were called upon to make such a determination.

of 22 O.S. Supp. 2020 § 1014(A), which was in effect until November 1, 2011.[24] Count VI alleges the protocol (which is consistent with the amended version of the first sentence of § 1014(A) but not the earlier version), violates Article V, section 54. Plaintiffs argue the amended version of the statute creates a significant risk of increased punishment as compared to the pre-November 1, 2011 version of the statute. The court rejects this argument. Article V, section 54 is not violated by the protocol or by the complained-of amendment to § 1014(A), neither of which impact the way in which the penalty (death) will be carried out. In the language of Article V, section 54, neither the protocol nor the amendment "affect any accrued right, or penalty incurred...."

The court concludes that defendants are entitled to judgment as a matter of law on Count VI.

## H. The Motion Will Be Granted as to Count VII

Count VII alleges a Fourteenth Amendment procedural due process claim. In this count, plaintiffs allege they have a protected life and liberty interest in being executed with the use of "an ultrashort-acting barbiturate" as required by the first sentence in the version of § 1014(A) in effect before November 1, 2011. Plaintiffs argue that "[a]llowing Defendants to execute Plaintiffs using a method that state law did not permit when Plaintiffs were sentenced and which would disadvantage

---

[24] Prior to the amendment which became effective on November 1, 2011, the first sentence of § 1014(A) provided: "The punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced...." Effective November 1, 2011, the first sentence of § 1014(A) was amended to provide as follows: "The punishment of death shall be carried out by the administration of a lethal quantity of a drug or drugs until death is pronounced...." (Oklahoma's highest courts have held that for purposes of Article V, section 54, there is no material difference between a statutory repeal and an amendment, because an amendment, to a certain degree, operates as a repeal of prior law. Witherow v. State, 400 P.3d 902, 904, n. 2 (Okla. Crim. App. 2017), citing One Chicago Coin's Play Boy Marble Board v. State ex rel. Adams, 212 P.3d 129, 133 (Okla. 1949).)

Plaintiffs and create a significant risk of increased punishment would, by definition, violate their due process rights under the United States Constitution."  Doc. no. 425, p. 53, n. 14.

At the motion to dismiss stage, the court held that Count I, construed as a claim brought under the Due Process Clause of the Fourteenth Amendment, failed on its merits.  Doc. no. 349, pp. 3-7.  At that time, the court addressed Whitaker v. Livingston, 732 F.3d 465 (5th Cir. 2013), indicating its agreement with Whitaker's statement that:  "The lack of a cognizable liberty interest is fatal to the due process claim." Whitaker, 500, citing Sepulvado v. Jindal, 729 F.3d 413, 420 (5th Cir. 2013). As Whitaker stated, "Even if the Fourteenth Amendment sometimes protects liberty interests not explicitly enumerated in the Constitution, we know of no case, in the context of executions, in which the Supreme Court has found a liberty interest to exist, based on the contours of the Eighth Amendment, that goes beyond what that Amendment itself protects." Whitaker, 467.

Count VII, like Count I (as construed), rests on the Fourteenth Amendment. Whereas Count I alleges defendants' failure to disclose sufficient information regarding the protocol violates plaintiffs' due process rights, Count VII alleges plaintiffs have a protected interest in being executed in the manner specified in the earlier version of § 1014(A), that is, with the use of "an ultrashort-acting barbiturate."  Count VII, like Count I, fails as a matter of law; both counts rest on the incorrect premise that the Fourteenth Amendment provides a cognizable due process interest in the manner of execution.  The court concludes that defendants are entitled to judgment as a matter of law on Count VII.

I.  <u>The Motion Will Be Granted as to Count IX</u>

Count IX is a human experimentation claim.  It is brought under the Eighth and Fourteenth Amendments.  Count IX alleges the execution drugs called for by

the protocol have not been tested on non-human animals.  Count IX alleges the use of these drugs on unconsenting human subjects constitutes high-risk experimentation with lethal drugs, violating a prisoner's Eighth Amendment right to be free from cruel and unusual punishment, and violating a prisoner's substantive due process right to liberty as protected by the Fourteenth Amendment.

