## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RICHARD GLOSSIP, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Case No. CIV-14-665-F** |
| | ) | |
| **RANDY CHANDLER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION ON BEHALF OF PLAINTIFF JULIUS JONES AND OTHER RELIGIOUS OBJECTOR PLAINTIFFS ON THE SUPPLEMENTAL RECORD OF THE EXECUTION OF JOHN GRANT

Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022

Emma V. Rolls, OBA # 18820
Office of the Federal Defender
for the Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102

COUNSEL FOR JULIUS JONES

November 18, 2021

Jon M. Sands
Federal Public Defender District of Arizona
Dale A. Baich (OH Bar No. 0025070)
Jennifer M. Moreno (CA Bar No. 244967)
Michael W. Lieberman, OBA #32694
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

# **TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND AND NEW EVIDENCE ................................................... 3

III.   ARGUMENT .................................................................................................. 8

       A.     Legal Standard................................................................................. 8

       B.     The Religious Objector Plaintiffs Now Show A Likelihood of
              Success on the Merits on Count II ................................................. 9

       C.     The Other Factors Warrant Preliminary Relief. ........................ 14

IV.    CONCLUSION ............................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Attorney General of Oklahoma v. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) ........................................................................... 14

*Baze v. Rees*,
553 U.S. 35 (2008) ...................................................................................... 9, 12

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) ............................................................................... 11, 12

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
966 F.2d 460 (9th Cir. 1992) ........................................................................... 15

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ....................................................................... 14

*In re Kemmler*,
136 U.S. 436 (1890) ......................................................................................... 9

*In re Ohio Execution Protocol Litig.*,
840 F. Supp. 2d 1044 (S.D. Ohio 2012) ........................................................... 14

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................ 8

## I.     INTRODUCTION

The Religious Objector Plaintiffs (except John Grant who has been executed) renew their motion for preliminary injunction based on new, supplemental evidence of the botched John Grant execution.  This motion is brought on an emergency basis as Julius Jones faces execution November 18, 2021 at 4 pm Central Time.  Notwithstanding the Oklahoma Pardon and Parole Board's September 13, 2021 recommendation that Governor Stitt commute Mr. Jones's death sentence to life with the possibility of parole, and its November 1, 2021 recommendation of clemency by the Oklahoma Pardon and Parole Board, Governor Stitt has not acted as of 8 AM Central Time.  This motion is being filed now admittedly on the day of Julius Jones's execution. Nonetheless, it is timely under circumstances where the Governor has not acted on the clemency recommendation that, if accepted, would have obviated the need for this motion being filed seeking emergency relief today as it relates to Julius Jones.

The Religious Objector Plaintiffs previously moved for a preliminary injunction before the execution of John Grant, which motion was denied by this Court, followed by an emergency stay granted by the Tenth Circuit. That opinion held that this Court had abused its discretion in finding no likelihood of success on the merits on the second prong of the *Glossip* test.  The Supreme Court vacated without opinion or explanation as to whether its vacatur was based on a prong of the *Glossip* test or other grounds.  On November 12, 2021, the Tenth Circuit affirmed this Court's denial of the prior preliminary injunction in an opinion holding that, on the then-existing record, this Court had not abused its discretion finding that the showing was not sufficient on the first prong of

*Glossip*. That said, the Tenth Circuit in footnote 2 of that opinion limited its ruling to the first prong of *Glossip* on the record that existed at that time.  It did not address the second prong of *Glossip* or otherwise address or change its prior ruling that this Court's failure to find the showing met on the second prong was an abuse of discretion.

The Religious Objector Plaintiffs respectfully submit that this Court now can and should find that the second prong of *Glossip* has been satisfied and that the new supplemental evidence on the first prong of *Glossip* now meets the burden and supports granting preliminary injunctive relief. **A status quo injunction is requested to stay the execution of Julius Jones now scheduled for the 4 PM Central on November 18, 2021.**

The supplemental evidence offered here goes directly to establishing a likelihood of success on the first prong of *Glossip* and on this basis this Court may and should now enter injunctive relief.  This new supplemental evidence includes the sworn declarations of witnesses to John Grant's execution and the testimony of medical experts who have reviewed this testimony, including one medical doctor who has conducted, and is currently evaluating evidence from, an autopsy on John Grant.  This evidence provides compelling evidence that the Execution Protocol and the use of midazolam, as well as the cursory consciousness checks done under the Protocol, pose a serious and substantial risk of severe suffering and pain to prisoners. Prong one is thus now satisfied on this new, supplemental record and this Court should find prong two met, as the Tenth Circuit held that this Court's prior ruling on the preliminary injunction was an abuse of discretion for not finding that prong met.

