# EXHIBIT 1

## Declaration of Julie Gardner

I, Julie Gardner, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1. I am an investigator with the Capital Habeas Unit of the Office of the Federal Public Defender in Oklahoma City. Our office represented John Marion Grant who was executed on October 28, 2021. I was one of the two witnesses Mr. Grant requested to be present for his execution. Assistant Federal Public Defender Meghan LeFrancios was his other witness.

2. Prior to Mr. Grant's execution, I had witnessed the execution of a federal inmate and 5 executions by the State of Oklahoma. Mr. Grant's execution was the first execution I witnessed where Midazolam was one of the drugs administered. I hope to never witness another execution where Midazolam is being used. It was horrifying to watch.

3. Ms. LeFrancios and I were sitting approximately 9 feet from Mr. Grant and looking over at him from an angle where we could see his left side. His left wrist was restrained. I observed the IV insertion point near the bend of his left arm. From where I was seated, I could not see if there was an IV on his right arm; however, I assumed there was because I could see a line dangling underneath the headrest that was not attached to the IV on left side of his body.

4. When the curtains opened, a DOC official began reading the warrant. Mr. Grant quickly began talking over the official and the microphone was cut off before the reading of the warrant concluded. I believe the DOC official finished reading the warrant and then he moved down by Mr. Grant's feet. There was never any indication that the execution was going to begin, except for the official moving to stand by his feet. At this point I started my stopwatch.

5. It took a while for anything to happen. Mr. Grant even raised his head and looked over his right shoulder back towards where the drugs were being remotely administered, as if to see what was happening. About 30 to 40 seconds after I had started my stop watch, I observed fluid beginning to flow through the tube. At this point Mr. Grant was looking at the ceiling.

6. When I started to see the drugs flow, I started to watch for changes in his breathing and to see if he tried to move his arm. At first it seemed to be smooth, peaceful and he even closed his eyes. He didn't move his arm. Then it seemed like the drug hit and his chest expanded and he took a deep breath and let it out. The breaths that followed the first deep breath were more violent and irregular. His chest was heaving and it appeared like he was gasping for air. His head was moving. His mouth was moving as if he was trying to suck in air. Then he turned his head to the right and started vomiting and continued to vomit. His face and neck were covered in vomit. I saw the vomit around his mouth bubble up and pop as the air from his lungs was being forced out. Then as he took air back in, the vomit would sink back down around his mouth. It appeared like he was drowning in his own vomit.

7. Almost 4 minutes after I had seen the fluids flowing through the IV, a woman who was wearing a mask entered the chamber with a towel and appeared to wipe/scoop the vomit out of his mouth. She then proceeded to wipe the vomit off of his face and neck in an effort to clean him up. As she was doing this, a man who was wearing a blue wrap over his head that also covered his mouth, came out to help her. They both appeared to be nervous and hurried. When the woman first entered the room, her eyes widened when she saw Mr. Grant. As for the man, his hands were visibly shaking as he was wiping off Mr. Grant's face. They exited the room.

8. Mr. Grant's chest continued to heave, he continued to gasp for air, and he continued to vomit. As he exhaled, vomit would fling out of his mouth. I think the two individuals came back out and cleaned him off again. Eventually, John's breathing started to slow down and his chest was not heaving as much. He was also not vomiting as much. The vomit that was around his mouth and on his lips appeared foamy.

9. Approximately 7 minutes into the execution, the man came back into the room. As the man entered, Mr. Grant raised his head and turned it towards us (to his left). He also tried to raise/move his left shoulder but it was strapped down. The man took hold of Mr. Grant's face and turned it back to where it was centered. He wiped off the foamy vomit around his mouth. He removed Mr. Grant's glasses and wiped around his eyes. The man then left the room.

10. Because I had seen Mr. Grant move his head and try to raise his shoulder, I did not think he was unconscious. However, someone announced over the intercom "the inmate is unconscious." I looked down at my stop watch and we were at the 7 minute mark. John's breathing was slowing and shallow at this point and his chest was not moving as much or as violently.

11. After it was announced that the "inmate is unconscious," I noticed fluids started moving through the IV line. It was only a second or two before I saw Mr. Grant's left cheek flutter and his breath "puffed out" over his lips. His head was facing to his right. His breathing slowed. All movements slowed and eventually stopped altogether.

12. The man entered the room again and pushed his fingers into Mr. Grant's jugular on his left side. (The skin around Mr. Grant's neck seemed slack as did his jaw.) He then appeared to squeeze Mr. Grant's throat with his thumb on Mr. Grant's right side. He left the room. Seconds later Director Crow came in an announced that the execution was over at 4:21. (My stop watch showed the execution took approximately 12 minutes and 40 seconds.)

13. I have read the attached article by Sean Murphy, a reporter with the Associated Press, and I agree with his description of the execution.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

_____  
Julie Gardner

_11/17/21_____  
Date



# Oklahoma executes inmate who dies vomiting and convulsing

By SEAN MURPHY   October 28, 2021



McALESTER, Okla. (AP) — Oklahoma administered the death penalty Thursday on a man who convulsed and vomited as he was executed for the 1998 slaying of a prison cafeteria worker, ending a six-year execution moratorium brought on by concerns over its execution methods,

John Marion Grant, 60, who was strapped to a gurney inside the execution chamber, began convulsing and vomiting after the first drug, the sedative midazolam, was administered. Several minutes later, two members of the execution team wiped the vomit from his face and neck.

Before the curtain was raised to allow witnesses to see into the execution chamber, Grant could be heard yelling, "Let's go! Let's go! Let's go!" He delivered a stream of profanities before the lethal injection started. He was declared unconscious about 15 minutes after the first of three drugs was administered and declared dead about six minutes after that, at 4:21 p.m.

