# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

RICHARD GLOSSIP, *et al.*,        )
                                  )
    Plaintiffs,                   )
                                  )
    vs.                           )        Case No. CIV-14-665-F
                                  )
RANDY CHANDLER, *et al.*,         )
                                  )
    Defendants.                   )

## __PLAINTIFFS' TRIAL BRIEF__

Harry P. Cohen (admitted *pro hac vice*)
Michael K. Robles (admitted *pro hac vice*)
James K. Stronski (admitted *pro hac vice*)
Kenton Walker (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022

Emma V. Rolls
Office of the Federal Public Defender
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102

Jon M. Sands
Federal Public Defender
District of Arizona
Dale A. Baich
Jennifer M. Moreno
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

COUNSEL FOR PLAINTIFFS

Alex Kursman
Lynne Leonard
Shawn Nolan
Assistant Federal Defenders
Capital Habeas Unit
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street
Philadelphia, PA 19106

COUNSEL FOR PHILLIP HANCOCK

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES........................................................................... iii

I.   SUMMARY OF EVIDENCE SATISFYING *BAZE/GLOSSIP* PRONGS I AND II ... 1

     A.   Prong I ..................................................................................... 2

     B.   Prong II .................................................................................... 4

II.  PROFFERED EVIDENCE BY WITNESSES AND EVIDENTIARY ISSUES .......... 5

     A.   Witnesses Whose Testimony Will Establish that the Pain
          Associated with Administration of the Execution Drugs is
          Constitutionally Intolerable

          1.   Dr. Mark Edgar ................................................................. 5

          2.   Dr. Michael Weinberger.................................................... 7

          3.   Julie Gardner .................................................................. 10

          4.   Meghan LeFrancois......................................................... 11

          5.   Dr. Joseph Cohen ........................................................... 11

          6.   Spencer Hahn ................................................................. 12

     B.   Witness Whose Testimony Will Establish that Midazolam Does Not
          Render a Prisoner Insensate to the Constitutionally Intolerable Pain of the
          Execution Drugs.

          Dr. Craig Stevens ............................................................. 12

     C.   Witness Whose Testimony Will Establish that the Execution Protocol Does
          Not Contain Sufficient Safeguards to Guard Against a Sensate Prisoner
          Experiencing Constitutionally Intolerable Pain.

          Dr. Reginald Wilkinson.................................................... 13

D.     Witnesses Whose Testimony Will Establish that there Are Available Alternatives to the Current Execution Method that Will Significantly Reduce a Substantial Risk of Severe Pain and Suffering.

    1.     Dr. David Sherman ............................................................................ 14

    2.     Dr. Lawrence Block ......................................................................... 15

    3.     Dr. James Williams .......................................................................... 16

E.     Evidentiary Issues .................................................................................... 18

III. THE EVIDENCE PLAINTIFFS WILL PROFFER SATISFIES PLAINTIFFS' BURDEN UNDER THE BAZE/GLOSSIP STANDARD ........................................ 19

A.     The Evidence Satisfies Plaintiffs' Burden on Prong I ................................ 19

B.     The Evidence Satisfies Plaintiffs' Burden on Prong II .............................. 21

    1.     Removal or Paralytic and Addition of Fentanyl ............................. 22

    2.     Barbiturate Plus Opioid .................................................................... 23

    3.     Firing Squad ..................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................. 27

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Baze v. Rees*,
    553 U.S. 35 (2008) ..................................................................................... 20

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ......................................................................... 19, 22

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ............................................................................... 21

*Glossip v. Gross*,
    576 U.S. 863 (2015) ................................................................................... 19

## FEDERAL CIRCUIT COURT CASES

*In re Ohio Execution Protocol,*
    860 F.3d 881 (6th Cir. 2017) ..................................................................... 22

## FEDERAL RULES

FRE Rule 803(6) ........................................................................................ 18, 19

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD GLOSSIP, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-14-665-F |
| | ) | |
| RANDY CHANDLER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' TRIAL BRIEF

Pursuant to the Court's August 31, 2021, Courtroom Minute Sheet (Doc. 469), Plaintiffs hereby respectfully submit their trial brief.

## I.   SUMMARY OF EVIDENCE SATISFYING *BAZE/GLOSSIP* PRONGS I AND II

Plaintiffs' evidence at trial will satisfy both of the *Baze/Glossip* prongs to support a finding that Oklahoma's execution protocol is unconstitutional under the Eighth Amendment to the United States Constitution. Specifically, the evidence will prove that Oklahoma's three-drug execution protocol – 500 mg of midazolam followed by 100 mg vecuronium bromide followed by 240 mEq potassium chloride – is sure or very likely to cause serious illness and needless suffering (prong I) and that alternative methods of execution are available that are feasible, readily implemented, and, in fact, will significantly reduce a substantial risk of severe pain (prong II).

