# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| RICHARD GLOSSIP, *et al.*, | |
| *Plaintiffs,* | |
| v. | No:    14-cv-665-F |
| RANDY CHANDLER, *et al.*, | |
| *Defendants.* | |

## DEFENDANTS' TRIAL BRIEF

TABLE OF AUTHORITIES ................................................................ II

DEFENDANTS' TRIAL BRIEF ............................................................. 1

I.     Legal Standards for Plaintiffs' Eighth Amendment Claim ....................... 1

II.    Expected Testimony at Trial ...................................................... 5

    A.    Dr. Joseph F. Antognini ..................................................... 5

    B.    Dr. Ervin Yen .................................................................. 9

    C.    Dr. Daniel E. Buffington .................................................... 12

    D.    Justin Farris ................................................................... 15

    E.    Director Scott Crow .......................................................... 16

III.   The Trial Evidence Will Show Plaintiffs' Eighth Amendment Claim Fails ........ 18

    A.    Plaintiffs' claim fails on the merits at the first *Glossip* prong ............... 18

    B.    Plaintiffs' claim fails on the merits at the second *Glossip* prong. ........... 23

CONCLUSION ................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Abdur'Rahman v. Parker*,
    558 S.W.3d 606 (Tenn. 2018) ........................................................................... 2, 4, 5

*Arthur v. Comm'r, Alabama Dep't of Corr.*,
    840 F.3d 1268 (11th Cir. 2016)..................................................................2, 3, 4, 12, 22

*Asay v. State*,
    224 So. 3d 695 (Fla. 2017)...................................................................................12

*Barr v. Lee*,
    140 S. Ct. 2590 (2020).................................................................................. 1, 2, 22

*Baze v. Rees*,
    553 U.S. 35 (2008) ................................................................ 1, 2, 3, 4, 21, 22

*Brooks v. Warden*,
    810 F.3d 812 (11th Cir. 2016) ........................................................... 2, 4, 24

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019)...................................................................................... 2, 5

*Glossip v. Gross*,
    576 U.S. 863 (2015)............................................... 1, 2, 3, 4, 19, 20, 21, 23, 24

*Grant v. Crow*,
    No. 22-6012, Order (10th Cir. Jan. 24, 2022)...........................................19

*Gray v. McAuliffe*,
    No. 3:16CV982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017).................................. 2, 12

*Grayson v. Warden*,
    672 F. App'x 956 (11th Cir. 2016) ................................................................... 2, 12

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
    980 F.3d 123 (D.C. Cir. 2020) ................................................................... 1, 5, 22

*In re Ohio Execution Protocol Litig.*,
    881 F.3d 447 (6th Cir. 2018) ........................................................... 1, 2, 3, 20, 21, 22

*In re Ohio Execution Protocol Litig.*,
    946 F.3d 287 (6th Cir. 2019), *cert. denied sub nom.*
    *Henness v. DeWine*, 141 S. Ct. 7 (2020)................................................. 2, 4, 21, 22, 24

*In re Ohio Execution Protocol,*
    860 F.3d 881 (6th Cir. 2017) ............................................... 1, 2, 4, 5, 20, 21

*Jordan v. Comm'r, Mississippi Dep't of Corr.,*
    947 F.3d 1322 (11th Cir. 2020) ...................................................... 4, 23

*Jordan v. State,*
    266 So. 3d 986 (Miss. 2018) .......................................................... 2, 21

*Kelley v. Johnson,*
    496 S.W.3d 346 (Ark. 2016) .............................................................. 5

*Ledford v. Comm'r, Georgia Dep't of Corr.,*
    856 F.3d 1312 (11th Cir. 2017) ......................................................... 25

*Loden v. State,*
    264 So. 3d 707 (Miss. 2018) .......................................................... 2, 21

*McGehee v. Hutchinson,*
    463 F. Supp. 3d 870 (E.D. Ark. 2020) ........................... 2, 3, 19, 20, 22, 25

*McGehee v. Hutchinson,*
    854 F.3d 488 (8th Cir. 2017) (en banc) ............................ 1, 2, 4, 20, 23, 25

*Price v. Comm'r, Alabama Dep't of Corr.,*
    752 Fed. Appx. 701 (11th Cir. 2018) ..................................................... 5

*Price v. Dunn,*
    139 S. Ct. 1533 (2019) .................................................................... 4

*Stouffer v. Crow,*
    No. CIV-21-1000, 11/23/21 Tr. at 24 ................................................... 19

*Wilson v. Dunn,*
    2:16-CV-364, 2017 WL 5619427 (M.D. Ala. Nov. 21, 2017) .......................... 3, 22

DEFENDANTS' TRIAL BRIEF

## I.  Legal Standards for Plaintiffs' Eighth Amendment Claim

In order to prevail on the merits of their Eighth Amendment claim, "Plaintiffs face an exceptionally high bar." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 143 (D.C. Cir. 2020) (Rao, J., concurring in part); *see also id.* at 135 (per curiam opinion); *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020). After all, the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Glossip v. Gross*, 576 U.S. 863, 869 (2015). First, Plaintiffs must prove "that Oklahoma's lethal injection protocol creates a demonstrated risk of severe pain"—a risk that is "sure or very likely." *Glossip*, 576 U.S. at 877-78. Second, Plaintiffs must "plead and prove a known and available alternative." *Id.* at 880.

