```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF OKLAHOMA
 2

 3

 4

 5   RICHARD GLOSSIP, et al.,

 6            Plaintiffs,

 7   -vs-                            Case No. CIV-14-665-F

 8   RANDY CHANDLER, et al.,

 9            Defendants.

10

11
        VIDEOTAPED DEPOSITION OF LAWRENCE H. BLOCK, PhD
12
              TAKEN ON BEHALF OF THE DEFENDANTS
13
         ON FEBRUARY 12, 2021, BEGINNING AT 9:09 A.M.
14
                           VIA ZOOM
15

16   APPEARANCES

17   on behalf of the PLAINTIFFS

18   Ms. Pilar Stillwater (Via Zoom)
     CROWELL & MORING, LLP
19   3 Embarcadero Center
     26th Floor
20   San Francisco, CA 94111
     415-365-7444
21   pstillwater@crowell.com

22

23   (Appearances continued on next page.)

24   REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR

25
```

Page 2

1  (Appearances continued.)

2  Mr. James K. Stronski (Via Zoom
   CROWELL & MORING

3  590 Madison Avenue
   20th Floor

4  New York, New York 10022
   212-895-4217

5  jstronski@crowell.com

6

7  on behalf of the DEFENDANTS

   Mr. Bryan Cleveland (Via Zoom)

8  OKLAHOMA ATTORNEY GENERAL'S OFFICE
   313 N.E. 21st Street

9  Oklahoma City, OK 73105
   405-521-3921

10  bryan.cleveland@oag.ok.gov

11

12  ALSO PRESENT:  Mr. Sean Shell (Via Zoom)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1             I N D E X

2                          PAGE

3  Direct Examination by Mr. Cleveland      6

4

5             EXHIBITS

6  Exhibit     Description

7  1. Dr. Stevens' 1-11-21 report          20

8  2. Kang Study                           33

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1             STIPULATIONS

2

3      It is hereby stipulated and agreed by and

4  between the parties hereto, through their respective

5  attorneys, that the deposition of LAWRENCE H. BLOCK, PhD

6  may be taken pursuant to agreement and notice and in

7  accordance with the Federal Rules of Civil Procedure on

8  February 12, 2021, via Zoom, before Shannon S. Harwood,

9  CSR, RPR, CRR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1      THE VIDEOGRAPHER:  This is the videotaped

2  deposition of Dr. Lawrence Block taken on behalf of the

3  defendants in the matter of Richard Glossip, et al

4  versus Randy Chandler, et al, filed in the United States

5  District Court for the Western District of Oklahoma,

6  Case Number CIV-14-665-F.  This deposition is being held

7  via web conference on Friday, February 12th, 2021.

8  We're on the record at 9:09 a.m.

9      Will counsel please their appearances for the

10  record?

11      MR. STRONSKI:  Jim Stronski from Crowell &

12  Moring for plaintiffs and the witness, and with me Pilar

13  Stillwater from Crowell & Moring for the plaintiffs and

14  the witness.

15      MR. CLEVELAND:  And Bryan Cleveland from the

16  Oklahoma Attorney General's Office for defendants, and

17  I'll be taking the deposition.

18      THE VIDEOGRAPHER:  The court reporter will now

19  please swear in the witness.

20      (Witness sworn.)

21  WHEREUPON,

22           LAWRENCE W. BLOCK, PhD,

23  after having been first duly sworn, deposes and says in

24  reply to questions propounded as follows, to-wit;

25      DIRECT EXAMINATION

Page 6

1  BY MR. CLEVELAND:
2      Q.  All right.  Morning, Doctor.
3      A.  Good morning.
4      Q.  I'll be the one taking the deposition today,
5  as you just heard, so start out with some basic overview
6  type stuff here before we delve into the material.  I
7  say, have you been deposed before?
8      A.  I have.
9      Q.  Okay.  So you're probably familiar with some
10  of the instructions.  Try to give you just some of the
11  basic ones here.  First, as you probably are aware from
12  the boxes here, we have a videographer, but also a court
13  reporter, and for the reporter's sake, it's helpful if
14  you give answers to questions as yes and no or -- rather
15  than moving the head or saying "uh-huh" just because it
16  makes a clearer record.
17          Do you understand that?
18      A.  I do.
19      Q.  All right.  And, you know, from time to time,
20  obviously your -- I'll have questions, you'll have
21  answers, and your counsel may have objections and it's
22  important for the record that you, know, you let me
23  finish my questions and him finish his objections and
24  I'll try to let you finish your answer so that we have a
25  clear record.

Page 7

1          Do you understand that?
2      A.  Yes.
3      Q.  All right.  And are you taking any medication
4  or other substances today that would interfere with your
5  ability to testify truthfully and accurately in the
6  case?
7      A.  No.
8      Q.  All right.  And is there any other reason that
9  you'd be unable to answer questions truthfully --
10  truthfully and accurately in today's deposition?
11      A.  Not as far as I know, although I must say that
12  I do use an insulin pump.
13      Q.  Okay.
14      A.  And I keep track of my apparent blood glucose
15  values with a sensor --
16      Q.  Uh-huh --
17      A.  -- that I can see and so I can track my blood
18  glucose and make certain that I can make adjustments or
19  whatever.
20      Q.  Understood.  And I'll try to aim for breaks
21  about once an hour, but it's at your discretion.  So if
22  you want to take more frequent breaks or less frequent
23  or whatnot, always just let us know whenever you need to
24  take a break and we can do that.
25          Do you understand that?

Page 8

1      A.  Thank you.
2      Q.  Uh-huh.  And -- all right.  Now, what do you
3  know about the lawsuit that you're testifying in today?
4      MR. STRONSKI:  Objection to form.
5      A.  In what respect?
6      Q.  (By Mr. Cleveland)  Do you know what the
7  lawsuit is about?
8      MR. STRONSKI:  Objection to form.
9      A.  I have a general idea, but I have not reviewed
10  other documents.
11      Q.  (By Mr. Cleveland)  Understood.  I mean, what
12  would you say -- what's the general idea you have?
13      MR. STRONSKI:  Objection to form.
14      A.  The issue, at least, that I was asked to opine
15  on was the issue of preparing solutions that would be
16  used in the execution of an individual by the State.
17      Q.  (By Mr. Cleveland)  Okay.  Understood.  And
18  are you testifying on behalf of the plaintiffs or the
19  State today?
20      A.  The plaintiff.
21      Q.  All right.  And what did you do to prepare for
22  today's deposition?
23      A.  I've reviewed papers.  I've searched the
24  literature.  I've consulted with the attorneys.
25      Q.  All right.  What papers did you review?

Page 9

1      A.  A variety of papers that I have access to and
2  some papers that were referenced in other reports.
3      Q.  Okay.  Did you review any other reports?
4      A.  Other than those cited by me?  I -- I'm not
5  certain --
6      Q.  Exactly.
7      A.  -- know what you're referring to.
8      Q.  I mean, you -- you said talked -- you made a
9  reference to papers attached to other reports, so I was
10  just asking if you referred -- if you had read other
11  reports as well.
12      A.  Well --
13      MR. STRONSKI:  Object to the form.
14      A.  -- in my search of the literature, I'm certain
15  that I did read other papers.
16      Q.  (By Mr. Cleveland)  Okay.  Let's see here.
17  And let me pull it up.  Did you receive the two exhibits
18  that have been emailed from our office?
19      A.  I did.
20      Q.  Okay.  I'm going to pull up the first
21  attachment here, No. 1.
22          (Deposition Exhibit No. 1 was marked for
23  identification and made part of the record.)
24      Q.  (By Mr. Cleveland)  I'll try and share it as
25  well and then if you can pull it up as well.

Page 10

1    MS. STILLWATER: Counsel --
2    MR. CLEVELAND: Yeah.
3    MS. STILLWATER: -- I just wanted to clarify
4  that Dr. Block does have a paper copy of his report in
5  front of him along with a binder of the exhibits and the
6  materials cited and confirm that it's okay with you if
7  he wants to refer to that binder.
8    MR. CLEVELAND: Oh, yeah.  No, that's fine if
9  he wants to refer to it in paper.
10    MS. STILLWATER: Great.  Thank you.
11    Q.  (By Mr. Cleveland)  Pull this up.  There we
12  go.  Taking a second to pull up here.  All right.  I've
13  got the cover sheet of this PDF here.
14    Is this the report that you provided in this
15  case?
16    A.  Yes.
17    Q.  And I'll just scroll it down here too, and
18  then these conclusions on page, I guess, 20 of 21 of PDF
19  RDF inclusions that you submitted in this case?
20    MR. STRONSKI: Objection to form.
21    A.  Yes.
22    Q.  (By Mr. Cleveland)  And then exhibit -- I'll
23  mark this as Exhibit 1, this PDF.  It has listed in here
24  you have an Exhibit A that was your CV; is that correct?
25    A.  Yes.

Page 11

1    Q.  All right.  And then Exhibit B, I believe, is
2  a series of sources cited.  Is that a fair description
3  of your Exhibit B?
4    A.  Well, in the binder that I have, what tab
5  would that be under?
6    MR. STRONSKI: I -- I think in the binder that
7  you have, exhibit -- tab 2 is Exhibit A, and just for
8  the record, tab 3 and -- and later is what I believe
9  constitutes Exhibit B, which is everything you cite.
10  That's my understanding of -- of the binder you have,
11  Dr. Block.
12    Q.  (By Mr. Cleveland)  I can also look to make
13  sure.  It looks like, Dr. Block, the beginning of what I
14  have is Exhibit B, and what was produced to me, is a
15  study by JA Morley.
16    A.  Okay.
17    MR. STRONSKI: And that would be a tab in your
18  binder.
19    Q.  (By Mr. Cleveland)  And see if you have that
20  as tab 3?
21    A.  That's actually -- in the binder I have,
22  that's tab 12.
23    Q.  Okay.
24    MR. STRONSKI: So we'll -- we'll try to -- to
25  help you find what counsel pulls up, Dr. Block --

Page 12

1    THE WITNESS: Thank you, yeah.
2    MR. STRONSKI: -- it's in your binder.  They
3  should -- they all should be in your binder.
4    Q.  (By Mr. Cleveland)  And obviously, Doctor, if
5  you ever need a minute to find it, obviously just let me
6  know and we can pause to make sure you've got your copy
7  in front of you.
8    A.  Thank you.
9    Q.  All right.  I guess the other thing I should
10  ask you too, do you have any documents in front of you other
11  than those that Ms. Stillwater described?
12    A.  I do not.
13    Q.  Okay.  And then when did you begin preparing
14  your report in this case?
15    MR. STRONSKI: Objection to form.
16    A.  I think our discussions began in 2020.
17    Q.  (By Mr. Cleveland)  Okay.  And have you
18  prepared a report for a lethal injection case before?
19    A.  Could you repeat that, please?
20    Q.  Oh, sure.  Sorry.  I said, have you prepared a
21  report for a lethal injection case before this?
22    A.  I have not.
23    Q.  Okay.  And what are your views on capital
24  punishment?
25    MR. STRONSKI: Objection to form.  Outside the

Page 13

1  scope.
2    A.  Well, first, I must say that I was not asked
3  to opine on that and it's, I think, somewhat outside the
4  scope of my expertise.  It's something I've read about
5  and considered, but I've not come to any firm
6  conclusions one way or the other at this point.
7    Q.  (By Mr. Cleveland)  Okay.  I'm going to pull
8  up your CV and question about that so if you can
9  navigate to that in your binder there.
10    A.  Yes.
11    Q.  And it's -- for noting on the PDF, for the
12  record too, it's Exhibit A of Exhibit 1, starting at
13  page 22 of Exhibit 1.  I'm going to look at the third
14  page of the exhibit here, which starts with personal
15  data and professional experience.
16    A.  Okay.
17    Q.  All right.  I see here it says that you have a
18  Bachelor's in Pharmacy from University of Maryland in
19  1962?
20    A.  Yes.
21    Q.  All right.  In fact, I guess, looks like all
22  three of the degrees are from the University of
23  Maryland; is that correct?
24    A.  They are.
25    Q.  All right.  And it looks like your highest

