**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

**October 19, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

JAMES A. CODDINGTON;* 
BENJAMIN R. COLE; CARLOS 
CUESTA-RODRIGUEZ; RICHARD S. 
FAIRCHILD; WENDELL A. GRISSOM; 
MARLON D. HARMON; RAYMOND E. 
JOHNSON; EMMANUEL A. 
LITTLEJOHN; JAMES D. PAVATT; 
KENDRICK A. SIMPSON; KEVIN R. 
UNDERWOOD; BRENDA E. ANDREW; 
RICHARD E. GLOSSIP; PHILLIP D. 
HANCOCK; ALFRED B. MITCHELL; 
TREMANE WOOD; WADE LAY, by and 
through his next friend Rhonda Kemp; 
RONSON KYLE BUSH; SCOTT 
EIZEMBER; JOHN F HANSON; MICA 
ALEXANDER MARTINEZ; RICKY RAY 
MALONE; CLARANCE GOODE; 
ANTHONY SANCHEZ; MICHAEL 
DEWAYNE SMITH; JAMES RYDER; 
RICHARD ROJEM; JEMAINE 
MONTEIL CANNON,

     Plaintiffs - Appellants,

v.

SCOTT CROW; RANDY CHANDLER; 
BETTY GESELL; JOSEPH GRIFFIN; 
F. LYNN HAUETER; KATHRYN A. 
LAFORTUNE; STEPHAN MOORE; 
CALVIN PRINCE; T. HASTINGS 
SIEGFRIED; DARYL WOODARD; JIM 
FARRIS; ABOUTANAA EL HABTI;

No. 22-6100
(D.C. No. 5:14-CV-00665-F)
(W.D. Okla.)

_____

    * Plaintiff-Appellant James Coddington was executed by the State of 
Oklahoma on August 25, 2022.

JUSTIN FARRIS; MICHAEL
CARPENTER; JUSTIN GIUDICE,

      Defendants - Appellees.

_____

WADE LAY, by and through his next
friend Rhonda Kemp,

      Plaintiff - Appellant,

and

JAMES A. CODDINGTON; BRENDA E.
ANDREW; RONSON KYLE BUSH;
JEMAINE MONTEIL CANNON;
BENJAMIN R. COLE; CARLOS
CUESTA-RODRIGUEZ; RICHARD S.
FAIRCHILD; WENDELL A. GRISSOM;
MARLON D. HARMON; RAYMOND E.
JOHNSON; EMMANUEL A.
LITTLEJOHN; JAMES D. PAVATT;
KENDRICK A. SIMPSON; KEVIN R.
UNDERWOOD; RICHARD E. GLOSSIP;
PHILLIP D. HANCOCK; ALFRED B.
MITCHELL; TREMANE WOOD; SCOTT
EIZEMBER; JOHN F HANSON; MICA
ALEXANDER MARTINEZ; RICKY RAY
MALONE; CLARANCE GOODE;
ANTHONY SANCHEZ; MICHAEL
DEWAYNE SMITH; JAMES RYDER;
RICHARD ROJEM,

      Plaintiffs,

v.

SCOTT CROW; RANDY CHANDLER;
BETTY GESELL; JOSEPH GRIFFIN; F.
LYNN HAUETER; KATHRYN A.
LAFORTUNE; STEPHAN MOORE;
CALVIN PRINCE; T. HASTINGS

No. 22-6112
(D.C. No. 5:14-CV-00665-F)
(W.D. Okla.)

2

SIEGFRIED; DARYL WOODARD; JIM
FARRIS; ABOUTANAA EL HABTI;
JUSTIN FARRIS; MICHAEL
CARPENTER; JUSTIN GIUDICE,

　　Defendants - Appellees.

_____

### ORDER AND JUDGMENT**
_____

Before **TYMKOVICH**, **MURPHY** and **MORITZ**, Circuit Judges.
_____

Plaintiffs-Appellants are Oklahoma death-row inmates who brought this action under 42 U.S.C. § 1983 challenging Oklahoma's lethal injection protocol.[1]  In July 2020, they filed a Third Amended Complaint (TAC) asserting ten claims for relief. The district court dismissed or granted summary judgment to defendants on all but one of those claims, Count II, which asserted that Oklahoma's lethal injection protocol violates the Eighth Amendment to the United States Constitution.  The district court held a bench trial concerning Count II, ruled in favor of defendants, and entered final judgment in favor of defendants on all claims.