To the extent Count IX is brought under the Eighth Amendment, it is the equivalent of the human experimentation claim which was previously alleged in Count 7 of the original complaint.  This court denied relief on that claim at the preliminary injunction stage.  The court of appeals affirmed that ruling, rejecting plaintiffs' argument that this court erred when it applied the risk-analysis test of Baze instead of an "evolving standards of decency" analysis.  Warner v. Gross, 776 F.3d 721, 736 (10th Cir. 2015).

For the same reasons that Count 7 of the original complaint failed when it was before the court at an earlier stage, Count IX, to the extent it is based on the Eighth Amendment, fails today.  The Eighth Amendment does not require that, absent consent, a prisoner may only be executed in a manner that has been tested on non-human animals.  Count IX also fails to the extent it is premised on the Fourteenth Amendment.  The Fourteenth Amendment does not provide plaintiffs with a substantive due process right to be executed in a manner which has been tested on non-human animals.  *See*, Whitaker, 500 ("The lack of a cognizable liberty interest is fatal to the due process claim").  The court concludes that defendants are entitled to judgment as a matter of law on Count IX.

J.   The Motion Will Be Granted as to Count X

Count X relates to plaintiffs' right of access to governmental information under the First and Fourteenth Amendments.

To the extent Count X is brought under the Fourteenth Amendment, it is similar to Count I, previously dismissed.  Count I, construed as alleged under the Fourteenth Amendment, alleges that plaintiffs have not been provided with sufficient governmental information regarding the development and drafting of the protocol or the procedures that will be used to carry it out.  Similarly, Count X also addresses plaintiffs' alleged right to governmental information.  However, Count X focuses on a subset of that information, specifically, information regarding the source of the drugs to be used.  As already noted several times in this order, this court dismissed Count I because it agrees with Whitaker that the protocol, which goes to the manner of causing death rather than the penalty of death, does not implicate rights protected by due process.  This principle also controls the result with respect to plaintiffs' narrower set of claims, alleged in Count X, asserting that failure to provide plaintiffs with information about the source of the execution drugs deprives plaintiffs of notice and an opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

Other courts have found that neither the Fourteenth Amendment nor the First Amendment grant a prisoner the right to know where, how or by whom lethal injection drugs will be manufactured.  For example, Wellons v. Comm'r, Georgia Dep't of Corrections, 754 F.3d 1260, 1267 (11th Cir. 2014), which considered similar issues at the preliminary injunction stage, states as follows.

> We agree with the judgment of the district court. Neither the Fifth, Fourteenth, or First Amendments afford Wellons the broad right "to know where, how, and by whom the lethal injection drugs will be manufactured," as well as "the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *See Lewis v. Casey*, 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[S]tatements [in *Bounds*] appear to suggest that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court....These elaborations upon the right of access

to the courts have no antecedent in our pre *Bounds* cases, and we now disclaim them.") (citing *Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol."); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011) (holding that the prisoners, who argued that the Arkansas Method of Execution Act violated the due process clause because its secrecy denied them "an opportunity to litigate" their claim that the execution protocol violated the Eighth Amendment, failed to state a plausible due process access-to-the-courts claim). <u>Wellons has not established a substantial likelihood of success on the merits of his claim that the dearth of information regarding the nature of the pentobarbital that will be used in his execution and the expertise of those who will carry it out violates the First Amendment or his right to due process.</u>

<u>Wellons</u>, 754 F.3d at 1267 (emphasis added).