## II.     BACKGROUND AND NEW EVIDENCE

This case has an extended procedural history well known to the Court, including the recently-referenced motion for preliminary injunction that this motion seeks to supplement based on the evidence of John Grant's execution.

### The New Supplemental Evidence of John Grant's Pain and Suffering

Julie Gardner, an investigator with the Capital Habeas Unit of the Office of the Federal Public Defender in Oklahoma City, which office represented John Marion Grant, witnessed Mr. Grant's October 28, 2021 execution.  (*See* Ex. 1, Declaration of Julie Gardner dated November 14, 2021 ("Gardner Dec.") at ¶ 1).  Additionally, Meghan LeFrancois, an Assistant Federal Public Defender with the same office also witnessed the execution.  (*See* Ex. 2, Declaration of Meghan LeFrancois ("LeFrancois Dec.") at ¶ 1).

Before John Grant' s execution, Ms. Gardner had witnessed the execution of a federal inmate and five executions by the State of Oklahoma. All six of these lethal injection executions involved barbiturates (pentobarbital and thiopental) as an anesthetic instead of the sedative midazolam. Although she had considerable experience witnessing lethal injection executions, this was the first she witnessed with the inferior non-anesthetic drug.  (*See* Gardner Dec. at ¶ 2).  The substantial suffering apparent and observed in John Grant's midazolam execution were not present in the executions she witnessed that used barbiturates; based on this stark and shocking evidence of suffering, Ms. Gardner expressed the hope she would not have to observe another execution using midazolam. (*Id*.)

Ms. Gardner and Ms. LeFrancois sat about 9 feet from Mr. Grant and were positioned

such that they were looking over at him from an angle where they could see his left side. (*See* Gardner Dec. at ¶ 3; *See* LeFrancois Dec. ¶ 5). They observed the restraint on his left wrist and the IV insertion point near the bend of his left arm. (*See* Gardner Dec. at ¶ 3). A Department of Corrections official began reading the warrant immediately upon the opening of the curtains and after Mr. Grant began talking over the official, the microphone was turned off. (*See* Gardner Dec. at ¶ 4) After this official moved to stand at John Grant's feet, Ms. Gardner started timing the execution with a stop watch. (*Id.*) Mr. Grant initially raised his head and looked over his right shoulder back towards where the drugs were being remotely administered. About 30 to 40 seconds after the execution had begun as recorded on Ms. Gardner's stop watch, she began to see fluid flow through the tube attached to John Grant's left arm. At this point Mr. Grant was looking at the ceiling. (*See* Gardner Dec. at ¶ 5.).

Suddenly, it appeared that the first drug–midazolam–hit and Mr. Grant's chest expanded and he took a deep breath and let it out. The breaths that followed the first deep breath were more violent and irregular. (*See* Gardner Dec. at ¶ 6.) This also was described by an Associated Press reporter, Sean Murphy, as full-body convulsions that numbered about two dozen, and which descriptions Ms. Gardner also endorsed. (*See* Gardner Dec. at ¶ 13) Ms. Gardner described this violent movement as a heaving chest and gasping for air. Ms. LeFrancois testified that Mr. Grant appeared to be struggling to breathe. (*See* LeFrancois Dec. at ¶ 8). During these convulsions and gasping for breath, Mr. Grant's chest was heaving and his head was moving while his mouth moved looking like he was gasping for air. (*See* Gardner Dec. at ¶ 6).

4

While Mr. Grant was convulsing and heaving and gasping for air, he began to vomit. (*Id.*) This began about one and one-half minutes after the convulsions and gasping or struggling to breathe had begun. (*See* LeFrancois Dec. at ¶ 7). Mr. Grant was strapped to the gurney on his back and his face and neck were covered in vomit. (*See* Gardner Dec. at ¶ 6). Ms Gardner saw the vomit around his mouth bubble up and pop as the air from his lungs was being forced out. Then as he took air back in, the vomit would sink back down around his mouth. To Ms. Gardner, it appeared like he was drowning in his own vomit. (*Id.*) During this time, at one point, Mr. Grant moved his back dramatically off the gurney. (*See* LeFrancois Dec. at ¶ 8).