Someone vomiting while being executed is rare, according to observers.

ADVERTISEMENT

"I've never heard of or seen that," said Robert Dunham, executive director of the nonpartisan Death Penalty Information Center. "That is notable and unusual."

Michael Graczyk, a retired Associated Press reporter who still covers executions for the organization on a freelance basis, has witnessed the death penalty being carried out about 450 times. He said Thursday he could only recall one instance of someone vomiting while being put to death.

The Oklahoma attorney general and governor did not respond to questions about Grant's reactions to the drugs. In fact, Department of Corrections spokesman Justin Wolf said by email that the execution "was carried out in accordance with Oklahoma Department of Corrections' protocols and without complication."

A statement from Republican Gov. Kevin Stitt referenced a section of the Oklahoma Constitution in which voters overwhelmingly enshrined the death penalty.

ADVERTISEMENT

"Today, the Department of Corrections carried out the law of the State of Oklahoma and delivered justice to Gay Carter's family," Stitt said.

Grant was the first person in Oklahoma to be executed since a series of flawed lethal injections in 2014 and 2015. He serving a 130-year prison sentence for several armed robberies when witnesses say he dragged prison cafeteria worker Gay Carter into a mop closet and stabbed her 16 times with a homemade shank. He was sentenced to die in 1999.

"At least now we are starting to get justice for our loved ones," Carter's daughter, Pamela Gay Carter, said in a statement. "The death penalty is about protecting any potential future victims. Even after Grant was removed from society, he committed an act of violence that took an innocent life. I pray that justice prevails

for all the other victims' loved ones. My heart and prayers go out to you all."

Oklahoma moved forward with the lethal injection after the U.S. Supreme Court, in a 5-3 decision, lifted stays of execution that were put in place on Wednesday for Grant and another death row inmate, Julius Jones, by the 10th U.S. Circuit Court of Appeals.

The state's Pardon and Parole Board twice denied Grant's request for clemency, including a 3-2 vote this month to reject a recommendation that his life be spared.

Oklahoma had one of the nation's busiest death chambers until problems in 2014 and 2015 led to a de facto moratorium. Richard Glossip was just hours away from being executed in September 2015 when prison officials realized they received the wrong lethal drug. It was later learned the same wrong drug had been used to execute an inmate in January 2015.

The drug mix-ups followed a botched execution in April 2014 in which inmate Clayton Lockett struggled on a gurney before dying 43 minutes into his lethal injection — and after the state's prisons chief ordered executioners to stop.

While the moratorium was in place, Oklahoma moved ahead with plans to use nitrogen gas to execute inmates, but ultimately scrapped that idea and announced last year that it planned to resume executions using the same three-drug lethal injection protocol that was used during the flawed executions. The three drugs are: midazolam, a sedative, vecuronium bromide, a paralytic, and potassium chloride, which stops the heart.

Oklahoma prison officials recently announced that they had confirmed a source to supply all the drugs needed for Grant's execution plus six more that are scheduled to take place through March.

"Extensive validations and redundancies have been implemented since the last execution in order to ensure that the process works as intended," the Department of Corrections said in a statement.

More than two dozen Oklahoma death row inmates are part of a federal lawsuit challenging the state's lethal injection protocols, arguing that the three-drug method risks causing unconstitutional pain and suffering. A trial is set for early next year.

Dale Baich, an attorney for some of the death row inmates in that suit, said eyewitness accounts of Grant's lethal injection show Oklahoma's death penalty protocol isn't working as it was designed.

"This is why the U.S. Supreme Court should not have lifted the stay," Baich said in a statement. "There should be no more executions in Oklahoma until we go (to) trial in February to address the state's problematic lethal injection protocol."

Grant and five other death row inmates were dismissed from the lawsuit after none of them selected an alternative method of execution, which a federal judge said was necessary. But a three-member panel of the Denver-based 10th U.S. Circuit Court of Appeals determined that the inmates did identify alternative

methods of execution, even if they didn't specifically check a box designating which technique they would use. The panel had granted stays of execution on Wednesday for Grant and Jones, whose lethal injection is set for Nov. 18.

Jones — whose case has drawn national attention since being featured in 2018 on the ABC television documentary series "The Last Defense" — has a clemency hearing set for Tuesday. Jones, 41, has maintained his innocence in the 1999 shooting death of an Oklahoma City-area businessman. The state Pardons and Parole Board in March recommended that Stitt, the governor, commute his death sentence to life imprisonment.

Stitt has said he will not decide whether to spare Jones' life until the clemency hearing.

Grant and his attorneys did not deny that he killed Carter.

"John Grant took full responsibility for the murder of Gay Carter, and he spent his years on death row trying to understand and atone for his actions, more than any other client I have worked with," attorney Sarah Jernigan said Thursday in a statement after the execution.

But Grant's attorneys argued that key facts about the crime and Grant's troubled childhood were never presented to the jury. They maintained that Grant developed deep feelings for Carter and was upset when she fired him after he got in a fight with another kitchen worker.

"Jurors never heard that Mr. Grant killed Ms. Gay Carter while in the heat of passion and despair over the abrupt end of the deepest and most important adult relationship of his life," his attorneys wrote in his clemency application.

Pamela Carter, who also worked at the prison and was there the day her mother was killed, rejected the idea that her mother and Grant had anything more than a professional relationship and urged state officials to move forward with the execution.

"I understand he's trying to save his life, but you keep victimizing my mother with these stupid allegations," she told the Pardon and Parole Board this month. "My mother was vivacious. She was friendly. She didn't meet a stranger. She treated her workers just as you would on a job on the outside. For someone to take advantage of that is just heinous."

___

Associated Press writer Adam Kealoha Causey in Dallas contributed to this report.

ADVERTISEMENT