1

A.    **Prong I**

Under prong I, Plaintiffs' evidence will prove that: (1) the pain associated with the administration of midazolam, vecuronium bromide, and/or potassium chloride under the execution protocol is constitutionally intolerable; (2) midazolam, as administered under the execution protocol, does not render a prisoner insensate to the constitutionally intolerable pain of the execution drugs; and (3) the execution protocol does not contain sufficient safeguards to guard against a sensate prisoner experiencing constitutionally intolerable pain.

First, expert testimony by a Board-certified anatomic pathologist and neuropathologist, as well as an anesthesiologist, will establish that injection of midazolam, as called for by the execution protocol, will destroy delicate tissue of the prisoner's lungs and cause pulmonary edema, resulting in severe respiratory distress and associated sensations of drowning and asphyxiation. These expert opinions will be confirmed by witnesses to recent executions that have utilized midazolam, as well as a pathologist who performed an autopsy of John Marion Grant, following his October 28, 2021 execution. This testimony will demonstrate that prisoners in these executions exhibited signs consistent with air hunger, following administration of midazolam.

Second, expert testimony will demonstrate that vecuronium bromide and potassium chloride each cause constitutionally intolerable pain when administered to a sensate individual, which is not genuinely in dispute. Vecuronium bromide results in asphyxiation caused by paralysis and a feeling of chemical suffocation, and potassium chloride results in a feeling of being burned alive from the inside.

2

Third, expert testimony will show that midazolam, as administered under the execution protocol, does not render a prisoner insensate to the constitutionally intolerable pain and suffering—either that caused by its own action or by the action of the vecuronium bromide and potassium chloride. In order for midazolam to prevent unconstitutional levels of suffering, it must be able to maintain the prisoner in an insensate state. But it cannot do so. That is, while it may be capable of *inducing* anesthesia under certain circumstances, it is inadequate to *maintain* anesthesia for the time necessary to ensure that a prisoner will be insensate to the pain and suffering caused by the second and third drugs of the execution protocol. Multiple medical experts will explain how midazolam is ineffective to maintain a prisoner insensate to that pain and suffering, and they will demonstrate its ceiling effect— the point beyond which increased dosages fail to have a proportionally greater effect.

Finally, expert testimony will establish that the structure and provisions of Oklahoma's execution protocol itself fails to adequately protect against the substantial risk of a prisoner experiencing constitutionally intolerable pain. The protocol indisputably provides the Director with unilateral discretion to modify the protocol's procedures. A former Director of the Ohio Department of Rehabilitation and Corrections, who oversaw 20 lethal injection executions, will explain how dangerous such unfettered discretion is to the execution process and how it lacks any legitimate penological justification.

Moreover, medical experts will explain how various aspects of the execution protocol are insufficient to guard against a prisoner being sensate to pain and suffering when the second and third drugs are administered, including the inadequacy of the protocol's consciousness check, IV procedures, and training.

3

## B.      Prong II

Under prong II, Plaintiffs' evidence will prove that there are at least three available alternatives to the current execution method that are feasible, readily implemented, and that will significantly reduce a substantial risk of severe pain.

First, expert medical testimony will establish that the addition of fentanyl as a premedication, coupled with removal of the vecuronium bromide paralytic from the current execution will significantly reduce the risk of a prisoner remaining sensate and therefore suffering during the execution. The testimony will establish that fentanyl is readily available and that it is the best choice to use as an opioid premedication to mitigate suffering. Moreover, removal of the paralytic will ensure that a prisoner would be able to report any failure of the premedication or midazolam, something that cannot be done under the current method.

Second, expert medical testimony will establish that a single dose of either pentobarbital or sodium thiopental, with a pre-dose of an analgesic drug, such as fentanyl, will significantly reduce the risk of a prisoner suffering while sensate during the execution. Notably, these methods are already authorized and approved in Charts A and B of the Oklahoma execution protocol (albeit without the pre-dose of an analgesic drug). Additionally, both the federal government and multiple other states have used pentobarbital in executions in recent years, demonstrating its availability. It has been used recently in Texas, Georgia, Missouri, and South Dakota. Additionally, Arizona announced that it has located a supplier to provide compounded pentobarbital. Experts in the fields of chemistry and pharmaceutics will also demonstrate that pentobarbital and sodium pentothal can be

4

readily compounded and prepared for use in executions using commercially available ingredients and standard laboratory equipment.

Finally, expert testimony will demonstrate that death by firing squad is available and will significantly reduce the substantial risk of severe pain and suffering present in the current execution method. An experienced medical doctor who has over 40,000 hours of ER and ICU experience and expertise in firearms, will show that execution by firing squad can reliably cause a quick and painless death by targeting the cardiac bundle and denying blood supply to the central nervous system. Its simple nature and the availability of the means necessary to carry it out also substantially reduces the chances of an execution being "botched" by human error. Moreover, execution by firing squad is already authorized by Oklahoma law and at least one other state (Utah) has successfully completed executions by firing squad in recent years.

## II.     PROFFERED EVIDENCE BY WITNESSES AND EVIDENTIARY ISSUES

At trial, Plaintiffs intend to call the following witnesses in support of their case:

### A.     Witnesses Whose Testimony Will Establish that the Pain Associated with Administration of the Execution Drugs is Constitutionally Intolerable.