On *Glossip*'s first prong, again, the risk of severe pain is both <u>demonstrated</u> and <u>sure or very likely</u>. *See In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 451-53 (6th Cir. 2018); *see also In re Ohio Execution Protocol*, 860 F.3d 881, 886-88 (6th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 492-93 (8th Cir. 2017) (en banc); *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 913 (E.D. Ark. 2020). Accordingly, "speculative" expert testimony does not suffice. *Glossip*, 576 U.S. at 887. Plaintiffs also cannot succeed if "all that Plaintiffs can produce ... is a 'scientific controvers[y]' between credible experts battling between 'marginally safer alternative[s].'" *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 135 (quoting *Baze v. Rees*, 553 U.S. 35, 51 (2008)). Thus, the Eighth Amendment is not meant to "embroil the court[] in ongoing scientific controversies beyond their expertise." *Baze*, 553 U.S. at 51. Instead, courts must

1

afford "a measure of deference to a State's choice of execution procedures." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).[1]

Also relevant to *Glossip*'s first prong is the experience of states in using a method of execution and the rulings of other courts evaluating that method. *See Barr*, 140 S. Ct. at 2591 (noting these reasons to uphold the use of pentobarbital). As the Supreme Court noted in this case, "numerous courts have concluded that the use of midazolam as the first drug in a three-drug protocol is likely to render an inmate insensate to pain." *Glossip*, 576 U.S. at 881-82 (collecting cases). Since then, more states have adopted and used a 500 mg midazolam protocol without incident, and more courts have arrived at the same conclusion as the Supreme Court.[2] And this Court recognized "in the last ten years, authorities in various states have accumulated a significant body of experience using midazolam as a lethal injection drug." Doc. 276 at 7.

Of course, *Glossip*'s first prong does not require general anesthesia, a deep coma, or an insensate state—*i.e.* an absolutely painless execution—only that a method of execution does not produce a demonstrated and sure or very likely risk of *severe* pain. *See In re Ohio Execution*

---

[1] *See also Baze*, 553 U.S. at 67 (Alito, J., concurring) (in order to establish an Eighth Amendment violation, inmate must "do more than simply offer the testimony of a few experts or a few studies," but instead "should point to a well-established scientific consensus"); *Glossip*, 576 U.S. at 882 (adjudicating scientific disputes "test[s] the boundaries of the authority and competency of federal courts").

[2] *See, e.g., In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019), *cert. denied sub nom. Henness v. DeWine*, 141 S. Ct. 7 (2020); *In re Ohio Execution Protocol Litig.*, 881 F.3d 447 (6th Cir. 2018); *In re Ohio Execution Protocol*, 860 F.3d 881 (6th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488, 492 (8th Cir. 2017) (en banc); *Grayson v. Warden*, 672 F. App'x 956 (11th Cir. 2016); *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1303 (11th Cir. 2016); *Brooks v. Warden*, 810 F.3d 812 (11th Cir. 2016); *McGehee v. Hutchinson*, 463 F. Supp. 3d 870 (E.D. Ark. 2020); *Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017); *Loden v. State*, 264 So. 3d 707 (Miss. 2018); *Jordan v. State*, 266 So. 3d 986 (Miss. 2018); *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 613 (Tenn. 2018) (noting trial court ruling).

*Protocol Litig.*, 881 F.3d at 452-53. "Some risk of pain is inherent in any method of execution," so "the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47. And "the mere fact that a method of execution might result in some unintended side effects does not amount to an Eighth Amendment violation." *Glossip*, 576 U.S. at 883 n.3.

Plaintiffs also challenge Oklahoma's procedural safeguards—such as training, consciousness checks, and IV procedures—but *Baze* examined many similar claims seeking more procedural fail-safes, held them not constitutionally required, and then foreclosed any future claims by stating: "A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." 553 U.S. at 61. In adjudicating Plaintiffs' claims, the Court should not transform itself into a "board[] of inquiry charged with determining 'best practices' for executions." *Baze*, 553 U.S. at 51-52. This Court too has recognized "the Eighth Amendment does not permit the plaintiffs, nor does it require the court, to fly-speck a state's execution protocol to determine whether it covers everything it could conceivably cover." Doc. 349 at 9-10 & n.11; *see also In re Ohio Execution Protocol Litig.*, 881 F.3d at 453-54; *Arthur*, 840 F.3d at 1313; *McGehee*, 463 F. Supp. 3d at 882; *Wilson v. Dunn*, 2:16-CV-364, 2017 WL 5619427, at *9 (M.D. Ala. Nov. 21, 2017)).

On *Glossip*'s second prong, Plaintiffs must "plead and prove" an alternative method of execution that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 576 U.S. at 877, 880. The alternative must create such a substantial decrease in pain from the state's method that it shows the state's method "cruelly

'superadded'" pain to the punishment of death. *Bucklew*, 139 S.Ct. at 1126 (quoting *Baze*, 553 U.S. at 48); *see also Glossip*, 576 U.S. at 877; *Baze*, 553 U.S. at 51; *id.* at 67 (Alito, J., concurring).

Moreover, Plaintiffs cannot succeed by urging "the adoption of an entirely new method—one that had 'never been used to carry out an execution' and had 'no track record of successful use.'" *Bucklew*, 139 S. Ct. at 1129 (quoting *McGehee*, 854 F.3d at 493). So while a prisoner could "point to a well-established protocol in another State," the Eighth Amendment does not force a state "to be the first to experiment with a new method of execution"—one that is "untried and untested." *Id.* at 1128-30. The second prong is not satisfied by a method that "has *never* been used in an execution," even if the method is a modification of existing protocols. *Brooks*, 810 F.3d at 822. And Plaintiffs' proposed alternatives "must be sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Bucklew*, 139 S. Ct. at 1129 (citing *McGehee*, 854 F.3d at 493; *Arthur*, 840 F.3d at 1300); *cf. also Price v. Dunn*, 139 S. Ct. 1533, 1538-39 (2019) (Thomas, J., concurring).