Page 14

1  degree was a PhD in pharmacy; is that correct?
2      A.  Yes.
3      Q.  What kind of course work did you complete as
4  part of that program?
5      A.  Well --
6          MR. STRONSKI:  Objection to form.
7      A.  -- the graduate course work included work in
8  areas such as advanced organic chemistry, analytical
9  chemistry, pharmaceutics, industrial pharmacy, a wide
10  range, actually, of topics.
11      Q.  (By Mr. Cleveland)  Uh-huh.
12      A.  I -- I think, in fact, the first graduate
13  course I took was in biophysics.
14      Q.  Okay.
15      A.  So just a wide range.
16      Q.  Yeah.
17      A.  Of course --
18      Q.  Go ahead.
19          MR. STRONSKI:  I think he's done.
20      Q.  (By Mr. Cleveland)  Oh, okay.  I think there's
21  a slight delay on my end here.
22          I guess, was the master's part of the graduate
23  program for the PhD then?
24      A.  Yes.
25      Q.  Okay.  And then your dissertation, I saw you

Page 15

1  have the topic there.  Could you describe to me what
2  that was about?  I'm not sure if I understand all the
3  terms in there.
4      A.  The PhD --
5      Q.  Yes.
6      A.  -- dissertation?
7      Q.  Yes.
8      A.  Yes, factors affecting the use of structured
9  media as vehicles for topical application.  Basically my
10  interest was in semisolids, ointments, gels, creams,
11  that sort of vehicle as a means of applying drug to the
12  skin's surface and achieving a local or regional or even
13  possibly a systemic effect.  And what I wanted to
14  explore was the issues that might impact the formulation
15  of those kinds of delivery systems for drug application
16  topically.
17      Q.  Okay.  Understood.  What was your intended
18  career when you were pursuing graduate studies in
19  pharmacy?
20          MR. STRONSKI:  Objection to form.
21      A.  My initial expectation was that I would
22  ultimately get a position in the pharmaceutical
23  industry.
24      Q.  (By Mr. Cleveland)  Uh-huh.
25      A.  In the formulation department or in area --

Page 16

1  some other area of industrial pharmacy.
2      Q.  Uh-huh.
3      A.  That was my initial expectation.  At some
4  point, I changed my thought a bit and my objectives and
5  began to more seriously consider academic -- an academic
6  career.
7      Q.  Okay.  In fact, I believe on the next page of
8  your CV, but if I'm recalling correctly, wasn't your
9  first faculty appointment in 1968?
10      A.  It was.
11      Q.  Okay.  And so the year before you finished
12  your PhD?
13      A.  Right.  And the expectation was that I would
14  complete my PhD degree requirements within that first
15  academic year of my appointment, which I did.
16      Q.  Understood.  In fact, I believe that one was
17  at, forgive me if I'm mispronouncing this right -- never
18  mind.  Strike that.
19          So your 1968 position was at the University of
20  Pittsburgh?
21      A.  Yes.
22      Q.  And then beginning in 1970, this is where I'm
23  not sure I'm pronouncing it right, you were at Duquesne,
24  if I'm saying that right?
25      A.  Correct.

Page 17

1      Q.  And is that how you pronounce that, Duquesne?
2      A.  That is.
3      Q.  All right.  Only seen it in writing before,
4  so...
5      A.  Well, some people might pronounce it Duquesne,
6  but it's Duquesne.
7      Q.  Okay.  Make sure I have that one right.  All
8  right.  And then looks like you've been a full professor
9  of pharmaceutics since 1975 at Duquesne?
10      A.  Yes.
11      Q.  And did you obtain tenure in 1975 too then?
12      A.  I was tenured before that.
13      Q.  Okay.  Was that -- did you obtain tenure with
14  the associate professor position or was it entirely
15  separate?
16      A.  Correct.
17      Q.  Okay.  With associate.  And this is, you know,
18  going across both of this page and the prior one with
19  professional experience, so I noted too you had
20  extensive involvement with the United States
21  Pharmacopeia?
22      A.  Yes.
23      Q.  All right.  And, again, I guess, am I
24  pronouncing that one right, pharmacopeia?
25      A.  Yes.

Page 18

1    Q.  All right.  And what do you do on expert
2  panels with the United States Pharmacopeia?
3    A.  Well, expert panels --
4      MR. STRONSKI:  Objection to form.
5    A.  Expert panels are one area that is afforded
6  volunteers and typically expert panels include
7  individuals who are not regular volunteers among the
8  experts that USP makes arrangements with.
9        Expert committees are another story, in that
10  these were individuals who were selected for service
11  through a whole protocol that USP has established.  It's
12  a little more formal and much more involved in the
13  adoption of monographs, of standards, and the like.
14  Panels are -- or individuals on panels are empaneled to
15  provide advice and recommendations.
16    Q.  (By Mr. Cleveland)  Okay.  I saw a reference
17  to subcommittees on your CV, I believe, at the -- your
18  page 25 of the PDF.  I'll pull it here too so I've got
19  it on screen.
20        I say, are these subcommittees from 2015 to
21  2020 the committees you were just describing?
22    A.  Well, check and find that -- well, I can look
23  at the screen.
24    Q.  Correct.
25    A.  Oh, yes, at the top of the page.

Page 19

1    Q.  Yeah.
2    A.  Those are groups of USP volunteers with
3  expertise in particular areas and their deliberations,
4  again, are advisory, but the subcommittees are formed by
5  volunteers who are part of larger committees, expert
6  committees with USP.
7    Q.  Okay.  And I know some of these say 2020, but
8  I think that just may be from the date of the CV.  Are
9  you still a member the United States Pharmacopeia
10  subcommittees?
11    A.  A number of them, yes.
12    Q.  Let's see here.  I say, I know I think you
13  mentioned a monograph in a committee.  Have you been a
14  member of committee working on monographs like US
15  Pharmacopeia?
16    A.  I have.
17    Q.  And then as part of that committee, have you
18  been involved in drafting or revising monographs?
19    A.  I have.
20    Q.  All right.  And I guess also with the
21  reference standards, have you been a member of a
22  committee that was responsible for reference standards
23  with US Pharmacopeia?
24      MR. STRONSKI:  Objection to form.
25    A.  Yes, I've been involved with subcommittees

Page 20

1  panels and the like that have dealt with reference
2  standards.
3    Q.  (By Mr. Cleveland)  All right.  And have you,
4  you know, been part of drafting or advising reference
5  standards as part of your role with US Pharmacopeia?
6    A.  Yes.
7    Q.  This -- oh, this one is actually -- one more
8  thing with your academic experience.  I believe I saw
9  you're chair of your department from 1985 to 1999?
10    A.  Correct.
11    Q.  Why were you not chaipr after 1999?
12    A.  Because I lost the election.
13    Q.  Oh.  No, you're fine.  I believe too, if I'm
14  reading this correctly, after 2012, you're now a
15  professor emeritus; is that correct?
16    A.  Correct.
17    Q.  What does that title mean at Duquesne?
18    A.  It -- it means that I retain some access to
19  some of the university resources, for example, the
20  university library, and it also is just a designation of
21  an honored status afforded by my colleagues to me.
22    Q.  Do you still teach course work as a professor
23  emeritus?
24    A.  I do not.
25    Q.  Okay.  Was -- would 2012 be the last year you

Page 21

1  taught courses at Duquesne?
2    A.  Correct.
3    Q.  Scrolling down here further in here.  This
4  one, it's just a term I didn't understand.  It's going
5  down, it's page 40 of Exhibit 1.  I believe it has the
6  number 17 from your CV pages.  I can put it up here too.
7  You can see -- I saw a reference about the center of the
8  page for something called poster presentations and I
9  wasn't sure what that term meant.
10        So my question was, what did you mean by the
11  term poster presentations in your CV?
12    A.  Well, this is an approach to presentation of
13  information at associations, organizational meetings and
14  the like at conventions and the poster format is one
15  that allows you to provide an illustration, text, graphs
16  and the like that would be on display for attendees at
17  the convention or meeting --
18    Q.  Uh-huh.
19    A.  -- to review, to -- and typically there's a
20  time allowed for the presenter of the poster to interact
21  with attendees.  Questions can be asked and so on.  I
22  found this to be a very advantageous approach in
23  contrast to a podium presentation, an lecture, if you
24  will, in that you had this opportunity for direct
25  interaction with people.  You could not do that in a

Page 22

1  presentation -- a podium presentation, so it's one that
2  I made a substantial use of over the years.
3      Q.  Understood.  And what does the acronym AAPS
4  stand for under poster --
5      A.  It's the American Association of
6  Pharmaceutical Scientists.
7      Q.  All right.  This one may require scrolling or
8  -- so if you have your copy in front of you, but wanted
9  to know if any of the presentations in your CV involved
10  compounding drugs?  And if you want to take a minute to
11  review, I know you had several listed in your CV.
12      A.  Well, without taking some time to go through
13  it, I would say there were quite a number of
14  presentations that involved formulations that we
15  prepared in our laboratories.
16      Q.  Okay.
17      A.  Comprised compounding.
18      Q.  Yeah.  In fact, I should have clarified this
19  too.  How do you define compounding?
20      A.  Well, it may not be the most rigorous
21  definition --
22      Q.  Uh-huh.
23      A.  -- but certainly the understanding is that
24  compounding involves the combination of two or more
25  ingredients --

Page 23

1      Q.  Uh-huh.
2      A.  -- to prepare a finished formulation.
3      Q.  Okay.  And is synthesizing a pharmaceutical a
4  type of compounding?
5      MR. STRONSKI:  Objection to form.
6      A.  Could you repeat that, please?
7      Q.  (By Mr. Cleveland)  Sure.  And I guess what
8  I'm just trying to make sure I have the term right, but
9  if you -- I'll step back one question here.
10      I believe you mentioned in your report that
11  you had reviewed Dr. Sherman's expert report?
12      A.  Yes.
13      Q.  And is it fair to say that his report was
14  about synthesizing pharmaceuticals?
15      A.  I believe so.
16      MR. STRONSKI:  Objection to form.
17      Q.  (By Mr. Cleveland)  Okay.  And is that type of
18  synthesis he describes a form of compounding?
19      A.  His report describes the synthesis of what
20  ultimately would be an active pharmaceutical ingredient.
21      Q.  I mean, this is just purely, like,
22  definitional, one thing I just didn't understand is like
23  --
24      A.  Right.
25      Q.  -- is there a difference between synthesis and

Page 24

1  compounding or --
2      MR. STRONSKI:  Objection.  I'm sorry, go
3  ahead.  Sorry.  Go ahead.
4      Q.  (By Mr. Cleveland)  No, I say, is there a
5  difference between synthesis and compounding?
6      A.  Yes --
7      MR. STRONSKI:  Objection to form.
8      Q.  (By Mr. Cleveland)  No, go ahead.  I should
9  say, what is that difference?
10      A.  Synthesis is the preparation of a new
11  molecule.
12      Q.  Okay.
13      A.  From other molecules.
14      Q.  Okay.
15      A.  Or components.  Compounding involves one's
16  taking several components and combining them in some
17  fashion to form a new preparation.  It's not a synthetic
18  process, that is, there's no chemical reaction
19  necessarily.
20      Q.  Okay.  And to clarify these terms, because I
21  guess then, you know, I had -- the other question I have
22  on your presentations are, do any of your presentations
23  cover synthesizing pharmaceuticals?
24      A.  I'd have to look through them more closely.
25      Q.  Okay.

Page 25

1      A.  But by and large, we did not generally
2  synthesize components that were used in our compounding.
3      Q.  Okay.  And when you say "our," do you mean the
4  university?
5      A.  Well, I'm referring to work done by my
6  graduate students and I.
7      Q.  Okay.  Understood.  Different thing here.
8  Scrolling down.  Just a sec.  Wrong page number or
9  something.  Hold on here.  There we go.
10      All right.  This is on page 28 of Exhibit 1,
11  which I believe you have a number 5 on it in your CV,
12  has your licenses at the top.
13      MR. STRONSKI:  Which page are you on?
14      MR. CLEVELAND:  It's page 28 of Exhibit 1 and
15  it has a number 5 at the bottom of it in his CV.
16      A.  Right.
17      Q.  (By Mr. Cleveland)  All right.  Are you there,
18  Doctor?
19      A.  I am.
20      Q.  I say, I believe this says you were at one
21  time licensed in Maryland and Pennsylvania as a
22  pharmacist?
23      A.  Yes.
24      Q.  Are the only -- are those the only two states
25  that you've been a registered pharmacist in?

Page 26

1    A.  Yes.

2    Q.  And see the last date on here is 2008, so are

3  -- is it fair to say that you are no longer a registered

4  pharmacist in Pennsylvania?

5    A.  That's correct.

6    Q.  And why did your license or registration cease

7  in 2008?