_____

** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The Supreme Court recently reaffirmed that an action under § 1983 is the proper vehicle for such method-of-execution challenges.  *See Nance v. Ward*, 142 S. Ct. 2214, 2219 (2022).

In these consolidated appeals, plaintiffs challenge the district court's grant of summary judgment on two of their claims: Count IV, asserting unconstitutional denial of access to counsel and the courts; and Count V, asserting intentional deprivation of the right to counsel in violation of 18 U.S.C. § 3599.  They do not appeal Count II.

We have jurisdiction under 28 U.S.C. § 1291.  For the reasons explained below, we affirm the district court's judgment.

I.    **BACKGROUND**

A.    **Oklahoma's Previous Lethal Injection Protocol, the Lockett Execution, and Plaintiffs' Commencement of This Lawsuit**

Oklahoma carries out lethal-injection executions using a three-drug protocol that begins with a sedative, followed by a paralytic, followed by a drug that stops the heart.  For many years, Oklahoma used sodium thiopental, a barbiturate sedative, as the first drug to "induce[] a deep, comalike unconsciousness."  *Warner v. Gross*, 776 F.3d 721, 724 (10th Cir.) (internal quotation marks omitted), *aff'd sub nom. Glossip v. Gross*, 576 U.S. 863 (2015).  Pancuronium bromide, administered next, was employed as "a paralytic agent that inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration."  *Id.* (internal quotation marks omitted).  Finally, potassium chloride was used to "interfere[] with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest."  *Id.* at 725 (internal quotation marks omitted).

Death penalty opponents eventually convinced the makers of sodium thiopental and an alternative barbiturate, pentobarbital, not to sell those drugs for use in executions.  Thus, in 2014, Oklahoma switched to a 100-milligram dose of a benzodiazepine, midazolam hydrochloride, as the sedative.[2]  Vecuronium bromide was used as the paralytic agent, and potassium chloride continued to be used as the heart-stopping drug.

The State's first execution using midazolam occurred in April 2014, involving inmate Clayton Lockett.  The execution team administered the midazolam, declared Lockett to be unconscious, administered the vecuronium bromide, and then began administering the potassium chloride.  At this point, however, Mr. Lockett began to move and speak, complaining that something was wrong and the drugs were not working.  The execution team soon discovered the IV had been improperly set, causing the drugs to leak into the surrounding tissue rather than traveling directly into Lockett's bloodstream.  In all, it took forty-three minutes after the midazolam was first injected for Lockett to be declared dead.

In June 2014, plaintiffs filed this lawsuit.  They alleged, among other things, that the midazolam-first protocol is a form of cruel and unusual punishment, in violation of the Eighth Amendment.

---

[2] Midazolam is commonly known by its brand name, "Versed."

**B.** **The Revised Protocol, Subsequent Executions, and the Eventual Moratorium on Executions in Oklahoma**

The State investigated Mr. Lockett's execution.  In September 2014, it adopted a new execution protocol that permitted four alternative drug combinations to carry out lethal injection.  The fourth alternative called for the midazolam/vecuronium bromide/potassium chloride combination that was currently in use.  Under this revised protocol, however, the inmate would receive 500 milligrams of midazolam (by all accounts, a massive dose) at the outset of the execution.

Plaintiffs sought a preliminary injunction against the State's use of this revised protocol.  The district court denied the injunction and this court affirmed.  *See Warner*, 776 F.3d at 723–24.  Thus, in January 2015, Oklahoma executed Charles Warner using the revised protocol.

The Warner execution appeared to proceed without incident.  However, while preparing to execute another inmate, Richard Glossip, in September 2015, prison officials discovered they had received potassium acetate instead of potassium chloride.  That discovery led to further inquiry and it became clear they had likewise received (and used) potassium acetate in the Warner execution.  The governor of Oklahoma granted Glossip a reprieve to prevent the incorrect drug from being used on him.

A few weeks later, the parties filed a joint stipulation to close the case. Defendants agreed not to seek an execution date for any plaintiff or any other condemned prisoners until it provided plaintiffs with further information about its

execution protocol and gave plaintiffs official notice that the State would be able to comply with the express terms of the protocol.  The district court administratively closed the case.