The Eighth Circuit Court of Appeals has concluded that the First Amendment does not support a claim for failure to disclose the name and source of drugs to be used in an execution. <u>Zink v. Lombardi</u>, 783 F.3d 1089, 1112 (8th Cir. 2015). In addition to citing <u>Wellons</u>, <u>Zink</u> notes that after a divided panel of the Ninth Circuit enjoined the execution of an Arizona inmate until the state provided him with the name and provenance of drugs to be used in his execution, "The Supreme Court promptly vacated the injunction without dissent." <u>Zink</u>, 1112, referencing <u>Wood v. Ryan</u>, 759 F.3d 1076, 1088 (9th Cir. 2014), *vacated*, <u>Ryan v. Wood</u>, 573 U.S. 976 (2014). <u>Zink</u> affirmed the district court's dismissal of this and other claims. <u>Zink</u>, 1114.

Neither the Fourteenth nor the First Amendment requires the state to provide information to plaintiffs regarding the source of the execution drugs or the nature of

the company which manufactures those drugs.[25]   The court concludes that defendants are entitled to judgment as a matter of law on Count X.

## K. Conclusion as to Motion for Summary Judgment[26]

For the reasons stated in this order, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, as follows.

Count II.  The gist of Count II, which is alleged under the Eighth Amendment, is that lethal injection under Chart D will subject the prisoner to a constitutionally unacceptable risk of a constitutionally unacceptable level of pain and suffering. Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART with respect to this count.  The motion is GRANTED with respect to the claims alleged in Count II by plaintiffs Coddington, D. Grant, J. Grant, Jones, Lay and Postelle.  To the extent defendants move for summary judgment on the claims alleged in Count II by the other twenty-six plaintiffs, the motion is DENIED.

---

[25] Title 22 O.S. 2011 § 1015(B) has not been cited by any party.  Nevertheless, the court notes it. Section 1015(B) provides that "The identity of all persons who participate in or administer the execution process and persons who supply the drugs, medical supplies or medical equipment for the execution shall be confidential and shall not be subject to discovery in any civil or criminal proceedings."   To the extent this statute addresses those who supply execution drugs, the Oklahoma Supreme Court has construed it to make only the identity of the persons who supply the drugs confidential.  Lockett v. Evans, 330 P.3d 488, 491 (Okla. 2014).  The complaint does not allege that plaintiffs have a right to know the identity of the persons who supply the drugs, rendering § 1015(B) only marginally relevant.

[26] Embedded in plaintiff Wade Lay's pro se pleading filed on August 9, 2021, is a motion to "suspend the proceeding," in which he also seeks discovery and an evidentiary hearing.  Doc. no. 448, at 11-12.  That motion is **STRICKEN** as moot, in light of the rulings set forth in this order. If that motion were not moot, it would be denied because (i) the proceedings Mr. Lay contemplates (described at doc. no. 448, p. 12) have no connection with the issues before the court in this case, and (ii) granting the relief sought would, with no semblance of a showing of good cause, Husky Ventures, Inc. v. B55 Invs., Ltd., 911 F.3d 1000, 1019 (10th Cir. 2018), upend the schedule in this case.

Counts IV, V, VI, VII, IX and X.  Summary judgment is GRANTED in favor of defendants and against plaintiffs on Counts IV, V, VI, VII, IX and X.

Plaintiffs Against Whom Summary Judgment is Entered. Summary judgment on Counts II, IV, V, VI, VII, IX and X is GRANTED in favor of defendants and against plaintiffs Coddington, D. Grant, J. Grant, Jones, Lay and Postelle.  As Counts I, III and VIII were dismissed with prejudice at an earlier stage, no claims alleged by these six plaintiffs remain for trial.  The court has certified that final judgment should be entered under Rule 54(b), Fed. R. Civ. P., against these six plaintiffs.  Separate judgments will be entered for that purpose.

Counts Remaining to be Determined at Trial.   These rulings, along with the court's rulings at the motion to dismiss stage, mean that the only claims which remain for trial are those alleged in Count II by the twenty-six plaintiffs other than Coddington, D. Grant, J. Grant, Jones, Lay and Postelle.

L.  Scheduling, Trial Setting and Related Matters

By separate order, which will provide guidance as to the course of proceedings through the trial of this case, this matter will be set for a scheduling conference.

IT IS SO ORDERED this 11th day of August, 2021.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

14-0665p104.docx