Ms. Gardner reports after about four minutes of these observations, a person wearing a mask entered the chamber with a towel and appeared to wipe/scoop the vomit out of his mouth. This person proceeded to wipe the vomit off of his face and neck in an effort to clean him up. As this person was doing this, a second person wearing a blue wrap over the head that also covered the mouth, came out to help clean the vomit. They both appeared to be nervous and hurried. The second person's hands were visibly shaking as that person was wiping off Mr. Grant's face. (*See* Gardner Dec. at ¶ 7). Following entry and exit of these execution personnel, Mr. Grant's chest continued to heave, he continued to gasp for air, and he continued to vomit. As he exhaled, vomit would fling out of his mouth. The two individuals came back out to clean him off again. Eventually, Mr. Grant's breathing started to slow down and his chest was not heaving as much and he no longer was vomiting but the vomit that was around his mouth and on his lips appeared foamy. (*See* Gardner Dec. at ¶ 8).

At about the six and one-half or seven minutes mark into the execution, the second person who had come in to remove vomit entered the room again to do what turned out to be a quick and apparently quite cursory consciousness check.  As this person entered the room, Mr. Grant raised his head and turned it towards his left and towards where Ms. Gardner and Ms. LeFrancois were seated.  He also made a movement to raise and move his left shoulder against the restraints that strapped him down.  (*See* Gardner Dec. at ¶ 9). The person doing the consciousness check was the same person who earlier entered the execution chamber with visibly shaking hands to clean vomit off Mr. Grant a few minutes earlier.   This conscious check consisted of merely taking hold of Mr. Grant's face and turning it back to where it was centered and away from Ms. Gardner and Ms. LeFrancois. (*Id.*) The person doing the consciousness check then wiped off the foamy vomit from Mr. Grant's mouth and removed Mr. Grant's glasses and wiped around his eyes and then exited the room.  (*Id.*)  This was the full extent of the "consciousness check."  Notwithstanding the apparently voluntary movements of Mr. Grant to move his head to the left toward the observers and to try to move against the restraints, which Ms. Gardner reports in her declaration, it was announced over the intercom that "the inmate is unconscious." The stop watch was still at about the seven-minute mark after the completion of this quick "consciousness check." (Gardner Dec. at ¶ 10).  At this point, Mr. Grant was still breathing but his breathing and movement was no longer violent. (*Id.*)

After it was announced that the "inmate is unconscious," Ms. Gardner reports seeing fluids moving through the IV line. Within a couple of seconds, Mr. Grant's left check fluttered and his breath "puffed out" over his lips, which Ms. Gardner observed as Mr. Grant

then was facing toward his right.  Mr. Gardner's breathing slowed and all movements eventually stopped. (*See* Gardner Dec. at ¶ 10).  The person who conducted the cursory "consciousness check" entered the room again and pushed his fingers into Mr. Grant's jugular on his left side.  He then appeared to squeeze Mr. Grant's throat with his thumb on Mr. Grant's right side. He left the room. This apparently was how it was determined that Mr. Grant was dead.  Seconds later Director Crow came in an announced that the execution was over at 4:21. (*See* Gardner Dec. at ¶ 11).  It took 12 minutes and 40 seconds for the administration of these lethal injections drugs to cause the death of Mr. Grant as recorded by stop watch by Ms. Gardner.  (*See* Gardner Dec. at ¶ 11).

Dr. Michael Weinberger, a Professor at Columbia University Medical School, and a practicing Board-Certified Anesthesiologist and also a Board-Certified Pain Medicine Specialist has provided opinions in an expert report and will testify at trial that the Protocol, including its use of Midazolam and the consciousness check, among other problems, put prisoners at a substantial risk of severe pain and suffering. (*See* Ex. 3, Declaration of Michael Weinberger, M.D., dated November 15, 2021 ("Weinberger Dec." at ¶¶ 2-3). Dr. Weinberger reviewed the eyewitness accounts of John Grant's execution, and concluded that they provide corroborative evidence of his opinions in this case.  (*See* Weinberger Dec. at ¶ 5).  As Dr. Weinberger explains, the movements described by these eyewitnesses may have been voluntary and in view of these apparently voluntary movements of the head and the shoulder at about the time of the "consciousness check", the consciousness check as performed in this case was wholly inadequate. (*See* Weinberger Dec. at ¶ 6). The consciousness check described by the witnesses, as explained

by Dr. Weinberger, also appear inadequate to assess depth of sedation to assure the prisoner insensate and under adequate general anesthesia before administering the second and third drugs. (*See* Weinberger Dec. at ¶ 7). Consequently, it is reasonable to conclude based on this inadequate consciousness check that John Grant was at substantial risk of suffering severe pain and suffering from the second and third drugs.  Any other prisoners under this Protocol, including this inadequate consciousness check, would also be at substantial risk of severe pain and suffering as well. (*See* Weinberger Dec. at ¶ 7).