#### 1.     Dr. Mark Edgar

Dr. Mark Edgar is a practicing, board-certified anatomic pathologist and neuropathologist, with a subspecialty in bone and soft tissue pathology. He is a Senior Associate Consultant in the Department of Laboratory Medicine and Pathology at Mayo Clinic in Jacksonville, Florida and an Associate Professor of Pathology at Mayo Clinic College of Medicine and Science. Dr. Edgar routinely conducts autopsies, evaluates

biopsies and surgical specimens, and consults with other pathologists. He is also involved in the training of surgical pathology fellows and occasionally teaches residents and medical students.

Dr. Edgar's testimony will demonstrate that a 500 mg dose of midazolam administered pursuant to the Oklahoma execution protocol results in constitutionally unacceptable respiratory distress. In reaching his expert opinion, Dr. Edgar considered the execution protocol, package insert for injectable midazolam, and the autopsy reports of 31 prisoners who had been executed using lethal injection protocols employing midazolam, as well as an autopsy he personally performed on an executed prisoner, Robert Van Hook. Dr. Edgar's analysis of Mr. Van Hook's autopsy included analysis of tissue samples from Mr. Van Hook's body. He further considered scientific and medical publications and a chart of eyewitness accounts of executions using midazolam.

Dr. Edgar will explain that the rapid intravenous injection—as used in Oklahoma's execution protocol—of a massive dose of midazolam, which is highly acidic, will almost immediately destroy delicate tissue of the prisoner's lungs. As a result, the lungs will rapidly fill with blood and other fluids, resulting in acute (or flash) pulmonary edema. He will explain that in the 32 autopsies he considered, he found consistent and repeated instances of pulmonary edema attributable to large doses of IV-injected midazolam. The anatomic evidence showed that the vast majority (at least 27 of 32), and possibly all, of these prisoners developed pulmonary edema, and that the pulmonary edema occurred immediately following administration of the midazolam. In other words, the pulmonary edema was acute, meaning onset was sudden, and often severe. The presence of froth in

6

the airways confirmed that the onset of pulmonary edema occurred after administration of midazolam, and prior to the onset of the paralytic drug, because respiration is necessary for the production of foam and froth in the lungs and airways and will not occur after the onset of the paralytic, which causes a cessation of respiration. The eyewitness accounts Dr. Edgar reviewed for all but two of the 32 executions contained observations consistent with serious respiratory distress after the administration of midazolam but before administration of the paralytic, which provides further confirmation of the onset of pulmonary edema.

Dr. Edgar will also explain the effects of pulmonary edema on the body, including how it reduces the amount of oxygen in the blood, causes shortness of breath, and leads to sensations similar to drowning or asphyxiation as fluid occupies a greater volume of air space. He will further explain that a person who develops pulmonary edema while conscious and aware will show signs of increasing difficulty breathing and chest pain, up to and including sensations of terror associated with drowning and asphyxiation.

### 2.   Dr. Michael Weinberger

Dr. Michael Weinberger is Medical Director of the Pain Management Center, Associate Professor of Anesthesiology at Columbia University Medical Center, and Section Chief, Pain Medicine at Columbia University Department of Anesthesiology. He has over 35 years of experience in anesthesiology and pain management and is certified by the American Board of Internal Medicine and the American Board of Anesthesiology (Pain Medicine, Anesthesiology, Hospice and Palliative Medicine). In forming his opinions, Dr. Weinberger considered the Oklahoma execution protocol, autopsy reports of prisoners executed by lethal injection using midazolam, scientific and other publications, Dr. Edgar's

expert report, and press releases describing eyewitness accounts of executions of prisoners using midazolam.

Dr. Weinberger will testify that prisoners executed in accordance with the Oklahoma execution protocol face a substantial risk of experiencing severe pain and suffering as a result of the protocol's execution drugs and procedures. He will explain that midazolam, which is not an anesthetic, but rather a sedative, when administered alone, cannot reliably render and maintain a subject in an insensate state and induce *and maintain* anesthesia, or block perception or transmission of painful stimuli. Notably, midazolam is neither approved nor used for maintaining general anesthesia without other drugs. Dr. Weinberger will further explain that there is significant individual variation in response to midazolam, based on factors such as individual genetic differences, pharmacokinetics, interaction with other drugs, and existing medical conditions. As a result, there is a significant range in dosing required to achieve similar results between individuals. Moreover, he will explain that midazolam has a ceiling effect, meaning that additional amounts of the drug, even at much higher doses, will not produce an equally greater response in a subject or have proportionally greater effect.

Dr. Weinberger will further testify, consistent with Dr. Edgar's testimony, that administration of midazolam in the dose and concentration called for in the execution protocol leads to flash (acute) pulmonary edema, causing sensations of air hunger, drowning, and/or suffocation. And because midazolam does not reliably render a subject insensate and maintain general anesthesia, or block nociception in the presence of noxious stimuli, midazolam cannot reliably render and maintain a subject in an insensate state

during the severe suffering caused by the flash pulmonary edema. Similarly, it is unlikely to render and maintain a subject in an insensate state and induce and maintain general anesthesia in the presence of the pain or suffering caused by vecuronium bromide and potassium chloride.