Finally, an alternative method of execution is not "available" if the state has been unable to obtain it "despite a good-faith effort to do so." *Glossip*, 576 U.S. at 879. This does not require exhaustion every possibility to obtain the alternative, no matter how extraordinary, but rather the second prong is not met if the state has not secured the alternative through "ordinary transactional effort." *In re Ohio Execution Protocol Litig.*, 946 F.3d at 292. For drugs like sodium thiopental or pentobarbital, where the difficulty of obtaining the drug is well-documented, "at least three unsuccessful inquiries" is sufficient. *McGehee*, 854 F.3d at 493.[3]

---

[3] *See also Glossip*, 576 U.S. at 869-871; *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1331 (11th Cir. 2020); *In re Ohio Execution Protocol*, 860 F.3d at 891; *Price v. Comm'r, Alabama*

## II. Expected Testimony at Trial

At trial, Defendants intend to call the following witnesses. Their anticipated testimony, including as it relates to the anticipated testimony of Plaintiffs' witnesses, is summarized below.

### A. Dr. Joseph F. Antognini

Dr. Joseph F. Antognini is a board-certified anesthesiologist who was formerly a Professor of Anesthesiology and the Director of Peri-operative Services at the University of California, Davis. He has had over 30 years of experience in anesthesiology, actively placing patients under general anesthesia during that time until his recent retirement. He has also authored over 200 scientific publications with an area of research that focused on anesthetic mechanisms, including where anesthetics produce unconsciousness. Dr. Antognini has also testified in several cases involving state lethal injection protocols and courts, including the Supreme Court, have consistently relied on this testimony. *See, e.g.*, *Bucklew*, 139 S. Ct. at 1132; *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 21-5004, 2021 WL 164918, at *3 (D.C. Cir. Jan. 13, 2021) (Katsas and Walker, JJ., concurring); *In re Ohio Execution Protocol*, 860 F.3d at 890; *Jordan*, 266 So. 3d at 990.

Based on his experience in anesthesiology, his research, and his review of the scientific literature, Dr. Antognini will testify that midazolam is an anesthetic central nervous system depressant that can be used to induce unconsciousness, to the point of general anesthesia, for otherwise painful medical procedures. For example, Dr. Antognini will explain that medical studies show midazolam has been and can be used for painful procedures like cystoscopy,

---

*Dep't of Corr.*, 752 Fed. Appx. 701, 713 (11th Cir. 2018); *Kelley v. Johnson*, 496 S.W.3d 346, 358-59 (Ark. 2016); *Abdur'Rahman*, 558 S.W.3d at 623-25.

caesarean section, prostate biopsies, nasogastric tube placement, and endotracheal intubation, that latter of which involves a noxious stimulus greater than a surgical incision, and that anesthetic state can be maintained for long periods of time (*e.g.*, over 60 minutes). He will testify that these studies show, moreover, that midazolam is of similar efficacy as a general anesthetic as other drugs, such as thiopental or propofol, that are or were used every day in the operating room. Dr. Antognini will also show that midazolam has also been used in medical studies to produce unconsciousness and induce anesthesia, and will testify he himself has used midazolam for that purpose. Similarly, Dr. Antognini will explain studies in rats, dogs, and monkeys where large doses of midazolam induced anesthesia at a level appropriate for surgery.

Based on the FDA-approval label, Dr. Antognini will testify that midazolam is so powerful an anesthetic that it can cause a person to stop breathing and to die, and that it is approved for use alone in the induction of anesthesia at doses far lower than that called for in Oklahoma's execution protocol. And Dr. Antognini will testify that studies on newer benzodiazepines like remimazolam—drugs in the same class as midazolam—show they are capable of placing patients under general anesthesia with sufficient doses. Dr. Antognini will also testify that there is an absence of scientific evidence that midazolam has a ceiling effect that would cause persons injected with 500 mg of midazolam to experience severe pain from the injection of the drugs called for in Oklahoma's protocol.

Thus, Dr. Antognini will show that no pain or suffering from the second two drugs in Oklahoma's execution protocol (a muscle relaxant and potassium chloride) will be perceived by a person rendered unconscious by a 500 mg dose of midazolam. The paralytic will not cause

pain that would awaken a person anesthetized with midazolam, Dr. Antognini will testify, and even if there is some awareness of paralysis when sedated with midazolam, it will at most cause emotional distress that does not amount to severe pain. Indeed, he will point out that in both studies and clinical practice, midazolam is used alongside muscle relaxants during endotracheal intubation and in general to reduce the distress caused by muscle relaxants. Similarly, Dr. Antognini will testify that, while there is pain from injection of potassium chloride in an awake patient, a person anesthetized with 500 mg of midazolam would not experience pain from the potassium chloride, and there is no scientific evidence to support a contrary conclusion.

Dr. Antognini will also testify that the scientific evidence does not show that 500 mg of midazolam will cause "flash pulmonary edema" through an "acid effect," given the relatively moderate acidity of midazolam and the scientifically-demonstrated ability of the body to "buffer" that amount of an acidity, including in clinical practice. By contrast, Plaintiffs' experts Dr. Edgar and Dr. Weinberger are not aware of any study or occurrence of pulmonary edema in humans ever having been caused by midazolam acidity or the acidity of any other injection—relying instead on a rat study involving the injection of hydrochloric acid with no resultant pulmonary edema—and are not aware of the dose, concentration, or rate of injection of midazolam that would or would not cause pulmonary edema.

Any pulmonary edema—a common occurrence with drug overdoses—seen in inmate autopsies, Dr. Antognini will testify, can be explained by multiple other (more plausible) causes, including development of frothy pulmonary edema after death as shown by multiple medical studies, edema caused by airway obstruction resulting from midazolam anesthesia, or edema caused by apnea from the muscle relaxant. In any event, Dr. Antognini will explain why

any pulmonary edema will not cause conscious pain or suffering in an inmate injected with 500 mg of midazolam. Indeed, benzodiazepines (the class of drug that includes midazolam), Dr. Antognini will explain, are used clinically to relieve the suffering caused by pulmonary edema. Meanwhile, Plaintiffs' experts cannot present any scientific evidence, with respect to any inmate executed with 500 mg of midazolam, regarding how many seconds or minutes after injection of midazolam any pulmonary edema occurred, the severity of pulmonary edema at any particular point in time during the execution, and whether any inmate was conscious of any pain or suffering as a result of pulmonary edema at the time it was occurring.