8    A.  Well, I no longer felt it appropriate to -- I

9  didn't see myself subsequently entering into employment

10  as a pharmacist.

11    Q.  Okay.

12    A.  So maintaining my license really was not

13  necessary.

14    Q.  Understood.  And does the lack of a license

15  limit the work you can do at the university in any way?

16        MR. STRONSKI:  Objection to form.

17    A.  In no way.

18    Q.  (By Mr. Cleveland)  Okay.  I think that's the

19  questions I have on your CV.  So at this point, let's

20  turn to your report.

21    A.  Okay.

22    Q.  All right.  I'm going to paragraph 15 of your

23  report, which is page 5 of the Exhibit 1 PDF I have

24  here.  I believe it's number 4 on your report.

25    A.  Yes.

Page 27

1    Q.  I see paragraph 15 across a couple of pages,

2  you have a list of materials that you considered.

3    A.  I see that.

4    Q.  All right.  And I believe you have additional

5  materials that are cited and attached to this report; is

6  that correct?

7    A.  Yes.

8    Q.  Other than the materials listed here cited in

9  your report or attached as an exhibit, are there any

10  other documents that you reviewed for preparing this

11  report?

12    A.  Well, this lists the reports that -- or papers

13  or information that I relied upon.  There may have been

14  other resources that I used, but they weren't named.

15    Q.  All right.  And -- and after having prepared

16  this report, but before today's deposition, are there

17  other materials not listed or attached that you reviewed

18  in preparation for the deposition?

19        MR. STRONSKI:  Objection to form.

20    A.  Well, I'm certain that I did review the

21  literature beyond these items that are identified, but

22  it was purely to clarify some points or to just make

23  certain that I was accurate.

24    Q.  (By Mr. Cleveland)  Understood.  Do you

25  remember any of those other references particularly?

Page 28

1    A.  Offhand, no, I'd have to look back and see.

2    Q.  Understood.  I think I may have covered this,

3  but just making sure that we've done this before.  Did

4  you review any of the filings in this case?

5        MR. STRONSKI:  Objection to form.

6    A.  Any of the filings?

7    Q.  (By Mr. Cleveland)  I can clarify too.  I

8  mean, did you review plaintiff's complaint in this case?

9    A.  I'm really not certain if I did.

10    Q.  Okay.  And then in paragraph 14 of your

11  report, you open with a sentence about -- that you've

12  been informed by plaintiffs -- plaintiff's counsel that

13  defendants have testified, and then it goes on.

14    A.  Yes, I see that.

15    Q.  Did you review any documents where defendants

16  stated that?

17    A.  I don't recall.

18    Q.  Okay.

19        THE WITNESS:  Excuse me just for one moment.

20        MR. CLEVELAND:  Oh, yeah.

21        THE WITNESS:  Slight correction.  Thank you.

22    Q.  (By Mr. Cleveland)  Of course.  And this one

23  is scrolling down next to paragraph -- starting with

24  paragraph 26 of your report.  It's page 9 of the Exhibit

25  1.  It has the number 8 at the bottom of it.

Page 29

1    A.  Okay.

2    Q.  First question is actually just a terminology

3  one.  When we're talking about the sodium here, is it

4  properly called pentobarbital sodium or sodium

5  pentobarbital?

6    A.  Those terms have been used interchangeably.

7    Q.  Okay.  Either one is correct?

8    A.  Well, one would know that -- in either case as

9  to what the material is.

10    Q.  All right.  And so if I use either term today,

11  you'll understand what I'm asking about?

12    A.  I would hope so.

13    Q.  Making sure I get the terms right, Doctor.

14    A.  Yes.

15    Q.  All right.  Now, comparing paragraph 27 and 29

16  of your report, I saw two different descriptions.  Are

17  those describing different forms of pentobarbital?

18    A.  You're looking at paragraph 29?

19    Q.  At 27 and 29.

20    A.  I see.  Yeah, 27 describes the solid.

21    Q.  Okay.

22    A.  And 29 describes the solid and its solubility

23  in water.

24    Q.  Okay.  So I was reading paragraph 29 here.  Is

25  it -- is the pentobarbital sodium that appears as a

Page 30

1  white powder in the other descriptions that you provide
2  here?
3       MR. STRONSKI:  Objection to form.
4  A.  Both 27 and 29 --
5  Q.  (By Mr. Cleveland)  Uh-huh.
6  A.  -- refer to pentobarbital.  In the case of 27,
7  it's pentobarbital per se --
8  Q.  Okay.
9  A.  Not the sodium salt.
10  Q.  Okay.
11  A.  29 refers specifically to the sodium salt.
12  Q.  Okay.  And I believe in paragraph 29,
13  continuing on to the next page, that --
14  A.  Yes.
15  Q.  -- solutions can decompose on standing with
16  heat accelerating the decomposition.  And --
17  A.  Yes.
18  Q.  -- my question was at what heat does the
19  decomposition start accelerating?
20  A.  I can't recall precisely.
21  Q.  Okay.
22  A.  But I would -- my expectation is that heat
23  refers to temperatures above room temperature.
24  Q.  Okay.  This is a little different, but going
25  down to paragraph 31, you mentioned that sodium

Page 31

1  pentobarbital is manufactured and sold for injection in
2  the United States.  My question was, who is the
3  manufacturer that you're mentioning in paragraph 31?
4  A.  I believe some of the exhibits that were
5  provided include the labeling from some of the
6  pentobarbital sodium solutions, so I would have to look
7  back through the list.  I don't recall immediately, but
8  there is -- there are exhibits provided.
9  Q.  Okay.  And so the label from that manufacturer
10  is in your exhibits?
11  A.  I'm sorry, I missed that.
12  Q.  Is the label from that manufacturer in your
13  exhibits?
14  A.  I believe so.
15  Q.  Okay.
16  A.  Again, I'd have to check to make certain.
17  Q.  Yeah.  All right.  And then in paragraph 32,
18  you had a couple of citations.  I want to pull up the
19  first one.  I believe it says Gupta in paragraph 32.
20  Let me see if I have that correct here.  I have that
21  listed here as page 168 of Exhibit 1 and it has the
22  Bates Number Glossip 2054.
23       MR. STRONSKI:  And it's tab 7 in your binder,
24  Dr. Block.
25  Q.  (By Mr. Cleveland)  Yeah.

Page 32

1  A.  Yes.  Okay.  I have it.
2  Q.  All right.  Now, first, just in the abstract
3  in the very last sentence, I see where it describes a --
4  well, actually, I'll just let you read the abstract for
5  a second there.  All right.  And then at the end, it
6  mentions a loss in potency of 6.2 percent after being
7  boiled?
8  A.  Yes.
9  Q.  When sodium pentobarbital loses 6.2 percent of
10  potency, is it still usable in humans under the USP
11  reference standards?
12       MR. STRONSKI:  Objection to form.
13  A.  I would have to compare --
14  Q.  (By Mr. Cleveland)  Okay.
15  A.  -- that outcome as reported by Gupta --
16  Q.  Uh-huh.
17  A.  -- with what the monograph states.
18  Q.  I understand.  Was the monograph attached as
19  one of your exhibits?  It may have been.
20  A.  I am not certain.
21  Q.  Let's see here.  Notes here on page 372 of the
22  PDF and Glossip 2258, I saw, I believe, some page
23  regarding pentobarbital sodium apparently printed from
24  USP.  Don't know if that was the monograph that you're
25  referencing.

Page 33

1       MR. STRONSKI:  Maybe look at tab 20,
2  Dr. Block --
3       THE WITNESS:  Yes.
4       MR. STRONSKI:  -- in the binder.
5       THE WITNESS:  That's exactly where I am.
6  A.  Right.
7  Q.  (By Mr. Cleveland)  Is this the monograph you
8  were referencing?
9  A.  It is.
10  Q.  In fact, looking at the top, I see it says the
11  injection contains the equivalent of not less than 92
12  percent and not more than 108 percent of the labeled
13  amount.
14  A.  Right.
15  Q.  Does that mean that 92 percent is the minimum
16  purity for use or am I misunderstanding that?
17       MR. STRONSKI:  Objection to form.
18  A.  It's the minimum content --
19  Q.  (By Mr. Cleveland)  Okay.
20  A.  -- of pentobarbital sodium in a sterile
21  solution.
22  Q.  What's the difference between a content and
23  purity?
24       MR. STRONSKI:  Objection to form.
25  A.  Well, purity suggests that we're looking at

Page 34

1   the -- let me try and -- and be careful about that.
2   There are a number of different aspects of purity.
3      Q.  (By Mr. Cleveland)  Uh-huh.
4      A.  Including in the presence of impurities that
5   might be considered.
6      Q.  Uh-huh.
7      A.  But in this case, the monograph specification
8   refers specifically to the content of pentobarbital
9   sodium per se.
10     Q.  Okay.
11     A.  So when Gupta reported 6 percent after some
12  time in boiling water --
13     Q.  Uh-huh.
14     A.  -- that certainly would still be within this
15  monograph's range.
16     Q.  Uh-huh.  And then what does it mean to have
17  108 percent of the labeled amount?
18     A.  It means that the analytical outcome showed
19  that relative to a standard --
20     Q.  Uh-huh.
21     A.  -- there was 108 percent of the component, in
22  this case, the pentobarbital sodium, and it's an
23  acknowledgment of the fact that there's some
24  variability --
25     Q.  Uh-huh.

Page 35

1      A.  -- in analytical outcomes.
2      Q.  Yeah.
3      A.  And one would expect a range from plus or
4   minus the expected content.
5      Q.  Understood.  Flipping back to Gupta here, I
6   forget -- it's page 168 in the PDF, but I forget what
7   tab number it was in your binder.
8      A.  Okay.
9      MS. STILLWATER:  7.
10     MR. CLEVELAND:  Okay.
11     A.  Thank you.  Let's see.  I guess tab 7 in this
12  binder.
13     MR. STRONSKI:  Was there a question pending?
14  I -- I didn't --
15     MR. CLEVELAND:  Not yet.  I was waiting --
16     MR. STRONSKI:  Okay.
17     MR. CLEVELAND:  -- for the witness to tell
18  me --
19     MR. STRONSKI:  Got it.
20     MR. CLEVELAND:  -- he's got to tab 7 --
21     MR. STRONSKI:  Okay.
22     THE WITNESS:  I have it.
23     MR. STRONSKI:  Great.  Great.
24     MR. CLEVELAND:  He's still looking, so --
25     MR. STRONSKI:  Thank you.  Thanks.

Page 36

1      MR. CLEVELAND:  Yeah.
2      Q.  (By Mr. Cleveland)  I say, Great.  Are you at
3   tab 7 now, Doctor?
4      A.  Yes.
5      Q.  Okay.  This one, so looking at the subtitle on
6   this page, it says Preparation of Injection For
7   Stability Studies.  I believe it says re-packaged it
8   into both glass syringes and polypropylene syringes.  Am
9   I reading that correctly?
10     A.  Yes.  That's in the paragraph headed
11  Preparation of Injection For Stability Studies.
12     Q.  Yeah.
13     A.  Yes.
14     Q.  And this one, I mean, it's a little more
15  broadly, I guess, with the study, but was there any
16  difference in the stability of pentobarbital sodium in
17  glass syringes as opposed to polypropylene syringes?
18     A.  Well, Gupta indicates that there was no
19  significant loss of potency in either case.
20     Q.  Yeah.  And would you expect in your experience
21  any significant difference from using either syringe?
22     MR. STRONSKI:  Objection to form.
23     A.  And your question again was --
24     Q.  (By Mr. Cleveland)  Oh, yeah --
25     A.  -- would I expect --

Page 37

1      Q.  I said would you expect any difference in
2   potency of sodium pentobarbital in your experience from
3   using glass syringe versus polypropylene?
4      MR. STRONSKI:  Objection to form.
5      A.  Per this report, I would not.
6      Q.  (By Mr. Cleveland)  And this is with
7   one other reference in that paragraph I looked at
8   earlier, so give me a second here.  That's a little
9   bit -- so I'll go back to your report for a second just
10  so I can catch the reference was.  I believe in
11  paragraph 32 of your report, you had cited a report by
12  Priest and Geisbuhler.
13     A.  One moment.
14     MR. STRONSKI:  So I think in your binder,
15  Dr. Block, that may be --
16     MR. CLEVELAND:  18.
17     MR. STRONSKI:  -- tab 18.
18     A.  Yes, I have it.
19     Q.  (By Mr. Cleveland)  all right.  I'm just
20  noting the on PDF Exhibit 1 I have here, it is page 135,
21  just for the record.  Just to confirm we're looking at
22  the same thing, it's an article by Sidney M. Priest and
23  Timothy P. Geisbuhler?
24     A.  Yes.
25     Q.  And it's entitled Injectable Sodium

Page 38

1  Pentobarbital Stability at Room Temperature?

2      A.  Right.

3      Q.  And the Bates I have on it is Glossip 002021,

4  the page number at the bottom.