### C.      The Current Protocol & Plaintiffs' Third Amended Complaint

In February 2020, Oklahoma adopted the revised protocol now at issue.  That protocol includes the same three-drug combination in the same amounts as the protocol in effect at the time of the Warner execution and the called-off Glossip execution.[3]  The protocol also specifies that visits with the prisoner's attorneys of record must end "two hours prior to the scheduled execution or earlier if necessary to begin preparing the inmate for the execution."  R. vol. I at 820.[4]

In light of the revised protocol, the district court agreed to reopen the case, and plaintiffs filed the TAC, which remains the operative complaint.  The TAC asserted ten claims for relief, of which three remain relevant:

- Count II, which challenged the 500-milligram midazolam-first protocol as a form of cruel or unusual punishment. *i.e.*, it allegedly presents "a substantial risk of severe pain" as compared to "a feasible and readily

---

[3] The protocol provides three options for the second drug: pancuronium bromide, vecuronium bromide, and rocuronium bromide.  At an earlier stage of this litigation, the parties agreed that these chemicals are functionally equivalent for execution purposes. *See Glossip v. Gross*, 576 U.S. 863, 873 (2015).

[4] The record contains many overlapping pagination conventions.  In this order and judgment, all citations to the record are to the "Page *x* of *y*" designation at the bottom center of each page.

implemented alternative method of execution . . . that the State has refused to adopt without a legitimate penological reason," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).[5]

- Count IV, which asserted a right of access to the courts, and a corresponding right of an attorney's assistance, under the First, Fifth, and Sixth Amendments.[6]  Plaintiffs claimed that their attorneys must be allowed to view the entire execution procedure, from start to finish, so they can "identify, object to, challenge, or correct, any issues with the IV-setting or drug administration process."  R. vol. I at 198, ¶ 140.

- Count V, which alleged essentially the same injury as Count IV, but relied on 18 U.S.C. § 3599, a statute authorizing court-appointed counsel at public expense for indigent prisoners facing the death penalty.

---

[5] As already noted, plaintiffs have abandoned Count II, but the fact that they have abandoned it informs our analysis of the claims they still pursue.

[6] At summary judgment, plaintiffs described their invocation of the Fifth Amendment as inadvertent and asked the district court to treat that assertion as an allegation under the Fourteenth Amendment's due process clause.  *See* R. vol. I at 4084 n.16.

### D.      The District Court's Pretrial Disposition of Certain Claims

In September 2020, the district court dismissed three of plaintiffs' ten claims with prejudice.[7]  Then, in August 2021, the court granted summary judgment to the defendants on six additional claims, including Counts IV and V.[8]

As to Count IV, the district court reasoned that "[p]ractical and legal problems, entwined, are fatal to [the claim]."  R. vol. I at 5206.  The court noted "the practical realities attendant to litigation and emergency adjudication of any claim lodged while an execution is in progress" and opined that such difficulties risked subjecting the State to dilatory or speculative suits.  *Id.* at 5207.  It found nothing in governing authority that would support a right of access to counsel through all stages of the execution process and expiring only at the point when the prisoner was declared dead.  The district court further agreed with cases from other circuits holding that

---

[7] These three claims were: Count I, alleging a due process violation based on asserted failure to disclose sufficient information about the development of the protocol and execution procedures; Count III, alleging a due process and Eighth Amendment violation based on deliberate indifference to the plaintiffs' serious medical needs; and Count VIII, alleging that plaintiffs' sincerely held religious beliefs are violated by the requirement that they specify an alternative method of execution, *see Bucklew*, 139 S. Ct. at 1125.

[8] The other claims against which the district court granted summary judgment were: Count VI, alleging that the substitution of midazolam as an execution drug violates the *ex post facto* clauses of the United States and Oklahoma Constitutions; Count VII, alleging that use of midazolam violates due process; Count IX, alleging that plaintiffs will be subjected to human experimentation in violation of the Eighth Amendment; and Count X, alleging denial of a right of access to government information, in violation of the First Amendment.

plaintiffs raising similar claims had not shown actual injury, and so had failed to establish their standing to bring such a claim. *See id.* at 5208–11.

For similar reasons, the district court rejected Count V. In the court's view, plaintiffs had not shown that 18 U.S.C. § 3599 grants a more extensive right to counsel than the constitutional provisions asserted in Count IV.