Dr. Joe Cohen is a pathologist who has begun to evaluate the autopsy of John Grant, including conducting his own examination, and he is in the process of waiting to receive information from the Defendants' autopsy.   Dr. Cohen also submits a declaration supporting the opinion that the Protocol as administered in the John Grant execution subjects prisoners to a substantial risk of severe suffering, full-body convulsions and movements consistent with air hunger.  (*See* Ex. 4, Declaration of Joe Cohen, M.D. dated November 18, 2021 at ¶ 9).

## III.   ARGUMENT

### A.   Legal Standard

To be entitled to a preliminary injunction, generally, a party should demonstrate that (1) they will likely succeed on the merits of their claim(s); (2) without preliminary relief, they will likely suffer irreparable harm; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Religious Objector Plaintiffs now meet this standard to justify the short, limited status quo injunction needed here to prevent any further executions under

this Protocol until this Court finally resolves the Eighth Amendment challenge at the February 2022 trial.

Focusing now on Count II, which this Court has decided requires trial in a few short months, the new evidence of the botched execution of John Grant supports, along with the other evidence before this Court, a short preliminary injunction until the resolution of the February trial to ensure that no other prisoners are subject to this flawed Execution Protocol until the constitutionality of it is finally decided by this Court.[1]

### B.  The Religious Objector Plaintiffs Now Show A Likelihood of Success on the Merits on Count II

The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.*; *see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

---

[1] Yesterday, some members of the Oklahoma Pardon and Parole expressed similar concerns about the execution of Mr. Grant, and suggested that no executions take place until after the trial scheduled for February 2022. Kelly Doyle said, "Executions going the way they are currently going down. I don't feel comfortable making a [pardon or parole] decision." Feliz Romero, "Pardon & Parole Board Recommends Clemency to Bigler Stouffer Due to Concerns with State's Execution Protocol." News9.com, Nov. 17, 2021, https://www.news9.com/story/6195d5d1aca0680c12080c9e/pardon--parole-board-recommends-clemency-to-bigler-stouffer-due-to-concerns-with-states-execution-protocol. Larry Morris said, "I am dumbfounded that we are even dealing with any of these cases, because they would be exposed to the same drug cocktail." *Id.* Morris also said, "That whole trial that is scheduled to happen in February regarding those other inmates has to do with the drug cocktail and whether or not it works, and whether or not it exposes an inmate to cruel and unusual punishment[.]" *Id.*

The Court addressed Count II in its August 11th Order on summary judgment, analyzing the parties' arguments in the context of a two-prong test: (1) whether "the state's method presents 'a substantial risk of severe pain'"; and (2) whether "the alternative method of execution the prisoner is obliged to propose [is] 'feasible and readily implemented,' and [is] one that 'the State has refused to adopt without a legitimate penological reason.'" (Doc. 449 at 6-7). With respect to the first prong, the Court declined to grant summary judgment against Plaintiffs, finding the Plaintiffs' attacks on the protocol's safeguards supported by "credible expert criticism." (*Id.* at 14-15). The showings previously made on the first prong coupled with the evidence of the severe problems with the Execution Protocol as evidenced by John Grant's execution, now support a finding that the first prong is met.

Based on the new supplemental record of evidence of the pain and suffering of John Grant, this Court should conclude that the Religious Objector Plaintiffs have made a showing of a likelihood of success on the first prong of *Glossip* and specifically, that: (i) that before the consciousness check, that there is a substantial risk that the prisoner is sensate as evidenced by voluntary movements in the execution chamber at the six and one-half to seven minute mark and immediately before the so-called "consciousness check"; (ii) that violent convulsions, gasping for breath, vomiting and apparent difficulty breathing through the vomit and asphyxiation all evidence severe pain and the extreme suffering caused by suffocation and air hunger; and (iii) that the consciousness check was and is a cursory, unreliable and inadequate as actually implemented by the personnel in the execution of John Grant. These new eyewitness accounts and the opinions of Dr. Michael

Weinberger and Dr. Joe Cohen based on these accounts all support the conclusion that the Protocol, including the consciousness check as administered in the Protocol, is wholly inadequate and subjects prisoners to a substantial risk of severe pain suffering.