Dr. Weinberger will further explain that vecuronium bromide administered alone results in a slow death by asphyxiation caused by paralysis. He will explain that patients who have suffered intraoperative awareness while paralyzed, including as a result of vecuronium bromide, without being adequately sedated or anesthetized, describe feelings of pain, extreme fear and panic, distress, sensations of suffocation, and inability to signal to providers with gestures or facial expressions that they are aware and suffering. Potassium chloride administered alone produces cardiac arrest, the sensation of burning, and intense pain as it circulates through the body. Injections of more than 80-100 mEq/L are known to cause severe pain.

Dr. Weinberger will further explain that an individual administered midazolam and potassium chloride, pursuant to the execution protocol, would be able to communicate or otherwise demonstrate their feelings of pain and suffering caused by those drugs, if the vecuronium bromide was not administered. Moreover, the consciousness check method described in the execution protocol is not sufficient to ensure a subject is insensate to the noxious stimuli of pulmonary edema, or the effects of vecuronium bromide and potassium chloride.

### 3.    Julie Gardner

Julie Gardner is an investigator with the Capital Habeas Unit of the Office of the Federal Public Defender for the Western District of Oklahoma, whose office represented John Marion Grant. Ms. Gardner was one of two witnesses Mr. Grant requested to be present for his October 28, 2021, execution. In addition to witnessing Mr. Grant's execution, Ms. Gardner has witnessed one federal execution and five executions conducted by the State of Oklahoma. Mr. Grant's execution was the only one where midazolam was administered.

Ms. Gardner will testify regarding her observations of Mr. Grant's execution, which she described as horrifying to watch. Mr. Grant's chest expanded, following the administration of midazolam, and his breaths became more violent and irregular. His chest heaved, he appeared to be gasping for air, and he started vomiting and continued to vomit, which covered his face and neck. To Ms. Gardner, it appeared that Mr. Grant was drowning in his own vomit, and the vomit around his mouth and lips appeared foamy. According to Ms. Gardner's observation, approximately seven minutes into the execution, Mr. Grant raised his head and turned it and tried to raise his shoulder, but it was strapped down. Accordingly, Ms. Gardner did not think that Mr. Grant was unconscious. After Ms. Gardner witnessed additional fluids flow through the IV line after an announcement that the "inmate is unconscious," all movements slowed and eventually stopped. In all, the execution took approximately 12 minutes and 40 seconds, according to Ms. Gardner's stopwatch.

### 4.    Meghan LeFrancois

Meghan LeFrancois is an Assistant Federal Public Defender in the Capital Habeas Unit of the Federal Defender for the Western District of Oklahoma and was a member of John Marion Grant's legal team. Ms. LeFrancois was one of two witnesses Mr. Grant requested to be present for his October 28, 2021, execution.

Ms. LeFrancois will testify regarding her observations of Mr. Grant's execution. She observed Mr. Grant struggle to breathe soon after the DOC official stopped reading the warrant and she witnessed fluid flowing in the IV line. She then witnessed him start vomiting and observed a lot of vomit that appeared brown all over his mouth and neck, and on the floor. Mr. Grant continued to struggle to breathe for several minutes and was gasping for air. Ms. LeFrancois worried that Mr. Grant would choke on his vomit, or already had. She also observed his back lift dramatically off the gurney. And she observed Mr. Grant continue to breathe heavily after an announcement was made that he was unconscious. Soon thereafter, his breathing settled down and he became still.

### 5.    Dr. Joseph Cohen

Dr. Joseph Cohen is a full-time practicing forensic pathologist who is board-certified and responsible for death investigations in multiple counties in northern California. He has performed in excess of 7000 autopsy examinations over the past 27 years and has expertise in performing autopsy examinations for the purpose of determining the cause and manner of death. Dr. Cohen conducted an autopsy of John Marion Grant following his October 28, 2021 execution, subsequent to the autopsy conducted by the State.

Dr. Cohen will testify regarding his findings from his autopsy of Mr. Grant and his review of witness accounts of Mr. Grant's execution, including that: (1) Mr. Grant's conjunctivae reflected numerous petechial hemorrhages, consistent with an asphyxia mechanism of death; (2) Dr. Cohen cannot rule out aspiration of gastric contents (choking) as a contributing mechanism of death or rule out conscious pain and suffering; and (3) Dr. Cohen cannot rule out incomplete sedation, as the movements of Mr. Grant during the execution may be explained by Mr. Grant having been sensate to the pain and suffering.

It is important to note that, to date, the State has not provided access to the medical examiner's findings from the State's autopsy of Mr. Grant. Dr. Cohen may be able to present additional testimony if the State makes those findings available.

### 6.      Spencer Hahn

Spencer Hahn is an Assistant Federal Public Defender for the Middle District of Alabama. Mr. Hahn has been a witness to recent executions that have used midazolam. He will testify as to his observations of those executions.