Dr. Antognini will also testify that the IV Team members as specified in the execution protocol have the requisite training and experience to place the IV lines. He will testify that the IV Team Leader as specified in the protocol would have the requisite training and ability to determine if the inmate is sufficiently unconscious so as to be unaware of any pain associated with the drugs in the execution protocol, and that the consciousness checks observed in recent executions are medically sufficient for that purpose. Moreover, Dr. Antognini will explain why movement under general anesthesia does not necessarily indicate the unconscious person is awake, in pain, or aware of any pain, but instead is common during surgery, such that any movements by inmates after injection of 500 mg of midazolam are not likely a sign that the inmates are conscious or perceiving any pain.

Dr. Antognini will also testify that his personal observation of the execution of Donald Grant confirms all of the opinions stated above. He will relay his observations, informed by his experience and knowledge, that Donald Grant quickly became unconscious—as confirmed by his behavior, obstructed breathing, and lack of response to the consciousness checks

performed by the IV Team Leader (sternum rub, pinch, loud verbal stimulus)—and the execution proceeded without any complications or indication that he was sensate or in pain.

Finally, Dr. Antognini will testify as to why the firing squad will likely result in more pain and suffering than Oklahoma's execution protocol utilizing 500 mg of midazolam. The shattering of bone and damage to the spinal cord, Dr. Antognini will explain, would be severely painful. He will disagree with Dr. Williams' opinion that a bullet has an anesthetic effect. He will explain that even though consciousness might last only 8-10 seconds in some cases after a firing squad volley, the inmate would suffer pain during those 8-10 seconds. He will also testify that some executions would require a second volley, prolonging the pain. Similarly, Dr. Antognini will testify why another traditional method of execution—hanging—is likely to result in more severe pain than execution after administration of 500 mg of midazolam.

### B.  Dr. Ervin Yen

Dr. Ervin Yen is an anesthesiologist who has practiced in Oklahoma City hospitals for nearly four decades, specializing in cardiovascular anesthesiology. In the past, he has served as the President of the Oklahoma Society of Anesthesiologists and the Chief of the Anesthesiology Section at St. Anthony Hospital, and he has served for a decade as the Oklahoma delegate to the American Society of Anesthesiologists. In 2019, after four years of legislative service in the Oklahoma Legislature, he received the American Medical Association's Dr. Nathan Davis Award for Outstanding Government Service.

Dr. Yen will testify about his extensive hands-on experience with the drugs used in Oklahoma's execution protocol. He will testify about his experience with midazolam, which he administers weekly and has used on thousands of patients at different doses. He will testify

that midazolam is a central nervous system depressant, meaning it decreases brain and nervous system activity and produces a calming effect on the brain. He will testify that midazolam is and has been used clinically to induce general anesthesia and to help patients avoid being conscious of pain, among other things.

In addition, Dr. Yen will testify that he has used midazolam alone to induce general anesthesia, and that he would do so in the future in the appropriate circumstances. He will testify that this is contemplated by the FDA-approved package insert label and other sources, but that midazolam is not typically used in this way because it makes patients stay unconscious for too long. He will testify, based on his experience, that even a small (5 mg) dose of midazolam will make it likely that a patient will not experience discomfort, and that a massive dose of 500 mg will rapidly induce general anesthesia and make a person unable to feel any kind of pain for several hours. Moreover, he will testify that neither of the two additional drugs in the execution protocol will raise an inmate's consciousness or reverse midazolam's effects. Dr. Yen will also testify that administering an analgesic such as fentanyl prior to midazolam would not reduce pain during an execution because midazolam itself will already render a person deeply unconscious and unable to feel pain.

Dr. Yen will further testify that he has never observed a ceiling effect with midazolam, because in his own practice more midazolam given has always led to deeper sedation or unconsciousness. Dr. Yen will testify that patients commonly move while under general anesthesia and that such movements tell very little about a person's level of consciousness unless they are purposeful. Typical movements, Dr. Yen will attest, include gag reflexes, heavy breathing, coughing, and jerking. Furthermore, Dr. Yen will testify that he would expect to

see (and has seen) significant movements related to breathing with 500 mg of midazolam because of midazolam's tendency to cause a patient's airway to obstruct when given in large doses. He will also testify that pulmonary edema, if it did occur from a midazolam execution while the inmate was still alive, would likely be caused by this type of airway obstruction, but that such obstruction (and edema) would only occur after an inmate lost consciousness.

Regarding Oklahoma's execution protocol, Dr. Yen will testify that the medical professionals listed therein—physician, physician's assistant, nurse, etc.—are qualified to carry out the tasks assigned, such as setting an IV and determining whether an inmate is unconscious, and that the expertise of someone like an anesthesiologist is not necessary. Dr. Yen will also testify that the easiest consciousness check to perform, in his view, is to ask the inmate to move.

Dr. Yen will also respond to Plaintiffs' arguments about the firing squad. As a cardiovascular anesthesiology specialist, he will testify that, when shot in the chest, an inmate would likely have brain activity for seconds and perhaps even more than a minute, during which they would be suffering from pain as well as a feeling of suffocation. Contrary to Plaintiffs' expert, Dr. Williams, Dr. Yen will testify that a gunshot to the chest will not somehow anesthetize or stun the body so as to eliminate pain.  He will testify that he knows pain occurs even if a gunshot stops circulation or causes heart fibrillation. In his experience, patients who have automatic implanted defibrillators can feel the shock of the defibrillator firing even though circulation has stopped for several seconds due to fibrillation. Thus, he will testify that the risk of pain and suffering from a gunshot wound to the chest is greater than that of a midazolam injection of 500 mg.