5      A.  Right.

6      Q.  This one, I'm actually going to go down from

7  the front page.  I was looking at the third page of this

8  study.  It's actually the third carrying on to the

9  fourth, so page 2023 and 2024 under the heading

10  Discussion.

11      A.  Yes.

12      Q.  And I see that they describe that there are

13  other methods of dissolving sodium pentobarbital than

14  the one that they used in this study.  Now, my question

15  for you is, do you think that the method of

16  dissolving -- or the methods of dissolving they discuss,

17  the one they used or not, would make any difference to

18  the results they displayed here?

19      MR. STRONSKI:  Objection to form.

20      Q.  (By Mr. Cleveland)  In fact, let me make that

21  more precise, because I think they say the -- they say

22  there's a different method the University of Mississippi

23  has published for dissolving the drug first in ethanol.

24  And my question was, if they had used the University of

25  Mississippi's method they list here rather than the

Page 39

1  method they did, do you believe that would have changed

2  the results at all of their study?

3      MR. STRONSKI:  Objection to form.

4      A.  I can't say for certain.  I didn't review that

5  section further.

6      Q.  (By Mr. Cleveland)  Okay.

7      A.  They make reference to higher pH to keep the

8  drug in solution.

9      Q.  Uh-huh.  And what would the benefit or

10  advantage be of dissolving the drug first in ethanol?

11      MR. STRONSKI:  Objection to form.  Lack of

12  foundation.

13      Q.  (By Mr. Cleveland)  Sure.  Well, the sentence

14  here -- strike it and let me go here.

15      The sentence about the University of

16  Mississippi's method, Doctor, on page 2024.

17      A.  I see it.

18      Q.  And would you agree it says that their

19  protocol involve -- involves the drug is dissolved first

20  in ethanol?

21      A.  Right.

22      Q.  To the best of your knowledge, what benefit or

23  difference would be obtained by dissolving the

24  pentobarbital first in ethanol?

25      A.  Well, it's another approach to achieving

Page 40

1  solution.

2      Q.  Okay.  And then but you haven't reviewed the

3  University of Mississippi's method, correct?

4      A.  I did not go further into that, no.

5      Q.  Okay.  And on I believe it's -- well, this

6  same page and the one before, I was looking at this

7  page.  Let's start here, and I can share my screen on

8  this one, make sure you can see it.  I'm looking at

9  figure 4 on that same page.

10      MR. STRONSKI:  You're not sharing your screen

11  presently.  Oh, there we go.

12      MR. CLEVELAND:  There we go.  There.

13      MR. STRONSKI:  Okay.

14      MR. CLEVELAND:  Thanks for catching that.

15  Thought it was up there.

16      Q.  (By Mr. Cleveland)  All right.  So looking at

17  -- make sure I get it right here -- it's Glossip 2024,

18  figure 4, and I see the sentence right above it where it

19  says, "Originally our protocol specified examination of

20  bottles of pentobarbital every six months," and they

21  make the statements that, "The data in figures 2 and 4

22  obviates the need for such frequent examination."

23      And so my question was, and you can look at

24  both terms if you'd like, figure 4 and 2, would you

25  agree that -- with their statement that the data in

Page 41

1  figures 2 and 4 obviates the need for examining bottles

2  every six months?

3      MR. STRONSKI:  Objection to form.  Lack of

4  foundation.  Beyond the scope.

5      Q.  (By Mr. Cleveland)  Let me put it more

6  precisely for you, Doctor --

7      A.  I'd have to -- right.  I'd have to look at

8  that a little more closely --

9      Q.  Yeah, in fact --

10      A.  -- to make --

11      MR. STRONSKI:  I don't think he's done

12  answering.

13      MR. CLEVELAND:  Oh, yeah, I -- I know.  I

14  thought I had said I was going to rephrase my question.

15      MR. STRONSKI:  Oh, okay.  Okay.  That's fine.

16      MR. CLEVELAND:  That's all.  I was going to

17  just dry and redo my question for the doctor, because I

18  thought I could give him more clarity there, but I can

19  also --

20      MR. STRONSKI:  No, you -- please -- please --

21  please rephrase your question --

22      MR. CLEVELAND:  Yeah, exactly.  Let me

23  rephrase it --

24      MR. STRONSKI:  -- I didn't hear that.  I

25  thought he was answering.  Okay.

Page 42

1    MR. CLEVELAND: Oh, yeah, it was --
2    Q. (By Mr. Cleveland) You know, first of all,
3  just looking at figure 2, going back to Glossip 2023,
4  first, at a high level, what conclusions would you draw
5  from this figure yourself?
6    MR. STRONSKI: Objection to form.
7    A. By and large, figure 2 shows that
8  pentobarbital content did not vary all that much over an
9  extended period of time. We're looking at these
10  analyses of pentobarbital content over as much as 70,
11  probably 72 months, so over as much as six years.
12    Q. (By Mr. Cleveland) And so based on this
13  figure, would you expect pentobarbital sodium to be
14  stable at least 72 months?
15    A. Well --
16    MR. STRONSKI: Objection to form. Beyond the
17  scope.
18    A. The data suggests that it would be stable.
19    Q. (By Mr. Cleveland) Okay.
20    A. At least the solutions that were prepared by
21  this group.
22    Q. Okay. Understood. Yeah, and then scrolling
23  down here, on -- this is page 2024, I believe. Make
24  sure I have the number right. Yeah, page 2024, again,
25  page 138 on the PDF. On the last paragraph on the right

Page 43

1  side, they discuss the discoloration to a yellow color
2  of sodium pentobarbital?
3    A. Yes.
4    Q. Do the USP standards for sodium pentobarbital
5  include the color of the solution?
6    MR. STRONSKI: Objection to form.
7    A. I would have to go back to the USP
8  monograph --
9    Q. (By Mr. Cleveland) Okay.
10    A. -- regarding the description --
11    Q. Okay.
12    A. -- of the solution.
13    Q. In fact, here it's -- this study -- is it --
14  let's see here. They say -- the sentence you can see,
15  it's about the third sentence down here that there may
16  be, in fact no -- may, in fact, be no good reason for
17  disqualifying these preparations from use. My question
18  was whether you agreed or disagreed with their statement
19  that may be no reason to disqualify a yellowed sample
20  from use?
21    MR. STRONSKI: Objection to form.
22    A. Well, that's --
23    MR. STRONSKI: Outside the scope.
24    Q. (By Mr. Cleveland) All right. I think -- I
25  think he finished the objections. Go ahead, Doctor.

Page 44

1    A. That's their statement.
2    Q. My question was, do you agree with it or
3  disagree?
4    MR. STRONSKI: Same objections.
5    A. That's something I think I'd have to review
6  more closely.
7    Q. (By Mr. Cleveland) Okay. In fact, let's go
8  back to the monograph for a second, because I think it's
9  the final question on that exhibit. It's marked -- it
10  was Glossip 2258 or page 372 of Exhibit 1, but again, I
11  forget the tab number for your pentobarbital sodium
12  monograph.
13    A. Uh-huh.
14    Q. If you can turn that for a second. I'll ask
15  one of your counsel to remind us the tab number. I
16  think I have it on screen now, too.
17    MR. STRONSKI: Perhaps --
18    MS. STILLWATER: I think it's tab 20.
19    MR. STRONSKI: -- we go to 20.
20    Q. (By Mr. Cleveland) Okay.
21    A. Right. I have it.
22    Q. I say, does this monograph include the color
23  of pentobarbital sodium?
24    A. It does not.
25    Q. Okay.

Page 45

1    MR. CLEVELAND: Now, Doctor, we've been going
2  for about an hour, and like I said earlier, I usually
3  like to set about breaks every hour. Would you like to
4  take a break now?
5    THE WITNESS: That would be appreciated.
6    MR. CLEVELAND: All right. I'd say let's do
7  about a 10-minute break now, if that sounds good to
8  everyone.
9    THE WITNESS: Okay.
10    MR. STRONSKI: That's fine.
11    THE VIDEOGRAPHER: We're off the record at --
12  off the record at 10:11 a.m.
13    (A recess was taken from 10:11 a.m. to
14  10:30 a.m.)
15    THE VIDEOGRAPHER: The time is 10:30 a.m.
16  We're going back on the record.
17    Q. (By Mr. Cleveland) All right. Doctor, now in
18  the -- going on to the next paragraph in your report, so
19  I guess going to paragraph 33 of your report, which is
20  page 10 of Exhibit 1.
21    A. Yes.
22    Q. Now, in here, you mention -- you're talking
23  about room temperature storage of an appropriately
24  compounded sterile solution of pentobarbital sodium, and
25  I think this may be covered to some degree here, but

Page 46

1  wanted to make sure I understood a couple of terms
2  correctly.
3       How do you define the word sterile as you use
4  it here?
5       A.  Absence of microbial entities.
6       Q.  Okay.  And what would cause a solution to not
7  be sterile?
8       A.  Introduction of bacteria or other organisms by
9  contaminated equipment or containers or accessories,
10 exposure to the air, etcetera.
11      Q.  Okay.
12      A.  Any number of ways that these intruders could
13 gain access to the solution --
14      Q.  Okay.
15      A.  -- in preparation.
16      Q.  You then -- you've also used the term
17 appropriately compounded.  My question would be how
18 would pentobarbital sodium be inappropriately
19 compounded?
20      MR. STRONSKI:  Objection to form.
21      A.  One didn't follow the appropriate steps in
22 compounding a solution and rendering it sterile.
23      Q.  (By Mr. Cleveland)  Okay.  And are the steps
24 described in Priest and Geisbuhler and Gupta that you
25 cited in paragraph 32 appropriate compounding?

Page 47

1       A.  I'd have to go back and review their
2  statements.  It's not always clear that papers such as
3  those would recite in detail exactly what steps were
4  followed in preparing the solution.
5       Q.  Okay.  I mean, I'm happy to give you here a
6  minute too, because I would be interested for your take
7  on it.
8       A.  Okay.
9       Q.  Let's flip to Gupta again for second, I guess.
10      MR. STRONSKI:  Be tab 7.
11      Q.  (By Mr. Cleveland)  Tab 7.
12      A.  I'm there.
13      Q.  Page 168.
14      A.  Right.
15      Q.  And so, I mean, obviously I'll let you review,
16 but the question, in particular, would just be whether
17 the compounding done in the Gupta study is the
18 appropriate steps in your view?
19      A.  Well, their description of the preparation for
20 injection for stability studies --
21      Q.  Uh-huh.
22      A.  -- and the preparation of standard solutions
23 is somewhat terse, so some of the aspects perhaps are
24 not delineated.
25      Q.  Okay.  So there's insufficient description

Page 48

1  here for you to know whether they appropriately
2  compounded sodium pentobarbital?
3       MR. STRONSKI:  Objection to form.  Lack of
4  foundation.
5       A.  One has to assume that they followed standard
6  -- standard protocols for preparing sterile solutions or
7  compounding them.
8       Q.  (By Mr. Cleveland)  Okay.  And then turn to
9  the other one in Priest and Geisbuhler, which I have at
10 page 135 of Exhibit 1.
11      A.  Just a moment.
12      MR. STRONSKI:  It's tab 18 in your binder.
13      A.  Yes.
14      Q.  (By Mr. Cleveland)  And then I'll let you take
15 a minute to review, and the question would just be
16 whether the compounding steps taken by Priest and
17 Geisbuhler are the appropriate compounding steps in your
18 view?
19      A.  This is a little more complete --
20      Q.  Uh-huh.
21      A.  -- than what Gupta had cited, so it provides
22 additional detail that would be appropriate to
23 compounding the solution.
24      Q.  Are there any details missing from their
25 description of how they compounded sodium pentobarbital?