As to Count II, the district court granted summary judgment against plaintiffs Coddington, Donald Grant, John Grant, Jones, Lay, and Postelle. The district court ruled that these six plaintiffs' refusal to proffer an alternative method of execution meant they necessarily failed to meet their burden to show that the State's protocol presents a substantial risk of severe pain as compared to a feasible alternative, *see Bucklew*, 139 S. Ct. at 1125.

This left for trial only Count II as to the remaining plaintiffs. The district court set a bench trial to begin in late February 2022.

### E.  Executions Carried Out Between Summary Judgment and the Bench Trial

The district court's resolution of all claims against six plaintiffs left the State free to proceed with their executions. For reasons not relevant here, however, the district court eventually vacated its grant of summary judgment against plaintiffs Coddington and Lay. Also, the governor of Oklahoma commuted Jones's sentence to life without parole.

As to the remaining three plaintiffs who refused to proffer an alternative method of execution (Donald Grant, John Grant, and Postelle), their executions went

forward between October 2021 and February 2022, as did the execution of an inmate who had never been permitted to join this lawsuit, Bigler Stouffer.  The State used the protocol at issue here in those executions, and the circumstances of each execution became part of the evidence at the bench trial, as discussed below.

### F.    The Bench Trial and Resulting Order

In February and March 2022, the district court held a multi-day bench trial on Count II, at which several expert and lay witnesses testified.  The ultimate question, again, was whether the midazolam-first protocol presents "a substantial risk of severe pain" as compared to "a feasible and readily implemented alternative method of execution . . . that the State has refused to adopt without a legitimate penological reason," *Bucklew*, 139 S. Ct. at 1125.

Plaintiffs claimed that midazolam cannot render someone fully insensate, meaning the condemned prisoner would feel a sense of suffocation as the vecuronium bromide paralyzed his diaphragm, and then would feel an intense internal burning sensation from the potassium chloride.  Plaintiffs also claimed that the prisoner would have a sense of suffocation or drowning throughout, because midazolam causes fluid to accumulate in the lungs.

The district court heard expert testimony on both sides of these issues.  It ruled against plaintiffs in its findings of fact and conclusions of law, issued on June 6, 2022.  The court found, among other things, that the protocol's 500-milligram dose of midazolam will quickly and effectively render a condemned prisoner unconscious

11

and insensate, so the remainder of the execution process poses no substantial risk of severe pain.

The district court also made factual findings about the four executions carried out in between its summary judgment order and the bench trial. The only finding that continues to matter (given the arguments presented in the parties' briefs) is that the State had a problem with its "shadow board" in at least three of those executions, and probably all four. The shadow board is a special tray with a slot for each syringe to be used during the execution. Beneath each slot is a label of a particular color with the name and dosage of the drug to be administered through the corresponding syringe. The corresponding syringe is supposed to have the identical label. In the recent executions, the slots for vecuronium bromide were labeled rocuronium bromide (one of the alternative paralytics), although the syringes themselves were labeled vecuronium bromide. The district court found that the state had administered vecuronium bromide in each of the executions, despite the labeling discrepancy on the shadow board.

For these reasons and others, the district court ruled against plaintiffs on Count II and entered judgment accordingly, leading to this appeal.

### G. The OCCA's Orders Setting Execution Dates

After the district court entered judgment, the Oklahoma Court of Criminal Appeals (OCCA) entered orders setting execution dates for twenty-five of the inmates who remained in the case. We denied a request for stay of execution brought

by plaintiff Coddington, the first inmate scheduled for execution.  He was executed on August 25, 2022.

## II.   STANDARD OF REVIEW

The district court resolved the claims at issue (Counts IV and V) through summary judgment, so this court's review is de novo.  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011).

## III.   ANALYSIS

The Constitution protects a right of access to the courts, which "assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."  *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (identifying the right of access as a component of due process); *see also Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (observing that the Supreme Court has variously described the right of access to the courts as part of the Article IV privileges and immunities clause, the First Amendment petition clause, the Fifth and Fourteenth Amendments' respective due process clauses, and the Fourteenth Amendment's equal protection clause).

Plaintiffs describe the right in question as not just a right of access to the courts, but a right of access to their counsel, through whom they interact with the courts.  The relevant case law does not thoroughly flesh out the relationship between the right of access to courts and the right of access to one's attorney.  However, in a case challenging a prison's restrictions on lawyers visiting their incarcerated clients, this circuit has said that "access to counsel assured by the Sixth Amendment is

13

essential" to safeguard the Fourteenth Amendment right of access to the courts.