Regarding the second prong, the Court found that fact issues further precluded granting summary judgment as to each of the four alternatives identified in the Third Amended Complaint. (*Id.* at 23-26). Despite the foregoing findings, the Court did grant summary judgment as to the Religious Objector Plaintiffs, because they "declined to proffer an alternative for carrying out their sentence of death." (*Id.* at 18-19). The Religious Objector Plaintiffs each declined to proffer an alternative on moral, ethical, and/or religious grounds prohibiting them from being complicit in their own deaths in a way that they believe would be akin to suicide or assisting suicide. (*See e.g.*, Doc. 425-18 at 75, 123; Doc. 325 at 58-62). The Court found that this decision was "fatal to these plaintiffs' Eighth Amendment claims." (Doc. 449 at 19). As support, the Court cited the Supreme Court' s decision in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), that "*Glossip* expressly held that identifying an available alternative is 'a requirement of *all* Eight Amendment method-of-execution claims' alleging cruel pain" and "failure to identify an alternative [is] a dispositive shortcoming." (ECF No. 449 at 16-17 (emphasis in original)).

The Supreme Court, however, did not hold in any of these decisions that a prisoner must proffer an available alternative "for use in *carrying out his death sentence*," as the Court claimed in its Order. (ECF No. 449 at 7-8 (emphasis in original)). Consequently, the Supreme Court has also never addressed whether requiring a plaintiff to select his own method of execution violates his religious liberties. Most importantly, the Supreme Court

precedent is directed to the pleading of an alternative for comparison to the challenged method. It is not about prisoner choice and this Court's additional requirement that the prisoner be given a choice and be forced to make a choice would be unworkable – potentially compelling a state to develop multiple different protocols for different prisoners.

In *Bucklew*, the Supreme Court addressed its holdings in *Baze* and *Glossip*, and described the standard governing all Eighth Amendment method-of-execution claims, as follows:

> To establish that a State's chosen method cruelly "superadds" pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason.

*Bucklew*, 139 S. Ct. at 1117 (internal citations omitted)(emphasis in original).  Neither here nor anywhere else in *Bucklew* (or *Baze* or *Glossip*) does the Supreme Court decide or even consider whether this standard requires that the alternative method be identified specifically for use in the prisoner's ***own execution***.  Such a question was never at issue in any of the three cases.

In *Bucklew*, the Supreme Court recognized that "distinguishing between constitutionally permissible and impermissible degrees of pain is a necessarily comparative exercise," and that Mr. Bucklew's failure to identify an alternative procedure all together was a "dispositive shortcoming" of his complaint. *Id.* at 1117, 1121. In the present case, there is no such "dispositive shortcoming," because counsel for each of the Religious Objector Plaintiffs signed on to the Third Amended Complaint, which—unlike in

*Bucklew*—identified four alternative methods of execution for the "necessarily comparative exercise" described by the Supreme Court. (*See* Doc. 325, ¶ 114). The Religious Objector Plaintiffs, thus, satisfied the legal standard set out in *Baze*, *Glossip*, and *Bucklew*, identifying an available alternative, but simply declining to endorse a specific option for their own executions. This Court appears to be reading into *Bucklew* a requirement that simply is not there. The Religious Objector Plaintiffs are likely to succeed in overturning the Court's grant of summary judgment, as it rests upon a clear misinterpretation of Supreme Court precedent.

Moreover, as the Court found that serious questions of fact precluded granting summary judgment as to each of the four alternative methods of execution (Doc. 449 at 23-26), the Religious Objector Plaintiffs have the same triable issues of fact as the remaining plaintiffs. This Court also should now take direction on the showing made on the second prong of *Glossip* from the opinion of the Tenth Circuit granting an emergency stay before the execution of John Grant. The Tenth Circuit held with respect to the second prong of *Glossip* that this Court had abused its discretion finding it had not been met. The Supreme Court's vacatur of that opinion and stay was without opinion and the subsequent Tenth Circuit affirmance of this Court's denial of the prior preliminary injunction motion was decided strictly on the first prong of *Glossip*. This Court should follow the Tenth Circuit's decision finding grounds for the limited stay sought here at least on the second prong. And this Court can and should find a likelihood of success on the merits on the first prong now based on the supplemental evidence from the botched execution of John Grant.