### B.      Witness Whose Testimony Will Establish that Midazolam Does Not Render a Prisoner Insensate to the Constitutionally Intolerable Pain of the Execution Drugs.

### Dr. Craig Stevens

Dr. Craig Stevens is Professor of Pharmacology and full-time faculty member in the department of Pharmacology and Physiology at the College of Osteopathic Medicine, a unit of the Oklahoma State University, Center for Health Sciences.

Dr. Stevens will explain that the Oklahoma execution protocol presents a substantial risk that is sure or very likely to cause needless suffering, because midazolam cannot render

the prisoner insensate to the chemical suffocation that will result from vecuronium bromide or the pain of being burned alive from the inside by potassium chloride. He will explain midazolam's ceiling effect and the fact that it is unable to render a person insensate to pain no matter how much of it is injected into a person and no matter how quickly or slowly the second and third drugs are administered after the midazolam. Dr. Stevens will further explain that, in contrast to midazolam, the barbiturates pentobarbital and thiopental, will produce a state of general anesthesia.

As described above, Dr. Weinberger will also provide testimony regarding midazolam's ineffectiveness to render a subject insensate to pain.

### C.  Witness Whose Testimony Will Establish that the Execution Protocol Does Not Contain Sufficient Safeguards to Guard Against a Sensate Prisoner Experiencing Constitutionally Intolerable Pain.

#### Dr. Reginald Wilkinson

Dr. Reginald Wilkinson is a current member (and has been for over 20 years), and past chair, of the National Institute of Corrections Advisory Board, an agency within the Federal Bureau of Prisons. He has also served as President of the Association of State Correctional Administrators and the American Correctional Association. For over 15 years, Dr. Wilkinson served as the Director of the Ohio Department of Rehabilitation and Correction, where he was responsible for the creation and development of Ohio's execution policy and practices, as well as overseeing all executions conducted by the State of Ohio. As Director, he oversaw 20 executions, all of which were carried out by lethal injection.

Dr. Wilkinson will explain that there is no legitimate penological justification for the ODOC Director to have the unfettered discretion to modify the execution procedures

13

that the Oklahoma protocol provides. The protocol provides the Director with discretion to change the protocol any time when he or she determines it is "required." Dr. Wilkinson will explain how such discretion renders meaningless the procedures set forth in the protocol. He will further explain that any change involving a central function of an execution protocol has a significant impact on the prisoner and execution personnel carrying out the process and that there is no penological justification for the Director to retain such discretion.

Dr. Wilkinson will further establish that the Oklahoma execution protocol poses a substantial risk of harm to prisoners, because it fails to provide significant details and guidance concerning the establishment and maintenance of the IV catheter, the consciousness check, and because it fails to adequately set forth the training required for execution team members, posing a substantial risk that they will be unprepared to perform their duties and address unexpected contingencies. He will also explain that there is no penological impediment to implementation of the alternative lethal injection methods Plaintiffs have put forth.

As described above, Dr. Weinberger will also testify regarding the inadequacies of the current protocol.

**D.     Witnesses Whose Testimony Will Establish that there Are Available Alternatives to the Current Execution Method that Will Significantly Reduce a Substantial Risk of Severe Pain and Suffering.**

**1.     Dr. David Sherman**

Dr. David Sherman holds a Ph.D in Synthetic Organic Chemistry from Columbia University (1981) and is the Hans W. Vahlteich Professor of Medicinal Chemistry at the

14

University of Michigan. He holds appointments as Professor in the Department of Chemistry, Department of Medicinal Chemistry, and Department of Microbiology & Immunology. He was a founding Director of the Center for Chemical Genomics, an academic drug discovery center, and is a Research Professor in the Life Sciences Institute at the University of Michigan. He is also a member of the Michigan Drug Discovery executive board that oversees all academic drug discovery programs at the University. He has conducted research in the fields of synthetic chemistry and medicinal chemistry, microbial genetics and biochemistry, and proteomics over the past 40 years.

Dr. Sherman will explain that synthesis of Pentobarbital or Sodium Pentothal (thiopental), the execution chemicals listed in Charts A and B of Attachment D to the Oklahoma execution protocol, is feasible, available, and readily implemented. The method to synthesize both of them is efficient, scalable, and straightforward. The reactions needed for the synthesis require reactants that are commercially available, as well as standard laboratory equipment and glassware, while the safety protocols would be similar to those followed in a typical undergraduate organic chemistry laboratory course. He will further explain that there are both university and private company laboratories in Oklahoma that are capable of performing the synthesis of both chemicals, and are commercially available for hire.

### 2.    Dr. Lawrence Block

Dr. Lawrence Block is Professor Emeritus of Pharmaceutics, School of Pharmacy, at Duquesne University and is a member of various expert committees, panels, and subcommittees for the United States Pharmacopeia (USP). He was a Professor of

Pharmaceutics in the School of Pharmacy at Duquesne, prior to retiring in 2012. Throughout his career, he served as a consultant to numerous pharmaceutical and biotechnology companies, including Pfizer, Hoffman-LaRoche, Boehringer-Ingelheim, and FMC Corporation, and has also consulted for the Department of Public Welfare, Commonwealth of Pennsylvania.