Dr. Yen attended the executions of John Grant and Bigler Stouffer. In accordance with this Court's February 1, 2022 pre-trial conference order, Defendants will adopt Dr. Yen's prior testimony at hearings on November 22, 2021, and January 10, 2022 regarding his qualifications and his observations and conclusions with respect to those executions. In addition, Dr. Yen anticipates testifying about any observations and opinions he may have regarding the upcoming execution of Gilbert Postelle.

### C.  Dr. Daniel E. Buffington

Dr. Daniel E. Buffington is a clinical pharmacologist and the Medical Director of Clinical Pharmacology Services. He has had over 30 years of experience in clinical pharmacology in both academia and business, providing drug information support services, patient consultations (i.e., Medication Therapy Management), clinical research design and management, and forensic pharmacology services to prescribers, healthcare facilities, government, and law enforcement agencies. Dr. Buffington has also testified in several cases involving state lethal injection protocols and courts have consistently relied on this testimony. *See, e.g.*, *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1231 (11th Cir. 2017); *Gray v. McAuliffe*, No. 3:16CV982, 2017 WL 102970, at *12 (E.D. Va. Jan. 10, 2017); *Asay v. State*, 224 So. 3d 695, 701 (Fla. 2017).

Based on his education, training, and experience in pharmacology, Dr. Buffington will testify that midazolam is an anesthetic central nervous system depressant that can be used to induce unconsciousness, to the point of general anesthesia, for otherwise painful medical procedures. Dr. Buffington will explain that midazolam is a benzodiazepine that can be used in clinical practice to produce sedation, reduce anxiety, induce and maintain anesthesia, induce

anterograde amnesia, and treat specific seizure disorders. He will testify as to the standard clinical doses of midazolam, which are a small fraction of the amount used in Oklahoma's lethal injection protocol, as well as the expected time to onset of action and the expected duration of action in clinical doses. He will further explain from the literature on midazolam that it has dose dependent effects and that both its sedative and amnestic effects increase with the dose provided. In response to Plaintiffs' experts, Dr. Buffington will also testify that there is an absence of scientific evidence that midazolam has a ceiling effect or that any theoretical ceiling effect would occur before a person administered 500 mg of midazolam is unconscious and insensate to pain.

Dr. Buffington will show that the 500 mg does Oklahoma uses in its lethal injection protocol is more than sufficient to render a person unconscious and insensate to pain. He will explain the standard measurement system for depth of sedation and further testify that midazolam can place a person into either deep sedation or general anesthesia depending on the dose. He will also testify that deep sedation greatly reduces a person's ability to be conscious of or perceive pain and its intensity and that midazolam's sedative and amnestic effects would be sufficient to minimize any pain in Oklahoma's lethal injection even if administered at doses lower than the general anesthesia doses. He will show that doses as low as 10 mg of midazolam exceed standard clinical amounts and have been shown to cause organ failure and cardiac arrest. He will also demonstrate that the expected serum concentration range from a 500 mg bolus dose of midazolam far exceeds the toxic serum concentration range for midazolam. Thus, he will testify that 500 mg is more than sufficient to achieve general anesthesia.

Dr. Buffington will also explain the risks of midazolam in clinical practice. He will show that midazolam is approved and used for induction of general anesthesia and for short maintenance. He will also testify regarding the practice of off-label use and how the approved uses on the FDA label are not determinative of a drug's capabilities. He will then describe the black box warning on the FDA label and the commensurate risks of using midazolam for extended maintenance. He will further explain that midazolam can cause paradoxical movements when a person has airway obstruction and that these movements are merely indicative of the airway obstruction and are not a sign of any pain.

Dr. Buffington will also rebut testimony from Plaintiffs' experts about other side effects from midazolam. He will show that the data on hyperalgesia in humans who use midazolam concerns a rare and mild reaction at the injection site, which involves pain so mild that the FDA did not limit the use of midazolam in clinical practice even considering that possible reaction. He will also rebut arguments that the acidity of midazolam causes harms, explaining that midazolam is in the same acidity range as other medications commonly used in clinical practice and that the buffering ability of blood can counter the acidity as easily in midazolam as in other medications. He will also rebut allegations regarding midazolam causing suffering from pulmonary edema. He will testify that there is no evidence in the medical literature showing that pulmonary edema that is often present in postmortem examinations occurs before midazolam renders the inmate unconscious and insensate to pain. Thus, Dr. Buffington will testify that midazolam as used in Oklahoma's execution protocol will render a prisoner unconscious and insensate to pain and that there is no basis to conclude that an inmate executed under that protocol would experience pain.

### D. Justin Farris

Justin Farris is the Chief of Operations for the Oklahoma Department of Corrections ("DOC") and a named Defendant in this case. He has over twenty years of experience in the field of corrections and currently oversees a broad swathe of DOC functions, acting as a reviewer and adviser to the Director. During recent executions, he has also served as the H-Unit chief, where his responsibilities included direction of other teams and the observation of the inmate and the IV sites before and during the executions.

In his role as a DOC executive, Mr. Farris was tasked by the Director with reviewing other DOC employees' efforts to obtain execution drugs, which succeeded in obtaining midazolam, and with pursuing further efforts to obtain pentobarbital and sodium thiopental. Mr. Farris will testify as to his understanding of prior efforts and testify to what he and his team did in further efforts to obtain pentobarbital and sodium thiopental. He will explain after an extensive search, he was able to find compounding pharmacists willing to compound a supply of pentobarbital into an injectable format, but he was unable to find any with access to a supply of pentobarbital that they could compound. He will also explain that he was unable to find any source for sodium thiopental. He will further testify that sodium thiopental, pentobarbital, and fentanyl are all unavailable to DOC through their usual pharmaceutical suppliers due to restrictions imposed on sales to correctional institutions. Mr. Farris will explain that no lab with the proper licensing and other credentials for the manufacture of controlled substances has been willing to create pentobarbital for DOC.