Page 49

1       A.  Well, one would have to be careful to note
2  that this is preparing a solution, a sterile solution of
3  sodium pentobarbital with the specific components that
4  they cite.
5       Q.  Understood.  I guess the question would still
6  be, would the specific components they cite for
7  preparing the sterile solution, are there any steps
8  that are omitted from their description in your view?
9       MR. STRONSKI:  Objection to form.
10      A.  Without reviewing that more carefully, I would
11 say at least at the outset, that it looks to be
12 complete.
13      Q.  (By Mr. Cleveland)  Okay.  I'm going to turn
14 back to your report.
15      A.  Okay.
16      Q.  I'm going to go to the sodium pentothal
17 section starting at paragraph 34.
18      A.  Yes.
19      Q.  Again, first a terminology question.  I say, I
20 have often will call it sodium thiopental and I see you
21 have three other variations here.  If I say sodium
22 thiopental, will you understand that I mean the same
23 thing as sodium pentothal?
24      A.  Yes.
25      Q.  Okay.  And all these terms can be fairly used

Case 5:14-cv-00665-F    Document 649-1    Filed 05/09/22    Page 14 of 25

Page 50

1  interchangeably?

2  A. They have been.

3  Q. Okay. Making sure I get my terms correct. In

4  paragraph 36, you mentioned that sodium thiopental is

5  approved in the US for a certain list of uses?

6  A. Yes.

7  Q. I noticed the citation you had in footnote 19,

8  so I'm going to do a -- paragraph 36 says that it's an

9  archived drug label. Is sodium thiopental still

10 approved by the FDA, even though there's no current drug

11 label?

12      MR. STRONSKI: Objection to form. Beyond the

13 scope.

14 Q. (By Mr. Cleveland) First question, Doctor,

15 did you write in your report that sodium thiopental was

16 approved in the US for the following?

17 A. Yes.

18 Q. And how do you know that it is currently

19 approved in the US

20 A. Well, one could go to fda.gov and see what the

21 current status is for sodium thiopental or pentothal

22 sodium.

23 Q. And did you go to fda.gov to check --

24 A. I did.

25 Q. Okay. And did you find any current drug

Page 51

1  labels on fda.gov?

2  A. I did not.

3  Q. Okay. And does the lack of any current FDA

4  drug label limit the approved uses of sodium thiopental

5  in the US?

6      MR. STRONSKI: Objection to form. Beyond the

7  scope.

8  A. The lack of a commercial product --

9  Q. (By Mr. Cleveland) Uh-huh?

10 A. -- doesn't obviate the appropriateness of the

11 use of the material.

12 Q. Okay. Going down here to paragraph 37 and 38,

13 I see you cite a Haws, et al study?

14 A. Yes.

15 Q. I want to turn to that study for a minute.

16 A. Okay.

17 Q. And I'll need assistance from your counsel to

18 know what tab it is in your binder. I have it as page

19 147 in Exhibit 1.

20 A. Tab 8.

21 Q. Okay. You got it.

22 A. In our binder.

23 Q. All right. That works. I'm just confirming

24 we're on the same page, I have Glossip 002033, the page

25 number at the bottom?

Page 52

1  A. Right.

2  Q. This one, I'm actually going to go to the

3  fifth page of the study, which is Glossip 002037, and at

4  the heading labeled Discussion, page 151 of Exhibit 1.

5  A. Yes.

6  Q. It says, "The five factors usually considered

7  when evaluating the stability of a drug are chemical,

8  microbiological, physical, therapeutic and toxilogical

9  stability."

10      Do you see that?

11      MR. STRONSKI: You're reading from the first

12 paragraph?

13      MR. CLEVELAND: Yeah, from the first

14 paragraph --

15 A. Yes, I see.

16 Q. (By Mr. Cleveland) -- and the second

17 sentence. Okay. And this one, just wanted some help

18 understanding these terms. I guess I can go one by one.

19 What is -- what's the definition of chemical stability?

20 A. Well, chemical stability refers to the

21 compound not undergoing any chemical changes. In other

22 words, changes to the drug molecule.

23 Q. Okay.

24 A. That would result in the transformation of the

25 original molecule to others.

Page 53

1  Q. And what is microbiological stability?

2  A. If the solution prepared or preparation is

3  originally sterile, that it main sustains that sterility

4  over the course of that study.

5  Q. And what is physical stability?

6  A. That there -- that's stability that does not

7  involve any physical changes, whether it's the clarity

8  of the solution or its -- or the formation of

9  particulates or discoloration. All of that could be

10 considered physical instability if it occurred.

11 Q. And what is therapeutic stability?

12 A. Well, therapeutic stability meaning that it

13 has the same efficacy after storage as it did

14 originally.

15 Q. And how is therapeutic stability different

16 from potency?

17 A. Well, I think the terms potency and efficacy

18 and so on need to be defined.

19 Q. Okay.

20 A. I was not asked to consider therapeutic

21 stability.

22 Q. How would you define potency?

23 A. As the ability of a substance to produce an

24 effect.

25 Q. Okay. And I guess the fifth term here, how

Page 54

1  would you define toxicological stability?

2      A.  Again, it depends on what one considers to be

3  evidence of toxicology, adverse effects, unwanted

4  effects.

5      Q.  Okay.

6      A.  And that could involve a whole array of

7  different post-administration reactions or consequences.

8  Again, I was not asked to opine on that.

9      Q.  Okay.  And then on the second paragraph of the

10  discussion here, and I believe it's the third sentence,

11  has the phrase that, "Solutions of barbiturates degrade

12  relatively rapidly over time."

13      A.  Yes.

14      Q.  Now, I say, is pentobarbital a barbiturate?

15      A.  It is.

16      Q.  Does pentobarbital degrade relatively rapidly?

17  Or let me rephrase that.

18          Do solutions of pentobarbital degrade

19  relatively rapidly over time?

20      A.  Properly compounded or formulated solutions of

21  pentobarbital are relatively stable.

22      Q.  Okay.  Do solutions of sodium thiopental

23  degrade faster than solutions of sodium pentobarbital?

24      MR. STRONSKI:  Objection to form.  Lack of

25  foundation.

Page 55

1      A.  I would have to check back as to the

2  comparative stability of solutions of thiopental versus

3  pentobarbital.

4      Q.  Okay.

5      A.  But there is a difference.

6      Q.  Okay.  And -- and this may be in your report

7  too, so you can flip back if you need, but what

8  conclusion about the stability of sodium thiopental did

9  you arrive at from reviewing this study?

10      MR. STRONSKI:  Objection to form.

11      A.  Well, based on the work of Haws primarily,

12  stability of aqueous sodium pentothal solutions prepared

13  for use by a compounding pharmacy can be maintained for

14  six days at room temperature and much longer if

15  refrigerated.

16      Q.  (By Mr. Clevelad)  When you say six days at

17  room temperature, isn't that a shorter timeframe than

18  you had said that sodium pentobarbital solution can be

19  maintained at room temperature?

20      A.  Yes.

21      MR. STRONSKI:  Objection to form.

22      Q.  (By Mr. Cleveland)  Okay.  One other thing,

23  back on the Haws study again on the discussion page,

24  page 151 of Exhibit 1 or Glossip 2037.

25      A.  Just a moment.  37?

Page 56

1      Q.  Yep, it's --

2      A.  Okay.

3      Q.  -- page 2037.  And this one, I'm looking at

4  the last paragraph on the right-hand side, which starts

5  "in summary"?

6      A.  Yes.

7      Q.  And they mention syringes --

8      MR. STRONSKI:  I'm sorry, where are we?

9      MR. CLEVELAND:  Oh, it's page 151 of the PDF.

10  It's Glossip 002037, and it's the last paragraph on the

11  right-hand side starting "in summary."

12      MR. STRONSKI:  Got it.  Thank you.

13      MR. CLEVELAND:  Yeah, No worries.

14      Q.  (By Mr. Cleveland)  And it mentions here it

15  was prepared by an operating room pharmacy under a

16  sterile hood.  Do you see that?

17      A.  I do.

18      Q.  Now, first, what is an operating hood

19  pharmacy?

20      A.  Well, that's their expression.  It's a

21  pharmacy environment, I would assume, adjacent to or

22  part of an OR, an operating room.

23      Q.  Okay.

24      A.  But I'm not clear about that.  I'm not

25  certain.  That's their terminology.

Page 57

1      Q.  Understood.  I guess the other one they

2  mentioned, under a sterile hood.  My question --

3      A.  Right.

4      Q.  -- is a sterile hood typically part of the

5  process of preparing syringes of thiopental?

6      MR. STRONSKI:  Objection to form.

7      A.  A sterile hood --

8      Q.  (By Mr. Cleveland)  Uh-huh.

9      A.  -- sometimes referred to as a laminar flow

10  facility --

11      Q.  Uh-huh.

12      A.  -- would be considered a standard component in

13  a facility that processes -- that processes sterile

14  preparations.

15      Q.  Okay.  Flip back to your report here on

16  paragraph 39.  It's the title Heparin Saline Solution.

17  It's page 12 of Exhibit 1.

18      A.  Right.

19      Q.  And I guess looking across paragraphs 39

20  through 41, my question was, if you have any opinion on

21  the maximum time that a solution of Heparin can be

22  stored at room temperature with no loss of Heparin

23  activity?

24      MR. STRONSKI:  Objection to form.  Lack of

25  foundation.

Page 58

1    Q. (By Mr. Cleveland) Okay. We can start here.
2 I mean, paragraph 41, you had -- if I'm reading it
3 correctly, had cited a reference that solutions of
4 Heparin can be stored in normal saline at room
5 temperature with no loss of Heparin activity over 48
6 hours?
7    A. Yes.
8    Q. And my question was, when it says over 48
9 hours, do you know what the maximum time is beyond 48
10 hours?
11    A. I'd have to --
12    MR. STRONSKI: Objection to form.
13    A. -- examine the Mitchell report to see whether,
14 in fact, a further extension might be possible based on
15 their data, so...
16    Q. (By Mr. Cleveland) So I can give you a chance
17 to look at it here too.
18    A. Yes.
19    Q. Pull it up here and see if I can find my page
20 number on it too.
21    MR. STRONSKI: Tab 11 in your binder,
22 Dr. Block.
23    A. Yes, thank you. Okay.
24    Q. (By Mr. Cleveland) Making sure we're on the
25 same page here. I have -- my Glossip number is Glossip

Page 59

1 002170 at the bottom.
2    A. Right.
3    Q. Okay. And it's page 284 of the Exhibit 1 PDF.
4    A. I see that.
5    Q. And then question was just, you know, on
6 reviewing this study, if you knew what the maximum time
7 was over 48 hours that Heparin could be at room
8 temperature?
9    MR. STRONSKI: Objection to form.
10    A. The report by Mitchell and co-workers --
11    Q. (By Mr. Cleveland) Uh-huh.
12    A. Just employed a 48-hour period --
13    Q. Okay.
14    A. -- for evaluation.
15    Q. Okay.
16    A. So it would be difficult to extrapolate beyond
17 that time based on their report.
18    Q. And I believe this is just turning back to
19 paragraph 41 of your report. I'll give you a sec here.
20    A. Yes.
21    Q. I see, of course, there's the citations to
22 Mitchell and Shaw. My question was just whether there
23 were any other studies in your cited sources here that
24 discussed the storage solutions of Heparin at room
25 temperature?

Page 60

1    A. I don't believe I cited other references to
2 Heparin stability.
3    Q. Okay. I want to turn now to a different one
4 on looking at the monographs. This one, I don't think
5 we've looked at yet, it's the sodium thiopental
6 monograph. I have it as page 373 of the Exhibit 1 PDF
7 and it's Glossip 2259.
8    A. Yes, I see that.
9    Q. This one, it says at the first paragraph, "NLT
10 93 percent and NMT 107 percent of the labeled amount."
11 I say, first, on a basic level, is NLT and NMT just mean
12 not lesser than and not more than?
13    A. Not less than is NLT and NMT is not more than.
14    Q. Okay. And so these, again, are the -- or I
15 should say, are these the limits on the acceptable
16 composition of a solution of thiopental sodium for
17 injection?
18    A. Yes.
19    Q. Okay.
20    A. It's recognition of the variability and
21 analytical outcomes.
22    Q. And if you know, why would the minimum sodium
23 thiopental be 93 percent if the minimum for sodium
24 pentobarbital was 92 percent?
25    A. It's all based on a statistical analysis of

Page 61

1 the analytical results and so the variability may be
2 different in those two cases. They would not be the
3 same in one instance as in the other.
4    Q. Okay. And I guess I should clarify too. Are
5 these acceptance criteria meaning that it would be safer
6 use in humans at those levels?
7    MR. STRONSKI: Objection to form. Lack of
8 foundation.
9    Q. (By Mr. Cleveland) Maybe I can clarify first
10 too actually. I mean, when it says contains not less
11 than 93 percent and not more than 107 percent, is that
12 the acceptance criteria?
13    A. It would be.
14    Q. Okay. And is a solution that meets the
15 acceptance criteria safe for use in humans?
16    MR. STRONSKI: Objection to form --
17    A. I was not asked to --
18    MR. STRONSKI: -- lack of foundation. Beyond
19 the scope.
20    A. -- opine on the safety of the -- of the
21 formulation.
22    Q. (By Mr. Cleveland) Sorry, Doctor. I missed
23 the first half of what you said there.
24    A. I was not asked to opine on the safety of the
25 formulations.