*Mann v. Reynolds*, 46 F.3d 1055, 1059 (10th Cir. 1995).  Moreover, the State does

not argue that the right of access to the courts *never* includes a guarantee of contact

with one's attorney.  Thus, we will not dwell, in the abstract, on the scope of the

access-to-counsel guarantee within the right of access to the courts.  The question

presented in this case is how that guarantee applies, if at all, in the context of an

ongoing execution.

Plaintiffs say that the following aspects (or alleged aspects) of the current

protocol, "[t]aken together," Aplt. Opening Br. at 22, violate their right of access to

the courts (and counsel) in the execution context:

- "the Protocol denies counsel access to a telephone during the execution
  process, making it impossible for counsel to communicate with the
  courts or the Governor during the execution," *id.* at 21;[9]

- "the Protocol terminates prisoners' access to counsel two hours prior to
  the execution or earlier if necessary," *id.* (internal quotation marks
  omitted);

---

[9] Plaintiffs cite section VI.C.4 of the protocol for this restriction, but that
section merely announces that the inmate may invite five persons to witness the
execution.  *See* R. vol. I at 810.  We can find nothing in the protocol addressing
witnesses' phones.  That said, defendant strenuously argue that permitting phones
would create problems.  We therefore assume that phones are prohibited, even if the
protocol itself does not say so.

14

- "the Execution Protocol does not provide to counsel pre-execution readiness information or the results of pre-execution medical and mental health assessments, including issues establishing or maintaining IV access," *id.*;[10] and

- "the Protocol allows the Director to order that the curtains between the witness room and the execution chamber be closed at any time," *id.* at 22.[11]

Plaintiffs accordingly contend that "[t]he Protocol makes it effectively impossible for Plaintiffs to file a claim under the Eighth Amendment or request reprieve from the Governor . . . during the execution process." *Id.*

---

[10] The protocol says that, at least thirty-five days before the execution, the prisoner's medical condition must be assessed to determine if it poses problems to the execution process, including problems with setting or maintaining IV lines. *See* R. vol. I at 813–14. The protocol is silent about whether the outcome of that assessment may be shared with the prisoner's attorney.

[11] "At any time" is not clear. The relevant section of the protocol says,

> If, after approximately five (5) minutes the inmate remains conscious, the IV Team leader shall communicate this information to the director, along with all IV Team leader input. The director shall determine how to proceed or, if necessary, to start the procedure over at a later time or stop. The director may order the curtains to the witness viewing room be closed, and if necessary, for witnesses to be removed from the facility.

R. vol. I at 841–42. Plaintiffs appear to interpret the final sentence as unrelated to the two preceding sentences. Another interpretation would be that the director may close the curtains if the inmate remains conscious after five minutes. Because this order and judgment disposes of plaintiffs' claims on broader grounds, explained *infra*, we need not decide which interpretation is correct.

15

So framed, plaintiffs' access-to-courts claim runs into immediate difficulty. The right of access to the courts is not a freestanding right, but a means to vindicate other rights.  If plaintiffs have been "stymied" by official action from filing suit to redress an "arguably actionable harm," *Lewis v. Casey*, 518 U.S. 343, 351 (1996), or if government action has deprived them of "an arguable (though not yet established) claim," *id.* at 353 n.3, they may bring an access-to-courts claim to remove the barrier preventing them from filing the suit they wanted to bring in the first place, or to seek redress for a claim that has been forever lost, *see Christopher*, 536 U.S. at 412–14. But plaintiffs may not sue simply to remove a barrier they believe will interfere with their right of access to the courts, *assuming* a claim arises.  *See, e.g.*, *Lewis*, 518 U.S. at 351 (holding that prisoners could not invoke the access-to-courts right to reform the prison law library without showing that the library's inadequacies are preventing them from bringing, or caused them to lose, arguable constitutional claims).  Such a claim would fail the Article III requirement of an injury in fact, and the court would therefore lack jurisdiction to decide it.  *See id.* at 349 & n.1, 351; *see also Christopher*, 536 U.S. at 415 ("[T]he right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that an Article III injury must be "actual or imminent, not conjectural or hypothetical" (internal quotation marks omitted)).