13

### C.     The Other Factors Warrant Preliminary Relief.

The Religious Objector Plaintiffs have shown that they will suffer irreparable harm. If Defendants are permitted to carry out their executions before the Religious Objector Plaintiffs' cases are completed in this Court and subject to review on appeal, they will be executed while at the same time being foreclosed any appellate review of the serious constitutional questions they have raised on this record. There is nothing more final and irreversible than death. If the Religious Objector Plaintiffs are unconstitutionally executed, the injury is irreparable.

The issuance of a preliminary injunction is also in the public interest. *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 788 (10th Cir. 2009). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Indeed, "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012) (citation omitted).

The balance of equities tips in favor of the Religious Objector Plaintiffs. The Plaintiffs promptly raised and litigated their claims once the new lethal injection protocol was issued, and a schedule was set and relied upon by Plaintiffs with the understanding that executions would not proceed until the case was complete and subject to review on appeal. Moreover, the Religious Objector Plaintiffs sought relief from this Court, including the prior motion for preliminary injunction, promptly after the Court of Appeals' October 15, 2021 decision and the October 19, 2021 confirmation by counsel for

14

Defendants that the State would not agree to withdraw the execution dates. Moreover, the Religious Objector Plaintiffs have brought this motion for preliminary injunction on the new, supplemental evidence of the John Grant execution as soon as possible after that execution and before Plaintiffs and their experts have had full access to the autopsy of John Grant. It has been brought even before the Governor has acted on the Julius Jones Pardon and Parole Board recommendation of clemency and is necessitated at this time by that inaction.

Viewed in the context of the State's lengthy delay in developing its new protocol, the short stay sought here will have little adverse effect on the State's interest and will ensure that the State does not perform an unconstitutional execution. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J. dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."). Here, equity favors the issuance of the limited preliminary injunction that will prevent the Religious Objector Plaintiffs from being executed before final judgment is entered on their claims and before they can seek appellate review of their novel, substantial and serious claims.

## IV.    CONCLUSION

The Religious Objector Plaintiffs respectfully request that this Court grant a preliminary injunction on the new and supplemental record provided by the botched execution of John Grant, which supports the likelihood of success on the first prong of

Glossip, coupled with the direction provided by the Tenth Circuit's opinion granting an emergency stay on the proper construction and application of the second *Glossip* prong in this case.

Dated:  November 18, 2021                    Respectfully submitted,

                                             s/ Michael Lieberman
                                             Jon M. Sands
                                             Federal Public Defender District of Arizona

                                             Dale A. Baich (OH Bar No. 0025070)
                                             Jennifer M. Moreno (CA Bar No.
                                             244967)
                                             Michael W. Lieberman, OBA #32694
                                             850 West Adams Street, Suite 201
                                             Phoenix, Arizona 85007
                                             Telephone: (602) 382-2816
                                             dale_baich@fd.org
                                             jennifer_moreno@fd.org
                                             michael_lieberman@fd.org

                                             Harry P. Cohen (admitted *pro hac vice*)
                                             Michael K. Robles (admitted *pro hac
                                             vice*)
                                             James K. Stronski (admitted *pro hac
                                             vice*) CROWELL & MORING LLP
                                             590 Madison Avenue
                                             New York, NY 10022
                                             Telephone: (212) 223-4000
                                             hcohen@crowell.com
                                             mrobles@crowell.com
                                             jstronski@crowell.com

                                             Emma V. Rolls, OBA # 18820
                                             Office of the Federal Public Defender for
                                             the Western District of Oklahoma
                                             215 Dean A. McGee Ave., Suite 707
                                             Oklahoma City, OK 73102
                                             Telephone: (405) 609-5975
                                             emma_rolls@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2021, I electronically transmitted a copy of this Emergency Motion for Preliminary Injunction on Behalf of Plaintiff Julius Jones and Other Religious Objector Plaintiffs in The Supplemental Record of The Execution of John Grant to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to all counsel of record who are registered participants of the Electronic Case Filing System.

<u>s/ Michael Lieberman</u>