Dr. Block will explain that a compounding pharmacist licensed by the State can prepare the pentobarbital and sodium pentothal syringes called for by Charts A and B of Attachment D to the Oklahoma execution protocol.

### 3.   Dr. James Williams

Dr. James Williams is an emergency physician. He practices primarily at Citizen's Hospital in Victoria, Texas, as well as several other hospitals. He holds medical licenses in three states (Texas, Nebraska, and Wisconsin) and has served as Medical Director of several emergency departments during his career. He is board-certified by the American Board of Family Medicine. He is also certified in Advanced Trauma Life Support by the American College of Surgeons. He has more than 40,000 hours of ER and ICU experience and has provided medical care to thousands of trauma patients. Not only has Dr. Williams treated numerous gunshot victims, who have described the relative painfulness of their wounds to him, he has also received a gunshot wound to the right chest himself.

In addition to his medical training and experience, Dr. Williams has extensive experience with firearms. He has been a Police Medical Officer for a police department (City of Ripon, WI) for 10 years and a SWAT Team Physician for a Sheriff's Department (Waupaca, WI), where he operated as an embedded component of the SWAT Team,

16

participating in both training and actual SWAT operations, and being held to the same standards of firearms proficiency and combat standards as all other SWAT officers. He also has a lifetime of experience working with firearms, including hunting small and large game, participation in competitive shooting, and as a firearms instructor. He currently conducts firearms trainings for law enforcement agencies and authorized civilian organizations. Dr. Williams' expert opinion is based on his knowledge, training and experience in medicine and firearms, and on his review of the State of Utah's and U.S. Army's protocols for executions by firing squad.

Dr. Williams will explain that execution by firing squad causes a quick and painless death by targeting the cardiovascular bundle, which cuts off blood to the central nervous system. The effect is to cause an immediate cessation of blood circulation, resulting in a catastrophic drop in blood pressure in the brain. Because the brain's function depends upon a continuous supply of oxygen from blood, when the blood supply is stopped, loss of consciousness ensues rapidly (within 10 seconds or less) and cortical/brainstem death inevitably follows. In addition to providing a quick and relatively painless death, Dr. Williams will explain that execution by firing squad will substantially reduce the chance of a "botched" execution as compared to the current Oklahoma execution protocol, due to error on the part of the executioner(s), as a firing squad execution is simple and straightforward and the means (rifle and ammunition) are not subject to unreliability of supply. He will explain that both the Utah execution protocol and U.S. Army execution protocol by firing squad would suffice to provide a quick and painless death.

As described above, Drs. Wilkinson and Stevens will also testify regarding the availability of alternative methods of execution.

### E.    Evidentiary Issues

Under Federal Rule of Evidence 703, facts and data relied upon by experts need not be admissible so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Without question, the facts and data relied upon by Plaintiffs' experts are the type of facts and data reasonably relied on by experts in their fields and need not be independently admissible here. For instance, it is undoubtedly reasonable for a pathologist to consider and rely upon autopsy reports from autopsies that the pathologist did not personally conduct, as Dr. Edgar does, or to consider and rely upon witness accounts of an execution, as Dr. Cohen does.

Although they need not be admissible to be relied upon by Plaintiffs' experts, the Court should nonetheless admit all documents Plaintiffs offer at trial, including those relied upon by their experts. Under Federal Rule of Evidence 803(6), records of an act, event, condition, opinion, or diagnosis are not excluded by the rule against hearsay, regardless if the declarant is available as a witness, if:

A.    the record was made at or near the time by—or from information transmitted by—someone with knowledge;

B.    the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

C.    making the record was a regular practice of that activity;

D.     all these conditions are shown by the testimony of the custodian or another

qualified witness, or by a certification that complies with Rule 902(11) or

(12) or with a statute permitting certification; and

E.     the opponent does not show that the source of information or the method or

circumstances of preparation indicate a lack of trustworthiness.

To the extent the Court determines any records offered by Plaintiffs are otherwise

inadmissible, it should nonetheless admit them under Rule 803(6).

## III.   THE EVIDENCE PLAINTIFFS WILL PROFFER SATISFIES PLAINTIFFS' BURDEN UNDER THE *BAZE/GLOSSIP* STANDARD.

The evidence Plaintiffs will proffer at trial satisfies Plaintiffs' burden under the

*Baze/Glossip* standard. To succeed on their Eighth Amendment claim, Plaintiffs must show

that the State's execution protocol presents a "substantial risk of severe pain," *Bucklew v.*

*Precythe*, 139 S. Ct. 1112, 1125 (2019) (prong I), and "identify an alternative that is

feasible, readily implemented, and in fact significantly reduces a substantial risk of severe

pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (internal quotations and citations

omitted) (prong II).