In his role as the H-unit chief, Mr. Farris participated in the trainings for executions. He will testify as to his understanding of what the protocol calls for regarding training. He will

also describe the extensive training that occurred, including descriptions of scenarios at trainings. Mr. Farris will also testify regarding his observations of executions during which he served as the H-unit chief. In accordance with this Court's February 1, 2022 pre-trial conference order, Defendants will adopt Mr. Farris's prior testimony regarding the John Grant and Bigler Stouffer executions instead of repeating them at trial. Mr. Farris will also testify at trial regarding his observations of the Donald Grant and the Gilbert Postelle executions.

### E. Director Scott Crow

Scott Crow is the DOC's current director and a named Defendant in this case. Director Crow has over a quarter-century of experience in the field of corrections, and a decade of law enforcement experience before that. He has served as the director or acting director of DOC since mid-2019. In that role, Director Crow is responsible for all aspects of DOC operations, including personnel, training, budgeting, and overall policies of the agency.

Director Crow will testify about the various ways that the DOC's current execution protocol is an improvement over its past execution protocol.  This includes, but is not limited to, the current protocol's ensuring that the proper drugs are acquired, defining key terms, improving communication between the execution chamber and operations room, expanding the debriefing process after an execution, and increasing the required training.

In addition, Director Crow will testify about the DOC's extensive efforts to acquire various drugs approved for lethal injection in Oklahoma, including contacting the federal government, various states, and a multitude of local pharmacies and suppliers. He will testify that the DOC has made multiple proactive efforts—and expended significant time and resources—to acquire drugs like pentobarbital and sodium thiopental in various forms

16

(including compoundable pentobarbital), but that those attempts have thus far failed. These efforts, Director Crow will testify, has led to the DOC's acquisition of a reliable source for midazolam, vecuronium bromide, and potassium chloride, and that this source will be able to supply these three drugs in sufficient quantity for all of Oklahoma's pending executions. He will testify that this source, however, is not able to obtain pentobarbital, in either an injectable solution or a compoundable form, nor has it been able to obtain sodium pentothal or other sought-after drugs.

Director Crow will also testify that the DOC's current execution policy appropriately gives him discretion to handle contingencies, unforeseen developments, and exigent circumstances. He will emphasize that this discretion is by no means unfettered, however, as has been claimed by former Ohio Director Reginald Wilkinson, because it is properly limited in important ways. He will testify that his discretion is limited by the chain of command, whereby he is accountable to the Secretary of Public Safety and the Governor. And he will testify that his discretion in regard to the drugs listed in Attachment D of the execution protocol is limited: he cannot change the identity of the drugs being used beyond what is listed in Attachment D without a lengthy process, and even if he changes to other drugs actually listed in Attachment D he must provide 10 days' notice. Also important, he will testify that he does not have the authority or discretion to eliminate the physical consciousness check from the execution process, nor does he have the discretion to utilize expired drugs for an execution. Moreover, he will testify that he does not have the discretion to stop an execution that is proceeding exactly as planned, with the inmate unconscious and no other problematic issues existing. He will testify that, discretion or not, in his administration the IV Team Leader will

always be a licensed and qualified physician. And Director Crow will also testify about limited ways in which he would or already has exercised his discretion in recent executions.

Finally, Director Crow will testify about the extensive training required by the DOC policy, as well as explaining how that training has been implemented leading up to the executions that have taken place so far.

## III.   The Trial Evidence Will Show Plaintiffs' Eighth Amendment Claim Fails

### A.   Plaintiffs' claim fails on the merits at the first *Glossip* prong.

Courts across the country have concluded that, based on the scientific evidence and the experience of states, a 500 mg dose of midazolam will render an inmate insensate to pain during their execution with a three-drug protocol similar or the same as the one used by Oklahoma. *Glossip*, 576 U.S. at 881-82; *supra* n.2; Doc. 276 at 7. The testimony in this case concerning the recent executions in Oklahoma only confirm this fact. In the end, Plaintiffs' case is just the latest round of never-ending litigation against this tried-and-true protocol, alleging "new facts," as a "a ticket to the costly and time-consuming discovery that picks apart every aspect of the state's execution method" for "those inmates who see litigation as only a device of delay." *Middlebrooks v. Parker*, 22 F.4th 621, 622-23 (6th Cir. 2022) (Thapar, J., statement respecting denial of rehearing en banc). "[I]t's hard not to see all this for what it is. A transparent act of gamesmanship that seeks only one thing: Delay for delay's sake." *Id.* at 625.

The expert testimony will establish, based on scientific literature and the experience of Defendants' experts, that midazolam will induce general anesthesia, has been used to induce general anesthesia both clinically and in medical research, just as it is approved to do so by the

FDA. *Cf. Glossip*, 576 U.S. at 884-85. Moreover, a 500 mg dose will maintain that anesthetic state for the duration of the short execution process, as scientific studies and the executions themselves demonstrate. Indeed, the reason why midazolam is not commonly used today to induce general anesthesia is that its effects last *too long*, as compared to more modern anesthetics that wear off quickly.