Page 62

1  Q.  Okay.  I mean, do you have an opinion on
2  whether thiopental sodium at that acceptance criteria
3  could be used on humans?
4      A.  Well, with the USP's designation of these
5  upper and lower limits, solutions within that range I
6  would assume are acceptable for administration.
7      Q.  Okay.  And would that also be -- let me put it
8  differently.
9          Would a prepared solution of sodium
10 pentobarbital that meets the acceptance criteria in the
11 drug monograph for that solution also be safe for use in
12 humans?
13     A.  Referring to pentobarbital?
14     Q.  Right.  And so it's referring to the monograph
15 at Glossip 2258 or page 372 of the PDF.
16     A.  Right, I have that.
17         MR. STRONSKI:  Objection to form.
18     Q.  (By Mr. Cleveland)  Yeah.
19     A.  And the monograph states that injection
20 contains not less than 92 percent, 92.0 percent, not
21 more than 108.0 percent of the labeled amount of
22 pentobarbital sodium.
23     Q.  Yeah, and so then my question on that would be
24 similar.  Would a solution of pentobarbital sodium that
25 meets that acceptance criteria be safe for use in

Page 63

1  humans?
2      A.  It's a --
3          MR. STRONSKI:  Objection to form.  Lack of
4  foundation.  Beyond the scope.
5      A.  -- I was not asked to address the safety of
6  the preparation.
7      Q.  (By Mr. Cleveland)  And, again, I guess I
8  should start too, would you agree that this statement
9  about not less than 92 percent and not more than 108
10 percent is the acceptance criteria for pentobarbital
11 sodium?
12     A.  It's the USP's statement, yes.
13     Q.  And is it the right term to say it's the USP's
14 acceptance criteria?
15     A.  This is the expectation for a product that
16 meets the USP designation.
17     Q.  What's the difference between that and
18 acceptance criteria?
19     A.  Well, those are the acceptance criteria in
20 terms of the content of, in this case, pentobarbital
21 sodium.
22     Q.  Okay.  And then my question was, would a
23 solution of pentobarbital sodium that meets those
24 acceptance criteria be safe for use in humans?
25         MR. STRONSKI:  Objection to the form.  Beyond

Page 64

1  the scope.
2      A.  Again, I was not asked to opine on the safety
3  of the preparation.
4      Q.  (By Mr. Cleveland)  But I say, my question now
5  still, do you have an opinion on whether a solution that
6  meets those acceptance criteria would be safe for
7  injection in humans?
8          MR. STRONSKI:  Same objections.
9      A.  I would have to review that issue a little
10 more carefully --
11     Q.  (By Mr. Cleveland)  Okay.
12     A.  -- in order to opine on safety or
13 appropriateness.
14     Q.  Okay.  This -- now I'm going to turn back to
15 your report at paragraph -- starting in paragraph 42.
16     A.  What paragraph, please?
17     Q.  Paragraph 42.  I have that on -- it starts
18 with Preparation of Sterile Injections is the header,
19 it's page 13 of the --
20     A.  Yes.
21     Q.  This is across a couple of paragraphs, but
22 first I see that you mention on paragraph 42 a doctor of
23 pharmacy degree and a Pharm D program.  So my first
24 question was, are those terms the same degree?
25     A.  They are.

Page 65

1      Q.  Okay.  And then in paragraph 43, when you're
2  talking about the North American Pharmacist Licensure
3  Examination, my question was is this examination used by
4  the boards of pharmacy in every state?
5      A.  As far as I know, yes.
6      Q.  Okay.
7      A.  I'm not absolutely certain of that, but it's a
8  nationally accepted standard.
9      Q.  Okay.  But it wasn't used in both the states
10 where you obtained your license?
11     A.  I'd have to think back.
12     Q.  I know it was awhile ago.
13     A.  Pardon?
14     Q.  I said, oh, I know it was awhile ago.
15     A.  Yes.  In 1962 when I took my board exams --
16     Q.  Uh-huh.
17     A.  -- I'm not certain there was a NAPLEX exam
18 available.
19     Q.  Okay.
20     A.  Licensure in Pennsylvania was obtained by
21 reciprocity, meaning that Pennsylvania, the Commonwealth
22 of Pennsylvania, and the State of Maryland had a
23 reciprocal relationship.  Since I was registered in
24 Maryland, I could obtain by reciprocity the
25 corresponding license to practice in the Commonwealth of


Professional Reporters
800.376.1006
www.proreporters.com

Page 66

1  Pennsylvania.
2      Q.  Oh, yeah.  We have a similar system in law
3  licenses too.  Yeah, I know I remember the years from
4  your CV.  I guess, do you know if that examination is
5  used in those states now for licensure?
6      A.  The NAPLEX exam is currently used.
7      Q.  Is it currently used in Maryland or
8  Pennsylvania?
9      A.  Yes.
10      Q.  Okay.  Now, you mentioned both the Pharm D and
11  the State Board of Pharmacy licensure.  Is there any
12  other education that a pharmacist would need to be able
13  to prepare sterile compounding?  Let me rephrase that.
14  I didn't get that quite right.
15          Is there any -- other than the Pharm D and the
16  licensure listed here, is there any other education that
17  a pharmacist would need to be able to prepare sterile
18  compounds?
19      A.  Their professional education --
20      Q.  Okay.
21      A.  -- should include the practice, theoretical
22  and practical, aspects of preparing sterile solutions --
23      Q.  Okay.
24      A.  -- the expectation that the ACPE has of
25  appropriate accredited professional programs in pharmacy

Page 67

1  leading to the Pharm D degree.
2      Q.  Okay.  So a -- would a pharmacist who
3  graduated from an ACPE accredited Pharm D program have
4  the relevant education to prepare sterile compounds?
5      A.  Yes.
6      Q.  Okay.  And would a pharmacist who passes the
7  North American Licensure Examination have the relevant
8  experience to compound a sterile -- sterile injectable
9  preparation?
10      A.  Yes.
11      Q.  Okay.  Then on paragraph 46 of your report,
12  you mentioned that the -- these types of tests are
13  routine for pharmacies and pharmacists that meet the
14  current standards for the compounding of sterile
15  preparations as described above.
16          My question was, are those standards the
17  description that you provided in paragraphs 42 and 43?
18      A.  The standards in 42 -- in paragraph 42 and
19  43 --
20      Q.  Uh-huh.
21      A.  -- reflect -- reflect the appropriate training
22  and education of pharmacists, and in 44, the guidelines
23  for preparation, according to the USP, are cited as
24  well.
25      Q.  Okay.  So when you -- sorry.  Go ahead.  I --

Page 68

1  I missed that.  What was that?  Your last sentence, I
2  think I crossed talked --
3      A.  Was -- so 42, 43 and 44 describe what would be
4  appropriate for an individual compounding these
5  formulations.
6      Q.  Okay.  Then in paragraph 44, you mention
7  certificate of analysis.  Do you see that?
8      A.  Yes.
9      Q.  I saw in your exhibits, I believe it's
10  attached to the Swaan declaration, some certificates, so
11  I wanted to pull those up for a minute.  If I can find
12  my page number here.  On page 423 of the PDF, and it
13  looks like it's page 17 of Exhibit C, the Swaan
14  declaration.  And I can share it too so we can see that
15  we're on the same page.
16          MR. STRONSKI:  So where -- where are you in
17  the Swaan declaration?
18          MR. CLEVELAND:  I'm on -- it's on page 423 of
19  the PDF and it says at the top that it's page 17 of 26.
20  It appears that's of the Swaan declaration.
21          MR. STRONSKI:  Is it -- is it one of the
22  paragraphs in the declaration?
23          MR. CLEVELAND:  No, it's an attachment to the
24  declaration.  I should be sharing my screen now.  If you
25  can't see it, I can --

Page 69

1      A.  Page -- page 17 of 26?
2      Q.  (By Mr. Cleveland)  Yeah, it says document 231
3  it says at the top here.
4      A.  Yes.
5          MR. STRONSKI:  Hold on a second.
6      A.  I have that.
7      Q.  (By Mr. Cleveland)  Okay.  Make sure your
8  counsel found it there too.
9          MR. STRONSKI:  Okay.  Very good.
10      Q.  (By Mr. Cleveland)  Okay.  And, in fact, and
11  I'll make this is actually in your copy there, Doctor,
12  too.  I see there's this certificate and it looks like
13  there was -- the next three -- or next two pages are
14  also another certificate, page 18 and page 19 of 26.
15          Do you see those?
16      A.  I have that.
17      Q.  All right.  First, just a basic question.  Is
18  -- are these two examples representative of what you
19  mean when you say a certificate of analysis in your
20  report?
21      A.  They are examples of certificates of analysis.
22  In this case, in each case, for solutions of the named
23  drug, pentobarbital sodium at a concentration of 50
24  milligrams per milliliter.
25      Q.  And just looking at the page 17 of 26, which

Page 70

1 is page 423 of Exhibit 1, appears to me that there's
2 one, two, three, four, five different tests lifted --
3 listed on the left-hand side.  Do you see that?
4     A.  Just a moment.  Are we going back to my
5 report?
6     Q.  No, no, no.  This is still on the same exhibit
7 to the Swaan --
8     A.  Oh.
9     Q.  -- declaration.  That first certificate of
10 analysis.
11     A.  Okay.
12     Q.  All right.  Now, on the tests column on the
13 left-hand side, I believe I see five different tests.  I
14 say, do you also see five different tests listed there?
15     A.  Just a moment.
16     Q.  Uh-huh.
17     A.  I see that.
18     Q.  Are all five of these tests required on a
19 certificate of analysis?
20     MR. STRONSKI:  Objection to form.  Lack of
21 foundation.  Beyond the scope.
22     Q.  (By Mr. Cleveland)  All right.  I can -- we
23 can start first, Doctor, have you ever reviewed a
24 certificate of analysis before preparing this report?
25     A.  I have.

Page 71

1     Q.  Okay.  Have you prepared a certificate of
2 analysis before?
3     A.  I haven't prepared one.  I have reviewed them.
4     Q.  Okay.  Have you reviewed more than one
5 certificate of analysis --
6     A.  Yes.
7     Q.  -- before preparing this report?  Okay.
8     A.  I have.
9     Q.  Did the certificates that you reviewed
10 previously include all five of these tests?
11     A.  The certificate of analysis typically would be
12 based on requirements in the corresponding USP
13 monograph.
14     Q.  Okay.  So if I reviewed the USP monograph for
15 pentobarbital sodium, I would know what tests are
16 required on a certificate of analysis?
17     A.  That should indicate what would be required.
18     Q.  Okay.  Let's just flip back to it for a sec
19 and make sure I'm reading that monograph correctly.  I
20 believe pentobarbital sodium was at Glossip 2258 or page
21 372.
22     A.  Yes.
23     Q.  Looking at this monograph, where does it say
24 on here what tests are required for a certificate of
25 analysis?