As the district court put it, "[P]laintiffs assert a right . . . to have their counsel proctor the execution process, from beginning to end, with a view to initiating

16

litigation *if* they see something they deem constitutionally objectionable.  That, as a matter of law, is not sufficient."  R. vol. II at 638.  We agree.  By not appealing the district court's judgment on Count II, plaintiffs have abandoned their claim that the State's current protocol will likely cause them severe pain and suffering.  Thus, plaintiffs necessarily rely on a generic possibility that something might go wrong during their individual executions.  And just as the plaintiffs in *Lewis* could not use the access-to-courts right to reform the prison law library in anticipation of claims they might need to bring, plaintiffs here cannot invoke their access-to-courts right to reform the execution protocol in anticipation of claims they might want to file if something goes wrong during an execution.

Plaintiffs respond that if they cannot sue now to establish a right of close contact with their attorney throughout the execution process (and their attorney's right to a phone during that time), they will almost certainly be unable to bring a mid-execution Eighth Amendment claim in the event something goes wrong.  Plaintiffs point us to district court decisions relying on this logic to hold that injury-in-fact must be interpreted differently in the execution context, so that a condemned prisoner can bring an access-to-courts claim at a meaningful time.  *See, e.g.*, *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 925 (E.D. Ark. 2020) ("[T]he traditional actual injury analysis makes no sense when many of the claims could not even be recognized until during the execution process.  . . . [T]he circumstances of an execution present an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court." (internal quotation marks and

17

citation omitted)), *aff'd on other grounds sub nom. Johnson v. Hutchinson*, 44 F.4th 1116 (8th Cir. 2022).[12]

We appreciate plaintiffs' point, but no federal court may exercise jurisdiction beyond what Article III permits, and Article III does not permit suits based on "conjectural or hypothetical" injuries. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Thus, the district court properly declined jurisdiction over plaintiffs' access-to-courts claim based on the generic possibility that something might go wrong during an execution. *Cf. Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017) ("The plaintiffs point to the possibility of botched executions that access to counsel could address, but that is just the kind of isolated mishap that is not cognizable via a method-of-execution claim." (internal quotation marks omitted)).

Plaintiffs further argue, "The problems that arose during prior Oklahoma executions are commonplace, not isolated incidents." Aplt. Opening Br. at 13. Plaintiffs point to two types of problems: (1) difficulty with the IV, as in the Lockett execution; and (2) using a drug not permitted by the protocol, as in the Warner execution and the called-off Glossip executions (and which was arguably a risk in the four executions that took place between summary judgment and the bench trial, due

---

[12] Employing this reasoning, *McGehee* ordered that the parties abide by an agreement to allow an extra attorney in the viewing room, and access to a phone (potentially including a cell phone without a camera). *Id.* at 930–31. But, in the next subsection of the court's order, the court reverted—without explanation—to the traditional injury-in-fact standard to deny plaintiffs' attorneys an opportunity to witness the entire process up close (*e.g.*, inserting the IVs, pushing the syringes, etc.). *See id.* at 931–33.

to mislabeling on the shadow board).  We presume plaintiffs mean to say that this evidence shows they face an injury that is "imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  We find, to the contrary, that this evidence does not satisfy plaintiffs' burden to demonstrate they have standing.  *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) (holding that the party bringing the claim "must establish that they have standing to sue").

First, plaintiffs point us to nothing in the record showing that Oklahoma has regularly experienced issues with the IV, much less issues causing severe pain. *Cf. Glossip v. Gross*, 576 U.S. 863, 877 (2015) ("[P]risoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." (internal quotation marks omitted)).

Second, the fact that the State, in 2014, twice obtained a non-protocol drug to carry out an execution (potassium acetate instead of potassium chloride) does not elevate that possibility from hypothetical to imminent in future executions under the current protocol.  We also view the mislabeling on the shadow board as immaterial in these circumstances.  That discrepancy involved two *approved* drugs (vecuronium bromide vs. rocuronium bromide), not any non-protocol drugs.  Regardless, use of a non-protocol drug may violate the protocol, but it is not, without more, an Eighth

Amendment violation.  There is no evidence, for example, that the State's use of potassium acetate on Mr. Warner caused him any conscious pain.[13]

For these reasons, Oklahoma's earlier problems in the execution chamber are not enough to show that future similar problems are imminent, much less problems rising to an Eighth Amendment violation.