### A.     The Evidence Satisfies Plaintiffs' Burden on Prong I.

The evidence Plaintiffs will proffer at trial satisfies their burden of showing that the

State's execution protocol presents a substantial risk of severe pain. A method of execution

that presents a "substantial risk" of severe pain is one that is "sure or very likely to cause

serious illness and needless suffering." *Glossip*, 576 U.S. at 877. Oklahoma's execution

protocol is sure or very likely to subject Plaintiffs to severe pain and feelings of being burned alive from the inside, as well as sensations of air hunger, drowning, and suffocation.

The Supreme Court has made clear that death by suffocation is constitutionally intolerable if the subject is aware. *See Baze v. Rees*, 553 U.S. 35, 53 (2008). It has further recognized that administration of a paralytic (pancuronium bromide)[1] and potassium chloride presents an unconstitutional risk of suffocation and pain, if injected into someone who has not been adequately anesthetized. *Id.* ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). The evidence here will similarly show the unacceptable risks presented by the injection of vecuronium bromide and potassium chloride under the Oklahoma protocol. It will also demonstrate that there is an unacceptable risk that midazolam will not render a prisoner unconscious and insensate to pain, as intended, when the vecuronium bromide and potassium chloride are administered and that the midazolam itself will cause constitutionally intolerable suffering.

First, the evidence will demonstrate that a sensate individual subjected to vecuronium bromide will experience the feeling of chemical suffocation, while a sensate individual subjected to potassium chloride will experience the feeling of being burned alive from the inside. Administration by the State of either one of these drugs to a sensate

---

[1] For execution purposes, pancuronium bromide and vecuronium bromide are functionally equivalent. They are both paralytics and serve the same function at the doses used in executions.

20

prisoner would present an unconstitutional risk of severe pain and suffering. Because midazolam cannot reliably perform as intended under the Oklahoma execution protocol, the protocol subjects prisoners to both of these substantial risks of severe pain and suffering.

The testimony of Drs. Weinberger and Stevens will demonstrate that midazolam, used as called for by the execution protocol, is incapable by itself of rendering a subject insensate to pain and may even, in some circumstances, enhance pain. As a result, there is a substantial and almost certain risk that midazolam will leave the prisoner sensate when the vecuronium bromide and potassium chloride are administered.  This evidence will prove that Plaintiffs will be subjected to needless suffering, because midazolam will not render them insensate nor *maintain* a state of general anesthesia.

Plaintiffs' evidence will also prove that the current protocol's lack of safeguards presents a substantial risk of needless suffering. In particular, the protocol's provision of absolute discretion to the ODOC Director effectively negates any safeguards the protocol does contain. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021) (provision for "entirely discretionary exceptions" to an otherwise constitutional scheme may be fatal to its constitutionality).

### B.    The Evidence Satisfies Plaintiffs' Burden on Prong II.

The evidence Plaintiffs will proffer at trial satisfies their burden of showing that an alternative method of execution that significantly reduces a substantial risk of severe pain is available. In fact, the evidence will demonstrate that there are at least three such alternatives.

A proposed alternative method of execution is "available" if it is a "feasible and readily implemented alternative" that the State has "refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125. A plaintiff can meet his burden of showing availability by showing that his alleged alternative is "theoretically feasible." *Id*. at 1125, 1129. And he can show that the alleged alternative is similarly effective at causing death as the current protocol by showing a "track record of successful use" causing death. *Id*. at 1130. The proposed alternative method must be "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Id*. at 1125, 1129. However, it need not be presently authorized by state law. *Id.* at 1128. A plaintiff "may point to a well-established protocol in another State as a potentially viable option." *Id*. Finally, a plaintiff can demonstrate that the State should be able implement the proposed alternative with "ordinary transactional effort." *In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017).

The evidence Plaintiffs will proffer will demonstrate that each of their proposed alternative methods of execution will significantly reduce a substantial risk of severe pain, as compared to the current execution protocol, and that each method is feasible and readily implemented.

### 1.    Removal or Paralytic and Addition of Fentanyl

First, the proffered evidence will establish that Plaintiffs' proposed lethal-injection alternative utilizing a pre-dose of fentanyl, followed by 40 milligrams of midazolam and then potassium chloride, without a paralytic, is readily available and would substantially reduce the significant risk of severe pain posed by the midazolam protocol. There is no

dispute that the fentanyl that would be needed is available. Nor can there be any dispute that the State could utilize midazolam and potassium chloride, as it is currently using both of them under the current protocol.

Dr. Wilkinson's testimony will show that the State has no impediment to implementing the proposed alternative protocol. Moreover, the evidence will demonstrate that removal of the paralytic will ensure that the prisoner will be able to report any failure of the midazolam or pre-medication. That is a critical safeguard that would substantially reduce the risk of the prisoner experiencing the severe pain of potassium chloride if he were not already insensate.

Finally, Dr. Stevens' testimony will establish that the pre-dose of fentanyl is the ideal choice for an opioid premedication and that it will serve to mitigate any suffering that would otherwise be likely to occur if it were not used.