Plaintiffs' experts claim that midazolam cannot "reliably" induce general anesthesia and that it is uncommon to use midazolam for that purpose. *But see Glossip*, 576 U.S. at 885 n.5 (rejecting argument about midazolam's reliability as sufficient to succeed on Eighth Amendment claim). But all drugs have variable effects, and the scientific literature cited by Plaintiffs' experts confirms that midazolam's variability decreases as the size of the dose increases—and everyone agrees 500 mg is a massive dose. Indeed, this Court has already weighed the competing expert testimony on this issue and found Plaintiffs' case wanting. *See* Doc. 587 at 13-15. The "fact that a low dose of midazolam is not the best drug for maintaining unconsciousness during surgery says little about whether a 500-milligram dose of midazolam is constitutionally adequate for purposes of conducting an execution." *Glossip* 576 U.S. at 886; *see also McGehee*, 463 F. Supp. at 881, 884, 913.

Midazolam's reliability has also been demonstrated by its actual use in executions. As to the John Grant execution, this Court has already twice evaluated the various witness accounts of this event and concluded "Grant was unconscious and insensate to pain as a result of the administration of a massive dose of midazolam." Doc. 587 at 5-10; *see also Stouffer v. Crow*, No. CIV-21-1000, 11/23/21 Tr. at 24-29. The Tenth Circuit affirmed these factual findings. *See Grant v. Crow*, No. 22-6012, Order (10th Cir. Jan. 24, 2022); *Stouffer v. Crow*, No.

21-6153, Order at 3-4 (10th Cir. Dec. 6, 2021). And it is also undisputed that the executions of Bigler Stouffer and Donald Grant were without incident or any indication of severe pain. *See* Doc. 587 at 10-11.

Even if there is uncertainty as to whether midazolam can reliably produce general anesthesia, this is insufficient to meet the high bar of *Glossip*'s first prong of showing that the risk of severe pain is both <u>demonstrated</u> and <u>sure or very likely</u>. *See In re Ohio Execution Protocol Litig.*, 881 F.3d at 451-53; *see also In re Ohio Execution Protocol*, 860 F.3d at 886-88; *McGehee*, 854 F.3d at 492-93; *McGehee*, 463 F. Supp. 3d at 913. And the mere existence of a scientific controversy on this matter is insufficient for Plaintiffs' to succeed on their claim. *Glossip*, 576 U.S. at 882; *Baze*, 553 U.S. at 51; *id.* at 67 (Alito, J., concurring); *see also Bucklew*, 139 S. Ct. at 1125.

Plaintiffs' expert Dr. Stevens points to a purported "ceiling effect," but "[t]he relevant question here is whether midazolam's ceiling effect occurs below the level of a 500–milligram dose and at a point at which the drug does not have the effect of rendering a person insensate to pain caused by the second and third drugs," and, like in earlier phases of this case, "Petitioners provided little probative evidence on this point" beyond "speculative evidence." *Glossip*, 576 U.S. at 887.  Again, midazolam's use to induce general anesthesia, as indicated on the FDA-approved label, in clinical practice, scientific studies, and executions, demonstrates the lack of relevant ceiling effect. Not surprisingly, Dr. Stevens's testimony on this matter has been wildly inconsistent and Courts have roundly rejected his ceiling effect testimony and the claims of condemned inmates on this topic. *See In re Ohio Execution Protocol*, 860 F.3d at 888; *McGehee*, 463 F. Supp. 3d at 881, 884, 913. They have gone so far as to label Dr. Stevens's

testimony a "sham." *Loden*, 264 So. 3d at 711-13; *see also Jordan v. State*, 266 So. 3d 986, 990 (Miss. 2018). In short, the evidence fails to prove midazolam has a "demonstrated" ceiling effect that is "sure or very likely" to result in severe pain.

Of course, *Glossip*'s first prong does not require general anesthesia, *i.e.* an absolutely painless execution. *See Baze*, 553 U.S. at 47; *In re Ohio Execution Protocol Litig.*, 881 F.3d at 452-53. So even if midazolam at a 500 mg dose can only reliably produce "deep sedation" as opposed to "general anesthesia," that sedation generally and with midazolam specifically reduces the conscious experience of pain. Plaintiffs have not put forward any evidence that inmates, at that reduced consciousness and reduced experience of pain, are sure or very likely to experience *severe* pain from the latter two execution drugs. *See In re Ohio Execution Protocol Litig.*, 946 F.3d at 290-91; *see also In re Ohio Execution Protocol Litig.*, 881 F.3d at 452-53; *In re Ohio Execution Protocol*, 860 F.3d at 890.

Plaintiffs attempt to sidestep these facts by claiming inmates will suffer from "flash pulmonary edema" nearly instantaneously after injection of the midazolam, before it renders them unconscious, through an "acid effect" on the lungs. But as the testimony described above will show, that explanation of why some inmates have evidence of pulmonary edema found in their autopsies is based on theories with little basis in medical literature and that are demonstrably implausible in light of the scientific evidence regarding the injection of acidic solutions into the bloodstream. So while evidence of pulmonary edema may be seen in the autopsies, "the mere fact that a method of execution might result in some unintended side effects does not amount to an Eighth Amendment violation." *Glossip*, 576 U.S. at 883 n.3. The relevant question is the level of consciousness of a prisoner being executed when any

pulmonary edema occurs, the severity of pulmonary edema at that point, and the quantum of pain a prisoner is likely to experience at that severity and level of consciousness. *See Barr*, 140 S. Ct. at 2591; *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 137. On that, Plaintiffs' experts offer nothing but incredible speculation. And even if midazolam produced zero sedation, Plaintiffs' claim must fail because they produce no evidence that pulmonary edema would result in more pain than traditional constitutional methods of execution like hanging. *See In re Ohio Execution Protocol Litig.*, 946 F.3d at 290; *see also Barr*, 140 S. Ct. at 2591.