Page 72

1     A.  Certificates of analysis are not cited
2 explicitly in the monograph.
3     Q.  Okay.
4     A.  In USP monographs.  The monograph states the
5 expectations for the material.
6     Q.  Right.  Here, let me say that -- let me ask it
7 differently then here.  I guess, looking at this
8 monograph for pentobarbital sodium, what are the tests
9 that you would say are necessary for a certificate of
10 analysis for pentobarbital sodium?
11     A.  The identification, the result of a bacterial
12 endotoxin test.
13     Q.  Okay.
14     A.  The PH and other requirements under Chapter 1
15 of USP regarding injections and implanted drug product.
16     Q.  Okay.  I'll come back to that in a second, but
17 again, just going to go over to Glossip 2259, which is
18 the monograph for thiopental sodium.  And I'm not sure I
19 can pull it up in a readable version for you on the
20 screen share, because the font might be sized too small
21 if I scroll out, so you may want a paper copy.
22     MR. STRONSKI:  It's in your binder at 21,
23 Doctor.
24     A.  There.  Okay.
25     Q.  (By Mr. Cleveland)  Looking at this page 373

Page 73

1 of the Exhibit 1 PDF too, looking at this monograph for
2 thiopental sodium, what tests would you say are needed
3 on a certificate of analysis based on your review of
4 this monograph?
5     A.  Identification, for one, by the tests cited in
6 USP.  These are spectroscopic identification tests and
7 the result of an ignition test as another ID test and
8 then the outcome of the assay and other specific tests
9 that are cited for thiopental sodium for injection.
10     Q.  And what is an ignition test?
11     A.  That refers to a test involving heating a
12 sample of the product at high temperature and weighing
13 the residue.
14     Q.  Okay.  Now I'm going to flip back to your
15 report.  Don't think I can get the share on now.  This
16 is just going to go to paragraph -- I believe it's 40 --
17 sorry, had the wrong one on my note there.  Yeah, no,
18 45, paragraph 45.
19     A.  Yes.
20     Q.  Now, you say there, compound solutions
21 prepared with non-sterile ingredients.  Yeah, I mean, I
22 think we may have discussed this before, but what is a
23 non-sterile ingredient?
24     A.  An ingredient that has not been certified to
25 be sterile.



Page 74

1    Q.  Okay.  And you mentioned receiving non-sterile

2 ingredients from a commercial supplier.  If you know,

3 can commercial suppliers provide sterile active

4 ingredients?

5    A.  They can.

6    Q.  Okay.

7    A.  Assuming, of course, that the supplier is

8 providing the appropriate product.

9    Q.  Okay.  And how do you know if the active

10 ingredient received from a commercial supplier is

11 sterile or not?

12    A.  It would have to be stated.

13    Q.  Okay.  And whenever reviewing the tests for a

14 certificate of analysis, wasn't it true that there was a

15 bacterial test for solutions of sodium pentobarbital?

16 Obviously if you want to reference the monograph.

17    A.  You said for pentobarbital?

18    Q.  Uh-huh.

19    A.  Yes.  You're referring to which test then?

20    Q.  Here, let me pull it up here.  Yeah, the same

21 -- I mean, is the bacterial endotoxins test listed there

22 the one there for bacteria in the solution?

23      MR. STRONSKI:  Objection to form.  Lack of

24 foundation.

25    Q.  (By Mr. Cleveland)  Are we both on page

Page 75

1 Glossip 2258, Doctor?

2    A.  Yes.

3    Q.  Okay.  And on this page, do you see a test

4 entitled Bacterial Endotoxins Test?

5    A.  I do.

6    Q.  Is that a test for bacteria in pentobarbital

7 sodium solution?

8    A.  It's a test for the presence of endotoxins.

9    Q.  Okay.  And are there any other tests on this

10 monograph for bacteria in the solution?

11      MR. STRONSKI:  Objection to form.  Lack of

12 foundation.

13    A.  Other tests -- could you repeat that just to

14 be clear?

15    Q.  Yeah, sure.  I had asked -- here, let me

16 rephrase it too, so it's clearer.

17      On this monograph for pentobarbital sodium at

18 Glossip 2258, do you see any other tests listed that

19 would test for bacteria other than the bacterial

20 endotoxins test?

21    A.  The list of other requirements as cited in USP

22 Chapter 1. --

23    Q.  Okay.

24    A.  -- under Injections and Implanted Drug

25 Products, I believe, I'd have to go back to that chapter

Page 76

1 and be absolutely certain, but my recollection is that

2 that would also look for evidence of sterility.

3    Q.  Okay.  And was that Chapter 1 attached to your

4 report?

5    A.  I don't believe it was.

6    Q.  Okay.  And then, I mean, I'll put that request

7 just for you and your counsel, if you would mind sharing

8 a copy of that Chapter 1 cited in those monographs after

9 the deposition and questions are finished here.

10      And so then turning back to your report again

11 on paragraph 45.  And if a solution was prepared with

12 the non-sterile active ingredients as mentioned in your

13 paragraph 45, would any bacteria in the solution be

14 disclosed on the certificate of analysis that you listed

15 in paragraph 44?

16      MR. STRONSKI:  Objection to form.

17    A.  If the component that was supplied was not

18 sterile --

19    Q.  (By Mr. Cleveland)  Uh-huh.

20    A.  -- there may not be an indication on the

21 certificate of analysis of the presence of bacteria or

22 other microbiological contaminants.

23    Q.  Okay.  And so then the bacterial filter that

24 you -- or, actually, on paragraph 45, you mention a

25 bacterial filter, correct?

Page 77

1    A.  Yes.

2    Q.  What kind of bacteria does that filter filter,

3 for lack of a better word?

4    A.  Yes, an appropriately-sized filter would

5 filter out virtually all micro -- microbial

6 contaminates, if present.

7    Q.  Okay.  And what would an appropriately-sized

8 bacterial filter be for a solution of sodium

9 pentobarbital?

10    A.  A typical bacterial filter would have a

11 porosity of about .2 micrometers.

12    Q.  Okay.  And would -- in the filtering process

13 described in paragraph 45, would you use that same size

14 filter regardless of whether it's sodium pentobarbital

15 or sodium thiopental that you're filtering?

16    A.  In either case, that filter would be

17 appropriate.

18    Q.  Okay.  And then let's see here.  This one's

19 just a minor question on your attachments here.  I was

20 looking through the USP ones, Glossip page 2057, which

21 is the -- it's titled Pharmaceutical Compounding Sterile

22 Preparations, page 171 of the Exhibit 1 PDF, if you can

23 turn to that for a minute.

24      MR. STRONSKI:  Hold on a second.  I want to

25 make sure.  You're not putting things up, so I have to

Page 78

1  find it.

2     MR. CLEVELAND: Oh, yeah, exactly. And I say,

3  I can grab it here too there. I was making sure we can

4  get the tab number too. I just wanted him to have the

5  document in fron to him as well.

6     MR. STRONSKI: What -- what are you pulling

7  up?

8     MR. CLEVELAND: Here, let me get it here.

9  It's page 171 of the PDF. It was labeled Glossip

10 002057. I believe, appears to be --

11    MR. STRONSKI: Yeah, it's -- it's -- it's tab

12 22 in your binder.

13    A.  I have that.

14    Q.  (By Mr. Cleveland) Okay. And it's -- the

15 document in front of you is titled Pharmaceutical

16 Compounding Sterile Preparations?

17    A.  Yes.

18    Q.  And this is a USP document, correct?

19    A.  Yes.

20    Q.  The copy here at the top it says that no

21 longer official on this -- on 18th, December, 2020. Do

22 you see that?

23    A.  I do.

24    Q.  Do you know why this document is no longer

25 official?

Page 79

1     A.  It's been superceded by a newer -- a newer

2  chapter.

3     Q.  Okay. Have you reviewed the newer chapter?

4     A.  I have.

5     Q.  And were any of the changes in the newer

6  chapter related to sections that you're relying on in

7  your report?

8     A.  I did not make a direct comparison. It's my

9  understanding that compounding pharmacists are still

10 relying on 797 because there are still some issues that

11 need to be resolved before its successor is ultimately

12 approved and adopted.

13    Q.  Okay. And, I guess, just to be clear for my

14 own reference, when you say 797, does that number refer

15 to this particular version of pharmaceutical compounding

16 sterile preparations?

17    A.  It does.

18    MR. CLEVELAND: Okay. I know we're slightly

19 under an hour here. We're at 57 minutes, but this is a

20 -- I've hit a breaking point in a series of questions I

21 had, if you'd like to take another break here?

22    THE WITNESS: Okay.

23    MR. STRONSKI: So we're at 12 -- almost 12:30,

24 Dr. Block. Do you want to take a lunch break now or a

25 10-minute break or what -- what is your preference?

Page 80

1     THE WITNESS: Whatever you would do. At this

2  point, I could probably take a lunch break.

3     THE VIDEOGRAPHER: We're off the record at

4  11:28 a.m.

5     (A recess was taken from 11:28 a.m. to

6  12:08 a.m.)

7     THE VIDEOGRAPHER: The time is 12:08 p.m.

8  Going back on the record.

9     Q.  (By Mr. Cleveland) All right. At this time,

10 Doctor, I want to actually turn over to a different

11 exhibit. I'm going to pull up the expert report of

12 Dr. Sherman.

13    A.  Okay.

14    MR. STRONSKI: You may not have a hard copy of

15 that in a binder.

16    MR. CLEVELAND: Okay.

17    MR. STRONSKI: I don't know if he does or not.

18    MR. CLEVELAND: Okay.

19    MR. STRONSKI: It's not in -- it's not in the

20 same binder we've been looking at at least.

21    THE WITNESS: Okay.

22    MR. STRONSKI: So --

23    MS. STILLWATER: I don't think so, but

24 Dr. Block, unless you printed it yourself.

25    THE WITNESS: I think I do have it.

Page 81

1     MR. CLEVELAND: Okay.

2     THE WITNESS: Just a moment.

3     A.  I have it. I did print it off.

4     Q.  (By Mr. Cleveland) Okay. Let's share for a

5  second here. Let's see. On my screen, I have a

6  document entitled Expert Opinion of David H. Sherman,

7  PhD.

8     A.  Right.

9     Q.  Is the document on the screen the same one

10 that you're looking at in front of you?

11    A.  It appears to be, 14665, yeah, yes.

12    Q.  Okay. And then I'll mark this as Exhibit 2.

13    (Deposition Exhibit No. 2 was marked for

14 identification and made part of the record.)

15    Q.  (By Mr. Cleveland) Is this the report by

16 Dr. Sherman that you reviewed in preparation of your

17 report?

18    A.  Yes.

19    Q.  Okay. I guess I'll start a couple of high

20 level questions. Have you ever synthesized any

21 pharmaceuticals before?

22    MR. STRONSKI: Objection to form.

23    A.  I'm sure I have.

24    Q.  (By Mr. Cleveland) Okay. Have you

25 synthesized pentobarbital before?

Page 82

1    A.  I can't recall that specifically, no.
2    Q.  Okay.  Have you synthesized sodium thiopental
3  before?
4    A.  Again, I can't recall having done that either.
5  I may have.  I may not have.
6    Q.  Okay.  Now, in reviewing Dr. Sherman's report,
7  could you determine whether the method he is describing
8  uses sterile or non-sterile ingredients?
9       MR. STRONSKI:  Objection to form.
10   A.  I -- I'd have to go back to his report.
11   Q.  (By Mr. Cleeland)  Okay.
12   A.  If I may?
13   Q.  Yes, of course.
14   A.  His report only makes reference to the
15  chemicals used in synthesis being purchased from
16  commercial suppliers and used without further
17  purification.
18   Q.  Okay.  And if you know, what would the shelf
19  life be of pentobarbital produced using his described
20  method?
21      MR. STRONSKI:  Objection to form.
22   A.  I can't say for certain.  I did not
23  specifically review his report for that aspect.  Just
24  checking, if I may.
25   Q.  (By Mr. Cleveland)  Of course.

Page 83

1    A.  So he does not make reference other than to
2  the certificate of analysis that followed the
3  preparation of the materials.
4    Q.  Okay.  And do you otherwise know what the
5  shelf life of pentobarbital would be based on the
6  description he offers of his process?
7       MR. STRONSKI:  Objection to form.  Lack of
8  foundation.  Beyond the scope.
9    A.  I can't make a -- there's really not enough
10  information given here to be certain as to the stability
11  of the material.  This material was synthesized in his
12  laboratory.  That would require further study.
13   Q.  (By Mr. Cleveland)  Okay.  And then turning
14  specifically to page -- I believe it's 14 of his report,
15  paragraph 47.  It's paragraph 14 of Exhibit 2 that has
16  number 13 at the bottom.
17   A.  Paragraph?
18   Q.  47 entitled, A Person of Skill In The Art.
19   A.  Right.
20   Q.  Now, first, based on your education, are you
21  familiar with the skill necessary to synthesize
22  pharmaceuticals?
23   A.  Yes.
24      MR. STRONSKI:  Objection to form.  Lack of
25  foundation.