Plaintiffs also claim that their "exposure to the risk of a botched execution causes current emotional and psychological harm sufficient to establish Article III standing."  Aplt. Opening Br. at 17.  Plaintiffs never raised this argument in the district court, so they forfeited it—and they do not argue for plain-error review on appeal, so this court need not consider it.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011).  But we would reject the argument on the merits anyway.

---

[13] Plaintiffs claim that Mr. Warner was heard to say, "My body is on fire.  No one should go through this," as the potassium acetate entered his bloodstream.  Aplt. Opening Br. at 13 (internal quotation marks and brackets omitted).  In support, plaintiffs cite an allegation from the TAC.  *See* R. vol. I at 154, ¶ 37.  Plaintiffs cannot rely on allegations from the complaint to defeat summary judgment.  *See Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("[T]he nonmovant must go beyond the pleadings and designate specific facts . . . ." (internal quotation marks omitted)).  Regardless, the TAC says Warner spoke the alleged words as the *midazolam* was being administered (not the potassium acetate), after which he was declared unconscious.  As far as we are aware, plaintiffs have never since claimed that midazolam creates a burning sensation throughout the body.  Plaintiffs also direct the court to the first page of a state grand jury report concerning Warner's execution.  *See* R. vol. I at 1917.  That page says nothing about Warner's reaction to the execution drugs.  Although we have no duty to go beyond what plaintiffs have cited, *see Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003), we have reviewed the rest of the report and found nothing supporting plaintiffs' claim.

Plaintiffs' argument relies on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), where a class of more than 8,000 individuals sued TransUnion for, among other things, failing to follow reasonable procedures to ensure the accuracy of information in their credit files, *see id.* at 2202.  TransUnion had not disclosed inaccurate information as to all 8,000 class members—only about 1,800 had suffered that fate.  *See id.*  But the district court ruled, and the court of appeals agreed, that all 8,000 had Article III standing to bring the reasonable-procedures claim and seek damages.  *See id.*  The Supreme Court held, however, that only the 1,800 victims of inaccurate disclosure had standing to sue for damages.  *Id.* at 2208–14.  As to the rest of the class, the mere existence of inaccurate information in their files created no actionable injury.  *See id.* at 2210.

As part of its analysis, the Supreme Court included a footnote speculating that "a plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm."  *Id.* at 2211 n.7.  But the Court "t[ook] no position on whether or how such an emotional or psychological harm could suffice for Article III purposes" because the plaintiffs "ha[d] not relied on such a theory."  *Id.*

Plaintiffs in this case ask us to reach the issue the Supreme Court avoided in *TransUnion*, and to resolve it in their favor.  We need not do so.  We are confident that if this theory of Article III injury is valid, it would not apply here.  First, plaintiffs point us to nothing in the record supporting their claim that they currently experience emotional or psychological distress due to fear that something will go

wrong during their respective executions.  Second, if current emotional distress based on fear of future harm is enough for injury-in-fact, we believe that such a fear would need to be reasonably founded.  As previously explained, plaintiffs offer insufficient evidence that something is likely to go wrong and cause conscious, severe pain during their respective executions.

Finally, plaintiffs place heavy emphasis on 18 U.S.C. § 3599.  In the district court, plaintiffs' summary judgment briefing offered no specific defense of their § 3599 claim (Count V), but instead invoked the statute as one authority among many supporting the notion that they have a right of access to the courts (apparently referring to Counts IV and V collectively).  On appeal, however, they have made § 3599 a centerpiece of their argument and have recast it as granting a right of access to the governor instead of the courts.  They note that the statute says indigent litigants facing the death penalty may receive an appointed attorney at government expense, § 3599(a)(1), and the appointment continues through "all available post-conviction process," including "proceedings for executive or other clemency as may be available," § 3599(e).  So, they say, § 3599 grants them a right to petition the governor for a reprieve if something starts to go wrong during an execution—roughly analogous to what happened on the day of Mr. Glossip's execution when prison officials discovered they had received potassium acetate, not potassium chloride.[14]

---

[14] To be clear, Mr. Glossip's execution was not underway when prison officials made their discovery.  That discovery, and the governor's reprieve, came earlier in the day, without the intervention of the prisoner's counsel.

Without close attorney contact throughout the execution process, plaintiffs say they will never be able to exercise this alleged right.