### 2.    Barbiturate Plus Opioid

Second, the proffered evidence will establish that a barbiturate plus opioid lethal-injection protocol is readily available and would substantially reduce the significant risk of severe pain posed by the midazolam protocol. Plaintiffs will make the required showing with respect to their proposed compounded pentobarbital or sodium thiopental, plus a pre-dose of an anesthetic drug, such as fentanyl, method. In fact, the feasibility is demonstrated by the current Oklahoma execution protocol itself, which authorizes and approves executions using pentobarbital and sodium thiopental in Charts A and B of Attachment D to the protocol. The State cannot seriously dispute that the methods it has adopted in Charts A and B, and successfully utilized in prior executions, lack constitutional muster when

23

modified only by a pre-dose of an anesthetic drug like fentanyl. Instead, the State contends it is unable to procure the barbiturates. The trial evidence will demonstrate that procurement poses no bar to the State's implementation of Plaintiffs' alternative methods.

First, the State's procurement narrative is contradicted by the fact that the federal government has procured pentobarbital and utilized it in executions between July 2020 and January 2021. Similarly, the states of Texas, Georgia, Missouri, and South Dakota have each recently used pentobarbital for executions. And in an August 2020 letter from the Arizona Attorney General to the Governor of Arizona that has since been made public, the Attorney General advised the Governor that its office had found a lawful supplier of pentobarbital that could make the drug available for use in Arizona.

Second, the testimony of Drs. Sherman and Block will demonstrate the barbiturates may be obtained readily through compounding. Their testimony will show that the necessary ingredients are commercially available, that a compounding pharmacist licensed by the state can compound the drugs using standard laboratory equipment, and that an individual with the necessary experience could prepare the syringes that would be needed.

### 3.   Firing Squad

Finally, the evidence will demonstrate that execution by firing squad is available and would substantially reduce the significant risk of severe pain posed by the midazolam protocol. Execution by firing squad is currently authorized by the states of Oklahoma, Utah and Mississippi. In fact, Utah has used firing squad as a method of execution as recently as 2010. The evidence will further show the existence of well-established protocols for

execution by firing squad from the state of Utah and the U.S. Army, each of which could by implemented in Oklahoma with ordinary transactional effort.

Dr. Williams' testimony will prove that the use of firing squad will significantly reduce the substantial risk of severe pain presented by the current Oklahoma execution protocol. The testimony will show that, in contrast to the protocol's substantial risk of suffocation and pain, death by firing squad will be quick and virtually painless by virtue of the targeting of the cardiovascular bundle. When the cardiovascular bundle is hit by a bullet, it immediately causes a cessation of blood circulation at its source, which will deny the central nervous system the blood supply it requires to continue to function. The result is a loss of consciousness within seconds and with minimal pain. Death inevitably follows within minutes. The testimony will demonstrate that either the Utah protocol or U.S. Army protocol would suffice to cause a quick and painless death.

In addition to reducing the substantial risk of severe pain and suffering, Dr. Williams' testimony will establish that use of a firing squad substantially reduces the chance of an execution being "botched" by human error, as the means of execution (rifle and ammunition) are readily available and not subject to unreliability of supply, and the method of causing death is simple and straightforward for one with the necessary firearms training, of which there are many in law enforcement and the military.

Dated:  January 18, 2022                    Respectfully submitted,


                                            *s/ Emma V. Rolls*_____
                                            Emma V. Rolls, OBA # 18820
                                            Office of the Federal Public Defender
                                            215 Dean A. McGee Ave., Suite 707
                                            Oklahoma City, OK 73102
                                            Telephone: (405) 609-5975
                                            Emma_Rolls@fd.org

                                            Harry P. Cohen (admitted *pro hac vice*)
                                            Michael K. Robles (admitted *pro hac vice*)
                                            James K. Stronski (admitted *pro hac vice*)
                                            Kenton Walker (admitted *pro hac vice*)
                                            CROWELL & MORING LLP
                                            590 Madison Avenue
                                            New York, NY 10022
                                            Telephone: (212) 223-4000
                                            hcohen@crowell.com
                                            mrobles@crowell.com
                                            jstronski@crowell.com
                                            kentwalker@crowell.com

                                            Jon M. Sands
                                            Federal Public Defender District of Arizona
                                            Dale A. Baich (OH Bar No. 0025070)
                                            Jennifer M. Moreno (CA Bar No. 244967)
                                            850 West Adams Street, Suite 201
                                            Phoenix, Arizona 85007
                                            Telephone: (602) 382-2816
                                            Facsimile: (602) 889-3960
                                            dale_baich@fd.org
                                            jennifer_moreno@fd.org

                                            COUNSEL FOR PLAINTIFFS

                                            Alex Kursman
                                            Shawn Nolan
                                            Assistant Federal Defenders Capital Habeas Unit
                                            Federal Community Defender Office for the Eastern
                                            District of Pennsylvania
                                            601 Walnut Street

Philadelphia, PA 19106
Telephone: (215) 928-0520

COUNSEL FOR PHILLIP HANCOCK

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of January, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to all counsel of record who are registered participants of the Electronic Case Filing System.

*s/ Emma V. Rolls*