Finally, Plaintiffs' attack on Oklahoma's IV procedures, consciousness checks, and training regimen are insufficient to show an Eighth Amendment violation. Such claims are foreclosed by precedent. *Baze* examined many similar claims seeking more procedural fail-safes, held them not constitutionally required, and then foreclosed any future claims by stating: "A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." 553 U.S. at 61. Here, Oklahoma's protocol has *more* safeguards than the one upheld in *Baze*. *See id.* at 55-56. For example, compared to the consciousness checks in *Baze*, Oklahoma's are more robust both in terms of protocol (which requires a <u>physical</u> consciousness check by a medical professional, in addition to other methods) and actual practice (*e.g.* sternum rubs performed by a physician). *See id.* at 45-46, 60; *see also In re Ohio Execution Protocol Litig.*, 881 F.3d at 453-54; *Arthur*, 840 F.3d at 1313; *McGehee*, 463 F. Supp. 3d at 882; *Wilson v. Dunn*, 2:16-CV-364, 2017 WL 5619427, at *9 (M.D. Ala. Nov. 21, 2017)). By attempting to relitigate these issues, Plaintiffs are asking this court to transform itself into a "board[] of inquiry charged with determining 'best practices' for executions." *Baze*, 553 U.S. at 51-52; *see also* Doc. 349 at 9-10 & n.11.

Rather than a potential Eighth Amendment problem, the many procedural safeguards in Oklahoma's protocol solve or reduce any uncertainty about whether the drugs used create a sure or very likely risk of severe pain. *Glossip*, 576 U.S. at 863. For example, a physical consciousness check like a sternum rub confirms a state of general anesthesia, eliminating any purported risks of the "reliability" of midazolam to induce that state. The recent executions in Oklahoma in fact demonstrate the adequacy of Oklahoma's IV procedures, training, personnel, and consciousness checks. With all of this in place, Plaintiffs simply cannot prevail on the first *Glossip* prong.

### B.  Plaintiffs' claim fails on the merits at the second *Glossip* prong.

The evidence will also show Plaintiffs cannot prove the existence an alternative method of execution that is feasible, readily implemented, available, detailed, with a track record of successful use, and in fact significantly reduces a substantial risk of severe pain.

To start, Plaintiffs' opioid/barbiturate alternatives fails to satisfy *Glossip*'s second prong. The testimony will show Oklahoma has not been able to obtain possession of the barbiturates, including in a form that can be compounded, despite past and ongoing good faith efforts to acquire them. *Cf. McGehee*, 854 F.3d at 493. As multiple courts have observed, and this Court is well-aware, the extremely limited access that states have to pentobarbital and sodium thiopental is well-documented. *See Glossip*, 576 U.S. at 869-871; *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1331 (11th Cir. 2020). While other states have been able to use pentobarbital in the past, there is no evidence that they have a current source or that they are willing to share that source or their existing supply (if any) with Oklahoma. Thus,

"pentobarbital's continued availability in other jurisdictions is immaterial." *Middlebrooks*, 22 F.4th at 628 (Thapar, J., statement respecting denial of rehearing en banc).

Plaintiffs attempt to avoid this reality by offering an expert who suggests the state create a drug-cooking lab using undergraduate students to synthesize barbiturates. But the testimony will demonstrate even that is unfeasible and, in any event, attempting to synthesize our own barbiturates hardly counts as "ordinary transaction effort" to obtain alternative drugs. *In re Ohio Execution Protocol Litig.*, 946 F.3d at 292. Moreover, Plaintiffs' proposal to add an opioid to Oklahoma's existing barbiturate protocols lacks sufficient detail (Which opioid? How much?) and is untested in that it has never been used in executions. *See Bucklew*, 139 S. Ct. at 1128-30; *Brooks*, 810 F.3d at 822.

Plaintiffs' opioid/midazolam alternative is insufficient for some of the same reasons. Again, the purported alternative lacks the same specificity with respect to the proposed opioid, or even with the dose of midazolam proposed. That method has also never been tried before. To the extent midazolam *has* been used in combination with an opioid in past executions (of inmates Wood in Arizona and McGuire in Ohio), those executions did not go as intended. Indeed, the independent investigation of the Wood execution concluded that Arizona could improve its executions by implementing Oklahoma's three-drug protocol for midazolam instead of using the midazolam/opioid combination. *Glossip*, 576 U.S. at 892 n.8. This second alternative thus fails to meet *Glossip*'s second prong.

Plaintiffs' firing squad alternative also cannot satisfy the second *Glossip* prong. As the Eighth Circuit has observed, the firing squad would not "*significantly reduce* a substantial risk of severe pain" because "[i]t requires trained marksmen who are willing to participate and is

allegedly painless only if volleys are targeted precisely." *McGehee*, 854 F.3d at 488. Plaintiffs'

expert Dr. James Williams offered the same testimony found inadequate in that case and other

cases: that the firing squad causes painless death if the shots hit a precise target. *See id.*; *see also*

*Ledford v. Comm'r, Georgia Dep't of Corr.*, 856 F.3d 1312, 1318–19 (11th Cir. 2017); *McGehee*, 463

F. Supp. 3d at 915-16. Nor can Plaintiffs prove the risks of pain are substantially lower than

the risks in the midazolam protocol.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted to Defendants.

Respectfully submitted,

s/ *Mithun Mansinghani*

| | |
|---|---|
| BRYAN G. CLEVELAND, OBA 33860 | MITHUN MANSINGHANI, OBA 32453 |
| ANDY N. FERGUSON, OBA 33388 | *Solicitor General* |
| ZACH WEST, OBA 30768 | OFFICE OF ATTORNEY GENERAL |
| *Assistant Solicitors General* | STATE OF OKLAHOMA |
| | 313 N.E. 21st Street |
| | Oklahoma City, OK 73105 |
| | Phone:  (405) 521-3921 |
| | mithun.mansinghani@oag.ok.gov |

*Counsel for Defendants*