Page 84

1    Q.  (By Mr. Cleveland)  All right.  And do you
2  agree or disagree with paragraph 47 description of
3  person of skill in the art?
4       MR. STRONSKI:  Objection to form.  Beyond the
5  scope.
6    A.  I would agree with Dr. Sherman's description.
7    Q.  (By Mr. Cleveland)  Okay.  And I think that's
8  the questions I have on this report.  I guess now I'm
9  actually going to turn over to the -- back to your
10  report first.  Let's go to your report, paragraph --
11  paragraph 19 of your report, which is page 7 of the
12  Exhibit 1 PDF.
13   A.  Yes.
14   Q.  In the last sentence, you cite agreement with
15  one of Dr. Swaan's opinions as subject to clarification.
16  Do you see that?
17   A.  Yes, I do.
18   Q.  And when you say, "subject to clarification as
19  explained below," are you referring to paragraphs 42
20  through 44 of your declaration?
21   A.  Let me just review that.
22   Q.  Of course.
23   A.  And you're referencing 42?
24   Q.  42 through 44.  I was asking whether your use
25  of "subject to clarification as explained below" in

Page 85

1  paragraph 19 was referencing paragraphs 42 through 44 of
2  your report?
3       MR. STRONSKI:  Objection to form.
4    A.  That would be consistent with paragraphs 42
5  and 44.
6    Q.  (By Mr. Cleveland)  Okay.  Then I want to look
7  at the Swaan declaration itself.  This will be the
8  actual declaration portion, so it's Exhibit C starting
9  on page 377 of Exhibit 1, Exhibit C to your report.
10      MR. STRONSKI:  It's tab 3 in your binder.
11   A.  Okay.
12   Q.  (By Mr. Cleveland)  And we'll actually go to
13  paragraph 11 of the Swaan declaration, which is page 4
14  of it, and it appears to be page 381 of Exhibit 1. --
15   A.  Yes.
16   Q.  -- paragraph 11.  And if you'd review that
17  paragraph for a second.
18   A.  Yes.
19   Q.  Do you agree with his statement in paragraph
20  11?
21   A.  Yes.
22   Q.  Okay.  And then turning to paragraph 15, which
23  is on page 6 of the declaration, page 383 of Exhibit 1
24  PDF.
25   A.  Right.



Page 86

1  Q.  In the middle of paragraph 15, there's a
2  sentence that starts "as explained above."  Do you see
3  that?
4  A.  Yes.
5  Q.  And he describes that, "A fluctuation in
6  reported potency data is to be expected due to the
7  inherent variability and relative accuracy of the
8  potency assay."
9  A.  Yes.
10  Q.  Do you agree with him, that fluctuation is to
11  be expected due to the inherent variability and relative
12  accuracy of the potency assay?
13  A.  I do agree with him.
14  Q.  Okay.  And let's see here.  And then paragraph
15  17, which is page 8 of his declaration, page 385 of the
16  Exhibit 1 PDF.
17  A.  Right.
18  Q.  I guess as an initial question, you reviewed
19  the attachments to his declaration as well as his
20  declaration, right?
21  A.  You're referring to attachments to the Swaan?
22  Q.  Yes, exactly.  You're referring -- you've read
23  the attachments to the Swaan declaration as well as the
24  --
25  A.  Yes, I've -- I'e looked at those references.

Page 87

1  Q.  Okay.  And after reviewing those references,
2  did you agree with his statement at the -- on number 3
3  at the end of 17 that the quality assurance testing in
4  those attachments was within potency specifications for
5  lethal injection up until their one-year expiration
6  date?
7  MR. STRONSKI:  Objection to form.
8  A.  Well, he did insert the phrase "for lethal
9  injection."
10  Q.  (By Mr. Cleveland) Okay.
11  A.  And my only concern is that the potency
12  specifications for pentobarbital solution for injection
13  don't stipulate for lethal injection.
14  Q.  Okay.  And if you know, what would the
15  differences be between specifications for solution and
16  for a lethal injection?
17  A.  Well, I would not expect a difference, but
18  it's a phrase that is a qualification, and I can't say
19  for certain whether that would be appropriate or not.
20  Q.  Okay.
21  A.  I'd have to look at that more closely.
22  Q.  Understood.  Now, turning back to your report,
23  I'm going to go to the very end to paragraph 71.
24  A.  Yes.
25  Q.  I see, you know, in the first paragraph, you

Page 88

1  use the phrase "with knowledge and experience acquired
2  during the course of his or her education."  Do you see
3  that?
4  A.  Yes, I do.
5  Q.  And when you use that phrase, is that, again,
6  just referring to paragraphs 42, 43 and 44 of your
7  report?
8  A.  Just a moment.  That's correct.
9  Q.  Okay.  And then when you use the same phrase
10  -- well, actually to say, back on 71, you see that you
11  used the same phrase, "with knowledge and experience
12  acquired during the course of his or her education," in
13  bullet points 2 and 3 under paragraph 71?
14  A.  Yes.
15  Q.  And did the phrase have any different meaning
16  in those bullet points than it did in the first bullet
17  point of paragraph 71?
18  A.  Would be the same.
19  Q.  Okay.  You see you use the title Compounding
20  Pharmacist in paragraph 71.
21  A.  Yes.
22  Q.  Do you consider yourself to be a compounding
23  pharmacist?
24  A.  Since I'm involved in formulating
25  preparations --

Page 89

1  Q.  Uh-huh.
2  A.  -- with or without an active ingredient --
3  Q.  Uh-huh.
4  A.  -- in the process of making formulations, I
5  am, in effect, compounding, so I'm a compounding
6  pharmacist.
7  Q.  Okay.  And do I recall correctly that you're
8  no longer licensed by any state?
9  A.  That's correct.
10  Q.  Okay.  If you were still licensed by a state
11  as a pharmacist, would you say that you otherwise have
12  the knowledge and experience acquired during the course
13  of your education to perform the compounding you
14  describe in your report?
15  MR. STRONSKI:  Objection to form.  Beyond the
16  scope.
17  A.  Yes, I would say so.
18  Q.  (By Mr. Cleveland) Okay.  And so if you were
19  given the necessary amount of pentobarbital, would you
20  be able to perform the compounding of pentobarbital that
21  you describe in your report?
22  MR. STRONSKI:  The question is would he be
23  able?
24  MR. CLEVELAND:  Yes.  The question is, if he
25  were given the necessary amount of pentobarbital, would

Page 90

1  he be able to perform the compounding he describes in
2  his report?
3      A.  With the appropriate facilities and equipment
4  and environment, I could.
5      Q.  (By Mr. Cleveland)  Okay.  And the same
6  question with sodium pentothal.  If you were given the
7  necessary amount of sodium pentothal, would you be able
8  to perform the compounding that you describe in your
9  report?
10     A.  I could.
11     Q.  And would you be willing, given the necessary
12  amount of pentobarbital, to compound it as you describe
13  in your report for use by defendants?
14         MR. STRONSKI:  Objection.  Beyond the scope.
15  Objection, to the extent you're asking him to identify
16  himself as a potential source of lethal chemicals under
17  this protocol, we would instruct him not to answer.
18         MR. CLEVELAND:  Okay.  And I'm -- I'm going to
19  make the record of the other questions there too, but
20  understanding obviously a lot of disagreement on
21  objections.
22     Q.  (By Mr. Cleveland)  So if you were given the
23  necessary amount of sodium pentothal, would you be
24  willing to perform the compounding that you describe in
25  your report for defendants?

Page 91

1          MR. STRONSKI:  Objection to form.  Objection,
2  to the extent it would tend to identify Dr. Block as the
3  source of lethal chemicals under the protocol.  We would
4  instruct him at this time not to answer.
5      Q.  (By Mr. Cleveland)  Okay.  I don't think I
6  have --
7      A.  I could perform the compounding operations
8  involved in the preparation of those solutions.
9      Q.  And I don't think I asked Heparin saline.
10  Just to confirm, given access to necessary concentration
11  and amount of Heparin saline, would you be capable of
12  performing the compounding you described?
13     A.  Yes.
14     Q.  All right.  And then just making the record
15  for the other one.  If you were given the access to the
16  necessary concentration amount of Heparin saline, would
17  you be willing to perform the compounding of those
18  solutions for defendants?
19         MR. STRONSKI:  Same -- same objection and same
20  instruction not to answer based on the Secrecy Statute
21  and -- and the fact this would tend to disclose in
22  discovery Dr. Block as a source of lethal chemicals
23  under the protocol.
24     Q.  (By Mr. Cleveland)  Okay.  And I assume,
25  Doctor, that you're going to follow your counsel's

Page 92

1  instruction not to answer the three questions?
2      A.  Correct.
3      Q.  All right.  Other than Dr. Sherman's report,
4  have you reviewed any other witness statements in this
5  case?
6          MR. STRONSKI:  Objection to form.  Lack of
7  foundation.
8      A.  I reviewed Dr. Swaan's report and
9  Dr. Sherman's.  I don't recall any other witness reports
10  that were shown to me or that I examined.
11     Q.  (By Mr. Cleveland)  Okay.  And were you asked
12  by -- or no, let me rephrase this.
13         Would I be correct in concluding that you're
14  not offering any opinions on midazolam in your report?
15         MR. STRONSKI:  Object to form.  Outside the
16  scope.
17     A.  Yes, I was not asked to provide an opinion on
18  midazolam.
19     Q.  (By Mr. Cleveland)  Okay.  And have any of the
20  opinions in your report changed between the date of your
21  report and now?
22     A.  They have not.
23     Q.  All right.
24         MR. CLEVELAND:  And then subject to my request
25  for that Chapter 1 in the monographs, I think I'm

Page 93

1  otherwise concluded.
2          MR. STRONSKI:  I have no questions.  Thank
3  you, Dr. Block.
4          THE WITNESS:  Thank you.
5          MR. CLEVELAND:  Thank you, Doctor.  Appreciate
6  your time.
7          THE VIDEOGRAPHER:  This concludes the
8  videotaped deposition of Dr. Lawrence Block.  We're off
9  the record at 12:31 p.m.
10         (Deposition concluded at 12:31 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 94

1    JURAT

2         GLOSSIP VS. CHANDLER

3         JOB FILE NO. 149323

4    STATE OF OKLAHOMA

5    SS

6    COUNTY OF TULSA

7         I, LAWRENCE H. BLOCK, PhD, do hereby state

8    under oath that I have read the above and foregoing

9    deposition in its entirety and that the same is a full,

10   true and correct transcription of my testimony so given

11   at said time and place, except for the corrections

12   noted.

13

14        _____

15        Signature of Witness

16

17        Subscribed and sworn to before me, the

18   undersigned Notary Public in and for the State of

19   Oklahoma by said witness, LAWRENCE H. BLOCK, PhD, on

20   this _____ day of _____, 2021.

21

22

23        _____

24        NOTARY PUBLIC

25        MY COMMISSION EXPIRES: _____

Page 96

1              C E R T I F I C A T E

2

3    STATE OF OKLAHOMA )

4                     )

5    COUNTY OF TULSA  )

6

7         I, Shannon S. Harwood, a Certified Shorthand

8    Reporter in and for the State of Oklahoma, do hereby

9    certify that the foregoing is a true and correct

10   transcription of my shorthand notes of proceedings had

11   in Case Number CIV-14-665-F heard on the 12th day of

12   February, 2021, and is only valid with my stamped seal

13   and my original signature.

14

15        I further certify that I am not related to nor

16   attorney for either of said parties nor otherwise

17   interested in said action.

18

19        IN WITNESS WHEREOF, I have hereunto set my hand and

20   seal this 18th day of February, 2021.

21

22        _____

23

24        Shannon S. Harwood, CSR, RPR, CRR

25

Page 95

1         ERRATA SHEET

2         GLOSSIP VS. CHANDLER

3    DEPOSITION OF LAWRENCE H. BOCK, PhD

4    REPORTED BY:  SHANNON S. HARWOOD, CSR, RPR, CRR

5    DATE OF DEPOSITION TAKEN:  FEBRUARY 12, 2021

6         JOB FILE NO. 149323

7    PAGE  LINE  IS          SHOULD BE

8    ____  ____  _____  _____

9    ____  ____  _____  _____

10   ____  ____  _____  _____

11   ____  ____  _____  _____

12   ____  ____  _____  _____

13   ____  ____  _____  _____

14   ____  ____  _____  _____

15   ____  ____  _____  _____

16   ____  ____  _____  _____

17   ____  ____  _____  _____

18   ____  ____  _____  _____

19   ____  ____  _____  _____

20   ____  ____  _____  _____

21   ____  ____  _____  _____

22   ____  ____  _____  _____

23   ____  ____  _____  _____

24   ____  ____  _____  _____

25   ____  ____  _____  _____