In their reply brief, plaintiffs expand this argument even further. They say the Supreme Court has declared that § 3599 provides a broader right to counsel than the Sixth Amendment. They also argue that, because executive reprieve or clemency is ultimately a discretionary act of mercy (not a remedy for a legal injury), a condemned prisoner asserting his right to this form of relief "does not need a colorable Eighth Amendment claim, or any claim at all." Aplt. Reply Br. at 3.

As with their argument that current fear of future injury provides standing, plaintiffs never raised any of this in the district court—and they do not argue for plain-error review on appeal, so we need not consider this new access-to-the-governor theory, *Richison*, 634 F.3d at 1130–31.[15]  This is doubly true for the arguments newly raised in their reply brief. *See, e.g., United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) ("[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived."). But we find plaintiffs' arguments meritless, so we address them notwithstanding the waiver.

---

[15] In their reply brief, plaintiffs say that they preserved the argument by: (i) quoting § 3599 in their complaint, including the phrase from subsection (e) regarding "proceedings for executive or other clemency as may be available"; and (ii) arguing at summary judgment that § 3599, among other authorities, grants a right of access to counsel throughout the execution procedure. We are not persuaded.

Again, plaintiffs now say that § 3599 grants rights beyond what the Sixth Amendment confers. Perhaps this is intended to address the district court's conclusion that § 3599 grants no right of access to the courts and counsel beyond what the Constitution guarantees. Even then, plaintiffs frame their argument as a response to the State (not to the district court) and immediately tie this assertion to their claim that they have a right of access to the governor—so it is still not clear they intend to challenge the district court's reasoning, which focused on the scope of a right of access to the courts.

In any event, this argument is not helpful to plaintiffs' position, for several reasons. First, the case plaintiffs cite in support of their argument, *Martel v. Clair*, 565 U.S. 648 (2012), addressed a very narrow question, namely, what standard should apply when a capital defendant who has received appointed counsel under § 3599 moves for new counsel, *see id.* at 652. Second, contrary to plaintiffs' characterization of the case, *Martel* says that § 3599 "grants federal capital defendants and capital habeas petitioners enhanced rights of representation" as compared to the federal statute governing appointment of counsel in non-capital cases (18 U.S.C. § 3006A), *see* 565 U.S. at 658–59, not as compared to the Sixth Amendment. Third, the Court observed that § 3599 and § 3006A both provide counsel in situations where the Sixth Amendment does not mandate counsel at public expense, but it did so merely to emphasize that the Sixth Amendment was not the proper authority to consult when deciding what standard to apply when the defendant moves for new counsel under § 3599. *See* 565 U.S. at 661–62. Finally, whatever

24

Congress may have intended by § 3599 (and plaintiffs give us no reason to believe that Congress intended it to operate as they now claim), Congress cannot override Article III's injury-in-fact requirement. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.").

This last point also disposes of plaintiffs' argument that the right to seek reprieve or clemency from the governor need not be based on an underlying injury because such relief is an act of mercy, not redress for an injury. However plaintiffs choose to frame this claim, they cannot raise it in federal court without an actual or imminent injury-in-fact. Assuming for argument's sake that § 3599 grants a right of access to the governor, plaintiffs do not argue that they will inevitably appeal to the governor for mercy from the execution chamber. We are frankly unsure such an argument would be enough to sustain standing anyway, given that any condemned prisoner could claim as much, for any reason, which would turn standing into a *pro forma* pleading exercise. Regardless, as argued in their reply brief—which, again, is the first time they have raised this theory—they are still asking a federal court to assume jurisdiction over a claim that *might* arise, potentially justifying a request for relief (from the governor, in this case). Article III does not permit such an exercise of jurisdiction.

In short, plaintiffs have not carried their burden to show they face an imminent injury-in-fact as their respective executions are carried out. The district court correctly granted summary judgment in the State's favor on Counts IV and V.

25

## IV.    CONCLUSION

We affirm the district court's judgment on Counts IV and V of the Third

Amended Complaint.  This outcome resolves both appeals at issue in this

consolidated proceeding.

Entered for the Court
Per Curiam

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

October 19, 2022

To: Counsel of Record

**RE:**      **22-6100, 22-6112, Coddington, et al v. Crow, et al**
        Dist/Ag docket: 5:14-CV-00665-F

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

CMW/klp